# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD DENNIS, SONTERRA CAPITAL MASTER FUND, LTD., FRONTPOINT FINANCIAL SERVICES FUND, L.P., FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., AND FRONTPOINT FINANCIAL HORIZONS FUND, L.P., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE BANK, N.A. AUSTRALIA, CITIGROUP INC., CITIBANK, N.A., CITIBANK N.A., AUSTRALIA BRANCH, BNP PARIBAS, S.A., BNP PARIBAS, AUSTRALIA BRANCH, THE ROYAL BANK OF SCOTLAND GROUP PLC, RBS N.V., RBS GROUP (AUSTRALIA) PTY LIMITED, UBS AG, UBS AG, AUSTRALIA BRANCH, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD., COMMONWEALTH BANK OF AUSTRALIA, NATIONAL AUSTRALIA BANK LIMITED, WESTPAC BANKING CORPORATION, DEUTSCHE BANK AG, DEUTSCHE BANK AG, AUSTRALIA BRANCH, HSBC HOLDINGS PLC, HSBC BANK AUSTRALIA LIMITED, LLOYDS BANKING GROUP PLC, MACQUARIE GROUP LTD., MACQUARIE BANK LTD., ROYAL BANK OF CANADA, ROYAL BANK OF CANADA, AUSTRALIA BRANCH, MORGAN STANLEY, MORGAN STANLEY AUSTRALIA LIMITED, CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, BANK OF NEW ZEALAND, ICAP PLC, ICAP AUSTRALIA PTY LTD., TULLETT PREBON PLC, TULLETT PREBON (AUSTRALIA) PTY LTD., AND JOHN DOES NOS. 1-50<br><br>Defendants. | Docket No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ......................................................................................... 5

PARTIES ............................................................................................................................. 9

SUBSTANTIVE ALLEGATIONS ................................................................................... 29

   I. Background.................................................................................................................. 29

     A. The Money Market ............................................................................................... 29

     B. Australian Prime Banks ........................................................................................ 31

     C. The BBSW Fixing ................................................................................................ 33

     D. BBSW-Based Derivatives ................................................................................... 35

        1. BBSW-Based Swaps...................................................................................... 35

        2. BBSW-Based Forward Rate Agreements ..................................................... 36

        3. CME Australian Dollar Futures Contracts.................................................... 37

        4. Australian Dollar Foreign Exchange Swaps & Forwards............................. 38

        5. 90-Day Bank Accepted Bill Futures ............................................................ 38

   II.  Defendants Agreed to and Did Restrain Trade In, and Intentionally Manipulated
      the Prices of, BBSW-Based Derivatives.................................................................. 39

     A. Defendants Rigged BBSW by Coordinating Manipulative Transactions within the
       Fixing Window..................................................................................................... 40

        1. Defendants manipulated BBSW by artificially increasing or decreasing
          the supply of Prime Bank Bills during the Fixing Window......................... 40

        2. The Bank Defendants shared information regarding their net BBSW
          rate exposure to align interests on the direction of the manipulation ......... 44

        3. Defendants coordinated manipulative trades to maximize their impact
          on BBSW rates............................................................................................... 48

     B. The Broker Defendants Actively Participated in the Conspiracy by Facilitating
       Manipulative Trading for the Bank Defendants.................................................... 51

     C. Defendants Used their Dominant Positions in the AFMA and the AFMA Market
       Committees to Maintain their Ability to Manipulate BBSW ........................... 55

     D. Defendants Conspired to Create Special Positions and Reorganized their
       Trading Desks to Facilitate Manipulative Transactions.................................... 58

     E. Defendants Made False BBSW Submissions in Violation of AFMA Rules ................ 59

F. ASIC's Investigation into Defendants' Conduct While on the BBSW Panel
Continues to this Day ................................................................................ 61

III. Plaintiffs Transacted in BBSW-based Derivatives at Artificial Prices that
were Proximately Caused by Defendants' Manipulative Conduct ...................................... 62

A. Plaintiff Dennis ................................................................................... 62

B. Plaintiff Sonterra ................................................................................ 63

C. FrontPoint Plaintiffs .......................................................................... 65

TRADE AND COMMERCE ................................................................................. 66

CLASS ACTION ALLEGATIONS ....................................................................... 67

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ....................................... 69

CLAIMS FOR RELIEF ........................................................................................ 70

FIRST CLAIM FOR RELIEF ............................................................................... 70

SECOND CLAIM FOR RELIEF ........................................................................... 72

THIRD CLAIM FOR RELIEF .............................................................................. 73

FOURTH CLAIM FOR RELIEF ........................................................................... 74

FIFTH CLAIM FOR RELIEF ............................................................................... 74

SIXTH CLAIM FOR RELIEF ............................................................................... 79

SEVENTH CLAIM FOR RELIEF ......................................................................... 80

EIGHTH CLAIM FOR RELIEF ........................................................................... 81

PRAYER FOR RELIEF ....................................................................................... 82

DEMAND FOR JURY TRIAL ............................................................................. 83

Plaintiffs Richard Dennis, Sonterra Capital Master Fund, FrontPoint Financial Services Fund L.P., FrontPoint Asian Event Driven Fund, L.P., and FrontPoint Financial Horizons Fund, L.P., (collectively, "Plaintiffs") complain upon knowledge as to themselves and their acts and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 38-120) for their violations of law from at least January 1, 2003 through the date on which the effects of Defendants' unlawful conduct ceased ("Class Period") as follows:

## INTRODUCTION

1.       Defendants are horizontal competitors that deal in financial products priced, benchmarked, and/or settled based on the Bank Bill Swap Reference Rate ("BBSW"). BBSW is administered by the Australian Financial Markets Association (the "AFMA")—a trade group formed by Defendants—and is intended to represent the cost of borrowing funds in the Australian interbank money market based on actual transactions occurring between 9:55 A.M. and 10:00 A.M. Sidney Time (the "Fixing Window").

2.       BBSW-based derivatives are financial instruments that incorporate BBSW as a component of price. More than $1 trillion in BBSW-based derivatives traded "over-the-counter," directly between counterparties, within the United States during the month of April 2013 alone. In total, trillions of dollars of BBSW-based derivatives traded over-the-counter and on public exchanges within the United States during the Class Period.

3.       In 2016, the Australian Securities and Investments Commission ("ASIC") initiated proceedings against three BBSW panel banks – Defendants Australia and New Zealand Banking Group ("ANZ"), Westpac, and National Australia Bank ("NAB") – revealing rare "smoking gun" evidence, including emails, phone calls, and electronic chats, demonstrating a

conspiracy among BBSW panel banks and interdealer brokers to fix the prices of BBSW-based derivatives.

4.      This evidence of collusion follows ASIC's 2013 and 2014 settlements with Defendants UBS, RBS, and BNP Paribas, in which those BBSW panel members admitted to making false BBSW submissions to manipulate the rate for their financial benefit.

5.      These settlements and new collusive communications released in ASIC's filings show that Defendants fixed BBSW-based derivatives prices using multiple means, including: (1) engaging in manipulative money market transactions during the BBSW Fixing Window; (2) making false BBSW rate submissions that did not reflect actual transaction prices; (3) uneconomically buying or selling money market instruments at a loss to cause artificial derivatives prices; and (4) sharing proprietary information to align interests and avoid conduct that could harm conspiracy members.

6.      Defendants generated hundreds of millions of dollars in illicit profits by artificially fixing BBSW-based derivatives prices at levels that benefited their trading books. For example, during the Class Period ANZ calculated that it had a daily BBSW exposure of up to $6 billion,[1] meaning ANZ had the potential to make or lose $125,000 per "basis point," *i.e.*, one hundredth of one percent (0.01%), change in the daily BBSW fixing. Relying on this calculation, ANZ senior management conservatively estimated that taking an "aggressive" approach to manipulating BBSW would result in at least $30 million in illicit profit *per basis point, per year*.

7.      Bank Defendants further institutionalized BBSW manipulation by designating a senior trader, known as the "Single Face to Market" or "the powerful owl" at Commonwealth Bank, to coordinate manipulative transactions with Broker Defendants ICAP and Tullett Prebon

---

[1] Unless otherwise indicated, "$" refers to Australian dollars.

in advance of the Fixing Window. For example, while serving as ANZ's Single Face to Market, Paul Woodward messaged Broker Defendant Tullett Prebon just before the Fixing Window on February 28, 2011: *I've got a big set already and I'll be pushing the fuck out of it.* Broker Defendants were more than happy to execute these manipulative transactions because their massive size – often billions of Australian dollars – generated huge illicit commission payments from the Bank Defendants involved in manipulating the BBSW fix.

8.      Defendants manipulated BBSW so frequently that traders often joked about how easy it was to fix the rate. When one ANZ trader sarcastically commented "lucky the rate sets are all legit and there is no manipulation within the Australian financial system", his colleague replied "ahahah." In another instance, a trader at Commonwealth Bank sent a cartoon bus with "BBSW" written on the side to a co-conspirator at Westpac. The Westpac trader, acknowledging that both had successfully manipulated the BBSW fix that day, jokingly replied: "You been run over by that big fat bus? … saw the lovely cba having a small lash as well. . .nice work!"

9.      Defendants' ultimate goal was to increase the profitability of their BBSW-based derivatives positons. Given the bilateral, zero-sum nature of derivatives trades, every time BBSW moved in Defendants' favor it caused a corresponding loss to Plaintiffs and the Class. Defendants openly discussed the callous nature of their conspiracy, including the fact that the profits reaped by manipulating BBSW came at the expense of their customers. For example, in a September 2009 chat, ANZ trader Carina Wong described how ANZ intentionally extracted excess profits from "custy," *i.e.*, customer, positons by manipulating BBSW:

> I do the rateset in the morning too – which is kinda fun it's all about moving the rate set, as there are large floating positions that build up due to all the swaps we do so whenever a custy wants to pay a swap, ie pay fixed, so, come the rate set day, we will short in that bucket yeah yeah – sorry, so that's the background, the reasons why you want to push it

10.     In a similar June 2010 phone call, Westpac trader Colin "the Rat" Roden explained how it was always the "end users" of BBSW-based derivatives who "get stiffed" by Defendants' manipulative conduct:

> Some end users who don't know, you know, corporates and people who don't know who get stiffed by people… [a]nd then in two years' time there's some enquiry that you have been fucking with the rate set that's cost them all 10 basis points.

11.     Plaintiffs and Class members were the "end users" of BBSW-based derivatives that Roden referred to who transacted in an artificial market and were otherwise disadvantaged by Defendants' concerted conduct and manipulation. *See* Part III, *infra*.

12.     Defendants actively concealed their scheme from market participants and government regulators, hampering investigations into the BBSW manipulation, including ASIC's, by refusing to turn over requested documents. NAB's obstructionist behavior recently forced ASIC to seek an order compelling NAB to comply with four statutory notices requesting that it produce certain documents and telephone conversations relevant to the BBSW investigation. At the hearing, ASIC's lawyer indicated that this was not the first time NAB had stonewalled the government and refused to produce potentially incriminating evidence, telling the court that "[NAB] haven't complied and they are late ... these practices have been going on for a long, long time".

13.     ASIC's ongoing investigation has already uncovered communications in which Defendants openly conspire to fix BBSW and the prices of BBSW-based derivatives. Plaintiffs have good reason to believe and do allege that the limited, public materials available to date are only the "tip of the iceberg." Given the persistent, pervasive, and secret nature of Defendants' multi-year conspiracy, as well as the negotiated nature of Defendants' public settlements,

Plaintiffs believe that substantial evidentiary support for the claims alleged herein will be unearthed after a reasonable opportunity for discovery.

<u>**JURISDICTION AND VENUE**</u>

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. § 25, and Section 1964 of RICO, 18 U.S.C. §1964. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy, and under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

15.     Venue is proper in this District pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, §1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. §1391(b), (c), and (d). One or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

16.     Each Defendant transacts business, including in BBSW-based derivatives, throughout the United States and with counterparties located in the United States. For example, Defendants ANZ, Citibank, Commonwealth Bank of Australia ("CBA"), BNP Paribas, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, Macquarie Bank, Morgan Stanley, Royal Bank of Canada ("RBC"), Royal Bank of Scotland ("RBS"), UBS, Westpac, ICAP, and Tullett Prebon maintained substantial trading books of foreign exchange and/or interest rate derivatives, including BBSW-based derivatives, in the United States throughout the Class Period.

17.     Defendants are the most active BBSW-based derivatives dealers in the country and the largest Australian dollar derivatives traders by volume in the world. Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market. This survey measures the "turnover," or volume of transactions, in foreign exchange and interest rate derivatives within the United States. The Federal Reserve Bank of New York survey only includes data from the largest dealers located within the United States and transactions that are located within the United States. Dealers located outside of the United States report their figures to the central bank where they are located.

18.     Defendants Citibank, BNP Paribas, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Morgan Stanley, RBS, and UBS each participated in the Federal Reserve Bank of New York's survey of foreign exchange and interest rate derivatives dealers throughout the Class Period, indicating that they entered into foreign exchange and interest rate derivatives transactions, including transactions priced, benchmarked, and/or settled based on BBSW, from within the United States.

19.     In 2007, approximately $15 trillion in Australian dollar foreign exchange and interest rate derivatives, including derivatives priced and/or settled based on BBSW, were traded in the United States alone. In total, more than $100 trillion in Australian dollar foreign exchange and interest rate derivatives, which are priced and/or settled based on BBSW, were traded over-the-counter within the United States during the Class Period.

20.     Throughout the Class Period, the Australian dollar/ United States dollar currency pair was by far the most widely traded currency pair involving the Australian dollar, accounting for roughly half of all foreign exchange contracts for which the Australian dollar was one leg of

the transaction. A larger volume of Australian dollar derivatives traded in the United States than in Australia during the Class Period.

21.     Defendants used electronic messaging, chatrooms, telephones, emails and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint. As a direct result of the BBSW-related conduct alleged herein, Defendants themselves transmitted and caused Thomson Reuters to electronically transmit false BBSW rates to U.S. market participants who transacted in BBSW-based derivatives.

22.     The aim of Defendants' conduct was to fix BBSW and the prices of BBSW-based derivatives, including those transacted with counterparties located in the United States. Defendants' gains from fixing BBSW came at the expense of Plaintiffs and the other members of the Class that traded BBSW-based derivatives in the United States during the Class Period.

23.     U.S. market participants traded trillions of dollars in BBSW-based derivatives in the United States during the Class Period. Defendants, as BBSW contributor banks, members of the AFMA, and sophisticated market participants, knew that Thomson Reuters, Bloomberg, and other financial information services disseminated BBSW throughout the United States. Defendants also knew that BBSW was used in the United States to price, benchmark and/or settle BBSW-based derivatives purchased, sold, or owned here.

24.     Defendants caused artificial BBSW rates, trade confirmations incorporating these false rates, and communications containing requests to manipulate these rates to be distributed over U.S. wires using servers located in the United States. Defendants' manipulative conduct, as alleged herein, had a direct, substantial and reasonably foreseeable effect on United States'

domestic commerce. Such direct effects injured Plaintiffs and give rise to Plaintiffs' claims within the meaning of the Foreign Trade Antitrust Improvements Act.

25.     Defendants BNP Paribas, Credit Suisse, Deutsche Bank, Lloyds, and Macquarie Bank Ltd., registered their New York branch or representative or agency offices with the New York State Department of Financial Services ("NYSDFS") to do business in this state under New York Banking Law § 200-b. Defendants HSBC and Lloyds also registered wholly-owned subsidiaries, HSBC Bank N.A. and Lloyds Bank plc, respectively, with the NYDFS.

26.     Defendants RBS and UBS are registered with the Connecticut Department of Banking under § 36a-428g of the Connecticut General Statutes.

27.     Defendant Tullett Prebon's swap execution facility, known as "tpSEF", is a wholly-owned subsidiary of Tullett Prebon and is permanently registered with the U.S. Commodity Futures Trading Commission ("CFTC"). TpSEF is headquartered in New Jersey.

28.     Defendants ICAP plc and Tullett Prebon plc, through subsidiaries ICAP Securities USA and Tullett Prebon Financial Services LLC, respectively, are registered with the Financial Industry Regulatory Authority and the Securities and Exchange Commission.

29.     Each Defendant is subject to enhanced supervision by the Board of Governors of the Federal Reserve System. Defendants Credit Suisse, Citigroup, Deutsche Bank, JP Morgan Chase & Co., Morgan Stanley, and UBS AG are members of the Federal Reserve Board of Governors' Large Institution Supervision Coordinating Committee, which is designed to coordinate supervision of the largest, most systematically important financial institutions in the United States.

30.     Defendants employed personnel who were tasked with actively marketing and selling BBSW-based derivatives to investors located in the United States. For example, senior

8

NAB trader Gavin Sheridan was the Head of Swap Trading UK and US and worked in the Rates business unit of NAB's Global Markets Division during the Class Period. On information and belief, other Defendants similarly directed sales personnel to find counterparties for BBSW-based derivatives transactions in the United States.

31.     U.S.-based Defendants JP Morgan, Citibank, and Morgan Stanley formed part of the conspiracy to manipulate BBSW. The other Defendants consciously chose to conspire with the U.S.-based Defendants to distort BBSW and the prices of BBSW-based derivatives traded in the United States. For example, on March 8, 2011, a trader at JP Morgan offered to help transfer Prime Bank Bills to an NAB trader to manipulate BBSW (*infra* at ¶ 188). On another occasion, an NAB trader noted that Citibank and Morgan Stanley had helped him to successfully fix the 6m BBSW rate, writing: "Great rate set for us today as we have a receive set in both 3 and 6mth… the main sellers were Morgan Stanley and Citi… MS has more to sell tom."

<u>PARTIES</u>

A.     **Plaintiffs**

32.     Plaintiff Richard Dennis ("Dennis) is a natural person who resides in Florida. Dennis engaged in U.S.-based transactions for BBSW-based derivatives, including hundreds of Australian dollar futures contracts traded on the Chicago Mercantile Exchange ("CME"), during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a direct and proximate result of Defendants' manipulative conduct, Dennis was damaged and suffered legal injury, including a net loss, on CME Australian dollar futures contracts transacted during the Class Period. *See ¶¶* 228-230, *infra*.

33.     Plaintiff Sonterra Capital Master Fund ("Sonterra") is an investment fund with its principal place of business in New York. Sonterra Capital Master Fund engaged in U.S.-based

transactions for BBSW-based derivatives, including Australian dollar foreign exchange swaps and forwards directly with Defendant Morgan Stanley, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. *See ¶¶ 231-239, infra.* As a direct and proximate result of Defendants' manipulative conduct, Sonterra was damaged and suffered legal injury on Australian dollar foreign exchange forwards transacted with Morgan Stanley during the Class Period. *See ¶¶231-239, infra.*

34.    Plaintiff FrontPoint Financial Services Fund, L.P., is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. FrontPoint Financial Services Fund, L.P., engaged in U.S.-based transactions for BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. *See ¶¶ 240-242, infra.* As a direct and proximate result of Defendants' manipulative conduct, FrontPoint Financial Services Fund, L.P. was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period. *See ¶¶ 240-242, infra.*

35.    Plaintiff FrontPoint Asian Event Driven Fund, L.P., is an investment fund with its principal place of business in Greenwich, Connecticut. FrontPoint Asian Event Driven Fund, L.P., engaged in U.S.-based transactions for BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. *See ¶¶ 240-242, infra.* As a direct and proximate result of Defendants' manipulative conduct, FrontPoint Asian Event Driven Fund, L.P. was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period.

36.    Plaintiff FrontPoint Financial Horizons Fund, L.P., is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. FrontPoint Financial

Horizons Fund, L.P., engaged in U.S.-based transactions for BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. *See* ¶¶240-242, *infra*. As a direct and proximate result of Defendants' manipulative conduct, FrontPoint Financial Horizons Fund, L.P., was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period.

37.     Collectively, Plaintiffs FrontPoint Financial Services Fund, L.P., FrontPoint Asian Event Driven Fund, L.P., and FrontPoint Financial Horizons Fund, L.P. are referred to as "FrontPoint." FrontPoint collectively traded more than $100 million in BBSW-based swaps with Defendant Macquarie during the Class Period.

**B.     Citibank**

38.     Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its headquarters at 399 Park Avenue, New York, New York 10043.

39.     Defendant Citibank, N.A. is a federally-chartered national banking association incorporated in South Dakota and is a wholly-owned subsidiary of Defendant Citigroup. Citibank, N.A. maintains its head office at 399 Park Avenue, New York, New York 10043. Citibank, N.A. was an AFMA Prime Bank from 2005 through December 23, 2008.

40.     Defendant Citibank N.A., Australia Branch was a member of the BBSW Panel during the Class Period.

41.     Collectively, Citigroup, Inc., Citibank, N.A., and Citibank N.A., Australia Branch are referred to as "Citibank."

**C.     JPMorgan**

42.     Defendant JPMorgan Chase & Co. is a Delaware corporation with its headquarters located at 270 Park Avenue, New York, New York 10017. JPMorgan Chase & Co.

provides businesses, institutions, and individuals with investment banking, treasury and securities, asset management, private banking, and commercial banking services. Its U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which include interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps. JPMorgan Chase & Co. is registered with the Board of Governors of the Federal Reserve System.

43.     Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association headquartered at 270 Park Avenue, New York, New York 10017. JPMorgan Chase Bank, N.A. is a wholly-owned subsidiary of Defendant J.P. Morgan Chase & Co. JPMorgan Chase Bank, N.A. is a provisionally registered swap dealer with the CFTC. JPMorgan Chase Bank, N.A was an AFMA Prime Bank from early 2009 through November 30, 2011.

44.     Defendant JPMorgan Chase Bank, N.A. Australia operates as a subsidiary of JP Morgan Chase Bank, N.A. During the Class Period, JPMorgan Chase Bank, N.A. Australia was a member of the BBSW Panel.

45.     Collectively, JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and JPMorgan Chase Bank, N.A. Australia are referred to as "JPMorgan."

**D.     BNP Paribas**

46.     Defendant BNP Paribas, S.A. is one of the world's largest global banking organizations and is headquartered in Paris, France. BNP Paribas, S.A. maintains a branch at 787 Seventh Avenue, New York, New York 10019. BNP Paribas S.A.'s New York branch, which serves as the headquarters of BNP Paribas S.A.'s U.S. operations, is registered with NYSDFS and licensed to do business in this state. BNP Paribas S.A. is also regulated by the Board of

12

Governors of the Federal Reserve System. BNP Paribas S.A. considers its New York Branch to be a "material entity" within the United States.[2]

47.    BNP Paribas S.A. has significant retail operations in the U.S., and offers corporate and investment banking services to clients in New York through its Global Equities and Commodity Derivatives division, among others.[3] BNP Paribas S.A. employs approximately 15,000 people in the U.S. and maintains locations in nine states.[4] According to its 2013 U.S. Resolution Plan, BNP Paribas S.A. is "a global player in the derivatives markets" and "actively trades in derivatives . . . including swaps, forwards, futures, and options."[5] BNP Paribas S.A.'s U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which include interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[6] BNP Paribas S.A. is a provisionally registered swap dealer with the CFTC. BNP Paribas S.A. was an AFMA Prime Bank from 2005 through February 24, 2012.

48.    BNP Paribas S.A. entered into a settlement with ASIC on January 28, 2014, in which it admitted to manipulating BBSW.[7]

49.    Defendant BNP Paribas, Australia Branch is a wholly-owned subsidiary of BNP Paribas and was a member of the BBSW Panel during the Class Period.

50.    Collectively, BNP Paribas S.A., and BNP Paribas Australia Branch are referred to as "BNP Paribas."

---

[2] *Public Section, BNP Paribas 165(d) Resolution Plan*, BNP PARIBAS (July 1, 2013) at 4.

[3] *Id*. at 2.

[4] *Id*.

[5] *Id*. at 7.

[6] *See Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2007,* at 12, 16-17 (BNP Paribas participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction") (hereinafter "Federal Reserve Bank of New York 2007 Survey").

[7] *Enforceable Undertaking with BNP Paribas*, AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION (Jan. 28, 2014).

**E.      RBS**

51.      Defendant The Royal Bank of Scotland Group plc ("RBS") is a registered bank holding company. This includes a substantial presence in the United States as alleged more particularly below. According to RBS' 2013 U.S. Resolution Plan, the Group made 24% of its income for the 2013 year in the United States.[8]

52.      RBS maintains a Foreign Representative Office, registered with the NYSDFS, in this District at 340 Madison Avenue, New York, New York. RBS is a provisionally registered swap dealer with the CFTC.

53.      RBS's U.S. headquarters is located in Connecticut. RBS operates a Connecticut branch ("The Royal Bank of Scotland plc, Connecticut Branch"), located at 600 Washington Boulevard, Stamford, CT 06901. The Royal Bank of Scotland plc, Connecticut Branch is regulated by the Connecticut Department of Banking and licensed do business in that state.

54.      RBS employs derivatives traders, who are responsible for trading a variety of financial instruments, such as interest rate swaps and forward rate agreements, priced, benchmarked or settled to BBSW. These traders are located throughout the world, including in New York and Connecticut.

55.      During the Class Period, RBS transacted in BBSW-based derivatives with counterparties located within the United States, including asset management corporations, business corporations, insurance companies, universities, and non-profit organizations.

56.      In the Deferred Prosecution Agreement entered into by Defendant RBS with the Department of Justice on February 5, 2013 for manipulating worldwide benchmark interest rates such as the London Interbank Offered Rate ("LIBOR"), RBS provided the DOJ with certain

---

[8] *Public Section, RBSG 165(d) Resolution Plan*, RBS GROUP PLC (Oct. 1, 2014) at i-2.

supplemental information regarding "additional benchmark rates" which RBS requested be kept

under seal pending the result of further DOJ investigations:

> Although not addressed in Attachment A, this Agreement also
> encompasses RBS's submissions for the additional benchmark
> rates listed in Attachment C, which is also incorporated into this
> Agreement. The rates listed in Attachment C are the focus of an
> ongoing investigation and, for that reason, Attachment C will be
> held in confidence by the parties to this Agreement, will not be
> included in the public filing of this document, and will not be made
> available to the public unless and until the Department of Justice,
> in its sole discretion, determines that such information can and
> should be disclosed.

57. Plaintiffs have good grounds to believe that these submissions, when disclosed,

will provide further evidence that RBS engaged in additional collusive and manipulative

activities regarding BBSW.

58. Defendant RBS N.V. is part of The Royal Bank of Scotland Group plc and is the

successor entity to ABN AMRO N.V., which was a member of the BBSW Panel from 2005

through December 31, 2006. Defendant RBS N.V. was a member of the BBSW Panel from

January 1, 2007 to November 18, 2010. Defendant Royal Bank of Scotland plc, Australia

succeeded RBS N.V. on the BBSW Panel from November 19, 2010 to April 30, 2012.

59. Defendant RBS Group (Australia) Pty Limited operates as a subsidiary of The

Royal Bank of Scotland Group plc. The Royal Bank of Scotland Group plc and RBS N.V.

entered into a settlement with ASIC on July 21, 2014 and admitted to manipulating BBSW.[9]

60. Collectively, The Royal Bank of Scotland Group plc, RBS Group (Australia) Pty

Limited, and RBS N.V. are referred to as "RBS."

---

[9] *Enforceable Undertaking with RBS*, AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION (July 21, 2014).

F.   **UBS**

61.   Defendant UBS AG ("UBS") is a banking and financial services company headquartered in Switzerland. UBS provides investment banking, asset management, and wealth management services for private, corporate, and institutional clients worldwide. It has operations in over 50 countries, including the United States where UBS maintains a very substantial presence.

62.   UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its headquarters in New York and Stamford, Connecticut. UBS's Stamford Branch ("UBS AG, Stamford Branch) is the primary booking center for UBS's foreign exchange business with U.S. clients and U.S. corporate lending business. UBS AG, Stamford Branch also houses operations and support functions for other U.S. branches and subsidiaries.

63.   UBS is registered with the Office of the Comptroller of the Currency ("OCC") and the CFTC as a provisionally-registered swap dealer. UBS is also licensed and supervised by the Board of Governors of the Federal Reserve System and is registered with the Connecticut Department of Banking. UBS' U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, and foreign exchange swaps.[10]

64.   During the Class Period, UBS's Rates Division and Short Term Interest Rate ("STIR") desk transacted in interest rate derivatives, such as interest rate swaps, whose value depended on BBSW through traders located in Connecticut.

65.   UBS filed a Resolution Plan with the Federal Reserve in 2014 in which it acknowledged that it is a global institution with the majority of its operations located in

---

[10] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (UBS participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

Switzerland, the United Kingdom, and the United States.[11] UBS' shares are registered as Global Registered Shares on the NYSE.

66.     In 2012, the CFTC found that UBS traders "attempted to manipulate the official fixings" of BBSW, among other rates, to benefit their derivatives trading positions.[12]

67.     UBS also entered into a settlement with ASIC on December 23, 2013, in which it admitted to submitting false BBSW rates from its STIR desk and that UBS derivatives traders caused UBS to submit false BBSW rates.[13]

68.     Defendant UBS AG, Australia Branch is a wholly-owned subsidiary of UBS AG and is based in Sydney, Australia. UBS AG, Australia Branch was a member of the BBSW Panel during the Class Period.

### G.     Australia and New Zealand Banking Group

69.     Defendant Australia and New Zealand Banking Group Ltd. ("ANZ") is headquartered in Melbourne, Australia. ANZ is the fourth-largest bank in Australia and among the top twenty largest banks in the world.[14] ANZ was an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period.

70.     ANZ maintains a licensed branch at 277 Park Avenue, New York, New York 10172. ANZ's New York branch is registered as a Foreign Banking Organization with the U.S. Office of the Comptroller of Currency ("OCC") and regulated by the Federal Reserve Bank of New York. ANZ is also regulated by the Board of Governors of the Federal Reserve System. ANZ has operated its New York branch since December 1968. ANZ provides corporate and

---

[11] *2014 UBS US Resolution Plan - Public Section*, UBS AG (July 2014) at 4.

[12] *CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against UBS AG*, at 38 n. 21, CFTC Docket No. 15-20 (Dec. 19, 2012).

[13] *Enforceable Undertaking with UBS*, AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION (Dec. 23, 2013).

[14] *2015 Annual Report*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD. (2015) at 1.

investment banking services and international trade finance from its New York branch, including

foreign exchange, currency options, and credit and interest rate derivatives.[15] ANZ considers its

New York branch to be an "extension" of the bank in the United States.[16] ANZ's American

Depository Receipts ("ADRs") are listed on the New York Stock Exchange ("NYSE").

71.     Through its wholly-owned subsidiary ANZ Securities, Inc., ANZ's New York-

based team supports trade and investment flows between clients in America with Australia, New

Zealand and Asia. ANZ is provisionally registered as a swap dealer under the Commodity

Exchange Act.

72.     When transacting with counterparties in this District, ANZ regularly designates

New York law as the governing law and agrees that the courts of this District have jurisdiction.

ANZ's Trade Terms for U.S.-based counterparties include an addendum titled "State of New

York, United States of America as Governing Jurisdiction" that applies "where New York, New

York, United States of America is the Governing Jurisdiction (being the city and the state in the

United States of America in which the Customer's ANZ Office is located)".

**H.     Commonwealth Bank of Australia**

73.     Defendant Commonwealth Bank of Australia ("CBA") is headquartered in

Sydney, Australia. CBA is a multinational bank and is one of the largest financial institutions in

Australia. CBA was an AFMA Prime Bank and a member of the BBSW Panel throughout the

Class Period.

74.     CBA has offices located in New York and Houston. CBA's New York office is

located at 599 Lexington Avenue, New York, New York 10022. CBA offers a full range of

---

[15] *Public Section of 2013 § 165(d) Tailored Resolution Plan*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD., (Dec. 31, 2013) at 3.

[16] *Id.* at 2.

financial services from its New York office to American clients, including foreign exchange sales and spot trading, interest rate derivatives, commodities, fixed income products, and money market services. CBA offers a full range of financial services to Australian and New Zealand corporate and institutional clients with interests in the Americas as well as North American companies with connections in Australia and New Zealand or who are considering expanding their business to the region. CBA's New York team provides global markets services, including foreign exchange and interest rate derivatives. CBA is a provisionally registered swap dealer with the CFTC.

75.     CBA's New York branch is regulated by the OCC and is supervised by the Federal Reserve Bank of New York as a branch operation of a Foreign Banking Organization.[17]

**I.     National Australia Bank**

76.     Defendant National Australia Bank Limited ("NAB" or "nab") is one of the largest financial institutions in the Asia-Pacific region and is headquartered in Melbourne, Australia. NAB was an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period.

77.     In the United States, NAB operates primarily through its federally licensed New York branch located at 245 Park Avenue, #2800, New York, New York 10167.[18] NAB's New York branch is regulated by its licensing authority, the OCC, and the Federal Reserve Bank of New York. The New York branch provides funding, investment and risk solutions to financial institutions and global banks, as well as business, personal and wealth customers of NAB. NAB is a CFTC registered swaps dealer.

---

[17] *Public Section of 2013 § 165(d) Tailored Resolution Plan*, COMMONWEALTH BANK AUSTRALIA (Dec. 31, 2013) at 2.

[18] *Public Section of 2013 § 165(d) Tailored Resolution Plan*, NATIONAL AUSTRALIA BANK LIMITED (2013).

78.     Defendant the Bank of New Zealand ("BNZ") is a wholly-owned subsidiary of Defendant NAB and is headquartered in Auckland, New Zealand.

79.     Collectively, NAB and BNZ are referred to as "NAB".

**J.      Westpac**

80.     Defendant Westpac Banking Corporation is a wholly owned subsidiary of Westpac Banking Group, and was both an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period.

81.     Westpac Banking Group operates a federally-licensed branch in New York located at 575 5th Ave, New York, New York 10017. Westpac considers its New York Branch to be a legal and operational extension of Westpac Banking Group. Westpac is a provisionally registered swap dealer with the CFTC.

82.     Collectively, Defendants Westpac Banking Group and Westpac Banking Corporation are referred to as "Westpac".

**K.      Deutsche Bank**

83.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany. Deutsche Bank was an AFMA Prime Bank from May 1, 2007 to December 23, 2008. Deutsche Bank maintains a very substantial presence in the United States, as is more particularly alleged below.

84.     Deutsche Bank's U.S. headquarters is in New York. Its New York branch is located at 60 Wall Street, New York, New York 10005. Deutsche Bank considers its New York branch to be a "material entity" within the United States.[19] Deutsche Bank AG, New York Branch acts as an agent of Deutsche Bank AG in the United States and in this District. Deutsche

---

[19] *Resolution Plan July 2014 Submission, Section 1: Public Section*, DEUTSCHE BANK AG (July 1, 2014) at 4.

Bank's New York branch has been registered with NYSDFS and licensed to do business in this

state since 1978. Deutsche Bank is also registered with the Board of Governors of the Federal

Reserve System. Deutsche Bank's New York branch has more than 1,700 employees and total

assets exceeding $152 billion. Deutsche Bank is a registered swap dealer with the CFTC.

Deutsche Bank's U.S.-based dealers trade in the over-the-counter foreign exchange and

derivatives markets, which includes interest rate swaps, forward rate agreements, foreign

exchange swaps, and currency swaps.[20]

85.     Deutsche Bank AG, through its wholly owned subsidiary, Deutsche Bank

Securities Inc., engages in a high volume of securities transactions, including clearing activities,

currency transactions, interest rate derivatives, and swaps, on behalf of American clients and

with counterparties located in the United States and in this District.

86.     Defendant Deutsche Bank AG, Australia Branch is a wholly-owned subsidiary of

Deutsche Bank and is headquartered in Sydney, Australia. During the Class Period, Deutsche

Bank AG, Australia Branch was a member of the BBSW Panel.

87.     Collectively, Deutsche Bank and Deutsche Bank AG, Australia Branch are

referred to as "Deutsche Bank".

**L.     HSBC**

88.     Defendant HSBC Holdings plc is a British public limited company with its

principal place of business in London. HSBC Holdings plc is the parent company of one of the

world's largest banking and financial services groups, with subsidiaries providing services in 75

countries and territories and approximately 16,000 employees in the United States. Through its

American subsidiaries, HSBC Holdings plc's U.S.-based dealers trade in the over-the-counter

---

[20] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (Deutsche Bank participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

foreign exchange and derivatives markets, which include interest rate swaps, forward rate agreements, and foreign exchange swaps.[21] HSBC Holdings plc's ADRs are listed on the NYSE.

89.    Defendant HSBC Bank Australia Limited is a wholly-owned subsidiary of Defendant HSBC Holdings plc and is headquartered in Sydney, Australia. HSBC Bank Australia Limited is HSBC Holdings plc's principal banking subsidiary in Australia.[22] During the Class Period, HSBC Bank Australia Limited was a member of the BBSW Panel.

90.    Collectively, HSBC Holdings plc and HSBC Bank Australia Limited are referred to as "HSBC".

**M.    Lloyds**

91.    Defendant Lloyds Banking Group plc ("Lloyds") is a U.K.-based financial services group that provides a wide range of retail and commercial banking services. Lloyds Banking Group plc was formed on January 19, 2009 when Lloyds TSB Group plc (the parent company of Lloyds TSB Bank plc) acquired HBOS plc. After this acquisition, Lloyds TSB Group plc changed its name to Lloyds Banking Group plc, the ultimate parent of Lloyds TSB Bank plc and HBOS. On September 23, 2013, Lloyds TSB Bank plc changed its name to Lloyds Bank plc. Lloyds Banking Group plc's U.S. activities "are primarily undertaken" by the New York branch of Lloyds Bank plc.  Lloyds designates the Lloyds Bank plc New York branch as its "material entity" in the United States.  Lloyds' ADRs are listed on the New York Stock Exchange.

92.    Lloyds maintained a substantial presence in the U.S. as is more particularly alleged below. Lloyds is a registered swap dealer with the CFTC. Lloyds also operates a New

---

[21] *See Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2010,* at 13, 17-18 (HSBC participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer) (hereinafter "Federal Reserve Bank of New York 2010 Survey").

[22] *Id.* at 6.

York branch ("Lloyds Bank plc, New York Branch") located in this District at 1095 Avenue of the Americas, New York, NY 10036. Lloyds Bank plc, New York Branch is registered with the NYSDFS and licensed to do business in this state.

93.     Lloyds Bank plc, New York Branch is one of the material entities in the United States that conducts core business lines and/or critical operations for Lloyds and acts as an agent for Lloyds Bank in the United States and in this District. Lloyds Bank plc, New York Branch's primary activities include providing lending and deposit products to U.S. commercial banks and insured depository institutions, other financial institutions, corporate non-financial institutions, and government agencies.

94.     Lloyds engaged in Australian dollar-denominated lending and derivatives transactions with counterparties located within the United States during the Class Period. Lloyds entered such transactions with asset management corporations, mortgage and loan corporations, insurance companies, banks, and other financial institutions that frequently transact in Australian dollar-denominated derivatives, including BBSW-based derivatives.

95.     The Australian subsidiary of HBOS plc, Bank of Scotland Plc, Australia Branch, was a member of the BBSW Panel until November 15, 2010, when it became Lloyds TSB Bank plc, Australia. Lloyds TSB Bank plc, Australia was a member of the BBSW Panel from November 15, 2010, until the end of the Class Period.

96.     HBOS Treasury Services PLC was an AFMA Prime Bank from May 1, 2007 until November, 2010, when it became Lloyds TSB Bank plc Australia Branch. Defendant Westpac acquired Lloyds' Australian assets in October, 2013.

**N.     Macquarie Bank**

97.     Defendant Macquarie Group Ltd. is a global banking and diversified financial services corporation headquartered in Sydney, Australia. Through its wholly-owned subsidiary,

23

Macquarie Securities (USA) Inc., Macquarie has been expanding its operations in the United States.

98.     Defendant Macquarie Bank Ltd. ("Macquarie Bank") is an Australian corporation headquartered in Sydney, Australia, and is a global provider of banking, advisory, trading, asset management, and retail financial services. Macquarie Bank is a wholly-owned subsidiary of Defendant Macquarie Group Ltd. Macquarie Bank maintains a foreign representative office at 125 West 55th Street, 22nd Floor, New York, NY 10019, which is regulated by the NYDFS.

99.     Macquarie Bank was a member of the BBSW Panel during the Class Period.

100.    Macquarie Bank transacted in BBSW-based interest rate swaps with Plaintiff FrontPoint throughout the class period. The transactions between Macquarie Bank and FrontPoint called for floating payments based on BBSW to be made to Macquarie Bank's account with the Bank of New York in New York.

**O.     Royal Bank of Canada**

101.    Defendant Royal Bank of Canada ("RBC") is the largest bank in Canada and is a bank holding company registered with the Federal Reserve.[23] In the United States, RBC offers a full suite of products and services which include corporate and investment banking, equity and debt origination and distribution, and structuring and trading. In the U.S., RBC has full industry sector coverage and offers a full investment banking product range and competes with large U.S. and global investment banks as well as smaller regional firms. RBC is a provisionally registered swap dealer with the CFTC.

102.    RBC maintains four federal branches (three in New York, New York and one in Miami, Florida); two state agencies in Texas; four representative offices, located in California,

---

[23] *US Resolution Plan Section I – Public Section*, ROYAL BANK OF CANADA (Dec. 2013) *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/royal-bk-of-canada-3g-20131231.pdf

Delaware, Texas and Washington State; a subsidiary national bank, RBC Bank (Georgia), National Association, and a full service broker-dealer with its principal place of business in New York, New York.[24]

103.    Defendant Royal Bank of Canada, Australia Branch is a wholly-owned subsidiary of RBS. Royal Bank of Canada, Australia Branch was on the BBSW Panel during the Class Period.

### P.    Morgan Stanley

104.    Defendant Morgan Stanley is a Delaware Corporation with its headquarters located at 1585 Broadway, New York, New York 10036.

105.     Defendant Morgan Stanley Australia Limited is headquartered in Sydney, Australia. Morgan Stanley Australia Limited provides investment banking services in Australia. It advises, originates, trades, manages, and distributes capital for governments, institutions, and individuals. During the Class Period, Morgan Stanley Australia Limited was a reserve member of the BBSW Panel.

106.    Collectively, Morgan Stanley and Morgan Stanley Australia Limited are referred to as "Morgan Stanley."

### Q.    Credit Suisse

107.    Defendant Credit Suisse Group AG ("Credit Suisse Group") is a Swiss banking and financial services company incorporated in Switzerland. Credit Suisse Group provides a broad range of services to individual and corporate clients, such as investment banking, private banking, and asset management for customers located globally. Of its six primary offices, one is located in this District at 11 Madison Avenue, New York, New York 10010. Together with its

---

[24] *Id.* at 5.

subsidiaries, Credit Suisse Group employs over 8,000 people in the United States, over 7,000 of which are in New York.

108.    Defendant Credit Suisse AG, a wholly owned subsidiary of Defendant Credit Suisse Group, maintains an office at 11 Madison Ave. New York, NY 10010. Credit Suisse AG is registered with the NYSDFS and licensed to do business in this state. Credit Suisse AG is also licensed and supervised by the Board of Governors of the Federal Reserve System. Collectively, Defendants Credit Suisse Group and Credit Suisse AG are referred to as "Credit Suisse."

109.    In 2013, Credit Suisse ranked first in overall fixed income trading in the United States with the largest market share of all dealers.[25]  Credit Suisse's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps, priced, benchmarked and/or settled based on BBSW.[26]  Credit Suisse's Investment Banking Department houses its Rate Products Team, which is a global market maker in cash and derivatives markets and a primary dealer in the United States, trading, *inter alia*, interest rate swaps and options and other risk management structures and forms.

110.    Credit Suisse Group's U.S.-based dealers actively trade in the over-the-counter foreign exchange and interest rate derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[27]

111.    Credit Suisse's U.S. broker-dealer subsidiary has been operating continuously in the United States since 1932, when the First Boston Corporation was founded, according to

---

[25] *See* Greenwich Associates, *2013 Greenwich Leaders: U.S. Fixed Income*, at 1.

[26] *See* Federal Reserve Bank of New York 2010 Survey, at 12, 16-17.

[27] *See id.* at 12, 16-17 (Credit Suisse participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

testimony that Credit Suisse's managing director, Daniel Mathisson, provided to the U.S. Senate

Committee on Banking, Housing, and Urban Affairs on October 28, 2009, regarding trading and

market structure issues. Credit Suisse's Advanced Execution Services is a team of approximately

200 financial and technological professions based in New York that executes trades

electronically on behalf of mutual funds, pension funds, hedge funds, and other broker-dealers.

112.    **The BBSW Panel:** Defendants ANZ, BNP Paribas, Australia Branch, Citibank

NA, Australia Branch, CBA, Deutsche Bank AG, Australia Branch, HSBC Bank Australia

Limited, JP Morgan Chase Bank NA, Australia Branch, Lloyds TSB Bank plc Australia Branch,

Macquarie Bank Limited, NAB, Royal Bank of Canada, Australia Branch, RBS Group

(Australia) Pty Limited, UBS AG, Australia Branch, and Westpac were members of the BBSW

Panel during the Class Period. These entities are referred to collectively as "Panel Banks."

113.    **AFMA Prime Banks:** Defendants ANZ, CBA, NAB, and Westpac were

designated AFMA Prime Banks during the entirety of the Class Period. Defendant JP Morgan

Chase, N.A. was a designated AFMA Prime Bank from early 2009 through November 2011.

Defendant BNP Paribas, Australia Branch was a designated AFMA Prime Bank from 2005

through February 24, 2012. Defendant Citibank NA was an AFMA Prime Bank from 2005

through December 23, 2008. Defendant Deutsche Bank AG was an AFMA Prime Bank from

May 1, 2007 through December 23, 2008. HBOS Treasury Services plc was an AFMA Prime

Bank from May 1, 2007 through September 29, 2010. Collectively, the designated AFMA Prime

Banks are referred to as "Prime Banks."

**R.     ICAP**

114.    Defendant ICAP plc is a UK-based voice broker and is the largest provider

of electronic dealer broker and post trade risk services in the world. ICAP trades a wide range of

derivative products, including interest rate derivatives, credit, credit derivatives, foreign exchange, interest rate swaps, and equity swaps.

115. Defendant ICAP Australia Pty Ltd. is headquartered in Sydney, Australia and is the Australian subsidiary of ICAP plc. Collectively, ICAP plc and ICAP Australia Pty Ltd. are referred to as "ICAP."

**S.    Tullett Prebon**

116. Defendant Tullett Prebon plc is headquartered in London, United Kingdom and is one of the world's leading interdealer brokers. Tullett Prebon products include fixed income securities and derivatives, interest rate derivatives, treasury products, equities, and energy and commodities.

117. Tullett Prebon has its principal offices in New Jersey, London, Hong Kong, Singapore and Tokyo. Tullett Prebon's wholly-owned subsidiary, Tullett Prebon Financial Services LLC, is based in this District at One Seaport Plaza, 199 Water St, New York, NY 10038.

118. Defendant Tullett Prebon (Australia) Pty. Limited is an Australian subsidiary of Tullett Prebon plc headquartered in Sydney, Australia. Collectively, Tullett Prebon plc and Tullett Prebon (Australia) Pty. Limited are referred to as "Tullett Prebon."

119. **Broker Defendants:** ICAP and Tullett Prebon were the only brokerages operating in the Prime Bank Bill market during the daily BBSW Fixing Window and possessed a 100% market share in this market during the Class Period. ICAP and Tullett Prebon are collectively referred to as the "Broker Defendants."

120. John Doe Defendants Nos. 1-50 are other entities or persons, including banks, derivatives traders, and other co-conspirators whose identities are currently unknown to Plaintiffs. The John Doe Defendants participated in, furthered, and/or combined, conspired, or

agreed with others to perform the unlawful acts alleged herein, including the restraint of trade and manipulation of BBSW and the prices of BBSW-based derivatives.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

#### A.   The Money Market

121.   Financial market participants commonly distinguish between two kinds of markets: "capital markets" – like the stock market or bond market – where companies go to raise funds for long-term purposes, and the "money market," where borrowing and lending occurs on a short-term basis, typically for periods of less than one year.

122.   Banks are some of the most important money market participants. Banks both borrow from the money market to fund their operations and act as dealers in related over-the-counter interest rate derivatives, like swaps (*see* Part I.D.1 *infra*), which allow third-parties to exchange future cash payments based on movements in specified market interest rates.

123.   Banks use the money market to borrow money by issuing "Bank Bills." Bank Bills are bills of exchange — similar to checks — that require the issuing bank to pay a specified amount of money, *i.e.*, the "face value" of the bill, on a certain maturity date. The number of days between when a Bank Bill is issued and when it matures determines its "tenor."  For example, a Bank Bill that matures in 90 days has a three-month tenor, while one maturing in 180 days has a six-month tenor.

124.   Banks issue Bank Bills at a discount to their face value. In this way, a Bank Bill serves as a short term loan, with the difference between the price paid for the bill and its face value representing the amount of interest. For example, assume an investor pays $98,382.75 to purchase a Bank Bill with a face value of $100,000 that matures in 120 days. When the investor

redeems that Bank Bill at maturity it will receive the full $100,000 face value, $1,617.25 more than what it paid to purchase that bill. The extra $1,617.25 represents the amount of interest the bank paid to borrow $98,382.75 for 120 days, or approximately 5% annually.

125.   This example also demonstrates the inverse relationship between a Bank Bill's purchase price and its yield. Because interest is represented as the difference between a Bank Bill's purchase price and its face value, the amount of interest paid increases as the bill's purchase price decreases and vice versa. For example, if the purchase price of the Bank Bill in ¶ 123 above increased from $98,382.75 to $99,000.00, the yield of that bill would decrease to approximately 3.1% annually, as the purchase price moved closer to the face value. A decrease in the purchase price of that Bank Bill to below $98,382.75, however, would increase the yield to greater than 5% as the difference between the purchase price and $100,000 face value increased.

126.   Bank Bills can be "accepted" or "endorsed" by any bank. When a bank accepts a Bank Bill it becomes obligated to pay the face value of that bill on the maturity date. If instead a bank endorses a Bank Bill, it becomes obligated to pay the face value of that bill at maturity only if the acceptor or drawer is unable to do so. The terms "Bank Accepted Bill" and "Bank Endorsed Bill" refer to Bank Bills that have been accepted or endorsed, respectively.

127.   In addition to issuing Bank Bills, banks also sell certificates of deposit ("CDs") to raise short term funds. A CD is a document evidencing a deposit placed with a depository institution for a certain amount of time. The certificate states the terms of the deposit, typically the amount of the deposit, the maturity date, the interest rate paid, and the method under which interest is calculated.

128.    CDs can be either negotiable or nonnegotiable. A negotiable CD ("NCD") can be sold by the depositor to other parties who can in turn resell the NCD in the secondary market. In contrast, a nonnegotiable CD generally must be held by the depositor until maturity.

**B.    Australian Prime Banks**

129.    The Australian Financial Markets Association ("AFMA") is a trade association and the principal Australian financial markets industry group. Each Defendant, either directly or through a subsidiary it controlled, was a member of the AFMA during the Class Period.

130.    The AFMA organizes several committees, each with its own functions, procedures, and criteria for membership. One of the main AFMA committees is the Market Governance Committee, which is responsible for developing and maintaining market protocols used to facilitate and promote the efficient and orderly running of the over-the-counter derivatives markets in Australia.

131.    The Market Governance Committee oversees a number of sub-committees with the objective of developing consensus in the market on technical matters such as transaction documentation, trading conventions, and market data. One of these sub-committees, the Negotiable & Transferable Instruments ("NTI") Committee, is responsible for maintaining the conventions for trading money market instruments, including Bank Bills and NCDs.

132.    The NTI Committee is also instrumental in running the AFMA's annual election of "Prime Banks," a designated subset of banks operating in Australia whose Bank Bills and NCDs are recognized as having the highest quality with regard to liquidity, credit, and consistency of relative yield.

133.    To be eligible for Prime Bank status, a bank must be (1) an Australian Prudential Regulation Authority ("APRA") authorized deposit-taking institution; (2) classified by APRA as either an Australian-owned bank, foreign subsidiary bank, or branch of a foreign bank that is

authorized to carry on banking business under the Australian Banking Act of 1959 or comparable legislation in its country of origin; and (3) able to meet certain credit rating criteria.

134.     Prime Banks are appointed through an election process from among the eligible banks. On or following the anniversary of the prior election the AFMA asks all institutions that meet the Prime Bank eligibility criteria to nominate a list of banks. Next, banks that the NTI Committee deems to be significant traders and investors in Bank Accepted Bills and NCDs vote on which of the nominated banks should be appointed Prime Banks. Votes are weighted according to a formula determined by the NTI Committee so that the most active market participants have a proportionally higher involvement in the process than less active members.

135.     The voting structure favors consistency. Existing Prime Banks are re-appointed if they capture at least 70% of the weighted survey vote. New banks face a higher threshold and must receive 80% of the weighted survey vote to become a Prime Bank. The process assumes that there will be at least three banks eligible and nominated as Prime Banks in each election.

136.     During the Class Period, there were between four and eight Prime Banks: Defendants ANZ, CBA, NAB, and Westpac were designated as Prime Banks for the whole Class Period while Defendant Citibank was designated as a Prime Bank from 2005 through December 23, 2008. Defendant BNP Paribas was a designated Prime Bank from 2005 through February 24, 2012. Defendant Deutsche Bank was a designated Prime Bank from May 1, 2007, through December 23, 2008. Defendant JP Morgan Chase, N.A. and HBOS Treasury Services PLC were appointed Prime Banks for shorter periods of time, from early 2009 through November 30, 2011, and May 1, 2007, through September 29, 2010, respectively.

137.     There are several advantages to the Prime Bank designation. Bank Bills and NCDs issued by Prime Banks trade at the lowest possible interest rates as a homogenous asset

class known as "Prime Bank Bills." This increases liquidity and allows Prime Banks to raise funds in the money market at a discount. Prime Banks are also automatically members of the BBSW Panel and directly involved in setting Australia's short-term interbank interest rate.

138.    Prime Bank Bills are traded in two ways, either (a) through "dealer markets" comprised of interdealer brokers who acted as intermediaries, quoting prices at which their respective clients would buy ("bid") and sell ("offer") Prime Bank Bills as counterparties to and from other market participants; or (b) in direct trades between counterparties.

139.    Broker Defendants ICAP and Tullett Prebon were the only interdealer brokers operating markets for Prime Bank Bills during the Class Period. Both maintained electronic systems for reporting Prime Bank Bill prices and would post bids and offers for Prime Bank Bills at all tenors shortly after receiving bids and offers for their clients. This pricing information, once posted, became accessible by, and visible to, other market participants, in contrast to the direct trades between counterparties, which remained private.

C.    The BBSW Fixing

140.    BBSW is intended to reflect the observed rate of interest paid on Prime Bank Bills actually traded in the Australian money market. The rate is calculated based on submissions from a group of fourteen panel banks, including Prime Banks, who are selected periodically through a private election held at the discretion of the current BBSW Panel. This discretionary election process resulted in an extremely low turnover in panel membership. For example, while there were several BBSW panel elections during the Class Period, following each election the panel remained unchanged.

141.    The AFMA's Market Governance Committee administers the rate-setting process through its BBSW sub-committee, which is responsible for the overall management of the

BBSW rate, rates directly related to the BBSW rate,[28] the procedure for the production of the BBSW rate, and the resolution of disputes among AFMA members involving BBSW and directly related rates.

142.    The BBSW Committee is comprised of two representatives from each of the following AFMA committees: (1) NTI Committee; (2) Interest Rate Options Committee; and (3) Swaps Committee. In addition, there is also one broker representative, two investment manager representatives, and one borrower representative on the committee. Although the exact membership of the BBSW Committee is secret, ASIC revealed that it included several of Defendants' traders directly involved in manipulating the BBSW during the Class Period, including:

(a)  Paul Woodward, Andrew Miller, and Matthew Morris from ANZ (*see* Part II.A *infra*);

(b)  Colin Roden, Sophie Johnston, and Michael Dodd from Westpac (*see* Part II.A *infra*); and

(c)  Paul Howarth and Michael Tsakiris from NAB. (*See* Part II.A *infra*).

143.    According to AFMA guidelines, the BBSW is fixed every business day using the following procedure. First, the BBSW Panel Banks submit to the AFMA the observed "mid-rate," *i.e.*, the midpoint between the bid price at which banks offer to buy and the ask price at which they offer to sell, Prime Bank Bills with six tenors – one, two, three, four, five, and six months – traded between 9:55 A.M. and 10:00 A.M. Sydney Time (the "Fixing Window"). Panel members also submitted rates for the nine-month and twelve-month tenors until January 5, 2009, when the nine and twelve-month rates were discontinued.

---

[28] For example, the AFMA also publishes a rate called "BBSY", which creates a "bid" and an "offer" rate from BBSW by adding or subtracting five basis points (0.05%) to the BBSW fix.

144.     The BBSW Panel Banks were supposed to base their submissions to the AFMA on prices that were displayed on two Prime Bank Bill trading screens, one from ICAP and one from Tullett Prebon. The BBSW Panel Banks had access to these screens during the Fixing Window in real time.

145.     Next, the AFMA calculates the BBSW "fix" for each tenor by ranking the quotes in numerical order and eliminating the highest and lowest submissions – a procedure known as "topping and tailing" – before averaging the remaining six submissions. The AFMA then publishes the resulting average rate to financial data providers, including Thomson Reuters and Bloomberg, who distribute BBSW rates within the United States, Australia, and other markets.

### D.      BBSW-Based Derivatives

146.     The BBSW fix directly affects the prices of financial instruments that incorporate the rate as a component of price (collectively "BBSW-based derivatives") including, for example: (i) BBSW-based swaps; (ii) BBSW-based forward rate agreements; (iii) Australian dollar futures contracts; (iv) Australian dollar foreign exchange forwards; and (v) 90-day Bank Accepted Bill futures contracts. More than $1 trillion in BBSW-based derivatives traded "over-the-counter," directly between counterparties, within the United States during the month of April 2013 alone. In total, trillions of dollars in BBSW-based derivatives traded over-the-counter and on public exchanges within the United States during the Class Period.

#### 1.      BBSW-Based Swaps

147.     A swap is an over-the-counter BBSW-based derivative in which two parties exchange the obligation to make a series of payments based on some underlying principal amount for some set period of time. BBSW determines the price and payments due under BBSW-based swaps by determining the amount paid or received by each party.

148.    There are many different types of BBSW-based swaps. For example, in the most common "plain vanilla" interest rate swap, the parties agree to a "fixed-for-floating" exchange in which one party will make payments based on a variable price or rate, *e.g.*, BBSW, while the other will make payments based on a fixed rate, *e.g.*, 1.5%, for the same notional amount.

149.    Counterparties may also use swaps to conduct a "floating-for-floating" exchange in which both parties agree to make payments based on a variable price or rate. For example, one party can agree to make payments equal to the return on a stock or index, *e.g.*, the ASX 200, an index of the largest 200 stocks listed on the Australian Stock Exchange, in exchange for receiving interest rate payments based on a variable interest rate, like BBSW.

150.    Payments under a swap contract are due at regular intervals, *e.g.*, every six months, for the duration of the agreement on certain specified "fixing" or "reset" dates. Each time a payment is due, the amount owed by the two parties are netted against each other so that only the party with the larger obligation will make a payment. For example, assume Party A enters into a floating-for-floating swap contract with Party B and agrees to make payments every six months equal to the return of the ASX 200 index. In exchange, Party B agrees to make payments to Party A every six months based on the six-month BBSW tenor. On each reset date, if six-month BBSW is greater than the percentage return of the ASX 200 index, Party B has the larger obligation and will make a payment to Party A. But if the ASX 200 returns more on a percentage basis than six month BBSW, Party A has the larger obligation and will make a payment to Party B.

### 2. BBSW-Based Forward Rate Agreements

151.    A forward rate agreement ("FRA") is an interest rate forward contract. FRAs, which are also known as single-period swaps, are similar to interest rate swaps and represent an agreement between two counterparties to exchange fixed-for-floating interest rate payments on

36

some principal amount at a future reset date. On the reset date, the party with the larger

obligation makes an interest rate payment equal to the difference between the fixed rate and

floating rate specified in the contract. For example, assume Party A enters into a FRA with Party

B in which Party A agrees to receive 4% interest on $1,000,000 and Party B agrees to receive

interest equal to six-month BBSW, determined on a date one year in the future, for the same

underlying principal amount. If, after one year, six-month BBSW is higher than 4%, Party A

must pay Party B the difference in interest between 4% and the six-month BBSW fixing on that

date. However, if six-month BBSW is lower than 4%, Party B must pay Party A the difference in

interest.  Thus, BBSW determines the price and payments due under a BBSW-based FRA.

### 3.   CME Australian Dollar Futures Contracts

152.    A CME Australian dollar futures contract is an exchange-traded BBSW-based

derivative that represents an agreement to buy (called a "long" position) or sell (called a "short"

position) 100,000 Australian dollars in terms of U.S. dollars on some future date. Prices of CME

Australian dollar futures contracts are determined by a formula that incorporates BBSW as one

of its terms. This formula uses BBSW to adjust the "spot price" of Australian dollars for

immediate delivery to account for the "cost of carry," *i.e.*, the amount of interest earned on

Australian dollar deposits over the duration of the agreement.

153.    Because BBSW is a component in the formula used to price CME Australian

dollar futures contracts, there is a statistically significant relationship between a change in

BBSW and a change in the prices of CME Australian dollar futures contracts. Plaintiffs used a

regression analysis – a statistical process that evaluates the relationships among variables – to

verify this relationship by comparing the daily change in: (1) the closing price of the CME

Australian dollar futures contracts closest to expiration; (2) the spot price of purchasing

Australian dollars in terms of U.S. dollars; and (3) the one, three, and six-month tenors of

BBSW. This regression analysis produced statistically significant results indicating that a change in BBSW affects the prices of CME Australian dollar futures contracts.

### 4.   Australian Dollar Foreign Exchange Swaps & Forwards

154.    A foreign exchange swap is a contract in which two counterparties agree to exchange streams of interest payments in different currencies for an agreed-upon period of time and to exchange principal amounts in different currencies at an agreed-upon exchange rate at maturity. There are two components to a foreign exchange swap: (1) a spot transaction in which the parties buy or sell a certain amount of one currency (*e.g.*, Australian dollars) at the current market prices for immediate delivery (*i.e.*, typically within two days); and (2) a foreign exchange forward, which reverses the spot transaction by buying or selling an equivalent amount of a second currency (*e.g.*, U.S. dollars) on some future maturity date (*e.g.*, 14 days later).

155.    An Australian dollar foreign exchange forward is an agreement to buy or sell Australian dollars on some future date and the over-the-counter equivalent of a CME Australian dollar futures contract. As a result, Australian dollar foreign exchange forwards are priced using the same formula that determines the value of CME Australian dollar futures contracts and the prices of Australian dollar foreign exchange forwards are affected by changes in BBSW for the reasons stated in ¶ 153 above.

### 5.   90-Day Bank Accepted Bill Futures

156.    90-day Bank Accepted Bill ("BAB") futures contracts are standardized contracts in which one party, the "long," agrees to buy a 90-day Prime Bank Bill with a face value of $1,000,000 at a specified yield (and thus price) on a certain future expiration date and another party, the "short," agrees to sell a 90-day Prime Bank Bill with a face value of $1,000,000 at a specified yield (and thus price) on the same future expiration date.

157.   BAB futures contracts expire at noon on one of four dates per year; the Thursday before the second Friday in each of March, June, September, and December.

158.   BAB futures contracts are "deliverable," meaning that if a BAB futures contract is held through the expiration date then the "short" party must actually deliver the 90-day Prime Bank Bill(s) to the "long" party, who must then actually pay for those Prime Bank Bill(s). Delivery occurs on the day following the day on which the BAB futures contract expires.

159.   BAB futures contracts are traded on the ASX24 exchange. A party can enter into BAB Futures contracts with a term (time left to the expiry date) of up to five years.

160.   BAB futures contracts are quoted in terms of 100 minus the annual percentage yield of the underlying Prime Bank Bills. So a BAB futures contract quoted at "96" means that the parties to the BAB futures contract agree to buy (or sell) $1,000,000 of 90-day Prime Bank Bill(s) on the expiry date at a price that represents a yield of 4% (that is, the "price" of the 90-day Prime Bank Bill will be discounted to reflect a yield of 4%).

161.   As BBSW Panel members and the largest BBSW-based derivatives dealers in the world, Defendants understood the direct, mathematical pricing relationships described above and that manipulating the BBSW fixing would affect the prices of BBSW-based derivatives, including those traded within the United States.

## II.   Defendants Agreed to and Did Restrain Trade In, and Intentionally Manipulated the Prices of, BBSW-Based Derivatives

162.   ASIC's investigation uncovered hundreds of communications evidencing a conspiracy among Defendants to systematically manipulate BBSW by *inter alia*: (1) engaging in manipulative transactions during the Fixing Window; (2) making false BBSW submissions in violation of AFMA guidelines; (3) sharing proprietary information regarding BBSW-based derivatives positions with other Defendants; and (4) using their control over the AFMA rule-

making process to ensure that BBSW remained susceptible to manipulation. This manipulative conduct, together with UBS', RBS', and BNP Paribas' admitted false reporting of BBSW, fixed BBSW-based derivatives prices at artificial levels that financially benefited Defendants at the expense of Plaintiffs and the Class.

### A. Defendants Rigged BBSW by Coordinating Manipulative Transactions within the Fixing Window

163. Bank Defendants rigged BBSW by engaging in transactions during the Fixing Window to manipulate the supply of Prime Bank Bills. These illegitimate trades were often uneconomic. Communications show that Defendants would intentionally lose money on Prime Bank Bill transactions to manipulate BBSW in a direction that generated considerably larger profits from their derivatives positions. Thus, the net gain from manipulating the fixing was positive even when the Prime Bank Bill transactions that Defendants' used to manipulate the fixing resulted in a loss.

164. To maximize their impact on the BBSW fixing, Bank Defendants conferred with each other before executing these manipulative transactions, aligning their interests and recruiting co-conspirators to trade in the same direction. Bank Defendants also engaged in transactions with each other before the start of the Fixing Window to concentrate the supply of Prime Bank Bills, which they referred to as "stock," "ammo," or "bullets," so that their traders, with help from the Broker Defendants, could "puke out" a massive quantity during the Fixing Window.

### 1. Defendants manipulated BBSW by artificially increasing or decreasing the supply of Prime Bank Bills during the Fixing Window

165. The forces of supply and demand determine the prices and, therefore, yields, of Prime Bank Bills. Defendants' strategy of manipulating the BBSW fixing was effective because they controlled the supply of Prime Bank Bills during the Fixing Window. For example, as

Prime Bank Bill supply increases, Prime Bank Bill prices decrease and yields rise.

*See* ¶¶ 124-125 *supra*. Thus, artificially increasing the supply of Prime Bank Bills during the

Fixing Window results in an artificially higher BBSW fix.

166.    ANZ trader Mark Budrewicz explained the effect of selling Prime Bank Bills to

increase supply during the Fixing Window to ANZ analyst Saju Yohannan in the December 10,

2010 phone conversation below:

> **December 10, 2010**:
>
> ANZ [Budrewicz]: BBSW is a traded rate at 10 o'clock…people in the market
> can affect that rate by selling bills or buying bills in the market…So by me selling
> bills, I'm adding to the supply of bills into the market, right - - which then pushed
> the yield higher… Or pushes the price lower and the yield higher conversely…So
> all I'm doing is I'm taking those bills and selling them back out on the same day
>
> ANZ [Yohannan]: All right

167.    Budrewicz's example was not a hypothetical. ANZ calculated that it had a $5.4

billion net long exposure to the results of the December 10, 2010 fixing, *i.e.*, it would benefit

from an increase in the rate, and planned to manipulate BBSW higher on that day.

168.    To carry out this plan, Budrewicz acquired $1.575 billion in Prime Bank Bills

over two days for the express purpose of manipulating the BBSW fix. First, he purchased $860

million in Prime Bank Bills from various sources on December 9, 2010, explaining to a

colleague in a contemporaneous email that this "stock is going to be used to affect a rate set that

I have tomorrow."  Next, he purchased and held 715 December 2010 BAB futures contracts on

the expiration date, taking delivery of $715 million in Prime Bank Bills on December 10, 2010.

Budrewicz explained in a different conversation with Yohannan that these additional bills were

also going to be used to manipulate the BBSW fix:

**December 10, 2010**

> ANZ [Budrewicz]: I still ended up taking 715 bills into expiry. These are
> physically delivered, ie I will receive $715mio 90day bills on Friday. What
> I have done today, is to sell them into the rate set to help push it in my favour.

169.     Standing for delivery of these 715 BAB futures contracts was uneconomic and

caused ANZ to lose money. But as Budrewicz explained, in another message to Yohannan, the

massive size of ANZ's exposure made up for the loss and resulted in a net profit:

**December 10, 2010**:

> ANZ [Budrewicz]: Now I would have lost money on the bills. However if my rate
> set is larger…than 715 mill, say its $2bn. I've push that rate set 6 points on $2bn.
> I might have lost 715mill, 6 points…but net – net I'm still better

170.     ANZ sold all $1.575 billion in Prime Bank Bills it had acquired during the

December 10, 2010 Fixing Window. This massive sale accounted for 62.2% of all Prime Bank

Bills traded that day. Following this transaction, one-month and three-month BBSW tenors

increased from 4.85% and 5.07% on December 9 to 4.905% and 5.095% on December 10, 2010,

financially benefiting ANZ's large net long position.

171.     Prime Bank Defendants could also increase supply by issuing new Prime Bank

Bills during the Fixing Window. This had the same effect as selling and would drive Prime Bank

Bill prices lower while increasing yields. For example, in the chat below Budrewicz explains that

ANZ planned on issuing new bills during the December 1, 2010 Fixing Window to manipulate

BBSW higher:

**December 1, 2010**:

> ANZ [Budrewicz]: so we are issuing today into the rate set
> i am not concerned with the level would like to push it as high as possible

172.    Following this communication, both the one-month and three-month BBSW tenors increased by 1 and 3 basis points respectively, from 4.82% and 5.07% on November 30, 2010 to 4.83% and 5.1% on December 1, 2010, consistent with ANZ's plan.

173.    While increasing Prime Bank Bill supply during the Fixing Window caused prices to fall and yields to rise, decreasing supply had the opposite effect. Decreasing Prime Bank Bill supply during the Fixing Window through large purchases would cause bill prices to increase and yields to fall, resulting in an artificially lower BBSW fixing.

174.    This cause and effect relationship is demonstrated in the conversation below, where Westpac traders Colin "the Rat" Roden and William Hosie discuss purchasing $1.2 billion in Prime Bank Bills to manipulate one-month BBSW artificially lower:

> **July 1, 2011**:
>
> Westpac [Roden]: Mate you're a fucking thief
>
> Westpac [Hosie]: A thief. Why?
>
> Westpac [Roden]: I heard about the 1 month
>
> Westpac [Hosie]: Yeah mate, we got it back down . . . I bought 340 from CBA and one through Jase and I've bought 220 all from Goldmans in the, in the other once . . . So didn't actually spending too much, spent like 1.2 [billion] across both
>
> Westpac [Roden]: That's good, that's good, that's very good

175.    Consistent with this conversation, one-month BBSW decreased by four basis points from 4.87% on June 30, 2011, to 4.83% on July 1, 2011, following Westpac's large purchase of Prime Bank Bills during the Fixing Window that day.

176.    Bank Defendants were willing to spend billions of dollars purchasing Prime Bank Bills to manipulate the BBSW fixing because they realized a much larger gain on their BBSW-based derivatives positions as a result. For example, in the conversation below Westpac trader

Sophie Johnston, known among traders as the "Perfume Steam Roller" because of how she would "run over" or manipulate the BBSW fixing, explained to an undisclosed group of Westpac employees that while Roden had spent roughly $2 billion purchasing Prime Bank Bills to manipulate BBSW lower, Westpac's exposure was large enough that it still realized a net gain:

> **April 7, 2010**
>
> Well Col[in Roden] spent a crap load of money yesterday and he sold quite a bit today ... he bought like 2 billion dollars' worth of stock for the rate set so ... he's sold I think today. Spend 2 for 20's not bad. So he'll be selling stuff over the next couple of days because he's got no rate sets for like another week or whatever so that shouldn't be too much of an outflow of cash.

177.    In fact, on April 6, 2010, Westpac bought $1.853 billion in 30-day Prime Bank Bills from the money market, accounting for 100% of all purchases made in that tenor through the Broker Defendants.

> 2.    The Bank Defendants shared information regarding their net BBSW rate exposure to align interests on the direction of the manipulation

178.    The Bank Defendants decided whether to increase or decrease supply during the Fixing Window based on their net BBSW rate exposure and shared information regarding their BBSW-based derivatives positions to align interests on whether to fix BBSW higher or lower. For example, in the instant message below NAB trader Robert Collins and HSBC trader Carl Radford discuss their BBSW exposure, *e.g.*, whether they are paying ("pay") or receiving ("rec") interest based on the BBSW, the size of their positions, and the desired BBSW fix:

> **December 20, 2010**
>
> NAB [Collins]: what you have rateset wise on 17 18 jan
>
> NAB [Collins]: 6mnth
>
> HSBC [Radford]: i rec a yard today

NAB [Collins]: i need to rec 17th pay 18

NAB [Collins]: of 6mnth wowo

HSBC [Radford]: nada

NAB [Collins]: 1yd

HSBC [Radford]: that will be fun

NAB [Collins]: so you need the set higher in 6mnth

NAB [Collins]: so do i and so does my short end

HSBC [Radford]: i need set higher today

179.   This practice of sharing proprietary information with supposed competitors was endemic among the Bank Defendants. For example, Collins also shared information about NAB's BBSW exposure, derivatives positions, and desired fixings with others, including CBA trader Garfield Lee:

**January 25, 2011**

CBA [Lee]: you have 6m on thurs?

NAB [Collins]: 6m set?

CBA [Lee]: yes

NAB [Collins]:  na got bugger all on it

NAB [Collins]: 75mill i need it lower

NAB [Collins]: i have 31 jan 6mnth up

NAB [Collins]: which is good

NAB [Collins]: so a pay set on 27th and 28th and a rec set on 31st

180.    Credit Suisse trader Chris Corbett received proprietary information from NAB as well, sharing his bank's BBSW exposure with Collins in exchange for secret information about the planned movement of BBSW.

**July 19, 2011**

NAB [Collins]: the set is going to be volatile next few days

Credit Suisse [Corbett]: so long as 3mth pops at some stage im ok . . .

NAB [Collins]: i think tom goes up and following day goes down

Credit Suisse [Corbett]: excellent info

NAB [Collins]: don't repeat

Credit Suisse [Corbett]: I wont

181.    Corbett also contacted NAB trader Paul Howarth, as exemplified in the June 4, 2010 conversation below, to ask if he knew anyone manipulating the BBSW fixing that day:

**June 4, 2010**

Credit Suisse [Corbett]: Hi paul . . . is this genuine issuance in the 6mth . . . or just some stock selling for set purposes?

182.    Communications released in ASIC's complaint against ANZ show traders routinely exchanging information about the bank's BBSW exposure, derivatives positions, and upcoming manipulations with multiple co-conspirators. For example, in the chat below, ANZ trader Jason Pritchard tells Credit Suisse trader Bradley Harper of a plan to manipulate BBSW over the next few days:

**March 4, 2010**

ANZ [Pritchard]: absolutely ZIP LOCK but we are going to buy a lot on Monday . . . and slaughter it on Tuesday and Wednesday . . . Slaughter it . . . or try

Credit Suisse [Harper]: cheers

46

183.   ANZ trader Michael Dodd shared similar information with Macquarie traders Renaye Skidmore and Beth Wallace on multiple occasions. For example:

**February 20, 2011**

ANZ [Dodd]: [to Macquarie trader Skidmore] We'll print some CD's today if you have any interest. We're looking to push the rate set higher.

**June 3, 2011** [9:54 A.M.]

ANZ [Dodd]: [to Macquarie trader Wallace] And I can tell you that we will be looking to sell to make them go higher

**June 3, 2011** [10:09 A.M.]

ANZ [Dodd]: [to Macquarie traders Wallace and Skidmore] Big rate set 3m tom. We want it higher

184.   Sharing proprietary information about BBSW exposure and derivatives positons allowed the Bank Defendants to reach consensus on the direction they would manipulate BBSW and amplify their effect on the rate. For example, in the conversation below, NAB trader Paul "Howie" Howarth explains to Bank of New Zealand trader Murray Jones that three-month BBSW increased by almost 10 basis points, from 4.29% to 4.385% on March 24, 2010, because *everyone* wanted it higher:

**March 24, 2010**

BNZ [Jones]: Howie – we are hearing BBSW printed 10 points wider today. Is this just BBSW volatility or is there something more fundamental behind it??

NAB [Howarth]: everyone wanted it set up, so its back to where it should be ie. 20 over ois . . . that last couple of days were just noise

BNZ [Jones]: so not a function of funding pressures

NAB [Howarth]: no

185.   Consistent with Howarth's explanation for the rate increase, communications released by ASIC show that in addition to sharing proprietary information about their BBSW-

based derivatives positions and rate exposure, Defendants also coordinated transactions to manipulate the results of the BBSW fix in a direction that financially benefited those positions.

3. <u>Defendants coordinated manipulative trades to maximize their impact on BBSW rates</u>

186. Bank Defendants coordinated transactions for at least two reasons: (1) to concentrate Prime Bank Bill supply prior to the Fixing Window; and (2) to amplify the effect of manipulative transactions during the Fixing Window by having multiple co-conspirators buy or sell Prime Bank Bills at the same time.

a) *Defendants helped their co-conspirators acquire the "ammo" they needed to manipulate BBSW*

187. Bank Defendants frequently spoke of their need to acquire Prime Bank Bills, which they referred to as "stock," "bullets," or "ammo," so they could carry out manipulative transactions during the Fixing Window and manipulate BBSW. The chats below are some examples of traders at ANZ, Westpac, and NAB discussing Prime Bank Bills in this context:

**<u>June 8, 2010</u>**

<u>Westpac [Roden]</u>: we bought it to have ammunition because we were like 20,000 contracts short so he set it up for a bit

**<u>March 9, 2011</u>**

<u>ANZ [Budrewicz]</u>: i have taken some stock in mar futs just working out whether to buy some more. . . more about getting ammo rather than hedging the rate set

**<u>January 19, 2012</u>**

<u>NAB [McVicar]</u>: Big down in 3s Monday so want to have some ammo for that

188. To ensure that their co-conspirators had enough "ammunition" to manipulate the BBSW fix, Bank Defendants organized trades before the start of the Fixing Window to supply each other with Prime Bank Bills. For example, in the chat below, JPMorgan trader Imran Ismail

offers to provide NAB with an extra $250 million in "ammunition" on March 8, 2011, to assist in manipulating BBSW higher the next day:

**March 8, 2011**

JPMorgan [Ismail]: you must be more confident tmrrw. . .im giving you more ammunition! . . .an extra 250 for you to jam it with!

189.     Consistent with this plan to manipulate BBSW higher, the one-month and three-month BBSW tenors increased from 4.83% and 4.965% on March 8, 2011, to 4.845% and 4.975% on March 9, 2011, respectively.

> b)  *Defendants coordinated manipulative trades in the same direction to maximize their impact on BBSW*

190.     Bank Defendants also conspired with each other to trade in the same direction during the Fixing Window.  The Bank Defendants bought and sold Prime Bank Bills as a group to amplify their manipulative impact on the BBSW fix. For example, CBA trader Garfield Lee, who was fired in the wake of ASIC's investigation, regularly spoke with Westpac trader Colin "the Rat" Roden about coordinating manipulative conduct during the Fixing Window. The two had the following exchange on April 22, 2010:

**April 22, 2010**

CBA [Lee]: Waiting for you to start some BBSW fireworks.

Westpac [Roden]: Yet again … you steal ideas/women/whatevr (sic) … have a look at yourself and leave the funny stuff to the pro's!

191.     Later that year, on November 25, 2010, Lee sent Roden the following picture of a bus with the letters "BBSW" written on the side:

```
                                              V~~~ ~~~ ~~~
            _|| |=======================|
            (__||              ~~~~~|~
          __//_]]| |   B  B  S  W    ~~~|~~
         >|:__ 1|1             ~~~~~~|~
         [/.-.\= |-|.--._.-.==========._._.-.=;
         -|(o)\~~~|(o)|(o)\~~"~"~~|(o)|(o)\
            '.'    '.'.'      '.'.'
```

192.   Roden responded to Lee, recognizing that Westpac and CBA had manipulated the

BBSW fix and praised CBA for its "nice work":

> **April 22, 2010**
>
> Westpac [Roden]: You been run over by that big fat bus? … saw the lovely cba
> having a small lash as well...nice work!

193.   Roden and Lee knew that Defendants' collusive misconduct in rigging BBSW

was harming other market participants and, in April 2010, Roden commented that BBSW had

become a "bloody dangerous gane [sic]…full flack [sic] jacket stuff."  Lee responded: "You say

that with the innocence of pol pot in 1980", a testament to Westpac's role in the manipulation.

194.   Traders at NAB and UBS engaged in similar collusive conduct. For example, in

the chat below NAB trader Michael Tsakiris discusses manipulating BBSW on "turn dates",

typically the end of the month or year, with UBS trader Jason Coulloupas:

> **October 19, 2010**
>
> UBS [Coulloupas]: no interest in the 30th . . .why are you trying to jam the turn
> dates. . . you being a phuckhead?
>
> NAB [Tsakiris]: haha
>
> UBS [Coulloupas]: i remember last year i moved it 8 pts.. ha.. so I would make it
> 9.5/7.5.. and knowing the book probably 10/8
>
> NAB [Tsakiris]: yea its got smashed last yr..

UBS [Coulloupas]: i was happy to smash it..

**B.     The Broker Defendants Actively Participated in the Conspiracy by Facilitating Manipulative Trading for the Bank Defendants**

195.    The Broker Defendants were ideal co-conspirators because of their position as intermediaries in the Bank Bill market. Their frequent contact with Bank Defendants gave the Broker Defendants a wealth of information that enhanced the cartel's efficacy, including other banks' (a) BBSW rate exposure; (b) Prime Bank Bill stock levels; and (c) plans for manipulative trading during the Fixing Window. Broker Defendants served as a conduit for this information, coordinating with at least one senior trader at each bank, known as the "Single Face to Market," who was responsible for issuing orders to ICAP and Tullett Prebon for rapid execution during the Fixing Window. The Broker Defendants were, in turn, rewarded for their participation in the conspiracy with outsized commission payments, generated by facilitating the high-volume trades used by the Bank Defendants to manipulate the BBSW fix.

196.    The Single Face to Market would instruct the Broker Defendants on the direction the Defendants planned to manipulate BBSW before the Fixing Window started. For example, the following communications are from Paul Woodward, who served as ANZ's Single Face to Market in addition to being a member of the AFMA's NTI and BBSW Committees:

**March 10, 2011**

ANZ [Woodward] to Tullett [Donlan]: I've got a big set already and I'll be pushing the fuck out of it

**August 10, 2011**

ANZ [Woodward] to New Edge Capital [Prosser], Tullett [Donlon] and ICAP [Smith]: I'm going to be very busy in the rate set. I'm going to smash the market.

197.    Broker Defendants maintained communication with the Bank Defendants' traders before, during, and after the Fixing Window to execute the desired manipulative strategy. In

51

addition to informing a Broker Defendant of their preference for the BBSW fix, traders from

Bank Defendants would pre-authorize the Broker Defendants to use their Prime Bank Bill stock

to achieve the desired fixing. For example, Paul Howarth, an NAB trader and a member of the

AFMA's NTI Committee, told Matthew Blades at ICAP which direction to manipulate BBSW

and provided him with the necessary stock to trade during the Fixing Window:

> **February 22, 2011**
>
> NAB [Howarth]: I've got a …ahh…big set to the upside in the three month
>
> ICAP [Blades]: Right you've now got three buyers against you. Another one just arrived… Yep and just see if I can do it in 20's and just keep punching it up? That sort of thing.
>
> NAB [Howarth]: Yeah, yeah I wanted to get this high set. You can have …take 400 for a start… Make it 700… Alright. I've got… You've got 700 to sell for me… I want it set as high as possible.
>
> ICAP [Blades]: Understood… ok… You want it to be high. Yep OK.

198.     Working together, the Broker Defendants and the Bank Defendants maximized

the impact of their efforts to manipulate BBSW. For example, after the Fixing Window on

February 22, 2011, Howarth had the following conversation with Blades:

> **February 23, 2011**
>
> ICAP [Blades]: So you got a 91 print yesterday, that worked out
>
> NAB [Howarth]: That worked out alright. Thank you for your help with that

199.     The Broker Defendants shared knowledge about the other Bank Defendants'

positions and preferred fixings with their clients. By planning BBSW manipulation in advance,

the Broker Defendants could help the Bank Defendants acquire enough "stock" (to move BBSW

higher) or offload enough "stock" (to move BBSW lower) to significantly impact BBSW. For example, Howath had the following conversations with Graeme Bruce at Tullett Prebon:

**March 10, 2011**

NAB [Howarth]: You won't see Citi again now and CBA I doubt whether you'll see. But Col could.[29] And I'm lining up buyers from the institutional and customer side to buy stock on opportunity Monday Tuesday.

Tullett [Bruce]: Yep

NAB [Horwath]: And then I'll take the rest of the inventory into my book.

Tullett [Bruce]: Yep, it's probably not going to be Tuesday is it? It's probably more likely to be tomorrow or Monday.

200.    The Broker Defendants' status as intermediaries in the Bank Bill market also provided them with unique information about the various Bank Defendants' positions, including the direction of BBSW from which each Bank Defendant would most benefit. The Bank Defendants relied on the Broker Defendants' advance knowledge of other Bank Defendants' manipulation plans to coordinate and maximize the manipulative effects of their Prime Bank Bill trading. For example, the following chat took place immediately before the Fixing Window on April 7, 2011:

**April 7, 2011**

NAB [Howarth]: I've got a down set as well

Tullett [Bruce]: Ah okay, got ya

NAB [Howarth]: And I do need the stock

Tullett [Bruce]: Right, so all the stars are aligned

NAB [Howarth]: So they are all aligned so – the other side, the other side

---

[29] "Col" refers to Colin Roden of Westpac.

of five two we can start stepping it up but, yeah, you can give yourself a
billion to buy and I want the set low.

201.    The Bank Defendants also conspired with the Broker Defendants to line up trades

in Prime Bank Bills at artificial prices – either above or below market rates – to manipulate

BBSW. As part of this manipulative trading strategy, Defendants would overpay for Prime Bank

Bills with a lower yield when they wanted to manipulate BBSW downward and sell Prime Bank

Bills at artificially higher yields, giving away returns at above market interest rates, when they

wanted to manipulate BBSW higher. For example, on April 30, 2010, Westpac had a short

position of $2.85 billion. Westpac trader Sophie Johnston, who also served as Chairperson of the

AFMA NTI Committee and was a member of the BBSW Committee, had the following

conversation with ICAP broker Howell that morning:

**April 30, 2010**

ICAP [Howell]: …Yours at 44 ANZ selling. You're the 44

Westpac [Johnston]: Keep me there…

ICAP [Howell]: I did 80 [indistinct] you're the 44

Westpac [Johnston]:  buy 44 bid I don't want to see 50. Keep me at 44 bid.

ICAP [Howell]: Okay what's that?

Westpac [Johnston]: Keep me at 44 bid

ICAP [Howell]: Jesus, hang on . . . You've got a fair bit . . . getting multiple hits
by ANZ, CBA and NAB.

202.    In the above exchange, Johnston offers to buy 30-day Prime Bank Bills at a yield

of 4.44% and instructs ICAP to keep her bid at that level because she does not want yield to rise

to 4.50%. This instruction is uneconomic and demonstrates a manipulative trade. Absent

manipulation, an entity buying Prime Bank Bills wants yields to rise because rising yields result

in lower bank bill prices. *See* Part I.A. *supra.* Instead of taking the lower prices, Johnston

continued to bid at below market rates, overpaying for Prime Bank Bills with a lower yield during the Fixing Window to manipulate BBSW artificially lower.

203.    This manipulative trading caused one-month BBSW to decrease by a basis point on April 30, 2010, from 4.37% the previous day to 4.36%, financially benefiting Westpac's $2.85 billion net short position.

204.    As illustrated by the conversations above, the Broker Defendants' goal was to drive BBSW higher or lower in accordance with their clients' positions, rather than finding the actual best price to trade Prime Bank Bills in the Bank Bill market.

**C.    Defendants Used Their Dominant Positions in the AFMA and the AFMA Market Committees to Maintain Their Ability to Manipulate BBSW**

205.    Defendants used their domination of the AFMA Market Governance Committees, including the BBSW and NTI Committees, to control the BBSW rule-making process, conceal complaints from other market participants, and perpetuate the BBSW methodology that they used to secretly manipulate BBSW. The existence of the BBSW and NTI Committees, and the supposed oversight that these Committees maintained over the BBSW Rate-Setting Process, created the illusion that BBSW was a trustworthy, reliable market rate.

206.    By placing BBSW-based derivatives traders on the Market Governance Committees, Defendants created a conflict of interest. In many instances, Defendants went one step further and placed BBSW manipulators in important positions on the BBSW and NTI Committees. For example, Paul Woodward, who was ANZ's Single Face to Market during the Class Period, also served as ANZ's representative on both the BBSW and NTI Committees. ANZ also appointed traders Matthew Morris and Andrew Miller to serve on both the NTI and BBSW Committees during the Class Period. All three of ANZ's representatives regularly manipulated BBSW. (*See* Part II.A-B *supra*).

55

207.    Similarly, Westpac placed its most prolific BBSW manipulators, Colin Roden, Sophie Johnston, and Michael Dodd (*See* Part II.A-B *supra*) on both the NTI and BBSW Committees during the Class Period. In fact, Sophie Johnston served as Chairperson of the NTI Committee in at least 2010 and 2011.

208.    NAB traders Paul Howarth and Michael Tsakiris served as NAB representatives on the NTI Committee, during the same time period when Howarth and Tsakiris regularly manipulated BBSW (*See* Part II.A-B *supra*). NAB traders Robert Collins and Hermeet Najjhur, both of whom also manipulated BBSW during the Class Period, represented NAB on the BBSW Committee.

209.    Defendants appointed senior executives at the highest ranks of the AFMA, including Chair (Morgan Stanley) and Deputy Chair (NAB) of the AFMA, ensuring that oversight of the BBSW process by the Board of Directors was illusory because of each banks' conflicting motive to keep BBSW susceptible to manipulation so they could generate additional illicit profits. The following Defendants placed senior executives on the AFMA Board of Directors during the Class Period: Morgan Stanley, NAB, Deutsche Bank, UBS, JPMorgan, Citi, CBA, Macquarie, Westpac, ANZ, Credit Suisse, and RBS. Throughout the Class Period, Defendants maintained a substantial majority of seats on the AFMA Board of Directors.

210.    Defendants used their domination of the AFMA Market Committees to propose rules and regulations that kept the Committees' activities secret. For example, throughout the Class Period, a Market Committee rule held that "minutes are confidential documents and care should be taken in their circulation."

211.    The Defendants used their control of the BBSW Rate-Setting Process to keep BBSW susceptible to manipulation. For example, in a 2012 position paper, the AFMA rejected a

proposal to switch to a mechanical calculation system whereby BBSW would be calculated by averaging of the National Best Bid and Best Offer rates for Prime Bank Bills at each tenor, as well as introducing a number of complementary measures. The AFMA rejected the proposed reforms and defended the existing methodology, despite the fact that the proposed changes would lead to less manipulated BBSW rates.

212.     This decision is indicative of collusion in the rule-making process because the Defendants knew that the BBSW rate-setting mechanism allowed them to manipulate BBSW to gain an unfair advantage over counterparties. For example, traders at NAB and ANZ made the following statements about the shortfalls in how the BBSW was set:

> **May 14, 2010**
>
> NAB [Elder]: physical rate set . . . keeps us honest? or
> easy to manipulate if you have the cash?
>
> NAB [Snooks]: indeed
>
> **March 7, 2012**
>
> ANZ [Tarraran]: there is no doubt that BBSW/BKBM can be moved around by
> buying/selling paper and new issuance

213.     With control over the AFMA, the NTI Committee, and the BBSW Committee, Defendants implemented a complaint procedure to create the impression that they were actually taking measures to ensure that BBSW represented an accurate rate and were investigating reports of suspicious activity. But this only served as another way for Defendants to conceal their wrongdoing by dismissing complaints about BBSW without any explanation, ensuring those issues never saw the light of day. For example, during the Class Period market participants complained of "a tendency for the BBSW rate to increase relative to other short-term domestic rates during the mid-month and end-month cycles." After purportedly investigating the

discrepancies, the BBSW Committee reported that "[t]his review confirmed that the overall [BBSW] process is in keeping with best practice, and further confirmed that variations in the BBSW rate are consistent with and reflect normal market forces." The AFMA provided no explanation for the discrepancies that gave rise to the complaint.

### D. Defendants Conspired to Create Special Positions and Reorganized their Trading Desks to Facilitate Manipulative Transactions

214.    CBA and ANZ both designated a senior employee as the "single face to market" who was ultimately responsible for communicating trading strategy during the Fixing Window to the Broker Defendants. At CBA this person was known as the "powerful owl" and was in charge of planning trades that would manipulate BBSW to increase the profitability of CBA's BBSW-based derivatives positions.

215.    In a chat between Roden and Lee, Roden convinced Lee that CBA and Westpac could make even more money manipulating BBSW if CBA shifted responsibility for BBSW manipulation from its derivatives trading group to its treasury group because the treasury group had a greater BBSW Rate Exposure, and thus a larger incentive to conspire in manipulating the rate. By enlisting CBA in Roden's plan to manipulate BBSW lower, Roden knew that Westpac's efforts to manipulate BBSW would be twice as effective:

> CBA [Lee]: so I'll make the recommendation that we take it all back ... and 20 yrs later when it gets through all the politics [sic] and bureaucracy, some bloke will be the new you.

> Westpac [Roden]: It's just another liability, your treasury rate sets dwarf the CBA FM [financial markets] rate sets… [t]he goal is to get bbsw down as your liabilities are set off it … FM [markets] its usually to get it up.

216.    Lee agreed to wrest control over CBA's BBSW submissions for Westpac and CBA's benefit, describing his efforts as "the Westpac treasury replication project," and solidifying a conspiratorial link between the two banks.

217.    In other instances, traders shared proprietary information regarding their upcoming BBSW exposure to alert co-conspirators of when they needed to manipulate BBSW in a certain direction. This way, other Bank Defendants would not unknowingly engage in transactions that would reduce the effect of their manipulative conduct.  Bank Defendants that received advance notice of a particular manipulative trading strategy profited from this secret information by transacting in BBSW-based derivatives with non-cartel counterparties who were unaware that BBSW would be rigged on the settlement date. For example, on or around May 16, 2011, Westpac trader Sophie Johnston learned that NAB had a large BBSW rate exposure on a series of upcoming days.  Rather than engage in transactions that were against NAB and could cancel out the effects of its manipulative trading, Johnston used that information to hedge Westpac's trading book, engaging in BBSW-based derivatives tractions with other market participants that would generate a profit for Westpac, offsetting any losses resulting from NAB's manipulative conduct.

### E.    Defendants Made False BBSW Submissions in Violation of AFMA Rules

218.    In addition to manipulative trading, Defendants submitted false BBSW rates that were intended to benefit their own BBSW-based derivatives positions instead of following AFMA guidelines and reporting observed Prime Bank Bill rates. For example, UBS' internal investigation found that UBS personnel in charge of submitting BBSW rates would ask UBS derivatives traders for their preferred rates, and then submit those preferred rates to benefit UBS' derivatives positions. This conduct occurred from at least 2005 through 2011.

219.    In some instances, Defendants went even further to encourage BBSW manipulation by appointing their derivatives traders as BBSW submitters, creating a direct conflict of interest between the bank's profit motive and its obligation to submit accurate market rates. For example, 89% of RBS' BBSW submissions were actually submitted by RBS' BBSW-

based derivatives traders during the Class Period. Even on the rare occasions when RBS' money market personnel made submissions, they did so based on preferences expressed by RBS derivatives traders via a dedicated chat room entitled "BBSW rate set".

220.     The Defendants accepted, and even solicited, BBSW manipulation requests from traders based in other major international financial centers. For example, BNP Paribas' submitters solicited requests to submit BBSW rates at a particular artificial level from derivatives traders located in Singapore.

221.     Even when Defendants allowed non-traders to submit BBSW contributions, they encouraged their submitters to first look to the bank's trading positions and submit BBSW rates that favored the bank's trading positions, as opposed to following AFMA guidelines and submitting the observed mid-rate of trades during the Fixing Window. For example, when submitters at BNP did not receive explicit instructions from derivatives traders for where to set BBSW, they simply calculated which direction would be most profitable for BNP and submitted rates that were skewed accordingly.

222.     An analysis of Defendants' BBSW submissions indicates that more than just UBS, BNP Paribas, and RBS made false BBSW submission during the Class Period. The figure below, which was submitted to the International Organization of Securities Commissions by the AFMA, compares the variance between BBSW Panel Bank submissions during the Class Period with the variance between banks that were members of the U.S. dollar LIBOR panel. This chart shows that, in contrast to U.S. dollar LIBOR, there was almost no variation between the quotes submitted by the Panel Banks during the Class Period:



223.    Absent collusion among BBSW Panel Banks, there should be greater variation in the Panel Banks' submissions than demonstrated above. For example, if UBS, RBS, and BNP Paribas were the *only* banks submitting false BBSW rates, their false submissions should register as outliers in the analysis and increase variation among the Panel's submissions. The fact that the Panel Banks still submitted nearly identical rates for at least four years while three Defendants *admitted* to making false submissions reflects collusion in the submission process.

**F.    ASIC's Investigation into Defendants' Conduct While on the BBSW Panel Continues to this Day**

224.    ASIC has devoted significant resources to its ongoing investigation of Defendants' BBSW-related misconduct and remains confident that it will bring charges against other Defendants, in addition to the pending actions against ANZ, NAB, and Westpac.

225.    Greg Medcraft, Chairman of ASIC, has announced that ASIC's investigation is expansive in nature and encompasses all of the entities involved in the BBSW rate-setting process, including Defendants here. For example, in a hearing before the Australian Senate on August 14, 2015, Medcraft was asked to give an example of the type of investigation in which

ASIC might seek reimbursement for legal costs by Senator Deborah O'Neill of the Parliamentary Joint Committee on Corporations and Financial Services. Medcraft testified that "we are investigating the banks of BBSW at the moment."

226.     Prior to Commissioner Medcraft's testimony about ASIC's ongoing BBSW investigation, ANZ issued a press release in 2014 revealing that ASIC's investigation extended to at least the fourteen Panel Banks:

> Since mid-2012 ASIC has been undertaking inquiries of 14 BBSW panel bank members in relation to the integrity of their past involvement in the BBSW submission process.

227.     Following ANZ's announcement that ASIC was investigating the Panel Banks' BBSW-related conduct, Australian media reports confirmed that the Panel Banks were under investigation for their conduct while they were members on the BBSW Panel. For example, in a June 3, 2015 article titled "'Appalling'' Banks Hindering ASIC Probe into Swap Rate," The Australian, one of Australia's leading newspapers, reported:

> It is understood that ASIC is working its way through the 14 panel members that set the swap rate, including the nation's major banks. ASIC is pouring over millions of documents, including texts, records of telephone calls and other methods of communication.

### III.    Plaintiffs Transacted in BBSW-based Derivatives at Artificial Prices that were Proximately Caused by Defendants' Manipulative Conduct

#### A.    Plaintiff Dennis

228.     Plaintiff Richard Dennis purchased CME Australian dollar futures contracts that were priced, benchmarked and/or settled based on BBSW, from within the United States during the Class Period at artificial prices proximately caused by Defendants' manipulative conduct. *See* ¶¶ 152-153 *supra*. For example, on November 22, 2010, Dennis purchased 119 December 2010 CME Australian dollar futures contracts and sold 120 December 2010 CME Australian dollar

futures contracts, resulting in a net short position of one December 2010 CME Australian dollar futures contract.

229.     Communications released by ASIC show that at least NAB was involved in manipulating BBSW artificially higher on November 22, 2010 to financially benefit its $4.6 billion net long exposure to BBSW that day. NAB trader Michael Tsakiris described the events during the November 22, 2010 Fixing Window in his daily rate set email:

> **November 22, 2010**
>
> NAB [Tsakiris]: "Rate set. Speak of Smashed.. [sic] we attempted to defend out 4 yard rate set with 200M with not much luck… Sold 00 to mainly UBS resulting in a 5.00 rate set… damn…"

230.     As a result of Defendants' manipulative conduct, Dennis was damaged and suffered legal injury, including a $170.00 net loss on his November 22, 2010, CME Australian dollar futures position.

**B.     Plaintiff Sonterra**

231.     Plaintiff Sonterra engaged in dozens of Australian dollar foreign exchange swaps and forwards worth more than $490 million U.S. dollars from within the U.S. directly with Defendant Morgan Stanley during the Class Period at artificial prices proximately caused by Defendants' manipulative conduct. For example, on November 5, 2010, Sonterra entered into a foreign exchange swap with Morgan Stanley worth $330,000 Australian dollars that matured on November 30, 2010.

232.     Communications released as part of ASIC's complaint against NAB show that on November 5, 2010, Defendants, including Westpac, were engaged in manipulating one-month BBSW artificially lower:

> **November 5, 2010**:
>
> NAB [Tsakiris]: 1mth as per usual getting crunched lower...

WPK bid 1mth at 4.80

233.     This manipulative conduct caused one-month BBSW to remain unchanged from the previous day. By maintaining one-month BBSW at an artificially lower level, Defendants' manipulation of BBSW on November 5, 2010 artificially increased the cost for Sonterra to purchase Australian dollars from Morgan Stanley on November 30, 2010. As a result, Sonterra was injured when it entered into an Australian dollar foreign exchange swap with Morgan Stanley on November 5, 2010, at an artificially higher price.

234.     Similarly, on June 3, 2011, Sonterra entered into an Australian dollar foreign exchange forward, agreeing to sell $280,320 to Morgan Stanley on June 7, 2011.

235.     Communications released as part of ASIC's complaint against ANZ show that on June 2, 2011, ANZ traders Mark Budrewicz and Sean Collier discussed issuing more than $500 million in Prime Bank Bills during the Fixing Window on June 3, 2011, to manipulate BBSW artificially higher to benefit the bank's $4.1 billion net long BBSW-based derivatives position:

> **June 2, 2011**:
>
> ANZ [Collier]: how much do you need on 3mth issuance for your rate set tomorrow? Simon mentioned 500m or do you need more?
>
> ANZ [Budrewicz]: if we could do more that would be good

236.     ASIC found that on June 3, 2011, ANZ issued $543 million in Prime Bank Bills and sold at least an additional $97 million of inventory during the Fixing Window to manipulate BBSW artificially higher. This manipulation artificially increased the amount of Australian dollars required for Sonterra to fulfill its obligation to Morgan Stanley on June 7, 2011. As a result, Sonterra was damaged when it entered into an Australian dollar foreign exchange forward with Morgan Stanley on June 3, 2011 at an artificially lower price.

237.    Other communications indicate that Sonterra entered into Australian dollar foreign exchange swaps with Morgan Stanley when the bank was involved in manipulating BBSW lower.  For example, on May 14, 2010, Sonterra entered into a foreign exchange swap with Morgan Stanley worth $1,000,000 Australian dollars that matured on May 28, 2010.

238.    On May 12, 2010, CBA trader Garfield Lee had the following conversation with NAB's Paul Howarth regarding Morgan Stanley's involvement in manipulating BBSW:

**May 12, 2010**:

NAB [Horwath]: what does an IB care about a major banks bill maturities? They don't even get involved in MM unless it's in an attempt to fudge the set . . . for example Moron Stanley came to rateset wanting it lower they drive it lower enough to bring me out to issue

CBA [Lee]: I think the idea also removes the need for these IBs with bill portfolios to spray them out on those days

NAB [Horwath]: they spray them to try and distort the set . . . why do they need bill portfolios when they don't have a fracise/ answer, to play around at set

239.    Consistent with Morgan Stanley's desire for an artificially lower BBSW fix, on May 14, 2010, the one-month, three-month and six-month BBSW tenors all decreased. This decrease in BBSW artificially increased the cost for Sonterra to purchase Australian dollars from Morgan Stanley on May 28, 2010. As a result, Sonterra was injured when it entered into an Australian dollar foreign exchange swap contract with Morgan Stanley on May 14, 2010, at an artificially higher price.

**C.    FrontPoint Plaintiffs**

240.    The FrontPoint Plaintiffs engaged in hundreds of BBSW-based swap transactions during the Class Period from within the U.S., including directly with Defendant Macquarie at artificial prices proximately caused by Defendants' manipulative conduct. For example, on February 23, 2010, Plaintiff FrontPoint Asian Event Driven Fund, L.P. entered into a swap with

Defendant Macquarie Bank in which Macquarie agreed to make interest rate payments to FrontPoint Asian Event Driven Fund, L.P equal to one-month BBSW on certain valuation dates.

241.    Communications released by ASIC in its complaint against Westpac show that on July 1, 2010, one of the valuation dates listed in the swap agreement between FrontPoint Asian Event Driven Fund, L.P. and Defendant Macquarie, at least Defendant Westpac was involved in manipulating one-month BBSW artificially lower:

> **<u>July 1, 2011</u>**
>
> <u>Westpac [Roden]</u>: Mate, you're a fucken thief
>
> <u>Westpac [Hosie]</u>: A thief. Why?
>
> <u>Westpac [Roden]</u>: I heard about the 1 month
>
> <u>Westpac [Hosie]</u>: Yeah mate, we got it back down

242.    As a result of Defendants' manipulative conduct, and consistent with the conversation above, one-month BBSW decreased by four basis points on July 1, 2011, from 4.87% to 4.83%. This decrease in one-month BBSW caused injury to Plaintiff FrontPoint Asian Event Driven Fund, L.P, which received less in interest than it should have from Defendant Macquarie on July 1, 2011.

## **<u>TRADE AND COMMERCE</u>**

243.    Beginning on at least January 1, 2003, Defendants engaged in a continuing contract, combination, or conspiracy in restraint of trade in violation of the Sherman Act.

244.    During the Class Period, Defendants sold substantial quantities of BBSW-based derivatives in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which Defendants produced BBSW-based derivatives.

245.    The Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

246.    During the Class Period, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## **CLASS ACTION ALLEGATIONS**

247.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following Class:[30]

> All persons or entities that engaged in U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled based on BBSW at any time from at least January 1, 2003, through the date on which the effects of Defendants' unlawful conduct ceased.

> Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this complaint, and the United States government.

248.     The Class is so numerous that individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically-dispersed Class members transacted in BBSW-based derivatives worth trillions of dollars during the Class Period.

249.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

250.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate representatives of the Class and have no interest which is adverse

---

[30] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust litigation.

251.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

    a. whether Defendants and their co-conspirators engaged in a combination or conspiracy to manipulate BBSW and the prices of BBSW-based derivatives in violation of the Sherman Act;

    b. the identity of the participants in the conspiracy;

    c. the duration of the conspiracy;

    d. the character and nature of the acts performed by the Defendants in furtherance of their conspiracy;

    e. whether Defendants' unlawful conduct caused injury to the business and property of Plaintiffs and the Class;

    f. whether Defendants' unlawful acts violate the RICO Act;

    g. whether Defendants manipulated the price of Australian dollar futures contracts and other BBSW-based financial instruments in violation of the CEA;

    h. the appropriate measure of damages sustained by Plaintiffs and Class members.

252.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly-situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized

68

litigation would be substantial. The prosecution of separate actions by individual members of the

Class would create a risk of inconsistent or varying adjudications establishing incompatible

standards of conduct for the Defendants.

253.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the

management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

254.    The applicable statutes of limitations relating to the claims for relief alleged

herein were tolled because of fraudulent concealment involving both active acts of concealment

by Defendants and inherently self-concealing conduct.

255.    The secret nature of Defendants' conspiracy—which relied on non-public

methods of communication, including private instant messages, to conceal their agreements to

manipulate BBSW and the prices of BBSW-based derivatives—was intentionally self-

concealing. This concealment-through-secrecy prevented Plaintiffs from uncovering their

unlawful conduct.

256.    Defendants used affirmative acts of concealment to hide their violations of law

from Plaintiffs and the Class, including: (1) knowingly submitting (or causing to be submitted)

BBSW quotes that were false, misleading, or inaccurate because they were manipulative, based

in whole or in part on impermissible and illegitimate factors, such as the rate that would

financially benefit Defendants' BBSW-based derivatives positions and/or the BBSW-based

derivatives positions of their co-conspirators; (2) implicitly representing that their BBSW

submissions were a reliable and truthful assessment of, and only of, each Defendant's

observations of the traded mid-rates for Prime Bank Bills during the Fixing Window; (3) using

secret, collusive trades during the Fixing Window to manipulate BBSW and the prices of

BBSW-based derivatives; (4) representing, through the AFMA and its subcommittees, that

BBSW was a legitimate benchmark determined by submissions that complied with their own guidelines.

257.    Many, if not all, of these affirmative acts of concealment were also inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other members of the Class.

258.    As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence prior to the time of public disclosures reporting the manipulation of BBSW and the prices of BBSW-based derivatives. Plaintiffs thus assert the tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)

### (Against all Defendants)

259.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

260.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

261.    During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of

BBSW and the prices of BBSW-based derivatives, by conspiring to, *inter alia*: (1) engage in manipulative money market transactions during the BBSW Fixing Window; (2) make false BBSW rate submissions that did not reflect actual transaction prices; (3) uneconomically buy or sell money market instruments at a loss to cause artificial derivatives prices; and (4) share proprietary BBSW-based derivatives information.

262.    This conspiracy to manipulate the prices of BBSW-based derivatives caused both Plaintiffs and members of the Class to be overcharged and underpaid in their BBSW-based derivatives transactions. Plaintiffs and members of the Class also were deprived of the ability to accurately price BBSW-based derivatives entered into during the Class Period and to accurately determine the settlement value of BBSW-based derivatives by reference to an accurate BBSW. Plaintiffs and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts in furtherance of the conspiracy.

263.    The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the BBSW-based derivatives market. There is no legitimate business justification for, nor pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pre-textual or could have been achieved by less restrictive means.

264.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act throughout the Class Period.

265.    Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act and under § 4 of the Clayton Act.

266.     Plaintiffs and members of the class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### (Manipulation in Violation of the Commodity Exchange Act)

### (7 U.S.C. §§ 1, *et seq.*)

### (Against All Defendants)

267.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

268.     Each Defendant is liable under §§ 6(c), 9, and 22, of the CEA, codified at 7 U.S.C. §§ 9, 13, and 25 respectively, for the manipulation of BBSW and the prices of BBSW-based derivatives that were priced, benchmarked, and/or settled based on BBSW.

269.     Defendants had the ability to manipulate BBSW and the price of BBSW-based derivatives. Defendants, through interstate commerce, knowingly submitted or caused to be submitted false rate quotes to the AFMA and engaged in manipulative Prime Bank Bill transactions during the Fixing Window. These submissions and manipulative trades were used to determine the official published BBSW. By virtue of the BBSW methodology, the Defendants had the ability to influence and did affect the rates that would become the official BBSW. Further, because of their market power as Prime Banks and major dealers of BBSW-based derivatives, the Defendants had the ability to influence and did affect the prices of BBSW-based derivatives.

270.     As evidenced by communications revealed by ASIC, the Defendants fully, intentionally, and systematically manipulated BBSW and BBSW-based derivatives prices to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) of dollars in illegitimate profits on BBSW-based derivatives, held by themselves or other co-

72

conspirators, the prices of which (and thus profits or losses) were priced, benchmarked and/or settled based on BBSW. As an intended and direct consequence of Defendants' knowingly unlawful conduct, the prices of Plaintiffs' BBSW-based derivatives, and those traded by Class members, were manipulated to artificial levels by Defendants.

271.    During the Class Period, BBSW and the prices of derivatives that were priced, benchmarked, and/or settled based on BBSW were artificial and did not result from legitimate market information, competition, or supply and demand factors. Defendants directly caused artificial BBSW and artificial prices of BBSW-based derivatives by, *inter alia*, making false BBSW submissions to the AFMA and conducting manipulative trading activity in the money market for Prime Bank Bills that created artificial supply and demand.

272.    As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial BBSW and prices of derivatives that were priced, benchmarked, and/or settled based on BBSW.

## THIRD CLAIM FOR RELIEF

### (Principal-Agent Liability in Violation of § 2 of the Commodity Exchange Act)

### (Against All Defendants)

273.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

274.    Each Defendant is liable under § 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

275.    Plaintiffs and members of the Class seek the actual damages they sustained in BBSW-based derivatives for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

**(Aiding and Abetting Liability in Violation of § 22 of the Commodity Exchange Act)**

**(Against All Defendants)**

276.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

277.    Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation of BBSW and willfully intended to assist these manipulations, which resulted in artificial BBSW-based derivatives prices during the Class Period in violation of § 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

278.    Plaintiffs and members of the Class seek the actual damages they sustained in BBSW-based derivatives for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**

**18 U.S.C. §§ 1961 *et seq.***

**(Against all Defendants)**

279.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

280.    18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

281.    18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

282.     Under 18 U.S.C. § 1961(1), and as applicable to § 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

283.     18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and at least the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

284.     18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

285.     18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C. § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, fraud, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such a scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

286.     At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including, *inter alia*, by making false BBSW rate submissions, engaging in fraudulent Prime Bank Bill transactions solely intended to impact BBSW, sharing proprietary order flow or position information with co-conspirators, or directing

75

other employees to do so, among other predicate acts of wire fraud), were "an enterprise" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and hierarchy of corporate direction and control.

287.    At all relevant times, Plaintiffs were a "person" within the meaning of 18 U.S.C. § 1961(3).

288.    Defendants' collective association, including through their participation together (i) as members of the AFMA and its subcommittees; (ii) as BBSW Panel Banks; and (iii) acting as a trading bloc and engaging in secret collusive trades in the Prime Bank Bill market to manipulate BBSW, constitutes the RICO enterprise in this case. Every member of the enterprise participated in the process of trading or causing to be traded bank bill trades at artificial prices, BBSW-based derivative price quotes, trade confirmations including those false rates, and confirmations for collusive transactions intended to impact BBSW, during the Class Period. As alleged herein, each Defendant engaged in the acts of wire fraud in furtherance of the conspiracy and participated as a member of the association-in-fact enterprise.

289.    Defendants completed all elements of wire fraud within the United States or while crossing United States borders. Defendants did so by: (a) transmitting or causing to be transmitted artificial BBSW rates in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (b) transmitting or causing to be transmitted false and artificial BBSW submissions that were relied on by Thomson Reuters and the AFMA in collecting, calculating, publishing, and/or disseminating the daily BBSW rates that were transmitted, published, and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; and (c) transmitting or causing to be

76

transmitted confirmations for fraudulent transactions intended to impact BBSW in the U.S. or while crossing U.S. borders through electronic servers located in the United States.

290.    The common purpose of the enterprise was simple: profiteering. By engaging in the predicate acts alleged including, but not limited to, entering into collusive and artificial BBSW transactions to cause distorted BBSW rates to be transmitted to Thomson Reuters as agent for the AFMA, and by exchanging BBSW-based derivatives positions and prices, Defendants affected the prices of BBSW-based derivatives, rendering them artificial. This directly resulted in Defendants reaping hundreds of millions (if not billions) of dollars in illicit trading profits on their BBSW-based derivatives positions.

291.    Defendants each committed far more than two predicate acts of wire fraud. As alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

     a.    The transmission of artificial BBSW rates to Thomson Reuters in the United States for further dissemination;

     b.    The electronic transmission of confirmations for collusive transactions intended to manipulate BBSW;

     c.    Causing the transmission and dissemination in the United States of the artificial BBSW rates by Thomson Reuters as agent for the AFMA;

     d.    Causing the transmission and dissemination in the United States of distorted BBSW individual bank quotes by Thomson Reuters;

     e.    The transmission and dissemination of false bid and ask price quotes for BBSW-based derivatives within the United States;

     f.    Electronic communications and instant messages containing manipulative requests that emanated from within the United States or were routed through electronic servers located within the United States; and

     g.    Sending trade confirmations based on manipulated and false BBSW rates to counterparties within the United States.

292.    Defendants' misconduct underlying the predicate acts of wire fraud occurred within the United States. Defendants caused and conspired to cause the manipulated BBSW to be published to servers in the U.S., and used U.S. wires to transmit artificial BBSW rates, confirmations for collusive transactions intended to impact BBSW, and other electronic communications containing requests to manipulate these rates.

293.    Defendants' racketeering scheme affected interstate commerce. Trillions of dollars in BBSW-based derivatives were traded within the United States during the Class Period, including, but not limited to, currency forward agreements, interest rate swaps, and forward rate agreements.

294.    As alleged herein, Plaintiffs' and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, depriving Plaintiffs and the Class of their money relative to their BBSW-based derivatives contracts was the very purpose of the Defendants' scheme. Plaintiffs and members of the Class seek treble damages for the injuries they have sustained, as well as restitution, cost of suit, and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

295.    As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class seek an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SIXTH CLAIM FOR RELIEF

**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**

**18 U.S.C. § 1962(d)**

**(Against all Defendants)**

296.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

297.     Apart from constructing and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

298.     The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

299.     Defendants organized and implemented the scheme, and insured it continued uninterrupted, by concealing their manipulation of BBSW and the prices of BBSW-based derivatives from Plaintiffs and members of the Class.

300.     Defendants knew their manipulative scheme would defraud participants in the BBSW-based derivatives market, yet each Defendant agreed to participate despite their understanding of the fraudulent nature of the enterprise.

301.     As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiffs and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy, indeed, those effects were precisely why the scheme was concocted.

302.     Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

303.     As a direct and proximate result of the subject racketeering activity, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SEVENTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

### (Against Defendants Macquarie Bank Limited and Morgan Stanley)

304.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

305.     To the extent required this claim is pled in the alternative to Plaintiffs' eighth claim for relief in accordance with FED. R. CIV. P. 8(d) and other applicable law.

306.     Plaintiff FrontPoint entered into binding and enforceable contracts with Defendant Macquarie Bank in connection with transactions for BBSW-based derivatives. Plaintiff Sonterra entered into binding and enforceable contracts with Defendant Morgan Stanley in connection with transactions for BBSW-based derivatives.

307.     Each contract includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not to take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

308.     Defendants Macquarie Bank and Morgan Stanley breached their duty to Plaintiffs FrontPoint and Sonterra, respectively, and without reasonable basis and with improper motive,

acted in bad faith by, among other things, (a) intentionally manipulating BBSW for the express purpose of generating illicit profits from its BBSW-based derivatives; and (b) conspiring with other Defendants to manipulate BBSW and the prices of BBSW-based derivatives.

309.    As a direct and proximate result of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purpose of these contracts, Plaintiffs FrontPoint, Sonterra, and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment in Violation of Common Law)

### (Against all Defendants)

310.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

311.    To the extent required this claim is pleaded in the alternative to Plaintiffs' seventh claim for relief in accordance with FED. R. CIV. P. 8(d).

312.    Defendants and members of the Class, including Plaintiffs, entered into BBSW-based derivatives transactions. These transactions were directly priced, benchmarked, and/or settled based on BBSW, which was supposed to reflect actual market conditions in a market where Defendants were supposed to be perpetually competing. Rather than compete honestly and aggressively with each other, Defendants colluded to manipulate BBSW and the prices of BBSW-based derivatives to ensure they had an unfair advantage in the marketplace.

313.    Defendants financially benefitted from their unlawful acts, reaping illicit profits by, *inter alia*, (i) coordinating the manipulation of BBSW by taking advantage of the BBSW submission process or other activities designed to artificially suppress, inflate, maintain, or

otherwise alter BBSW and the prices of BBSW-based derivatives; and (ii) acting as a trading bloc and engaging in secret, collusive trades in the swap market to manipulate BBSW. These unlawful and inequitable acts caused Plaintiffs and Class members to suffer injury, lose money, and otherwise be deprived of the benefit of accurate BBSW rates, as well as the ability to accurately price, benchmark and or settle BBSW-based derivatives transactions. As a result, Plaintiffs and the Class received, upon execution or settlement of their trades, less in value than they would have received absent Defendants' wrongful conduct. Plaintiffs' and the Class' losses correspond to Defendants' unlawful gains.

314.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

315.    Plaintiffs and members of the Class seek restitution of the monies of which they were unfairly and improperly deprived as described herein.

## PRAYER FOR RELIEF

Plaintiffs demand relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate  §1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.      For a judgment awarding Plaintiffs and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.      That the Court award Plaintiffs and the Class damages against Defendants for their violations of the Commodity Exchange Act;

H.      That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and the Class;

I.      That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

J.      That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

K.      That the Court directs such further relief as it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  August 16, 2016                    Respectfully submitted,
White Plains, New York

LOWEY DANNENBERG COHEN &
HART, P.C.

/s/ Vincent Briganti
Vincent Briganti

Geoffrey M. Horn
Peter D. St. Phillip
Raymond Girnys
Christian Levis
One North Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: vbriganti@lowey.com
        ghorn@lowey.com
        pstphillip@lowey.com
        rgirnys@lowey.com
        clevis@lowey.com

/s/Christopher Lovell
Christopher Lovell
Victor E. Stewart
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677
Email: clovell@lshllp.com
        vestewart@lshllp.com
        bjaccarino@lshllp.com

*Counsel for Plaintiffs*