## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD DENNIS, SONTERRA CAPITAL MASTER FUND, LTD., FRONTPOINT FINANCIAL SERVICES FUND, L.P., FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., AND FRONTPOINT FINANCIAL HORIZONS FUND, L.P., on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>    -against-<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE BANK, N.A. AUSTRALIA BRANCH, BNP PARIBAS, S.A., BNP PARIBAS, AUSTRALIA BRANCH, THE ROYAL BANK OF SCOTLAND GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, RBS N.V., RBS GROUP (AUSTRALIA) PTY LIMITED, UBS AG, UBS AG, AUSTRALIA BRANCH, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD., COMMONWEALTH BANK OF AUSTRALIA, NATIONAL AUSTRALIA BANK LIMITED, WESTPAC BANKING CORPORATION, DEUTSCHE BANK AG, DEUTSCHE BANK AG, AUSTRALIA BRANCH, HSBC HOLDINGS PLC, HSBC BANK AUSTRALIA LIMITED, LLOYDS BANKING GROUP PLC, LLOYDS BANK PLC, LLOYDS TSB BANK PLC, AUSTRALIA, MACQUARIE GROUP LTD., MACQUARIE BANK LTD., ROYAL BANK OF CANADA, RBC CAPITAL MARKETS LLC, ROYAL BANK OF CANADA, AUSTRALIA BRANCH, MORGAN STANLEY, MORGAN STANLEY AUSTRALIA LIMITED, CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, ICAP PLC, ICAP AUSTRALIA PTY LTD., TULLETT PREBON PLC, TULLETT PREBON (AUSTRALIA) PTY LTD., AND JOHN DOES NOS. 1-50.<br>                           Defendants. | Docket No. 16 CV 6496<br><br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

JURISDICTION AND VENUE ............................................................................................5

PARTIES ..............................................................................................................................10

SUBSTANTIVE ALLEGATIONS ......................................................................................44

   I. Background..................................................................................................................44

     A. The Money Market ...............................................................................................44

     B. Australian Prime Banks .......................................................................................46

     C. The BBSW Fixing................................................................................................48

     D. BBSW-Based Derivatives ...................................................................................49

        1. BBSW-Based Swaps....................................................................................50

        2. BBSW-Based Forward Rate Agreements....................................................51

        3. CME Australian Dollar Futures Contracts ..................................................51

        4. Australian Dollar Foreign Exchange Swaps & Forwards............................52

        5. 90-Day Bank Accepted Bill Futures ...........................................................53

   II. Defendants Agreed to and Did Restrain Trade In, and Intentionally Manipulated
      the Prices of, BBSW-Based Derivatives ..................................................................54

     A.Defendants Rigged BBSW by Coordinating Manipulative Transactions within the Fixing
       Window...................................................................................................................54

        1. Defendants manipulated BBSW by artificially increasing or decreasing
          the supply of Prime Bank Bills during the Fixing Window................................55

        2. The Bank Defendants shared information regarding their net BBSW
          rate exposure to align interests on the direction of the manipulation ...............59

        3. Defendants coordinated manipulative trades to maximize their impact
          on BBSW rates.................................................................................................65

     B. The Broker Defendants Actively Participated in the Conspiracy by Facilitating Manipulative
       Trading for the Bank Defendants ...........................................................................68

     C. Defendants Used their Dominant Positions in the AFMA and the AFMA Market
       Committees to Maintain their Ability to Manipulate BBSW ................................72

     D. Defendants Conspired to Create Special Positions and Reorganized their
       Trading Desks to Facilitate Manipulative Transactions.........................................75

     E. Defendants Made False BBSW Submissions in Violation of AFMA Rules...........77

F. ASIC's Investigation into Defendants' Conduct While on the BBSW Panel Continues to this Day ...................................................................................................79

III. Plaintiffs Transacted in BBSW-based Derivatives at Artificial Prices that were Proximately Caused by Defendants' Manipulative Conduct ................................80

    A. Plaintiff Dennis................................................................................................80

    B. Plaintiff Sonterra .............................................................................................80

    C. FrontPoint Plaintiffs.........................................................................................83

TRADE AND COMMERCE .............................................................................................84

CLASS ACTION ALLEGATIONS .....................................................................................84

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT..........................................86

CLAIMS FOR RELIEF .....................................................................................................88

FIRST CLAIM FOR RELIEF ............................................................................................88

SECOND CLAIM FOR RELIEF ........................................................................................89

THIRD CLAIM FOR RELIEF ...........................................................................................91

FOURTH CLAIM FOR RELIEF ........................................................................................91

FIFTH CLAIM FOR RELIEF ............................................................................................91

SIXTH CLAIM FOR RELIEF ............................................................................................96

SEVENTH CLAIM FOR RELIEF ......................................................................................97

EIGHTH CLAIM FOR RELIEF.........................................................................................98

PRAYER FOR RELIEF ....................................................................................................99

DEMAND FOR JURY TRIAL........................................................................................ 100

Plaintiffs Richard Dennis, Sonterra Capital Master Fund, Ltd., FrontPoint Financial Services Fund L.P., FrontPoint Asian Event Driven Fund, L.P., and FrontPoint Financial Horizons Fund, L.P., (collectively, "Plaintiffs") complain upon knowledge as to themselves and their acts and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 41-160) for their violations of law from at least January 1, 2003 through the date on which the effects of Defendants' unlawful conduct ceased ("Class Period") as follows:

**INTRODUCTION**

1.      Defendants are horizontal competitors that deal in financial products priced, benchmarked, and/or settled based on the Bank Bill Swap Reference Rate ("BBSW"). BBSW is administered by the Australian Financial Markets Association (the "AFMA")—a trade group formed by Defendants—and is intended to represent the cost of borrowing funds in the Australian interbank money market based on actual transactions occurring between 9:55 A.M. and 10:05 A.M. Sydney Time (the "Fixing Window").

2.      (a) BBSW-based derivatives are financial instruments that incorporate BBSW as a component of price. More than $1 trillion in BBSW-based derivatives traded "over-the-counter," directly between counterparties, within the United States during the month of April 2013 alone. In total, trillions of dollars of BBSW-based derivatives traded over-the-counter and on public exchanges within the United States during the Class Period.

(b) Plaintiffs and Class members who transacted in the United States are the "end users" of BBSW and BBSW-based derivatives who, in the zero sum game of derivatives trading, were the persons injured by Defendants' horizontal conspiracy to manipulate prices in favor of the Defendants' derivatives trading positions. As Defendants' unlawful conspiracy and manipulation made more money for the Defendants, it caused greater injury to Plaintiffs and the Class members transacting here in the United States. As reflected in Defendants' communications with one another,

1

they were well aware and fully intended that their conspiracy to benefit themselves was and would disadvantage the "end users" including Plaintiffs and the members of the Class transacting in the United States. *See e.g.* ¶10, *infra*.

3.      In 2016, the Australian Securities and Investments Commission ("ASIC") initiated proceedings against three BBSW panel banks – Defendants Australia and New Zealand Banking Group ("ANZ"), Westpac, and National Australia Bank ("NAB") – revealing rare "smoking gun" evidence, including emails, phone calls, and electronic chats, demonstrating a conspiracy among BBSW panel banks and interdealer brokers to fix the prices of BBSW-based derivatives. ASIC is proceeding to trial against ANZ, NAB, and Westpac beginning on September 25, 2017.

4.      This evidence of collusion follows ASIC's 2013 and 2014 settlements with Defendants UBS, RBS, and BNP Paribas, in which those BBSW panel members admitted to making false BBSW submissions to manipulate the rate for their financial benefit.

5.      These settlements and new collusive communications released in ASIC's filings show that Defendants fixed BBSW-based derivatives prices using multiple means, including: (1) engaging in manipulative money market transactions during the BBSW Fixing Window; (2) making false BBSW rate submissions that did not reflect actual transaction prices; (3) uneconomically buying or selling money market instruments at a loss to cause artificial derivatives prices; and (4) sharing proprietary information to align interests and avoid conduct that could harm co-conspirators.

6.      Defendants generated hundreds of millions of dollars in illicit profits by artificially fixing BBSW-based derivatives prices at levels that benefited their trading books. For example, during the Class Period ANZ calculated that it had daily BBSW exposures of $6 billion,[1] meaning ANZ had the potential to make or lose $125,000 per "basis point," *i.e.*, one hundredth of one percent (0.01%), change in the daily BBSW fixing. Relying on this calculation, ANZ senior

---

[1] Unless otherwise indicated, "$" refers to Australian dollars.

management conservatively estimated that taking an "aggressive" approach to manipulating BBSW would result in at least $30 million in illicit profit *per basis point, per year.*

7.     The Bank Defendants[2] further institutionalized BBSW manipulation by designating a senior trader, known as the "Single Face to Market" or known as "the powerful owl" at Commonwealth Bank, to coordinate manipulative transactions with Broker Defendants ICAP and Tullett Prebon in advance of the Fixing Window. For example, while serving as ANZ's Single Face to Market, Paul Woodward messaged Broker Defendant Tullett Prebon just before the Fixing Window on February 28, 2011: "*I've got a big set already and I'll be pushing the fuck out of it.*" Broker Defendants were more than happy to execute these manipulative transactions because their massive size — often billions of Australian dollars — generated huge illicit commission payments from the Bank Defendants involved in manipulating the BBSW fix.

8.     Defendants manipulated BBSW so frequently that traders often joked about how easy it was to fix the rate. When one ANZ trader sarcastically commented "lucky the rate sets are all legit and there is no manipulation within the Australian financial system," his colleague replied "ahahah." In another instance, a trader at Commonwealth Bank sent a cartoon bus with "BBSW" written on the side to a co-conspirator at Westpac. The Westpac trader, acknowledging that both had successfully manipulated the BBSW fix that day, jokingly replied: "You been run over by that big fat bus? … saw the lovely cba having a small lash as well. . .nice work!"

9.     Defendants' ultimate goal was to increase the profitability of their BBSW-based derivatives positions. Defendants openly discussed the callous nature of their conspiracy, including

---

[2] JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., JPMorgan Chase Bank, N.A. Australia, BNP Paribas, S.A., BNP Paribas, Australia Branch, The Royal Bank of Scotland Group Plc, RBS N.V., RBS Group (Australia) Pty Limited, UBS AG, UBS AG, Australia Branch, Australia and New Zealand Banking Group Ltd., Commonwealth Bank of Australia, National Australia Bank Limited, Westpac Banking Corporation, Deutsche Bank AG, Deutsche Bank AG, Australia Branch, HSBC Holdings Plc, HSBC Bank Australia Limited, Lloyds Banking Group Plc, Lloyds Bank Plc, Lloyds TSB Bank plc, Australia, Macquarie Group Ltd., Macquarie Bank Ltd., Royal Bank of Canada, RBC Capital Markets LLC, Royal Bank of Canada, Australia Branch, Morgan Stanley, Morgan Stanley Australia Limited, Credit Suisse Group AG, and Credit Suisse AG are collectively referred to as the "Bank Defendants."

the fact that the profits reaped by manipulating BBSW came at the expense of their customers. For example, in a September 2009 chat, ANZ trader Carina Wong, a fixed income trader at ANZ, described how ANZ extracted excess profits from "custy," *i.e.*, customer, positions by manipulating BBSW:

> I mainly take positions in babs, futures, ibs, ois, curve, nothing fancy – typical fixed income[.] I do the rateset in the morning too – which is kinda fun it's all about moving the rate set, as there are large floating positions that build up due to all the swaps we do so whenever a custy wants to pay a swap, ie pay fixed, so, come the rate set day, we will short in that bucket yeah yeah – sorry, so that's the background, the reasons why you want to push it

10.     In a similar June 2010 phone call, Westpac trader Colin "the Rat" Roden explained how it was always the "end users" of BBSW-based derivatives who "get stiffed" by Defendants' manipulative conduct:

> Some end users who don't know, you know, corporates and people who don't know who get stiffed by people… [a]nd then in two years' time there's some enquiry that you have been fucking with the rate set that's cost them all 10 basis points.

11.     Plaintiffs and Class members were the "end users" of BBSW-based derivatives that Roden referred to who transacted in an artificial market and were otherwise disadvantaged by Defendants' concerted conduct and manipulation. *See* Part III, *infra*.

12.     Defendants actively concealed their scheme from market participants and government regulators, hampering investigations into the BBSW manipulation, including ASIC, by refusing to turn over requested documents. NAB's obstructionist behavior recently forced ASIC to seek an order compelling NAB to comply with four statutory notices requesting that it produce certain documents and telephone conversations relevant to the BBSW investigation. At the hearing, a lawyer for ASIC indicated that this was not the first time NAB had stonewalled the government and refused to produce potentially incriminating evidence, telling the court that "[NAB] haven't complied and they are late ... these practices have been going on for a long, long time".

13.     In responsive pleadings in Australia, ANZ, NAB, and Westpac admitted a substantial number of the allegations described in this Complaint. For example, ANZ, NAB, and Westpac admitted, *inter alia*, that (1) the electronic chats and telephone conversations described in this Complaint did in fact take place on the dates indicated, (2) the Prime Bank Bill transactions described in Part II*, supra*, occurred on the dates indicated (3) the Defendants calculated BBSW rate exposures *i.e.*, the amount they stood to profit from an increase or decrease in BBSW, throughout the Class Period (4)  BBSW-based swaps, BBSW-based forward rate agreements, and Australian dollar foreign exchange swaps and forwards — described in Part I.D. *infra*, among other financial instruments, are settled by reference to BBSW, and (5) movements in BBSW cause parties to these financial instruments to pay more or receive less than they otherwise would have absent a change in BBSW. This Class consists of parties who transacted these instruments in the United States.

14.     ASIC's ongoing investigation has already uncovered communications in which Defendants openly conspire to fix BBSW and the prices of BBSW-based derivatives. Plaintiffs have good reason to believe and do allege that the limited, public materials available to date are only the "tip of the iceberg." Given the persistent, pervasive, and secret nature of Defendants' multi-year conspiracy, as well as the negotiated nature of Defendants' public settlements, Plaintiffs believe that substantial evidentiary support for the claims alleged will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. § 25, and Section 1964 of RICO, 18 U.S.C. §1964. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy, and under 28 U.S.C. §1332 because the

amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

16.     Venue is proper in this District pursuant to, among other statutes, section 22 of the CEA, 7 U.S.C. § 25(c), §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, §1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. §1391(b), (c), and (d). One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

17.     Each Defendant transacts business, including in BBSW-based derivatives, throughout the United States and with counterparties located in the United States. For example, Defendants ANZ, Commonwealth Bank of Australia ("CBA"), BNP Paribas, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, Macquarie Bank, Morgan Stanley, NAB, Royal Bank of Canada ("RBC"), Royal Bank of Scotland ("RBS"), UBS, and Westpac traded foreign exchange and/or interest rate derivatives, including BBSW-based derivatives, in the United States throughout the Class Period.

18.     Defendants are the most active BBSW-based derivatives dealers in the country and the largest Australian dollar derivatives traders in the world. Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market. This survey measures the "turnover," or volume of transactions, in foreign exchange and interest rate derivatives within the United States. The Federal Reserve Bank of New York survey only includes data from the largest dealers located within the United States and transactions that are located within the United States. Dealers located outside of the United States report their figures to the central bank where they are located.

19.     Defendants BNP Paribas, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Morgan Stanley, RBS, and UBS each participated in the Federal Reserve Bank of New York's survey

of foreign exchange and interest rate derivatives dealers throughout the Class Period, indicating that they entered into foreign exchange and interest rate derivatives transactions, including transactions priced, benchmarked, and/or settled based on BBSW, from within the United States.

20.     In 2007, approximately $15 trillion in Australian dollar foreign exchange and interest rate derivatives, including derivatives priced and/or settled based on BBSW, were traded in the United States alone. In total, more than $100 trillion in Australian dollar foreign exchange and interest rate derivatives, which are priced and/or settled based on BBSW, were traded over-the-counter within the United States during the Class Period.

21.     Throughout the Class Period, the Australian dollar/United States dollar currency pair was by far the most widely traded currency pair involving the Australian dollar, accounting for roughly half of all foreign exchange contracts for which the Australian dollar was one leg of the transaction. For example, based on Reserve Bank of Australia survey data for April 2013, a larger volume of Australian dollar-denominated foreign exchange derivatives traded in the United States than in Australia during the Class Period.

22.     Defendants used electronic messaging, chatrooms, telephones, emails and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint. As a direct result of the BBSW-related conduct alleged in this Complaint, Defendants purposefully directed false and manipulated BBSW rates to the United States market via Thomson Reuters, which published false BBSW rates to U.S. market participants who transacted in BBSW-based derivatives.

23.     From offices located in the United States, Defendants targeted United States counterparties for transactions that were priced and/or settled based on BBSW.  Defendants' knew that their gains from fixing BBSW came at the expense of Plaintiffs FrontPoint, Sonterra, and Dennis, *see* Part III, *supra*, and the other members of the Class. For example, at least Defendants

Macquarie, Deutsche Bank, RBS, UBS, and Credit Suisse traded Australian dollar-denominated swaps with the FrontPoint Plaintiffs while these same Defendants were manipulating BBSW.

24.     Defendants determined the direction they wanted to manipulate BBSW by calculating their net BBSW exposure, *i.e.*, the amount they stood to gain or lose from changes in BBSW, prior to the Fixing Window. Defendants included trades with United States-based counterparties in this BBSW exposure calculation and purposefully directed their conduct at the U.S. market to financially benefit these positions.

25.     U.S. market participants traded trillions of dollars in BBSW-based derivatives in the United States during the Class Period. Defendants, as BBSW contributor banks, members of the AFMA, and substantial players in the U.S. market for BBSW-based derivatives, knew that Thomson Reuters, Bloomberg, and other financial information services disseminated BBSW throughout the United States. Defendants also knew that BBSW was used in the United States to price, benchmark and/or settle BBSW-based derivatives purchased, sold, or owned here.

26.     Defendants caused artificial BBSW rates, trade confirmations incorporating these false rates, and communications containing requests to manipulate these rates to be distributed over U.S. wires using servers located in the United States. Defendants' manipulative conduct, as alleged herein, had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce. Such direct effects injured Plaintiffs and give rise to Plaintiffs' claims under the Foreign Trade Antitrust Improvements Act.

27.     Defendants BNP Paribas, Credit Suisse, Deutsche Bank, Lloyds, and Macquarie Bank Ltd., registered their New York branch or representative or agency offices with the New York State Department of Financial Services ("NYSDFS") to do business in this state under New York Banking Law § 200-b. Defendants HSBC and Lloyds also registered wholly-owned subsidiaries, HSBC Bank N.A. and Lloyds Bank plc, respectively, with the NYSDFS.

28.     Defendants RBS and UBS are registered with the Connecticut Department of Banking under § 36a-428g of the Connecticut General Statutes.

29.     Defendant Tullett Prebon's swap execution facility, known as "tpSEF," is a wholly-owned subsidiary of Tullett Prebon and is permanently registered with the U.S. Commodity Futures Trading Commission ("CFTC"). TpSEF is headquartered in New Jersey.

30.     Defendants ICAP plc and Tullett Prebon plc, through subsidiaries ICAP Securities USA and Tullett Prebon Financial Services LLC, are registered with the Financial Industry Regulatory Authority ("FINRA") and the Securities and Exchange Commission (the "SEC").

31.     Each Bank Defendant is subject to enhanced supervision by the Board of Governors of the Federal Reserve System. Defendants Credit Suisse, Deutsche Bank, JPMorgan Chase & Co., Morgan Stanley, and UBS AG are members of the Federal Reserve Board ("FRB") of Governors' Large Institution Supervision Coordinating Committee, which is designed to coordinate supervision of the largest, most systematically important financial institutions in the United States.

32.     Defendants employed personnel who were tasked with actively marketing and selling BBSW-based derivatives to investors located in the United States. For example, senior NAB trader Gavin Sheridan was the Head of Swap Trading UK and US and worked in the Rates business unit of NAB's Global Markets Division during the Class Period. Other Defendants similarly directed sales personnel to find counterparties for BBSW-based derivatives transactions in the United States.

33.     Defendants actively marketed and sold products that were settled based on BBSW from their trading desks located in the United States. *See infra at* ¶¶ 41-160. Defendants established and maintained these trading desks for the purpose of entering into derivatives transactions, including foreign exchange and interest rate derivatives transactions, with counterparties located in the United States, including members of the Class.

34.     U.S.-based Defendants JPMorgan and Morgan Stanley formed part of the conspiracy to manipulate BBSW. The other Defendants consciously chose to conspire with the U.S.-based Defendants to distort BBSW and the prices of BBSW-based derivatives traded in the United States. For example, on March 8, 2011, a trader at JPMorgan offered to help transfer Prime Bank Bills to an NAB trader to manipulate BBSW. *See* ¶ 240, *infra*. On another occasion, an NAB trader noted that Morgan Stanley had helped him to successfully fix the 6m BBSW rate and had shared its intention to sell Prime Bank Bills during the Fixing Window the next day, writing: "Great rate set for us today as we have a receive set in both 3 and 6mth… the main sellers were Morgan Stanley and Citi… MS has more to sell tom."

## PARTIES

### A.     Plaintiffs

35.     Plaintiff Richard Dennis ("Dennis) is a natural person who resides in Florida. Dennis engaged in U.S.-based transactions for BBSW-based derivatives, including hundreds of Australian dollar futures contracts traded on the Chicago Mercantile Exchange ("CME"), during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a direct and proximate result of Defendants' manipulative conduct, Dennis was damaged and suffered legal injury, including a net loss, on CME Australian dollar futures contracts transacted during the Class Period. *See* ¶¶ 283-285, *infra*.

36.     During a substantial part of the Class Period, Plaintiff Sonterra Capital Master Fund, Ltd., ("Sonterra") was an investment fund with its principal place of business in New York. Sonterra engaged in U.S.-based transactions for BBSW-based derivatives, including Australian dollar foreign exchange swaps and forwards directly with Defendant Morgan Stanley, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. *See* ¶¶ 286-294, *infra*. As a direct and proximate result of Defendants' manipulative

10

conduct, Sonterra was damaged and suffered legal injury on Australian dollar foreign exchange forwards transacted with Morgan Stanley during the Class Period. *See* ¶¶ 286-294, *infra*.

37.     During a substantial part of the Class Period, Plaintiff FrontPoint Financial Services Fund, L.P., was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut and its investment team based in this District. FrontPoint Financial Services Fund, L.P., engaged in U.S.-based transactions for BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. *See* ¶¶ 295-297, *infra*. As a direct and proximate result of Defendants' manipulative conduct, FrontPoint Financial Services Fund, L.P., was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period. *See* ¶¶ 295-297, *infra*.

38.     During a substantial part of the Class Period, Plaintiff FrontPoint Asian Event Driven Fund, L.P., was an investment fund with its principal place of business in Greenwich, Connecticut. FrontPoint Asian Event Driven Fund, L.P., engaged in U.S.-based transactions for BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. *See* ¶¶ 295-299, *infra*. As a direct and proximate result of Defendants' manipulative conduct, FrontPoint Asian Event Driven Fund, L.P., was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period. *See* ¶¶ 295-299, *infra*.

39.     During a substantial part of the Class Period, Plaintiff FrontPoint Financial Horizons Fund, L.P., was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut and its investment team based in this District. FrontPoint Financial Horizons Fund, L.P., engaged in U.S.-based transactions for BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. *See* ¶¶ 295-297, *infra*. As a direct and proximate result of Defendants'

11

manipulative conduct, FrontPoint Financial Horizons Fund, L.P., was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period. *See* ¶¶ 295-297, *infra*.

40.    Collectively, Plaintiffs FrontPoint Financial Services Fund, L.P., FrontPoint Asian Event Driven Fund, L.P., and FrontPoint Financial Horizons Fund, L.P., are referred to as "FrontPoint." FrontPoint collectively traded more than $100 million in BBSW-based swaps with Defendant Macquarie during the Class Period.

**B.    JPMorgan**

41.    Defendant JPMorgan Chase & Co. is a Delaware corporation with its headquarters located at 270 Park Avenue, New York, NY10017. JPMorgan Chase & Co. provides businesses, institutions, and individuals with investment banking, treasury and securities, private banking, and commercial banking services. Its U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps. JPMorgan "actively manages the risks from its exposure to these derivatives by entering into other derivative transactions or by purchasing or selling other financial instruments that partially or fully offset the exposure from client derivatives."[3]

42.    Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association headquartered at 270 Park Avenue, New York, New York 10017. JPMorgan Chase Bank, N.A. is a wholly-owned subsidiary of JPMorgan Chase & Co. JPMorgan Chase Bank, N.A. is a provisionally registered swap dealer with the CFTC. JPMorgan Chase Bank, N.A was an AFMA Prime Bank from early 2009 through November 30, 2011.

---

[3] *Public Section of 2015 § 165(d) Tailored Resolution Plan*, JPMorgan Chase & Co, (July 1, 2015) at 45, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/jpmchase-165-1507.pdf.

43.     Defendant JPMorgan Chase Bank, N.A. Australia Branch operates as a subsidiary of JPMorgan Chase Bank, N.A. During the Class Period, JPMorgan Chase Bank, N.A. Australia Branch was a member of the BBSW Panel.

44.     Collectively, JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and JPMorgan Chase Bank, N.A. Australia are referred to as "JPMorgan."

**C.     BNP Paribas**

45.     Defendant BNP Paribas, S.A., is one of the world's largest global banking organizations and is headquartered in Paris, France. BNP Paribas, S.A. maintains a branch at 787 Seventh Avenue, New York, NY 10019. BNP Paribas, S.A.'s New York Branch is the legal and operational extension of BNP Paribas, S.A. and thus, is not a separate legal entity.[4] BNP Paribas's New York branch serves as the headquarters of BNP Paribas's U.S. operations.

46.     BNP Paribas S.A. filed its most recent U.S. Resolution Plan on December 31, 2015 with the Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation (the "FDIC"), as required by Title I, Section 165(d) of the Dodd-Frank Act.[5]

47.     BNP Paribas S.A. is registered with NYSDFS and licensed to do business in this state. BNP Paribas is also regulated by the Board of Governors of the Federal Reserve System. BNP Paribas S.A. considers its New York Branch to be a "material entity" within the United States.[6]

48.     BNP Paribas S.A. offers corporate and investment banking services to clients in New York through its Global Equities and Commodity Derivatives division, among others.[7] BNP Paribas S.A. employs approximately 15,000 people in the U.S. and maintains locations in nine states.[8] BNP Paribas S.A. markets itself in the United States through events like the Billy Jean King Cup in New

---

[4] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, BNP Paribas, (Dec. 31, 2015) at 21, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/bnp-165-1512.pdf.
[5] *Id.* at 1.
[6] *Id.* at 30.
[7] *Id.* at 2.
[8] *Id.*

York City, that BNP Paribas S.A., uses to "target[…] clients in the New York region, the Bank's North American headquarters."[9] BNP Paribas S.A. is "a global player in the derivatives markets" and "actively trades in derivatives . . . including swaps, forwards, futures, and options."[10] BNP Paribas S.A.'s U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which include interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[11] BNP Paribas S.A. is a provisionally registered swap dealer with the CFTC. BNP Paribas S.A. was an AFMA Prime Bank from 2005 through February 24, 2012.

49. BNP Paribas' S.A.'s G10 interest rates and foreign exchange product areas are housed within its Fixed Income trading division. Beginning in early 2007, BNP Paribas S.A. "aimed to significantly enhance [its] fixed income structured products business in the U.S."[12] by adding personnel to its New York-based interest rate derivatives trading and sales teams. For example, BNP Paribas S.A. hired HSBC's former Head of Interest Rate Derivatives Trading, Sam Nunn, in its New York office as a Managing Director and Head of Interest Rates and Foreign Exchange ("FX") Structuring.[13] At the same time, BNP Paribas S.A. bolstered its New York interest rate derivatives sales team by hiring Mallory Brooks as Managing Director and Head of the Core Interest Rates Sales Team in the U.S. to market interest rate derivatives to clients based in the United States.[14] In a press

---

[9] *See Press Release, BNP Paribas USA, BNP Paribas welcomes the world tennis elite to the United States* (Mar. 17, 2010), *available at* http://usa.bnpparibas/en/2010/03/17/bnp-paribas-welcomes-the-world-tennis-elite-to-the-united-states/.

[10] *See BNP 2013 Resolution Plan, supra note 4, at 7.*

[11] *See* Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2007, at 12, 16-17 (BNP Paribas participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction") (hereinafter "Federal Reserve Bank of New York 2007 Survey").

[12] The Bank Defendants traded foreign exchange and interest rate derivatives from trading desks within their fixed income trading businesses. Fixed income traders price these products by reference to an internally developed model known as a yield curve, which is designed to predict future cash flows by forecasting the value of benchmark interest rates.

[13] *See* Press Release, BNP Paribas USA, Appointments-BNP Paribas enhances its structured products and interest rates business in New York (May 2, 2007), *available at* http://usa.bnpparibas/en/2007/05/02/appointments-bnp-paribas-enhances-its-structured-products-and-interest-rates-business-in-new-york/.

[14] *Id.*

release to announce the new hires, a senior BNP Paribas S.A. manager commented that "the heart of BNP Paribas Fixed Income activities has always been the derivatives business."[15]

50.     BNP Paribas S.A.'s focus on the U.S. interest rate derivatives market continued throughout the Class Period. In 2011, BNP Paribas S.A. announced that it had promoted two executives to lead its Fixed Income, Americas division from New York, describing the move as "maximi[z]ing the synergies between trading and sales and increasing the size of our flow products businesses."[16] Since at least January 2005, BNP Paribas S.A. has directed considerable resources to offer a full range of fixed income products to American clients from its New York office and has placed senior New York-based executives on its global Fixed Income Executive Committee.[17] New York-based foreign exchange traders led BNP Paribas S.A.'s weekly global FX meetings, which were attended by BNP Paribas S.A. FX traders located in Australia and elsewhere.

51.     In November 2012, BNP Paribas S.A. hired three members to its FX team in New York, bolstering the bank's "commitment to its North American clients."[18] In a press release announcing the move, BNP Paribas S.A. explained that it was "focused on expanding and deepening BNP Paribas' relationships with targeted investors" located in the United States.[19] The press release highlighted BNP Paribas S.A.'s decision to focus its FX and interest rate trading activities on United States-based investors, writing that one new hire "brings excellent client relationships and broad market knowledge to help grow BNP Paribas' presence with US asset managers."[20] The press release quotes George Nunn, BNP Paribas S.A.'s Head of FX and Emerging Markets Sales North America,

---

[15] *Id.*

[16] Press Release, BNP Paribas Hong Kong, BNP Paribas Corporate & Investment Banking announces senior appointments within Fixed Income (June 24, 2011), *available at* http://www.bnpparibas.com.hk/en/2011/06/24/bnp-paribas-corporate-investment-banking-announces-senior-appointments-within-fixed-income/.

[17] *See BNP Paribas Fixed Income Reorganises Its Structure and Management Team to Give Clients a More Integrated Coverage across Asset Classes and Products*, BUSINESS WIRE (London), Jan. 21, 2005, *available at* http://www.businesswire.com/news/home/20050121005240/en/BNP-Paribas-Fixed-Income-Reorganises-Structure-Management.

[18] *BNP Paribas Expands Its Foreign Exchange Presence in the US*, MARKETWIRE (New York), Nov. 9, 2012, *available at* http://www.marketwired.com/press-release/bnp-paribas-expands-its-foreign-exchange-presence-in-the-us-1724226.htm.

[19] *Id.*

[20] *Id.*

who stated, "In support of our strategy to expand our overall fixed income flow capabilities, these additions are in line with our growth plans for BNP Paribas' US FX group, and will help us achieve our goal of being a leading global FX provider with our target Institutional client base."[21]

52.     BNP Paribas S.A. entered into a settlement with ASIC on January 28, 2014, in which it admitted to manipulating BBSW.[22] In the settlement, BNP Paribas further admitted that its ALM-Treasury Business, which "manages the liquidity and market risks (interest rate and currency) arising from the bank's balance sheet activities," submitted false BBSW rates to benefit its derivatives positions during the Class Period. BNP Paribas further advertises that executive level ALM-Treasury staff are based in New York.[23] New York-based ALM-Treasury staff "actively manage BNP Paribas' interest rate and liquidity risk positions" and "trade off balance sheet products," including benchmark interest rate swaps on a spot and forward basis.

53.     Defendant BNP Paribas, Australia Branch is a wholly-owned subsidiary of BNP Paribas S.A. and was a member of the BBSW Panel during the Class Period. BNP Paribas, Australia Branch was a designated AFMA Prime Bank from 2005 through February 24, 2012.

54.     Collectively, BNP Paribas S.A. and BNP Paribas Australia Branch are referred to as "BNP Paribas."

   **D.     RBS**

55.     Defendant The Royal Bank of Scotland plc ("RBS Bank") is a wholly-owned subsidiary of Defendant The Royal Bank of Scotland Group plc ("RBS Group"). RBS Group is a

---

[21] *Id.*

[22] *Enforceable Undertaking with BNP Paribas*, AUSTRALIAN SECURITIES AND INVESTMENT COMMISSION (Jan. 28, 2014), *available at* http://asic.gov.au/about-asic/media-centre/find-a-media-release/2014-releases/14-014mr-asic-accepts-enforceable-undertaking-from-bnp-paribas/.

[23] *Job Detail for Vice President - ALM Treasury/Prime Solutions & Financing*, CLIMBER, http://jobs.climber.com/jobs/Management-Business/New-York-NY-03582-USA/Vice-President-ALM-Treasury-Prime-Solutions-Financing-P-L-Supervisor-Standard-Permanent/170633626 (last visited Dec. 13, 2016).

registered bank holding company. This includes a substantial presence in the United States as alleged more particularly below.

56.     RBS Group filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[24] According to RBS Group's 2014 U.S. Resolution Plan, the Group made 24% of its income for the 2013 year in the United States.[25]

57.     RBS Bank maintains a Foreign Representative Office, registered with the NYSDFS, in this District at 340 Madison Avenue, New York, New York. RBS is a provisionally registered swap dealer with the CFTC.

58.     RBS Bank's U.S. headquarters is located in Connecticut. RBS Bank operates a Connecticut branch ("The Royal Bank of Scotland plc, Connecticut Branch"), located at 600 Washington Boulevard, Stamford, CT 06901. The Royal Bank of Scotland plc, Connecticut Branch is regulated by the Connecticut Department of Banking and licensed do business in that state.

59.     From its Stamford offices, RBS offers United States-based clients the full spectrum of financial products including Rates,[26] Asset-Backed Products, Credit, Prime Services, Foreign Exchange and Short-Term Markets.[27] RBS Markets and International Banking division, the wholesale banking division of RBS Group, advertises itself as "focuse[d] on its core strength in fixed income," including foreign exchange and interest rate derivative products. In 2012, 47% of RBS Bank's Markets division revenues were derived from the rates and FX businesses. RBS' Markets and International Banking identifies its "three key trading hubs" as "Stamford, London, and Singapore," in that order.[28] RBS traders based in Stamford also trade interest rate swaps on U.S.-based electronic

---

[24] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Royal Bank of Scotland Group plc, (Dec. 31, 2015) at i-1, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/rbs-165-1512.pdf.
[25] *See Public Section of 2014 § 165(d) Resolution Plan*, Royal Bank of Scotland Group plc, (Oct. 1, 2014) at i-2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/rbs-165-1410.pdf.
[26] "Rates" is commonly used to describe a trading desk that focuses on interest rate derivatives products. *See* Part I. D., *infra*.
[27] *See Director, EM FX Trading*, ROYAL BANK OF SCOTLAND CAREERS, http://jobs.rbs.com/jobs/6189990-director-em-fx-trading?bid=326 (last visited Dec. 13, 2016).
[28] *Id.*

trading platforms.[29] During the Class Period, Michael Lyublinsky, Global Co-Head of Fixed Income Commodities and Currencies for RBS, directed RBS' currency and interest rate derivative trading activities from Stamford, Connecticut.[30] RBS also employs other senior traders and directors in its Stamford office to focus on trading Asian currencies and interest rates in the United States market with medium-to-large sized corporate clients, as well as sovereigns and the public sector.[31] RBS also maintains a specialized Interest Rates Derivatives Business in the United States.[32]

60.     RBS derivatives traders are responsible for trading financial instruments, such as interest rate swaps and forward rate agreements, priced, benchmarked or settled to BBSW. These traders are located throughout the world, and, as alleged more particularly in ¶ 59, *supra*, trade from RBS offices located in New York and Connecticut.

61.     During the Class Period, RBS transacted in BBSW-based derivatives with counterparties located within the United States, including asset management corporations, business corporations, insurance companies, universities, and non-profit organizations.

62.     In the Deferred Prosecution Agreement entered into by RBS with the DOJ on February 5, 2013 for manipulating worldwide benchmark interest rates such as the London Interbank Offered Rate ("LIBOR"), RBS provided the DOJ with certain supplemental information regarding "additional benchmark rates" which RBS requested be kept under seal pending the result of further DOJ investigations:

> Although not addressed in Attachment A, this Agreement also encompasses RBS's submissions for the additional benchmark rates listed in Attachment C, which is also incorporated into this Agreement. The rates listed in Attachment C are the focus of

---

[29] *See* Press Release, TradeWeb, The Royal Bank of Scotland Joins TradeWeb's Swaps Platform, *available at* http://www.tradeweb.com/News/News-Releases/The-Royal-Bank-of-Scotland-Joins-TradeWeb-s-Swaps-Platform/.
[30] *See* Michael Lyublinsky, BLOOMBERG, http://www.bloomberg.com/research/stocks/private/person.asp?personId=12145384&privcapId=716949&previousCapId=271459&previousTitle=GLEACHER%20&%20CO%20INC (last visited Dec. 13, 2016).
[31] See *Director, EM FX Trading*, ROYAL BANK OF SCOTLAND CAREERS, http://jobs.rbs.com/jobs/6189990-director-em-fx-trading?bid=326 (last visited Dec. 13, 2016).
[32] *See Front Office Developer – Swaps*, ROYAL BANK OF SCOTLAND CAREERS, http://jobs.rbs.com/jobs/2521473-front-office-developer-swaps (last visited Dec. 13, 2016).

an ongoing investigation and, for that reason, Attachment C will be held in
confidence by the parties to this Agreement, will not be included in the public filing
of this document, and will not be made available to the public unless and until the
Department of Justice, in its sole discretion, determines that such information can
and should be disclosed.[33]

63.     Plaintiffs have good grounds to believe that these submissions, when disclosed, will

provide further evidence that RBS engaged in additional collusive and manipulative activities

regarding BBSW.

64.     Defendant RBS N.V. is part of The Royal Bank of Scotland Group plc and is the

successor entity to ABN AMRO N.V., which was a member of the BBSW Panel from 2005 through

December 31, 2006. Defendant RBS N.V. was a member of the BBSW Panel from January 1, 2007

to November 18, 2010. The Royal Bank of Scotland plc, Australia succeeded RBS N.V. on the

BBSW Panel from November 19, 2010 to April 30, 2012.

65.     In a July 21, 2014 settlement with ASIC, the Royal Bank of Scotland Group plc and

RBS N.V. admitted that, while on the BBSW Panel, each entity made false BBSW submissions in

order to benefit BBSW-based derivatives positions.[34] These entities also admitted to engaging in

Prime Bank Bill trading to manipulate BBSW fixings.[35] At the same time, RBS Money Markets,

foreign exchange, and rates traders booked BBSW-based derivatives trades with United States-based

counterparties from offices located in New York and Connecticut.

66.     In its settlement with ASIC, the Royal Bank of Scotland plc and RBS N.V. admitted

the following:

The relevant conduct involved communications in which Derivative Traders or
Money Market Traders discussed their own (or their desk's) financial position in

---

[33] United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement
with The Royal Bank of Scotland PLC (Feb. 5, 2013), at ¶ 2, n. 1, *available at* https://www.justice.gov/atr/case-
document/file/509081/download.
[34] *See Enforceable Undertaking with RBS*, AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION (July 21, 2014) *available at*
http://asic.gov.au/about-asic/media-centre/find-a-media-release/2014-releases/14-169mr-asic-accepts-enforceable-undertaking-
from-the-royal-bank-of-scotland/.
[35] *Id.* at ¶ 3.3, *available at* http://download.asic.gov.au/media/1301281/028492039.pdf.

connection with the entering of RBS's BBSW Submissions, or discussions between the Delta Desk and Money Market Desk regarding a direction in which submissions should be entered by reference to the desk's positions. Submitters openly acknowledged preferences and at times, solicited preferences. A dedicated chat room entitled "BBSW rate set" was used for such communications during the period I October 2009 to 25 November 2010.[36]

67.     Defendant RBS Group (Australia) Pty Limited operates as a subsidiary of RBS Group and was a member of the BBSW Panel during the Class Period.

68.     Collectively, RBS Group, RBS Bank, RBS Group (Australia) Pty Limited, and RBS N.V. are referred to as "RBS."

**E.     UBS**

69.     Defendant UBS AG ("UBS") is a banking and financial services company headquartered in Switzerland. UBS provides investment banking, asset management, and wealth management services for private, corporate, and institutional clients worldwide. It has operations in over 50 countries, including the United States where UBS maintains a substantial presence.

70.     UBS filed its most recent U.S. Resolution Plan on July 1, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[37]

71.     UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its headquarters in New York and Stamford, Connecticut. UBS's Stamford Branch ("UBS AG, Stamford Branch") is the primary booking center for UBS's foreign exchange business with U.S. clients and U.S. corporate lending business. UBS AG, Stamford Branch also houses operations and support functions for other U.S. branches and subsidiaries.

72.     UBS is registered with the OCC and the CFTC as a provisionally-registered swap dealer. UBS is also licensed and supervised by the Board of Governors of the Federal Reserve System and is registered with the Connecticut Department of Banking. UBS's U.S.-based dealers

---

[36] *Id.* at ¶ 3.2, *available at* http://download.asic.gov.au/media/1301281/028492039.pdf.
[37] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, UBS, AG, (July 1, 2015) at 4-5, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/ubs-165-1507.pdf.

trade in the over-the-counter foreign exchange and derivatives markets, including interest rate

swaps, forward rate agreements, and foreign exchange swaps.[38]

73.     During the Class Period, UBS's Rates Division and Short Term Interest Rate

("STIR") desk transacted in interest rate derivatives, such as interest rate swaps, whose value

depended on BBSW through traders located in Connecticut.

74.     UBS filed a Resolution Plan with the Federal Reserve in 2014 in which it

acknowledged that it is a global institution with the majority of its operations located in Switzerland,

the United Kingdom, and the United States.[39] UBS's shares are registered as Global Registered

Shares on the NYSE.

75.     UBS positioned executive-level foreign exchange personnel, including its Head of

Americas Client Strategy for Foreign Exchange, Rates & Credit at its Connecticut and New York

offices during the Class Period.

76.     In 2012, the CFTC found that UBS traders manipulated BBSW, among other rates,

to benefit their derivatives trading positions.[40] In addition, UBS suspended some of its foreign

exchange traders from New York in 2014 after completing internal investigations.[41] These same

internal investigations uncovered evidence of BBSW manipulation by UBS derivatives traders.

---

[38] *See Federal Reserve Bank of New York 2007 Survey*, *supra* note 37, at 12, 16-17 (UBS participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).
[39] *See Public Section of 2014 § 165(d) Tailored Resolution Plan*, UBS AG, (July 1, 2014) at 4, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/ubs-165-1407.pdf.
[40] CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against UBS AG, at 38, n. 21, CFTC Docket No. 15-20 (Dec. 19, 2012).
[41] *See* Liam Vaughan, Amberdeen Choudhury, and Gavin Finch, *UBS Said to Suspend Traders in New York, Zurich, Singapore*, BLOOMBERG, Mar. 26, 2014, *available at* http://www.bloomberg.com/news/articles/2014-03-26/ubs-said-to-suspend-fx-traders-in-new-york-zurich-and-singapore-i2zcvvxf.

77.     UBS also entered into a settlement with ASIC on December 23, 2013, in which it admitted to submitting false BBSW rates from its STIR desk and that UBS derivatives traders caused UBS to submit false BBSW rates.[42] In the settlement, UBS made the following admission:

> at times during [the period of January 30, 2005 through November 23, 2006], Derivative Traders had expressed preferences as to the direction or level of BBSW Submissions and at times, preferences were solicited by a Submitter himself or herself. Submitter Influence may also have occurred at other times from about 2005 until early 2011.[43]

78.     Defendant UBS AG, Australia Branch is a wholly-owned subsidiary of UBS AG and is based in Sydney, Australia. UBS AG, Australia Branch was a member of the BBSW Panel during the Class Period.

**F.     Australia and New Zealand Banking Group**

79.     Defendant Australia and New Zealand Banking Group Ltd. ("ANZ") is headquartered in Melbourne, Australia. ANZ is the fourth-largest bank in Australia and among the top twenty largest banks in the world.[44] ANZ was an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period.

80.     ANZ filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[45]

81.     ANZ maintains a licensed branch at 277 Park Avenue, New York, NY 10172, where it recently relocated to a space containing over 20,000 rentable square feet and a trading floor.[46] ANZ's New York branch is registered as a Foreign Banking Organization with the U.S.

---

[42] *Enforceable Undertaking with UBS,* AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION (Dec. 23, 2013) *available at* http://asic.gov.au/about-asic/media-centre/find-a-media-release/2013-releases/13-366mr-asic-accepts-enforceable-undertaking-from-ubs/

[43] *Id.* at ¶ 3.2, *available at* http://download.asic.gov.au/media/1301413/028553828.pdf.

[44] *See* 2015 Annual Report, Australia and New Zealand Banking Group Ltd. (2015), at 1, *available at* http://news.iguana2.com/anz/ASX/ANZ/433344.

[45] *See Public Section of 2015 § 165(d) Tailored Resolution Plan,* Australia and New Zealand Banking Group Limited, (Dec. 31, 2015) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/anz-165-1512.pdf.

[46] *See* Sarah Danckert, *Sex clubs, racial insults: Inside ANZ's New York Office,* THE SYDNEY MORNING HERALD, Nov. 16, 2016, *available at* http://www.smh.com.au/business/banking-and-finance/sex-clubs-racial-insults-inside-anzs-new-york-office-20161115-gspid2.html

Office of the Comptroller of Currency ("OCC") and regulated by the Federal Reserve Bank of New York and the Board of Governors of the Federal Reserve System.

82.     ANZ has operated its New York branch since December 1968.[47] ANZ provides corporate and investment banking services and international trade finance from its New York branch, including foreign exchange, currency options, and credit and interest rate derivatives.[48] In September 2005, Mark Timoney joined ANZ's New York commodity and trade finance team as its Vice-President to grow ANZ's structured commodity finance business as well as servicing core clients in their classical trade finance needs.[49] Current ANZ New York-based Head of Financial Institutions FX Sales—Americas, Cameron Whiteley, moderated a panel discussion titled "Finance & Investment Series - Panel Discussion & Networking Reception 'Making Cents - Aussie Dollar Outlook'" sponsored by ANZ and the American Australian Association in November 2013. ANZ considers its New York branch to be an "extension" of the bank in the United States.[50] ANZ's American Depository Receipts ("ADRs") are listed on the New York Stock Exchange ("NYSE").

83.     ANZ employs executive-level foreign exchange derivatives traders in its New York office to trade products, including Australian dollar-denominated derivatives, during the Class Period.[51] For example, Ravi Nursey, Managing Director of Corporate Foreign Exchange Sales, Enilolobo Oyo, Vice President of Foreign Exchange Sales, Cameron Whiteley, Head of Financial Institutions FX Sales, Americas, Raghu Prabhakaran, Vice President FX Options, and Charlie Lachman, Global Head of Markets, were among the more than 100 employees in ANZ's New York

---

[47] *See ANZ in the USA*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, https://www.anz.com/unitedstates/en/about-us/our-company/anz-usa/?pid=brd-pbl-text-ahp-sep11-anzintheusa (last visited Dec. 4, 2016).
[48] *See Public Section of 2013 § 165(d) Tailored Resolution Plan*, Australia and New Zealand Banking Group Limited, (Dec. 31, 2013) at 3, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/anz-165-1312.pdf.
[49] *See ANZ New York Welcomes Absa man*, GLOBAL TRADE REVIEW, Sept. 9, 2005, *available at* http://www.gtreview.com/news/on-the-move/anz-new-york-welcomes-absa-man/.
[50] *See* ANZ *2013 Resolution Plan, supra* note 48, at 2.
[51] *See Oyo v. ANZ Securities, Inc. et al*, 1:2016-cv-05436 (S.D.N.Y. 2016).

office.[52] These employees' responsibilities included settling trades booked by other ANZ trading offices located in Asia as well as trading interest rate and FX derivatives with counterparties located in the United States.[53] ANZ also employed sales personnel for interest rate-related products for the Asia, Australia, and New Zealand markets from its New York office. During the Class Period, traders from other ANZ offices also travelled to New York to meet with senior FX traders in the United States.[54]  From its Australian offices, ANZ employed full-time personnel to trade forward exchange contracts, FX options and forwards during New York market hours. ANZ is a provisionally registered as a swap dealer under the Commodity Exchange Act.

84.     ANZ's Financial Institutions Group – Americas is based in its New York office and targets customers such as insurance companies, banks, hedge funds, and other non-bank financial institutions for products including interest rate and foreign exchange derivatives. Through its wholly-owned subsidiary ANZ Securities, Inc., ANZ's New York-based team supports trade and investment flows between clients in America with Australia, New Zealand and Asia.

85.     When transacting with counterparties in this District, ANZ designates New York law as the governing law and agrees that the courts of this District have jurisdiction.[55] For example, ANZ's Trade Terms for U.S.-based counterparties include an addendum titled "State of New York, United States of America as Governing Jurisdiction" that applies "where New York, New York, United States of America is the Governing Jurisdiction (being the city and the state in the United States of America in which the Customer's ANZ Office is located)."[56]

86.     ANZ admitted that it "prepared an estimate of the BBSW Rate Set Exposure" of its Global Markets division daily during the Class Period. ANZ used its BBSW Rate Set Exposure to

---

[52] *Id.*
[53] *Id.*
[54]*See id.*
[55] *See ANZ Trade Terms United States*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, Sep. 2010, *available at* https://www.anz.com/resources/c/b/cbe699804a9991fdbaacfe220cbfc79e/trade-terms.pdf?MOD=AJPERES
[56] *Id.*

calculate the direction to move BBSW. At the same time, ANZ Global Markets personnel in its New York offices transacted in BBSW-based derivatives with counterparties located in the United States.

### G.     Commonwealth Bank of Australia

87.     Defendant Commonwealth Bank of Australia ("CBA") is headquartered in Sydney, Australia. CBA is a multinational bank and is one of the largest financial institutions in Australia. CBA was an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period.

88.     Defendant CBA filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[57]

89.     CBA has offices located in New York and Houston. CBA's New York office is located at 599 Lexington Avenue, New York, NY 10022. Since 1977, CBA has offered a full range of financial services from its New York office to American clients, including foreign exchange sales and spot trading, interest rate derivatives, commodities, fixed income products, and money market services.[58] CBA offers a full range of financial services to Australian and New Zealand corporate and institutional clients with interests in the Americas as well as North American companies with connections in Australia and New Zealand or who are considering expanding their business to the region. CBA's New York team provides global markets services, including foreign exchange and interest rate derivatives. CBA is a provisionally registered swap dealer with the CFTC.

90.     From its New York office, CBA quotes short term interest rate, foreign exchange options, and FX forwards products to Corporates, Central Banks, Pension Funds and Hedge Funds. CBA's New York-based short term interest rate trading is concentrated within G10 currencies, with a focus on Australian dollar, Japanese Yen, and Euro, and manages risk through exchange-traded and over-the-counter products. For example, at least a Director of Short Term Interest Rate

---

[57] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Commonwealth Bank of Australia, (Dec. 31, 2015) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/cba-165-1512.pdf.
[58] *See CBA 2015 Resolution Plan, supra* note 57, at 2.

Trading, a Director of Short Term Interest Rate Derivatives, and two Directors of Interest Rate Options Trading are based in CBA's New York office. From at least September 2010 through July 2012, Commonwealth Bank employed Senior Short Term Interest Rate ("STIR") Traders in their New York office to price short-term interest rate derivatives, including instruments that were priced or settled based on BBSW, directly with American counterparties. CBA's Head of Foreign Exchange Sales, Americas is also based in its New York office. CBA also employs full-time in-house legal counsel to provide specialized legal counsel for CBA's trading and sales activities in the Americas.

91.    CBA's New York branch is regulated by the OCC and is supervised by the Federal Reserve Bank of New York as a branch operation of a Foreign Banking Organization.[59]

**H.    National Australia Bank**

92.    Defendant National Australia Bank Limited ("NAB" or "nab") is one of the largest financial institutions in the Asia-Pacific region and is headquartered in Melbourne, Australia. NAB was an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period.

93.    Defendant NAB filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[60]

94.    In the United States, NAB operates primarily through its federally licensed New York branch located at 245 Park Avenue, #2800, New York, NY 10167.[61] NAB has operated in New York since 1972.[62] NAB's New York branch is regulated by its licensing authority, the OCC, and the Federal Reserve Bank of New York. The New York branch provides funding, investment and risk solutions to financial institutions as well as business and wealth customers of NAB.

---

[59] *See Public Section of 2013 § 165(d) Tailored Resolution Plan*, Commonwealth Bank of Australia, (Dec. 31, 2013) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/cba-165-1312.pdf.
[60] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, National Australia Bank Limited, (Dec. 31, 2015) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/nab-165-1512.pdf.
[61] *See Public Section of 2013 § 165(d) Tailored Resolution Plan*, National Australia Bank Limited (Dec. 31, 2013), *available at* https://www.fdic.gov/regulations/reform/resplans/plans/nab-165-1312.pdf.
[62] *National Australia Bank Limited*, NAB USA, https://www.nationalaustraliabank.com/nabunitedstates/en/home (last visited Dec. 13, 2016).

95.     NAB operates an interest rates sales and trading business from its New York office. It trades Interest Rate products such as swaps, futures, forward rate agreements, and foreign exchange forwards both with other NAB trading desks and with external clients. NAB's New York Interest Rate desk manages client orders during the New York afternoon across FX and interest rate products for NAB trading desks located in Asia. NAB employs its Head of Global Institutional Banking, Patrick Ryan, in New York City. NAB also employ a dedicated team of 80 foreign exchange specialists to provide superior service globally quoting prices on a 24-hour basis through sales teams located in different time zones, including in the United States,[63] to allow NAB clients to access liquidity and execute spot, forward, and swap transactions 24 hours a day.[64] NAB is also a CFTC registered swaps dealer.

**I.     Westpac**

96.     Defendant Westpac Banking Corporation ("Westpac") is a wholly owned subsidiary of Westpac Banking Group, and was both an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period.

97.     Westpac filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[65]

98.     Westpac operates a federally-licensed branch in New York located at 575 5th Ave, New York, NY 10017. In March 2015, Westpac renewed and expanded its lease at 575 Fifth

---

[63] *See FX at a glance*, NATIONAL AUSTRALIA BANK (2009),
https://www.wholesale.nabgroup.com/RiskManagement/ForeignExchange/Pages/Default.aspx (last visited Dec. 2, 2016).
[64] *See Market leading FX advice and solutions*, NATIONAL AUSTRALIA BANK (2009),
https://www.wholesale.nabgroup.com/Pages/FXSolutions.aspx (last visited Dec. 2, 2016).
[65] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Westpac Banking Corporation, (Dec. 31, 2015) at 4-5, *available at*
https://www.fdic.gov/regulations/reform/resplans/plans/wbc-165-1512.pdf.

Avenue, having resided there since 1996.[66] The renewal option "enables Westpac to maintain its prestigious location [and] redesign its layout to accommodate a growing subsidiary…"[67]

99.     Westpac has history spanning more than 40 years' of operating in America and a dedicated US based team, headquartered in New York.[68] Westpac considers its New York Branch to be a legal and operational extension of Westpac Banking Group.[69] Westpac's New York Branch is a U.S. federally-licensed branch and therefore is subject to supervision, examination and extensive regulation by the Federal Reserve Bank under the U.S. International Banking Act of 1978 and related regulations.[70] Westpac is a provisionally registered swap dealer with the CFTC.[71]

100.    Westpac has further cemented its New York footprint by soliciting internship opportunities for its Westpac Americas, New York program, where candidates were encouraged to "Immerse yourself in New York's financial sector while supporting Westpac to develop relationships with some of the world's biggest companies." [72] Globally, Westpac's specialty is in AUD and NZD currencies, focusing on international clients wishing to do business with Australia and New Zealand. It has offices in Europe, the U.S., and Asia. Westpac's Financial Markets and Treasury Division, which was primarily responsible for managing Westpac's trading activities in the BBSW Fixing Window, boasts that it "is a leading provider of Fixed Income, Foreign Exchange and Commodities products and services to our core retail, corporate and institutional clients, wherever they are

---

[66] *See Aussie bank recommits at 575 Fifth*, REAL ESTATE WEEKLY, Mar. 31, 2015, http://rew-online.com/2015/03/31/aussie-bank-recommits-at-575-fifth/ (last visited Dec. 4, 2016).
[67] *Id.*
[68] *See Westpac group globally at a glance*, WESTPAC NEW ZEALAND LIMITED (2016), https://www.westpac.co.nz/wib/about-us/westpac-group-globally-at-a-glance/ (last visited Dec. 4, 2016).
[69] *See Westpac 2015 Resolution Plan, supra* note 65, at 16.
[70] *See Public Section of 2013 § 165(d) Tailored Resolution Plan*, Westpac Banking Corporation, (Dec. 31, 2013) at 13, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/wbc-165-1312.pdf.
[71]*See Corporate terms and conditions*, WESTPAC BANKING CORPORATION, https://www.westpac.com.au/terms-and-conditions/wib-terms-conditions/ (last visited Dec. 2, 2016).
[72] Press Flyer, Westpac, Institutional Banking Intern: Westpac Americas (2015), https://internz.aut.ac.nz/students/international-internships/2016-opportunities/westpac-americas2 (last visited Dec. 4, 2016).

located," through teams based in Australia, New York, and London.[73] Westpac's New York office

allows it to offer clients "[r]ound the clock 24hr 5.5 days a week coverage providing seamless

execution" via electronic foreign exchange trading platforms.[74] During the Class Period, Westpac

employed a Director and VP of Corporate Foreign Exchange and Interest Rate Derivatives in its

New York office as well as a Director of Corporate Foreign Exchange and Commodities sales to

provide risk management services, including foreign exchange, commodities, and interest rates, to

Westpac's North American client base, consisting of Fortune 100 companies from a diverse industry

set encompassing mining, media and technology, industrials, financials, energy and utilities.

101.    Westpac's foreign exchange forward business trades BBSW-based derivatives with

United States counterparties from its offices in New York. The Global Head of FX Forwards, Craig

Betts, manages a global team based in New York, London, Sydney, and Auckland.

102.    Westpac's Group Treasury book is managed throughout the trading day by Westpac

employees based in New York, London, and Sydney. During New York hours, the book is managed

by William Trembath, a Senior Associate in Group Treasury, from his office in New York. Westpac

made the following admissions about its Group Treasury book in its responsive pleadings in

Australian Federal Court:

> Group Treasury dealt in financial products and entered into
> transactions involving financial products, including Actual BBSW
> Referenced Products and BAB Futures, on the Defendant's behalf
>
> * * *
>
> the net profit and loss of the Defendant affected by a movement in BBSW was
> determined by a range of matters including Group Treasury's exposure to the level
> of BBSW on any given day.

---

[73] *Financial Markets & Treasury,* Westpac Group Graduate Programs (2013),
https://graduates.westpacgroup.com.au/intern_financial_markets (last visited Dec. 4, 2016).
[74] *eFX,* Westpac Banking Corporation, https://www.westpac.com.au/corporate-banking/financial-markets/foreign-exchange/efx/
(last visited Dec. 4, 2016).

103.     Westpac further admitted that it calculated its daily BBSW exposure by aggregating the total long BBSW positions and short BBSW positions from its Group Treasury book. Accordingly, when Westpac Group Treasury personnel transacted with counterparties located in the United States and entered those trades into its Group Treasury trading book, they knew that those trades would be benefited from Westpac's BBSW manipulation. Accordingly, Westpac purposefully directed its manipulation of BBSW at the United States market.

### J.     Deutsche Bank

104.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany. Deutsche Bank maintains a substantial presence in the United States, as is more particularly alleged below.

105.     Deutsche Bank filed its most recent U.S. Resolution Plan on July 1, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[75]

106.     Deutsche Bank based executive and senior-level interest rate and foreign exchange swaps traders at its New York office to trade products including G10 denominated currencies during the Class Period. From its New York office, Deutsche Bank offered FX, Rates and over the counter derivatives to its clients.[76] Deutsche Bank employs full-time specialized legal counsel at its New York office who specifically, "draft, review, and advise on over-the-counter derivatives and options (including credit, FX and rates) and structured finance transactions."[77]

107.     Deutsche Bank's U.S. headquarters is in New York. Its New York branch is located at 60 Wall Street, New York, NY 10005. Deutsche Bank considers its New York branch to be a

---

[75] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Deutsche Bank AG, (July 1, 2015) at 1, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/deutschebank-165-1507.pdf.
[76] *See Job Announcement, Debt Market Structure*, DEUTSCHE BANK (Oct. 3, 2016).
[77] *Job Announcement, Counsel in Global Markets Team (Fixed Income & Currencies (FIC) and Swaps Infrastructure VP*, DEUTSCHE BANK (Aug. 1, 2016).

"material entity" within the United States.[78] Deutsche Bank AG, New York Branch acts as an agent of Deutsche Bank AG in the United States and in this District. Deutsche Bank AG, New York Branch has been registered with NYSDFS and licensed to do business in this state since 1978. Deutsche Bank is also registered with the Board of Governors of the Federal Reserve System. Deutsche Bank's New York branch has more than 1,700 employees and total assets exceeding $152 billion. Deutsche Bank is a registered swap dealer with the CFTC. Deutsche Bank's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[79]

108.    Through its wholly owned subsidiary, Deutsche Bank Securities Inc., Deutsche Bank engages in a high volume of securities transactions, including clearing activities, currency transactions, interest rate derivatives, and swaps, on behalf of American clients and with counterparties located in the United States and in this District.

109.    Deutsche Bank AG entered into Australian dollar-denominated derivatives transactions with Plaintiffs FrontPoint Asian Event Driven Fund L.P., FrontPoint Financial Services Fund L.P., and FrontPoint Financial Horizons Fund L.P., during the Class Period. Deutsche Bank AG agreed that these transactions were governed by New York law, listed its New York headquarters as its address for notices,  and agreed to the following provision:

> **Governing Law**. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of law doctrine).

110.    Defendant Deutsche Bank AG, Australia Branch is a wholly-owned subsidiary of Deutsche Bank and is headquartered in Sydney, Australia. During the Class Period, Deutsche Bank

---

[78] *See Public Section of 2014 § 165(d) Tailored Resolution Plan*, Deutsche Bank AG, (July 1, 2014) at 4, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/deutschebank-idi-1407.pdf.

[79] *See Federal Reserve Bank of New York 2007 Survey*, *supra* note 11, at 12, 16-17 (Deutsche Bank participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

AG, Australia Branch was a member of the BBSW Panel. Deutsche Bank was an AFMA Prime

Bank from May 1, 2007 to December 23, 2008.

111.     Collectively, Deutsche Bank and Deutsche Bank AG, Australia Branch are referred

to as "Deutsche Bank".

### K.     HSBC

112.     Defendant HSBC Holdings plc is a British public limited company with its principal

place of business in London. HSBC Holdings plc is the parent company of one of the world's

largest banking and financial services groups, with subsidiaries providing services in 75 countries and

territories and approximately 16,000 employees in the United States. Through its American

subsidiaries, HSBC Holdings plc's U.S.-based dealers trade in the over-the-counter foreign exchange

and derivatives markets, which include interest rate swaps, forward rate agreements, and foreign

exchange swaps.[80] HSBC Holdings plc's ADRs are listed on the NYSE.

113.     HSBC's former global head of foreign exchange cash trading, Mark Johnson, was

indicted and arrested by the FBI in the United States after an investigation of HSBC's foreign

exchange trading practices.[81] Prior to his arrest, Johnson relocated to HSBC's New York offices for

his role as head of foreign exchange and commodities in the Americas.[82] In 2014, the CFTC ordered

HSBC to pay $275 million in fines for manipulating foreign exchange rates in the United States.[83]

114.     HSBC employs foreign exchange and interest rate derivative traders in New York,

including FX traders Rohan Yelvigi, who "executes daily foreign exchanges trades, spot, forward,

---

[80] *See* Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2010, at 13, 17-18 (HSBC participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer) (hereinafter "Federal Reserve Bank of New York 2010 Survey").
[81] Matt Turner, *Betrayal, corruption, and manipulation: 2 traders have been charged with 'front-running'*, BUSINESS INSIDER (July 20, 2016) *available at* http://www.businessinsider.com/report-a-big-name-hsbc-trader-just-got-arrested-2016-7.
[82] Martin Arnold & Caroline Binham, *HSBC internal probe 'cleared' top forex traders*, CNBC (July 21, 2016, *available at* http://www.cnbc.com/2016/07/21/hsbc-internal-probe-cleared-top-forex-traders.html.
[83] Press Release, U.S. Commodity Futures Trading Commission, CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates (Nov. 12, 2014), *available at* http://www.cftc.gov/PressRoom/PressReleases/pr7056-14.

swaps, options structures," Adler Shiga, Sooyun Byun, and Vice President of foreign exchange Elio

Spieza. HSBC also employs foreign exchange sales staff to target investors in New York, including a

team dedicated to soliciting foreign exchange business with United States-based hedge funds. Jason

Merritt, Vice-Presidents of FX Sales, and Sandra Tamayo, Senior Vice President and Head of FX

Bank Sales, are both based in HSBC's New York office.

115.    From 2006 to 2015, Senior VP of Institutional FX Sales Patrick Pisapia and Senior

VP of FX Sales Paul Denslow were based in New York.  Lon Dolan is currently Senior Vice-

President of FX Sales for HSBC's New York office. HSBC Holdings plc filed its most recent U.S.

Resolution Plan on December 31, 2015 with the Board of Governors of the Federal Reserve System

and the FDIC, as required by Title I, Section 165(d) of the Dodd-Frank Act.[84]

116.    Defendant HSBC Bank Australia Limited is a wholly-owned subsidiary of HSBC

Holdings plc and is headquartered in Sydney, Australia. HSBC Bank Australia Limited is HSBC

Holdings plc's principal banking subsidiary in Australia.[85] During the Class Period, HSBC Bank

Australia Limited was a member of the BBSW Panel.

117.    Collectively, HSBC Holdings plc and HSBC Bank Australia Limited are referred to

as "HSBC".

**L.    Lloyds**

118.    Defendant Lloyds Bank plc ("Lloyds") is a U.K.-based financial services group that

provides a wide range of banking services and is a wholly-owned subsidiary of Defendant Lloyds

Banking Group plc.  Lloyds Banking Group plc was formed on January 19, 2009 when Lloyds TSB

Group plc (the parent company of Lloyds TSB Bank plc) acquired HBOS plc. After this acquisition,

Lloyds TSB Group plc changed its name to Lloyds Banking Group plc, the ultimate parent of

---

[84] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, HSBC Holdings plc, (Dec. 31, 2015) at 1, *available at*
https://www.fdic.gov/regulations/reform/resplans/plans/hsbc-165-1512.pdf.
[85] *See* Federal Reserve Bank of New York 2010 Survey, *supra* note 80, at 6.

Lloyds TSB Bank plc and HBOS. On September 23, 2013, Lloyds TSB Bank plc changed its name to Lloyds Bank plc. Lloyds Banking Group plc's U.S. activities "are primarily undertaken" by the New York branch of Lloyds Bank plc.  Lloyds designates the Lloyds Bank plc New York branch as its "material entity" in the U.S. Lloyds' ADRs are listed on the New York Stock Exchange.

119.    Lloyds Banking Group plc filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[86]

120.    Lloyds maintained a substantial presence in the U.S. as is more particularly alleged below. Lloyds is a registered swap dealer with the CFTC. Lloyds also operates a New York branch ("Lloyds Bank plc, New York Branch") located in this District at 1095 Avenue of the Americas, New York, NY 10036. Lloyds Bank plc, New York Branch is registered with the NYSDFS and is licensed to do business in this state.

121.    Lloyds Bank plc, New York Branch is a material entity in the United States that conducts core business lines and/or critical operations for Lloyds and acts as an agent for Lloyds Bank in the United States and in this District. Lloyds Bank plc, New York Branch's primary activities include providing lending and deposit products to U.S. banks, other financial institutions, corporate non-financial institutions, and government agencies.

122.    Lloyds engaged in Australian dollar-denominated lending and derivatives transactions with counterparties located within the United States during the Class Period. Lloyds entered such transactions with asset management corporations, mortgage and loan corporations, insurance companies, banks, and other financial institutions that frequently transact in Australian dollar-denominated derivatives, including BBSW-based derivatives.

---

[86] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Lloyd's Banking Group plc, (Dec. 31, 2015) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/lloyds-165-1512.pdf.

123.     Lloyds based executive and director-level foreign exchange trading personnel at its New York office, including its Head of Foreign Exchange Trading for North America, during the Class Period. In 2015, when Garry Popofsky was hired by Lloyds Bank as its Head of Foreign Exchange Sales for the U.S., Andy Schaeffer, Lloyds' Head of Markets in North America, said "Our ability to attract someone of Garry's calibre and experience to the North America team demonstrates the capability and reputation we are building in the US. Garry's arrival will ensure even more focus can be given to delivering high-quality products and service to our clients."[87]

124.     To connect United States-based clients to the Australian financial markets, Lloyds employed foreign exchange sales personnel who rotated between its Sydney and New York offices. For example, Paul Bernasconi served as Director of FX Institutional Sales and was based in both Sydney and New York.

125.     The Australian subsidiary of HBOS plc, Bank of Scotland Plc, Australia Branch, was a member of the BBSW Panel until November 15, 2010, when it became Defendant Lloyds TSB Bank plc, Australia. Lloyds TSB Bank plc, Australia is a subsidiary of Lloyds and was a member of the BBSW Panel from November 15, 2010, until the end of the Class Period.

126.     HBOS Treasury Services PLC was an AFMA Prime Bank from May 1, 2007 until November, 2010, when it became Lloyds TSB Bank plc Australia Branch. Defendant Westpac acquired Lloyds' Australian assets in October, 2013.

**M.     Macquarie Bank**

127.     Defendant Macquarie Group Ltd. is a global banking and diversified financial services corporation headquartered in Sydney, Australia. Through its wholly-owned subsidiary, Macquarie Securities (USA) Inc., Macquarie has been expanding its operations in the United States.

---

[87] Robert Mackenzie Smith, *Lloyds appoints US head of FX sales*, FX WEEK, Apr. 29, 2015, *available at* http://www.fxweek.com/fx-week/news/2406155/lloyds-bank-appoints-head-of-fx-sales-for-us.

128.    Defendant Macquarie Bank Ltd. ("Macquarie Bank") is an Australian corporation headquartered in Sydney, Australia, and is a global provider of banking, advisory, trading, asset management, and retail financial services. Macquarie Bank is a wholly-owned subsidiary of Macquarie Group Ltd. Macquarie Bank maintains a foreign representative office at 125 West 55th Street, 22nd Floor, New York, NY 10019, which is regulated by the NYSDFS. Including its wholly-owned subsidiaries, Macquarie maintains twenty-five offices in total across the United States. Macquarie's head of operations for the U.S., Michael McLaughlin, is based in New York.[88] Macquarie Group recruits students in the District for its New York offices:

> Fourteen employees from The Macquarie Group, a global investment banking and financial services firm, offered resume critiques and conducted mock interviews with nine DDC (Double Discovery Center—Columbia College, Columbia University) juniors and sophomores. The afternoon gave students real-world experience as they prepare for college admissions and future job interviews. Staff members from the firm's Macquarie Capital, Commodities and Financial Markets, Securities, Risk Management, Financial Management Group, IT, and Legal divisions conducted resume critiques and mock-interviews.[89]

129.    Macquarie Bank, Ltd. transacted in BBSW-based interest rate swaps with Plaintiffs FrontPoint Financial Horizons Fund L.P., FrontPoint Asian Event Driven Fund L.P., and FrontPoint Financial Services Fund L.P., during the Class Period. The transactions between Macquarie Bank and FrontPoint called for floating payments based on BBSW to be made to Macquarie Bank's account with the Bank of New York in New York. In the ISDA Master Agreements governing these transactions, Macquarie included the following provision:

> **Governing Law**. This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement or any Transaction (whether in contract, tort or otherwise) shall be

---

[88] See David Bauerlein, *Global heavy-hitting bank Macquarie Group plans move to downtown Jacksonville that could create 123 jobs*, THE FLORIDA TIMES-UNION, Aug. 6, 2015, *available at* http://jacksonville.com/news/metro/2015-07-30/story/global-heavy-hitting-bank-macquarie-group-plans-move-downtown#.

[89] Lisa Herndon, *The Macquarie Group held mock interview sessions with DDC juniors and sophomores*, Colombia College, Colombia University, https://ddc.college.columbia.edu/news/macquarie-group-held-mock-interview-sessions-ddc-juniors-and-sophomores (last visited Dec. 13, 2016).

governed by, the law of the State of New York (without reference to any choice of law rules that would result in the application of the law of any other jurisdiction).

130.   Macquarie Bank was a member of the BBSW Panel during the Class Period.

**N.   Royal Bank of Canada**

131.   Defendant Royal Bank of Canada is the largest bank in Canada and is a bank holding company registered with the Federal Reserve.[90] In the United States, RBC offers a full suite of products and services which include corporate and investment banking, equity and debt origination and distribution, and structuring and trading. In the U.S., RBC has full industry sector coverage, offers a full investment banking product range, and competes with large U.S. and global investment banks as well as smaller regional firms. RBC is a provisionally registered swap dealer with the CFTC.

132.   Defendant RBC Capital Markets is a premier global investment bank and is a wholly-owned subsidiary of the Royal Bank of Canada.

133.   Royal Bank of Canada filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[91]

134.   RBC has had a presence in the United States since 1899, when RBC opened a New York State chartered agency.[92] RBC maintains four federal branches (three in New York, New York and one in Miami, Florida); two state agencies in Texas; four representative offices, located in California, Delaware, Texas and Washington State; a subsidiary national bank, RBC Bank (Georgia), National Association, and a full service broker-dealer with its principal place of business in New York, NY.[93] RBC has over 700 traders in New York and in the last decade has continued expanding

---

[90] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Royal Bank of Canada, (Dec. 31, 2015) at 12, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/rbc-165-1512.pdf.
[91] *Id.* at 3-4.
[92] *Id.* at 5.
[93] *Id.* at 5.

its New York operations.[94] In 2016, RBC announced additional plans to boost its share in the U.S. investment banking market and expand its presence in U.S. capital markets.[95]

135.    In 2010, RBC built a new 71,000-square-foot trading floor and hired approximately seventy people in trading and technology.  Robert Grubert, managing director, head of U.S. equity sales and trading specifically celebrated that he "can [now] walk down the rows and go from options to equities to emerging markets to high-yield to investment grade to FX" and can teach traders about relationships between products.  In 2012, RBC reported employing 1,705 front-office and 897 back-office employees in the United States with equity and fixed income sales and trading capabilities to target investors located in the United States.

136.    From 2011 to 2012, RBC generated 25% of its Fixed Income and Currency revenue, which includes interest rate and FX derivatives, from the United States. RBC's New York FX business includes executives such as Elsa Lignos, Managing Director and Head of North American G10 FX Strategy, and Daniel Tenengauze, head of Emerging Markets and Global FX Strategy.

137.    In 2012, Jonathan Hunter, Global Head, Fixed Income & Currencies, gave a speech for RBC's "Analyst and Investor Day."  In this discussion, Hunter described exactly what Fixed Income and Currencies do, including using derivative and FX products out of New York, one of its primary hubs.  Some of these specific functions include "provide derivative solutions to clients through the use of interest rate swaps, cross-currency swaps and provide foreign exchange services and solutions."  Hunter has overseen RBC Capital Markets' Fixed Income and Currencies business from RBC's New York offices since 2006. In total, RBC derives roughly $8 billion annually from its activities in the United States.

---

[94] *See* Boyd Erman, *How RBC is making waves in New York*, THE GLOBE AND MAIL, Aug. 23, 2012, *available at* http://www.theglobeandmail.com/globe-investor/how-rbc-is-making-waves-in-new-york/article4320190.
[95] *See* John Tilak, *RBC targets market share gains in U.S. investment banking*, REUTERS, Mar. 4, 2016, *available at* http://www.reuters.com/article/us-rbc-usa-idUSKCN0W52LW.

138.    Defendant Royal Bank of Canada, Australia Branch is a wholly-owned subsidiary of RBS. Royal Bank of Canada, Australia Branch was on the BBSW Panel during the Class Period.

139.    Royal Bank of Canada, RBC Capital Markets, and Royal Bank of Canada, Australia Branch are collectively referred to as "RBC."

### O.    Morgan Stanley

140.    Defendant Morgan Stanley is a Delaware Corporation with its headquarters located at 1585 Broadway, New York, New York 10036. Morgan Stanley's FX business provides execution in spot, forward and derivative currency markets to government and institutional clients (including sovereigns and government agencies, corporations, pension plans, hedge funds and mutual funds).[96]

141.    Morgan Stanley filed its most recent U.S. Resolution Plan on July 1, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[97]

142.    Defendant Morgan Stanley Australia Limited is headquartered in Sydney, Australia. Morgan Stanley Australia Limited provides investment banking services in Australia. It advises, originates, trades, and manages capital for governments, institutions, and individuals. During the Class Period, Morgan Stanley Australia Limited was a reserve member of the BBSW Panel.

143.    Collectively, Morgan Stanley and Morgan Stanley Australia Limited are referred to as "Morgan Stanley."

### P.    Credit Suisse

144.    Defendant Credit Suisse Group AG ("Credit Suisse Group") is a Swiss banking and financial services company incorporated in Switzerland. Credit Suisse Group provides a broad range of services to individual and corporate clients, such as investment banking, private banking, and asset management for customers located globally. Of its six primary offices, one is located in this

---

[96] *See Public Section of 2012 § 165(d) Tailored Resolution Plan*, Morgan Stanley, (June 29, 2012) at 25-26, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/morgan-1207.pdf.
[97] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Morgan Stanley, (July 1, 2015) at 3-4, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/morgan-165-1507.pdf.

District at 11 Madison Avenue, New York, NY 10010. Together with its subsidiaries, Credit Suisse

Group employs over 8,000 people in the United States, over 7,000 of which are in New York.

145.    Credit Suisse Group filed its most recent U.S. Resolution Plan on July 1, 2015 as

required by Title I, Section 165(d) of the Dodd-Frank Act.[98]

146.    Defendant Credit Suisse AG, a wholly owned subsidiary of Defendant Credit Suisse

Group, maintains an office at 11 Madison Ave. New York, New York 10010. Credit Suisse AG is

registered with the NYSDFS and licensed to do business in this state. Credit Suisse AG is also

licensed and supervised by the Board of Governors of the Federal Reserve System and the Federal

Reserve Bank of New York. Credit Suisse is also regulated by the SEC, the NYSE, the FINRA, the

National Futures Association, and the U.S. Commodity Futures Trading Commission.[99] Collectively,

Defendants Credit Suisse Group and Credit Suisse AG are referred to as "Credit Suisse."

147.    In 2013, Credit Suisse ranked first in overall fixed income trading in the U.S. with the

largest market share of all dealers.[100] Credit Suisse's U.S.-based dealers trade in the over-the-counter

foreign exchange and derivatives markets, which include Australian dollar interest rate swaps,

forward rate agreements, foreign exchange swaps, and currency swaps.[101] Credit Suisse's Investment

Banking Department houses its Rate Products Team, which is a global market maker in cash and

derivatives markets and a primary dealer in the United States, trading, *inter alia*, interest rate swaps

and options and other risk management structures and forms.

148.    Credit Suisse's U.S.-based dealers actively trade in the over-the-counter foreign

exchange and interest rate derivatives markets, which includes interest rate swaps, forward rate

---

[98] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Credit Suisse Group AG, (July 1, 2015) at 3, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/creditsuisse-165-1507.pdf.
[99] *Id.* at 18.
[100] *See* Greenwich Associates, *2013 Greenwich Leaders: U.S. Fixed Income*, at 1, *available at* https://www.greenwich.com/fixed-income-fx-cmds/2013-greenwich-leaders-us-fixed-income.
[101] *See Federal Reserve Bank of New York 2010 Survey*, supra note 80, at 12, 16-17.

agreements, foreign exchange swaps, and currency swaps.[102] Credit Suisse based executive level Vice Presidents, interest rates derivatives traders, and its Global Head of FX Electronic Trading in its New York office during the Class Period. In New York, Credit Suisse traders took "proprietary and hedging positions in FX forwards and other FX and interest rate (IR) products, including IR futures, IR options, IR swaps, OIS, FRAs, FX spot and FX options."

149.    Credit Suisse's U.S. broker-dealer subsidiary has been operating continuously in the United States since 1932, when the First Boston Corporation was founded, according to testimony that Credit Suisse's managing director, Daniel Mathisson, provided to the U.S. Senate Committee on Banking, Housing, and Urban Affairs on October 28, 2009, regarding trading and market structure issues. Credit Suisse's Advanced Execution Services is a team of approximately 200 financial and technological professions based in New York that executes trades electronically on behalf of mutual funds, pension funds, and hedge funds.

150.    Credit Suisse entered into Australian dollar-denominated swaps with Plaintiff FrontPoint Asian Event Driven Fund L.P., during the Class Period. The schedule to the ISDA Master Agreement governing these transactions contained the following provision:

> **Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the State of New York, without reference to choice-of-law doctrine, and each party hereby submits to the jurisdiction of the Courts of the State of New York.

151.    **The BBSW Panel:** Defendants ANZ, BNP Paribas, Australia Branch, Australia Branch, CBA, Deutsche Bank AG, Australia Branch, HSBC Bank Australia Limited, JPMorgan Chase Bank NA, Australia Branch, Lloyds TSB Bank plc Australia Branch, Macquarie Bank Limited, NAB, Royal Bank of Canada, Australia Branch, RBS Group (Australia) Pty Limited, UBS AG,

---

[102] *Id.* at 12, 16-17 (Credit Suisse participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

Australia Branch, and Westpac, along with Citibank NA, were members of the BBSW Panel during the Class Period. These entities are referred to collectively as "Panel Banks."

152.    **AFMA Prime Banks:** Defendants ANZ, CBA, NAB, and Westpac were designated AFMA Prime Banks during the entirety of the Class Period. Defendant JPMorgan Chase, N.A. was a designated AFMA Prime Bank from early 2009 through November 2011. Defendant BNP Paribas, Australia Branch was a designated AFMA Prime Bank from 2005 through February 24, 2012. Defendant Deutsche Bank AG was an AFMA Prime Bank from May 1, 2007 through December 23, 2008. HBOS Treasury Services plc was an AFMA Prime Bank from May 1, 2007 through September 29, 2010. Citibank NA was an AFMA Prime Bank from 2005 through December 23, 2008. Collectively, the designated AFMA Prime Banks are referred to as "Prime Banks."

## Q.    ICAP

153.    Defendant ICAP plc is a UK-based voice broker and is the largest provider of electronic dealer broker and post trade risk services in the world. ICAP trades a wide range of derivative products, including interest rate derivatives, credit derivatives, foreign exchange, interest rate swaps, and equity swaps. ICAP SEF (US) LLC is a limited liability company organized under the laws of the State of Delaware and is a wholly owned subsidiary of ICAP Broking Holdings North America LLC. The ultimate parent company of ICAP SEF (US) LLC is ICAP plc, a company listed on the London Stock Exchange. ICAP SEF (US) LLC's Swap Execution Facility Rulebook list the laws of the State of New York, without regard to its conflict of laws principles, as the governing law for all disputes arising out of or related to the SEF or any transaction.[103] ICAP's Swap Exchange Facility offers BBSW-based derivatives on to market participants in the United States.

---

[103] *Swap Execution Facility Rulebook (Version 2.5)*, ICAP SEF (US) LLC (Feb. 2015) at 46, *available at* http://www.cftc.gov/filings/orgrules/rule013015icapsefsef002.pdf.

154.     Defendant ICAP Australia Pty Ltd. is headquartered in Sydney, Australia and is the Australian subsidiary of ICAP plc. Collectively, ICAP plc and ICAP Australia Pty Ltd. are referred to as "ICAP."

**R.     Tullett Prebon**

155.     Defendant Tullett Prebon plc is headquartered in London and is one of the world's leading interdealer brokers. Tullett Prebon products include fixed income securities and derivatives, interest rate derivatives, treasury products, equities, and energy and commodities.

156.     Tullett Prebon has its principal offices in New Jersey, London, Hong Kong, Singapore and Tokyo. Tullett Prebon's wholly-owned subsidiary, Tullett Prebon Financial Services LLC, is based in this District at One Seaport Plaza, 199 Water St, New York, NY 10038. Defendant Tullett Prebon's swap execution facility, known as "tpSEF", is a wholly-owned subsidiary of Tullett Prebon and is permanently registered with the ("CFTC"). tpSEF Inc.'s Rulebook lists the law of the State of New York as governing the SEF Rules regardless of the laws that would otherwise apply under applicable choice-of-law principles.[104]

157.     Defendant Tullett Prebon (Australia) Pty. Limited is an Australian subsidiary of Tullett Prebon plc headquartered in Sydney, Australia. Collectively, Tullett Prebon plc and Tullett Prebon (Australia) Pty. Limited are referred to as "Tullett Prebon."

158.     **Broker Defendants:** ICAP and Tullett Prebon were the only brokerages operating in the Prime Bank Bill market during the daily BBSW Fixing Window and possessed a 100% market share in this market during the Class Period. ICAP and Tullett Prebon are collectively referred to as the "Broker Defendants."

---

[104] *tpSEF Inc. Rulebook*, tpSEF Inc. (Nov. 10, 2016) at 88, *available at* http://www.tullettprebon.com/swap_execution_facility/documents/tpSEF%20-%20Rulebook.pdf?20161122.

159.    John Doe Defendants Nos. 1-50 are other entities or persons, including banks, derivatives traders, and other co-conspirators whose identities are currently unknown to Plaintiffs. The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade and manipulation of BBSW and the prices of BBSW-based derivatives.

## SUBSTANTIVE ALLEGATIONS

I.    Background

A.    The Money Market

160.    Financial market participants commonly distinguish between two kinds of markets: "capital markets" – like the stock market or bond market – where companies go to raise funds for long-term purposes, and the "money market," where borrowing and lending occurs on a short-term basis, typically for periods of less than one year.

161.    Banks are some of the most important money market participants. Banks both borrow from the money market to fund their operations and act as dealers in related over-the-counter interest rate derivatives, like swaps (*see* Part I.D.1 *infra*), which allow third-parties to exchange future cash payments based on movements in specified market interest rates.

162.    Banks use the money market to borrow money by issuing "Bank Bills." Bank Bills are bills of exchange — similar to checks — that require the issuing bank to pay a specified amount of money, *i.e.*, the "face value" of the bill, on a certain maturity date. The number of days between when a Bank Bill is issued and when it matures determines its "tenor." For example, a Bank Bill that matures in 90 days has a three-month tenor, while one maturing in 180 days has a six-month tenor.

163.    Banks issue Bank Bills at a discount to their face value. In this way, a Bank Bill serves as a short term loan, with the difference between the price paid for the bill and its face value representing the amount of interest. For example, assume an investor pays $98,382.75 to purchase a

44

Bank Bill with a face value of $100,000 that matures in 120 days. When the investor redeems that Bank Bill at maturity it will receive the full $100,000 face value, $1,617.25 more than what it paid to purchase that bill. The extra $1,617.25 represents the amount of interest the bank paid to borrow $98,382.75 for 120 days, or approximately 5% annually.

164.    This example also demonstrates the inverse relationship between a Bank Bill's purchase price and its yield. Because interest is represented as the difference between a Bank Bill's purchase price and its face value, the amount of interest paid increases as the bill's purchase price decreases and vice versa. For example, if the purchase price of the Bank Bill in ¶ 163 above increased from $98,382.75 to $99,000.00, the yield of that bill would decrease to approximately 3.1% annually, as the purchase price moved closer to the face value. A decrease in the purchase price of that Bank Bill to below $98,382.75, however, would increase the yield to greater than 5% as the difference between the purchase price and $100,000 face value increased.

165.    Bank Bills can be "accepted" or "endorsed" by any bank. When a bank accepts a Bank Bill it becomes obligated to pay the face value of that bill on the maturity date. If instead a bank endorses a Bank Bill, it becomes obligated to pay the face value of that bill at maturity only if the acceptor or drawer is unable to do so. The terms "Bank Accepted Bill" and "Bank Endorsed Bill" refer to Bank Bills that have been accepted or endorsed, respectively.

166.    In addition to issuing Bank Bills, banks also sell certificates of deposit ("CDs") to raise short term funds. A CD is a document evidencing a deposit placed with a depository institution for a certain amount of time. The certificate states the terms of the deposit, typically the amount of the deposit, the maturity date, the interest rate paid, and the method of interest calculation.

167.    CDs can be either negotiable or nonnegotiable. A negotiable CD ("NCD") can be sold by the depositor to other parties who can in turn resell the NCD in the secondary market. In contrast, a nonnegotiable CD generally must be held by the depositor until maturity.

B.      **Australian Prime Banks**

168.    The Australian Financial Markets Association ("AFMA") is a trade association and the principal Australian financial markets industry group. Each Defendant, either directly or through a subsidiary it controlled, was a member of the AFMA during the Class Period.

169.    The AFMA organizes several committees, each with its own functions, procedures, and criteria for membership. One of the main AFMA committees, the Market Governance Committee, is responsible for developing and maintaining market protocols used to facilitate and promote the efficient and orderly running of the over-the-counter derivatives markets in Australia.

170.    The Market Governance Committee oversees a number of sub-committees with the objective of developing consensus in the market on technical matters such as transaction documentation, trading conventions, and market data. One of these sub-committees, the Negotiable & Transferable Instruments ("NTI") Committee, is responsible for maintaining the conventions for trading money market instruments, including Bank Bills and NCDs.

171.    The NTI Committee also runs the AFMA's annual election of "Prime Banks," a designated subset of banks operating in Australia whose Bank Bills and NCDs are recognized as having the highest quality with regard to liquidity, credit, and consistency of relative yield.

172.    To be eligible for Prime Bank status, a bank must be (1) an Australian Prudential Regulation Authority ("APRA") authorized deposit-taking institution; (2) classified by APRA as either an Australian-owned bank, foreign subsidiary bank, or branch of a foreign bank that is authorized to carry on banking business under the Australian Banking Act of 1959 or comparable legislation in its country of origin; and (3) able to meet certain credit rating criteria.

173.    Prime Banks are appointed through an election process from among the eligible banks. On or following the anniversary of the prior election the AFMA asks all institutions that meet the Prime Bank eligibility criteria to nominate a list of banks. Next, banks that the NTI

Committee deems to be significant traders and investors in Bank Accepted Bills and NCDs vote on which of the nominated banks should be appointed Prime Banks. Votes are weighted according to a formula determined by the NTI Committee so that the most active market participants have a proportionally higher involvement in the process than less active members.

174.     The voting structure favors consistency. Existing Prime Banks are re-appointed if they capture at least 70% of the weighted survey vote. New banks face a higher threshold and must receive 80% of the weighted survey vote to become a Prime Bank. The process assumes that there will be at least three banks eligible and nominated as Prime Banks in each election.

175.     During the Class Period, there were between four and eight Prime Banks: Defendants ANZ, CBA, NAB, and Westpac were designated as Prime Banks for the whole Class Period. Defendant BNP Paribas was a designated Prime Bank from 2005 through February 24, 2012. Defendant Deutsche Bank was a designated Prime Bank from May 1, 2007, through December 23, 2008. Defendant JPMorgan Chase, N.A. and HBOS Treasury Services PLC were appointed Prime Banks for shorter periods of time, from early 2009 through November 30, 2011, and May 1, 2007, through September 29, 2010, respectively. Citibank was also a designated AFMA Prime Bank from 2005 through December 23, 2008.

176.     There are several advantages to the Prime Bank designation. Bank Bills and NCDs issued by Prime Banks trade at the lowest possible interest rates as a homogenous asset class known as "Prime Bank Bills." This increases liquidity and allows Prime Banks to raise funds in the money market at a discount. Prime Banks are also automatically members of the BBSW Panel and directly involved in setting Australia's short-term interbank interest rate.

177.     Prime Bank Bills are traded in two ways, either (a) through "dealer markets" comprised of interdealer brokers who acted as intermediaries, quoting prices at which their

respective clients would buy ("bid") and sell ("offer") Prime Bank Bills as counterparties to and from other market participants; or (b) in direct trades between counterparties.

178.    Broker Defendants ICAP and Tullett Prebon were the only interdealer brokers operating markets for Prime Bank Bills during the Class Period. Both maintained electronic systems for reporting Prime Bank Bill prices and would post bids and offers for Prime Bank Bills at all tenors shortly after receiving bids and offers for their clients. This pricing information, once posted, became accessible by, and visible to, other market participants, in contrast to the direct trades between counterparties, which remained private.

## C.    The BBSW Fixing

179.    BBSW is intended to reflect the observed rate of interest paid on Prime Bank Bills actually traded in the Australian money market. The rate is calculated based on submissions from a group of fourteen panel banks, including Prime Banks, who are selected periodically through a private election held at the discretion of the current BBSW Panel. This discretionary election process resulted in an extremely low turnover in panel membership. While there were several BBSW panel elections during the Class Period, but the composition of the panel did not change.

180.    The AFMA's Market Governance Committee administers the rate-setting process through its BBSW sub-committee, which is responsible for the overall management of the BBSW rate, rates directly related to the BBSW rate,[105] the procedure for the production of the BBSW rate, and the resolution of disputes among AFMA members involving BBSW and directly related rates.

181.    The BBSW Committee is comprised of two representatives from each of the following AFMA committees: (1) NTI Committee; (2) Interest Rate Options Committee; and (3) Swaps Committee. In addition, there is also one broker representative, two investment manager

---

[105] For example, the AFMA also publishes a rate called "BBSY", which creates a "bid" and an "offer" rate from BBSW by adding or subtracting five basis points (0.05%) to the BBSW fix.

representatives, and one borrower representative on the committee. Although the exact membership of the BBSW Committee is secret, ASIC revealed that it included several of Defendants' traders directly involved in manipulating the BBSW during the Class Period, including:

> (a) Paul Woodward, Andrew Miller, and Matthew Morris from ANZ (*see* Part II.A *infra*);
>
> (b) Colin Roden, Sophie Johnston, and Michael Dodd from Westpac (*see* Part II.A *infra*);
>
> (c) Paul Howarth and Michael Tsakiris from NAB. (*See* Part II.A *infra*).

182.    According to AFMA guidelines, the BBSW is fixed every business day using the following procedure. First, the BBSW Panel Banks submit to the AFMA the observed "mid-rate," *i.e.*, the midpoint between the bid price at which banks offer to buy and the ask price at which they offer to sell, Prime Bank Bills with six tenors – one, two, three, four, five, and six months – traded between 9:55 A.M. and 10:05 A.M. Sydney Time (the "Fixing Window"). Panel members also submitted rates for the nine-month and twelve-month tenors until January 5, 2009, when the nine and twelve-month rates were discontinued.

183.    The BBSW Panel Banks were supposed to base their submissions to the AFMA on prices that were displayed on two Prime Bank Bill trading screens, one from ICAP and one from Tullett Prebon. The BBSW Panel Banks had access to these screens during the Fixing Window.

184.    Next, the AFMA calculates the BBSW "fix" for each tenor by ranking the quotes in numerical order and eliminating the highest and lowest submissions – a procedure known as "topping and tailing" – before averaging the remaining six submissions. The AFMA then publishes the resulting average rate to financial data providers, including Thomson Reuters and Bloomberg, who distribute BBSW rates within the United States, Australia, and other markets.

### D.    BBSW-Based Derivatives

185.    The BBSW fix directly affects the prices of financial instruments that incorporate the rate as a component of price (collectively "BBSW-based derivatives") including, for example: (i)

BBSW-based swaps; (ii) BBSW-based forward rate agreements; (iii) Australian dollar futures contracts; (iv) Australian dollar foreign exchange forwards; and (v) 90-day Bank Accepted Bill futures contracts. More than $1 trillion in BBSW-based derivatives traded "over-the-counter," directly between counterparties, within the United States during the month of April 2013 alone. In total, tens of trillions of dollars in BBSW-based derivatives traded over-the-counter and on public exchanges within the United States during the Class Period.

### 1.   BBSW-Based Swaps

186.    A swap is an over-the-counter BBSW-based derivative in which two parties exchange the obligation to make a series of payments based on some underlying principal amount for some set period of time. BBSW determines the price and payments due under BBSW-based swaps by determining the amount paid or received by each party.

187.    There are many different types of BBSW-based swaps. For example, in the most common "plain vanilla" interest rate swap, the parties agree to a "fixed-for-floating" exchange in which one party will make payments based on a variable price or rate, *e.g.*, BBSW, while the other will make payments based on a fixed rate, *e.g.*, 1.5%, for the same notional amount.

188.    Counterparties may also use swaps to conduct a "floating-for-floating" exchange in which both parties agree to make payments based on a variable price or rate. For example, one party can agree to make payments equal to the return on a stock or index, *e.g.*, the ASX 200, an index of the largest 200 stocks listed on the Australian Stock Exchange, in exchange for receiving interest rate payments based on a variable interest rate, like BBSW.

189.    Payments under a swap contract are due at regular intervals, *e.g.*, every six months, for the duration of the agreement on certain specified "fixing" or "reset" dates. Each time a payment is due, the amount owed by the two parties are netted against each other so that only the party with the larger obligation will make a payment. For example, assume Party A enters into a

floating-for-floating swap contract with Party B and agrees to make payments every six months equal to the return of the ASX 200 index. In exchange, Party B agrees to make payments to Party A every six months based on the six-month BBSW tenor. On each reset date, if six-month BBSW is greater than the percentage return of the ASX 200 index, Party B has the larger obligation and will make a payment to Party A. But if the ASX 200 returns more on a percentage basis than six month BBSW, Party A has the larger obligation and will make a payment to Party B.

### 2.   BBSW-Based Forward Rate Agreements

190.     A forward rate agreement ("FRA") is an interest rate forward contract. FRAs, which are also known as single-period swaps, are similar to interest rate swaps and represent an agreement between two counterparties to exchange fixed-for-floating interest rate payments on some principal amount at a future reset date. On the reset date, the party with the larger obligation makes an interest rate payment equal to the difference between the fixed rate and floating rate specified in the contract. For example, assume Party A enters into a FRA with Party B in which Party A agrees to receive 4% interest on $1,000,000 and Party B agrees to receive interest equal to six-month BBSW, determined on a date one year in the future, for the same underlying principal amount. If, after one year, six-month BBSW is higher than 4%, Party A must pay Party B the difference in interest between 4% and the six-month BBSW fixing on that date. However, if six-month BBSW is lower than 4%, Party B must pay Party A the difference in interest.  Thus, BBSW determines the price and payments due under a BBSW-based FRA.

### 3.   CME Australian Dollar Futures Contracts

191.     A CME Australian dollar futures contract is an exchange-traded BBSW-based derivative that represents an agreement to buy (called a "long" position) or sell (called a "short" position) 100,000 Australian dollars in terms of U.S. dollars on some future date. Prices of CME Australian dollar futures contracts are determined by a formula that incorporates BBSW as one of its

terms. This formula uses BBSW to adjust the "spot price" of Australian dollars for immediate delivery to account for the "cost of carry," *i.e.*, the amount of interest earned on Australian dollar deposits over the duration of the agreement.

192.    Because BBSW is a component in the formula used to price CME Australian dollar futures contracts, there is a statistically significant relationship between a change in BBSW and a change in the prices of CME Australian dollar futures contracts. Plaintiffs used a regression analysis – a statistical process that evaluates the relationships among variables – to verify this relationship by comparing the daily change in: (1) the closing price of the CME Australian dollar futures contracts closest to expiration; (2) the spot price of purchasing Australian dollars in terms of U.S. dollars; and (3) the one, three, and six-month tenors of BBSW. This regression analysis produced statistically significant results indicating that a change in BBSW affects the prices of CME Australian dollar futures contracts.

### 4.    Australian Dollar Foreign Exchange Swaps & Forwards

193.    A foreign exchange swap is a contract in which two counterparties agree to exchange streams of interest payments in different currencies for an agreed-upon period of time and to exchange principal amounts in different currencies at an agreed-upon exchange rate at maturity. There are two components to a foreign exchange swap: (1) a spot transaction in which the parties buy or sell a certain amount of one currency (*e.g.*, Australian dollars) at the current market prices for immediate delivery (*i.e.*, typically within two days); and (2) a foreign exchange forward, which reverses the spot transaction by buying or selling an equivalent amount of a second currency (*e.g.*, U.S. dollars) on some future maturity date (*e.g.*, 14 days later).

194.    An Australian dollar foreign exchange forward is an agreement to buy or sell Australian dollars on some future date and is the over-the-counter equivalent of a CME Australian dollar futures contract. Australian dollar foreign exchange forwards are priced using the same

formula that determines the value of CME Australian dollar futures contracts and the prices of Australian dollar foreign exchange forwards are affected by changes in BBSW for the reasons stated in ¶ 192 above.

     5.   <u>90-Day Bank Accepted Bill Futures</u>

195.    90-day Bank Accepted Bill ("BAB") futures contracts are standardized contracts in which one party, the "long," agrees to buy a 90-day Prime Bank Bill with a face value of $1,000,000 at a specified yield (and thus price) on a certain future expiration date and another party, the "short," agrees to sell a 90-day Prime Bank Bill with a face value of $1,000,000 at a specified yield (and thus price) on the same future expiration date.

196.    BAB futures contracts expire at noon on one of four dates per year; the Thursday before the second Friday in each of March, June, September, and December.

197.    BAB futures contracts are "deliverable," meaning that if a BAB futures contract is held through the expiration date then the "short" party must actually deliver the 90-day Prime Bank Bill(s) to the "long" party, who must then actually pay for those Prime Bank Bill(s). Delivery occurs on the day following the day on which the BAB futures contract expires.

198.    BAB futures contracts are traded on the ASX24 exchange. A party can enter into BAB Futures contracts with a term (time left to the expiry date) of up to five years.

199.    BAB futures contracts are quoted in terms of 100 minus the annual percentage yield of the underlying Prime Bank Bills. So a BAB futures contract quoted at "96" means that the parties to the BAB futures contract agree to buy (or sell) $1,000,000 of 90-day Prime Bank Bill(s) on the expiry date at a price that represents a yield of 4% (that is, the "price" of the 90-day Prime Bank Bill will be discounted to reflect a yield of 4%).

200.    As BBSW Panel members and the largest BBSW-based derivatives dealers in the world, Defendants understood the direct, mathematical pricing relationships described above and

that manipulating the BBSW fixing would affect the prices of BBSW-based derivatives, including those traded within the United States.

II. **Defendants Agreed to and Did Restrain Trade In, and Intentionally Manipulated the Prices of, BBSW-Based Derivatives**

201.     ASIC's investigation uncovered hundreds of communications evidencing a conspiracy among Defendants to systematically manipulate BBSW by *inter alia*: (1) engaging in manipulative transactions during the Fixing Window; (2) making false BBSW submissions in violation of AFMA guidelines; (3) sharing proprietary information regarding BBSW-based derivatives positions with other Defendants; and (4) using their control over the AFMA rule-making process to ensure that BBSW remained susceptible to manipulation. This manipulative conduct, together with UBS', RBS', and BNP Paribas' admitted false reporting of BBSW, fixed BBSW-based derivatives prices at artificial levels that financially benefited Defendants at the expense of Plaintiffs and the Class.

A.     **Defendants Rigged BBSW by Coordinating Manipulative Transactions within the Fixing Window**

202.     Bank Defendants rigged BBSW by engaging in transactions during the Fixing Window to manipulate the supply of Prime Bank Bills. These illegitimate trades were often uneconomic. Communications show that Defendants would intentionally lose money on Prime Bank Bill transactions to manipulate BBSW in a direction that generated considerably larger profits from their derivatives positions. Thus, the net gain from manipulating the fixing was positive even when the Prime Bank Bill transactions Defendants' used to manipulate the fixing resulted in a loss.

203.     Defendants' manipulation of BBSW had already developed into a routine business practice by February 2003, when NAB's Head of Money Markets coached a colleague about "our natural BBSW advantage." In October 2003, an NAB dealer wrote that there was "[n]o strong need to get funds in right now, unless opp[o]rtunity arises to protect a rate set."

54

204.   To maximize their impact on the BBSW fixing, Bank Defendants conferred with each other before executing these manipulative transactions, aligning their interests and recruiting co-conspirators to trade in the same direction. Bank Defendants also engaged in transactions with each other before the start of the Fixing Window to concentrate the supply of Prime Bank Bills, which they referred to as "stock," "ammo," or "bullets," so that their traders, with help from the Broker Defendants, could "puke out" a massive quantity during the Fixing Window.

      1.   <u>Defendants manipulated BBSW by artificially increasing or decreasing the supply of Prime Bank Bills during the Fixing Window</u>

205.   The forces of supply and demand determine the prices and, therefore, yields, of Prime Bank Bills. Defendants' strategy of manipulating the BBSW fixing was effective because they controlled the supply of Prime Bank Bills during the Fixing Window. As Prime Bank Bill supply increases, Prime Bank Bill prices decrease and yields rise. *See* ¶¶ 163-164, *supra*. Thus, artificially increasing the supply of Prime Bank Bills during the Fixing Window results in an artificially higher BBSW fix.

206.   To determine which direction to manipulate BBSW on a given day, Defendants engaged in a daily practice of calculating the net BBSW exposure, *i.e.*, the amount of profit or loss caused by movements in BBSW, of certain trading books. Through this process, Defendants were able to track in real-time the amount of revenue they derived from each basis point change in BBSW and ensure that their manipulative trading was executed with mathematical precision.

207.   ANZ trader Mark Budrewicz explained the effect of selling Prime Bank Bills to increase supply during the Fixing Window to ANZ analyst Saju Yohannan in the December 10, 2010 phone conversation below:

      **<u>December 10, 2010</u>**

      <u>ANZ [Budrewicz]</u>: BBSW is a traded rate at 10 o'clock…people in the market can affect that rate by selling bills or buying bills in the market…So by me selling bills, I'm adding to the supply of bills into the market, right - - which then pushed the

yield higher… Or pushes the price lower and the yield higher conversely…So all I'm doing is I'm taking those bills and selling them back out on the same day

ANZ [Yohannan]: All right

208.    Budrewicz's example was not a hypothetical. ANZ calculated that its Global Markets book had a $5.4 billion net long exposure to the results of the December 10, 2010 fixing, *i.e.*, it would benefit from an increase in the rate, and planned to manipulate BBSW higher on that day.

209.    To carry out this plan, Budrewicz acquired $1.575 billion in Prime Bank Bills over two days for the express purpose of manipulating the BBSW fix. First, he purchased $860 million in Prime Bank Bills from various sources on December 9, 2010, explaining to a colleague in a contemporaneous email that this "stock is going to be used to affect a rate set that I have tomorrow." Next, he purchased and held 715 December 2010 BAB futures contracts on the expiration date, taking delivery of $715 million in Prime Bank Bills on December 10, 2010. Budrewicz explained in a different conversation with Yohannan that these additional bills were also going to be used to manipulate the BBSW fix:

**December 10, 2010**

ANZ [Budrewicz]: I still ended up taking 715 bills into expiry. These are physically delivered, ie I will receive $715mio 90day bills on Friday. What I have done today, is to sell them into the rate set to help push it in my favour.

210.    Standing for delivery of these 715 BAB futures contracts was uneconomic and caused ANZ to lose money. But as Budrewicz explained, in another message to Yohannan, the massive size of ANZ's BBSW exposure made up for the loss and resulted in a net profit:

**December 10, 2010**
ANZ [Budrewicz]: Now I would have lost money on the bills. However if my rate set is larger…than 715 mill, say its $2bn. I've push that rate set 6 points on $2bn. I might have lost 715mill, 6 points…but net – net I'm still better

211.    ANZ sold all $1.575 billion in Prime Bank Bills it had acquired during the December 10, 2010 Fixing Window. This massive sale accounted for 62.2% of all Prime Bank Bills traded that

day. Following this transaction, one-month and three-month BBSW tenors increased from 4.85% and 5.07% on December 9 to 4.905% and 5.095% on December 10, 2010, financially benefiting ANZ's large net long position.

212.     Prime Bank Defendants could also increase supply by issuing new Prime Bank Bills during the Fixing Window. This had the same effect as selling and would drive Prime Bank Bill prices lower while increasing yields. For example, in the chat below Budrewicz explains that ANZ planned on issuing new bills during the December 1, 2010 Fixing Window to manipulate BBSW higher to benefit ANZ's long BBSW exposure of $777 million:

> **December 1, 2010**
> ANZ [Budrewicz]: so we are issuing today into the rate set
> I am not concerned with the level would like to push it as high as possible… will decs bills move, if todays BBSW gets rammed?

213.     Following this communication, both the one-month and three-month BBSW tenors increased by 1 and 3 basis points respectively, from 4.82% and 5.07% on November 30, 2010 to 4.83% and 5.1% on December 1, 2010, consistent with ANZ's plan.

214.     The ability to manipulate BBSW by issuing new Prime Bank Bills served as a major incentive for banks to acquire and then retain Prime Bank status. In the chat below, which took place just after Citibank and BNP Paribas acquired Prime Bank status, a trader from NAB relays a conversation he had with a Citibank trader where the Citibank trader had complained of Citibank's inability to "issue" Prime Bank Bills in the Fixing Window to offset Westpac's downward manipulation of BBSW:

> **March 9, 2005**
> NAB [Reid]: FYI, in a chat with David Heriot from Citibank ages ago, he has showed that he has had a rate setting to the tune of 2 bio, that went against him when WBC pushed the rate down & he couldn't issue to offset it. Not sure if this is a continuing swap interest, or just a FRA set, but it would appear he will be there at times to support the rate.

57

215.    While increasing Prime Bank Bill supply during the Fixing Window caused prices to fall and yields to rise, decreasing supply had the opposite effect. Decreasing Prime Bank Bill supply during the Fixing Window through large purchases would cause bill prices to increase and yields to fall, resulting in an artificially lower BBSW fixing.

216.    This cause and effect relationship is demonstrated in the conversation below, where Westpac traders Colin "the Rat" Roden and William Hosie discuss purchasing $1.2 billion in Prime Bank Bills to manipulate one-month BBSW artificially lower:

> **July 1, 2011**
> Westpac [Roden]: Mate you're a fucking thief
> Westpac [Hosie]: A thief. Why?
> Westpac [Roden]: I heard about the 1 month
> Westpac [Hosie]: Yeah mate, we got it back down . . . I bought 340 from CBA and one through Jase and I've bought 220 all from Goldmans in the, in the other once . . . So didn't actually spending too much, spent like 1.2 [billion] across both
> Westpac [Roden]: That's good, that's good, that's very good

217.    Consistent with this conversation, one-month BBSW decreased by four basis points from 4.87% on June 30, 2011, to 4.83% on July 1, 2011, following Westpac's large purchase of Prime Bank Bills during the Fixing Window that day.

218.    Bank Defendants were willing to spend billions of dollars purchasing Prime Bank Bills to manipulate the BBSW fixing because they realized a much larger gain on their BBSW-based derivatives positions as a result. For example, in the conversation below Westpac trader Sophie Johnston, known among traders as the "Perfume Steam Roller" because of how she would "run over" or manipulate the BBSW fixing, explained to an undisclosed group of Westpac employees that while Roden had spent roughly $2 billion purchasing Prime Bank Bills to manipulate BBSW lower, Westpac Group Treasury's BBSW short exposure of $14.06 billion was large enough that it still realized a net gain:

<u>April 7, 2010</u>
Well Col[in Roden] spent a crap load of money yesterday and he sold quite a bit today ... he bought like 2 billion dollars' worth of stock for the rate set so ... he's sold I think today. Spend 2 for 20's not bad. So he'll be selling stuff over the next couple of days because he's got no rate sets for like another week or whatever so that shouldn't be too much of an outflow of cash.

219.     In fact, on April 6, 2010, Westpac bought $1.853 billion in 30-day Prime Bank Bills from the money market, accounting for 100% of all purchases made in that tenor through the Broker Defendants.

220.     Defendants created large distortions in BBSW by timing their manipulative trading when they knew the market was illiquid. For example, CBA trader Garfield Lee learned that Westpac's Colin Roden had manipulated BBSW by six basis points, from 3.27% to 3.21%, in a single day on which Westpac's $560 million purchase of 90 day Prime Bank Bills constituted 100% of the market:

<u>June 30, 2009</u>
<u>Westpac [Conway]:</u> have a look at bbsw
***
<u>Westpac [Conway]:</u> 3mthhbills [sic] 3.18/3.14[.] from 3.27 yday [sic]
<u>CBA [Lee]:</u> yr [sic] guys[.] i [sic] hear[.] farkin carnts [sic]
<u>Westpac [Conway]:</u> y [sic][.] amazing
<u>CBA [Lee]:</u> you make out of that? [sic]
<u>Westpac [Conway]:</u> yeah weve [sic] had a cracker

2.   <u>The Bank Defendants shared information regarding their net BBSW rate exposure to align interests on the direction of the manipulation</u>

221.     The Bank Defendants decided whether to increase or decrease supply during the Fixing Window based on their net BBSW rate exposure and shared information regarding their BBSW-based derivatives positions to align interests on whether to fix BBSW higher or lower. For example, in the instant message below NAB trader Robert Collins and HSBC trader Carl Radford

discuss their BBSW exposure, *e.g.*, whether they are paying ("pay") or receiving ("rec") interest based on the BBSW, the size of their positions, and the desired BBSW fix:

> **December 20, 2010**
> <u>NAB [Collins]</u>: what you have rateset wise on 17 18 jan 6mnth
> <u>HSBC [Radford]</u>: i rec a yard today
> <u>NAB [Collins]</u>: i need to rec 17th pay 18 of 6mnth wowo
> <u>HSBC [Radford]</u>: nada
> <u>NAB [Collins]</u>: 1yd
> <u>HSBC [Radford]</u>: that will be fun I need set higher today
> <u>NAB [Collins]</u>: so you need the set higher in 6mnth so do i and so does my short end

222.    Defendants also shared their trading strategies, *i.e.* whether they would be buying or selling, prior to the BBSW Fixing Window. This knowledge allowed Defendants to predict fluctuations in BBSW that were not caused by genuine economic factors and gave Defendants and their co-conspirators an advantage over counterparties who did not have access to this information. For example, in the following two conversations, NAB trader Collins tells HSBC trader Radford that NAB would be buying during the BBSW Fixing Window that day:

> **February 26, 2010**
> <u>NAB [Collins]</u>: u strapped in[.] rateset[.] 3mnth set might be ok
> <u>HSBC [Radford]</u>: fk i have some on it
> <u>NAB [Collins]</u>: we are bbuyers[.] 6s we are buyers too[,] but sets looking ok
> \*\*\*
> <u>NAB [Collins]</u>: there killing it
> <u>HSBC [Radford]</u>: h[o]wie the terminator[106]

223.    Defendants often shared information about BBSW movements over a sustained period of time. This information enabled co-conspirators to determine which direction BBSW would be trading for weeks into the future and establish trading positions that allowed them to profit from this knowledge. For example, in the following chat, NAB's Collins tells HSBC's Radford to expect NAB to be a buyer during BBSW Fixing Windows occurring at the end of the month:

---

[106] "Howie" is a nickname for NAB trader Paul Howarth.

> **April 30, 2010**
> NAB [Collins]: careful in the sets\[.] our investor base just workedd it out
> HSBC [Radford]: haha
> NAB [Collins]: so we haev orders to buy 3yds now[.] on end of months[.] think this
> will be the case going fwd[.] keep that to yourself[.] be inting to see what happens
> today
> HSBC [Radford]: really thats good news :-)

224.    This practice of sharing proprietary information with supposed competitors was

endemic among the Bank Defendants. For example, Collins also shared information about NAB's

BBSW exposure, derivatives positions, and desired fixings with others, including CBA trader

Garfield Lee, so they could coordinate trading Prime Bank Bills in the same direction:

> **January 25, 2011**
> CBA [Lee]: you have 6m on thurs [Thursday, January 27, 2011]?
> NAB [Collins]: 6m set?
> CBA [Lee]: yes
> NAB [Collins]:  na got bugger all on it
> NAB [Collins]: 75mill i need it lower
> NAB [Collins]: i have 31 jan 6mnth up
> NAB [Collins]: which is good
> NAB [Collins]: so a pay set on 27th and 28th and a rec set on 31st

225.    NAB and CBA followed through on the plan to manipulate BBSW lower on January

27, 2011, and congratulated each other just after the Fixing Window that morning. In the following

chat, CBA's Lee compliments Howarth on their successful manipulation and Howarth reveals that

he "presold" Prime Bank Bills before the Fixing Window to clear space in his credit limit to buy

Prime Bank Bills during the Fixing Window:

> **January 27, 2011**
> CBA [Lee]: well done.
> NAB [Howarth]: hardly bought a thing maybe 500 certainly sold more pre rateset
> CBA [Lee]: so you sold pre rateset and bought into the set genius

226.    In the following chat, Credit Suisse trader Chris Corbett also receives proprietary information from NAB. Corbett shares Credit Suisse's BBSW exposure with Collins in exchange for secret information about the planned manipulation of BBSW:

> **July 19, 2011**
> NAB [Collins]: the set going to be volatile next few days
> Credit Suisse [Corbett]: so long as 3mth pops at some stage im ok
> NAB [Collins]: just saw howies [NAB trader Paul Howarth's] sets
> Credit Suisse [Corbett]: im paid it and pay more next 2 days. oh fark do I need to FRA out?
> NAB [Collins]: i think tom goes up and following day goes down
> Credit Suisse [Corbett]: excellent info
> NAB [Collins]: don't repeat
> Credit Suisse [Corbett]: I wont

227.    Corbett also contacted NAB trader Michael Tsakiris, as exemplified in the conversation below, to ask how much lower they planned to manipulate BBSW that day:

> **February 15, 2012**
> Credit Suisse [Corbett]: whats the expected drop this time around in 3s and 6s my you maniupulators
> NAB [Tsakiris]: 32 and 34 best guess

228.    Deutsche Bank received information about the future manipulation of BBSW from ANZ. On March 3, 2009, ANZ's Pritchard disclosed to a Deutsche Bank trader in a chat message that he was "trying to ram a rate set" during the Fixing Window that day.

229.    Communications released in ASIC's complaint against ANZ show traders routinely exchanging information about the bank's BBSW exposure, derivatives positions, and upcoming manipulations with multiple co-conspirators. For example, in the chat below, ANZ trader Jason Pritchard tells Credit Suisse trader Bradley Harper of a plan to manipulate BBSW the following week to benefit ANZ's $7.1 billion long exposure, warning him to "ZIP LOCK," *i.e.*, to keep the information secret:

**March 4, 2010**

<u>ANZ [Pritchard]</u>: what about this basis and rate sets???!!! what the fcuk is going on?

<u>Credit Suisse [Harper]</u>: medic[.] you mates (and idols) driving it

<u>ANZ [Pritchard]</u>: cnuts[.] why?

<u>Credit Suisse [Harper]</u>: no idea, but not doubt they are stuffing their internal pricing and taking external with it

<u>ANZ [Pritchard]</u>: cnuts[.] absolutely ZIP LOCK but we are going to buy a lot on Monday [March 8] . . . and slaughter it on Tuesday and Wednesday . . . Slaughter it . . . . or try

<u>Credit Suisse [Harper]</u>: cheers

230.     ANZ trader Michael Dodd shared similar information with Macquarie traders Renaye Skidmore and Beth Wallace on multiple occasions. For example, Dodd revealed ANZ's net long exposure of $5.8 billion and $4.1 billion on February 20, 2011 and June 3, 2011, respectively:

**February 20, 2011**

<u>ANZ [Dodd]</u>: [to Macquarie trader Skidmore] We'll print some CD's today if you have any interest. We're looking to push the rate set higher.

**June 3, 2011 [9:54 A.M.]**

<u>ANZ [Dodd]</u>: [to Macquarie trader Wallace] And I can tell you that we will be looking to sell to make them go higher

**June 3, 2011 [10:09 A.M.]**

<u>ANZ [Dodd]</u>: [to Macquarie traders Wallace and Skidmore] Big rate set 3m tom. We want it higher

231.     Westpac similarly disclosed its BBSW manipulation plans to supposed competitors at other Defendants in advance of the Fixing Window. In a chat with Colin Roden of Westpac, Craig Betts, who later joined Westpac as Global Head of FX Forwards, revealed that he knew ahead of time that Westpac planned to manipulate BBSW:

**September 23, 2008**

<u>ABN AMRO [Betts]</u>: …okay BBSW.. let you go do some ramping cheers

<u>Westpac [Roden]</u>: ar yes

232.     In another message on July 20, 2011, Westpac trader William Hosie wrote to his colleagues in Westpac's Group Treasury division that he learned in advance that "It is going to be

impossible to sell in the set bec[au]se the only buyers there are playing for a rateset (stockpiling to sell it out – RBS and Woody [Paul Woodward] at ANZ)." Hosie's message indicates that he knew ahead of the Fixing Window that both ANZ and RBS were going to manipulate the supply of Prime Bank Bills by stockpiling, and then selling, a large quantity of Prime Bank Bills for the purpose of "playing for a rateset," as opposed to a legitimate funding strategy.

233.    Defendants further shared information about internal single counterparty credit exposure limits, referred to simply as "credit" by traders. By sharing information about available credit at each bank, Defendants knew each other's Fixing Window trading strategy, and thus, the direction of BBSW, ahead of time. For example, in the following chat, a trader from NAB reveals that he has received a tip from other Defendants that the banks, as a bloc, are "full" on Deutsche Bank credit:

> **April 7, 2008**
> NAB [Johnson]: Will find it difficult to defend the 1mth with Deutsche issuing into the 1mth and most (including us) full on their credit.

234.    As Johnson predicted, Deutsche Bank issued one-month Prime Bank Bills into the Fixing Window on April 8, 2008, causing one-month BBSW to set at 7.70%, an increase of twelve basis points from the previous trading day.

235.    Sharing proprietary information about BBSW exposure and derivatives positions allowed the Bank Defendants to reach consensus on the direction to manipulate BBSW and amplify their effect on the rate. For example, in the conversation below, NAB trader Paul "Howie" Howarth explains to Bank of New Zealand trader Murray Jones that three-month BBSW increased by almost 10 basis points, from 4.29% to 4.385% on March 24, 2010, because *everyone* wanted it higher:

> **March 24, 2010**
> BNZ [Jones]: Howie – we are hearing BBSW printed 10 points wider today. Is this just BBSW volatility or is there something more fundamental behind it??

> NAB [Howarth]: everyone wanted it set up, so its back to where it should be ie. 20 over ois . . . that last couple of days were just noise
> BNZ [Jones]: so not a function of funding pressures
> NAB [Howarth]: no

236.    Consistent with Howarth's explanation for the rate increase, communications released by ASIC show that in addition to sharing proprietary information about their BBSW-based derivatives positions and rate exposure, Defendants also coordinated transactions to manipulate the results of the BBSW fix in a direction that financially benefited those positions.

###### 3.    Defendants coordinated manipulative trades to maximize their impact on BBSW

237.    Bank Defendants coordinated transactions for at least two reasons: (1) to concentrate Prime Bank Bill supply prior to the Fixing Window; and (2) to amplify the effect of manipulative transactions during the Fixing Window by having multiple co-conspirators buy or sell Prime Bank Bills at the same time.

###### a)    *Defendants helped their co-conspirators acquire the "ammo" they needed to manipulate BBSW*

238.    Bank Defendants frequently spoke of their need to either acquire Prime Bank Bills or clear up credit lines to purchase Prime Bank Bills, which they referred to as "stock," "bullets," or "ammo," so they could carry out manipulative transactions during the Fixing Window and manipulate BBSW. The chats below are some examples of traders at ANZ, Westpac, and NAB discussing Prime Bank Bills in this context:

> **June 8, 2010**
> Westpac [Roden]: … I'm going to fuck them as well that's why I don't want to get I'm going to fuck the rate set right on the 10th… I am a big receiver. Problem is I'm a massive receiver on the 15th, right because it's 14th but then you end up in late territory… On the 14th I got like a 4 yard rate set, right so I'm going to deliver. We may not deliver but we may as well. We've got, we've got about 2.2 billion of other bank billable paper, which we are definitely going to deliver because we need the credit lines… we bought it to have ammunition because we were like 20,000 contracts short so he set it up for a bit

> **March 9, 2011**
> ANZ [Budrewicz]: i have taken some stock in mar futs just working out whether to
> buy some more. . . more about getting ammo rather than hedging the rate set
>
> **January 19, 2012**
> NAB [McVicar]: Big down in 3s Monday [January 23, 2012] so want to have some
> ammo for that

239.     To ensure that their co-conspirators had enough "ammunition" to manipulate the

BBSW fix, Bank Defendants organized trades before the start of the Fixing Window to supply each

other with Prime Bank Bills. For example, in the chat below, JPMorgan trader Imran Ismail offers to

provide NAB with an extra $250 million in "ammunition" on March 8, 2011, to assist in

manipulating BBSW higher the next day:

> **March 8, 2011**
> JPMorgan [Ismail]: you must be more confident tmrrw. . .im giving you more
> ammunition! . . .an extra 250 for you to jam it with!

240.     Consistent with this plan to manipulate BBSW higher, the one-month and three-

month BBSW tenors increased from 4.83% and 4.965% on March 8, 2011, to 4.845% and 4.975%

on March 9, 2011, respectively.

241.     The Broker Defendants helped the Bank Defendants manipulate BBSW lower by

lining up counterparties to accept Prime Bank Bills that a Bank Defendant purchased during the

Fixing Window. This allowed Bank Defendants who made large Prime Bank Bill purchases during

the Fixing Window to dispose of their newly acquired Prime Bank Bills after the Fixing Window. In

this manner, Defendants could buy Prime Bank Bills to manipulate yields lower, and then sell the

Prime Bank Bills to a co-conspirator to free up credit limit space to purchase more Prime Bank Bills

on subsequent days.  For example, ICAP's Howell placed Westpac's Prime Bank Bills with

JPMorgan immediately after Westpac purchased $980 million of Prime Bank Bills to benefit its $2.85

billion short position during that day's Fixing Window:

**April 30, 2010**

ICAP [Howell]: What I am working on is the girls from Chase might have a bit more cash might be able to buy some more bills and might be able to reduce some of your [stock]

Westpac [Roden]: Just get rid of the ANZ stuff mate

> b) *Defendants coordinated manipulative trades in the same direction to maximize their impact on BBSW*

242.    Bank Defendants also conspired with each other to trade in the same direction during the Fixing Window.  The Bank Defendants bought and sold Prime Bank Bills as a group to amplify their manipulative impact on the BBSW fix. For example, CBA trader Garfield Lee, who was fired in the wake of ASIC's investigation, regularly spoke with Westpac trader Colin "the Rat" Roden about coordinating manipulative conduct during the Fixing Window. The two had the following exchange on April 22, 2010:

**April 22, 2010**

CBA [Lee]: Waiting for you to start some BBSW fireworks.

Westpac [Roden]: Yet again … you steal ideas/women/whatevr (sic) … have a look at yourself and leave the funny stuff to the pro's!

243.    Later that year, on November 25, 2010, Lee sent Roden the following picture of a bus with the letters "BBSW" written on the side:



244.    Roden responded to Lee, recognizing that Westpac and CBA had manipulated the BBSW fix and praised CBA for its "nice work":

**April 22, 2010**

Westpac [Roden]: You been run over by that big fat bus? … saw the lovely cba having a small lash as well...nice work!

67

245.     Roden and Lee knew that Defendants' collusive misconduct in rigging BBSW was harming other market participants and, in April 2010, Roden commented that BBSW had become a "bloody dangerous gane [sic]...full flack [sic] jacket stuff."  Lee responded: "You say that with the innocence of pol pot in 1980", a testament to Westpac's role in the manipulation.

246.     Defendants discouraged traders from offering competitive prices to customers and knew that, by prioritizing BBSW manipulation, they were hurting their clients. For example, on May 16, 2005, NAB trader Paul Foley ("Foles") refused to "control the set" *i.e.*, manipulate BBSW, on a date when NAB had a significant BBSW exposure. When NAB trader Michael Krohn learned of Foley's actions, he complained to his colleague David Page that "[w]e had two yards setting to the topside today. only winner was Foles's client."

247.     Traders at NAB and UBS engaged in similar collusive conduct. For example, in the chat below NAB trader Michael Tsakiris discusses manipulating BBSW on "turn dates", typically the end of the month or year, with UBS trader Jason Coulloupas:

> **October 19, 2010**
> UBS [Coulloupas]: no interest in the 30th . . .why are you trying to jam the turn dates. . . you being a phuckhead?
> NAB [Tsakiris]: haha
> UBS [Coulloupas]: i remember last year i moved it 8 pts.. ha.. so I would make it 9.5/7.5.. and knowing the book probably 10/8
> NAB [Tsakiris]: yea its got smashed last yr.
> UBS [Coulloupas]: i was happy to smash it.

**B.     The Broker Defendants Actively Participated in the Conspiracy by Facilitating Manipulative Trading for the Bank Defendants**

248.     The Broker Defendants were ideal co-conspirators because of their position as intermediaries in the Bank Bill market. Their frequent contact with Bank Defendants gave the Broker Defendants a wealth of information that enhanced the cartel's efficacy, including other banks' (a) BBSW rate exposure; (b) Prime Bank Bill stock levels; and (c) plans for manipulative trading during the Fixing Window. Broker Defendants served as a conduit for this information,

coordinating with at least one senior trader at each bank, known as the "Single Face to Market," who was responsible for issuing orders to ICAP and Tullett Prebon for rapid execution during the Fixing Window. The Broker Defendants were, in turn, rewarded for their participation in the conspiracy with outsized commission payments, generated by facilitating the high-volume trades used by the Bank Defendants to manipulate the BBSW fix.

249.    The Single Face to Market would instruct the Broker Defendants on the direction the Defendants planned to manipulate BBSW before the Fixing Window started. For example, the following communications are from Paul Woodward, who served as ANZ's Single Face to Market in addition to being a member of the AFMA's NTI and BBSW Committees:

> **March 10, 2011**
> ANZ [Woodward] to Tullett [Donlan]: I've got a big set already and I'll be pushing the fuck out of it
> **August 10, 2011**
> ANZ [Woodward] to New Edge Capital [Prosser], Tullett [Donlan] and ICAP [Smith]: I'm going to be very busy in the rate set. I'm going to smash the market.

250.    Consistent with Woodward and Donlan's plan, three-month BBSW moved from 4.96% on March 10, 2011 to 4.985% on March 11, 2011, benefitting ANZ's $4.6 billion long exposure. Three-month BBSW also moved higher on August 10, 2011, from 4.77% the previous day to 4.86%, benefitting ANZ's $200 million long BBSW exposure.

251.    Broker Defendants maintained communication with the Bank Defendants' traders before, during, and after the Fixing Window to execute the desired manipulative strategy. In addition to informing a Broker Defendant of their preference for the BBSW fix, traders from Bank Defendants would pre-authorize the Broker Defendants to use their Prime Bank Bill stock to achieve the desired fixing. For example, Paul Howarth, an NAB trader and a member of the AFMA's NTI Committee, told Matthew Blades at ICAP to manipulate BBSW upward to benefit

NAB's $4.35 billion long exposure. To achieve this, Howarth provided him with the necessary stock to trade during the Fixing Window:

> **February 22, 2011**
> NAB [Howarth]: I've got a …ahh…big set to the upside in the three month
> ICAP [Blades]: Right you've now got three buyers against you. Another one just arrived… Yep and just see if I can do it in 20's and just keep punching it up? That sort of thing.
> NAB [Howarth]: Yeah, yeah I wanted to get this high set. You can have …take 400 for a start… Make it 700… Alright. I've got… You've got 700 to sell for me… I want it set as high as possible.
> ICAP [Blades]: Understood… ok… You want it to be high. Yep OK.

252.     Working together, the Broker Defendants and the Bank Defendants maximized the impact of their efforts to manipulate BBSW. For example, after the Fixing Window on February 22, 2011, Howarth had the following conversation with Blades:

> **February 23, 2011**
> ICAP [Blades]: So you got a 91 print yesterday, that worked out
> NAB [Howarth]: That worked out alright. Thank you for your help with that

253.     The Broker Defendants shared knowledge about the other Bank Defendants' positions and preferred fixings with their clients. By planning BBSW manipulation in advance, the Broker Defendants could help the Bank Defendants acquire enough "stock" (to move BBSW higher by selling Prime Bank Bills) or offload enough "stock" (to move BBSW lower by buying Prime Bank Bills) to significantly impact BBSW. For example, Howarth had the following conversations with Graeme Bruce at Tullett Prebon in which they discussed plans to acquire stock to decrease BBSW lower to benefit NAB's $2.95 billion short position on Monday, March 14, 2011:

> **March 10, 2011**
> NAB [Howarth]: You won't see Citi again now and CBA I doubt whether you'll see. But Col could.[107] And I'm lining up buyers from the institutional and customer side to buy stock on opportunity Monday Tuesday.

---

[107] "Col" refers to Colin Roden of Westpac.

> Tullett [Bruce]: Yep
> NAB [Horwath]: And then I'll take the rest of the inventory into my book.
> Tullett [Bruce]: Yep, it's probably not going to be Tuesday is it? It's probably more likely to be tomorrow or Monday [March 14, 2011].

254.    The Broker Defendants' status as intermediaries in the Bank Bill market also provided them with unique information about the various Bank Defendants' positions, including the direction of BBSW from which each Bank Defendant would most benefit. The Bank Defendants relied on the Broker Defendants' advance knowledge of other Bank Defendants' manipulation plans to coordinate and maximize the manipulative effects of their Prime Bank Bill trading. For example, the following chat took place immediately before the Fixing Window on April 7, 2011:

> **April 7, 2011**
> NAB [Howarth]: I've got a down set as well
> Tullett [Bruce]: Ah okay, got ya
> NAB [Howarth]: And I do need the stock
> Tullett [Bruce]: Right, so all the stars are aligned
> NAB [Howarth]: So they are all aligned so – the other side, the other side of five two we can start stepping it up but, yeah, you can give yourself a billion to buy and I want the set low.

255.    The Bank Defendants also conspired with the Broker Defendants to line up trades in Prime Bank Bills at artificial prices – either above or below market rates – to manipulate BBSW. As part of this manipulative trading strategy, Defendants would overpay for Prime Bank Bills with a lower yield when they wanted to manipulate BBSW downward and sell Prime Bank Bills at artificially higher yields, giving away returns at above market interest rates, when they wanted to manipulate BBSW higher. For example, on April 30, 2010, Westpac had a short position of $2.85 billion. Westpac trader Sophie Johnston, who also served as Chairperson of the AFMA NTI Committee and was a member of the BBSW Committee, had the following conversation with ICAP broker Howell that morning:

> **April 30, 2010**
> ICAP [Howell]: …Yours at 44 ANZ selling. You're the 44

Westpac [Johnston]: Keep me there…
ICAP [Howell]: I did 80 [indistinct] you're the 44
Westpac [Johnston]:  buy 44 bid I don't want to see 50. Keep me at 44 bid.
ICAP [Howell]: Okay what's that?
Westpac [Johnston]: Keep me at 44 bid
ICAP [Howell]: Jesus, hang on . . . You've got a fair bit . . . getting multiple hits by ANZ, CBA and NAB.

256.    In the above exchange, Johnston offers to buy 30-day Prime Bank Bills at a yield of 4.44% and instructs ICAP to keep her bid at that level because she does not want yield to rise to 4.50%. This instruction is uneconomic and demonstrates a manipulative trade. Absent manipulation, an entity buying Prime Bank Bills wants yields to rise because rising yields result in lower bank bill prices. *See* Part I.A. *supra*. Instead of taking the lower prices, Johnston continued to bid at below market rates, overpaying for Prime Bank Bills with a lower yield during the Fixing Window to manipulate BBSW artificially lower.

257.    This manipulative trading caused one-month BBSW to decrease by a basis point on April 30, 2010, from 4.37% the previous day to 4.36%, financially benefiting Westpac's $2.85 billion net short position.

258.    As illustrated by the conversations above, the Broker Defendants' goal was to drive BBSW higher or lower in accordance with their clients' positions, rather than finding the actual best price to trade Prime Bank Bills in the Bank Bill market.

### C.    Defendants Used Their Dominant Positions in the AFMA and the AFMA Market Committees to Maintain Their Ability to Manipulate BBSW

259.    Defendants used their domination of the AFMA Market Governance Committees, including the BBSW and NTI Committees, to control the BBSW rule-making process, conceal complaints from other market participants, and perpetuate the BBSW methodology that they used to secretly manipulate BBSW. The existence of the BBSW and NTI Committees, and the supposed

72

oversight that these Committees maintained over the BBSW Rate-Setting Process, created the illusion that BBSW was a trustworthy, reliable market rate.

260.    By placing BBSW-based derivatives traders on the Market Governance Committees, Defendants created a conflict of interest. In many instances, Defendants went one step further and placed BBSW manipulators in important positions on the BBSW and NTI Committees. For example, Paul Woodward, who was ANZ's Single Face to Market during the Class Period, also served as ANZ's representative on both the BBSW and NTI Committees. ANZ also appointed traders Matthew Morris and Andrew Miller to serve on both the NTI and BBSW Committees during the Class Period. All three of ANZ's representatives regularly manipulated BBSW. *See* Part II.A-B, *supra.*

261.    Similarly, Westpac placed its most prolific BBSW manipulators, Colin Roden, Sophie Johnston, and Michael Dodd, *see* Part II.A-B *supra*, on both the NTI and BBSW Committees during the Class Period. In fact, Sophie Johnston served as Chairperson of the NTI Committee in at least 2010 and 2011.

262.    NAB traders Paul Howarth and Michael Tsakiris served as NAB representatives on the NTI Committee, during the same time period when Howarth and Tsakiris regularly manipulated BBSW. *See* Part II.A-B, *supra.* NAB traders Robert Collins and Hermeet Najjhur, both of whom also manipulated BBSW during the Class Period, represented NAB on the BBSW Committee.

263.    Defendants appointed senior executives at the highest ranks of the AFMA, including Chair (Morgan Stanley) and Deputy Chair (NAB) of the AFMA, ensuring that oversight of the BBSW process by the Board of Directors was illusory because of each banks' conflicting motive to keep BBSW susceptible to manipulation so they could generate additional illicit profits. The following Defendants placed senior executives on the AFMA Board of Directors during the Class Period: Morgan Stanley, NAB, Deutsche Bank, UBS, JPMorgan, CBA, Macquarie, Westpac, ANZ,

73

Credit Suisse, and RBS. Throughout the Class Period, Defendants maintained a majority of seats on the AFMA Board of Directors.

264.    Defendants used their domination of the AFMA Market Committees to propose rules and regulations that kept the Committees' activities secret. For example, throughout the Class Period, a Market Committee rule held that "minutes are confidential documents and care should be taken in their circulation."

265.    The Defendants used their control of the BBSW Rate-Setting Process to keep BBSW susceptible to manipulation. In a 2012 position paper, the AFMA rejected a proposal to switch to a mechanical calculation system whereby BBSW would be calculated by averaging of the National Best Bid and Best Offer rates for Prime Bank Bills at each tenor, as well as introducing a number of complementary measures. The AFMA rejected the proposed reforms and defended the existing methodology even though the proposed changes would have led to less manipulated BBSW rates.

266.    This decision is indicative of collusion in the rule-making process because the Defendants knew that the BBSW rate-setting mechanism allowed them to manipulate BBSW to gain an unfair advantage over counterparties. For example, traders at NAB and ANZ made the following statements about the shortfalls in how the BBSW was set:

> **May 14, 2010**
> NAB [Elder]: physical rate set . . . keeps us honest? or
> easy to manipulate if you have the cash?
> NAB [Snooks]: indeed
>
> **March 7, 2012**
> ANZ [Tarraran]: there is no doubt that BBSW/BKBM can be moved around by
> buying/selling paper and new issuance

267.    With control over the AFMA, the NTI Committee, and the BBSW Committee, Defendants implemented a complaint procedure to create the impression that they were actually taking measures to ensure that BBSW represented an accurate rate and were investigating reports of

suspicious activity. But this only served as another way to conceal their wrongdoing. Complaints

about BBSW were dismissed without explanation, ensuring those issues never saw the light of day.

For example, during the Class Period market participants complained of "a tendency for the BBSW

rate to increase relative to other short-term domestic rates during the mid-month and end-month

cycles." After purportedly investigating the discrepancies, the BBSW Committee reported that "[t]his

review confirmed that the overall [BBSW] process is in keeping with best practice, and further

confirmed that variations in the BBSW rate are consistent with and reflect normal market forces."

The AFMA provided no explanation for the discrepancies that gave rise to the complaint.

### D.   Defendants Conspired to Create Special Positions and Reorganized their Trading Desks to Facilitate Manipulative Transactions

268.    CBA and ANZ both designated a senior employee as the "single face to market"

who was ultimately responsible for communicating trading strategy during the Fixing Window to the

Broker Defendants. At CBA this person was known as the "powerful owl" and was in charge of

planning trades that would manipulate BBSW to increase the profitability of CBA's BBSW-based

derivatives positions.

269.    In a chat between Roden and Lee, Roden convinced Lee that CBA and Westpac

could make even more money manipulating BBSW if CBA shifted responsibility for BBSW

manipulation from its derivatives trading group to its treasury group because the treasury group had

a greater BBSW Rate Exposure, and thus a larger incentive to conspire in manipulating the rate.

Roden coached Lee how to "make the case" to CBA's then-CEO, Ralph Norris, to give Lee control

over CBA's BBSW activities, explaining that, by shifting control over BBSW to its Group Treasury,

CBA could derive an extra "couple of 100 million dollars very easily." By enlisting CBA in Roden's

plan to manipulate BBSW lower, Roden knew that Westpac's efforts to manipulate BBSW would be

twice as effective:

> Westpac [Roden]: it sucks[.] why dont you give ralph a call and explain teh situation.,,.,save teh bank a couple of 100 million dollars..very esasily [sic]
> CBA [Lee]: give me some guidance here mate
> Westpac [Roden]: it could make your career !
> CBA [Lee]: how do I make the acse? [sic]
> Westpac [Roden]: teh new vincent !
> CBA [Lee]: HA! I wanna be the new col roden[.] being vincent is too hard on the lungs and liver
> Westpac [Roden]: cases is easy....1. it is just another liability 2, your ( ie treasury) ratesets with dwarf teh cba FM rate sets 3. teh goal is to get bbsw down as all your liabilities are set off it ...FM s is usually to get it up...we are talikng [sic] massive dollars here [sic]
> CBA [Lee]: yes[.] I see that[.] you see that[.] how do I prove it
> Westpac [Roden]: logic[.] even if you start by just getting the owl/ bbsw within treasury

270.    Lee agreed to wrest control over CBA's BBSW submissions for Westpac and CBA's benefit, describing his efforts as "the Westpac treasury replication project," and solidifying a conspiratorial link between the two banks.

271.    In other instances, traders shared proprietary information regarding their upcoming BBSW exposure to alert co-conspirators of when they needed to manipulate BBSW in a certain direction. This way, other Bank Defendants would not unknowingly engage in transactions that would reduce the effect of their manipulative conduct.  Bank Defendants that received advance notice of a particular manipulative trading strategy profited from this secret information by transacting in BBSW-based derivatives with non-cartel counterparties who were unaware that BBSW would be rigged on the settlement date. For example, on or around May 16, 2011, Westpac trader Sophie Johnston learned that NAB had a large BBSW rate exposure on a series of upcoming days. Rather than engage in transactions that were against NAB and could cancel out the effects of its manipulative trading, Johnston used that information to hedge Westpac's trading book, engaging in BBSW-based derivatives tractions with other market participants that would generate a profit for Westpac, offsetting any losses resulting from NAB's manipulative conduct.

E.      **Defendants Made False BBSW Submissions in Violation of AFMA Rules**

272.    In addition to manipulative trading, Defendants submitted false BBSW rates that were intended to benefit their own BBSW-based derivatives positions instead of following AFMA guidelines and reporting observed Prime Bank Bill rates. For example, UBS' internal investigation found that UBS personnel in charge of submitting BBSW rates would ask UBS derivatives traders for their preferred rates, and then submit those preferred rates to benefit UBS' derivatives positions. This conduct occurred from at least 2005 through 2011.

273.    In some instances, Defendants went even further to encourage BBSW manipulation by appointing their derivatives traders as BBSW submitters, creating a direct conflict of interest between the bank's profit motive and its obligation to submit accurate market rates. For example, 89% of RBS' BBSW submissions were actually submitted by RBS' BBSW-based derivatives traders during the Class Period. Even on the rare occasions when RBS' money market personnel made submissions, they did so based on preferences expressed by RBS derivatives traders via a dedicated chat room entitled "BBSW rate set".

274.    The Defendants accepted, and even solicited, BBSW manipulation requests from traders based in other major international financial centers. For example, BNP Paribas' submitters, who were part of BNP Paribas's ALM-Treasury division, solicited requests to submit BBSW rates at a particular artificial level from derivatives traders located in Singapore.

275.    Even when Defendants allowed non-traders to submit BBSW contributions, they encouraged their submitters to first look to the bank's trading positions and submit BBSW rates that favored the bank's trading positions, as opposed to following AFMA guidelines and submitting the observed mid-rate of trades during the Fixing Window. For example, when submitters at BNP did not receive explicit instructions from derivatives traders for where to set BBSW, they simply

calculated which direction would be most profitable for BNP and submitted rates that were skewed accordingly.

276.     An analysis of Defendants' BBSW submissions indicates that more than just UBS, BNP Paribas, and RBS made false BBSW submission during the Class Period. The figure below, which was submitted to the International Organization of Securities Commissions by the AFMA, compares the variance between BBSW Panel Bank submissions during the Class Period with the variance between banks that were members of the U.S. dollar LIBOR panel. This chart shows that, in contrast to U.S. dollar LIBOR, there was almost no variation between the quotes submitted by the Panel Banks during the Class Period:



277.     Absent collusion among BBSW Panel Banks, there should be greater variation in the Panel Banks' submissions than demonstrated above. For example, if UBS, RBS, and BNP Paribas were the *only* banks submitting false BBSW rates, their false submissions should register as outliers in the analysis and increase variation among the Panel's submissions. The fact that the Panel Banks still submitted nearly identical rates for at least four years while three Defendants *admitted* to making false submissions reflects collusion in the submission process.

78

F.     **ASIC's Investigation into Defendants' Conduct While on the BBSW Panel Continues to this Day**

278.     ASIC has devoted significant resources to its ongoing investigation of Defendants' BBSW-related misconduct and remains confident that it will bring charges against other Defendants, in addition to the pending actions against ANZ, NAB, and Westpac.

279.     Greg Medcraft, Chairman of ASIC, has announced that ASIC's investigation is expansive in nature and encompasses all of the entities involved in the BBSW rate-setting process, including Defendants here. For example, in a hearing before the Australian Senate on August 14, 2015, Medcraft was asked to give an example of the type of investigation in which ASIC might seek reimbursement for legal costs by Senator Deborah O'Neill of the Parliamentary Joint Committee on Corporations and Financial Services. Medcraft testified that "we are investigating the banks of BBSW at the moment."

280.     Prior to Commissioner Medcraft's testimony about ASIC's ongoing BBSW investigation, ANZ issued a press release in 2014 revealing that ASIC's investigation extended to at least the fourteen Panel Banks:

> Since mid-2012 ASIC has been undertaking inquiries of 14 BBSW panel bank members in relation to the integrity of their past involvement in the BBSW submission process.

281.     Following ANZ's announcement that ASIC was investigating the Panel Banks' BBSW-related conduct, Australian media reports confirmed that the Panel Banks were under investigation for their conduct while they were members on the BBSW Panel. For example, in a June 3, 2015 article titled "'Appalling'" Banks Hindering ASIC Probe into Swap Rate," The Australian, one of Australia's leading newspapers, reported:

> It is understood that ASIC is working its way through the 14 panel members that set the swap rate, including the nation's major banks. ASIC is pouring over millions of documents, including texts, records of telephone calls and other methods of communication.

282.     While ASIC's investigation in the BBSW Panel is ongoing, it is taking cases against ANZ, NAB, and Westpac for BBSW manipulation to trial beginning on September 25, 2017.

### III.   Plaintiffs Transacted in BBSW-based Derivatives at Artificial Prices that were Proximately Caused by Defendants' Manipulative Conduct

#### A.   Plaintiff Dennis

283.     Plaintiff Richard Dennis purchased CME Australian dollar futures contracts that were priced, benchmarked and/or settled based on BBSW, from within the United States during the Class Period at artificial prices proximately caused by Defendants' manipulative conduct. *See* ¶ 35 *supra*. For example, on November 22, 2010, Dennis purchased 119 December 2010 CME Australian dollar futures contracts and sold 120 December 2010 CME Australian dollar futures contracts, resulting in a net short position of one December 2010 CME Australian dollar futures contract.

284.     Communications released by ASIC show that at least NAB was involved in manipulating BBSW artificially higher on November 22, 2010 to financially benefit its $4.6 billion net long exposure to BBSW that day. NAB trader Michael Tsakiris described the events during the November 22, 2010 Fixing Window in his daily rate set email:

> **November 22, 2010**
> NAB [Tsakiris]: "Rate set. Speak of Smashed.. [sic] we attempted to defend out 4 yard rate set with 200M with not much luck… Sold 00 to mainly UBS resulting in a 5.00 rate set… damn…"

285.     As a result of Defendants' manipulative conduct, Dennis was damaged and suffered legal injury, including a $170.00 net loss on his November 22, 2010, CME Australian dollar futures position.

#### B.   Plaintiff Sonterra

286.     Plaintiff Sonterra engaged in dozens of Australian dollar foreign exchange swaps and forwards worth more than $490 million U.S. dollars from within the United States directly with

Defendant Morgan Stanley during the Class Period at artificial prices proximately caused by Defendants' manipulative conduct. For example, on November 5, 2010, Sonterra entered into a foreign exchange swap with Morgan Stanley worth $330,000 Australian dollars that matured on November 30, 2010.

287.    Communications released as part of ASIC's complaint against NAB show that on November 5, 2010, Defendants, including Westpac, were engaged in manipulating one-month BBSW artificially lower:

> **November 5, 2010**
> NAB [Tsakiris]: 1mth as per usual getting crunched lower...
> WPK bid 1mth at 4.80

288.    This manipulative conduct caused one-month BBSW to remain unchanged from the previous day. By maintaining one-month BBSW at an artificially lower level, Defendants' manipulation of BBSW on November 5, 2010 artificially increased the cost for Sonterra to purchase Australian dollars from Morgan Stanley on November 30, 2010. As a result, Sonterra was injured when it entered into an Australian dollar foreign exchange swap with Morgan Stanley on November 5, 2010, at an artificially higher price.

289.    Similarly, on June 3, 2011, Sonterra entered into an Australian dollar foreign exchange forward, agreeing to sell $280,320 to Morgan Stanley on June 7, 2011.

290.    Communications released as part of ASIC's complaint against ANZ show that on June 2, 2011, ANZ traders Mark Budrewicz and Sean Collier discussed issuing more than $500 million in Prime Bank Bills during the Fixing Window on June 3, 2011, to manipulate BBSW artificially higher to benefit the bank's $4.1 billion net long BBSW-based derivatives position:

> **June 2, 2011**
> ANZ [Collier]: how much do you need on 3mth issuance for your rate set tomorrow? Simon mentioned 500m or do you need more?
> ANZ [Budrewicz]: if we could do more that would be good

291.     ASIC found that on June 3, 2011, ANZ issued $543 million in Prime Bank Bills and sold at least an additional $97 million of inventory during the Fixing Window to manipulate BBSW artificially higher. This manipulation artificially increased the amount of Australian dollars required for Sonterra to fulfill its obligation to Morgan Stanley on June 7, 2011. As a result, Sonterra was damaged when it entered into an Australian dollar foreign exchange forward with Morgan Stanley on June 3, 2011 at an artificially lower price.

292.     Other communications indicate that Sonterra entered into Australian dollar foreign exchange swaps with Morgan Stanley when the bank was involved in manipulating BBSW lower. For example, on May 14, 2010, Sonterra entered into a foreign exchange swap with Morgan Stanley worth $1,000,000 Australian dollars that matured on May 28, 2010.

293.     On May 12, 2010, CBA trader Garfield Lee had the following conversation with NAB's Paul Howarth regarding Morgan Stanley's involvement in manipulating BBSW:

> **May 12, 2010**
> NAB [Horwath]: what does an IB care about a major banks bill maturities? They don't even get involved in MM unless it's in an attempt to fudge the set . . . for example Moron Stanley came to rateset wanting it lower they drive it lower enough to bring me out to issue
> CBA [Lee]: I think the idea also removes the need for these IBs with bill portfolios to spray them out on those days
> NAB [Horwath]: they spray them to try and distort the set . . . why do they need bill portfolios when they don't have a fracise/ answer, to play around at set

294.     Consistent with Morgan Stanley's desire for an artificially lower BBSW fix, on May 14, 2010, the one-month, three-month and six-month BBSW tenors all decreased. This decrease in BBSW artificially increased the cost for Sonterra to purchase Australian dollars from Morgan Stanley on May 28, 2010. As a result, Sonterra was injured when it entered into an Australian dollar foreign exchange swap contract with Morgan Stanley on May 14, 2010, at an artificially higher price.

C.       **FrontPoint Plaintiffs**

295.     The FrontPoint Plaintiffs engaged in hundreds of BBSW-based swap transactions during the Class Period from within the U.S., including directly with Defendant Macquarie at artificial prices proximately caused by Defendants' manipulative conduct. For example, on February 23, 2010, Plaintiff FrontPoint Asian Event Driven Fund, L.P., entered into a swap governed by the ISDA Master Agreement described in ¶ 129, *infra*, with Defendant Macquarie Bank in which Macquarie agreed to make interest rate payments to FrontPoint Asian Event Driven Fund, L.P., equal to one-month BBSW on certain valuation dates.

296.     Communications released by ASIC in its complaint against Westpac show that on July 1, 2010, one of the valuation dates listed in the swap agreement between FrontPoint Asian Event Driven Fund, L.P., and Defendant Macquarie, at least Defendant Westpac was involved in manipulating one-month BBSW artificially lower:

> **July 1, 2011**
> Westpac [Roden]: Mate, you're a fucken thief
> Westpac [Hosie]: A thief. Why?
> Westpac [Roden]: I heard about the 1 month
> Westpac [Hosie]: Yeah mate, we got it back down

297.     As a result of Defendants' manipulative conduct, and consistent with the conversation above, one-month BBSW decreased by four basis points on July 1, 2011, from 4.87% to 4.83%. This decrease in one-month BBSW caused injury to Plaintiff FrontPoint Asian Event Driven Fund, L.P., which received less in interest than it should have from Defendant Macquarie on July 1, 2011.

298.     Plaintiff FrontPoint Asian Event Driven Fund, L.P., also entered into a swap with Macquarie Bank in which FrontPoint received one-month BBSW on January 27, 2011. This time, at least NAB and CBA were involved in manipulating one-month BBSW artificially lower:

**January 27, 2011**
<u>CBA [Lee]</u>: Well done.
<u>NAB [Howarth]</u>: hardly bought a thing maybe 500 certainly sold more pre rateset
<u>CBA [Lee]</u>: so you sold pre rateset and bought into the set genius

299.    As a result of Defendants' manipulative conduct, and consistent with the conversation above, one-month BBSW decreased by four basis points on January 27, 2011, from 4.88 to 4.84. This decrease in one-month BBSW caused injury to Plaintiff FrontPoint Asian Event Driven Fund, L.P., which received less in interest than it should have from Defendant Macquarie on January 27, 2011.

## TRADE AND COMMERCE

300.    Beginning on at least January 1, 2003, Defendants engaged in a continuing contract, combination, or conspiracy in restraint of trade in violation of the Sherman Act.

301.    During the Class Period, Defendants sold substantial quantities of BBSW-based derivatives in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which Defendants produced BBSW-based derivatives.

302.    The Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

303.    During the Class Period, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## CLASS ACTION ALLEGATIONS

304.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following Class:[108]

> All persons or entities that engaged in U.S.-based transactions in financial
> instruments that were priced, benchmarked, and/or settled based on BBSW

---

[108] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

at any time from at least January 1, 2003, through the date on which the effects of Defendants' unlawful conduct ceased.

Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this complaint, and the United States government.

305.    The Class is so numerous that individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically-dispersed Class members transacted in BBSW-based derivatives worth trillions of dollars during the Class Period.

306.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

307.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate representatives of the Class and have no interest which is adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust litigation.

308.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

a. whether Defendants and their co-conspirators engaged in a combination or conspiracy to manipulate BBSW and the prices of BBSW-based derivatives in violation of the Sherman Act;

b. the identity of the participants in the conspiracy;

c. the duration of the conspiracy;

d. the character and nature of the acts performed by the Defendants in furtherance of their conspiracy;

e. whether Defendants' unlawful conduct caused injury to the business and property of Plaintiffs and the Class;

f. whether Defendants' unlawful acts violate the RICO Act;

g. whether Defendants manipulated the price of Australian dollar futures contracts and other BBSW-based financial instruments in violation of the CEA;

h. the appropriate measure of damages sustained by Plaintiffs and Class members.

309.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly-situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

310.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

311.    The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

312.     The secret nature of Defendants' conspiracy—which relied on non-public methods of communication, including private instant messages, to conceal their agreements to manipulate BBSW and the prices of BBSW-based derivatives—was intentionally self-concealing. This concealment-through-secrecy prevented Plaintiffs from uncovering their unlawful conduct.

313.     Defendants used affirmative acts of concealment to hide their violations of law from Plaintiffs and the Class, including: (1) knowingly submitting (or causing to be submitted) BBSW quotes that were false, misleading, or inaccurate because they were manipulative, based in whole or in part on impermissible and illegitimate factors, such as the rate that would financially benefit Defendants' BBSW-based derivatives positions and/or the BBSW-based derivatives positions of their co-conspirators; (2) implicitly representing that their BBSW submissions were a reliable and truthful assessment of, and only of, each Defendant's observations of the traded mid-rates for Prime Bank Bills during the Fixing Window; (3) using secret, collusive trades during the Fixing Window to manipulate BBSW and the prices of BBSW-based derivatives; (4) representing, through the AFMA and its subcommittees, that BBSW was a legitimate benchmark determined by submissions that complied with their own guidelines.

314.     Many, if not all, of these affirmative acts of concealment were also inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other members of the Class.

315.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence prior to the time of public disclosures reporting the manipulation of BBSW and the prices of BBSW-based derivatives. Plaintiffs thus assert the tolling of the applicable statutes of limitations

affecting the rights of the claims for relief asserted. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)**
**(Against all Defendants)**

316.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

317.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

318.    During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of BBSW and the prices of BBSW-based derivatives, by conspiring to, *inter alia*: (1) engage in manipulative money market transactions during the BBSW Fixing Window; (2) make false BBSW rate submissions that did not reflect actual transaction prices; (3) uneconomically buy or sell money market instruments at a loss to cause artificial derivatives prices; and (4) share proprietary BBSW-based derivatives information.

319.    This conspiracy to manipulate the prices of BBSW-based derivatives caused both Plaintiffs and members of the Class to be overcharged and underpaid in their BBSW-based derivatives transactions. Plaintiffs and members of the Class also were deprived of the ability to accurately price BBSW-based derivatives entered into during the Class Period and to accurately determine the settlement value of BBSW-based derivatives by reference to an accurate BBSW. Plaintiffs and members of the Class thus received, during the term of their transactions and upon

settlement, less in value than they would have received absent Defendants' conspiracy and overt acts in furtherance of the conspiracy.

320.    The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the BBSW-based derivatives market. There is no legitimate business justification for, and no pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pre-textual or could have been achieved by less restrictive means.

321.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act throughout the Class Period.

322.    Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act and under § 4 of the Clayton Act.

323.    Plaintiffs and members of the class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF
### (Manipulation in Violation of the Commodity Exchange Act)
### (7 U.S.C. §§ 1, *et seq.*)
### (Against All Defendants)

324.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

325.    Each Defendant is liable under §§ 6(c), 9, and 22, of the CEA, codified at 7 U.S.C. §§ 9, 13, and 25 respectively, for the manipulation of BBSW and the prices of BBSW-based derivatives that were priced, benchmarked, and/or settled based on BBSW.

326.    Defendants had the ability to manipulate BBSW and the price of BBSW-based derivatives. Defendants, through interstate commerce, knowingly submitted or caused to be

submitted false rate quotes to the AFMA and engaged in manipulative Prime Bank Bill transactions during the Fixing Window. These submissions and manipulative trades were used to determine the official published BBSW. By virtue of the BBSW methodology, the Defendants had the ability to influence and did affect the rates that would become the official BBSW. Further, because of their market power as Prime Banks and major dealers of BBSW-based derivatives, the Defendants had the ability to influence and did affect the prices of BBSW-based derivatives.

327.    As evidenced by communications revealed by ASIC, the Defendants fully, intentionally, and systematically manipulated BBSW and BBSW-based derivatives prices to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) of dollars in illegitimate profits on BBSW-based derivatives, held by themselves or other co-conspirators, the prices of which (and thus profits or losses) were priced, benchmarked and/or settled based on BBSW. As an intended and direct consequence of Defendants' knowingly unlawful conduct, the prices of Plaintiffs' BBSW-based derivatives, and those traded by Class members, were manipulated to artificial levels by Defendants.

328.    During the Class Period, BBSW and the prices of derivatives that were priced, benchmarked, and/or settled based on BBSW were artificial and did not result from legitimate market information, competition, or supply and demand factors. Defendants directly caused artificial BBSW and artificial prices of BBSW-based derivatives by, *inter alia*, making false BBSW submissions to the AFMA and conducting manipulative trading activity in the money market for Prime Bank Bills that created artificial supply and demand.

329.    As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial BBSW and prices of derivatives that were priced, benchmarked, and/or settled based on BBSW.

## THIRD CLAIM FOR RELIEF
### (Principal-Agent Liability in Violation of § 2 of the Commodity Exchange Act)
### (Against All Defendants)

330.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

331.     Each Defendant is liable under § 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

332.     Plaintiffs and members of the Class seek the actual damages they sustained in BBSW-based derivatives for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Liability in Violation of § 22 of the Commodity Exchange Act)
### (Against All Defendants)

333.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

334.     Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation of BBSW and willfully intended to assist these manipulations, which resulted in artificial BBSW-based derivatives prices during the Class Period in violation of § 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

335.     Plaintiffs and members of the Class seek the actual damages they sustained in BBSW-based derivatives for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Racketeer Influenced and Corrupt Organizations Act)
### 18 U.S.C. §§ 1961 *et seq.*
### (Against all Defendants)

336.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

337.    18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

338.    18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

339.    Under 18 U.S.C. § 1961(1), and as applicable to § 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

340.    18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and at least the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

341.    18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

342.    18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C. § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, fraud, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such a scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

343.    At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including, *inter alia*, by making false BBSW rate submissions, engaging in fraudulent Prime Bank Bill transactions solely intended to impact BBSW, sharing proprietary order flow or position information with co-conspirators, or directing other employees to do so, among other predicate acts of wire fraud), were "an enterprise" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and hierarchy of corporate direction and control.

344.    At all relevant times, Plaintiffs were a "person" within the meaning of 18 U.S.C. § 1961(3).

345.    Defendants' collective association, including through their participation together (i) as members of the AFMA and its subcommittees; (ii) as BBSW Panel Banks; and (iii) acting as a trading bloc and engaging in secret collusive trades in the Prime Bank Bill market to manipulate BBSW, constitutes the RICO enterprise in this case. Every member of the enterprise participated in the process of trading or causing to be traded bank bill trades at artificial prices, BBSW-based derivative price quotes, trade confirmations including those false rates, and confirmations for collusive transactions intended to impact BBSW, during the Class Period. As alleged herein, each Defendant engaged in the acts of wire fraud in furtherance of the conspiracy and participated as a member of the association-in-fact enterprise.

346.    Defendants completed all elements of wire fraud within the United States or while crossing United States borders. Defendants did so by: (a) transmitting or causing to be transmitted artificial BBSW rates in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (b) transmitting or causing to be transmitted false and artificial BBSW submissions that were relied on by Thomson Reuters and the AFMA in collecting, calculating, publishing, and/or disseminating the daily BBSW rates that were transmitted, published, and

disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; and (c) transmitting or causing to be transmitted confirmations for fraudulent transactions intended to impact BBSW in the U.S. or while crossing U.S. borders through electronic servers located in the United States.

347. The common purpose of the enterprise was simple: profiteering. By engaging in the predicate acts alleged including, but not limited to, entering into collusive and artificial BBSW transactions to cause distorted BBSW rates to be transmitted to Thomson Reuters as agent for the AFMA, and by exchanging BBSW-based derivatives positions and prices, Defendants affected the prices of BBSW-based derivatives, rendering them artificial. This directly resulted in Defendants reaping hundreds of millions (if not billions) of dollars in illicit trading profits on their BBSW-based derivatives positions.

348. Defendants each committed far more than two predicate acts of wire fraud. As alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

    a.   The transmission of artificial BBSW rates to Thomson Reuters in the United States for further dissemination;

    b.   The electronic transmission of confirmations for collusive transactions intended to manipulate BBSW;

    c.   Causing the transmission and dissemination in the United States of the artificial BBSW rates by Thomson Reuters as agent for the AFMA;

    d.   Causing the transmission and dissemination in the United States of distorted BBSW individual bank quotes by Thomson Reuters;

    e.   The transmission and dissemination of false bid and ask price quotes for BBSW-based derivatives within the United States;

    f.   Electronic communications and instant messages containing manipulative requests that emanated from within the United States or were routed through electronic servers located within the United States; and

94

g.      Sending trade confirmations based on manipulated and false BBSW rates to counterparties within the United States.

h.      Sending communications to encourage, negotiate, or complete the sale or purchase of price-fixed BBSW-based financial instruments to counterparties within the United States.

349.    Defendants' misconduct underlying the predicate acts of wire fraud occurred within the United States. Defendants caused and conspired to cause the manipulated BBSW to be published to servers in the U.S., and used U.S. wires to transmit artificial BBSW rates, confirmations for collusive transactions intended to impact BBSW, and other electronic communications containing requests to manipulate these rates.

350.    Defendants' racketeering scheme affected interstate commerce. Trillions of dollars in BBSW-based derivatives were traded within the United States during the Class Period, including, but not limited to, currency forward agreements, interest rate swaps, and forward rate agreements.

351.    As alleged herein, Plaintiffs' and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, depriving Plaintiffs and the Class of their money relative to their BBSW-based derivatives contracts was the very purpose of the Defendants' scheme. Plaintiffs and members of the Class seek treble damages for the injuries they have sustained, as well as restitution, cost of suit, and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

352.    As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class seek an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SIXTH CLAIM FOR RELIEF
### (Violation of the Racketeer Influenced and Corrupt Organizations Act)
### 18 U.S.C. § 1962(d)
### (Against all Defendants)

353.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

354.     Apart from constructing and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

355.     The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

356.     Defendants organized and implemented the scheme, and insured it continued uninterrupted, by concealing their manipulation of BBSW and the prices of BBSW-based derivatives from Plaintiffs and members of the Class.

357.     Defendants knew their manipulative scheme would defraud participants in the BBSW-based derivatives market, yet each Defendant agreed to participate despite their understanding of the fraudulent nature of the enterprise.

358.     As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiffs and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy, indeed, those effects were precisely why the scheme was concocted.

359.     Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

360.    As a direct and proximate result of the subject racketeering activity, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SEVENTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (Against Defendants Macquarie Bank, Morgan Stanley, Credit Suisse, Deutsche Bank AG, and UBS)

361.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

362.    To the extent required this claim is pled in the alternative to Plaintiffs' eighth claim for relief in accordance with FED. R. CIV. P. 8(d) and other applicable law.

363.    FrontPoint Plaintiffs entered into binding and enforceable contracts with Defendants Macquarie Bank, Credit Suisse, Deutsche Bank AG, and UBS in connection with transactions for BBSW-based derivatives. Plaintiff Sonterra entered into binding and enforceable contracts with Defendant Morgan Stanley in connection with transactions for BBSW-based derivatives.

364.    Each contract includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not to take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

365.    Defendants Macquarie Bank, Morgan Stanley, Credit Suisse, Deutsche Bank, and UBS breached their duty to Plaintiffs FrontPoint and Sonterra, respectively, and without reasonable basis and with improper motive, acted in bad faith by, among other things, (a) intentionally manipulating BBSW for the express purpose of generating illicit profits from its BBSW-based

derivatives; and (b) conspiring with other Defendants to manipulate BBSW and the prices of BBSW-based derivatives.

366.    As a direct and proximate result of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purpose of these contracts, Plaintiffs FrontPoint, Sonterra, and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**
**(Unjust Enrichment in Violation of Common Law)**
**(Against all Defendants)**

367.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

368.    To the extent required this claim is pleaded in the alternative to Plaintiffs' seventh claim for relief in accordance with FED. R. CIV. P. 8(d).

369.    Defendants and members of the Class, including Plaintiffs, entered into BBSW-based derivatives transactions. These transactions were directly priced, benchmarked, and/or settled based on BBSW, which was supposed to reflect actual market conditions in a market where Defendants were supposed to be perpetually competing. Rather than compete honestly and aggressively with each other, Defendants colluded to manipulate BBSW and the prices of BBSW-based derivatives to ensure they had an unfair advantage in the marketplace.

370.    Defendants financially benefited from their unlawful acts, reaping illicit profits by, *inter alia*, (i) coordinating the manipulation of BBSW by taking advantage of the BBSW submission process or other activities designed to artificially suppress, inflate, maintain, or otherwise alter BBSW and the prices of BBSW-based derivatives; and (ii) acting as a trading bloc and engaging in secret, collusive trades in the swap market to manipulate BBSW. These unlawful and inequitable acts caused Plaintiffs and Class members to suffer injury, lose money, and otherwise be deprived of the

98

benefit of accurate BBSW rates, as well as the ability to accurately price, benchmark and or settle BBSW-based derivatives transactions. As a result, Plaintiffs and the Class received, upon execution or settlement of their trades, less in value than they would have received absent Defendants' wrongful conduct. Plaintiffs' and the Class' losses correspond to Defendants' unlawful gains.

371.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

372.    Plaintiffs and members of the Class seek restitution of the monies of which they were unfairly and improperly deprived as described herein.

## PRAYER FOR RELIEF

Plaintiffs demand relief as follows:

A.      That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

B.      That the unlawful conduct alleged herein be adjudged and decreed to violate §1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.      That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.      For a judgment awarding Plaintiffs and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.      That the Court award Plaintiffs and the Class damages against Defendants for their violations of the Commodity Exchange Act;

H.      That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and the Class;

I.      That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

J.      That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

K.      That the Court directs such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  December 16, 2016
White Plains, New York

Respectfully submitted,

LOWEY DANNENBERG COHEN & HART, P.C.

/s/ Vincent Briganti
Vincent Briganti
Geoffrey M. Horn
Peter D. St. Phillip
Raymond Girnys
Christian Levis
Roland R. St. Louis, III
One North Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: vbriganti@lowey.com
        ghorn@lowey.com
        pstphillip@lowey.com

100

rgirnys@lowey.com
clevis@lowey.com
rstlouis@lowey.com

/s/Christopher Lovell
Christopher Lovell
Victor E. Stewart
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677
Email: clovell@lshllp.com
        vestewart@lshllp.com
        bjaccarino@lshllp.com

*Counsel for Plaintiffs*