UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
RICHARD DENNIS, et al.,

                    Plaintiffs

                -against-                                16-cv-6496 (LAK)

JPMORGAN CHASE & CO., et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

> Christian Levis
> Geoffrey Milbank Horn
> Lee Jason Lefkowitz
> Peter Dexter St. Phillip, Jr.
> Raymond Peter Girnys
> Roland Raymond St. Louis, III
> Sitso W. Bediako
> Vincent Briganti
> LOWEY DANNENBERG P.C.
>
> Christopher Lovell
> Edward Y. Kroub
> LOVELL STEWART HALEBIAN JACOBSON LLP
>
> *Attorneys for Plaintiffs*
>
> Paul Christopher Gluckow
> Abram Jeremy Ellis
> Alan Craig Turner
> Alexander Nuo Li
> Eamonn Wesley Campbell
> Francis John Acott
> Jonathan Thomas Menitove

Mary Beth Forshaw
Michael Steven Carnevale
Rachel Serenity Sparks Bradley
Sarah Emily Phillips
SIMPSON THACHER & BARTLETT LLP (NY)
*Attorneys for Defendants JPMorgan Chase & Co. &
JPMorgan Chase Bank, N.A.*

Jayant W. Tambe
Kelly A. Carrero
Stephen Jay Obie
JONES DAY (NYC)
*Attorneys for Defendant BNP Paribas, S.A.*

David Sapir Lesser
Fraser Lee Hunter, Jr.
Jamie Stephen Dycus
WILMER CUTLER PICKERING HALE & DORR LLP (NYC)
*Attorneys for Defendants The Royal Bank of Scotland Group
plc, RBS N.V., RBS Group (Australia) Pty Limited & The
Royal Bank of Scotland plc*

Eric Jonathan Stock
Jefferson Eliot Bell
Mark Adam Kirsch
GIBSON, DUNN & CRUTCHER, LLP (NY)
*Attorneys for Defendant UBS AG*

Jeffrey T. Scott
Mark Aaron Popovsky
SULLIVAN & CROMWELL, LLP (NYC)
*Attorneys for Defendant Commonwealth Bank of Australia*

Penny Shane, II
Corey Omer
SULLIVAN & CROMWELL, LLP (NYC)

Christopher Michael Viapiano
SULLIVAN & CROMWELL, LLP (WASHINGTON DC)
*Attorneys for Defendant Australia and New Zealand Banking
Group Ltd.*

David Harold Braff
Matthew Joseph Porpora
Stephen Hendrix Oliver Clarke
SULLIVAN & CROMWELL, LLP (NYC)
*Attorneys for Defendant National Australia Bank Limited*

Daniel Slifkin
Michael A. Paskin
Timothy Gray Cameron
CRAVATH, SWAINE & MOORE LLP
*Attorneys for Defendant Westpac Banking Corporation*

Andrew Joshua Lichtman
Stephen Louis Ascher
JENNER & BLOCK LLP (NYC)

Thomas J. Perrelli
JENNER & BLOCK LLP (DC)
*Attorneys for Defendant Deutsche Bank AG*

Lewis J. Liman
Breon Stacey Peace
Charity Eunah Lee
Jennifer Kennedy Park
Nowell D. Bamberger
CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for Defendants HSBC Holdings plc & HSBC
Bank Australia Limited*

Marc Joel Gottridge
Benjamin Andrew Fleming
Kevin Timothy Baumann
Lisa Jean Fried
HOGAN LOVELLS US LLP (NYC)
*Attorneys for Defendant Lloyds Banking Group plc*

Christopher Martin Paparella
Marc Alan Weinstein
HUGHES HUBBARD & REED LLP
*Attorneys for Defendants Macquarie Group Ltd. &
Macquarie Bank Ltd.*

Marshall Howard Fishman
Christine Vanessa Sama
GOODWIN PROCTER, LLP (NYC)
*Attorneys for Defendants Royal Bank of Canada & RBC*
*Capital Markets LLC*

Jon Randall Roellke
Kenneth Ian Schacter
Anthony R. Van Vuren
MORGAN, LEWIS & BOCKIUS LLP (NY)
*Attorneys for Defendants Morgan Stanley & Morgan*
*Stanley Australia Limited*

Adam Shawn Mintz
David George Januszewski
Elai E. Katz
Herbert Scott Washer
Jason Michael Hall
Sheila Chithran Ramesh
CAHILL GORDON & REINDEL LLP
*Attorneys for Defendants Credit Suisse Group AG & Credit*
*Suisse AG*

Brian S. Fraser
AKERMAN LLP

H. Rowan Gaither, IV
Shari A. Brandt
RICHARDS KIBBE & ORBE LLP (NYC)
*Attorneys for Defendants ICAP plc & ICAP Australia Pty*
*Ltd.*

Brian Theodore Kohn
Harry Simeon Davis
SCHULTE, ROTH & ZABEL LLP
*Attorneys for Defendants Tullett Prebon plc & Tullett*
*Prebon (Australia) Pty Ltd.*

Table of Contents

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   I.     Derivatives and the Money Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   II.    The BBSW Rate "Set" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.    Prime Bank Bills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      B.    The Rate "Set" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   III.   BBSW-Based Derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   IV.   The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      A.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   V.    The Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      A.    Antitrust Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      B.    CEA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      C.    RICO Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      D.    State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
   VI.   Defendants' Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   I.     Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
      A.    Constitutional Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
      B.    Standing to Represent Purported Class . . . . . . . . . . . . . . . . . . . . . 30
   II.    Pleading Standard on Rule 12(b)(6) Motion . . . . . . . . . . . . . . . . . . . . . . . . 38
   III.   Antitrust Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      A.    Antitrust Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      B.    Plausible Antitrust Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
      C.    Extraterritoriality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
   IV.   CEA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
      A.    CEA Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
      B.    Plausible CEA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
      C.    Extraterritoriality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
   V.    RICO Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      A.    RICO Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
      B.    Plausible RICO Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
      C.    RICO Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
      D.    Extraterritoriality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
   VI.   Breach of Implied Covenant of Good Faith and Fair Dealing . . . . . . . . . . . . . . 96
   VII.  Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
   VIII. Fraudulent Concealment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
      A.    Antitrust Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
      B.    CEA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
      C.    State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
   IX.   Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

A. Personal Jurisdiction Arising From Defendants' Contacts . . . . . . . . . . 107
B. Personal Jurisdiction Arising from Defendants' Consent . . . . . . . . . . 128
C Pendent Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
D. Jurisdictional Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

LEWIS A. KAPLAN, *District Judge.*

This purported class action is the latest in a growing number of lawsuits accusing financial institutions of manipulating interest rates used as benchmarks for the pricing of various financial derivatives among other purposes. In this case, defendants – a collection of entities from fifteen major banks and two major brokerage firms – are accused of conspiring to manipulate the Bank Bill Swap Reference Rate ("BBSW"), a rate set at the relevant times in Australia but allegedly used widely in the United States and elsewhere in the world. All defendants[1] move to dismiss for lack of subject-matter jurisdiction and failure to state a claim.[2] Certain defendants (the "Foreign Defendants") move also to dismiss as to them for lack of personal jurisdiction,[3] and as to a subgroup of these defendants (the "Venue Defendants") with respect to certain of the claims, on the additional ground of improper venue.[4] Defendants' motions each are granted in part and denied in part.

---

[1]

Per the request of defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. the motion to dismiss is stayed as to them.

[2]

DI 132.

[3]

DI 109.

The Foreign Defendants are: BNP Paribas, S.A.; UBS AG; Australia and New Zealand Banking Group Ltd.; Commonwealth Bank of Australia; National Australia Bank Limited; Westpac Banking Corporation; Deutsche Bank AG; Credit Suisse Group AG; Credit Suisse AG; HSBC Holdings plc; HSBC Bank Australia Limited; ICAP plc; ICAP Australia Pty Ltd.; Lloyds Banking Group plc; Lloyds Bank plc; Macquarie Group Ltd.; Macquarie Bank Ltd.; Royal Bank of Canada; Morgan Stanley Australia Limited; The Royal Bank of Scotland Group plc; The Royal Bank of Scotland plc; RBS N.V.; RBS Group (Australia) Pty Limited; Tullett Prebon plc; and Tullett Prebon (Australia) Pty Ltd.

[4]

The Venue Defendants are: Credit Suisse Group AG; HSBC Holdings plc; HSBC Bank Australia Limited; ICAP plc; ICAP Australia Pty Ltd.; Lloyds Banking Group plc; Macquarie Group Ltd.; Morgan Stanley Australia Limited; The Royal Bank of Scotland Group plc; The Royal Bank of Scotland plc; RBS N.V.; RBS Group (Australia) Pty Limited; Tullett Prebon plc; and Tullett Prebon (Australia) Pty Ltd.

*Background*

BBSW is a benchmark interest rate, somewhat similar in concept to the London Interbank Offered Rate ("LIBOR") in that it is used to price certain types of financial derivatives. Plaintiffs here, all of whom "engaged in U.S.-based transactions for BBSW-based derivatives" during the purported class period,[5] bring claims under the Clayton Act, the Commodity Exchange Act ("CEA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"). They sue as well on state law claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing.

The following facts are alleged in the amended complaint, the truth of which the Court is bound to assume when considering a motion to dismiss the amended complaint.[6]

I.     *Derivatives and the Money Market*

In order to understand the claims in this case, it is helpful first to provide some background information on financial derivatives and BBSW.

A derivative is "a contract whose value is based on the performance of an underlying financial asset, index, or other investment."[7] The contractual terms of derivatives vary widely, but

---

[5]  DI 63 ("AC") at ¶¶ 35-39.

[6]  *See Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chic. v. Bank of N.Y. Mellon*, 775 F.3d 154, 159 (2d Cir. 2014) (applying standard in respect of motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (citing *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013))).

[7]  John Downes & Jordan Elliot Goodman, BARRON'S DICTIONARY OF FINANCE AND INVESTMENT TERMS 187 (9th ed. 2014) [hereinafter *Barron's*]; *see also CSX Corp. v. Children's Inv. Fund Mgmt. (UK)*, 562 F. Supp. 2d 511, 519 (S.D.N.Y. 2008), *aff'd in part*

2

they generally fall into four basic structures: forward contracts, futures contracts, options, and swaps. A forward contract is a contract for the purchase or sale of some underlying asset for an agreed-upon price at some point in the future.[8] A futures contract is similar to a forward, except that it is traded on a regulated exchange and has standardized terms.[9] An option is a contract that gives the holder the right (but not the obligation) to buy or sell an underlying asset at some point in the future.[10] Finally, a swap in broad strokes is an instrument pursuant to which two counterparties agree to exchange periodic cash flows over a specific length of time.[11]

Swaps come in various forms, one of which is an interest rate swap. An interest rate swap generally obligates each party to pay an amount equal to the amount of interest that would be payable on an agreed upon notional principal amount if that amount actually had been borrowed.[12]

---

[8] *& rev'd in part*, 654 F.3d 276 (2d Cir. 2011) ("The term 'derivative,' as the term is used in today's financial world, refers to a financial instrument that derives its value from the price of an underlying instrument or index.").

*Barron's* at 289; *see also* Barbara J. Etzel, WEBSTER'S NEW WORLD FINANCE AND INVESTMENT DICTIONARY 139 (2003).

[9] *Id.* at 144.

Derivatives may be traded on regulated exchanges or over-the-counter. Exchange-traded futures are uniform as to most terms and vary only in particular ways. Over-the-counter derivatives, including forwards, are neither listed nor traded on an exchange and may be customized to suit the particular counterparties involved. *Barron's* at 529.

[10] *Id.* at 517.

[11] *CSX Corp.*, 562 F. Supp. 2d at 519.

[12] *See trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 709 (S.D.N.Y. 2017) (defining typical interest rate swap "a transaction between two counterparties in which one stream of future interest payments [on a notional debt obligation] is exchanged for another such stream on the same notional amount" (internal quotation marks and citations omitted)).

In the most common type of interest rate swap, one party agrees to pay to the other an amount equal to the amount of interest on the notional principal amount if the hypothetical born of the notional principal amount bore a fixed interest rate while the other party agrees to pay an amount equal to the amount of interest if the hypothetical loan bore interest at a floating rate based on a benchmark such as LIBOR.[13]  For example:

> "Counterparty A and Counterparty B enter into a five-year swap with the following terms: Counterparty A agrees to pay Counterparty B an amount equal to 6 percent per annum on a notional principal of $20 million, and Counterparty B agrees to pay Counterparty A an amount equal to one-year LIBOR plus 1 percent per annum on the same notional principal amount. For simplicity, let us assume the counterparties exchange payments annually on December 31, beginning in 2017 and concluding in 2021. At the end of 2017, Counterparty A will pay Counterparty B $1,200,000 (*i.e.*, $20,000,000 x 6 percent). Let us assume further that on December 31, 2016, one-year LIBOR was 5.33 percent. At the end of 2017, then, Counterparty B will pay Counterparty A $1,266,000 (*i.e.*, $20,000,000 x (5.33 percent + 1 percent))."[14]

Another type of swap is a foreign exchange ("FX") swap, in which "two counterparties agree to exchange streams of interest payments in different currencies for an agreed-upon period of time and to exchange principal amounts in different currencies at an agreed-upon exchange rate at maturity."[15]  According to the amended complaint, "[t]here are two components to a foreign exchange swap: (1) a spot transaction in which the parties buy or sell a certain amount of one currency (*e.g.*, Australian dollars) at the current market prices for immediate delivery (*i.e.*, typically within two days); and (2) a foreign exchange forward, which reverses the spot transaction by buying or selling an equivalent amount of a second currency (*e.g.*, U.S. dollars) on some future

---

[13]
      *Id.*; *see also Barron's* at 749-50.

[14]
      *trueEX, LLC*, 266 F. Supp. 3d at 709.

[15]
      AC at ¶ 193; *see also Barron's* at 749.

maturity date (*e.g.*, 14 days later)."[16]

## II.     The BBSW Rate "Set"

### A.     Prime Bank Bills

Because BBSW rates are "intended to reflect the observed rate of interest paid on Prime Bank Bills actually traded in the Australian money market," it is necessary next to provide some background on Prime Bank Bills.[17]

#### 1.     Bank Bills and Certificates of Deposit

Banks regularly borrow money on the money market by issuing "bank bills" and certificates of deposit ("CDs").[18]

A bank bill is a bill of exchange that requires the issuing bank to pay a specified amount of money – the "face value" of the bill – on a certain maturity date. The number of days between the date on which a bank bill is issued and the date on which it matures is referred to as the "tenor" of the bank bill.[19] Bank bills may be "accepted" or "endorsed" by any bank. When a bank

---

[16]

AC at ¶ 193.

[17]

*Id.* at ¶ 179.

The money market is the market for short-term debt instruments – that is, a debt obligation due within one year. *Barron's* at 459, 693.

[18]

AC at ¶¶ 162, 166.

[19]

*Id.* at ¶ 162. For example, if a bank bill matures in 90 days, it has a three-month tenor. *Id.*

accepts a bank bill, the bill becomes a bank accepted bill (a "BAB") and the accepting bank becomes obligated to pay its face value upon maturity. When a bank endorses a bank bill, it becomes obligated to pay the face value of that bill at maturity if the acceptor is unable to do so.[20]

A CD is a document evidencing a deposit with the issuing bank for a certain amount of time. Upon maturity, the purchaser receives its deposit plus interest. CDs may be negotiable or nonnegotiable. A negotiable CD (an "NCD") can be sold by the depositor on the secondary market whereas a nonnegotiable CD generally must be held until maturity.[21]

Issuing a bank bill or a CD is economically equivalent to borrowing money. Bank bills are sold at discounts to their face value. The issue price that the bank receives when it issues a bank bill is equivalent to the principal of the loan. Upon maturity, when the bank pays the face value to the purchaser of the bank bill, it effectively repays the loan plus interest, with the interest being equal to the difference between the face value and issue price.[22] Similarly, a bank that issues a CD "borrows" the amount deposited and upon maturity repays the deposited amount plus interest.[23]

---

[20]

  *Id.* at ¶ 165.

[21]

  *Id.* at ¶¶ 166-167.

[22]

  *Id.* at ¶¶ 163-164.

  In so stating, the Court implies nothing concerning the tax treatment of such transactions under U.S. or foreign law.

[23]

  *Id.* at ¶ 166.

## 2. AFMA and Prime Banks

"The Australian Financial Markets Association ('AFMA') is a trade association and the principal Australian financial markets industry group."[24] AFMA, through a subcommittee of the larger organization, facilitates the annual election of Prime Banks.[25] Prime Banks are "a designated subset of banks operating in Australia whose [b]ank [b]ills and NCDs are recognized as having the highest quality with regard to liquidity, credit and consistency of relative yield."[26] "Prime Bank Bills," the financial instruments that relate to BBSW, are bank bills and NCDs issued by Prime Banks.[27]

## B. The Rate "Set"

As stated above, BBSW is "intended to reflect the observed rate of interest paid on Prime Bank Bills actually traded in the Australian money market."[28]

Until September 27, 2013, BBSW was calculated on a daily basis using submissions from each of fourteen panel banks that, together, comprised the "BBSW Panel."[29] The Court

---

[24]
    *Id.* at ¶ 168.

[25]
    *Id.* at ¶¶ 169-171.

[26]
    *Id.* at ¶ 171.

[27]
    *Id.* at ¶ 176.

[28]
    *Id.* at ¶ 179.

[29]
    *Id.* at ¶ 179.

As of September 27, 2013, the process of calculating BBSW changed to move away from

understands from the amended complaint that any banks designated as Prime Banks automatically became members of the BBSW Panel[30] and that the remaining members of the Panel were "selected periodically through a private election held at the discretion of the [then] current BBSW Panel."[31]

Each bank on the BBSW Panel submitted to AFMA the observed "mid-rate" – that is, treating the discount on the issue price of a Prime Bank Bill as if it were an interest rate, the midpoint between the rates at which banks offered to buy and sell Prime Bank Bills – for Prime Bank Bills at each of six tenors traded between 9:55 am and 10:05 am (Sydney Time) (the "Fixing Window").[32]

The banks derived these mid-rates with the help of trading brokers who facilitated Prime Bank Bill transactions between banks.[33]  During the relevant period, ICAP and Tullett Prebon were the only interdealer brokers operating markets for Prime Bank Bills.  In order to broker trades,

---

panel bank submissions and toward an automated process whereby rates were extracted directly from brokers and electronic markets.  Evolution of the BBSW Methodology, C O U N C I L  O F  F I N .  R E G U L A T O R S , https://www.cfr.gov.au/publications/consultations/evolution-of-the-bbsw-methodology/ (last visited Nov. 20, 2018).  Effective January 1, 2017, the AFMA stopped acting as the administrator for BBSW.  The Australian Securities Exchange now administers BBSW. Market Data, AFMA, https://afma.com.au/data (last visited Nov. 20, 2018).

[30]

AC at ¶ 176.

[31]

*Id.* at ¶ 179.

According to the amended complaint, "[t]his discretionary election process resulted in an extremely low turnover in panel membership.  While there were several BBSW panel elections during the Class Period, but [sic] the composition of the panel did not change."  *Id.*

[32]

*Id.* at ¶ 182.

[33]

*Id.* at ¶ 177.

each operated its own electronic system for reporting the prices of Prime Bank Bills and would post bids for and offers of Prime Bank Bills on that system so that they would be visible to participating financial institutions.[34] The BBSW Panel banks were supposed to base the "mid-rates" that they submitted to AFMA on the rates displayed on each of the brokers' electronic trading screens.[35]

Upon receipt of the submissions from the banks on the BBSW Panel, AFMA would calculate BBSW for each tenor by ranking the submissions for Prime Bank Bills of each tenor, eliminating the highest and lowest submissions, and averaging the remaining rates. These averages – that is, the BBSW rates for each tenor – then would be published to financial data providers including Thomson Reuters and Bloomberg for global distribution.[36]

## III.    BBSW-Based Derivatives

The Court turns next to a discussion of the six types of financial instruments referred to in the amended complaint that incorporate BBSW as a component of the price of the instrument ("BBSW-Based Derivatives").[37]

•    *BBSW-Based Swaps*: As discussed above, a swap is a derivative in which two parties exchange obligations to make a series of payments based on some underlying principal amount for some set period of time. In a BBSW-based swap, at least one

---

[34]

*Id.* at ¶¶ 177-178.

[35]

*Id.* at ¶ 183.

[36]

*Id.* at ¶ 184.

[37]

*Id.* at ¶ 185.

of the parties' payment obligations references BBSW.[38]

- *BBSW-Based Forward Rate Agreements*: A forward rate agreement ("FRA") is an interest rate forward contract, also known as a single-period swap. In an FRA, the two parties agree to exchange amounts equal to the amount of interest that would be payable on the same notional principal amount, but at different would-be interest rates, on some agreed upon date in the future. In a BBSW-based FRA, at least one party is obligated to pay an amount equal to the would-be interest payment at a floating rate that is tied to BBSW.[39]

- *Chicago Mercantile Exchange Australian Dollar Futures*: A Chicago Mercantile Exchange ("CME") Australian dollar future is "an exchange-traded BBSW-based derivative that represents an agreement to buy . . . or sell . . . 100,000 Australian dollars in terms of U.S. dollars on some future date."[40] "Prices of CME Australian dollar futures contracts are determined by a formula that incorporates BBSW as one of its terms" – that is, the contractual formula adjusts the price of the Australian dollars for immediate delivery "to account for . . . the amount of interest earned on Australian dollar deposits over the duration of the agreement."[41]

- *Australian Dollar FX Forwards & Swaps*: An Australian dollar FX forward is another type of "agreement to buy or sell Australian dollars on some future date" and can be thought of as "the over-the-counter equivalent of a CME Australian dollar futures contract."[42] These forwards are priced using the same formula that determines the value of CME Australian dollar futures contracts and thus incorporate BBSW as a component of their price. An Australian dollar FX swap is an FX swap

---

[38]

    *Id.* at ¶ 186.

[39]

    *Id.* at ¶ 190.

[40]

    *Id.* at ¶ 191.

[41]

    *Id.*

    Plaintiffs allege also that "there is a statistically significant relationship between a change in BBSW and a change in the prices of CME Australian dollar futures contracts" because BBSW is incorporated into the formula used to price CME Australian dollar futures contracts. *Id.* at ¶ 192.

[42]

    *Id.* at ¶ 194.

using Australian dollars as one of the underlying currencies.[43] As discussed above, an FX forward is one of the two components of an FX swap. An Australian dollar FX swap that involves an Australian dollar FX forward that in turn incorporates BBSW as a component of price thus will also be dependent at least to some extent on BBSW.

- *90-Day BAB Futures*: A 90-day BAB futures contract is a standardized, exchange-traded contract in which one party agrees to buy from the other party a 90-day Prime Bank Bill with a face value of $1 million at a specified yield on a certain future date.[44]

## IV. The Parties

### A. Plaintiffs

There are five named plaintiffs in this case, each of whom or which "engaged in U.S.-based transactions for BBSW-Based Derivatives" during the class period. The amended complaint alleges the following:

1. Richard Dennis ("Dennis") is a natural person who resides in Florida. He entered into a large number of CME Australian dollar futures contracts, including on November 22, 2010, a day on which defendant National Australia Bank ("NAB") allegedly "was involved in manipulating BBSW artificially higher."[45]

2. Sonterra Capital Master Fund, Ltd. ("Sonterra") was an investment fund with its principal place of business in New York.[46] Sonterra entered into Australian dollar FX swaps and

---

[43] *Id.* at ¶ 193.

[44] *Id.* at ¶¶ 195, 198.

[45] *Id.* at ¶¶ 35, 283-285.

[46] *Id.* at ¶ 36.

forwards worth more than $490 million from within the United States directly with defendant Morgan Stanley, including as follows:

- An FX swap on November 5, 2010, a day on which defendant Westpac allegedly engaged in manipulating one-month BBSW artificially lower,[47]

- An FX forward on June 3, 2011, a day on which defendant Australia and New Zealand Banking Group ("ANZ") allegedly manipulated BBSW artificially higher,[48] and

- An FX swap on May 14, 2010, two days after defendant Morgan Stanley's involvement in the BBSW rate set was discussed among defendants NAB and Commonwealth Bank of Australia ("CBA").[49]

3. FrontPoint Asian Event Driven Fund, L.P., ("FrontPoint Event Driven") was an investment fund with its principal place of business in Greenwich, Connecticut.[50] FrontPoint Financial Services Fund, L.P. and FrontPoint Financial Horizons Fund, L.P. both were limited partnerships, from the Cayman Islands and Delaware, respectively, with their principal places of business in Greenwich, Connecticut and investment teams in New York.[51] The amended complaint alleges that each of the three FrontPoint plaintiffs (collectively, the "FrontPoint Plaintiffs") engaged in BBSW-based swap transactions from within the United States directly with defendant Macquarie

---

[47]
    *Id.* at ¶¶ 286-288.

[48]
    *Id.* at ¶¶ 289-291.

[49]
    *Id.* at ¶¶ 292-294.

[50]
    *Id.* at ¶ 38.

[51]
    *Id.* at ¶¶ 37, 39.  The amended complaint alleged that FrontPoint Financial Services Fund, L.P. was a Delaware limited partnership as well, but subsequent court filings indicate that this entity in fact was established in the Cayman Islands.  DI 187-1 at 4.

at artificial prices proximately caused by defendants' manipulative conduct.[52] Specifically, FrontPoint Event Driven entered into:

- A swap governed by an ISDA Master Agreement in which Macquarie agreed to make payments to FrontPoint Event Driven equal to one-month BBSW on certain valuation dates, including on July 1 2010, the same day that defendant Westpac allegedly manipulated the 1-month BBSW lower, and

- A one-month BBSW swap with Macquarie on January 27, 2011, a day when CBA and NAB allegedly manipulated BBSW.[53]

The putative class of plaintiffs is defined as "[a]ll persons or entities that engaged in U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled based on BBSW at any time from at least January 1, 2003, through the date on which the effects of Defendants' unlawful conduct ceased."[54]

B.    Defendants

Defendants are horizontal competitors that deal in financial products that are priced, benchmarked, and/or settled by reference to a BBSW rate, including (1) twenty-five banking entities from fifteen different banks, including JPMorgan, BNP Paribas, RBS, UBS, ANZ, CBA, NAB,

---

[52]

AC at ¶¶ 37-39.

[53]

*Id.* at ¶¶ 295-299.

There are no specific examples of transactions provided with respect to either FrontPoint Financial Services Fund, L.P. or FrontPoint Financial Horizons Fund, L.P. The amended complaint alleges also that defendants Macquarie, Deutsche Bank, Royal Bank of Scotland ("RBS"), UBS, and Credit Suisse traded Australian dollar-denominated swaps with the FrontPoint Plaintiffs while BBSW was being manipulated, but does not allege how these Australian dollar-denominated swap were connected to BBSW. *Id.* at ¶ 23.

[54]

*Id.* at ¶ 304.

Westpac, Deutsche Bank, HSBC, Lloyds, Macquarie, Royal Bank of Canada, Morgan Stanley, and

Credit Suisse, (2) two entities from ICAP, a UK-based brokerage firm, and (3) two entities from

Tullett Prebon, another UK-based brokerage firm.

## V.    The Amended Complaint

Plaintiffs' allegations follow largely from the findings of a series of investigations

by the Australian Securities and Investments Commission ("ASIC").

In mid-2016, ASIC initiated proceedings against defendants ANZ,[55] Westpac,[56] and

NAB[57] in the Federal Court of Australia, accusing each of the three banks of attempting improperly

to influence BBSW.  In early 2018, ASIC commenced similar proceedings against defendant CBA.[58]

---

[55]

*A.S.I.C. v. Australia and New Zealand Banking Group Limited*, *ACN 005 357 522*, Concise Statement at 1 (F.C.A. Mar. 4, 2016) (accusing ANZ of engaging "in market manipulation, unconscionable conduct and other unlawful behaviour which likely influenced the setting of the BBSW in such a way as to advantage ANZ over others with an opposite exposure to the BBSW" on 44 occasions between March 9, 2010 and May 25, 2012).

[56]

*A.S.I.C. v. Westpac Banking Corporation*, *ACN 007 457 141*, Concise Statement at 1 (F.C.A. Apr. 5, 2016) (accusing Westpac of trading Prime Bank Bills "with the intention and likely effect of influencing the setting of the [BBSW] to its advantage and to the disadvantage of parties to certain products who had an opposite exposure to the BBSW" on 16 occasions between April 6, 2010 and June 6, 2012).

[57]

*A.S.I.C. v. National Australia Bank Limited*, *ACN 004 044 937*, Concise Statement at 1 (F.C.A. June 7, 2016) (accusing NAB of trading "Prime Bank Bills in the Bank Bill Market with the intention and likely effect of influencing the setting of the [BBSW] to its advantage, or to the advantage of one of its business units, and to the disadvantage of parties to certain products who had an opposite exposure to the BBSW" on 50 occasions between June 8, 2010 and December 24, 2012).

[58]

*A.S.I.C. v. Commonwealth Bank of Australia*, *ACN 123 123 124*, Concise Statement at 1 (F.C.A. Jan. 30, 2018) (accusing CBA of "trading Prime Bank Bills in the Bank Bill market with the purpose of affecting the yield of Prime Bank Bills and the setting of the [BBSW] to its advantage or to the advantage of one of its business units . . . and to the disadvantage of

In its original statements of claim against ANZ, Westpac, and NAB, ASIC released a large collection of emails, phone calls, and electronic chats among traders from the banks and brokerage firms that ultimately were named as defendants in this case. Plaintiffs commenced this

parties to certain products who had an opposite exposure to the BBSW" between January 31, 2012 and around October 2012 and of knowing or believing "that other Prime Banks, including ANZ, NAB and Westpac, also engaged in this trading practice").

Ultimately, ANZ and NAB each settled with ASIC for a total of $50 million (Au) in penalties and costs and acknowledged improperly attempting to manipulate BBSW on numerous occasions. Press Release, ASIC, 17-393MR ASIC Accepts Enforceable Undertakings from ANZ and NAB to Address Conduct Relating to BBSW (Nov. 20, 2017), https://asic.gov.au/about-asic/media-centre/find-a-media-release/2017-releases/17-393mr-a sic-accepts-enforceable-undertakings-from-anz-and-nab-to-address-conduct-relating-to-bbsw/. CBA and ASIC also reached an agreement in principle to settle the legal proceeding, pursuant to which CBA agreed to pay $25 million (Au) and acknowledge its unconscionable conduct related to BBSW on numerous occasions. Press Release, CBA Group, CBA and ASIC Agree In-Principle Settlement Over BBSW (May 9, 2018), https://www.asx.com.au/asxpdf/20180509/pdf/43twn0khh969y5.pdf. Each of NAB, ANZ, and CBA agreed also to take certain measures to change its BBSW rate setting practices and to be subject to monitoring by an independent expert. As to Westpac, the Federal Court of Australia concluded, following trial, that Westpac had traded Prime Bank Bills on four occasions with the dominant purpose of influencing BBSW in order to favor its BBSW exposure. Press Release, ASIC, 18-151MR Federal Court Finds Westpac Traded to Affect the BBSW and Engaged in Unconscionable Conduct (May 24, 2018), https://asic.gov.au/about-asic/media-centre/find-a-media-release/2018-releases/18-151mr-f ederal-court-finds-westpac-traded-to-affect-the-bbsw-and-engaged-in-unconscionable-con duct/. The Court subsequently imposed a penalty of $3.3 million (Au) on Westpac, which apparently was the maximum applicable penalty. Patrick Durkin, *Westpac Fined $3.3 million in ASIC BBSW Case: "Clearly Inadequate"*, THE AUSTRALIAN FINANCIAL REVIEW (Nov. 9, 2018, 3:43 P.M., updated at 4:56 P.M.), https://www.afr.com/business/banking-and-finance/westpac-fined-33-million-in-asic-bbsw -case-20181109-h17pv7.

In prior years (2012 and 2014), ASIC had accepted enforceable undertaking related to BBSW from defendants UBS, BNP Paribas and RBS. Unlike ASIC's more recent settlements with ANZ, NAB, and CBA, however, none of UBS, BNP Paribas or RBS admitted to any wrongdoing as part of their settlement. *See* Enforceable Undertaking between The Royal Bank of Scotland plc and ASIC at § 5.9 (July 21, 2014), available at https://download.asic.gov.au/media/1301287/028492040.pdf; Enforceable Undertaking between BNP Paribas and ASIC at § 5.5 (Jan. 28, 2014), available at https://download.asic.gov.au/media/1301239/028399392.pdf; Enforceable Undertaking between UBS AG and ASIC at § 5.5 (Dec. 23, 2013), available at https://download.asic.gov.au/media/1301413/028553828.pdf.

action on August 16, 2016 alleging that defendants used various means systematically to manipulate BBSW and seeking damages for alleged violations of the Sherman Act, the CEA, and the RICO Act and claims of unjust enrichment and breach of the implied covenant of good faith and fair dealing. Plaintiffs quote directly from ASIC's disclosures throughout the amended complaint.

### A. Antitrust Claims

Plaintiffs allege that defendants, in violation of the federal antitrust laws, "entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of BBSW and the prices of BBSW-Based Derivatives, by conspiring to, *inter alia*: (1) engage in manipulative money market transactions during the BBSW Fixing Window; (2) make false BBSW rate submissions that did not reflect actual transaction prices; (3) uneconomically buy or sell money market instruments at a loss to cause artificial derivatives prices; and (4) share proprietary BBSW-[B]ased [D]erivatives information."[59] As a result, plaintiffs allege that they were "overcharged and underpaid in their BBSW-[B]ased [D]erivatives transactions" and "deprived of the ability to accurately price" and "determine the settlement value of BBSW-[B]ased [D]erivatives by reference to an accurate BBSW."[60]

---

[59]

AC at ¶ 318.

With respect to the allegations concerning the submission of false Prime Bank Bill mid-rates, *id.* at ¶ 272, in some instances, the individuals responsible for making the mid-rate submissions would accept and even solicit requests for BBSW manipulation from derivatives traders. In others, the banks gave the responsibility for making BBSW submissions to BBSW-Based Derivative traders, thus creating a conflict of interest. *Id.* at ¶¶ 273-275.

[60]

*Id.* at ¶ 319.

The allegations concerning the manipulative money market transactions mentioned above merit some explanation. The amended complaint alleges that bank defendants, with the assistance of the broker defendants, rigged BBSW rates by engaging in uneconomic transactions during the Fixing Window to manipulate the supply of Prime Bank Bills in the market. In other words, defendants engaged in Prime Bank Bill transactions during the Fixing Window without regard to whether the transaction would be profitable for the bank but, rather, with the intention of driving BBSW in a direction that would generate profits from their positions in BBSW-Based Derivatives as a whole.[61]

To that end, the bank defendants would calculate their net exposure to the various BBSW rates on a daily basis and then increase the supply of and demand for Prime Bank Bills in the market by selling or buying them in large numbers, respectively, during the Fixing Window.[62] In addition, they issued new Prime Bank Bills during the Fixing Window to further increase supply.[63] As the supply of or demand for Prime Bank Bills increased, their issue prices consequently would decrease or increase, again respectively. As the price of a Prime Bank Bill decreased, its effective interest rate would increase, and vice versa.[64] These strategies thus allowed the banks to push their own BBSW rate submissions, based on the observed mid-rates of Prime Bank Bills during the Fixing Window, higher or lower.

---

[61]    *Id.* at ¶ 202.

[62]    *Id.* at ¶¶ 206-211, 215-217.

[63]    *Id.* at ¶¶ 212-213.

[64]    *Id.* at ¶ 205.

According to the amended complaint, the bank defendants did not engage in this effort unilaterally. Rather, they conferred with one another ahead of these manipulative transactions, "aligning their interests and recruiting co-conspirators to trade in the same direction."[65] In addition, the bank defendants allegedly gave one another advance notice as to whether they planned to buy or sell during the Fixing Window, allowing them "to predict fluctuations in BBSW that were not caused by genuine economic factors and gave Defendants and their co-conspirators an advantage over counterparties who did not have access to this information."[66] To maximize their impact on the market, defendants allegedly transacted with one another ahead of the Fixing Window to concentrate the supply of Prime Bank Bills that would be used to manipulate BBSW.[67] Certain banks even reorganized their trading desks to make specific groups that had a greater exposure to BBSW-Based Derivatives – and thus "a larger incentive to conspire in manipulating the rate" – responsible for the bank's BBSW activities.[68]

The amended complaint alleges that the broker defendants actively participated in the alleged conspiracy to manipulate BBSW by facilitating these manipulative trades for the bank defendants. Banks pre-authorized the broker defendants to trade the banks' caches of Prime Bank Bills until the interest rate landed at the banks' desired level.[69] The brokers were instructed to line

---

[65]

 *Id.* at ¶ 204; *see also id.* at ¶ 221.

[66]

 *Id.* at ¶ 222; *see also id.* at ¶¶ 223-236.

[67]

 *Id.* at ¶¶ 238-240.

[68]

 *Id.* at ¶¶ 269-270.

[69]

 *Id.* at ¶ 251.

up trades at artificial prices, rather than find the actual best bid for a Prime Bank Bill transaction, in order to push BBSW in one direction or another.[70] The brokers acted also as conduits of information for the bank defendants. According to the amended complaint, "[t]heir frequent contact with Bank Defendants gave the Broker Defendants a wealth of information that enhanced the cartel's efficacy, including other banks' (a) BBSW rate exposure; (b) Prime Bank Bill stock levels; and (c) plans for manipulative trading during the Fixing Window."[71] The banks consequently relied on the brokers, who shared knowledge about other banks' positions and preferred BBSW rates with them.[72] The brokers then coordinated with the BBSW traders at the banks, facilitated the banks' desired high-volume trades, and earned "outsized commission payments."[73]

The amended complaint alleges also that defendants used their positions in AFMA "to control the BBSW rule-making process, conceal complaints from other market participants, and perpetuate the BBSW methodology that they used to secretly manipulate BBSW."[74] The bank defendants positioned their BBSW-Based Derivatives traders, and in certain cases, their Prime Bank Bill traders who were generally responsible for manipulating BBSW, on relevant AFMA governance

---

[70]   *Id.* at ¶¶ 255-258.

[71]   *Id.* at ¶ 248.

[72]   *Id.* at ¶¶ 253-254.

[73]   *Id.* at ¶ 248.

[74]   *Id.* at ¶ 259.

committees to compromise AFMA's oversight of BBSW.[75] They proposed also rules to keep the committees' activities secret, including by making meeting minutes confidential.[76] Finally, they used their control over the committees' decisions to reject proposals to mechanize the BBSW rate set.[77]

### B.    CEA Claims

Plaintiffs allege also that defendants violated the CEA (1) as primary violators, (2) in their capacities as principals in respect of the manipulation committed by their "agents, representatives, and/or other persons acting for them in the scope of their employment,"[78] and (3) as aiders and abettors,[79] by using their influence to manipulate BBSW as well as the prices of BBSW-Based Derivatives.[80] Defendants violated the CEA by engaging in the manipulative transactions described above and by submitting false BBSW rates in order to "obtain[] hundreds of millions (if not billion) of dollars in illegitimate profits on BBSW-[B]ased [D]erivatives, held by themselves or other co-conspirators, the prices of which . . . were priced, benchmarked, and/or

---

[75]
  *Id.* at ¶¶ 260-263, 267.

[76]
  *Id.* at ¶ 264.

[77]
  *Id.* at ¶ 265.

[78]
  *Id.* at ¶ 331.

[79]
  *Id.* at ¶ 334.

[80]
  *Id.* at ¶ 325.

settled based on BBSW."[81]  As a result of defendants' manipulation, the BBSW-Based Derivatives in which plaintiffs and the purported class members transacted allegedly were priced at artificial levels.[82]

C.     RICO Act Claims

Plaintiffs assert also substantive and conspiracy RICO violations.  The RICO Act makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt"[83] and for "any person to conspire" to so conduct or participate.[84]  The "racketeering activity" alleged in the amended complaint is wire fraud, as defined under 18 U.S.C. § 1343.

The amended complaint alleges that "[d]efendants' collective association, including through their participation together (i) as members of the AFMA and its subcommittees; (ii) as BBSW Panel Banks; and (iii) acting as a trading bloc and engaging in secret collusive trades in the Prime Bank Bill market to manipulate BBSW, constitutes the RICO enterprise."[85]  The members of

---

[81]     *Id.* at ¶¶ 326-327.

[82]     *Id.*

[83]     18 U.S.C. § 1962(c).

[84]     *Id.* § 1962(d).

[85]     AC at ¶ 345.

this enterprise allegedly participated in and conspired to participate in domestic wire fraud by: "(a) transmitting or causing to be transmitted artificial BBSW rates in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (b) transmitting or causing to be transmitted false and artificial BBSW submissions that were relied on by Thomson Reuters and the AFMA in collecting, calculating, publishing, and/or disseminating the daily BBSW rates that were transmitted, published, and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; and (c) transmitting or causing to be transmitted confirmations for fraudulent transactions intended to impact BBSW in the U.S. or while crossing U.S. borders through electronic servers located in the United States."[86]  Through this scheme, defendants defrauded participants in the BBSW-Based Derivatives market, depriving plaintiffs and purported class members of "their money relative to their BBSW-[B]ased [D]erivatives contracts."[87]

### D.     State Law Claims

Finally, plaintiffs assert two state law claims.  First, they assert breach of the implied covenant of good faith and fair dealing against defendants Macquarie Bank, Morgan Stanley, Credit Suisse, Deutsche Bank AG, and UBS.  They allege that the FrontPoint Plaintiffs "entered into binding and enforceable contracts with Defendants Macquarie Bank, Credit Suisse, Deutsche Bank AG, and UBS in connection with transactions for BBSW-[B]ased [D]erivatives" and that "Sonterra entered into binding and enforceable contracts with Defendant Morgan Stanley in connection with

---

[86]

      *Id.* at ¶¶ 345-346; *see also id.* at ¶ 348 (listing alleged predicate acts); *id.* at ¶¶ 354-356 (asserting separate cause of action for conspiracy to violate RICO Act).

[87]

      *Id.* at ¶¶ 351, 357.

transcriptions for BBSW-[B]ased [D]erivatives."[88]  These defendants allegedly breached the implied covenant and frustrated the purpose of these contracts by "(a) intentionally manipulating BBSW for the express purpose of generating illicit profits from its BBSW-[B]ased [D]erivatives; and (b) conspiring with other Defendants to manipulate BBSW and the prices of BBSW-[B]ased [D]erivatives."[89]

Finally, plaintiffs assert a claim of unjust enrichment against all defendants.[90]  They allege that defendants entered into BBSW-Based Derivatives transactions but that, "[r]ather than compete honestly and aggressively with each other, Defendants colluded to manipulate BBSW and the prices of BBSW-[B]ased [D]erivatives to ensure they had an unfair advantage in the marketplace."[91]  Defendants' "unlawful and inequitable acts caused Plaintiffs and Class members to suffer injury, lose money, and otherwise be deprived of the benefit of accurate BBSW rates, as well as the ability to accurately price, benchmark and or settle BBSW-[B]ased [D]erivatives transactions."[92]  Plaintiffs consequently received less and defendants received more in value in than they would have received absent defendants' wrongful conduct.[93]

---

[88]      *Id.* at ¶ 363.

[89]      *Id.* at ¶¶ 365-366.

[90]      To the extent required, plaintiffs assert their claims of unjust enrichment and breach of the implied covenant of good faith and fair dealing in the alternative in accordance with Federal Rule of Civil Procedure 8(d).  *Id.* at ¶¶ 362, 368.

[91]      *Id.* at ¶ 369.

[92]      *Id.* at ¶ 370.

[93]      *Id.*

## VI.    Defendants' Motions

All defendants now move to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  The Foreign Defendants move also to dismiss the amended complaint pursuant to Rule 12(b)(2), and the Venue Defendants move to dismiss plaintiffs' antitrust claims pursuant to Rule 12(b)(3).[94]

Defendants' motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim rests on alternative grounds.  Defendants challenge plaintiffs' standing under Article III of the Constitution as well as under the Clayton Act, the CEA, and the RICO Act to bring each respective cause of action.  In addition, they assert that the amended complaint fails to state a claim upon which relief can be granted under either federal or state law.  Finally, defendants argue that each federal cause of action should be dismissed as impermissibly extraterritorial and that all but the RICO claims should be dismissed as untimely.

The Foreign Defendants move also to dismiss each of plaintiffs' claims for lack of personal jurisdiction, and the Venue Defendants move to dismiss plaintiffs' antitrust claims for improper venue.  The amended complaint alleges that the Foreign Defendants are subject to personal jurisdiction on a number of bases, including that (1) all Foreign Defendants are subject to general personal jurisdiction in New York, (2) all Foreign Defendants are subject to specific personal

---

[94]    Defendants have filed a separate motion to dismiss the claims brought by Sonterra and the FrontPoint Plaintiffs because, defendants allege, these plaintiffs no longer exist and therefore lack standing and legal capacity to sue.  DI 207 (notice of motion by letter), DI 213 (brief). The Court will resolve that motion in a separate opinion and does not now reach the issues there raised.

jurisdiction,[95] and (3) certain defendants have consented to personal jurisdiction by registering their New York branches under New York Banking Law § 200 and by entering into contracts governed by ISDA Master Agreements with the FrontPoint Plaintiffs. In the alternative, plaintiffs argue that they should be permitted to engage in jurisdictional discovery. The Foreign Defendants challenge jurisdiction on each of these grounds.

*Discussion*

## I.    Standing

### A.    Constitutional Standing

"To establish standing under Article III of the Constitution, a plaintiff must allege '(1) *injury-in-fact*, which is a concrete and particularized harm to a legally protected interest; (2) *causation* in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief.'"[96] Defendants here challenge both injury-in-fact and causation.[97]

---

[95]

As discussed later in this opinion, the Venue Defendants' motion to dismiss, although characterized as one for improper venue, in substance challenges plaintiffs' antitrust claims for lack of personal jurisdiction, which in turn depends on the Clayton Act's venue provision.

[96]

*Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018) (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992))) (emphasis in original).

[97]

As discussed above, the Court will write separately on and does not now reach the questions of Sonterra's and the FrontPoint Plaintiffs' standing raised in defendants' subsequent motion to dismiss.

*1.     Injury-In-Fact*

Injury-in-fact is a "low threshold" that "need not be capable of sustaining a valid cause of action."[98]  As the Second Circuit recently stated:

> "To successfully plead injury-in-fact, a plaintiff must only 'clearly . . . allege facts demonstrating,' *Warth v. Seldin*, 422 U.S. 490, 518, 95 S. Ct. 2197, 45 L.Ed.2d 343 (1975) (quoted in *Spokeo*, 136 S. Ct. at 1547), that she had a 'a legally protected interest in a manner that is concrete and particularized' and that a defendant 'inva[ded]' that interest.  *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. 2130). . . . Unless an allegation of injury is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy,' *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89, 118 S. Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Oneida Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666, 94 S. Ct. 772, 39 L.Ed.2d 73 (1974) ), the mere fact that it 'raises a federal question . . . confers power [on a federal court] to decide that it has no merit, as well as to decide that it has.' *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 249, 71 S. Ct. 692, 95 L.Ed. 912 (1951)."[99]

Plaintiffs Dennis, Sonterra, and FrontPoint Event Driven here allege that defendants manipulated BBSW on days when these plaintiffs transacted in BBSW-Based Derivatives, thereby impacting the price of and/or periodic payments due on such derivatives and causing these plaintiffs to be either overcharged or underpaid.  This alleged injury readily meets the "low threshold" for injury-in-fact.  The harm of "pa[ying] too much" or "receiv[ing] too little" is a "classic economic

---

[98]

*Ross v. Bank of Am. N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation marks and citations omitted); *see also Harry*, 889 F.3d at 110-11 ("While the pleading of a cause of action must possess enough heft to show that the pleader is *entitled to relief*, to plead standing, the pleader need only show that allowing her to *raise* her claim in federal court would not move so beyond the court's ken as to usurp the power of the political branches." (emphasis in original) (internal quotation marks and citations omitted)).

[99]

*Harry*, 889 F.3d at 110-11.

injury-in-fact."[100]  In *Gelboim v. Bank of America Corporation*,[101] for example, the Second Circuit considered an Article III challenge to plaintiffs who there alleged that they had been "harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR."[102]  The Circuit concluded that plaintiffs had "easily satisfied" the injury-in-fact requirement.[103]

Nor is the Court persuaded by defendants' argument that plaintiffs might just as easily have been benefitted by the alleged manipulation.  This argument is premature at best.  The mere "fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing."[104]

Accordingly, Dennis, Sonterra and FrontPoint Event Driven each sufficiently has alleged injury-in-fact.  In contrast, the amended complaint does not allege that either FrontPoint Financial Horizons Fund, L.P. or FrontPoint Financial Services Fund, L.P. engaged in any BBSW-Based Derivatives transactions on days when BBSW allegedly was manipulated.  These two named

---

[100]

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 53 (S.D.N.Y. 2016) (internal quotation marks omitted).

[101]

823 F.3d 759 (2d Cir. 2016).

[102]

*Id.* at 770.

[103]

*Id.*

[104]

*Ross*, 524 F.3d at 222 (internal quotation marks and citation omitted); *see also Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 53 ("At this stage, the appropriate question is whether the alleged manipulation of ISDAfix plausibly caused each Plaintiff to suffer *some* loss under the terms of *some* derivative at *some* point during the years the conspiracy allegedly took place." (emphasis in original)).

plaintiffs therefore lack constitutional standing and their claims must be dismissed.

2.    *Fairly Traceable*

Defendants next argue that the injuries of plaintiffs Dennis and Sonterra cannot fairly be traced to the alleged conspiracy because they have not alleged sufficiently that BBSW was a component of the prices of their CME Australian futures contracts and Australian dollar FX swaps and forwards.[105]

But the amended complaint alleges that the "[p]rices of CME Australian dollar futures contracts are determined by a formula that incorporates BBSW as one of its terms."[106] Specifically, the alleged formula "uses BBSW to adjust the 'spot price' of Australian dollars for immediate delivery to account for the 'cost of carry,' *i.e.*, the amount of interest earned on Australian dollar deposits over the duration of the agreement."[107] And plaintiffs' Australian dollar FX forwards are alleged to have been essentially "over-the-counter equivalent[s] of . . . CME Australian dollar futures contract[s]" that "are priced using the same formula that determines the value of CME Australian dollar futures contracts."[108] Finally, these Australian dollar FX forwards are one of the two

---

[105]

    DI 134 at 10-12.

[106]

    AC at ¶ 191.

[107]

    *Id.*; *see also id.* at ¶ 192 (alleging statistically significant relationship between changes in BBSW and changes in the prices of CME Australian dollar futures contracts).

[108]

    *Id.* at ¶ 194.

28

components of an Australian dollar FX swap.[109]  These allegations, the truth of which this Court is

bound to assume at this motion to dismiss stage, are sufficient to make out a causal connection

between defendants' alleged manipulation of BBSW and Dennis' and Sonterra's diminished returns

on their BBSW-Based Derivatives.[110]

        Defendants' various arguments that a causal nexus between the alleged manipulation

and each of plaintiffs' specific transactions is implausible fail as well.[111]  As an initial matter, the

standard for Article III standing is not whether such the alleged injury is *plausibly* fairly traceable,

but, rather, whether the injury is *possibly* fairly traceable.[112]  Moreover, the Court declines at this

early stage of litigation to make assumptions about how enduring or short-lived the effect of the

alleged misconduct might have been on a given BBSW-Based Derivative.

        Finally, the dates identified in the amended complaint in any event "do not purport

to be the universe of defendants' communications and misconduct"[113] or of plaintiffs' transactions

---

[109]

    *Id.* at ¶ 193.

[110]

    *See, e.g., Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *9 (S.D.N.Y. Feb. 21, 2017) ("If defendants are correct and the Complaint inaccurately describes the Euribor's role in these transactions, the issue could likely be resolved through a summary judgment motion at the proper juncture."); *see also Gelboim*, 823 F.3d at 776 (rejecting similar argument in context of antitrust injury because that type of disputed factual issue "must be reserved for the proof stage").

[111]

    DI 134 at 11-13 (citing, among other authorities, *In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR II")*, 962 F. Supp. 2d 606, 622 (S.D.N.Y. 2013)).

[112]

    *See Harry*, 889 F.3d at 110-11 (comparing pleading standards for stating cause of action and constitutional standing).

[113]

    *Sullivan*, 2017 WL 685570, at *11; *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) (rejecting argument that a complaint need "allege facts that, if proven, would establish . . . actual harm in real trades in specific

in BBSW-Based Derivatives. In *John v. Whole Foods Market Group, Inc.*,[114] the Second Circuit concluded that the plaintiff, a regular purchaser of certain items from Whole Foods Market, had Article III standing to sue Whole Foods in light of a report that Whole Foods had "systematically" and "routinely" overcharged for those products during the general period in which the plaintiff had made his purchases.[115] Although *Whole Foods* does not directly control, it nonetheless weighs in favor of plaintiffs, who have asserted here that defendants engaged in systematic manipulation of BBSW and that the trades alleged in the amended complaint are only some examples of numerous transactions entered into by plaintiffs.

### B. Standing to Represent Purported Class

Defendants argue also that plaintiffs "lack standing to assert claims regarding FRAs and BAB Futures because [p]laintiffs do not claim to have transacted in those products."[116]

"[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged

---

currencies on particular days" (emphasis omitted)).

[114]

858 F.3d 732 (2d Cir. 2017).

[115]

*Id.* at 737-38; *see also id.* ("Taking these allegations as true and drawing all reasonable inferences in his favor, it is plausible that John overpaid for at least one product. John's complaint thus satisfies the 'low threshold' required to plead injury in fact." (citation omitted)).

[116]

DI 134 at 9-10.

to have caused injury to other members of the putative class by the same defendants."[117]  If both of these requirements are met, "the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf."[118]  As discussed above, plaintiffs Dennis, Sonterra, and Front Point Event Driven satisfy the first prong of this test.  The Court now considers whether they satisfy the second.

In *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,[119] the Second Circuit considered a purported class action brought by holders of mortgage-backed certificates issued in a collection of offerings.  The action, filed against the issuing and underwriting financial institutions, alleged that the registration statements issued in the offerings for the certificates had contained "similar if not identical" false or misleading information in violation of the Securities Act of 1933.[120]  The question there was whether the named plaintiffs had standing to litigate claims with respect to certificates from offerings in which the named plaintiffs had not purchased certificates and with respect to certificates from different tranches of the offerings in which the named plaintiffs had purchased certificates.[121]

The Circuit first considered the hypothetical scenario of a claim brought by a

---

117
        *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotation marks and citations omitted).

118
        *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chic.*, 775 F.3d at 161.

119
        693 F.3d 145 (2d Cir. 2012).

120
        *Id.* at 149, 162.

121
        The varying tranches in the offering dictated the payment priority to the various holders of the certificates.

purchaser of debt asserting that the relevant offering documents contained a misrepresentation about the issuing company's impending insolvency and that the same misrepresentation appeared in the offering documents for each of a series of debt offerings by the company. The court noted that such a claim "would raise a 'set of concerns' nearly identical to that of a purchaser from another offering: the misrepresentation would infect the debt issued from every offering in like manner, given that all of it is backed by the same company whose solvency has been called into question."[122] In comparison, the certificates at issue had been backed by distinct sets of loans issued by distinct set of originators. The Circuit concluded that "differences in the identity of the originators backing the Certificates matter[ed] for the purposes of assessing whether [the alleged] claims raise[d] the same set of concerns" because the alleged misstatements concerned origination guidelines.[123] This meant that the proof of any given injury alleged "would center on whether the particular originators of the loans backing the particular Offering from which a Certificate-holder purchased a security had in fact abandoned its underwriting guidelines, rendering defendants' Offering Documents false or misleading."[124] Accordingly, the Circuit concluded that "to the extent certain Offerings were backed by loans originated by originators common to those backing the [offerings from which the named plaintiffs had purchased certificates], NECA's claims raise[d] a sufficiently similar set of concerns

---

[122]
     *Id.* at 163.

[123]
     *Id.*

[124]
     *Id.*

to permit it to purport to represent Certificate-holders from those Offerings."[125]  The Circuit concluded also that the differences among the various tranches in a given offering were of no moment to class standing because the difference in priority with respect to receiving cash flows "[did] not alter the fact that all of the Certificate-holders' cash flows within any such Offering or Group derive[d] from loans originated by some of the same originators," but rather impacted only the relative damages that class members would receive.[126]

In a subsequent case involving residential mortgage-based securities ("RMBS"),[127] the Second Circuit did not permit a named plaintiff to assert "breach-of-duty" claims against the trustee of a RMBS trust in which the named plaintiff did not invest.  There, the defendant had served as the trustee for 530 different RMBS trusts, and the named plaintiff had invested in a subset of those trusts.[128]  The originator of the mortgage loans underlying the securities in the trust had made several representations and warranties in respect of the credit quality and underwriting of the loans. According to plaintiffs, however, it had failed to adhere to prudent underwriting standards and thus

---

[125]

       *Id.* at 164; *see also Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chic.*, 775 F.3d at 161 (explaining that in *NECA-IBEW*, "the named plaintiff had the right incentives, largely because the proof contemplated for all of the claims would be sufficiently similar").

[126]

       *Id.*; *see also id.* at 164-65 ("Their ultimate damages will of course vary depending on their level of subordination, but 'it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(a), let alone class standing." (quoting *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010))).

[127]

       *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chic. v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014).

[128]

       *Id.* at 156.

breached several of the representations and warranties. These breaches allegedly had resulted in significant losses to the holders because the underlying loans had defaulted at higher than expected rates.[129] Plaintiffs consequently sued defendant, as trustee, for breach of its fiduciary duties of care and loyalty, breach of contract, breach of the covenant of good faith, and breach of the Trust Indenture Act.

The Circuit held that the named plaintiff did not have standing to assert claims on behalf of the purported class members who invested in RMBS trusts in which the named plaintiff had not invested because the defendant's alleged misconduct – which included failure to notify certificate holders of the originator's breaches of the governing agreements, failure to force the originator to repurchase defaulted mortgage loans, and failure to ensure that the mortgage loans held by the trusts were correctly documented – had to be "proved loan-by-loan and trust-by-trust."[130]

Plaintiffs here allege that defendants conspired to and did manipulate BBSW on a systematic basis, which manipulation resulted in artificial pricing of BBSW-Based Derivatives across the globe, including in the United States. The proof required for plaintiffs to prevail on their federal claims – that is, their claims under the Clayton Act, the CEA and the RICO Act – will be largely identical because, as described above, the allegations underlying these claims are that defendants engaged in manipulative Prime Bank Bill transactions and submitted false BBSW rates. That plaintiffs and the purported class members transacted in different derivatives is relevant only to the question of damages because plaintiffs have sufficiently alleged that BBSW was a component

---

[129]

       *Id.*

[130]

       *Id.* at 162; *see also id.* (distinguishing *NECA-IBEW*, in which the defendant had been accused of making the same misstatements as to origination across multiple offerings).

of the prices of the derivatives in which they transacted as well as of the FRAs described in the amended complaint.[131]  Although 90-day BAB futures contracts stand on somewhat different footing because they are priced by reference to 90-day Prime Bank Bills, rather than BBSW, the proof needed to prevail on claims with respect to those derivatives – *i.e.*, that defendants manipulated BBSW by manipulating the prices of Prime Bank Bills – largely will overlap as well.

The remaining state law claims, however, stand apart from the federal claims.  Unlike the federal claims, in respect of which a plaintiff's specific relationship with defendants is relevant only or substantially to damages, a plaintiff's connection to the defendants is central to the question of liability in the case of claims of breach of the implied covenant of good faith and fair dealing and unjust enrichment.

The promise of good faith and fair dealing is treated as an implied provision in every contract that "is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."[132]  "In order to find a breach of the implied covenant, a party's action must 'directly

---

131

 *See, e.g., Sullivan*, 2017 WL 685570, at *8 (concluding plaintiffs alleging identical federal claims in respect of alleged Euribor manipulation had class standing to assert claims on behalf of plaintiffs that transacted in FRAs because "any harm suffered by a party to an FRA as a result of the Euribor's manipulation would have been caused by the identical misconduct of the identical parties" and "[l]iability would turn on the same proof as to the allegedly false Euribor submissions").

132

 *Skillgames, LLC v. Brody*, 1 A.D.3d 247, 252, 767 N.Y.S.2d 418, 423 (1st Dept. 2003) (internal quotation marks omitted) (citing *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 68 (1978); *Jaffe v. Paramount Commc'ns Inc.*, 222 A.D.2d 17, 22-23, 644 N.Y.S.2d 43, 47 (1st Dept. 1996)); *see also Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) ("Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included." (internal quotation marks and citations omitted)).

violate an obligation that may be presumed to have been intended by the parties.'"[133]

The terms of contracts for BBSW-Based Derivatives that are traded over the counter – that is, BBSW-based swaps, BBSW-based FRAs, and Australian dollar FX forwards and swaps – are negotiated and customized to the particular investor. As the terms across these contracts vary, so too do the "obligation[s] that may be presumed to have been intended by the parties."[134] Accordingly, liability for the breach of the implied covenant of good faith and fair dealing with respect to such contracts may be determined only on a contract-by-contract basis. Plaintiffs therefore do not have standing to represent absent purported class members who entered into BBSW-based FRAs because plaintiffs do not allege that they themselves entered into such derivatives.

The analysis is somewhat different with respect to the exchange-traded BBSW-Based Derivatives – that is, CME Australian dollar futures and 90-day BAB futures – but the result is the same. The contract terms for a given type of exchange-traded future are almost entirely standardized. They vary only with respect to the maturity date and price of the derivative, and the prices in turn are determined by a set formula based in part either on a 90-day Prime Bank Bill or a BBSW rate.[135] Accordingly, the manipulative conduct alleged in the amended complaint likely would "infect" these derivatives contracts "in like manner"[136] and, although the question is not now before the Court, a

---

[133]

*Gaia House Mezz LLC v. State Street Bank & Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407-08 (2d Cir. 2006)).

[134]

*Id.*

[135]

AC at ¶¶ 191, 195-199.

[136]

*NECA-IBEW*, 693 F.3d at 163.

strong case could be made that a plaintiff's burden to sustain a claim for breach of the implied covenant of good faith and fair dealing as to such a contract would be largely identical to anyone else who entered into a contract for the same type of future.  The only meaningful differences would be with respect to the damages suffered, if any, by a given contract holder.

Here, however, defendants challenge plaintiffs' class standing to represent purported class members who traded 90-day BAB futures.  None of the named plaintiffs alleges that it traded 90-day BAB futures.  Accordingly, plaintiffs' claims for breach of the implied covenant will not raise a "sufficiently similar set of concerns"[137] to those of the would-be class members.  Plaintiffs therefore lack class standing as to purported class members who entered into contracts for 90-day BAB futures.

The analysis is similar with respect to plaintiffs' claims of unjust enrichment.  In order to sustain an unjust enrichment claim under New York law, "[a] plaintiff must show 'that (1) the other party was enriched, (2) at that party's expense, and (3) that "it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered."'"[138] A plaintiff cannot support a claim of unjust enrichment against a defendant without alleging some kind of connection to that defendant.[139]  Liability therefore will depend on each plaintiff's relationship to a

---

[137]

Id. at 164.

[138]

Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011) (quoting Citibank, N.A. v. Walker, 12 A.D.3d 480, 481, 787 N.Y.S.2d 48 (2d Dept. 2004); Baron v. Pfizer, Inc., 42 A.D.3d 627, 629-30, 840 N.Y.S.2d 445 (3d Dept. 2007)) (internal quotation marks omitted).

[139]

Id. ("Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated." (citing Sperry v. Crompton Corp., 8 N.Y.3d 204, 215 (2007)).

given defendant. Where a relationship is governed by a customized, negotiated contract for a derivative traded over the counter, that relationship will change from contract to contract. Where, however, a relationship is governed by a standardized contract for an exchange-traded derivative such as a future, the concerns raised in respect of one such contract will be largely identical to the concerns raised in respect of any other such contracts. Nonetheless, none of the named plaintiffs traded in the type of contract at issue here, which is a 90-day BAB future.

The Court concludes that plaintiffs do not have class standing to assert their state law claims for breach of the implied covenant of good faith and fair dealing or unjust enrichment on behalf of absent plaintiffs who traded in BBSW-based FRAs or 90-day BAB futures. The contracts related to BBSW-based FRAs will differ across the holders of such contracts. And although the proof required for holders of 90-day BAB futures to prevail on claims for either breach of the implied covenant of good faith and fair dealing or unjust enrichment likely would be largely identical across such holders, none of the plaintiffs here falls into that group. Accordingly, plaintiffs have standing to assert their federal claims, but not their state law claims, on behalf of the purported class members who traded in BBSW-based FRAs and 90-day BAB futures.

## II.    Pleading Standard on Rule 12(b)(6) Motion

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"[140] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

---

[140] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

inference that the defendant is liable for the misconduct alleged."[141]  The Court generally "accept[s] all factual allegations in the complaint as true and draw[s] all reasonable inferences in the plaintiffs' favor" when considering a motion to dismiss.[142]

To the extent a claim sounds in fraud, however, the complaint is subject to the heightened pleading standard of Rule 9(b) and "must state with particularity the circumstances constituting fraud."[143]  Although "the fraud alleged must be stated with particularity . . . the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great specificity."[144] Nonetheless, a complaint "must allege facts that give rise to a strong inference of fraudulent intent,"[145] which "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[146]

---

[141]

*Id.*

[142]

*Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)) (internal quotation marks omitted).

[143]

Fed. R. Civ. P. 9(b).

[144]

*Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 338 (S.D.N.Y. 2010) (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996)) (internal quotation marks omitted).

[145]

*Id.* (internal quotation marks and citations omitted).

[146]

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (internal quotation marks and citations omitted).

## III. Antitrust Claims

Plaintiffs' first cause of action is a claim against all defendants under Section 4 of the Clayton Act asserting a violation of Section 1 of the Sherman Act, which provides, in relevant part:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."[147]

Section 4 of the Clayton Act, which sets forth a private right of action to bring a Sherman Act claim for damages, provides, in relevant part:

> "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."[148]

### A. Antitrust Standing

Defendants first challenge plaintiffs' ability to bring their federal antitrust claims under the concept of "antitrust standing" – that is whether plaintiffs have pled "enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief"[149] under Section 4 of the Clayton Act.

"It is a well-established principle that, while the United States is authorized to sue

---

[147]     15 U.S.C. § 1.

[148]     *Id.* § 15(a).

[149]     *Harry*, 889 F.3d at 110 (citing *Ashcroft*, 556 U.S. at 678).

anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'"[150] "Like constitutional standing, antitrust standing is a threshold inquiry resolved at the pleading stage."[151] In determining whether a plaintiff has antitrust standing, the Court "'assume[s] the existence' of an antitrust violation"[152] and considers two questions:

(1)    "[H]ave [plaintiffs] suffered antitrust injury?"

(2)    "[A]re [plaintiffs] efficient enforcers of the antitrust laws?"[153]


### 1.    Antitrust Injury

"Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."[154] Rather, "[a]n antitrust injury 'should reflect the anticompetitive effect either of the [antitrust] violation or of anticompetitive acts made possible by the violation.'"[155] Accordingly, "[i]t is not enough for the actual injury to be

---

[150]

Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 436 (2d Cir. 2005).

[151]

Gelboim, 823 F.3d at 770 (citing Gatt Commc'ns v. PMC Assocs., L.L.C., 711 F.3d 68, 75 (2d Cir. 2013)).

[152]

Harry, 889 F.3d at 115 (quoting Gelboim, 823 F.3d at 770).

[153]

Gelboim, 823 F.3d at 772; accord Daniel, 428 F.3d at 436-38.

[154]

Gelboim, 823 F.3d at 772 (quoting Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 534 (1983) (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n. 14 (1972))) (internal quotation marks omitted).

[155]

Id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

'causally linked' to the asserted violation."[156]  Rather, "plaintiffs must demonstrate that they themselves have sustained an '*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"[157]

This inquiry involves three steps:

"[F]irst the plaintiff must 'identify the practice complained of and the reasons such a practice is or might be anticompetitive'; then the court must 'identify the actual injury the plaintiff alleges' by 'look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct'; and finally, the court must 'compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.'"[158]

As to the first question, plaintiffs here assert that defendants, in coordination with one another, manipulated BBSW and the prices of BBSW-Based Derivatives by conspiring to engage in manipulative and uneconomic money market transactions during the Fixing Window, by sharing proprietary BBSW-Based Derivative information with one another, and by making false BBSW rate submissions.[159]  That is sufficient.

As to the second, plaintiffs allege that they were "overcharged and underpaid in their BBSW-[B]ased [D]erivatives transactions" and were "deprived of the ability to accurately price BBSW-[B]ased [D]erivatives entered into during the Class Period and to accurately determine the

---

[156]

*Gatt Commc'ns, Inc.*, 711 F.3d at 76 (internal quotation marks and citations omitted).

[157]

*Daniel*, 428 F.3d at 438 (quoting *Brunswick Corp.*, 429 U.S. at 489) (emphasis in original).

[158]

*Harry*, 889 F.3d at 115 (quoting *Gatt Commc'ns, Inc.*, 711 F.3d at 76).

[159]

AC at ¶ 318.

settlement value of BBSW-[B]ased [D]erivatives by reference to an accurate BBSW."[160]   They consequently received "less in value" on their BBSW-Based Derivatives transactions than they otherwise would have.[161]   That too is sufficient.

The third query is resolved quickly in favor of plaintiffs.   "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"[162]

The Second Circuit's decision in *Gelboim* is instructive.   The Circuit there concluded that plaintiffs – consumers in the market for various LIBOR-based derivatives – sufficiently alleged antitrust injury when they claimed that they had received lower rates of return on their derivatives as a result of defendants' collusion to depress LIBOR.[163]   Because defendants' alleged conduct constituted a horizontal price fixing scheme – that is, a *per se* violation of the federal antitrust laws – the plaintiffs did not need to make a "showing of actual adverse effect in the marketplace."[164]   In alleging that they, as consumers in the marketplace for financial instruments the prices of which had been influenced by defendants' alleged conspiracy, had received less for their money than they would

---

[160]

*Id.* at ¶ 319.

[161]

*Id.*

[162]

*Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp.*, 429 U.S. at 489).

[163]

*Id.* at 771-75.

[164]

*Id.* at 776.

43

have absent defendants' conduct, they had sufficiently alleged antitrust injury.[165]

Unlike the complaint in *Gelboim*, the allegations in the amended complaint here do not assert that BBSW was consistently moved in the same direction by defendants. But this is of no import with respect to the issue of antitrust standing. Plaintiffs allege that defendants each made a regular practice of determining the optimal BBSW rate that would maximize their profits on BBSW-Based Derivatives and that they then worked together to move BBSW to that spot. This alleged coordinated effort is no less an example of horizontal price fixing than the alleged LIBOR scheme in *Gelboim*. Plaintiffs Dennis, Sonterra, and FrontPoint Event Driven each has alleged that it was overcharged and underpaid on its BBSW-Based Derivatives transactions as a result of a *per se* violation of the Sherman Act. They have plausibly alleged antitrust injury.

### 2. Efficient Enforcers

The Court now turns to consider whether plaintiffs Dennis, Sonterra, and FrontPoint Event Driven would be efficient enforcers of the antitrust laws.

In the Second Circuit:

"The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury."[166]

---

[165]

*Id.*

[166]

*Id.* at 772 (citing *Port Dock & Stone Corp. v. Oldcastle, Northeast, Inc.*, 507 F.3d 117, 121-22 (2d Cir. 2007)).

*(a)     Causation*

The first factor to consider is the "'directness or indirectness of the asserted injury,' which requires evaluation of the 'chain of causation' linking [plaintiffs'] asserted injury and the Banks' alleged price-fixing."[167]

Plaintiffs' claims, with rare exceptions, are different from the typical price fixing case in which defendants are sellers that collectively agree on an input to the price and plaintiffs are buyers from one or members of the conspiracy. The amended complaint, for the most part, does not allege that plaintiffs transacted directly with defendants. This implicates the concept of umbrella standing – which typically is relevant "when a cartel controls only part of a market" and a plaintiff-consumer that dealt only with a non-cartel member "alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole."[168]

The Second Circuit considered umbrella standing in *Gelboim*, stating, in relevant part:

"At first glance, here there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks. At the same time, however, if the Banks control only a small percentage of the ultimate identified market, this case may raise the . . . concern of damages disproportionate to wrongdoing . . . . Requiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would, if appellants' allegations were proved at trial, not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated."[169]

---

167

     *Id.* at 778 (quoting *Associated Gen. Contractors*, 459 U.S. at 540).

168

     *Id.*

169

     *Id.* at 779 (citations omitted).

The Court is not persuaded that concerns related to umbrella standing need bear on this case. The amended complaint does not allege that a group of conspirators, without controlling the entire market for a commodity, fixed prices for that commodity. In those circumstances, the question of causation is whether the conspirators that did not transact directly with a plaintiff nonetheless affected the price of the commodity in which the plaintiff transacted. In contrast, the conspiracy alleged here involves essentially all of the entities that contribute to setting BBSW and asserts that these banks and brokers affected the price of all derivatives priced or benchmarked by reference to BBSW.[170]

Plaintiffs allege that they engaged in transactions for such derivatives and that their returns were lower because of defendants' anticompetitive conduct. The Court has rejected already defendants' arguments that plaintiffs have failed to allege a plausible link between BBSW and the derivatives in which plaintiffs transacted. Nor do plaintiffs need to allege plausibly that their losses were not offset by gains on other BBSW-linked trades.[171] These allegations amount to a plausible and sufficiently direct causal link between plaintiffs' injuries and defendants' alleged misconduct. The question of with whom plaintiffs transacted directly is irrelevant.

---

[170]

See *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 555 (S.D.N.Y. 2016) (reaching this conclusion in context of plaintiffs who alleged that "the 'Fix Price determines the price of the entire silver market' such that . . . there is little room for any interfering price impact due to the actions of non-culpable entities or exogenous market forces"); *see id.* ("In other words, Defendants are not merely alleged to have conspired to alter prices within a particular segment or region of the market but rather are alleged to have manipulated the benchmark price, upon which all market participants (buyers and sellers alike) relied in trading silver investments across a variety of markets.").

[171]

*Cf. Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 53 (rejecting this argument in context of constitutional standing).

### (b) More Direct Victims

The second factor to be considered in the efficient enforcer analysis is "the 'existence of more direct victims of the alleged conspiracy.'"[172]

Concerns with respect to indirect purchasers prevailed in *Illinois Brick Co. v. Illinois*.[173] The Supreme Court there held that the State of Illinois could not recover damages in an antitrust action against manufacturers of concrete block that had sold the block to masonry contractors, which in turn sold the block to general contractors from whom the State purchased masonry structures containing the concrete block. Allowing indirect purchasers to recover in such cases "would create a serious risk of multiple liability for defendants," and would require courts to undertake the "uncertain[] and difficult[]" process of reconstructing price and output decisions.[174] Ruling otherwise would have risked "transform[ing] treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge – from direct purchasers to middlemen to ultimate consumers."[175]

The indirect purchaser doctrine does not present the same concerns in this case. This is not a case of a fixed price commodity or even a fixed price component of a commodity being

---

[172] *Gelboim*, 823 F.3d at 778 (quoting *Associated Gen. Contractors*, 459 U.S. at 545); *see id.* at 779 ("[N]ot every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced.").

[173] 431 U.S. 720 (1977).

[174] *Id.* at 730-32.

[175] *Id.* at 737; *see also Simon v. KeySpan Corp.*, 694 F.3d 196, 202 (2d Cir. 2012) ("[I]t is nearly impossible for a court to determine which portion of an overcharge is actually borne by the direct purchaser and which portion is borne by a subsequent indirect purchaser.").

passed through a distribution chain to plaintiffs. Plaintiffs have not indirectly borne the effects of the alleged conspiracy. Nor is *Illinois Brick* properly read to permit antitrust standing only among plaintiffs in direct privity with defendants.[176] Defendants allegedly fixed BBSW, which then was incorporated into various derivatives. Accordingly, anyone who engaged in BBSW-Based Derivatives transactions on days when BBSW was manipulated would have been injured regardless of whether they purchased such derivatives directly from defendants.[177] In like circumstances, the Second Circuit has suggested that "directness may have diminished weight."[178]

Indeed, who would be a victim more direct than these plaintiffs to bring antitrust claims alleging a conspiracy to fix BBSW? Defendants allegedly manipulated BBSW in order to impact the prices of, and thereby increase their returns on, BBSW-Based Derivatives. Consumers in the BBSW-Based Derivatives market are the most natural and direct victims of the alleged conspiracy. This factor, accordingly, weighs in plaintiffs' favor.

### (c) Speculative Damages

The third factor is "the extent to which appellants' damages claim is 'highly

---

[176]

In re London Silver Fixing, Ltd., Antitrust Litig., 213 F. Supp. 3d at 554.

[177]

See Gelboim, 823 F.3d at 779 ("[O]ne peculiar feature of this case is that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of a [sic] the Banks."); see also 1 ANTITRUST LAW DEVELOPMENTS § 9B(4)(b), at 749 (8th ed. 2017) ("Most courts have restricted the application of Illinois Brick to situations in which a plaintiffs' recovery requires proof of overcharges or undercharges passed through a chain of distribution." (footnotes omitted)).

[178]

Gelboim, 823 F.3d at 779.

speculative.'"[179]  Defendants argue that damages here would be highly speculative because "[t]o attempt to ascertain damages in this case, the Court would have to construct a 'but for' BBSW rate for each day of the years-long Class Period and then hypothesize how market participants . . . would have altered their behavior and thereby changed the prices of the instruments at issue, based on this 'but for' rate."[180]

But this misstates the principles governing damages in private antitrust litigation. Although it is true that "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork,"[181] a verdict as to damages may be reached on the basis of "probable and inferential" data if "direct and positive proof" is unavailable.[182]  In *Bigelow v. RKO Radio Pictures*,[183] the Supreme Court rejected a challenge to an antitrust damages verdict even though plaintiffs' losses in receipts during the period of defendants' unlawful restraint on trade could not be determined with total certainty.[184]  The Court there upheld the jury's damages verdict, which had been based on a comparison of the plaintiff's receipts before and after the defendants' unlawful actions, concluding that "[a]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim" and would act as "an

---

[179]    *Id.* at 778 (quoting *Associated Gen. Contractors*, 459 U.S. at 542).

[180]    DI 134 at 24.

[181]    *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

[182]    *Id.*

[183]    *Id.*

[184]    *Id.* at 262-65.

inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain."[185]

The Second Circuit, considering this third factor in *Gelboim*, echoed the Supreme Court, stating, "some degree of uncertainty stems from the nature of antitrust law."[186] It nonetheless remarked also that "highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement" and that "it [was] difficult to see how appellants would arrive at such an estimate, even with the aid of expert testimony."[187] Specifically, it noted that the case before it presented numerous "unusual challenges," namely:

> "The disputed transactions were done at rates that were negotiated, notwithstanding that the negotiated component was the increment above LIBOR. And the market for money is worldwide, with competitors offering various increments above LIBOR, or rates pegged to other benchmarks, or rates set without reference to any benchmark at all."[188]

The question for courts to consider, it held, was "whether the damages would *necessarily* be highly speculative."[189]

This Court concludes that standing here is not defeated by the risk of speculative damages. Plaintiffs have alleged sufficiently that the derivatives transactions in which they engaged

---

[185]

    *Id.* at 264-65; *accord Gelboim*, 823 F.3d at 779.

[186]

    *Gelboim*, 823 F.3d at 779; *see also id.* at 780 ("Impediments to reaching a reliable damages estimate often flow from the nature and complexity of the alleged antitrust violation.").

[187]

    *Id.* at 779.

[188]

    *Id.* at 780.

[189]

    *Id.* (emphasis added) (internal quotation marks and citations omitted).

depended on BBSW and that defendants' conduct altered the prices of BBSW-Based Derivatives. Although the damages calculations in this case may indeed be complex, it is possible, as plaintiffs repeatedly allege, to calculate one's exposure to changes in BBSW based on one's BBSW-Based Derivative positions. As another judge in this district reasoned in a prior benchmark rate case, "because exogenous factors affect price movements in most antitrust cases, and because the existence of such factors does not alone defeat standing, questions regarding the extent of Plaintiffs' injuries can best be resolved at a later stage."[190] In any case, it would be entirely premature to foreclose this claim at this most preliminary stage. In the event that it were to become clear that the appropriate level of certainty as to damages is unattainable here, the point again would be available to defendants at later stages of the case.

### (d) Duplicate Recovery and Complex Damages Apportionment

The final factor in the efficient enforcer analysis is "the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'"[191] In *Gelboim*, the Second Circuit focused on, but drew no conclusions from, the various government regulatory investigations and lawsuits that were then in progress in respect of

---

[190]

*In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 658 (S.D.N.Y. 2016); *cf. Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014) ("[P]otential difficulty in ascertaining and apportioning damages is not . . . an independent basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." (emphasis omitted)).

[191]

*Gelboim*, 823 F.3d at 778 (quoting *Associated Gen. Contractors*, 459 U.S. at 543-44).

the alleged widespread manipulation of LIBOR.[192]

Defendants raise no challenge to plaintiffs' antitrust standing on this basis and the Court finds no reason to do so *sua sponte*. As a practical matter, the scale of the investigations into various of the defendants by ASIC, as of the date of this opinion, is nowhere close to that of the ongoing proceedings and investigations related to the alleged manipulation of LIBOR.

In the circumstances, the Court concludes that the efficient enforcer factors, taken together, weigh in plaintiffs' favor. Accordingly, plaintiffs Dennis, Sonterra, and FrontPoint Event Driven have standing to pursue their federal antitrust claims against defendants.

B.      *Plausible Antitrust Claims*

To avoid dismissal, plaintiffs must allege an antitrust violation stemming from defendants' transgression of Section 1 of the Sherman Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."[193] "The crucial question in a Section 1 case is therefore whether the challenged conduct 'stem[s] from independent decision or from an agreement, tacit or express.'"[194]

---

[192]

      *Id.* at 780 (stating that it was "wholly unclear on this record how issues of duplicate recovery and damage apportionment c[ould] be assessed").

[193]

      15 U.S.C. § 1; *see also Gelboim*, 823 F.3d at 770.

[194]

      *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

1.      *Pleading Standard*

To state a plausible claim for conspiracy under Section 1 of the Sherman Act, a complaint must include "enough factual matter (taken as true) to suggest that an agreement was made."[195]  The claim need not be probable, but the amended complaint must plead "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[196]  The Supreme Court has stated:

> "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."[197]

That said, allegations of parallel conduct need not be so robust that the only plausible explanation for defendants' conduct is an agreement.  "[T]he plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment or a trial."[198]  Indeed, "a given set of actions may well be subject to diverging

---

[195]

*Twombly*, 550 U.S. at 556.

[196]

*Id.*; *Gelboim*, 823 F.3d 781 ("Circumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (internal quotation marks omitted)).

[197]

*Twombly*, 550 U.S. at 556-57.

[198]

*Anderson News, L.L.C.*, 680 F.3d at 184 (citations omitted); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely."

interpretations, each of which is plausible."[199]   Faced with multiple plausible interpretations, the Second Circuit has stated:

> "The choice between or among plausible inferences or scenarios is one for the factfinder.  The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.  Fact-specific questions cannot be resolved on the pleadings.  A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."[200]

There are two ways that an antitrust plaintiff may plead facts sufficient to support the inference that a conspiracy actually existed.  "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws."[201]  However, given that "in many antitrust cases, this type of 'smoking gun' can be hard to come by, especially at the pleading stage," a complaint, alternatively, may defeat a motion to dismiss by alleging "circumstantial facts supporting the *inference* that a conspiracy existed."[202]  With respect to this second method, an antitrust plaintiff can cross the "line separating conspiracy from parallelism," and thus state a sufficiently plausible antitrust claim, "with allegations of interdependent conduct,

---

[199]

(internal quotation marks and citations omitted)).

*Anderson News, L.L.C.*, 680 F.3d at 184.

[200]

*Id.* at 184-85 (internal quotation marks and citations omitted); *see also Starr*, 592 F.3d at 325 (rejecting argument that plaintiffs needed to allege facts that tended to exclude independent self-interested conduct as an explanation for defendants' parallel behavior).

[201]

*Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

[202]

*Id.* (emphasis in original).

accompanied by circumstantial evidence and plus factors."[203]  Although these examples are "neither exhaustive nor exclusive," such plus factors may include "(1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications."[204]

### 2.    Application

Plaintiffs here allege that defendants – "horizontal competitors" in the market for financial products – undertook collective action to manipulate BBSW in order to influence the prices of, and therefore the returns on, derivatives the fair market value of which was allegedly linked to BBSW.  Plaintiffs, in other words, allege a horizontal price-fixing conspiracy – a *per se* violation of the federal antitrust laws.[205]

The Court concludes that the amended complaint alleges "interdependent conduct,

---

[203]

*Gelboim*, 823 F.3d at 781 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 136) (internal quotation marks omitted).

[204]

*Id.* (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 136 & n.6) (internal quotation marks omitted).

[205]

*See id.* at 771; *see also Anderson News, L.L.C.*, 680 F.3d at 182 (defining "horizontal agreements" as "agreements between competitors at the same level of the market structure" (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)) (internal quotation marks and alteration omitted)).

That BBSW is not itself a price is of no moment.  The amended complaint alleges that the benchmark rate is incorporated as a component of the price of certain financial instruments and "the fixing of a component of price violates the antitrust laws."  *Gelboim*, 823 F.3d at 771.

accompanied by circumstantial evidence and plus factors"[206] sufficient to state a claim under the Clayton Act.

In particular, the amended complaint alleges that defendants each engaged in noneconomic transactions of Prime Bank Bills to push the prices of the bills up or down, thereby pushing BBSW submissions in the opposite direction. It is alleged also that defendants made false BBSW rate submissions to AFMA and used their positions on the various AFMA committees to maintain the *status quo* and, hence, their ability to manipulate BBSW. And all of this conduct allegedly was undertaken with a common motive among defendants – that is "increased profits" on defendants' BBSW-Based Derivatives positions.[207]

Defendants argue that this case is distinguishable from *Gelboim* in that the defendants there allegedly conspired to move LIBOR in the same direction (down). But it is not necessary for defendants' interests to be aligned at all times to share a common motive. The allegations create a plausible claim that defendants conspired to rig the process of setting the BBSW rate such that, over time, each would benefit by realizing profits on their respective derivative positions.[208] This is not unlike the thinking among coconspirators who collectively engage in non-competitive bidding. In such cases, the coconspirators will agree that one among them should get a certain job and that a

---

[206]

 *Id.* at 781 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 136) (internal quotation marks omitted).

[207]

 *Id.* at 781-82.

[208]

 *See, e.g., Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 55 (concluding plaintiffs sufficiently alleged antitrust conspiracy in part because they alleged defendants had "common motive to conspire – namely that Defendants were major players in the market for interest rate derivatives who were jointly motivated by a desire to maximize profits by manipulating the ISDAfix benchmark rates"); *see also Sullivan*, 2017 WL 685570, at *13.

subsequent job then will go to a different competitor – all with the understanding that, over time, each coconspirator will benefit from their collective rigging of the bidding process.[209]

In addition, the amended complaint contains extensive allegations of inter-firm communications and cooperative efforts among defendants – including the sharing of information with one another about their respective exposures to BBSW, the strategic trading of Prime Bank Bills ahead of the Fixing Window to enable one another to flood the market and artificially raise BBSW, and, in the case of the broker defendants, the facilitation of various noneconomic transactions.[210] Finally, the claims brought by ASIC against various defendants and those defendants' admissions of misconduct also support an inference that an agreement among defendants

---

[209]

> *See, e.g., FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263 (AKH), 2018 WL 4830087, at *4 (S.D.N.Y. Oct. 4, 2018) ("While the derivative positions of Panel Members may differ on a given day, a subset of the Panel may benefit from a given manipulation, and the remainder may wait for their winning day to come, being privy to the knowledge of where the rates are heading. In such a conspiracy, where Panel Members communicate with one another, they can plan their trades around the anticipated rates, buying when low, selling when high, and circumventing the market risk confronting those not privy to foreshadowed rates.").

[210]

> The Court is not persuaded by defendants' argument that the amended complaint improperly contains pleadings only as to the group of defendants as a whole, rather than as to each individual defendant. The Court respectfully departs from others that have dismissed claims for improper group pleading. *E.g.*, *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 553 (S.D.N.Y. 2017) ("'[E]ach defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose. Mere generalizations as to any particular defendant – or even defendants as a group – are insufficient.'" (quoting *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016)). In the Court's view, dismissing plaintiffs' claims for failing to include specific conspiracy allegations as to each defendant in the amended complaint would be premature at this early stage of litigation. *See generally Gelboim*, 823 F.3d. *Cf. Starr*, 592 F.3d at 325 (holding that in case where antitrust claim of agreement rests on the parallel conduct, plaintiffs are "not required to mention a specific time, place or person involved in each conspiracy allegation").

existed.[211]

These allegations create a plausible claim that defendants conspired to rig the process of setting BBSW such that, over time, each would benefit by realizing profits on their respective derivative positions. The machinery of the conspiracy was such that, at least on certain days, there was agreement among at least some defendants artificially to drive BBSW higher or lower.[212] Drawing all reasonable inferences in plaintiffs' favor, the Court concludes that the amended complaint plausibly alleges that a conspiracy to violate the federal antitrust laws existed among defendants.

## C.     *Extraterritoriality*

Defendants next assert that plaintiffs' antitrust claims are impermissibly extraterritorial under the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), which provides, in relevant part, that antitrust actions may not be maintained with respect to:

> "[C]onduct involving trade or commerce . . . with foreign nations unless—(1) such conduct has a direct, substantial and reasonably foreseeable effect—(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United

---

[211]

See *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 55 ("The mere existence of such investigations is a circumstance that, 'when combined with parallel behavior, might permit a jury to infer the existence of an agreement.'" (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 136 n. 6)); *see also FrontPoint Asian Event Driven Fund, L.P.*, 2018 WL 4830087, at *3.

[212]

See *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("[T]he machinery employed by a combination for price-fixing is immaterial. Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*.").

States; and (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section."[213]

In determining whether plaintiffs allege an impermissibly extraterritorial application of the federal antitrust laws, the Court considers two questions: First, "does the price-fixing activity constitute conduct involving trade or commerce . . . with foreign nations?"[214]  Second, does "the conduct nonetheless fall[] within a domestic-injury exception to the general rule?"[215]

Defendants challenge the antitrust claims in the amended complaint on the basis that the conduct alleged does not fall into the "domestic-injury exception."  This exception "applies (and makes the Sherman Act nonetheless applicable) where the conduct (1) has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.'"[216]

### 1.    Direct, Substantial and Reasonably Foreseeable Effect

Defendants argue that "all of the purported manipulative conduct occurred in Australia" and that the amended complaint suggests merely a ripple effect on domestic commerce.[217]  But the Second Circuit has held that "foreign anticompetitive conduct can have the statutorily

---

[213]

15 U.S.C. § 6a.

[214]

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004) (internal quotation marks and citations omitted).

[215]

*Id.* at 159.

[216]

*Id.* (quoting 15 U.S.C. § 6(a)).

[217]

DI 134 at 24-25.

required 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic or import commerce even if the effect does not follow as an immediate consequence of the defendant's conduct, so long as there is a reasonably proximate causal nexus between the conduct and the effect."[218]

Plaintiffs plead that defendants manipulated BBSW on a regular basis in order to impact the prices of and increase profits on BBSW-Based Derivatives. They plead also that substantial quantities of BBSW-Based Derivatives were sold in the United States.[219] As another judge in this district previously stated, "There can be no serious dispute that the manipulation of a benchmark that is globally disseminated and serves as a pricing component of derivatives sold widely in the United States, as plaintiffs have plausibly alleged, would have a foreseeable effect within the United States."[220] The question whether an alleged effect on U.S. commerce is direct, substantial and reasonably foreseeable clearly is one of fact,[221] and these allegations are sufficient to state a claim upon which relief may be granted.

### 2. Effect Gives Rise to a Claim

This second prong of the analysis pertains to the causal connection between the

---

[218]

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 398 (2d Cir. 2014).

[219]

AC at ¶¶ 300-303.

[220]

*Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 569; *see also Sullivan*, 2017 WL 685570, at *22.

[221]

*See* U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N , *Antitrust Guidelines for International Enforcement and Cooperation* § 3.2, at 21 (Jan. 13, 2017).

alleged conduct and injury. For the domestic-injury exception to apply, "the domestic effect" of defendants' alleged conduct "must proximately cause the plaintiff's injury."[222]

The alleged effect of defendants' conduct is the manipulation of prices of BBSW-Based Derivatives. Plaintiffs' alleged injury is that they were overcharged and underpaid on the BBSW-Based Derivatives transactions in which they engaged as a result of defendants' conduct. The amended complaint sufficiently alleges that this injury was reasonably foreseeable from the alleged effect of defendants' conduct and therefore gave rise to their antitrust claim.

IV.    *CEA Claims*

Plaintiffs assert three CEA claims against each defendant.

Their first is that all defendants are liable as principals under Section 6(c) of the CEA, which, in relevant part, makes it unlawful to:

> "[M]anipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."[223]

---

[222]

*Lotes Co.*, 753 F.3d at 414.

[223]

7 U.S.C. § 9(3).

Section 6(c) of the CEA makes it unlawful also to "use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance" in violation of rules promulgated by the Commodity Futures Trading Commission ("CFTC") and to "make any false or misleading statement of a material fact to the [CFTC]." *Id.* § 9(1)-(2); *see also id.* § 1a(8) (defining "Commission"). Neither provision is implicated by the factual allegations in the amended complaint.

In the same cause of action, the amended complaint asserts that all defendants are liable as principals under Section 9 of the CEA, codified at 7 U.S.C. § 13, which defines criminal

Section 22 establishes a private right of action for violations of Section 6(c). It provides, in relevant part:

> "Any person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person . . . – (D) "who purchased or sold [any contract of sale of any commodity for future delivery (or option on such contract or any commodity)] or swap if the violation constitutes . . . a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap."[224]

Plaintiffs allege also principal-agent liability[225] and aiding and abetting liability[226] against all defendants.

A.      CEA Standing

1.      *FrontPoint Plaintiffs and Sonterra*

Defendants argue that Sonterra and the FrontPoint Plaintiffs lack standing under the CEA on the basis that the pre-Dodd Frank CEA governs this case, not the current version of the statute.

_____

penalties arising from similar conduct.

[224]

*Id.* § 25(a)(1).

[225]

*See id.* § 2(a)(1)(B) ("The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.").

[226]

*See id.* § 25(a)(1) ("Any person . . . who violates this chapter or who *willfully aids, abets, counsels, induces, or procures* the commission of a violation of this chapter shall be liable . . . ." (emphasis added)).

The CEA was amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, which became effective on July 21, 2011.[227] Among other things, the amendment added swaps to the purview of Sections 6(c) and 22, quoted above.[228] Prior to that amendment, the CEA excluded a "sale of any cash commodity for deferred shipment or delivery" from the term "future delivery"[229] as well as agreements, contracts, and transactions in "excluded commodities" if the agreement, contract or transaction was (1) entered into by "eligible contract participants" and (2) not executed or traded on a trading facility.[230] Similarly, the CEA then excluded agreements, contracts, and transactions in most commodities if the agreement, contract or transaction was (1) entered into by "eligible contract participants," (2) subject to individual negotiation by the parties, and (3) not executed or traded on a trading facility.[231] A financial institution acting for its own account was included in the definition of "eligible contract participant."[232] Defendants therefore argue that the CEA excluded the swaps and forwards allegedly entered into by the FrontPoint Plaintiffs and Sonterra prior to the effective date of Dodd Frank.

Even if the pre-Dodd Frank version of the CEA excluded such swaps and forwards,

---

[227] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 754, 124 Stat. 1376, 1754 (2010) (enacted on July 21, 2010).

[228] *Id.* §§ 741(b), 1730-31.

[229] 7 U.S.C. § 1a(19) (2006).

[230] *Id.* § 2(d).

[231] *Id.* § 2(g).

[232] *Id.* § 1a(12)(A)(i).

the amendments to the CEA enacted by Dodd Frank became effective before the changes AFMA made to the BBSW rate set process, which occurred just over two years later in September 2013. Accordingly, it is unclear whether all of the transactions allegedly entered into by the FrontPoint Plaintiffs and Sonterra would fall under the pre-Dodd Frank version of the CEA. Nonetheless, plaintiffs have waived their CEA claims in respect of BBSW-Based Derivatives other than CME Australian dollar futures contracts – the derivatives in which Dennis transacted.[233] Accordingly, Sonterra's and the FrontPoint Plaintiffs' claims under the CEA will be dismissed.

### 2. Dennis

In order to assert a CEA claim, a private plaintiff must meet the requirements of Section 22.[234] "These requirements used to be referred to as 'statutory standing,' but, to avoid incorrectly portraying them as jurisdictional requirements, they are now referred to as 'simply a question of whether the particular plaintiff has a cause of action under the statute.'"[235] Because Section 22 "limits a defendant's liability to 'actual damages,'" a private plaintiff must plausibly allege "actual injury caused by the violation in addition to the elements of whatever violation they allege in order to successfully state a claim."[236]

---

[233]      DI 156 at 28-31 (stating that FrontPoint Plaintiffs and Sonterra do not allege CEA claims for BBSW-Based Derivatives traded before Dodd Frank became effective and addressing merits only as to CME futures contracts).

[234]      *Harry*, 889 F.3d at 111.

[235]      *Id.* (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)).

[236]      *Id.* (internal quotation marks and citations omitted).

In order to plead actual injury, Dennis was obliged to allege plausibly that (1) he "transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations," and (2) "the manipulated prices were to [his] detriment."[237]

Defendants argue that Dennis fails to meet the requirements of Section 22 because he has not pled that defendants' alleged manipulations affected either the price of his CME futures contracts or the price of a commodity underlying his CME futures contracts.[238] But as this Court has discussed in the context of constitutional and antitrust standing, this argument lacks merit at this stage. The amended complaint alleges that Dennis purchased and sold CME Australian dollar futures contracts that were priced, benchmarked and/or settled based on BBSW.[239] He has pled sufficiently that BBSW was a component of the price of the CME Australian dollar futures contracts in which he transacted. "Commodity and derivative contracts that index their price formulae to prices of other contracts are linked in a rule-based manner, and several cases in this circuit have found such a link to create a sufficient connection for CEA pleading purposes."[240]

Dennis alleges further that he purchased and sold these derivatives at artificial prices caused by defendants' manipulative conduct. For example, Dennis alleges that he had a net short position of one CME Australian dollar futures contract on November 22, 2010. On that day,

---

[237]

  *Id.* at 112.

[238]

  DI 134 at 30-31.

[239]

  AC at ¶ 283; *see also id.* at ¶ 191 (alleging formulaic connection between CME Australian dollar futures and BBSW).

[240]

  *Harry*, 889 F.3d at 113 (citing, among others, *Gelboim*, 823 F.3d at 765-66).

defendant NAB allegedly was involved in manipulating BBSW artificially higher, causing Dennis to suffer a $170 net loss on his CME Australian dollar futures position.[241]  These allegations are sufficient to state a plausible actual injury.  He need not specify, at this early stage in the litigation, exactly which tenor of BBSW was manipulated nor explain precisely how the pricing relationship worked.[242]  Dennis therefore meets the requirements of Section 22.

B.      *Plausible CEA Claims on Behalf of Dennis*

That leaves for consideration the plausibility of Dennis' CEA claims alone.

Defendants argue that Dennis has failed to state a CEA claim for price manipulation. "The CEA prohibits manipulation of the price of any commodity or commodity future."[243]  "While the CEA itself does not define the term, a court will find manipulation where '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.'"[244] Defendants argue that Dennis' CEA claims must be dismissed because he fails to plead that defendants caused artificial prices and acted with the requisite intent.

---

[241]

AC at ¶¶ 283-285.

[242]

*Cf. Harry*, 889 at 113 n.4 ("In articulating this [Section 22] standard, we do not impose a loss causation requirement, which would mandate demonstrating losses in specific trades. We have never imported loss causation from the securities context and we do not begin to do so with this case." (citation omitted)).

[243]

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (citing 7 U.S.C. §§ 9(1), 13(a)(2)).

[244]

*Id.* (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)).

*1.     Pleading Standard*

As an initial matter, the Court concludes, and Dennis does not dispute, that his CEA claims sound in fraud.[245]  Whether or not the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure applies depends on the conduct alleged.  The requirement that a plaintiff plead with particularity "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."[246]  In this case, defendants are accused of trading Prime Bank Bills at uneconomic prices and knowingly submitting false mid-rates in order to artificially raise or lower BBSW rates and, consequently, collect illegitimate profits.  These allegations suggest fraudulent conduct on defendants' part.[247]  Accordingly, Dennis' CEA claims are subject to the heightened pleading requirements of Rule 9(b).

As noted earlier, a complaint subject to Rule 9(b) must "state with particularity the circumstances constituting fraud or mistake."[248]  In the context of manipulation claims, however, the Second Circuit has stated that although the Rule 9(b) pleading standard applies, because "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge," "at the early stages

---

[245]

        The Second Circuit has not decided whether, as a general rule, CEA claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *Id.* at 180-81; *see also Sullivan*, 2017 WL 685570, at *30 ("Courts apply Rule 9(b)'s pleading requirements to the CEA on a case-by-case basis.").

[246]

        *Rombach*, 355 F.3d at 171.

[247]

        *See id.* at 172 (concluding a claim sounded in fraud where it alleged that statements were "inaccurate and misleading" and "contained untrue statements of material facts" and that "materially false and misleading written statements were issued" (emphasis omitted) (internal quotation marks omitted)).

[248]

        Fed. R. Civ. P. 9(b).

of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."[249]  Rather, "a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."[250]

As to *scienter*, a plaintiff must show, at a minimum, that the defendant or defendants "acted (or failed to act) with the purpose or conscious object of causing or affecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand."[251]  Although "the requisite intent of the alleged perpetrator of the fraud need not be alleged with great specificity,"[252] a complaint must nonetheless, "allege facts that give rise to a strong inference of fraudulent intent."[253]  *Scienter* "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[254]

---

[249]

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101-02 (2d Cir. 2007).

[250]

*Id.* at 102; *see also Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 573 ("Rule 9(b)'s heightened pleading standard 'is generally relaxed in the context of manipulation-based claims, where the complaint must simply specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" (quoting *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d at 566)).

[251]

*In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 670 (internal quotation marks and citations omitted).

[252]

*Amusement Indus., Inc.*, 693 F. Supp. 2d at 338  (quoting *Chill*, 101 F.3d at 267) (internal quotation marks omitted).

[253]

*Id.* (internal quotation marks and citation omitted).

[254]

*Lerner*, 459 F.3d at 290-91.

### 2. Liability

As noted above, plaintiffs first assert that all defendants are liable as principals – that is, that defendants themselves intentionally manipulated or caused to be manipulated the price of Dennis' CME Australian dollar futures by manipulating the BBSW rate set.[255]

Plaintiffs assert also principal-agent and aiding and abetting liability against each of the defendants.

"'[A] claim for principal-agent liability requires that the agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the agent's actions were within the scope of his or her employment.'"[256]

To be found liable for aiding and abetting, on the other hand, a defendant must "in some sort associate himself with the venture" – that is, "that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."[257]  In the context of a CEA claim, then, a complaint bringing a claim for aiding and abetting liability must allege that the "aider and abettor" knew that the primary violator intended to engage in price manipulation.  "[A] complaint with weak allegations about a defendant's affirmative assistance may still state a claim for aiding and abetting if its allegations about the defendant's knowledge and intent are particularly

---

[255]

*See In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d at 173.

[256]

*Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 574 (quoting *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d at 571).

[257]

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d at 182 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)) (internal quotation marks omitted); *see also id.* ("[A] complaint . . . states a claim for aiding and abetting under 7 U.S.C. § 25 when it plausibly alleges conduct that would constitute aiding and abetting under 18 U.S.C. § 2.").

strong, and vice versa."[258]  "Accordingly, in evaluating a complaint alleging the aiding and abetting of a violation of the CEA, allegations about the defendant's knowledge, intent, and actions should not be evaluated in isolation, but rather in light of the complaint as a whole."[259]

### (1)    Bank Defendants

Dennis here makes extensive allegations as to the "nature, purpose, and effect" of the alleged fraudulent conduct – each defendant submitted false BBSW rates and engaged in uneconomic transactions to artificially increase or decrease BBSW, thereby increasing their respective profits on BBSW-Based Derivatives.  Moreover, the amended complaint alleges motive and opportunity as to each defendant.  The banks' common motive allegedly was to maximize their profits on their global BBSW-Based Derivatives positions, and each bank, by virtue of participating in Prime Bank Bill transactions had the opportunity to manipulate BBSW, regardless of whether the bank was on the BBSW Panel.

Many of the allegations in the amended complaint, however, attribute conduct and motivation to defendants as a group rather than to each of the twenty-nine named defendants.[260]  In order to satisfy the particularity requirements of Rule 9(b), a complaint should articulate how each

---

[258]

 *Id.* at 183.

[259]

 *Id.*

[260]

 *See, e.g., Sullivan*, 2017 WL 685570, at *30-31 (concluding that "summary references of a collective intent among all 'defendants,' while making allegations as to only three" was insufficient to state CEA claims against other defendants); *City of Perry, Iowa v. Procter & Gamble Co.*, 188 F. Supp. 3d 276, 290 (S.D.N.Y. 2016) (claim that "lumps all Defendants together" is "plainly insufficient to satisfy Rule 9(b)'s heightened pleading requirements").

defendant is implicated in the alleged fraudulent conduct.

The amended complaint in this case makes detailed allegations that defendants ANZ,[261] Westpac,[262] and NAB[263] bought and sold large numbers of Prime Bank Bills during the Fixing Window in order to move BBSW in a profitable direction. HSBC,[264] CBA,[265] and Credit Suisse[266] are alleged to have engaged in setting BBSW to some extent as well.[267] Meanwhile, the traders at UBS, RBS, BNP Paribas who were in charge of submitting BBSW mid-rates to AFMA solicited rate submission requests from their colleagues who traded in BBSW-Based Derivatives.[268] As against the defendant entities from these ten banks, the amended complaint satisfies the

---

[261]
> AC at ¶¶ 208-213 (on December 1 and December 10, 2010), 229-230 (in March 2010 and February and June 2011), 238 (discussing plans to acquire "ammo" on March 9, 2011), 249-250 (March 10 and August 10, 2011).

[262]
> *Id.* at ¶¶ 216-220 (on July 1, 2011, April 7, 2010 and June 30, 2009), 238 (June 8, 2010), 255-257 (on April 30, 2010).

[263]
> *Id.* at ¶¶ 221-223 (in February, April, and December 2010), 226 (in July 2011), 235 (on March 24, 2010), 238-239 (on January 23, 2012 and March 9, 2011), 251-252 (on February 22, 2011).

[264]
> *Id.* at ¶¶ 221-223 (on December 20, 2010).

[265]
> *Id.* at ¶¶ 242-244 (on April 22, 2010).

[266]
> *Id.* at ¶ 226 (promising not to repeat information shared on July 19, 2011).

[267]
> Westpac and CBA allegedly structured their trading desks to maximize their profits from manipulating the BBSW rate set. *Id.* at ¶¶ 269-270.

[268]
> *Id.* at ¶¶ 272-275.

particularity requirement of Rule 9(b) by alleging the role played by each bank.[269]

In contrast, the amended complaint makes either no or minimal mention of the remaining defendants – that is, the entities from the Royal Bank of Canada, Deutsche Bank, Lloyds, Macquarie, and Morgan Stanley. As to the entities from these five banks, Dennis' CEA claims will be dismissed.

### (2) Broker Defendants

The allegations against the broker defendants are more limited. Both ICAP[270] and Tullett Prebon[271] are alleged to have facilitated large transactions in Prime Bank Bills for the bank defendants during the Fixing Window and provided information about the Prime Bank Bill market in exchange for large commission fees. These allegations are insufficient to support a CEA claim against the broker defendants.

---

[269]

The CEA claims as to principal-agent liability and aiding and abetting liability as to these defendants are sustained as well. There is no indication here that the employees mentioned in the amended complaint acted outside of the scope of their employment. Indeed, the profit-seeking motive alleged in the amended complaint would naturally benefit the institutions for which the employees worked.

The amended complaint sufficiently alleges aiding and abetting liability as well. Defendant banks allegedly knew that efforts to manipulate BBSW were widespread and shared information with one another to coordinate transactions and align interests. In addition, the banks facilitated other banks' manipulative trading by providing them with "ammunition" in order to be able sell off more Prime Bank Bills during a given Fixing Period. These acts of affirmative assistance and indications of knowledge and intent suffice to state a claim of aiding and abetting liability against the entities from the nine bank defendants mentioned above.

[270]

*Id.* at ¶¶ 241, 251-252.

[271]

*Id.* at ¶ 253.

In *In re Amaranth Natural Gas Commodities Litigation*,[272] the Second Circuit considered Amaranth Advisors ("Amaranth"), a hedge fund that had been accused of accumulating large positions in natural gas futures and swaps and engaging in manipulative trading therewith. J.P. Futures had been accused of aiding and abetting Amaranth's manipulation of natural gas futures through its services as Amaranth's futures commission merchant and clearing broker. Specifically, the complaint alleged that J.P. Futures had processed and settled Amaranth's trades on the New York Mercantile Exchange ("NYMEX") and had earned over $32 million in commissions in twenty months from Amaranth's trading. By virtue of its position, J.P. Futures knew of Amaranth's positions and trading activity, including the positions that Amaranth took in respect of its allegedly manipulative trading strategies. J.P. Futures knew when Amaranth violated NYMEX positions limits or exceeded NYMEX accountability levels and knew that Amaranth was being investigated by both NYMEX and the CFTC. It nonetheless had continued to service all of Amaranth's trades, including those that put Amaranth's positions above applicable NYMEX position limits and accountability levels and those for which J.P. Futures had to bypass its own internal position limits.[273]

The Circuit there dismissed the CEA claim against J.P. Futures, concluding that the allegations that J.P. Futures had aided and abetted Amaranth in manipulating natural gas derivative prices were insufficient.[274] The court reasoned that (1) Amaranth's large positions on their own did

---

[272]

730 F.3d 170 (2d Cir. 2013).

[273]

*Id.* at 178-79.

[274]

*Id.* at 183 ("[A]llegations of such knowledge and intent, considered in connection with the routine services that J.P. Futures allegedly provided to Amaranth, fail to state a claim for

not necessarily imply manipulation,[275] and (2) although the type of trading activity in which Amaranth had engaged was strongly suggestive of an intent to manipulate, J.P. Futures had not been alleged to have done anything more than provide "routine clearing firm services."[276]  The Circuit concluded that, without alleging greater knowledge of the principal wrongdoing or more active involvement in that wrongdoing, the plaintiffs had failed to state a claim for aiding and abetting Amaranth against J.P. Futures.[277]

The amended complaint in this case, as it applies to the broker defendants, suffers from similar deficiencies.  Although the brokers are alleged to have helped facilitate the bank defendants' manipulative trades in Prime Bank Bills, the amended complaint does not plead facts suggesting that the brokers specifically intended to manipulate BBSW rates.  Indeed, the allegations do not assert anything other than the routine provision of brokerage services against either ICAP or Tullett Prebon.  The amended complaint therefore fails to state a claim for liability as either a principal or an aider and abettor under the CEA against the broker defendants.

---

aiding and abetting manipulation under the CEA.").

[275]

*Id.* at 184-85.

[276]

*Id.* at 185.

Moreover, even though J.P. Futures had extended Amaranth's credit limit and bypassed their internal position limits to accommodate Amaranth's trades, these "non-routine" activities had been alleged to have been performed only in connection with Amaranth's accumulation of large open positions, not with Amaranth's manipulative trades.  *Id.* at 185-86.

[277]

*Id.* at 186.

## C.    Extraterritoriality

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."[278]   Unless Congress clearly has expressed its affirmative intention to "give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions."[279]

The Supreme Court has articulated "a two-step framework" to analyze the issue of extraterritoriality:

> "At the first step, we ask whether the presumption against extraterritoriality has been rebutted – that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction. If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.' If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."[280]

### 1.    Presumption Against Extraterritoriality

"The CEA as a whole . . . is silent as to extraterritorial reach."[281]   Moreover, and unlike in the case of plaintiffs' federal antitrust claim, as to which the FTAIA provided a clear

---

[278]

See *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (internal quotation marks and citations omitted).

[279]

*Id.* (internal quotation marks and citations omitted).

[280]

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2101 (2016).

[281]

*Loginovskaya v. Batratchenko*, 764 F.3d 266, 271 (2d Cir. 2014).

indication that Congress "endorsed an extraterritorial application of the Sherman Act,"[282] there is no statute indicating an intention by Congress to apply the CEA extraterritorially. Because the presumption against extraterritoriality has not been rebutted, we "presume [the CEA] is primarily concerned with domestic conditions."[283] It therefore is necessary to consider the "focus of congressional concern."[284]

### 2. Domestic Application

In *Morrison v. National Australia Bank Ltd.*,[285] the Supreme Court held that the Securities Exchange Act had no extraterritorial application and concluded that no civil suit under Section 10(b) could be sustained unless predicated on a transaction involving (1) a security listed on a domestic exchange, or (2) a domestic purchase or sale of another security.[286] The Second Circuit subsequently concluded, in *Absolute Activist Value Master Fund Ltd. v. Ficeto*,[287] that in order for a transaction to be "domestic" for purposes of the Securities Exchange Act and *Morrison's* second prong, either the parties must incur irrevocable liability or title to the securities must pass within the

---

[282]

*Sullivan*, 2017 WL 685570, at *22; *accord Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 569.

[283]

*Loginovskaya*, 764 F.3d at 272 (quoting *Morrison*, 561 U.S. at 255) (internal quotation marks omitted).

[284]

*Id.* (quoting *Morrison*, 561 U.S. at 266) (internal quotation marks omitted).

[285]

561 U.S. 247 (2010).

[286]

*Id.* at 267.

[287]

677 F.3d 60 (2d Cir. 2012).

United States.[288]

The Second Circuit has extended both *Morrison* and *Absolute Activist* to the CEA, concluding that "*Morrison's* domestic transaction test in effect decides the territorial reach of CEA § 22"[289] and that a plaintiff bringing a CEA claim must "demonstrate that the transfer of title or the point of irrevocable liability for [the applicable transaction] occurred in the United States."[290]  On the other hand, the Second Circuit has "never concluded . . . that *Morrison's* 'domestic exchange' prong applies to the CEA either to broaden or to narrow its extraterritorial reach."[291]

In this case, the BBSW-Based Derivatives in which Dennis transacted were traded on a domestic exchange – the CME.  The relevant inquiry is whether Dennis thus has alleged sufficiently that his transactions in CME Australian dollar futures contracts occurred in the United States.  The answer unmistakably is yes.  But this is not the end of the inquiry.

In *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*,[292] the Second Circuit considered a claim under Section 10(b) of the Securities Exchange Act involving swaps that allegedly were entered into in the United States but were linked to the prices of Volkswagen stock on European exchanges.  The alleged fraud had been conducted by Porsche, which was accused of making statements and taking actions to deny and conceal its intention to take over Volkswagen.

---

[288]

    *Id.* at 67.

[289]

    *Loginovskaya*, 764 F.3d at 272.

[290]

    *Id.* at 274.

[291]

    *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 67 (2d Cir. 2018).

[292]

    763 F.3d 198 (2d Cir. 2014).

The plaintiffs there alleged that they had relied on these statements in entering into swaps that were economically equivalent to taking short positions in Volkswagen stock and that they were injured when the stock price of Volkswagen rose dramatically following Porsche's public announcement of its true intentions.[293] The Circuit there concluded that "while [*Morrison*] unmistakably made a domestic securities transaction . . . necessary to a properly domestic invocation of § 10(b), such a transaction is *not alone sufficient* to state a properly domestic claim under the statute."[294] It then dismissed the complaint as "so predominantly foreign as to be impermissibly extraterritorial"[295] because "the imposition of liability under § 10(b) on these foreign defendants with no alleged involvement in plaintiffs' transactions, on the basis of the defendants' largely foreign conduct, for losses incurred by the plaintiffs in securities-based swap agreements based on the price movements of foreign securities would constitute an impermissibly extraterritorial extension of the statute."[296] The court reasoned that to hold otherwise "would require courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it."[297]

---

[293]

    *Id.* at 201.

[294]

    *Id.* at 215 (emphasis added).

[295]

    *Id.* at 216.

[296]

    *Id.* at 201.

[297]

    *Id.* at 215; *see also id.* at 215-16 ("If the domestic execution of the plaintiffs' agreements could alone suffice to invoke § 10(b) liability with respect to the defendants' alleged conduct in this case, then it would subject to U.S. securities laws conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges, in the absence of any congressional provision addressing the incompatibility of U.S. and foreign law nearly certain to arise.").

Setting aside the open question of whether *Parkcentral* applies to claims brought under the CEA, the reasoning in that case weighs in favor of sustaining Dennis' CEA claims. Although the conduct alleged here largely occurred in Australia and was intended to affect a foreign benchmark interest rate, the amended complaint alleges that defendants engaged in the alleged manipulation in order to increase their returns on derivatives linked to BBSW. The conduct necessarily was intended to reach BBSW-Based Derivatives worldwide, including in the United States. In the Court's view, this distinguishes *Parkcentral* from this case. The defendants in *Parkcentral* allegedly engaged in fraud "with respect to stock in a German company traded only on exchanges in Europe" and even if the company's false statements had "been intended to deceive investors worldwide," the alleged fraud was effectuated in order to permit the take over of one foreign company by another.[298] The amended complaint here, on the other hand, alleges that the United States is a large market for BBSW-Based Derivatives.[299] In consequence, defendants' alleged actions plausibly depended on their impact on BBSW-Based Derivatives around the world, and in particular, in the United States. Dennis therefore has alleged a sufficiently domestic application of the CEA.[300]

---

[298]

*Id.* at 216.

[299]

AC at ¶ 20.

[300]

Nor is the Court persuaded by *In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298 (S.D.N.Y. 2017), in which the district court considered defendants who were producers, refiners and traders of Brent crude oil that allegedly entered into transactions to intentionally manipulate Brent Crude Oil prices and the prices of Brent Crude Oil futures and derivatives contracts. The court there applied *Parkcentral* and concluded that the application would be extraterritorial even though the derivatives in question were traded on a domestic

## V.     RICO Act Claims

Plaintiffs assert two RICO counts against all defendants: a substantive RICO violation predicated on a pattern of wire fraud and a conspiracy to violate the RICO Act.  18 U.S.C. § 1962(c) makes it unlawful:

> "[F]or any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

It is unlawful also "for any person to conspire to violate [18 U.S.C. § 1962(c)]."[301]

"Racketeering activity" includes violations of the wire fraud statute,[302] which makes it unlawful for anyone:

> "[H]aving devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, [to] transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."[303]

An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal

---

[301]  exchange.  *Id.* at 309.  This case is distinguishable from *Brent Crude* because most of the derivatives in that case were not priced by reference to the allegedly manipulated rate.  *Id.* at 310.  Here, in contrast, Dennis alleges not only that the derivatives in which he transacted were linked to BBSW, but that defendants acted with the intent to take advantage worldwide of the link between BBSW and BBSW-Based Derivatives such as his.

[301]  18 U.S.C. § 1962(d).

[302]  *See id.* § 1961(1)(B) (incorporating by reference 18 U.S.C. § 1343).

[303]  *Id.* § 1343.

80

entity."[304] A pattern of racketeering activity requires at least two acts of racketeering activity to have been committed within ten years of one another.[305]

A.     *RICO Standing*

A civil remedy under RICO is available to private plaintiffs who are "injured in [their] business or property by reason of a violation of [18 U.S.C. § 1962]."[306] "This language 'has been construed to require that in order to merit standing, a civil RICO plaintiff must establish that the RICO violation at issue was a proximate cause of the injury to the plaintiff's business or property for which redress is sought.'"[307] "Because a plaintiff must show injury by the conduct constituting the violation of RICO, the injury must be caused by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts."[308]

Defendants argue only that "[t]he analysis for RICO standing mirrors that for antitrust standing . . . and [that] Plaintiffs' alleged injuries here are too indirect and speculative to support

---

[304]

    *Id.* § 1961(4).

[305]

    *Id.* § 1961(5).

[306]

    *Id.* § 1964(c); *see also Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990).

[307]

    *First Capital Asset Mgmt. v. Brickellbush*, 218 F. Supp. 2d 369, 379 (S.D.N.Y. 2002) (citing *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1344 (2d Cir. 1994)).

[308]

    *Id.* (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985))) (internal quotation marks omitted).

RICO standing for the same reasons that their alleged injuries fail to support antitrust standing."[309] But plaintiffs allege that they were deprived of at least some of the value of their BBSW-Based Derivatives and that this injury was caused by defendants' persistent manipulation of BBSW rates, which manipulation constituted a pattern of wire fraud. As discussed above, plaintiffs have alleged sufficiently that BBSW was a component of the price of the derivatives in which they transacted. To suggest that the manipulation of a component of the price of a derivative impacts the overall price and therefore the returns on such derivative requires no great leap of logic. It therefore was entirely foreseeable that systematic efforts to manipulate BBSW would in turn injure parties on the wrong end of the affected BBSW-Based Derivatives.

While plaintiffs Dennis, Sonterra, and FrontPoint Event Driven point to specific transactions in which they paid too much or received too little as a result of defendants' alleged misconduct, neither FrontPoint Financial Services Fund, L.P. nor FrontPoint Financial Horizons Fund, L.P. do so. Accordingly, plaintiffs Dennis, Sonterra, and FrontPoint Event Driven – whose alleged injuries were a foreseeable consequence of defendants' alleged RICO violations – have standing to bring their RICO claims. The RICO claims of the other plaintiffs will be dismissed.

## B.    *Plausible RICO Violations*

To state a claim for a violation of RICO, a complaint must allege that the defendant violated Section 1962 – that is, it must allege: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which

---

[309]        DI 134 at 38.

affect interstate or foreign commerce."[310]  Defendants assert that the amended complaint fails to allege either an enterprise or a pattern of predicate acts of racketeering.

### 1.    Enterprise

"[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."[311]  Such an enterprise "must have a 'structure' exhibiting three features: a purpose, relationships among the individuals associated with the enterprise, and longevity sufficient to permit the associates to pursue the purpose of the enterprise."[312]  "'[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.'"[313]

Defendants assert that the amended complaint fails to show that each of the defendants shared a common purpose to engage in fraud.  Defendants argue also that amended complaint fails to show that the defendants worked together to achieve the fraudulent purpose and that each defendant knowingly participated in the such fraud with the requisite intent to harm.[314]  The Court is not so persuaded.

---

[310]    *Town of West Hartford*, 915 F.2d at 100 (quoting 18 U.S.C. § 1962(a)-(c) (1976)).

[311]    *Boyle v. United States*, 556 U.S. 938, 948 (2009).

[312]    *Elsvier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 305-06 (S.D.N.Y. 2010).

[313]    *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *First Capital Asset Mgmt., Inc.*, 385 F.3d at 174); *see also Elsevier Inc.*, 692 F. Supp. 2d at 306-07 (discussing the "relationship requirement" for an association-in-fact).

[314]    DI 134 at 41 (citation omitted).

Each of the three structural requirements for an association-in-fact are met. The amended complaint alleges that "defendants' collective association . . . acting as a trading bloc and engaging in secret collusive trades in the Prime Bank Bill market to manipulate BBSW" constituted a RICO enterprise.[315] The common purpose of the alleged enterprise was to manipulate BBSW as needed to increase profits on BBSW-Based Derivatives. This is sufficient to satisfy the first of the three structural requirements. The amended complaint alleges also that defendants associated with one another by sharing information and providing one another with Prime Bank Bills ahead of the Fixing Window to permit large trades. This satisfies the second structural requirement. Finally, with respect to longevity, the amended complaint alleges that these activities were ongoing for the duration of the Class Period.

The amended complaint, which alleges that defendants shared private information with one another, including their plans to drive BBSW rates in one direction or the other, and assisted one another in transacting large numbers of Prime Bank Bills, states a plausible claim that defendants actively participated in the alleged scheme to manipulate BBSW with the intention of profiting on their BBSW positions at the expense of unwitting counterparties. The amended complaint thus sufficiently alleges that defendants formed a RICO enterprise.

### 2. *Pattern of Wire Fraud*

Defendants challenge plaintiffs' RICO claims on the additional basis that plaintiffs fail to allege a pattern of racketeering.

The wire fraud statute prohibits any use of interstate wires in furtherance of any

---

[315] AC at ¶ 345.

fraudulent scheme. There are three elements of a wire fraud violation: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme."[316] Because the predicate acts alleged in the amended complaint are wire fraud, plaintiffs' RICO claims are subject to the heightened pleading standard under Rule 9(b).[317] Accordingly, a RICO plaintiff "must plead the alleged [wire] fraud with particularity, and establish that the [communications] were in furtherance of a fraudulent scheme."[318]

Defendants argue that plaintiffs' RICO claims must be dismissed because they are grounded entirely on generalized allegations that each defendant engaged in acts of wire fraud in furtherance of the conspiracy. The Second Circuit has stated that generally in the RICO context, where mail or wire fraud are the alleged predicate acts, a "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements."[319] However, as another judge in this district has stated previously:

"Courts in the Second Circuit have applied a different standard in cases where '[a]

---

[316]

 *United States v. Shelleff*, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotation marks and citations omitted).

[317]

 *See, e.g., Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013); *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172-73 (2d Cir. 1999).

[318]

 *Lundy*, 711 F.3d at 119 (citing *McLaughlin v. Anderson*, 962 F.2d 187, 190-91 (2d Cir. 1992)).

[319]

 *Id.* (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)) (internal quotation marks omitted).

plaintiff claims that . . . mails or wires were simply used in furtherance of a master plan to defraud,' but does not allege that 'the communications [themselves] . . . contained false or misleading information.' In such cases, including 'complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity.' Instead, 'Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme.'"[320]

Here, the amended complaint alleges that each defendant conspired to "engag[e] in secret collusive trades in the Prime Bank Bill market to manipulate BBSW" and distort returns on BBSW-Based Derivatives.[321] In furtherance of this scheme, each defendant engaged in acts of wire fraud, including: (1) the transmission of artificial BBSW rates to Thomson Reuters in the United States, (2) the electronic transmission of confirmations for collusive transactions intended to manipulate BBSW, (3) causing the transmission and dissemination in the United States of the artificial BBSW rates by Thomson Reuters as agent for the AFMA, (4) causing the transmission and dissemination in the United States of distorted BBSW individual bank quotes by Thomson Reuters, (5) the transmission and dissemination of false bid and ask price quotes for BBSW-Based Derivatives within the United States, (6) electronic communications and instant messages containing manipulative requests that emanated from within the United States or were routed through electronic servers located within the United States, (7) sending out trade confirmations based on manipulated

---

[320]

*Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145-46 (S.D.N.Y. 2014) (quoting *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y.1998)); *see also id.* at 146 (collecting cases); *Spira v. Nick*, 876 F. Supp. 553, 559 (S.D.N.Y. 1995) (concluding that circumstances constituting fraud were stated with sufficient particularity and holding that Rule 9(b) did not require that "mailings and wire communications relied upon as jurisdictional elements of the predicate acts, but which are not themselves said to have been fraudulent," be alleged with particularity).

[321]

AC at ¶¶ 345, 347.

and false BBSW rates to counterparties within the United States, and (8) sending communications to encourage, negotiate or complete the sale or purchase of price-fixed BBSW-based financial instruments to counterparties within the United States.[322]

These allegations, however, are largely generalized to all defendants and to that extent are insufficient to meet the pleading standard. Although the amended complaint need not list every single allegedly fraudulent use of interstate wires involved in the overall scheme, it nonetheless is necessary to "inform each defendant of the nature of his alleged participation in the fraud."[323]

As discussed above, the amended complaint sets forth detailed allegations that traders at ANZ, Westpac, NAB, HSBC, CBA, and Credit Suisse bought and sold large numbers of Prime Bank Bills during the Fixing Window in order to move BBSW in a profitable direction and that traders at UBS, RBS, and BNP Paribas who were in charge of submitting BBSW mid-rates to AFMA solicited rate submission requests from their colleagues who traded in BBSW-Based Derivatives. Although the instances of alleged manipulative transactions and submissions of false BBSW rates are not alleged in great detail, these allegations serve at least to inform the defendant entities from these banks of the "nature of [their] alleged participation in the fraud." As to these defendants, the amended complaint has alleged racketeering activity sufficient to survive a motion to dismiss. As to the remaining bank defendants – that is, the defendant entities from the Royal Bank of Canada, Deutsche Bank, Lloyds, Macquarie, and Morgan Stanley – plaintiffs' RICO claims are dismissed.

---

[322]

*Id.* at ¶ 348.

[323]

*Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 578 (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)) (internal quotation marks omitted).

Similarly, although ICAP and Tullett Prebon are alleged to have facilitated large transactions in Prime Bank Bills for the bank defendants during the Fixing Window and provided information about the Prime Bank Bill market in exchange for large commission fees, there are no well-pled factual allegations in the amended complaint that either entity acted with specific intent to engage in the alleged fraudulent scheme.

Accordingly, the substantive RICO cause of action is sustained against the defendant entities from ANZ, Westpac, NAB, HSBC, CBA, Credit Suisse, UBS, RBS, and BNP Paribas. Plaintiffs' substantive RICO claims will be dismissed as to the remaining defendants.

### C.    RICO Conspiracy

Defendants next argue that plaintiffs have failed to state a claim of a RICO conspiracy because the amended complaint does not allege a conscious agreement among defendants to violate RICO.[324]

"The core of a RICO conspiracy is an agreement to commit predicate acts, and a RICO civil conspiracy complaint must specifically allege such an agreement."[325]  Allegations of a conspiracy:

> "[M]ust set forth specific facts tending to show that each of the defendants entered into an agreement to conduct the affairs of a particular, identified enterprise through a pattern of racketeering activity – not simply that each defendant committed two or more acts that would qualify as predicate acts, without regard to whether those acts

---

[324]

DI 134 at 42.

[325]

*Elsevier Inc.*, 692 F. Supp. 2d at 313 (citing *Hecht*, 897 F.2d at 25).

were committed in furtherance of the activity of the enterprise."[326]

Defendants rely largely on *Elsevier Inc. v. W.H.P.R., Inc.*,[327] in which the district court considered a RICO conspiracy claim against a group of individual defendants who allegedly had purchased academic journals from the plaintiff at the discounted price for individuals, rather than the higher price for institutions, and then resold those journals to institutions at a profit. The court there concluded that the conspiracy claim could not survive a motion to dismiss because the complain "contain[ed] nothing more than a conclusory allegation of an agreement among defendants and a further allegation that each of the individual defendants committed certain discrete acts of fraud."[328] Here in contrast, plaintiffs allege cooperation among defendants – including through the exchange of information and the provision of "ammunition" to help one another execute manipulative Prime Bank Bill transactions. These allegations amounted to a plausible claim that the defendants had formed an antitrust conspiracy and are sufficient also to state a claim that they were part of a RICO conspiracy. Accordingly, plaintiffs' RICO conspiracy claims also are sustained against the defendant entities from ANZ, Westpac, NAB, HSBC, CBA, Credit Suisse, UBS, RBS, and BNP Paribas and dismissed as to the remaining defendants.

---

[326]

        *Id.* (emphasis omitted).

[327]

        *Id.*

[328]

        *Id.* at 313.

D.    *Extraterritoriality*

Finally, defendants assert that plaintiffs' RICO claims should be dismissed as impermissibly extraterritorial.   The Court proceeds through the two-step inquiry set forth in *Morrison*.

1.    *Presumption Against Extraterritoriality*

In *RJR Nabisco, Inc. v. European Community*,[329] the Supreme Court concluded that "Congress intended the [§ 1962(c)] prohibition . . . to apply extraterritorially in tandem with the underlying predicates, without regard to the locus of the enterprise."[330]   Accordingly, a RICO claim may be based on foreign racketeering activity only if the predicate act(s) underlying the claim apply extraterritorially.[331]   The predicate acts alleged in this case all are instances of wire fraud.[332]   In *RJR Nabisco*, the Second Circuit considered whether Congress had manifested an intent that the federal

---

[329]

  136 S. Ct. 2090 (2016).

[330]

  *Id.* at 2105.

[331]

  The Supreme Court there held also that "[i]rrespective of any extraterritorial application of § 1962 . . . § 1964(c) does not overcome the presumption against extraterritoriality." Therefore, "[a] private RICO plaintiff . . . must allege and prove a domestic injury to its business or property." *Id.* at 2106 (emphasis omitted).  This point is not in contention in this case and, in any event, is sufficiently alleged.  *See Bascunan v. Elsaca*, 874 F.3d 806 (2d Cir. 2017) (alleged scheme in which defendant misappropriated funds held in New York bank account owned by plaintiff alleged a domestic injury to property).

[332]

  AC at ¶¶ 336-350.

wire fraud statute[333] apply extraterritorially and concluded that it had not.[334] The presumption against extraterritoriality therefore is not rebutted and the Court next considers whether plaintiffs nonetheless have alleged a domestic application of the RICO Act.

### 2.    *Domestic Application*

Whether plaintiffs have alleged a domestic RICO claim presents a close question. The Second Circuit has not "decide[d] precisely how to draw the line between domestic and extraterritorial applications of the wire fraud statute."[335]  In *RJR Nabisco*, for example, the Second Circuit stated that "[i]f domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States."[336] And in *Norex Petroleum Ltd. v. Access Industries, Inc.*,[337] in which a RICO complaint alleging that a group of foreign defendants had engaged in a racketeering conspiracy in order to acquire control over a Russian company in which the plaintiff had been a majority shareholder was dismissed as impermissibly extraterritorial, the Circuit stated only that:

---

[333]

18 U.S.C. § 1343.

[334]

*European Community v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), *rev'd and remanded on other grounds*, 136 S. Ct. 2090; *accord Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 580.

[335]

*European Community*, 764 F.3d at 142.

[336]

*Id.*

[337]

631 F.3d 29 (2d Cir. 2010).

"[S]imply alleging that some domestic conduct occurred cannot support a claim of domestic application. 'It is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.' [*Morrison*, 561 U.S. at 226 (emphasis in the original).] The slim contacts with the United States alleged by Norex are insufficient to support extraterritorial application of the RICO statute."[338]

Defendants here assert that the amended complaint fails to plead a domestic RICO claim because it "lacks any specific allegations concerning activities in (or directed at) the U.S."[339] Plaintiffs respond that the amended complaint alleges a domestic application of the wire fraud statute because all of the elements of wire fraud – that is, the formation of a scheme to defraud victims of money or other property and the use of interstate or foreign wire communications in furtherance of such scheme – occurred within the United States or while crossing U.S. borders. The amended complaint alleges specifically that defendants' domestic conduct involved: (1) "transmitting or causing to be transmitted artificial BBSW rates in the United States or while crossing U.S. borders through electronic servers located in the United States;" (2) "transmitting or causing to be transmitting false and artificial BBSW submissions that were relied on by Thomson Reuters and the AFMA in collecting, calculating, publishing, and/or disseminating the daily BBSW rates that were transmitted, published, and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States;" and (3) "transmitting or causing to be transmitted confirmations for fraudulent transactions intended to impact BBSW in the U.S. or while crossing U.S. borders through servers located in the United States."[340]

---

[338]    *Id.* at 33.

[339]    DI 134 at 39.

[340]    AC at ¶ 346.

As discussed above, however, plaintiffs' RICO claims in significant part are not pled with sufficient particularity. Indeed, plaintiffs' allegations of domestic conduct are entirely generalized. To the extent that plaintiffs assert well-pled factual allegations in support of their RICO claims, the allegations consist solely of activity that took place in Australia.

This Court considered the extraterritoriality question in *Chevron Corporation v. Donzinger*.[341] It there considered the various approaches that had been taken by federal courts and ultimately found persuasive the analysis articulated in *CGC Holding Company v. Hutchens*.[342]

In *CGC Holding*, the district court had rejected the contention that a RICO claim was impermissibly extraterritorial simply because "some of the participants in the enterprise reside[d] outside the United States."[343] Rather, the court held, "[t]he focus of the statute is the racketeering activity, *i.e.*, to render unlawful a pattern of *domestic* racketeering activity perpetrated by an enterprise."[344] It then concluded that although most of the enterprise participants had resided in Canada, the plaintiffs had stated a domestic claim because the racketeering activity had been "directed at and largely occurred within the United States." The defendants had "allegedly used telephone, mail, and email communications directed to potential borrowers in the United States" and traveled to the United States for purposes of the scheme. The court therefore concluded that the allegations in *CGC Holding* were "a far cry from those of *Norex* . . . where the actors, victims and

---

341

871 F. Supp. 2d 229 (S.D.N.Y. 2012).

342

824 F. Supp. 2d 1193 (D. Colo. 2011).

343

*Id.* at 1209 (emphasis in original).

344

*Id.*

conduct were foreign, and the connection to the United States was essentially incidental" because in *CGC Holding*, "the conduct of the enterprise within the United States was a key to its success."[345]

As this Court concluded in *Chevron*, the approach taken in *CGC Holding* appeals because it "afford[s] a remedy to a U.S. plaintiff who claims injury caused by domestic acts of racketeering activity without regard to the nationality or foreign character of the defendants or the enterprise," is "consistent with the Supreme Court's and [the Second] Circuit's repeated recognition that 'the heart of any RICO complaint is the allegation of a *pattern* of racketeering,'" and seems to be "consistent with Congressional intent, which included protecting American victims at least against injury caused by the conduct of the affairs of enterprises through patterns of racketeering activity that occur in this country."[346]  Applying this analysis to the alleged racketeering activity in *Chevron*, this Court readily concluded that the complaint had stated a domestic RICO claim because "[t]he scheme (1) allegedly was conceived and orchestrated in and from the United States (2) in order wrongfully to obtain money from a company organized under the laws of and headquartered in the United States, and to cover up unlawful and improper activities, and (3) acts in its furtherance were committed here by Americans and in Ecuador by both Americans and Ecuadorians."[347]

This focus on the alleged rackteering activity, rather than the location of the enterprise, has been endorsed in the Second Circuit which, in *Petroleos Mexicanos v. SK*

---

[345]

    *Id.* at 1210.

[346]

    *Chevron Corp.*, 871 F. Supp. 2d at 244-45 (emphasis in original).

[347]

    *Id.* at 245.

*Engineering and Construction Company,*[348] affirmed the dismissal of a civil RICO complaint involving bribes to approve overrun and expense payments in the course of an oil refinery rehabilitation project abroad. The complaint had alleged three contacts with the United States, namely, that the financing was obtained in the United States, the invoices were sent to the bank for payment, and the bank issued payment. There were no allegations that the scheme was directed from or to the United States and the primary activities involved in the alleged scheme – that is, falsifying the invoices, making the bribes, and approving the false invoices – had taken place outside of the United States. On this basis, the Circuit concluded that the allegations of domestic conduct were "simply insufficient" to sustain RICO jurisdiction.[349]

In this case, the conduct underlying the alleged scheme, including the facilitation of manipulative transactions and submission of false BBSW rates, took place entirely outside of the United States. It perhaps is not unexpected that several courts in this district have dismissed RICO claims in other benchmark rate manipulation cases alleging nearly identical domestic conduct.[350]

---

[348] 572 F. App'x 60 (2d Cir. 2014).

[349] *Id.* at 61.

[350] *See, e.g., Sonterra Capital Master Fund, Ltd.*, 277 F. Supp. 3d at 582 ("That the alleged goal of the conspiracy was to increase *worldwide* profits, including profits generated in the United States, cannot render 'domestic' a scheme that was otherwise centered abroad. Nor can the fact that the CHF LIBOR fixes were distributed *worldwide*, including into the United States, or that defendants carried out their manipulation from abroad through servers that happened to route their communications in the United States."); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263 (AKH), 2017 WL 3600425, at *14-15 (S.D.N.Y. Aug. 18, 2017) (concluding that the dissemination of the daily SIBOR rate throughout the United States via Thomson Reuters was merely incidental use of domestic wires because "[e]ven if defendants' allegedly wrongful conduct had an impact on the United States, any act of wire fraud committed in furtherance of the conspiracy was not sufficiently domestic as to overcome the presumption against extraterritoriality"); *Sullivan*, 2017 WL 685570, at *33 (concluding that "generalized allegations about the defendants' use of interstate wires to

Respectfully, this Court parts with those cases. Unlike in *Petroleos*, in which there were no allegations that the scheme was directed to or from the United States, the ultimate goal of the scheme alleged here – that is, affecting the prices of and returns on BBSW-Based Derivatives – necessarily implicated the worldwide market for such derivatives. Plaintiffs allege that the United States is among the largest markets for BBSW-Based Derivatives. It thus is reasonable to infer that the scheme largely was "directed to" the United States. Accordingly, although the conduct involved in the alleged conspiracy to manipulate BBSW generally is alleged to have taken place outside of the United States, the Court is not now in a position to dismiss plaintiffs' RICO claims as extraterritorial. Defendants' alleged scheme at least plausibly was directed at the United States, and the amended complaint therefore states a plausible domestic RICO claim.

VI.     *Breach of Implied Covenant of Good Faith and Fair Dealing*

Plaintiffs' first state claim is against defendants Macquarie Bank, Morgan Stanley, Credit Suisse, Deutsche Bank AG, and UBS for breach of the implied covenant of good faith and fair dealing. The amended complaint alleges that the FrontPoint Plaintiffs entered into binding contracts with Macquarie Bank, Credit Suisse, Deutsche Bank AG, and UBS and that Sonterra entered into binding contracts with Morgan Stanley, in each case, in connection with transactions for BBSW-Based Derivatives.[351]

---

coordinate the Euribor scheme" did not suffice to state a domestic RICO claim); *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1515487, at *8-9 (S.D.N.Y. Mar. 31, 2015) (rejecting similar contacts as "far too attenuated" and distinguishing *RJR Nabisco* "where the scheme was allegedly both managed from and directed at the U.S." (emphasis omitted)).

[351]     AC at ¶ 363.

"[I]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. . . .  Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included. This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[352]

Although the amended complaint alleges that the FrontPoint Plaintiffs contracted with Deutsche Bank, UBS, and Credit Suisse in "Australian dollar-denominated swaps,"[353] it is not clear from the pleading whether these swaps were linked to BBSW.  In addition there are no well-pleaded factual allegations in respect of either FrontPoint Financial Services Fund, L.P.'s or FrontPoint Financial Horizons Fund, L.P.'s supposed contracts with Macquarie Bank.  In contrast, the amended complaint sufficiently alleges transactions in BBSW-Based Derivatives between FrontPoint Event Driven and Macquarie Bank Ltd. and between Sonterra and Morgan Stanley, although the amended complaint does not specify whether Sonterra transacted with Morgan Stanley or Morgan Stanley Australia Limited.[354]

---

[352]

*Dalton*, 87 N.Y.2d at 396 (internal quotation marks and citations omitted); *see also Skillgames, LLC*, 1 A.D.3d at 252, 767 N.Y.S.2d at 423 ("Implicit in every contract is a promise of good faith and fair dealing, which is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." (quoting *Rowe*, 46 N.Y.2d at 68) (internal quotation marks omitted)).

While the amended complaint does not allege which law governs plaintiffs' state law claims, there is no dispute that New York law is applicable to both.  DI 134 at 44-45, DI 156 at 36.

[353]

AC at ¶ 23; *see also id.* at ¶ 109 (alleging that "Deutsche Bank AG entered into Australian dollar-denominated derivatives transactions with [the FrontPoint Plaintiffs] during the Class Period" and "agreed that these transactions were governed by New York law"); ¶ 150 (repeating allegation as to Credit Suisse).

[354]

*Id.* at ¶¶ 286-299.

FrontPoint Event Driven and Sonterra seek damages from defendants Macquarie Bank Ltd. and Morgan Stanley for their respective breaches of the implied covenant of good faith and fair dealing by (1) "intentionally manipulating BBSW for the express purpose of generating illicit profits from its BBSW-[B]ased [D]erivatives, and (2) conspiring with other Defendants to manipulate BBSW and the prices of BBSW-[B]ased [D]erivatives."[355]  It is plausible that in allegedly manipulating BBSW rates, defendants Macquarie Bank Ltd. and Morgan Stanley interfered with FrontPoint Event Driven and Sonterra's respective reasonable expectations that they would enjoy the maximum returns permitted by market forces on their BBSW-Based Derivatives transactions.  Their claims for breach of the implied covenant of good faith and fair dealing as to Macquarie Bank Ltd. and the Morgan Stanley defendants are, accordingly, sustained.  The remaining claims for breach of this implied covenant will be dismissed.

## VII.    Unjust Enrichment

Plaintiffs' final claim asserts unjust enrichment against all defendants.

As discussed above, a plaintiff alleging unjust enrichment under New York law "must show 'that (1) the other party was enriched, (2) at that party's expense, and (3) that "it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered".'"[356]  "The 'essence' of such a claim 'is that one party has received money or a benefit

---

[355]

    *Id.* at ¶¶ 365-366.

[356]

    *Mandarin Trading Ltd.*, 16 N.Y.3d at 182 (quoting *Citibank, N.A.*, 12 A.D.3d at 481; *Baron*, 42 A.D.3d at 629-630) (internal quotation marks omitted); *accord Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012).

at the expense of another.'"[357]   Accordingly, "courts require proof that the defendant received a 'specific and direct benefit' from the property sought to be recovered, rather than an 'indirect benefit,'"[358] which in turn requires that a plaintiff allege some kind of relationship or connection to that defendant.[359]

On this basis, plaintiffs' claims of unjust enrichment are dismissed as to all defendants except Macquarie Bank Ltd. and Morgan Stanley, with which FrontPoint Event Driven and Sonterra respectively allege having engaged in BBSW-Based Derivatives transactions directly. As discussed above with respect to plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, the amended complaint fails to sufficiently allege a relationship or connection between any other defendant and plaintiff.

Plaintiffs allege that  Morgan Stanley and Macquarie Bank Ltd. colluded with the other defendants to manipulate BBSW and the prices of BBSW-Based Derivatives to ensure that they would have an unfair advantage in the marketplace.  Defendants "financially benefitted from their unlawful acts . . . by, *inter alia*, (i) coordinating the manipulation of BBSW . . . ; and (ii) acting as a trading bloc and engaging in secret, collusive trades in the swap market to manipulate

---

[357]

*In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d at 574 (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905, 685 N.Y.S.2d 381 (4th Dept. 1999))).

[358]

*Id.* (quoting *Kaye*, 202 F.3d at 616).

[359]

*See also Mandarin Trading Ltd.*, 16 N.Y.3d at 182; *see also FrontPoint Asian Event Driven Fund, L.P.*, 2017 WL 3600425, at *16 ("While a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, there must exist a relationship or connection between the parties that is not too attenuated." (quoting *Georgia Malone & Co.*, 19 N.Y.3d at 516 (quoting *Sperry*, 8 N.Y.3d at 215-16)) (internal quotation marks omitted)).

BBSW."[360]  As a result, plaintiffs "received, upon execution or settlement of their trades [in BBSW-Based Derivatives], less in value than they would have received absent Defendants' wrongful conduct."[361]

Defendants argue that plaintiffs' unjust enrichment claims against Morgan Stanley and Macquarie Bank Ltd. must be dismissed because the subject matter in dispute is governed by an existing contract.[362]  It is true that "[w]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."[363]  A plaintiff may proceed on the "quasi-contract theory of unjust enrichment" only "where the contract does not cover the dispute in issue."[364]  In order for a contract to "cover the dispute in issue" and thus bar a plaintiff's quasi-contract claims, however, the contract "must specifically address" the actions that gave rise to the

---

[360]

AC at ¶¶ 369-370.

[361]

*Id.* at ¶ 370.

[362]

DI 134 at 45 (citing *Korea Life Ins. Co., Ltd. v. Morgan Guaranty Trust Co. of New York*, 269 F. Supp. 2d 424, 447 (S.D.N.Y. 2003)).

[363]

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 10, 948 N.Y.S.2d 292, 299 (1st Dept. 2012) (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009)) (internal quotation marks omitted); *see also Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012) ("[A] party may not recover in . . . unjust enrichment where the parties have entered into a contract that governs the subject matter." (internal quotation marks and citations omitted)).

[364]

*Ashwood Capital, Inc.*, 99 A.D.3d at 10, 948 N.Y.S.2d at 299; *see also Sullivan*, 2017 WL 685570, at *36 (citing *LIBOR II*, 962 F. Supp. 2d at 630).

dispute.[365]  That is to say, the contract must "clearly cover[] the dispute between the parties."[366]

Other courts in this district have interpreted this rule narrowly and, facing claims of unjust enrichment on similar factual allegations, denied motions to dismiss.  In *LIBOR II*,[367] for example, the court considered whether the plaintiffs' claims for unjust enrichment on the basis of the defendants' alleged manipulation of LIBOR were precluded by the existence of swap contracts between those plaintiffs and defendants.  The court concluded that "although the swap contracts clearly required defendants to pay plaintiffs the prescribed floating rate of return using . . . LIBOR . . . , the contracts did not 'clearly cover[]' the subject matter now at issue, namely whether defendants were permitted to manipulate LIBOR itself and thereby depress the amount they were required to pay plaintiffs."[368]

The Court now adopts this reasoning and concludes that dismissal of plaintiffs' unjust enrichment claims would be premature at this early stage in the litigation.  It certainly is plausible that the alleged contracts between FrontPoint Event Driven and Macquarie Bank Ltd. and between Sonterra and Morgan Stanley did not "clearly cover" the manipulation of the benchmark rate

---

[365]

*Union Bank, N.A. v. CBS Corp.*, No. 08 Civ. 8362 (PGG), 2009 WL 1675087, at *7 (S.D.N.Y. June 10, 2009).

[366]

*Id.* (emphasis omitted) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)); *see also id.* at *8 (holding that it was not appropriate for the court to rule "at the inception of this case and as a matter of law" that the parties' agreements governed the dispute at issue where there were allegations that "that resolution of the dispute require[d] going outside of the four corners of their agreements").

[367]

962 F. Supp. 2d 606 (S.D.N.Y. 2013).

[368]

*Id.* at 630; *see also Sullivan*, 2017 WL 685570, at *36 (citing *LIBOR II* and concluding that "[a]t the pleading stage, plaintiffs sufficiently allege that defendants' conduct in manipulating the Euribor went beyond the terms of any underlying agreements").

underlying the derivatives that were the subject of the contracts. Defendants' motion with respect to plaintiffs' claims of unjust enrichment therefore is denied against the Morgan Stanley defendants and Macquarie Bank Ltd. and granted as to the remaining defendants.

## VIII.    *Fraudulent Concealment*

Defendants' final argument in respect of their motion to dismiss for failure to state a claim is that each of plaintiffs' claims (except for their RICO claims) is untimely.

### A.    *Antitrust Claims*

The statute of limitation to bring a private antitrust action is four years.[369]  Plaintiffs filed their complaint on August 16, 2016, which means that conduct predating August 16, 2012 would fall outside of the limitations period, setting aside any questions of continuing violation and equitable tolling.  The amended complaint alleges that the limitations period tolled "because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct."[370]  Defendants argue that plaintiffs allege no injuries after July 1, 2011 and fail to plead fraudulent concealment with the requisite particularity.[371]

The Court will not dismiss plaintiffs' claims on statute of limitations grounds at the

---

[369]     15 U.S.C. § 15b.

[370]     AC at ¶ 311.

[371]     DI 134 at 25.

pleading stage unless the "complaint clearly shows the claim is out of time."[372]

> "[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part."[373]

A plaintiff may allege fraudulent concealment "by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing."[374]

In *State of New York v. Hendrickson Brothers, Inc.*,[375] the Second Circuit concluded that a bid-rigging conspiracy allegedly involving multiple defendants and lasting for over a year was an "inherently self-concealing fraud" such that "proof of the conspiracy itself sufficed to prove concealment by the coconspirators."[376]   The Circuit there reasoned that because a bid-rigging conspiracy was the "kind of enterprise that requires a number of participants" and, in order to incentivize each participate, needed to secure "agreement as to a number of contracts," such a conspiracy necessarily had to last for a prolonged period of time.   "In order to endure, it [had to]

---

[372]

    *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).

[373]

    *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

[374]

    *Id.*

[375]

    *Id.*

[376]

    *Id.* at 1083-84.

remain concealed from the victim of the collusive bids."[377]

Plaintiffs make similar allegations here. They highlight defendants' alleged use of private communications through instant messaging to ensure that their efforts to manipulate BBSW rates would remain concealed. As a result, plaintiffs argue, they had "no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence prior to the time of public disclosures reporting the manipulation of BBSW."[378]

Defendants next argue that plaintiffs were on notice of their claims by the time that ASIC announced its enforceable undertakings related to BBSW from UBS, BNP Paribas, and RBS, which were accepted between December 19, 2012 and July 21, 2014.[379] But defendants did not admit any wrongdoing in those earlier settlements.[380] Plaintiffs argue that they could not have been put on notice from these settlements that any other banks were involved in manipulating BBSW or that there was a widespread conspiracy to manipulate BBSW.[381] They argue that they were not on notice until the subsequent statements of claim were issued against ANZ, NAB, and Westpac in

---

[377]

 *Id.*

[378]

 AC at ¶ 315.

[379]

 DI 134 at 26.

[380]

 *See* Enforceable Undertaking between UBS AG and ASIC at § 5.5 (Dec. 23, 2013), available at https://download.asic.gov.au/media/1301413/028553828.pdf; Enforceable Undertaking between BNP Paribas and ASIC at § 5.5 (Jan. 28, 2014), available at https://download.asic.gov.au/media/1301239/028399392.pdf; Enforceable Undertaking between The Royal Bank of Scotland plc and ASIC at § 5.9 (July 21, 2014), available at https://download.asic.gov.au/media/1301287/028492040.pdf.

[381]

 DI 156 at 45.

2016.[382]  Indeed, it was at that point that ASIC released the communications between defendants upon which plaintiffs relied in their complaint.  Plaintiffs thus have alleged a plausible basis to find that their complaint was timely.  They are entitled to an opportunity to prove fraudulent concealment at trial or, at least, adduce a fuller record on a motion for summary judgment.

B.    CEA Claims

A claim for a violation of the CEA must be brought within two years.[383]  "A cause of action arises under the CEA when a party is placed on inquiry notice of the violation,"[384] which occurs "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."[385]  Plaintiffs again argue that they were not put on inquiry notice until ASIC filed its notice of claims against ANZ, NAB, and Westpac in 2016.[386]  For the reasons discussed above, these allegations are sufficient to survive a motion to dismiss.

---

[382]

*Id.* at 46.

[383]

7 U.S.C. § 25(c).

[384]

*Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 575 (quoting *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 512 (S.D.N.Y. 2004)) (internal quotation marks omitted).

[385]

*Id.* (quoting *In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 242 (S.D.N.Y. 2006) (quoting *LC Capital Partners v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003))).

[386]

DI 156 at 46.

C.    State Law Claims

Finally, the statutes of limitations for claims of breach of the implied covenant of good faith and fair dealing and unjust enrichment are six years,[387] and generally "begin[] to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury."[388]  Defendants again argue that plaintiffs failed to plead fraudulent concealment.  For the reasons discussed above, this argument is unavailing.  It would be premature at this stage to dismiss plaintiffs' state law claims as untimely.

IX.    Personal Jurisdiction

The Court now turns to the Foreign Defendants' motion to dismiss for lack of personal jurisdiction and improper venue.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists."[389]  "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant."[390]  In determining whether the requisite showing has

---

[387]

*Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 66.

[388]

*ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 594 (2015) (internal quotation marks and citations omitted).

[389]

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (quoting *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006)) (internal quotation marks omitted).

[390]

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010)) (internal quotation marks omitted).

been made, the Court "construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiffs."[391]

A.    *Personal Jurisdiction Arising From Defendants' Contacts*

Three requirements must be met in order for a court to exercise personal jurisdiction lawfully:

"First, the plaintiff's service of process upon the defendant must have been procedurally proper. Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective. . . . Third, the exercise of personal jurisdiction must comport with constitutional due process principles."[392]

There being no dispute as to the first of these three pleading requirements, the Court turns to the remaining requirements.

1.    *Statutory Basis*

"A plaintiff 'must establish the court's jurisdiction with respect to each claim asserted.'"[393] "For an out-of-state defendant in a federal question case, 'federal courts apply the forum state's personal jurisdiction rules if the applicable federal statute does not provide for national

---

391

> *Licci ex rel. Licci*, 732 F.3d at 167 (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).

392

> *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (internal quotation marks and citation omitted).

393

> *Charles Schwab Corp.*, 883 F.3d at 83 (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

service of process.'"[394]  Plaintiffs here assert federal claims under three federal statutes: the Clayton Act, the CEA, and the RICO Act, each of which provides for national service of process in certain circumstances.[395]

The only challenge to the statutory basis for personal jurisdiction is brought by the Venue Defendants in respect of plaintiffs' federal antitrust claims under the Clayton Act.[396]  Section 12 of the Clayton Act provides for national service of process as follows:

> "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be

[394]

*McGraw-Hill Global Educ. Holdings, LLC v. Mathrani*, 295 F. Supp. 3d 404, 410 (S.D.N.Y. 2017) (quoting *Sunward Elecs., Inc.*, 362 F.3d at 22); *accord Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013).

[395]

The relevant provision of the Clayton Act is discussed below.  The CEA provides for nationwide service of process without restriction:

"Process in such action may be served in any judicial district of which the defendant is an inhabitant or wherever the defendant may be found."  7 U.S.C. § 25(c); *see also Sullivan*, 2017 WL 685570, at *42.

The RICO Act provides for national service of process where "the 'ends of justice' so require," *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 70-71 (2d Cir. 1998); *Elsevier Inc.*, 692 F. Supp. 2d at 314-15, as follows:

"In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof."  18 U.S.C. § 1965(b).

[396]

Although the Foreign Defendants challenge also the statutory basis for plaintiffs' assertion of conspiracy jurisdiction, the Court need not reach this question because, as discussed below, plaintiffs have failed to make a *prima facie* showing of jurisdiction under a conspiracy jurisdiction theory.

found."[397]

"Because the service of process provision applies only to 'such cases' described in the preceding clause, the Second Circuit has concluded that nationwide service of process is permissible 'only in cases in which its venue provision is satisfied'"[398]  The Venue Defendants, characterizing this argument as a motion for improper venue, argue that "Plaintiffs cannot demonstrate proper venue under the Clayton Act" and therefore "cannot establish personal jurisdiction [as to their federal antitrust claim] over Venue Defendants."[399]  Plaintiffs respond to defendants' challenge only by arguing that the Clayton's Act's venue provision "supplements, and does not restrict" the general venue statute codified in 28 U.S.C. § 1391.[400]

Plaintiffs' argument falls short.  The first part of Section 12 of the Clayton Act, which permits "[a]ny suit, action, or proceeding under the antitrust laws against a corporation [to] be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business," is indeed an expanded venue provision.[401]  But the operative language for purposes of personal jurisdiction is found in the second half of the statute – that is, the service provision, which states that "all process *in such cases* may be served in the district of which

---

[397]

15 U.S.C. § 22.

[398]

*Sullivan*, 2017 WL 685570, at *36 (quoting *Daniel,* 428 F.3d at 423).

[399]

DI 110 at 30.

[400]

DI 153 at 29.

[401]

*Daniel*, 428 F.3d at 425 (describing this language as an "expansion of the bounds of venue" (emphasis omitted) (internal quotation marks and citation omitted)).

it is an inhabitant, or wherever it may be found."[402]  The Second Circuit has construed "in such cases" in accordance with its plain language.  As such, jurisdiction lies only in cases in which the venue provision of *Section 12*, not the general venue statute, is satisfied.[403]

Although plaintiffs fail to brief the issue, the Court considers whether the amended complaint has sufficiently alleged that the Venue Defendants satisfy the venue provision of Section 12 – that is, whether the amended complaint has sufficiently alleged that they "transact business" in the Southern District of New York.[404]

Under the Clayton Act, the nationwide service of process provision apples only where the action has been brought in a district "wherein [the defendant] may be found or transacts business."[405]  "The Supreme Court has construed the phrase 'transacts business,' as used in the venue provision of Clayton Act Section 12, to refer to 'the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character.'"[406]  However, "[f]or a defendant to transact business of any substantial character, there must be 'some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial

---

[402]

      *Id.* (distinguishing between these two provisions in Section 12 of the Clayton Act).

[403]

      *See id.* at 423.

[404]

      *See id.* at 430 (concluding alleged "contacts . . . with the State of New York as a whole, not specifically the Western District of New York" were irrelevant to venue under Section 12).

[405]

      15 U.S.C. § 22.

[406]

      *Daniel*, 428 F.3d at 428 (quoting *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948)).

district.'"[407]   The nature and amount of a defendant's contacts in a judicial district are to be "considered in light of the nature of [the defendant's] business."[408]

There are no allegations in the amended complaint that HSBC Holdings plc, HSBC Bank Australia Limited, ICAP plc, ICAP Australia Pty Ltd., Lloyds Banking Group plc, Morgan Stanley Australia Limited, The Royal Bank of Scotland Group plc, RBS N.V., RBS Group (Australia) Pty Limited, Tullett Prebon plc, and Tullett Prebon (Australia) Pty Ltd. – that is, eleven out of the fourteen Venue Defendants – transacted any business in New York.  Allegations that certain of these defendants are parent companies of subsidiaries that transact business in New York do not suffice to show that the parent companies transact business in New York.[409]  As to these defendants, the venue provision of Section 12 of the Clayton Act is not satisfied and the federal antitrust claims will be dismissed for lack of personal jurisdiction.

As to the remaining Venue Defendants, the limited allegations in the amended complaint are unavailing.  First, the amended complaint alleges that Credit Suisse Group AG "is a Swiss banking and financial services company incorporated in Switzerland" and that one of its six primary offices is located at 11 Madison Avenue, New York, NY, 10010.[410]  This allegation,

---

[407]

*Gates v. Wilkinson*, No. 01 Civ. 3145 (GBD), 2003 WL 21297296, at *1 (S.D.N.Y. June 4, 2003) (quoting *Daniel v. Am. Bd. of Emergency Medicine*, 988 F. Supp. 127, 257 (S.D.N.Y. 1997)).

[408]

*Daniel*, 428 F.3d at 430.

[409]

*See, e.g., Scophony Corp. of Am.*, 333 U.S. at 810-16 (considering activities of parent corporation separately from those of subsidiary); *cf. Charles Schwab Corp.*, 883 F.3d at 84 (concluding no personal jurisdiction where complaint failed to distinguish between parent and subsidiary entities).

[410]

AC at ¶ 144.

however, is challenged directly by the declaration of Daniel Kläy, Director of Credit Suisse Group AG, which states that Credit Suisse Group AG "has no offices in the United States and no employees in the United States" and that its "only connection to the United States is that it has subsidiaries that are located in or do business in the United States."[411] Indeed, a review of SEC filings indicates that Credit Suisse Group AG is "not an operating company" and merely "holds investments in subsidiaries."[412] This does not amount to "transacting business" in the Southern District of New York.

The amended complaint next alleges that the Royal Bank of Scotland plc "maintains a Foreign Representative Office, registered with the NYSDF, . . . at 340 Madison Avenue, New York, New York," and that its U.S. headquarters is located in Connecticut.[413] However, plaintiffs allege no specific activities conducted by any such Foreign Representative Office and the declaration of William Gougherty alleges that this entity's presence in the United States "consists of a single branch office located in Stamford, Connecticut and a license for a representative office in Jersey

---

[411]

DI 115 at 2.

[412]

*See* Credit Suisse Group AG, Annual Report (Form 20-F) at 135 (March 24, 2016); Credit Suisse Group AG, Annual Report (Form 20-F) at 125 (March 20, 2015); Credit Suisse Group AG, Annual Report (Form 20-F) at 114 (April 3, 2014); Credit Suisse Group AG, Annual Report (Form 20-F) at 108-09 (March 23, 2012); *see also Indymac Mortg.Holdings, Inc. v. Reyad*, 167 F. Supp. 2d 222, 237 (D. Conn. 2001) (concluding that although generally, the "court must take all allegations in the complaint as true," if an allegation as to venue is "contradicted by the defendants' affidavits, . . . a court may examine facts outside the complaint to determine whether venue is proper" (internal quotation marks and citations omitted)).

[413]

AC at ¶¶ 57-58.

City, New Jersey."[414]  Left with these minimal allegations, the Court concludes that plaintiffs have not sustained their burden to show that Royal Bank of Scotland plc "transacts business" in the Southern District of New York.

Finally, the amended complaint alleges that Macquarie Group Ltd. is a global banking and diversified financial services corporation headquartered in Sydney, Australia.  The only allegation connecting Macquarie Group Ltd. to the Southern District of New York is that it "recruits students in the [Southern District of New York] for its New York offices."[415]  This allegation does not sufficiently allege venue for purposes of Section 12.  There are no allegations in the amended complaint as to the regularity of such recruitment.  Nor does the amended complaint allege that Macquarie Group Ltd. has an office located in New York.  Moreover, Macquarie Group is a banking corporation, and there is no indication in the amended complaint that the alleged recruitment efforts comprise a substantial component of the company's business.  Without more, the Court cannot conclude that these recruiting efforts evidence the "practical, everyday business or commercial concept of doing business or carrying on business of any substantial character."[416]

For the foregoing reasons, the Court concludes that it cannot exercise personal jurisdiction with respect to plaintiffs' antitrust claims over the Venue Defendants.  These claims therefore will be dismissed.

---

[414]

DI 127 at 3.

[415]

AC at ¶ 128.

[416]

*Daniel*, 428 F.3d at 430 (internal quotation marks and citations omitted); *see also id.* (concluding venue was not proper where defendant's business was "certifying doctors who [met] its training and testing standards in the field of emergency medicine" and sole allegation was that defendant had mailed a copy of its application form to plaintiff in the district).

2.    *Due Process*

Having dismissed plaintiffs' antitrust claims against the Venue Defendants, the Court next considers whether its exercise of personal jurisdiction with respect to (1) plaintiffs' CEA, RICO Act, and state law claims against the Venue Defendants, and (2) all of plaintiffs' claims against the Foreign Defendants other than the Venue Defendants would "comport[] with due process protections established under the United States Constitution."[417]

"The Due Process Clause of the Fourteenth Amendment contains a State's authority to bind a nonresident defendant to a judgment of its courts."[418]  Accordingly, "the touchstone due process principle has been that, before a court may exercise jurisdiction over a person or an organization, such as a bank, that person or entity must have sufficient 'minimum contacts' with the forum 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'"[419]  "[T]he quality and nature of the defendant's contacts with the forum state" are evaluated "under a totality of the circumstances test."[420]  However, "[i]n a federal question case, the manner in which district courts assess whether the exercise of personal jurisdiction comports

---

[417]

*Licci ex rel. Licci*, 732 F.3d at 168.

[418]

*Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)).

[419]

*Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940))); *accord Walden*, 571 U.S. at 283.

[420]

*Licci ex rel. Licci*, 732 F.3d at 170 (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)) (internal quotation marks omitted).

with constitutional due process varies depending on the asserted statutory basis."[421]

        The Supreme Court has established two types of personal jurisdiction: general jurisdiction and specific jurisdiction. The Court considers each in turn below, but first turns to a threshold dispute between the parties – that is, in which forum must the Foreign Defendants have the requisite minimum contacts.

### (a)     Relevant Forum

        The amended complaint generally alleges that the Foreign Defendants have sufficient minimum contacts with the United States as a whole, rather than with New York State.[422] Plaintiffs argue that the appropriate forum for purposes of the due process analysis is the United States by virtue of the national service of process provisions in the Clayton Act, the CEA, and the RICO Act.[423]

        This argument is grounded in what is known as the nationwide contacts approach. Although the Second Circuit "has not yet decided" whether to adopt this approach, several other circuits "have endorsed the position that, when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal

---

[421]

      *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-cv-9391-GHW, 2017 WL 1169626, at *39 (S.D.N.Y. Mar. 28, 2017).

[422]

      AC at ¶¶ 17-33.

[423]

      DI 153 at 3-4.

jurisdiction are contacts with the United States as a whole."[424]  "The rationale underlying this national contacts approach is that when the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation."[425]

Several courts in this district addressing federal claims with national service of process – including claims alleging benchmark rate manipulation – have adopted this nationwide contacts approach.[426]  This Court now joins them.  The appropriate forum for purposes of determining whether the exercise of personal jurisdiction would comport with due process is the United States, rather than New York State.

### (b)    General Jurisdiction

A court with general personal jurisdiction over a foreign defendant may "hear any and

---

[424]

*Gucci Am., Inc.*, 768 F.3d at 142 n.21 (collecting cases); *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207 (2d Cir. 2003) (same); *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (stating "[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . the Fifth Amendment applies" and "the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state" (internal quotation marks omitted)); *cf. Waldman*, 835 F.3d at 330 ("'[T]he due process analysis [for purposes of the court's *in personam* jurisdiction] is basically the same under both the Fifth and Fourteenth Amendments. The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered.'" (quoting *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998))).

[425]

*Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 589-90 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR IV")*, No. 11-MDL-2262-NRB, 2015 WL 4634541, at *18 (S.D.N.Y. Aug. 4, 2015), *amended, In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2016)) (internal quotation marks omitted).

[426]

*E.g., id.*; *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *40; *Sullivan*, 2017 WL 685570, at *41-42; *S.E.C.*, 921 F. Supp. 2d at 253.

all claims against that defendant."[427]  But it by now is well established that "a court may assert general jurisdiction over foreign . . . corporations to hear any and all claims against them [only] when their affiliations with the State are so continuous and systematic as to render them essentially at home in the foreign State."[428]  "Aside from 'an exceptional case,'. . . a corporation is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business."[429]  In the guiding "exceptional case," the foreign corporation that was subject to general jurisdiction had moved its entire business to the United States from the Philippines during the Japanese occupation of World War II.[430]

Plaintiffs' argument that the Foreign Defendants are subject to general jurisdiction in the United States can be dispensed with quickly.  None of the Foreign Defendants is domiciled or has its principal place of business in the United States.  At most, plaintiffs have alleged that certain Foreign Defendants have an active branch office in the United States, which does not approach the "exceptional case" that would permit the Court to view the defendant as "at home" here.[431]  The Foreign Defendants thus are not subject to general jurisdiction in this forum.

---

[427]

   *Waldman*, 835 F.3d at 331.

[428]

   *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (internal quotation marks omitted); *accord Waldman*, 835 F.3d at 331.

[429]

   *Gucci Am., Inc.*, 768 F.3d at 135 (quoting *Daimler AG*, 571 U.S. at 137 & 139 n.19).

[430]

   *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48 (1952).

[431]

   *Gucci Am., Inc.*, 768 F.3d at 135.

*(c)      Specific Jurisdiction*

Specific jurisdiction is a significantly more limited doctrine.  It "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."[432]  "In order for a state court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'"[433]  That is to say, "the defendant's suit-related conduct must create a substantial connection with the forum State."[434]

The inquiry requires a two-step analysis:

> "First, the court must decide if the defendant has '"purposefully directed" his activities at . . . the forum and the litigation . . . "arise[s] out of or relate[s] to" those activities.'  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L.Ed.2d 528 (1985) (citation omitted).  Second, once the court has established these minimum contacts, it 'determine[s] whether the assertion of personal jurisdiction would comport with fair play and substantial justice.' *Id.* at 476, 105 S. Ct. 2174 (quoting [*Int'l Shoe Co.*,  326 U.S. at 320]).  *See also Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113-14, 107 S. Ct. 1026, 94 L.Ed.2d 92 (1987) (identifying fairness factors that courts should consider)."[435]

Generally, the "minimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and

---

432
    *Waldman*, 835 F.3d at 331 (quoting *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919) (internal quotation marks omitted).

433
    *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, *S.F. Cnty*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler AG*, 571 U.S. at 127).

434
    *Walden*, 571 U.S. at 284.

435
    *Gucci Am., Inc.*, 768 F.3d  at 136; *accord Waldman*, 835 F.3d at 331; *Licci ex rel. Licci*, 732 F.3d at 170.

could foresee being haled into court there."[436]  If however, "the conduct that forms the basis for the controversy occurs entirely out-of-forum," courts may employ the effects test, which permits a court to assert specific personal jurisdiction over a defendant "if the defendant expressly aimed its conduct at the forum."[437]  An additional theory of jurisdiction may be available in cases alleging a conspiracy if plaintiffs "allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."[438]  Plaintiffs argue that the Foreign Defendants have sufficient minimum contacts with the United States under each of these three theories.

The jurisdictional basis for plaintiffs' claims under the "purposeful availment" theory is that the Foreign Defendants engaged in suit-related conduct in the United States.  They allege that certain defendants "market[ed] and s[old] BBSW-[B]ased [D]erivatives in the United States."[439] These transactions are sufficiently related to plaintiffs' claims, they argue, because "they are the machinery through which Defendants committed a domestic *per se* antitrust violation by reaching into the forum to contract for price-fixed BBSW-[B]ased [D]erivatives with U.S. investors."[440]

---

[436]

    *Licci ex rel. Licci*, 732 F.3d at 170 (internal quotation marks and citations omitted).

[437]

    *Id.* at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

[438]

    *Charles Schwab Corp.*, 883 F.3d at 87 (citation omitted).

[439]

    DI 153 at 4; AC at ¶¶ 17, 33.

[440]

    DI 153 at 8.

In *Charles Schwab Corporation v. Bank of America Corporation*,[441] the Second Circuit considered Securities Exchange Act and state law claims brought by Charles Schwab against a group of financial institutions that allegedly had conspired in London to artificially suppress LIBOR. Certain of the defendant banks had directly and indirectly through broker-dealer subsidiaries or affiliates sold LIBOR-based debt instruments to Charles Schwab. Others were not alleged to have sold financial instruments to Charles Schwab. These defendants' "principal connection to th[e] case . . . [was] that they allegedly conspired with the other Defendants to manipulate LIBOR to Schwab's detriment."[442] Charles Schwab argued that its transactions with the direct-seller defendants in the forum state "[gave] rise to personal jurisdiction over both the direct and indirect seller Defendants, and jurisdiction, therefore, also [lay] as to the non-seller co-conspirator Defendants."[443]

With respect to the direct-seller defendants, the Circuit concluded that while the alleged in-forum transactions with plaintiff formed a sound basis for Charles Schwab's "claims for fraud relating to omissions by Defendants in the course of selling floating-rate instruments, interference with prospective economic advantage, breach of the implied covenant, and unjust enrichment," they did not "constitute 'suit-related conduct that create[ed] a substantial connection with [the forum state]'" with respect to plaintiff's "claims premised solely on Defendants' false

---

[441]

883 F.3d 68 (2d Cir. 2018).

[442]

*Id.* at 79.

[443]

*Id.* at 82.

LIBOR submissions in London."[444]  It reasoned that "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendants' purposeful contacts with the forum.'"[445]  In *Charles Schwab*, the Circuit held that the in-forum transactions "did not cause Defendants' false LIBOR submissions to the BBA in London, nor did the transactions in some other way give rise to claims seeking to hold Defendants liable for those submissions."[446]  Its conclusion, it added, was "only bolster[ed]" by the fact that Charles Schwab had "assert[ed] its false submission claims against all Defendants, including those that did not sell any products to Schwab."[447]

The Circuit then considered whether personal jurisdiction over the non-seller defendants would lie based on their membership in a conspiracy with the direct seller defendants. It noted that Charles Schwab had plausibly alleged a conspiracy,[448] but concluded that these allegations by themselves "[did] not mean that the forum contacts of the seller Defendants [were] necessarily imputed to the co-conspirators."[449]  The pleading had to allege that "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that

---

[444]

    *Id.* at 83-84 (quoting *Walden*, 571 U.S. at 284) (emphasis omitted).

[445]

    *Id.* at 84 (quoting *Waldman*, 835 F.3d at 341, 343).

[446]

    *Id.*

[447]

    *Id.*

[448]

    *Id.* at 86 (citing *Gelboim*, 823 F.3d at 781 & n.19).

[449]

    *Id.*; *see also id.* ("[T]he mere existence of a conspiracy is not enough.").

co-conspirator to jurisdiction in that state."[450] The court concluded that the direct-seller defendants' transactions with Charles Schwab "had nothing to do" with the alleged conspiracy to manipulate LIBOR. There therefore was "no reason to impute the [forum state] contacts to the co-conspirators."[451] Nor was the Second Circuit persuaded by plaintiff's argument that "Defendants conspired not only to manipulate LIBOR, but also 'to earn profits' from that manipulation."[452] It concluded that "financial self-interest is not the same as furthering a conspiracy through California-directed sales, and nowhere in Schwab's complaint are there allegations that Defendants undertook such sales as part of the alleged conspiracy."[453]

The Foreign Defendants argue that the Court should grant their motion to dismiss on the basis of *Charles Schwab* because "the alleged manipulation of BBSW – an Australian benchmark interest rate – was not caused by any transactions that any Defendant entered into in the United States."[454] Moreover, defendants argue, "such transactions would not be 'acts in furtherance of' the alleged conspiracy even if defendants had 'also [conspired] "to earn profits" from that manipulation.'"[455]

Plaintiffs argue that the "reputation-based" conspiracy alleged in *Charles Schwab*

---

[450]

*Id.* at 87 (citation omitted).

[451]

*Id.*

[452]

*Id.* (citation omitted).

[453]

*Id.*

[454]

Def. Letter of March 6, 2018, at 4 (emphasis omitted).

[455]

*Id.* (quoting *Charles Schwab Corp.*, 883 F.3d at 87).

should be distinguished from the "profit-motivated" conspiracy alleged here.[456]  They point to *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*,[457] in which the court considered an alleged conspiracy to manipulate CHF LIBOR.  The court there held that certain defendants were subject to specific personal jurisdiction because the "effects on CHF LIBOR-based derivatives in the United States" were "the *purpose* of defendants' manipulation."[458]  Reasoning that "[w]here the goal of the manipulation is to profit wrongfully from transacting in a product, the places where those transactions occur (not just the places where the price manipulation took place) are jurisdictionally relevant," the court concluded that "transacting in CHF LIBOR-based derivatives in the United States after manipulating CHF LIBOR for the purpose of wrongfully increasing the profits of those transactions constitute[d] 'purposeful availment' of the forum."[459]

But in *Charles Schwab*, which postdates *Sonterra*, the alleged conspiracy was undertaken both because "[b]y understating their true borrowing costs, Defendants were able to project an image of financial stability to investors who were sensitive to risks associated with major banks following the financial crisis that began in 2007" *and* because "[s]uppressing LIBOR . . . had the immediate effect of lowering Defendants' interest payment obligations on financial instruments

---

[456]

Pl. Letter of March 12, 2018, at 3; *see id.* (arguing that defendants here "could only achieve their conspiratorial goal of extracting higher (illegitimate) profits on their BBSW-[B]ased [D]erivatives transactions by ripping off innocent BBSW-[B]ased [D]erivatives investors like Plaintiffs and others similarly situated in the United States").

[457]

277 F. Supp. 3d 521 (S.D.N.Y. 2017).

[458]

*Id.* 591.

[459]

*Id.* at 591-92.

tied to LIBOR."[460]  Accordingly, the conspiracy to manipulate LIBOR alleged in *Charles Schwab*

was indeed motivated in part by financial incentives.  On this basis, the Court concludes that *Charles*

*Schwab* controls here and precludes a finding of personal jurisdiction – whether through the Foreign

Defendants' direct transactions in BBSW-Based Derivatives with plaintiffs or through a conspiracy

theory of jurisdiction – over plaintiffs' federal claims on the basis of the Foreign Defendants'

transactions in BBSW-Based Derivatives in the United States.[461]

       Plaintiffs assert in the alternative that Foreign Defendants are subject to personal

jurisdiction because their conspiracy, the conduct of which took place entirely outside of the United

States, nonetheless was purposefully directed at the United States.[462]

       To satisfy the effects test, a defendant's conduct must have been "expressly aimed"

at the forum.[463]  To that end, the relationship between the defendant and the forum must have arisen

"out of contacts that the 'defendant *himself*,'" as opposed to the plaintiff or third parties, created with

the forum.[464]  Moreover, the "analysis looks to the defendant's contacts with the forum State itself,

---

[460]

    *Charles Schwab Corp.*, 883 F.3d at 78; *see also* No. 1:11-md-02262-NRB DI 672 at 21 (amended complaint in *Charles Schwab*).

[461]

    The Court notes also that certain of plaintiffs' allegations concerning the Foreign Defendants' transactions in the United States attribute such transactions to corporate families and fail to distinguish between parent and subsidiary entities.  In these cases, personal jurisdiction is precluded on the additional basis that the allegations are "insufficiently 'individualized' to make out a *prima facie* case of personal jurisdiction."  *Charles Schwab Corp.*, 883 F.3d at 84.

[462]

    DI 153 at 16-21.

[463]

    *Licci ex rel. Licci*, 732 F.3d at 173.

[464]

    *Walden*, 571 U.S. at 284 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)); *id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

not the defendant's contacts with persons who reside there."[465]  It thus is "insufficient to rely on a

defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with

the forum to establish specific jurisdiction."[466]  Indeed even "the fact that harm in the forum is

foreseeable . . . is insufficient . . . [to] establish[] specific personal jurisdiction over a defendant."[467]

On this basis, the Second Circuit has interpreted Supreme Court jurisprudence to "suggest that a

defendant's mere knowledge that a plaintiff resides in a specific jurisdiction would be insufficient

to subject a defendant to specific jurisdiction in that jurisdiction if the defendant does nothing in

connection with the tort in that jurisdiction."[468]

     In *Charles Schwab*, the Second Circuit concluded that the effect of defendants'

conduct on California markets merely was foreseeable.[469]  Plaintiffs here argue that "[t]he Bank

Defendants planned their conduct based on each bank's 'net BBSW exposure' . . . aggregating the

value of positions across the entire bank, including transactions in the United States with U.S.

---

[465]

       *Id.* at 285; *see also id.* ("[T]he plaintiff cannot be the only link between the defendant and the forum.  Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him."); *id.* at 287 (explaining that in *Calder v. Jones*, the Court focused "the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story"); *Waldman*, 835 F.3d at 337-38 (concluding court lacked personal jurisdiction because terrorist attacks in Jerusalem in which U.S. nationals were killed were "random[ly] and fortuitous[ly]" connected to U.S. victims and "the Constitution requires much more purposefully directed contact with the forum").

[466]

       *Waldman*, 835 F.3d at 337 (quoting *Walden*, 571 U.S. at 286 (quoting *Burger King Corp.*, 471 U.S. at 475)) (internal quotation marks omitted).

[467]

       *Id.* at 339 (internal quotation marks and citations omitted).

[468]

       *Id.* at 338 (discussing *Walden*).

[469]

       *Charles Schwab Corp.*, 883 F.3d at 87-88.

investors."[470]  In plaintiffs' view, such misconduct "was 'expressly aimed' at the United States because the net BBSW exposure calculation always included U.S. transactions," resulting in the "perpetual[] victimiz[ation]" of U.S. customers."[471]  Indeed, these allegations set the Foreign Defendants' alleged conspiracy to manipulate BBSW apart from the LIBOR manipulation conspiracy in *Charles Schwab*, in which the defendants persistently suppressed LIBOR by submitting artificially low rates with no alleged regard to their in-forum LIBOR-based transactions.

Nonetheless, plaintiffs' arguments are unavailing.  The Foreign Defendants may indeed have incorporated their U.S.-based BBSW-Based Derivatives transactions into the calculation of their respective exposures to the rates.  But their conduct is connected more readily to the counterparties on their BBSW-Based Derivatives transactions, not the forum in which such transactions took place or where such counterparties were located.

This case can be analogized to *Walden v. Fiore*,[472] in which a group of airline passengers sued a police officer for violating their Fourth Amendment rights by seizing money from them in Georgia during the passengers' return trip to Nevada and then delaying the return of such monies.  The Supreme Court concluded that the police officer was not subject to specific personal jurisdiction in Nevada.  It reasoned that the officer had not formed any jurisdictionally relevant contacts with Nevada – the alleged intentional tort had not taken place in Nevada and the officer's only connection to the forum was that he allegedly had directed his conduct at plaintiffs whom he

---

[470]  DI 153 at 17.

[471]  *Id.* at 18.

[472]  571 U.S. 277 (2014).

knew had Nevada connections.[473] The plaintiffs' argument there that they had suffered "injury" caused by the defendant's allegedly tortious conduct in the forum – in that the passengers suffered from the delay of the return of their cash while they were in Nevada – similarly was unavailing. The Court concluded that "mere injury to a forum resident is not a sufficient connection to the forum" and that "[r]egardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State."[474]

Here, the Foreign Defendants are alleged to have engaged in calculating their exposure to BBSW-Based Derivatives while they were outside of the United States. That plaintiffs and the purported class members were in the United States and suffered from diminished returns on their BBSW-Based Derivatives transactions does not serve to connect the Foreign Defendants to the United States for jurisdictional purposes. There are no allegations that the Foreign Defendants expressly aimed their conduct at the forum – just that they expressly aimed their conduct at counterparties to BBSW-Based Derivative transactions around the world, some of whom happened to be in the United States. Plaintiffs' allegations that the United States was a substantial market for BBSW-Based Derivatives speak only to the foreseeability of the effect of the Foreign Defendants' conduct in the United States. Such contacts therefore are too "random, fortuitous, [and] attenuated"[475] to be a basis for the Court's exercise of personal jurisdiction over Foreign Defendants.

Because the Court has concluded that the Foreign Defendants lack sufficient

---

[473]  *Id.* at 289.

[474]  *Id.* at 290.

[475]  *Waldman*, 835 F.3d at 337 (quoting *Walden*, 571 U.S. at 286 (quoting *Burger King Corp.*, 471 U.S. at 475)) (internal quotation marks omitted).

minimum contacts, it need not consider "whether the assertion of personal jurisdiction would comport with fair play and substantial justice."[476]

## B. *Personal Jurisdiction Arising from Defendants' Consent*

### 1. *ISDA Master Agreements*

Plaintiffs next argue that the FrontPoint Plaintiffs' claims against Credit Suisse and Macquarie Bank Ltd. arise from transactions related to ISDA Master Agreements that contain consents to personal jurisdiction in New York.[477] They point specifically to two ISDA Master Agreements, which they alleged were in force during the Class Period and governed by New York law and pursuant to which these defendants transacted in BBSW-based swaps with the FrontPoint Plaintiffs.[478]

As an initial matter, it is unclear whether plaintiffs intend to allege that Credit Suisse Group AG or Credit Suisse AG entered into an ISDA Master Agreement with the FrontPoint Plaintiffs. The amended complaint states that these two defendants are referred to collectively as "Credit Suisse,"[479] and neither plaintiffs' brief nor the alleged ISDA Master Agreement itself specifies the Credit Suisse entity, or entities, that is party to the contact.[480] Plaintiffs' allegations as

---

[476]

*Licci ex rel. Licci*, 732 F.3d at 170 (quoting *Burger King Corp.*, 471 U.S. at 476).

[477]

DI 153 at 21-22.

[478]

*See* DI 154-3, DI 154-7.

[479]

AC at ¶ 146.

[480]

DI 154-7 at 1.

to Credit Suisse therefore are insufficiently individualized to make a *prima facie* showing that either Credit Suisse entity consented to personal jurisdiction in New York.[481]

With respect to Macquarie Bank Ltd., however, plaintiffs highlight an ISDA Master Agreement between Macquarie Bank Ltd. and FrontPoint Event Driven dated September 8, 2009.[482] Section 13 of the Agreement provides that when an ISDA Master Agreement is governed by New York law, "[w]ith respect to any suit, action, or proceedings related to this Agreement . . . each party irrevocably . . . submits to . . . the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City."[483] The schedule attached to this ISDA Master Agreement provides that the Agreement is governed by New York state law.[484] Finally, plaintiffs have produced an Equity Swap Transaction Confirmation, which "forms part of and is subject to, the ISDA Master Agreement dated as of 08 September 2009 . . . between Macquarie Bank Limited and [FrontPoint Even Driven],"[485] and which contemplates

---

[481]

    *See Charles Schwab Corp.*, 883 F.3d at 84.

[482]

    DI 154-3.

    As discussed above, plaintiffs FrontPoint Financial Services Fund, L.P. and FrontPoint Financial Horizons Fund, L.P. lack standing to assert their claims. Accordingly, the Court considers only the alleged ISDA Master Agreement to which FrontPoint Event Driven is party.

[483]

    DI 154-3 at 12.

[484]

    D 154-4 at ECF 13.

[485]

    DI 154-13 at ECF 2.

an equity swap with a "Floating Rate Option" of "AUD-BBR-BBSW."[486] This is sufficient to make a *prima facie* showing that defendant Macquarie Bank Ltd. consented to the exercise of personal jurisdiction in respect of each of the claims asserted by FrontPoint Event Driven in this case.

2.    *New York Banking Laws*

Plaintiffs next argue that defendants BNP Paribas S.A., Credit Suisse AG, Deutsche Bank AG, Lloyds Bank plc, and Macquarie Bank Ltd. have consented to general personal jurisdiction in New York by virtue of having registered to do business in New York under New York Banking Law § 200 and appointed the Superintendent of the NYSDFS as their agent for service of process.[487]

New York Banking Law § 200 provides, in relevant part:

"No foreign banking corporation . . . shall transact [banking business] in this state . . . unless such corporation shall have: . . .

"(3) Filed in the office of the superintendent . . . a duly executed instrument in writing, by its terms of indefinite duration and irrevocable, appointing the superintendent and his or her successors its true and lawful attorney, *upon whom all process in any action or proceeding against it on a cause of action arising out of a transaction with its New York agency or agencies or branch or branches, may be served with the same force and effect as if it were a domestic corporation and had been lawfully served with process within the state.*"[488]

---

[486]

*Id.* at ECF 4.

[487]

DI 153 at 22-25.

[488]

N.Y. BANKING LAW § 200(3) (emphasis added).

Plaintiffs point also to New York Banking Law § 200-b, which provides, in relevant part:

"[A]n action or special proceeding against a foreign banking corporation may be maintained by . . . a non-resident in the following cases only: . . . – where the defendant is a foreign banking corporation doing business in this state." *Id.* § 200-b(2)(e).

Plaintiffs rely on four cases, each of which is either not precedential, unpersuasive, or both.

In *Varga v. Credit Suisse*,[489] the then-exiled president of Hungary sued Credit Suisse demanding that the latter release to him funds that had been deposited with the bank as a safety net for his government if it ever were exiled from the country. The New York Supreme Court rejected as "untenable" the argument that Section 200(3) "should be construed as a limitation on the causes of action for which foreign banks may be sued in this state."[490] This section, it held, "merely limits the actions in which the Superintendent may be served."[491] Even if *Varga* were controlling, it does not indicate affirmatively that Section 200(3) provides for general personal jurisdiction. Nor has it been cited for such a proposition.

Plaintiffs point also to two cases in which courts concluded that a defendant from outside of the forum state had consented to personal jurisdiction for purposes of responding to information subpoenas served in order to enforce money judgments.[492] The context in those cases,

---

Reliance on this statute is unpersuasive as the New York Court of Appeals, in *Indosuez Int'l Fin. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 248 (2002), has indicated that Section 200-b provides for subject-matter jurisdiction, rather than personal jurisdiction, over claims against foreign parties.

[489]

155 N.Y.S.2d 655 (Sup. Ct. N.Y. Co. 1956).

[490]

*Id.* at 658.

[491]

*Id.*

[492]

*See Vera v. Republic of Cuba*, 91 F. Supp. 3d 561, 570-71 (S.D.N.Y. 2015), *rev'd on other grounds*, 867 F.3d 310 (2d Cir. 2017); *accord In re B&M Kingstone, LLC v. Mega Int'l Commercial Bank Co., Ltd.*, 131 A.D.3d 259, 265-67, 15 N.Y.S.3d 318, 322-24 (1st Dept. 2015).

however, was distinct from that before this Court.[493]  Indeed, in a subsequent case, Judge Hellerstein, who authored one of the judgment creditor cases, concluded in the context of a benchmark rate manipulation case related to Singaporean bank rates that "the questions and concerns raised in *Vera* [we]re not present [t]here"[494] because *Vera* "concerned whether a foreign bank with branches registered in New York must identify assets of judgment debtors over which it has custody, regardless of where the particular branches holding those assets might be located."[495]

Finally, plaintiffs point to *Brown v. Lockheed Martin Corporation*,[496] which held that a Connecticut banking registration statute could not subject registrants to general personal jurisdiction.[497]  The Second Circuit there stated in *dicta* that "the registration statute in the state of New York has been definitively construed" to "plainly advise the registrant that enrolling in the state as a foreign corporation and transacting business will vest the local courts with general jurisdiction over the corporation."[498]  In support of this statement, however, *Brown* cited a law review article

---

[493]

      *Vera*, 91 F. Supp. 3d at 564-65, 571-72 (limiting scope of opinion to "information subpoenas issued to a New York branch in the course of discovery relating to post-judgment execution proceedings").

[494]

      *FrontPoint Asian Event Driven Fund, L.P.*, 2017 WL 3600425, at *4.

[495]

      *Id.*

[496]

      814 F.3d 619 (2d Cir. 2016).

[497]

      *Id.* at 641 ("[I]n the absence of a clear legislative statement and a definitive interpretation by the Connecticut Supreme Court and in light of constitutional concerns, we construe Connecticut's registration statute and appointment of agent provisions not to require registrant corporations that have appointed agents for service of process to submit to the general jurisdiction of Connecticut courts.").

[498]

      *Id.* at 640.

which referred only to New York Business Corporation Law § 1301, not New York Banking Law § 200.[499]

Plaintiffs therefore have offered no legal basis upon which the Court should find that the applicable defendants consented to general personal jurisdiction by virtue of their registration under New York Banking Law § 200. The plain language of the statute suggests that, if anything, a banking corporation that registers under this statute would be subject to jurisdiction only in respect of a "cause of action arising out of a transaction with its New York agency or agencies or branch or branches,"[500] rather than any and all claims, as would be the case in a grant of general jurisdiction.[501] And just as plaintiffs' allegations did not amount to a plausible showing that the Foreign Defendants engaged in suit-related conduct in the United States sufficient to satisfy the minimum contacts threshold, so have plaintiffs failed to plead that their claims arise out of transactions with defendants' New York agencies or branches.

---

[499]

*Id.* (citing Tanya J. Monestier, *Registration Statutes, General Jurisdiction, and the Fallacy of Consent*, 36 CARDOZO L. REV. 1343, 1344-45 & nn. 2 & 4 (2015)).

[500]

N.Y. BANKING LAW § 200(3).

[501]

*See Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 586-87 ("Section 200(3) provides for service of process on a cause of action arising out of a transaction with the foreign bank's New York agency or agencies or branch or branches. The most natural reading of the provision does not provide general jurisdiction." (internal quotation marks and citations omitted)); *FrontPoint Asian Event Driven Fund, L.P.*, 2017 WL 3600425, at *4 ("By its express terms, this statute limits a foreign bank's consent to suits 'arising out of a transaction with its New York agency or agencies or branch or branches,' and is thus relevant only to specific jurisdiction, not general jurisdiction. Courts have been virtually unanimous in concluding that this statute does not provide for general jurisdiction."); *Sullivan*, 2017 WL 685570, at *39 ("The statute does not establish a consent to jurisdiction by the branch's foreign parent, and courts in this District have uniformly rejected plaintiffs' argument."); *7 West 57th Street Realty Co., LLC v. Citigroup, Inc.*, No. 13 Civ. 981 (PGG), 2015 WL 1514539, at *11 (S.D.N.Y. Mar. 31, 2015) ("The plain language of this provision limits any consent to personal jurisdiction by registered banks to *specific* personal jurisdiction.").

On this basis, the Court concludes that none of BNP Paribas S.A., Credit Suisse AG, Deutsche Bank AG, Lloyds Bank plc, or Macquarie Bank Ltd. has consented to general personal jurisdiction in New York by virtue of their registration under New York Banking Law § 200.

### C  Pendent Jurisdiction

To this point, the Court's discussion of personal jurisdiction has focused on plaintiffs' federal law claims. "The doctrine of pendent personal jurisdiction provides that 'where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available.'"[502]

With the exception of the claims asserted by FrontPoint Event Driven against Macquarie Bank Ltd., the Court has concluded that the plaintiffs have not made a *prima facie* showing that the Foreign Defendants are subject to personal jurisdiction in this Court. Accordingly, with the exception of Macquarie Bank Ltd., the Court is without a basis to exercise pendent jurisdiction over the Foreign Defendants in respect of plaintiffs' state law claims. As to Macquarie Bank Ltd., however, the Court agrees with plaintiffs[503] that the state law claims derive from "a common nucleus of operative fact" sufficient for the Court to assert personal jurisdiction in respect of FrontPoint Event Driven's state law claims.

---

[502]

*Charles Schwab Corp.*, 883 F.3d at 88 (quoting *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993)).

[503]

DI 153 at 4 n.5.

D.    *Jurisdictional Discovery*

Plaintiffs' final argument is that the "Court should decline to dismiss any Defendant before simple, targeted jurisdictional discovery has occurred," reasoning that defendants have "demonstrate[d] that much of the discoverable information remains exclusively in their hands by providing declarations and documents that only tell half the story, omitting any reference to their trades in the United States, use of U.S.-based personnel, facilities, and accounts, and consent to jurisdiction in ISDA Master Agreements."[504]  The Foreign Defendants respond that "[j]urisdictional discovery is inappropriate where, as here, Plaintiffs have failed to allege a *prima facie* case of jurisdiction."[505]

It is within the Court's discretion to allow jurisdictional discovery.[506]  Given that plaintiffs need only make a *prima facie* case for jurisdiction in order to *survive* a motion to dismiss pursuant to Rule 12(b)(2), it follows that the standard for allowing jurisdictional discovery is at least somewhat lower than that.  However, although plaintiffs broadly request jurisdictional discovery, they propose no actual plan for such discovery on the limited question of whether the Foreign Defendants are subject to personal jurisdiction in this Court.  In the circumstances, it would be inappropriate to permit limitless discovery at this stage of the proceedings.

---

504

*Id.* at 30.

505

DI 164 at 15 (citations omitted).

506

*Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 599 (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 186 (2d Cir. 1998)).

*Conclusion*

Defendants' motions to dismiss each are granted in part and denied in part, as follows:

A.    The motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim [DI 132] is granted (except as to defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.) to the following extent:

      (1)    All claims brought by plaintiffs FrontPoint Financial Services Fund, L.P. and FrontPoint Financial Horizons Fund, L.P. are dismissed;

      (2)    Plaintiffs do not have class standing to assert claims for breach of the implied covenant of good faith and fair dealing or unjust enrichment on behalf of purported class members to the extent such class members traded in BBSW-based forward rate agreements and 90-day BAB futures;

      (3)    The CEA claims brought by FrontPoint Asian Event Driven Fund, L.P. and Sonterra Capital Master Fund, Ltd. are dismissed;

      (4)    The remaining CEA and RICO Act claims are dismissed as to defendants Deutsche Bank AG, Royal Bank of Canada, RBC Capital Markets LLC, Lloyds Banking Group plc, Lloyds Bank plc, Macquarie Group Ltd., Macquarie Bank Ltd., Morgan Stanley, Morgan Stanley Australia Limited, ICAP plc, ICAP Australia Pty Ltd., Tullett Prebon plc, and Tullett Prebon (Australia) Pty Ltd.;

      (5)    The claims of breach of the implied covenant of good faith and fair dealing and unjust enrichment are dismissed as to all defendants except Macquarie Bank Ltd., Morgan Stanley, and Morgan Stanley Australia Limited, and

The motion [DI 132] is denied in all other respects.

B.    The motion to dismiss for lack of personal jurisdiction and improper venue [DI 109] is granted in all respects except that it is denied as to the claims brought by FrontPoint Asian Event Driven Fund, L.P. against defendant Macquarie Bank Ltd.

C.    Plaintiffs' request for jurisdictional discovery is denied without prejudice to their renewing such request within thirty (30) days after the date of entry hereof.

Any motion for leave to amend must be made no later than thirty (30) days after the date of entry hereof.

SO ORDERED.

Dated:          November 26, 2018

_____
Lewis A. Kaplan
United States District Judge