## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD DENNIS, SONTERRA CAPITAL MASTER FUND, LTD., FRONTPOINT FINANCIAL SERVICES FUND, L.P., FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., FRONTPOINT FINANCIAL HORIZONS FUND, L.P., AND ORANGE COUNTY EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>                           Plaintiffs,<br><br>                    -against-<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., BNP PARIBAS, S.A., THE ROYAL BANK OF SCOTLAND GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, RBS N.V., RBS GROUP (AUSTRALIA) PTY LIMITED, UBS AG, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD., COMMONWEALTH BANK OF AUSTRALIA, NATIONAL AUSTRALIA BANK LIMITED, WESTPAC BANKING CORPORATION, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, HSBC BANK AUSTRALIA LIMITED, LLOYDS BANKING GROUP PLC, LLOYDS BANK PLC, MACQUARIE GROUP LTD., MACQUARIE BANK LTD., ROYAL BANK OF CANADA, RBC CAPITAL MARKETS LLC, MORGAN STANLEY,  MORGAN STANLEY AUSTRALIA LIMITED, CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, ICAP PLC, ICAP AUSTRALIA PTY LTD., TULLETT PREBON PLC, TULLETT PREBON (AUSTRALIA) PTY LTD., AND JOHN DOES NOS. 1-50.<br><br>                           Defendants. | Docket No. 16 CV 6496<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 6

PARTIES ................................................................................................................................. 44

SUBSTANTIVE ALLEGATIONS ....................................................................................... 101

   I. Background............................................................................................................... 101

     A. The Money Market .......................................................................................... 101

     B. Australian Prime Banks ................................................................................... 103

     C. The BBSW Fixing............................................................................................ 105

     D. BBSW-Based Derivatives ............................................................................... 107

       1. BBSW-Based Swaps.................................................................................... 107

       2. BBSW-Based Forward Rate Agreements................................................... 108

       3. CME Australian Dollar Futures Contracts ................................................. 109

       4. Australian Dollar Foreign Exchange Swaps & Forwards................................. 109

       5. 90-Day Bank Accepted Bill Futures .......................................................... 110

   II. Defendants Agreed to and Did Restrain Trade In, and Intentionally Manipulated
      the Prices of, BBSW-Based Derivatives................................................................. 111

     A. Defendants Rigged BBSW by Coordinating Manipulative Transactions within the Fixing
       Window............................................................................................................ 111

       1. Defendants manipulated BBSW by artificially increasing or decreasing
         the supply of Prime Bank Bills during the Fixing Window................................. 112

       2. The Bank Defendants shared information regarding their net BBSW
         rate exposure to align interests on the direction of the manipulation ........................... 117

       3. Defendants coordinated manipulative trades to maximize their impact
         on BBSW rates.......................................................................................... 122

     B. The Broker Defendants Actively Participated in the Conspiracy by Facilitating Manipulative
       Trading for the Bank Defendants ..................................................................... 126

     C. Defendants Used their Dominant Positions in the AFMA and the AFMA Market
       Committees to Maintain their Ability to Manipulate BBSW ................................. 130

     D. Defendants Conspired to Create Special Positions and Reorganized their
       Trading Desks to Facilitate Manipulative Transactions........................................... 132

     E. Defendants Made False BBSW Submissions in Violation of AFMA Rules ........................ 134

i

F. ASIC's Investigation into Defendants' Conduct ..................................................... 136

III. Plaintiffs Transacted in BBSW-Based Derivatives at Artificial Prices that were Proximately Caused by Defendants' Manipulative Conduct ............................. 137

A. Plaintiff Dennis ..................................................................................................... 137

B. Plaintiff Sonterra .................................................................................................. 138

C. FrontPoint Plaintiffs ............................................................................................ 140

TRADE AND COMMERCE ........................................................................................... 147

CLASS ACTION ALLEGATIONS .................................................................................. 148

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT .......................... 150

CLAIMS FOR RELIEF ..................................................................................................... 151

FIRST CLAIM FOR RELIEF ........................................................................................... 151

SECOND CLAIM FOR RELIEF ...................................................................................... 153

THIRD CLAIM FOR RELIEF .......................................................................................... 154

FOURTH CLAIM FOR RELIEF ...................................................................................... 154

FIFTH CLAIM FOR RELIEF ........................................................................................... 155

SIXTH CLAIM FOR RELIEF .......................................................................................... 159

SEVENTH CLAIM FOR RELIEF .................................................................................... 160

EIGHTH CLAIM FOR RELIEF ....................................................................................... 161

PRAYER FOR RELIEF ..................................................................................................... 162

DEMAND FOR JURY TRIAL .......................................................................................... 163

Plaintiffs Richard Dennis, Sonterra Capital Master Fund, Ltd., FrontPoint Financial Services Fund L.P., FrontPoint Asian Event Driven Fund, L.P., FrontPoint Financial Horizons Fund, L.P., and Orange County Employees Retirement System ("OCERS") (collectively, "Plaintiffs") complain upon knowledge as to themselves and their acts and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 170-370) for their violations of law from at least January 1, 2003 through the date on which the effects of Defendants' unlawful conduct ceased ("Class Period") as follows:

## INTRODUCTION

1.      Defendants are horizontal competitors that deal in financial products priced, benchmarked, and/or settled based on the Bank Bill Swap Reference Rate ("BBSW"). BBSW is administered by the Australian Financial Markets Association (the "AFMA")—a trade group formed by Defendants—and is intended to represent the cost of borrowing funds in the Australian interbank money market based on actual transactions occurring between 9:55 A.M. and 10:05 A.M. Sydney Time (the "Fixing Window").

2.      (a) BBSW-Based Derivatives are financial instruments that incorporate BBSW as a component of price. More than $1 trillion in BBSW-Based Derivatives traded "over-the-counter," directly between counterparties, within the United States during the month of April 2013 alone. In total, trillions of dollars of BBSW-Based Derivatives traded over-the-counter and on public exchanges within the United States during the Class Period.

(b) Plaintiffs and Class members who transacted in the United States are the "end users" of BBSW and BBSW-Based Derivatives who, in the zero sum game of derivatives trading, were the persons injured by Defendants' horizontal conspiracy to manipulate prices in favor of the Defendants' derivatives trading positions. As Defendants' unlawful conspiracy and manipulation made more money for the Defendants, it caused greater injury to Plaintiffs and the Class members

1

transacting here in the United States. As reflected in Defendants' communications with one another, Defendants were well aware and fully intended that their conspiracy to benefit themselves would disadvantage the "end users" including Plaintiffs and the Class transacting in the United States. *See e.g.* ¶ 10, *infra*.

3.      In 2016 and 2017, the Australian Securities and Investments Commission ("ASIC") initiated proceedings against four BBSW panel banks – Defendants Australia and New Zealand Banking Group Limited ("ANZ"), Westpac Banking Corporation ("Westpac"), National Australia Bank Limited ("NAB"), and Commonwealth Bank of Australia ("CBA") – revealing rare "smoking gun" evidence, including emails, phone calls, and electronic chats, demonstrating a conspiracy among BBSW panel banks and interdealer brokers to fix the prices of BBSW-Based Derivatives. As a result of these proceedings, ASIC has so far recovered a total of $128.3 million Australian dollars ("AUD").[1]

4.      This evidence of collusion follows ASIC's 2013 and 2014 settlements with Defendants UBS, Royal Bank of Scotland, and BNP Paribas, in which those BBSW panel members admitted to making false BBSW submissions to manipulate the rate for their financial benefit.

5.      These settlements and new collusive communications released in ASIC's filings show that Defendants fixed BBSW-Based Derivatives prices using multiple means, including: (1) engaging in manipulative money market transactions during the BBSW Fixing Window; (2) making false BBSW rate submissions that did not reflect actual transaction prices; (3) uneconomically buying or selling money market instruments at a loss to cause artificial derivatives prices; and (4) sharing proprietary information to align interests and avoid conduct that could harm co-conspirators.

---

[1] ANZ and NAB settled for $50 million AUD each, and CBA settled for $25 million AUD. Justice Jonathan Beach imposed a penalty of $3.3 million AUD on Westpac after a bench trial, an amount he described as "clearly inadequate."

6.     Defendants generated hundreds of millions of dollars in illicit profits by artificially fixing BBSW-Based Derivatives prices at levels that benefited their trading books. For example, during the Class Period ANZ calculated that it had daily BBSW exposures of $6 billion, meaning ANZ had the potential to make or lose $125,000 per "basis point," *i.e.*, one hundredth of one percent (0.01%), change in the daily BBSW fixing. Relying on this calculation, ANZ senior management conservatively estimated that taking an "aggressive" approach to manipulating BBSW would result in at least $30 million in illicit profit *per basis point, per year*.

7.     The Bank Defendants[2] further institutionalized BBSW manipulation by designating a senior trader, known as the "Single Face to Market" or known as "the powerful owl" at Commonwealth Bank, to coordinate manipulative transactions with Broker Defendants ICAP and Tullett Prebon in advance of the Fixing Window. For example, while serving as ANZ's Single Face to Market, Paul Woodward messaged Broker Defendant Tullett Prebon just before the Fixing Window on February 28, 2011: "*I've got a big set already and I'll be pushing the fuck out of it.*" Broker Defendants were more than happy to execute these manipulative transactions because their massive size — often billions of Australian dollars — generated huge illicit commission payments from the Bank Defendants involved in manipulating the BBSW fix.

8.     Defendants manipulated BBSW so frequently that traders often joked about how easy it was to fix the rate. When one ANZ trader sarcastically commented "lucky the rate sets are all legit and there is no manipulation within the Australian financial system," his colleague replied "ahahah." In another instance, a trader at Commonwealth Bank sent a cartoon bus with "BBSW" written on the side to a co-conspirator at Westpac. The Westpac trader, acknowledging that both

---

[2] JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; BNP Paribas, S.A.; The Royal Bank of Scotland Group Plc; RBS N.V.; RBS Group (Australia) Pty Limited; UBS AG; Australia and New Zealand Banking Group Limited; Commonwealth Bank of Australia; National Australia Bank Limited; Westpac Banking Corporation; Deutsche Bank AG; HSBC Holdings Plc; HSBC Bank Australia Limited; Lloyds Banking Group Plc; Lloyds Bank Plc; Macquarie Group Ltd.; Macquarie Bank Ltd.; Royal Bank of Canada, RBC Capital Markets LLC; Morgan Stanley, Morgan Stanley Australia Limited, Credit Suisse Group AG, and Credit Suisse AG are collectively referred to as the "Bank Defendants."

had successfully manipulated the BBSW fix that day, jokingly replied: "You been run over by that

big fat bus? … saw the lovely cba having a small lash as well. . .nice work!"

9.      Defendants' ultimate goal was to increase the profitability of their BBSW-Based

Derivatives positions. Defendants openly discussed the callous nature of their conspiracy, including

the fact that the profits reaped by manipulating BBSW came at the expense of their customers. For

example, in a September 2009 chat, ANZ trader Carina Wong, a fixed income trader at ANZ,

described how ANZ extracted excess profits from "custy," *i.e.*, customer, positions by manipulating

BBSW:

> I mainly take positions in babs, futures, ibs, ois, curve, nothing fancy
> – typical fixed income[.] I do the rateset in the morning too – which is
> kinda fun it's all about moving the rate set, as there are large floating
> positions that build up due to all the swaps we do so whenever a custy
> wants to pay a swap, ie pay fixed, so, come the rate set day, we will
> short in that bucket yeah yeah – sorry, so that's the background, the
> reasons why you want to push it.

10.     In a similar June 2010 phone call, Westpac trader Colin "the Rat" Roden explained

how it was always the "end users" of BBSW-Based Derivatives who "get stiffed" by Defendants'

manipulative conduct:

> Some end users who don't know, you know, corporates and people
> who don't know who get stiffed by people… [a]nd then in two years'
> time there's some enquiry that you have been fucking with the rate set
> that's cost them all 10 basis points.

11.     Plaintiffs and Class members were the "end users" to whom Roden referred who

transacted in an *artificial* market and were otherwise disadvantaged by Defendants' concerted

conduct and manipulation. *See* Part III, *infra*.

12.     Defendants actively concealed their scheme from market participants and

government regulators, hampering investigations into the BBSW manipulation, including that by

ASIC, by refusing to turn over requested documents. NAB's obstructionist behavior forced ASIC to

seek an order compelling NAB to comply with four statutory notices requesting that it produce

4

certain documents and telephone conversations relevant to the BBSW investigation. At the hearing, a lawyer for ASIC indicated that this was not the first time NAB had stonewalled the government and refused to produce potentially incriminating evidence, telling the court that "[NAB] haven't complied and they are late ... these practices have been going on for a long, long time."

13.     ANZ, NAB, and CBA each settled the cases brought by ASIC by admitting to engaging in "unconscionable conduct." Judge Jagot, who approved the ANZ and NAB settlements, wrote that the public should be "shocked, dismayed, and disgusted" by these banks' conduct and declared that ANZ's and NAB's misconduct "involved a repeated failure to fulfil what would generally be perceived as the most basic standards of honesty, fairness and commercial decency." In responsive pleadings in Australia, ANZ, NAB, and Westpac admitted a substantial number of the allegations described in this Complaint. For example, ANZ, NAB, and Westpac admitted, *inter alia*, that (1) the electronic chats and telephone conversations described in this Complaint did in fact take place on the dates indicated, (2) the Prime Bank Bill transactions described in Part II, *infra*, occurred on the dates indicated, (3) the Defendants calculated BBSW rate exposures *i.e.*, the amount they stood to profit from an increase or decrease in BBSW, throughout the Class Period, (4) BBSW-based swaps, BBSW-based forward rate agreements, and Australian dollar foreign exchange swaps and forwards — described in Part I.D. *infra*, among other financial instruments, are settled by reference to BBSW, and (5) movements in BBSW cause parties to these financial instruments to pay more or receive less than they otherwise would have absent a change in BBSW.

14.     ASIC's investigation uncovered communications in which Defendants openly conspired to fix BBSW and the prices of BBSW-Based Derivatives. Plaintiffs have good reason to believe and do allege that the limited, public materials available to date are only the "tip of the iceberg." Given the persistent, pervasive, and secret nature of Defendants' multi-year conspiracy, as well as the negotiated nature of Defendants' public settlements, Plaintiffs believe that substantial

evidentiary support for the claims alleged will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. § 25, and Section 1964 of RICO, 18 U.S.C. § 1964. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

16.     Venue is proper in this District pursuant to, among other statutes, section 22 of the CEA, 7 U.S.C. § 25(c), §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, §1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1391(b), (c), and (d). One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

17.     Each Defendant transacts business, including in BBSW-Based Derivatives, throughout the United States and with counterparties located in the United States. For example, Defendants ANZ, CBA, BNP Paribas, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, Macquarie Bank, Morgan Stanley, NAB, Royal Bank of Canada ("RBC"), Royal Bank of Scotland ("RBS"), UBS, and Westpac traded foreign exchange and/or interest rate derivatives, including BBSW-Based Derivatives, in the United States throughout the Class Period.

18.     Defendants are the most active BBSW-Based Derivatives dealers in the country and the largest Australian dollar derivatives traders in the world. Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign

exchange market. This survey measures the "turnover," or volume of transactions, in foreign exchange and interest rate derivatives within the United States. The Federal Reserve Bank of New York survey only includes data from the largest dealers located within the United States and transactions that are located within the United States. Dealers located outside of the United States report their figures to the central bank where they are located.

19.     Defendants BNP Paribas, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Morgan Stanley, RBS, and UBS each participated in the Federal Reserve Bank of New York's survey of foreign exchange and interest rate derivatives dealers throughout the Class Period, indicating that they entered into foreign exchange and interest rate derivatives transactions, including transactions priced, benchmarked, and/or settled based on BBSW, from within the United States.

20.     In 2007, approximately $15 trillion in Australian dollar foreign exchange and interest rate derivatives, including derivatives priced and/or settled based on BBSW, were traded in the United States alone. In total, more than $100 trillion in Australian dollar foreign exchange and interest rate derivatives, which are priced and/or settled based on BBSW, were traded over-the-counter within the United States during the Class Period.

21.     Throughout the Class Period, the Australian dollar/United States dollar currency pair was by far the most widely traded currency pair involving the Australian dollar, accounting for roughly half of all foreign exchange contracts for which the Australian dollar was one leg of the transaction. For example, based on Reserve Bank of Australia survey data for April 2013, a larger volume of Australian dollar-denominated foreign exchange derivatives traded in the United States than in Australia during the Class Period.

22.     Defendants used electronic messaging, chatrooms, telephones, emails and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint. As a direct result of the

BBSW-related conduct alleged in this Complaint, Defendants purposefully directed false and manipulated BBSW rates to the United States market via Thomson Reuters, which published false BBSW rates to U.S. market participants who transacted in BBSW-Based Derivatives.

23.     From offices located in the United States, Defendants targeted United States counterparties for transactions that were priced and/or settled based on BBSW. Defendants' knew that their gains from fixing BBSW came at the expense of Plaintiffs FrontPoint, Sonterra, Dennis, and OCERS, *see* Part III, *infra*, and the other members of the Class. For example, at least Defendants Macquarie, Deutsche Bank, RBS, UBS, and Credit Suisse traded Australian dollar-denominated swaps with the FrontPoint Plaintiffs and Defendants Australia New Zealand Banking Group Limited, BNP Paribas, S.A., JPMorgan Chase Bank, N.A., HBSC Bank plc, Commonwealth Bank of Australia, Credit Suisse AG, Deutsche Bank AG, Royal Bank of Canada, Royal Bank of Scotland plc, UBS AG, and Westpac Banking Corporation transacted BBSW-based interest rate swaps and FX forwards directly with OCERS while these same Defendants were manipulating BBSW. *See* ¶¶ 494-534, *infra*.

24.     Defendants determined the direction they wanted to manipulate BBSW by calculating their net BBSW exposure, *i.e.*, the amount they stood to gain or lose from changes in BBSW, prior to the Fixing Window. Defendants included trades with United States-based counterparties in this BBSW exposure calculation and purposefully directed their conduct at the U.S. market to financially benefit these positions.

25.     U.S. market participants traded trillions of dollars in BBSW-Based Derivatives in the United States during the Class Period. Defendants, as BBSW contributor banks, members of the AFMA, and substantial players in the U.S. market for BBSW-Based Derivatives, knew that Thomson Reuters, Bloomberg, and other financial information services disseminated BBSW

throughout the United States. Defendants also knew that BBSW was used in the United States to price, benchmark and/or settle BBSW-Based Derivatives purchased, sold, or owned here.

26.     Defendants caused artificial BBSW rates, trade confirmations incorporating these false rates, and communications containing requests to manipulate these rates to be distributed over U.S. wires using servers located in the United States. Defendants' manipulative conduct, as alleged herein, had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce. Such direct effects injured Plaintiffs and give rise to Plaintiffs' claims under the Foreign Trade Antitrust Improvements Act.

27.     Defendants BNP Paribas, Credit Suisse, Deutsche Bank, Lloyds, and Macquarie Bank Ltd., registered their New York branch or representative or agency offices with the New York State Department of Financial Services ("NYSDFS") to do business in this state under New York Banking Law § 200-b. Defendants HSBC and Lloyds also registered wholly-owned subsidiaries, HSBC Bank N.A. and Lloyds Bank plc, respectively, with the NYSDFS.

28.     Defendants RBS and UBS are registered with the Connecticut Department of Banking under § 36a-428g of the Connecticut General Statutes.

29.     Defendant Tullett Prebon's swap execution facility, known as "tpSEF," is a wholly-owned subsidiary of Tullett Prebon and is permanently registered with the U.S. Commodity Futures Trading Commission ("CFTC"). TpSEF is headquartered in New Jersey.

30.     Defendants ICAP plc and Tullett Prebon plc, through subsidiaries ICAP Securities USA and Tullett Prebon Financial Services LLC, are registered with the Financial Industry Regulatory Authority ("FINRA") and the Securities and Exchange Commission (the "SEC").

31.     Each Bank Defendant is subject to enhanced supervision by the Board of Governors of the Federal Reserve System. Defendants Credit Suisse, Deutsche Bank, JPMorgan Chase & Co., Morgan Stanley, and UBS AG are members of the Federal Reserve Board ("FRB") of Governors'

Large Institution Supervision Coordinating Committee, which is designed to coordinate supervision of the largest, most systematically important financial institutions in the United States.

32.     Defendants employed personnel who were tasked with actively marketing and selling BBSW-Based Derivatives to investors located in the United States. For example, senior NAB trader Gavin Sheridan was the Head of Swap Trading UK and US and worked in the Rates business unit of NAB's Global Markets Division during the Class Period. Other Defendants similarly directed sales personnel to find counterparties for BBSW-Based Derivatives transactions in the United States.

33.     Defendants actively marketed and sold products that were settled based on BBSW from their trading desks located in the United States. Defendants established and maintained these trading desks for the purpose of entering into derivatives transactions, including foreign exchange and interest rate derivatives transactions, with counterparties located in the United States, including members of the Class.

34.     U.S.-based Defendants JPMorgan and Morgan Stanley formed part of the conspiracy to manipulate BBSW, as did domestic dealer subsidiaries HSBC Bank USA, N.A., and Morgan Stanley & Co. Limited. The other Defendants consciously chose to conspire with the U.S.-based Defendants to distort BBSW and the prices of BBSW-Based Derivatives traded in the United States. For example, on March 8, 2011, a trader at JPMorgan offered to help transfer Prime Bank Bills to an NAB trader to manipulate BBSW. *See* ¶ 450, *infra*. On another occasion, an NAB trader noted that Morgan Stanley had helped him to successfully fix the 6m BBSW rate and had shared its intention to sell Prime Bank Bills during the Fixing Window the next day, writing: "Great rate set for us today as we have a receive set in both 3 and 6mth… the main sellers were Morgan Stanley and Citi… MS has more to sell tom."

A.    **Defendants Consented to Personal Jurisdiction in this District Through ISDA Master Agreements and FEOMAs with OCERS.**

35.    **ISDA Master Agreements**. The International Swaps and Derivatives Association ("ISDA") is a trade association formed by dealer banks, including many of the Defendants. ISDA determines and promulgates industry-standard form contracts that facilitate trading between derivatives market participants. One such contract is an ISDA Master Agreement. An ISDA Master Agreement is a standard form agreement with 14 sections, designed so that parties who intend to enter into a series of over-the-counter derivative transactions can improve efficiency by agreeing in advance on certain terms that will apply in every trade. These forms are periodically updated by ISDA and identified by the year of the update, for example, the "1992 form" or "2002 form."

36.    Plaintiff OCERS executed hundreds of BBSW-Based Derivatives transactions, including interest rate swaps and FX forwards, with Defendants during the Class Period pursuant to the terms of an ISDA Master Agreement. *See* ¶¶ 53-82, 90-119, 127-155, *infra*. Each of OCERS's ISDA Master Agreements with the Defendants used either the 1992 or 2002 form. Each agreement was negotiated and executed from within the United States.

37.    The parties to each ISDA Master Agreement are required to make certain elections, such as which law will govern their agreement, where collateral for transactions should be wired, and who should be notified of any default event. These choices are typically reflected in the Schedule and Credit Support Annex, which are executed with the ISDA Master Agreement.

38.    The terms specified in the ISDA Master Agreement, Schedule, and Credit Support Annex are incorporated into and apply to each subsequent transaction entered into by the parties. This is codified by Section 1 of the 1992 and 2002 ISDA Master Agreement, which provides that "[a]ll Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this 'Agreement'), and the parties would not otherwise enter into any Transactions."

11

39.     Section 2 of the 1992 and 2002 ISDA Master Agreement provides that "[e]ach party will make each payment or delivery specified in each Confirmation[3] to be made by it, subject to other provisions of this Agreement," including that "[e]ach obligation . . .  is subject to (1) the condition precedent that no Event of Default or Potential Events of Default . . . has occurred and is continuing." Section 4 of the 1992 and 2002 ISDA Master Agreement further obliges each party to "comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party."

40.     The parties to an ISDA Master Agreement are also given the option to designate themselves as a "Multibranch Party" under Section 10 of the 1992 and 2002 form. Multibranch Parties act as a single entity for the purposes of a derivatives transactions and "may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule." Consistent with this single entity concept, Section 10(a) of the 1992 and 2002 ISDA Master Agreement further provides that:

---

[3] Section 9(e)(ii) of the 1992 and 2002 ISDA Master Agreement states that any form of written confirmation suffices to evidence a binding transaction:

The 2002 ISDA Master Agreement provides:

    (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

The 1992 ISDA Master Agreement provides:

    (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

> each party that enters into a Transaction through an Office other
> than its head or home office represents to the other party that,
> notwithstanding the place or booking office or jurisdiction of
> incorporation of such party, the obligations of such party are the
> same as if it had entered into the Transaction through its head or
> home office.

41.     Section 13 of the 1992 and 2002 ISDA Master Agreement requires parties to agree in advance on the substantive law that will govern their agreement and which forum will have jurisdiction to hear any disputes. There are two standard options for choice of law: the laws of the State of New York or English law. The parties typically indicate their selection in Part 4 of the Schedule attached to their ISDA Master Agreement. If New York law is selected, then under Section 13(b) of the 1992 and 2002 ISDA Master Agreement, the parties irrevocably submit to the "non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City." If English law is designated in the Schedule, the parties submit to the jurisdiction of the English courts.

42.     Section 13 of the 1992 ISDA Master Agreement states in relevant part:

> **13.     Governing Law and Jurisdiction**
> (a) ***Governing Law.*** This Agreement will be governed by and construed in accordance with the law specified in the Schedule.
>
> (b) ***Jurisdiction.*** With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—
>
> > (i) submits to the jurisdiction of the English Courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this agreement is expressed to be governed by the laws of the State of New York; and
> >
> > (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

43.     Section 13 of the 2002 ISDA Master Agreement states in relevant part:

> **13.     Governing Law and Jurisdiction**
> (a) ***Governing Law.*** This Agreement will be governed by and construed in
> accordance with the law specified in the Schedule.
>
> (b) ***Jurisdiction.*** With respect to any suit, action or proceedings relating to
> any dispute arising out of or in connection with this Agreement
> ("Proceedings"), each party irrevocably:—
>
>> (i) submits:—
>>
>>> (1) if this Agreement is expressed to be governed by English
>>> law, to (A) the non-exclusive jurisdiction of the English courts if
>>> the Proceedings do not involve a Convention Court and (B) the
>>> exclusive jurisdiction of the English courts if the Proceedings do
>>> involve a Convention Court; or
>>>
>>> (2) if this Agreement is expressed to be governed by the laws of
>>> the State of New York, to the non-exclusive jurisdiction of the
>>> courts of the State of New York and the United States District
>>> Court located in the Borough of Manhattan in New York City;
>>
>> (ii) waives any objection which it may have at any time to the laying of
>> venue of any Proceedings brought in any such court, waives any claim
>> that such Proceedings have been brought in an inconvenient forum
>> and further waives the right to object, with respect to such
>> Proceedings, that such court does not have any jurisdiction over such
>> party; and
>>
>> (iii) agrees, to the extent permitted by applicable law, that the bringing
>> of Proceedings in any one or more jurisdictions will not preclude the
>> bringing of Proceedings in any other jurisdiction.

44.     **FEOMA Master Agreements**. The Foreign Exchange and Options Master

Agreement ("FEOMA") operates much like the ISDA Master Agreement, establishing an industry-

accepted standardized contract for spot and forward foreign exchange transactions and currency

options. FEOMA was developed by the British Bankers' Association ("BBA") and the Foreign

Exchange Committee, an advisory committee sponsored by the Federal Reserve Bank of New York.

The standard FEOMA has 12 sections, designed so that parties who intend to enter into a series of

spot or forward exchange transactions or currency options can improve efficiency by agreeing in

advance on certain terms that will apply in every trade. Like the ISDA Master Agreement, the BBA updates the FEOMA periodically identifying the version of the form used by the year of the update (*e.g.*, the "1997 form").

45.     OCERS entered into hundreds of foreign exchange transactions, including Australian dollar foreign exchange forwards, with Defendants during the Class Period pursuant to the terms of a FEOMA. *See* ¶¶ 83-89, 120-26, 156-62, *infra*. Each FEOMA that OCERS entered with Defendants used the 1997 form. Each of these agreements were negotiated and executed from within the United States.

46.     The parties to each FEOMA are required to make certain elections, such as which law will govern their agreement, where collateral for transactions should be wired, and who should be notified of any default event. These choices are typically reflected in the Schedule to the FEOMA, which is executed with the FEOMA.

47.     The terms specified in the FEOMA and Schedule are incorporated into and apply to each subsequent transaction entered into by the parties. This is codified in Section 2 of the 1997 FEOMA, which provides that "[u]nless otherwise agreed in writing by the Parties, each FX Transaction and Option entered into between Designated Offices of the Parties on or after the Effective Date shall be governed by the Agreement."

48.     Section 12 of the 1997 FEOMA requires parties to agree in advance on the substantive law that will govern their agreement and which forum will have jurisdiction to hear any disputes. Part XIII of the Schedule provides two standard options for choice of law: New York or England. If the parties select New York, "each Party irrevocably submits to the non-exclusive jurisdiction of…the courts of the State of New York and the United States District Court located in

the Borough of Manhattan in New York City" with respect to any Proceedings arising under the agreement.[4]

49.     The parties to a FEOMA can also list "Designated Offices" in Part II of the Schedule. Designated Offices are considered to act as a single entity for the purposes of a transactions, as "each party...that enters into an FX Transaction or Option through an agency, branch, or office other than its head home office represents to the other Party...that, notwithstanding the place of booking office or jurisdiction or incorporation or organization of the first Party, the obligations of the first Party are the same as if it had entered into the FX Transaction or Option through its head or home office."

50.     OCERS employs several external asset managers to assist it in managing approximately $15 billion in assets. While OCERS enters into some ISDA Master Agreements and FEOMAs itself, at least three different external asset managers entered into ISDA Master Agreements and FEOMAs on OCERS' behalf with the Defendants.

51.     External asset managers routinely execute ISDA Master Agreements and FEOMAs with Defendants on behalf of multiple clients at once. In these circumstances, the ISDA Master Agreement has an "Appendix" listing the clients, *e.g.*, OCERS, that are parties to that agreement. The FEOMA likewise has an "Exhibit" listing the clients party to the agreement. These Appendices and Exhibits are periodically updated to add additional clients as parties to the ISDA Master Agreement or FEOMA that the external asset manager entered with Defendants on its clients' behalf. For example, an external asset manager may enter into an ISDA Master Agreement with a Defendant in 2003, which OCERS then becomes party to in 2008 as the result of an amended Appendix.

---

[4] In the form 1997 FEOMA, "Proceedings" is defined to include "any suit, action or other proceedings relating to the agreement, any FX Transaction or any Option."

52.     A dealer and customer will often execute dozens or hundreds of trades, if not more, pursuant to a single ISDA Master Agreement or FEOMA, which can stay in effect for years and cover a variety of OTC derivatives products. For example, Plaintiff OCERS entered into hundreds of BBSW-Based Derivative transactions pursuant to ISDA Master Agreements with Defendants Australia and New Zealand Banking Group Ltd.; BNP Paribas, S.A.; Commonwealth Bank of Australia; Credit Suisse AG; Deutsche Bank AG; Royal Bank of Canada; The Royal Bank of Scotland plc; UBS AG; and Westpac Banking Corporation. OCERS also entered into hundreds of BBSW-Based Derivative transactions pursuant to FEOMAs with Defendants Credit Suisse AG and UBS AG. The specific terms of certain example transactions that OCERS entered with Defendants and the relevant ISDA master agreement or FEOMA governing those trades are included below.

i.   OCERS's ISDA and FEOMA Governed Transactions with Defendants

1.   *Australia and New Zealand Banking Group Ltd.*

53.     ANZ entered into an ISDA Master Agreement with one of OCERS's external asset managers on February 14, 2007 (the "ANZ ISDA Master Agreement"). Ex. A, at 50-53.[5] The agreement used the 1992 form ISDA Master Agreement.

54.     The ANZ ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision states that each party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and
>
> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim

---

[5] Exhibits A-L were produced in redacted form to Plaintiff OCERS by OCERS's external asset managers. OCERS has not applied any additional redactions to these exhibits.

> that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

> Ex. A, at 13.

55.     The ANZ ISDA Master Agreement further provides that it governs any existing or subsequent transactions between ANZ and each entity listed on Appendix I to the Schedule to the ANZ ISDA Master Agreement, as defined in ¶ 56, *infra*. Ex. A, at 1.

56.     ANZ also executed a Schedule to the ANZ ISDA Master Agreement (the "Schedule to the ANZ ISDA Master Agreement") with OCERS's external asset manager on February 14, 2007. Ex. A, at 19. The Schedule to the ANZ ISDA Master Agreement provides that the agreement is entered into "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constitutes a separate agreement between ANZ and each respective entity listed in Appendix I. *Id.*

57.     ANZ designated itself as a "Multibranch Party" in the Schedule to the ANZ ISDA Master Agreement, stating that it may act through its offices in New York, among others, as well as any other office specified in a confirmation. *Id.*  ANZ also appointed its New York branch at 1177 Avenue of the Americas, New York, New York 10036, as its agent for service or process and all notices or communications arising under the agreement. Ex. A at 24-25.

58.     The parties to the ANZ ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of Part 4 of the Schedule to the ANZ ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

> Ex. A, at 26.

59.     On July 5, 2012, ANZ executed an Amended and Restated Appendix I to the

Schedule to the ANZ ISDA Master Agreement with OCERS's external asset manager. This

Amended and Restated Appendix I replaced the previous Appendix I and stated that the terms of

the ANZ ISDA Master Agreement applied to each "account listed on Appendix I to the Master

Agreement and the attached Revised Appendix I hereto." Ex. A, at 50.

60.     OCERS's account was one of the accounts listed in the Revised Appendix I to the

Schedule to the ANZ ISDA Master Agreement. Accordingly, OCERS became a party to the ANZ

ISDA Master Agreement, together with the Schedule to the ANZ ISDA Master Agreement, no later

than July 5, 2012.

61.     Pursuant to the ANZ ISDA Master Agreement, OCERS entered into at least 2

BBSW-based Australian dollar foreign exchange forward transactions with ANZ between July 16,

2014 and November 25, 2014, including the following examples:

   a.   One Australian dollar foreign exchange forward on July 16, 2014 agreeing to buy
        AUD 292,000 from ANZ on August 5, 2014 for $272,683.62;

   b.   One Australian dollar foreign exchange forward on November 25, 2014 agreeing to
        buy AUD 7,620,000 from ANZ on December 2, 2014 for $6,533,769.

62.     Under Section 1 of the ANZ ISDA Master Agreement, each of these BBSW-Based

Derivatives transactions was incorporated into and formed a single agreement with the ANZ ISDA

Master Agreement. *See* ¶ 38, *supra*. As a result, ANZ consented to personal jurisdiction for OCERS's

claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern

District of New York.

2.   *BNP Paribas, S.A.*

63.     BNP Paribas, S.A. entered into an ISDA Master Agreement (the "BNP Paribas

ISDA Master Agreement") with one of OCERS's investment advisers on August 5, 2005. Ex. B, at

75-76. The agreement used the 1992 form ISDA Master Agreement.

64.     The BNP Paribas ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision states that each party:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

> Ex. B, at 13.

65.     The BNP Paribas ISDA Master Agreement further provides that it governs any existing or subsequent transactions between BNP Paribas, S.A. and each entity listed on Appendix I to the Schedule to the BNP Paribas ISDA Master Agreement, as defined in ¶ 66, below. Ex. B, at 1.

66.     BNP Paribas, S.A. also executed a Schedule to the BNP Paribas ISDA Master Agreement (the "Schedule to the BNP Paribas ISDA Master Agreement") with OCERS's external asset manager on August 5, 2005. Ex. B, at 19. The Schedule to the BNP Paribas ISDA Master Agreement provides that the agreement is entered into "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constitutes a separate agreement between BNP Paribas and each respective entity listed in Appendix I. *Id.*

67.     BNP Paribas, S.A. designates itself as a "Multibranch Party" in the Schedule to the BNP Paribas ISDA Master Agreement, stating that it may act through its offices in New York, among others, as well as any other office specified in a confirmation. *Id.* BNP Paribas, S.A.

designated its New York branch at 787 Seventh Avenue, New York, NY 10019, as an appropriate office for all notices or communications arising from the agreement. Ex. B, at 24-25.

68.     The parties to the BNP Paribas ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of the Schedule to the BNP Paribas ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

> Ex. B, at 25.

69.     On March 14, 2008, BNP Paribas, S.A. executed an Amended and Restated Appendix I to the Schedule to the BNP Paribas ISDA Master Agreement with OCERS's external asset manager. This Amended and Restated Appendix I replaced the previous Appendix I and stated that the terms of the BNP Paribas ISDA Master Agreement applied to "each account listed on Appendix I to the Master Agreement and the attached Revised Appendix I hereto." Ex. B, at 75.

70.     OCERS's account was one of the accounts listed in the Revised Appendix I to the Schedule to the BNP Paribas ISDA Master Agreement. Accordingly, OCERS became a party to the BNP Paribas ISDA Master Agreement, together with the Schedule to the BNP Paribas ISDA Master Agreement, no later than March 14, 2008.

71.     Pursuant to the BNP Paribas ISDA Master Agreement, OCERS entered into at least 8 BBSW-based Australian dollar FX forward transactions with BNP Paribas, S.A. between February 6, 2009 and April 29, 2013, including the following examples:

a.  One Australian dollar foreign exchange forward on February 6, 2009 agreeing to buy AUD 653,000.00 from BNP Paribas, S.A. for $439,142.50 on February 19, 2009;

b.  Two Australian dollar foreign exchange forwards on December 9, 2010 agreeing to sell AUD 39,000.00 and AUD 46,000.00, respectively, to BNP Paribas, S.A. for $38,095.28 and $44,932.89, respectively, on January 28, 2011;

21

    c.    One Australian dollar foreign exchange forward on June 17, 2011 agreeing to sell AUD 392,588.50 to BNP Paribas, S.A. for $371,000.00 on June 30, 2011;

    d.    One Australian dollar foreign exchange forward on November 21, 2012 agreeing to buy AUD 176,000.00 from BNP Paribas, S.A. for $ 181,347.58 on January 10, 2013;

    e.    One Australian dollar foreign exchange forward on April 29, 2013 agreeing to buy AUD 1,740,000.00 from BNP Paribas, S.A. for $ 1,796,854.50 on May 23, 2013.

72.    Under Section 1 of the BNP Paribas ISDA Master Agreement, each of these BBSW-Based Derivatives transactions was incorporated into and formed a single agreement with the BNP Paribas ISDA Master Agreement. *See* ¶ 38, *supra*. As a result, BNP Paribas, S.A. consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

### 3. *Commonwealth Bank of Australia*

73.    CBA entered into an ISDA Master Agreement with one of OCERS's external asset managers on August 16, 2004 (the "CBA ISDA Master Agreement"). Ex. C, at 53-56. The agreement used the 1992 form ISDA Master Agreement.

74.    The CBA ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision stated that each party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Ex. C, at 13.

75.     The CBA ISDA Master Agreement further provides that it governs any existing or subsequent transactions between CBA and each entity listed on Appendix I to the Schedule to the CBA ISDA Master Agreement, defined below. Ex. C, at 1.

76.     CBA also executed a Schedule to the CBA ISDA Master Agreement (the "Schedule to the CBA ISDA Master Agreement") with OCERS's external asset manager on August 14, 2004. Ex. C, at 19. The Schedule to the CBA ISDA Master Agreement provides that the agreement is entered into "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constitutes a separate agreement between CBA and each respective entity listed in Appendix I. *Id.*

77.     CBA designates itself as a "Multibranch Party" in the Schedule to the CBA ISDA Master Agreement, stating that it may act through its New York office, among others. Ex. C, at 24. CBA designated its New York office as an appropriate office for all notices or communications arising from the agreement. Ex. C, at 24-26.

78.     The parties to the CBA ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of the Schedule to the CBA ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.
>
> Ex. C, at 27.

79.     On March 29, 2013, CBA executed an Amended and Restated Appendix I to the Schedule to the CBA ISDA Master Agreement with OCERS's external asset manager. This Amended and Restated Appendix I replaced the previous Appendix I and stated that the terms of

23

the CBA ISDA Master Agreement applied to each of the "accounts listed in the attached Appendix I." Ex. C, at 53.

80.     OCERS's account was one of the accounts listed in the Revised Appendix I to the Schedule to the CBA ISDA Master Agreement. Accordingly, OCERS became a party to the CBA ISDA Master Agreement, together with the Schedule to the CBA ISDA Master Agreement, no later than March 29, 2013.

81.     Pursuant to the CBA ISDA Master Agreement, OCERS entered into at least 1 BBSW-based interest rate swap and 5 BBSW-based Australian dollar foreign exchange forward transactions with CBA between October 23, 2007 and February 12, 2008, including:

a.   One Australian dollar foreign exchange forward on October 23, 2007 agreeing to buy AUD 330,800 from CBA for $292,535.37 on November 21, 2007;

b.   One Australian dollar foreign exchange forward on January 23, 2008 agreeing to buy AUD 1,706,000 from CBA for $1,476,372.40 on February 21, 2008.

82.     Under Section 1 of the CBA ISDA Master Agreement, each of these BBSW-Based Derivatives transactions was incorporated into and formed a single agreement with the CBA ISDA Master Agreement. *See* ¶ 38, *supra*. As a result, CBA consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

### 4.   *Credit Suisse AG*

83.     Credit Suisse AG entered a FEOMA with OCERS's through one of its external asset managers on March 16, 2006 (the "Credit Suisse FEOMA"). Ex. D, at 41-42. The Credit Suisse FEOMA used the standard form 1997 FEOMA. *See* ¶ 45.

84.     The Credit Suisse FEOMA contained the standard governing law and jurisdiction provision from section 12.2 of the form 1997 FEOMA described above. *See* ¶ 48, *supra*. This provision stated:

24

12.1 <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the jurisdiction set forth in Part XII of the Schedule without giving effect to conflict of laws principles.

12.2 <u>Consent to Jurisdiction</u>. (a) With respect to any Proceedings, each Party irrevocably (i) submits to the non-exclusive jurisdiction of the courts of the jurisdiction set forth in Part XIII of the Schedule and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to jurisdiction, that such court does not have jurisdiction over such Party.

Ex. D, at 24-25.

85.     Credit Suisse AG and OCERS, through one of its external asset managers, also executed a Schedule to the Credit Suisse FEOMA (the "Schedule to the Credit Suisse FEOMA") on March 16, 2006. Ex. D, at 26.

86.     In Part XII of the Schedule to the Credit Suisse FEOMA, Credit Suisse AG and OCERS selected the laws of "the State of New York" as the governing law for the Credit Suisse FEOMA. Ex. D, at 32.

87.     In Part XIII of the Schedule to the Credit Suisse FEOMA, Credit Suisse AG and OCERS agreed to the following provision:

<u>Consent to Jurisdiction</u>

In accordance with <u>Section 12.2</u> of this Agreement, each Party irrevocably submits to the non-exclusive jurisdiction of:

the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City.

Ex. D, at 32.

88.     Pursuant to the Credit Suisse FEOMA, OCERS entered into at least 2 BBSW-based Australian dollar forward exchange forward transactions with Credit Suisse AG, including:

a.  One Australian dollar foreign exchange forward on June 15, 2011 agreeing sell AUD 1,682,443.50 to Credit Suisse AG for $1,788,000 on July 19, 2011;

25

      b.  One Australian dollar foreign exchange forward on July 14, 2011 agreeing to sell AUD 1,572,515,65 to Credit Suisse AG for $1,678,000.00 on August 19, 2011.

89.     Pursuant to Section 2 of the Credit Suisse FEOMA, each of these BBSW-Based Derivatives transactions were incorporated into and formed a single agreement with the Credit Suisse FEOMA. *See* ¶ 47, *supra*. As a result, Credit Suisse AG consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

*5.  Deutsche Bank AG*

90.     Deutsche Bank AG ("Deutsche Bank") entered into an ISDA Master Agreement with one of OCERS's external asset managers on November 1, 2005 (the "Deutsche Bank ISDA Master Agreement"). Ex. E, at 65-69. The agreement used the 1992 form ISDA Master Agreement.

91.     The Deutsche Bank ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision states that each party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

> Ex. E, at 13.

92.     The Deutsche Bank ISDA Master Agreement further provides that it governs any existing or subsequent transactions between Deutsche Bank and each entity listed on Appendix I to the Schedule to the Deutsche Bank ISDA Master Agreement, defined below. Ex. E, at 1, 19.

93.     Deutsche Bank also executed a Schedule to the Deutsche Bank ISDA Master Agreement (the "Schedule to the Deutsche Bank ISDA Master Agreement") with OCERS's external asset manager on November 1, 2005. Ex. E, at 19. The Schedule to the Deutsche Bank ISDA Master Agreement provides that the agreement is entered into "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constitutes a separate agreement between Deutsche Bank and each respective entity listed in Appendix I. *Id.*

94.     Deutsche Bank designates itself as a "Multibranch Party" in the Schedule to the Deutsche Bank ISDA Master Agreement, stating that it may act through its offices in New York, among others. Ex. E, at 27-28.

95.     The parties to the Deutsche Bank ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of the Schedule to the ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

> Ex. E, at 28.

96.     On May 20, 2008, Deutsche Bank executed an Amended and Restated Appendix I to the Schedule to the Deutsche Bank ISDA Master Agreement with OCERS's external asset manager. This Amended and Restated Appendix I replaces the previous Appendix I and stated that the terms of the Deutsche Bank ISDA Master Agreement applied to each "account listed on Appendix I to the Master Agreement and the attached Revised Appendix I hereto." Ex. E, at 61.

97.    OCERS's account was one of the accounts listed in the Revised Appendix I to the Schedule to the Deutsche Bank ISDA Master Agreement. Accordingly, OCERS became a party to the Deutsche Bank ISDA Master Agreement, together with the Schedule to the Deutsche Bank ISDA Master Agreement, no later than May 20, 2008.

98.    Pursuant to the Deutsche Bank ISDA Master Agreement, OCERS entered into 15 BBSW-based interest rate swap transactions and at least 14 BBSW-based Australian dollar foreign forward transactions with Deutsche Bank between February 6, 2009 and March 12, 2015 including:

a. One interest rate swap February 6, 2009, agreeing to make interest payments to Deutsche Bank based on six-month BBSW in exchange for receiving a fixed 6.50% interest on AUD 900,000;

b. One interest rate swap on August 8, 2011, agreeing to make interest payments to Deutsche Bank based on six-month BBSW in exchange for receiving a fixed 5.0% interest on AUD 200,000;

c. One interest rate swap on June 6, 2012, agreeing to make interest payments to Deutsche Bank based on six-month BBSW in exchange for receiving a fixed 5.0% interest on AUD 200,000;

d. One interest rate swap on August 7, 2013 agreeing to make interest payments to Deutsche Bank based on six-month BBSW in exchange for receiving a fixed 4.5% interest on AUD 500,000;

e. One Australian dollar foreign exchange forward on May 26, 2011 agreeing to sell AUD 1,825,000 to Deutsche Bank for $1,916,397 on June 30, 2011;

f. One Australian dollar foreign exchange forward on June 3, 2013 agreeing to buy AUD 1,077,000 from Deutsche Bank for $1,048,425.04 on July 10, 2013;

g. One Australian dollar foreign exchange forward on March 12, 2015 agreeing to buy AUD 2,280,000 from Deutsche Bank for $1,746,858.48 on April 2, 2015.

99.    Under Section 1 of the Deutsche Bank ISDA Master Agreement, each of these BBSW-Based Derivatives transactions was incorporated into and formed a single agreement with the Deutsche Bank ISDA Master Agreement. *See* ¶ 38, *supra*. As a result, Deutsche Bank consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

*6. Royal Bank of Canada*

100.     Royal Bank of Canada ("RBC") entered into an ISDA Master Agreement with one of OCERS's external asset managers on August 4, 2003 (the "RBC ISDA Master Agreement"). Ex. F, at 62-65. This agreement used the 1992 form ISDA Master Agreement.

101.     The RBC ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision states that each party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

> Ex. F, at 13.

102.     The RBC ISDA Master Agreement further provides that it governs any existing or subsequent transactions between RBC and each entity listed on Appendix I to the Schedule to the RBC ISDA Master Agreement, defined below. Ex. F, at 1.

103.     RBC also executed a Schedule to the RBC ISDA Master Agreement (the "Schedule to the RBC ISDA Master Agreement") with OCERS's external asset manager on August 4, 2003. The Schedule to the RBC ISDA Master Agreement provided that the agreement was entered "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constituted a separate agreement between RBC and each respective entity listed in Appendix I. Ex. F, at 19.

104.    RBC designated itself as a "Multibranch Party" in the Schedule to the RBC ISDA

Master Agreement, stating that it may act through its offices in New York, among others, as well as

any other office specified in a confirmation. Ex. F, at 25. RBC also designated an account located in

New York as its address for transfers. Ex. F, at 24-25.

105.    The parties to the RBC ISDA Master Agreement selected New York law as the

governing law for their agreement. Provision (h) of the Schedule to the RBC ISDA Master

Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed
> in accordance with the laws of the State of New York without
> reference to choice of law doctrine.

> Ex. F, at 26.

106.    On March 14, 2008, RBC executed an Amended and Restated Appendix I to the

Schedule to the RBC ISDA Master Agreement with OCERS's external asset manager. This

Amended and Restated Appendix I replaced the previous Appendix I and stated that the terms of

the RBC ISDA Master Agreement applied to "each account listed on Appendix I" and that it

constituted a separate agreement between RBC and each respective entity listed in Appendix I. Ex.

F, at 62.

107.    OCERS's account was one of the accounts listed in the Amended and Restated

Appendix I to the Schedule to the RBC ISDA Master Agreement. Accordingly, OCERS became a

party to the RBC ISDA Master Agreement, together with the Schedule to the RBC ISDA Master

Agreement, no later than March 14, 2008.

108.    Pursuant to the RBC ISDA Master Agreement, OCERS entered into at least 2

BBSW-based interest rate swap transactions and 10 BBSW-based Australian dollar foreign exchange

forward transactions with RBC between January 11, 2007 and May 2, 2014, including:

a.  One interest rate swap on December 4, 2009, agreeing to make interest payments to RBC based on three-month BBSW in exchange for receiving a fixed 4.5% interest on AUD 300,000.00;

b.  One Australian dollar foreign exchange forward on July 27, 2010, agreeing to AUD 222,561.01 from RBC for $200,000 on August 31, 2010;

c.  One Australian dollar foreign exchange forward on May 20, 2011, agreeing to buy AUD 300,000.00 from RBC for $320,022 on May 31, 2011;

d.  One Australian dollar foreign exchange forward on September 19, 2012, agreeing to buy AUD 274,000.00 from RBC for $287,009.52 on October 11, 2012.

109.    Under Section 1 of the RBC ISDA Master Agreement, each of these BBSW-Based Derivatives transactions was incorporated into and formed a single agreement with the RBC ISDA Master Agreement. *See* ¶ 38, *supra*. As a result, RBC consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

### 7.    The Royal Bank of Scotland plc

110.    The Royal Bank of Scotland PLC ("RBS Bank") entered into an ISDA Master Agreement with one of OCERS's external asset managers on August 18, 2005 (the "RBS ISDA Master Agreement"). Ex. G, at 77-80. This agreement used the 1992 form ISDA Master Agreement.

111.    The RBS ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision states that each party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such

31

Proceedings, that such court does not have any jurisdiction over such party.

Ex. G, at 13.

112.    The RBS ISDA Master Agreement further provides that it governs any existing or subsequent transactions between RBS Bank and each entity listed on Appendix I to the Schedule to the RBS ISDA Master Agreement, defined below. Ex. G, at 1.

113.    RBS Bank also executed a Schedule to the RBS ISDA Master Agreement (the "Schedule to the RBS ISDA Master Agreement") with OCERS's external asset manager on August 18, 2005. The Schedule to the RBS ISDA Master Agreement provides that the agreement was entered into "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constitutes a separate agreement between RBS Bank and each respective entity listed in Appendix I. Ex. G, at 19.

114.    RBS Bank designates itself as a "Multibranch Party" in the Schedule to the RBS ISDA Master Agreement, stating that it may act through its offices in New York, among other locations, as well as any other office specified in a confirmation. Ex. G, at 27. RBS Bank also designated the office of its Legal Department – Derivatives Documentation located in Greenwich, Connecticut to receive copies of notices under the agreement.

115.    The parties to the RBS ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of the Schedule to the RBS ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

Ex. G, at 27.

116.    On March 14, 2008, RBS Bank executed an Amended and Restated Appendix I the Schedule to the RBS ISDA Master Agreement with OCERS's external asset

32

manager. This Amended and Restated Appendix I replaced the previous Appendix I and stated that the terms of the RBS ISDA Master Agreement applied to each "account listed on Appendix I."

117.     OCERS's account was one of the accounts listed in the Amended and Restated Appendix I to the Schedule to the RBS ISDA Master Agreement. Accordingly, OCERS became a party to the RBS ISDA Master Agreement, together with the Schedule to the RBS ISDA Master Agreement, no later than March 14, 2008.

118.     Pursuant to the RBS ISDA Master Agreement, OCERS entered into at least 1 BBSW-based interest rate swap and 7 BBSW-based Australian dollar foreign exchange forward transactions with RBS Bank from February 4, 2009 to July 15, 2013, including:

   a.   One interest rate swap on August 5, 2011 agreeing to make interest payments to RBS Bank based on six-month BBSW in exchange for receiving a fixed 6.0% on AUD 500,000.00;

   b.   One Australian dollar foreign exchange forward on February 4, 2009, agreeing to buy AUD 42,100.00 for $27,330.90 from RBS Bank on February 20, 2009;

   c.   One Australian dollar foreign exchange forward on January 24, 2011, agreeing to buy AUD 975,000.00 for $953,277.00 from RBS Bank on April 29, 2011;

   d.   One Australian dollar foreign exchange forward on September 2, 2011, agreeing to sell AUD 235,000.00 to RBS Bank for $250,040.00 on September 29, 2011;

   e.   One Australian dollar foreign exchange forward on June 6, 2012, agreeing to buy AUD 286,000.00 for $282,199.06 from RBS Bank on July 19, 2012.

119.     Under Section 1 of the RBS ISDA Master Agreement, each of these BBSW-Based Derivatives transactions was incorporated into and formed a single agreement with the RBS ISDA Master Agreement. *See* ¶ 38, *supra*. As a result, RBS Bank consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

33

*8. UBS AG*

120.     UBS AG entered into a FEOMA with OCERS through one of its external asset

managers on March 7, 2008 (the "UBS FEOMA"). Ex. H, at 4, 39-40. The UBS FEOMA used the

standard form 1997 FEOMA.

121.     The UBS FEOMA contained the standard governing law and jurisdiction provision

from section 12.2 of the form 1997 FEOMA described above. *See* ¶ 45, *supra*. This provision stated:

> 12.1 <u>Governing Law</u>.  This Agreement shall be governed by, and
> construed in accordance with, the laws of the jurisdiction set forth in
> Part XII of the Schedule without giving effect to conflict of laws
> principles.
>
> 12.2    <u>Consent to Jurisdiction</u>. (a) With respect to any Proceedings,
> each Party irrevocably (i) submits to the non-exclusive jurisdiction of
> the courts of the jurisdiction set forth in Part XIII of the Schedule and
> (ii) waives any objection which it may have at any time to the laying of
> venue of any Proceedings brought in any such court, waives any claim
> that such Proceedings have been brought in an inconvenient forum
> and further waives the right to object, with respect to jurisdiction, that
> such court does not have jurisdiction over such Party.
>
> Ex. H, at 24-25.

122.     UBS AG and OCERS, through one of its external asset managers, also executed a

Schedule to the UBS FEOMA (the "Schedule to the UBS FEOMA") on March 16, 2006. Ex. H, at

26.

123.     In Part XII of the Schedule to the UBS FEOMA, UBS AG and OCERS selected

"the State of New York" as the law governing the UBS FEOMA. Ex. H, at 31.

124.     In Part XIII of the Schedule to the UBS FEOMA, UBS AG and OCERS agreed to

the following provision:

> <u>Consent to Jurisdiction</u>
>
> In accordance with Section 12.2 of this Agreement, each Party
> irrevocably submits to the non-exclusive jurisdiction of: the courts
> of the State of New York and the United States District Court located in
> the Borough of Manhattan in New York City.

Ex. H, at 31-32.

125.    Pursuant to the UBS FEOMA, OCERS entered into at least 8 BBSW-based

Australian dollar foreign exchange forwards with UBS AG, including:

a.    One Australian dollar foreign exchange forward on August 15, 2008, agreeing to buy AUD 2,045,747.91 for 193,026,544 Japanese yen on November 19, 2008.

b.    One Australian dollar foreign exchange forward on January 21, 2009, agreeing to buy AUD 3,352,347.12 for 189,132,720 Japanese yen on November 19, 2008.

126.    Under Section 2 of the UBS FEOMA, each of these BBSW-Based Derivatives

transactions was governed by the UBS FEOMA. *See* ¶ 47, above. As a result, UBS AG consented to

personal jurisdiction in respect to each of OCERS claims arising out of or related to these BBSW-

Based Derivatives transactions.

127.    UBS AG also entered into an ISDA Master Agreement with one of OCERS's

external asset managers on April 12, 2001 (the "UBS ISDA Master Agreement"). Ex. I, at 46-49.

This agreement used the 1992 form ISDA Master Agreement.

128.    The UBS ISDA Master Agreement contained the standard 1992 form provision on

"Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision states that each

party irrevocably:

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Ex. I, at 13.

129.    The UBS ISDA Master Agreement further provides that it governs any existing or subsequent transactions between UBS AG and each entity listed on Appendix I to the Schedule to the UBS ISDA Master Agreement, defined below. Ex. I, at 1.

130.    UBS AG also executed a Schedule to the UBS ISDA Master Agreement (the "Schedule to the UBS ISDA Master Agreement") with OCERS's external asset manager on April 12, 2001. The Schedule to the UBS ISDA Master Agreement provides that the agreement was entered into "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constitutes a separate agreement between UBS AG and each respective entity listed in Appendix I. Ex. I, at 19.

131.    UBS AG designated itself as a "Multibranch Party" in the Schedule to the UBS ISDA Master Agreement, stating that it may act through any of its offices in United States, France, Hong Kong, Singapore, Sweden, Switzerland, England, and Wales. Ex. I, at 26. UBS AG also required that all notices or communication related to the agreement be sent to its Legal Affairs office located in Stamford, CT. Ex. I, at 25.

132.    The parties to the UBS ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of the Schedule to the UBS ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

> Ex. I, at 26.

133.    On February 15, 2007, UBS AG executed an Amended and Restated Appendix I to the Schedule to the UBS ISDA Master Agreement with OCERS's external asset manager. This Amended and Restated Appendix I replaced the previous Appendix I and stated that the terms of the UBS ISDA Master Agreement applied to each "account listed on Appendix I." Ex. I, at 46.

134.     OCERS's account was one of the accounts listed in the Amended and Restated Appendix I to the Schedule to the UBS ISDA Master Agreement. Accordingly, Plaintiff OCERS became a party to the UBS ISDA Master Agreement, together with the Schedule to the UBS ISDA Master Agreement, no later than August 19, 2013.

135.     Pursuant to the UBS ISDA Master Agreement, OCERS entered into at least 10 BBSW-based interest rate swaps and 10 BBSW-based Australian dollar foreign exchange forwards between September 2, 2008 and February 25, 2014, including:

a.   One interest rate swap on January 17, 2011 agreeing to make interest payments based on six-month BBSW to UBS AG in exchange for receiving a fixed 6.00% interest on AUD 6,600,000;

b.   One Australian dollar foreign exchange forward transaction on May 12, 2011 agreeing to sell AUD 122,500.00 for $130,820.20 on May 19, 2011;

c.   One Australian dollar foreign exchange forward transaction on September 21, 2011, agreeing to sell AUD 1,950,000.00 for $1,974,386.70 on September 29, 2011.

d.   One Australian dollar foreign exchange forward transaction on March 22, 2012, agreeing to buy AUD 522,000.00 for $540,249.12 on April 23, 2012.

e.   One Australian dollar foreign exchange forward transaction on September 7, 2012, agreeing to buy AUD 140,000.00 for $145,098.52 on October 11, 2012.

136.     Under Section 1 of the UBS ISDA Master Agreement, each of these BBSW-Based Derivatives transactions was incorporated into and formed a single agreement with the UBS ISDA Master Agreement. *See* ¶ 38, above. As a result, UBS AG consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

*9. Westpac Banking Corporation*

137.     Westpac Banking Corporation ("Westpac") entered into an ISDA Master Agreement with one of OCERS's external asset managers on February 21, 2007 (the "Westpac ISDA Master

Agreement"). Ex. J, at 74-77. This agreement used the 1992 form ISDA Master Agreement. *See* Ex. J.

138. The Westpac ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision states that each party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

> Ex. J, at 13.

139. The Westpac ISDA Master Agreement further provides that it governs any existing or subsequent transactions between Westpac and each entity listed on Appendix I to the Schedule to the Westpac ISDA Master Agreement, defined below. Ex. J, at 1.

140. Westpac also executed a Schedule to the Westpac ISDA Master Agreement (the "Schedule to the Westpac ISDA Master Agreement") with OCERS's external asset manager on February 21, 2007. The Schedule to the Westpac ISDA Master Agreement provides that the agreement was entered into "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constituted a separate agreement between Westpac and each respective entity listed in Appendix I. Ex. J, at 19.

141. Westpac designated itself as a "Multibranch Party" in the Schedule to the Westpac ISDA Master Agreement, stating that it may act through its offices in New York, among other

locations, as well as any other office specified in a confirmation. Ex. J, at 25. Westpac also appointed

its New York branch 575 Fifth Avenue, 39th Floor, New York, NY 10017, as its process agent and

an appropriate office for all notices or communications arising from the agreement.

Ex. J, at 24.

142.    The parties to the Westpac ISDA Master Agreement selected New York law as the

law governing their agreement. Provision (h) of the Schedule to the Westpac ISDA Master

Agreement read as follows:

> **Governing Law**. This Agreement will be governed by and construed
> in accordance with the laws of the State of New York without
> reference to choice of law doctrine.
>
> Ex. I, at 26.

143.    On March 14, 2008, Westpac executed an Amended and Restated Appendix I the

Schedule to the Westpac ISDA Master Agreement with OCERS's external asset manager. This

Amended and Restated Appendix I replaced the previous Appendix I and stated that the terms of

the Westpac ISDA Master Agreement applied to each "account listed on Appendix I."

144.    OCERS's account was one of the accounts listed in the Amended and Restated

Appendix I to the Schedule to the Westpac ISDA Master Agreement. Accordingly, Plaintiff OCERS

became a party to the Westpac ISDA Master Agreement, together with the Schedule to the Westpac

ISDA Master Agreement, no later than March 14, 2008.

145.    Pursuant to the Westpac ISDA Master Agreement, OCERS entered into at least 4

BBSW-based Australian dollar foreign exchange forward transactions directly with Westpac between

January 24, 2011 and July 11, 2013, including:

> a.    One Australian dollar foreign exchange forward transaction on January 24, 2011,
>       agreeing to buy AUD 479,000.00 for $468,231.12 on April 29, 2011;
>
> b.    One Australian dollar foreign exchange forward transaction on July 11, 2013
>       agreeing to buy AUD 320,148.06 for $ 292,000.00 on August 23, 2013.

146.    Under Section 1 of the Westpac ISDA Master Agreement, each of these BBSW-Based Derivatives transactions was incorporated into and formed a single agreement with the Westpac ISDA Master Agreement. *See* ¶ 38, *supra*. As a result, Westpac consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

*10.   HSBC Bank USA, N.A.*

147.    HSBC Bank USA, N.A.[6] entered into an ISDA Master Agreement with one of OCERS's external asset managers on June 1, 2004 (the "HSBC Bank USA, N.A. ISDA Master Agreement"). Ex. K, at 60-63. This agreement used the 1992 form ISDA Master Agreement. *See* Ex. K.

148.    The HSBC Bank USA, N.A. ISDA Master Agreement contained the standard 1992 form provision on "Governing Law and Jurisdiction" described above. *See* ¶ 42, *supra*. This provision states that each party irrevocably:

> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

---

[6] The 2008 HSBC Bank USA, N.A. ISDA Master Agreement and associated Schedule list "HSBC Bank USA" as the contracting party. According to HSBC Holdings plc's 2017 Annual Report, HSBC Bank USA is defined as "HSBC Bank USA, N.A., HSBC's retail bank in the US." The Amendment to the 2009 HSBC ISDA Master Agreement dated March 14, 2008 lists the party as "HSBC Bank USA, National Association." HSBC Bank US, N.A. is a domestic, wholly-owned subsidiary of HSBC Holdings plc and corporate affiliate of HSBC Bank Australia Limited that interacts with customers and executes trade documentation with them as agent for the entities organized within HSBC Holdings plc's Global Banking & Markets division, as more particularly alleged below.

Ex. K, at 13.

149.     The HSBC Bank USA, N.A. ISDA Master Agreement further provides that it governs any existing or subsequent transactions between HSBC Bank USA, N.A. and each entity listed on Appendix I to the Schedule to the HSBC Bank USA, N.A. ISDA Master Agreement, defined below. Ex. K, at 1.

150.     HSBC Bank USA, N.A. also executed a Schedule to the HSBC Bank USA, N.A. ISDA Master Agreement (the "Schedule to the HSBC Bank USA, N.A. ISDA Master Agreement") with OCERS's external asset manager on June 1, 2004. The Schedule to the HSBC Bank USA, N.A. ISDA Master Agreement provides that the agreement was entered into "on behalf of each respective entity listed on Appendix I to the Schedule hereto" and that it constitutes a separate agreement between HSBC Bank USA, N.A. and each respective entity listed in Appendix I. Ex. K, at 19.

151.     The parties to the HSBC Bank USA, N.A. ISDA Master Agreement selected New York law as the governing law for their agreement. Provision (h) of part 4 of the Schedule to the HSBC Bank USA, N.A. ISDA Master Agreement read as follows:

> **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

Ex. K, at 24.

152.     On March 14, 2008, HSBC Bank USA, N.A. executed an Amended and Restated Appendix I the Schedule to the HSBC Bank USA, N.A. ISDA Master Agreement with OCERS's external asset manager. This Amended and Restated Appendix I replaced the previous Appendix I and stated that the terms of the HSBC Bank USA, N.A. ISDA Master Agreement applied to each "account listed on Appendix I." Ex. K, at 60.

153.     OCERS's account was one of the accounts listed in the Amended and Restated Appendix I to the Schedule to the HSBC Bank USA, N.A. ISDA Master Agreement. Accordingly,

Plaintiff OCERS became a party to the HSBC Bank USA, N.A. ISDA Master Agreement, together with the Schedule to the HSBC Bank USA, N.A. ISDA Master Agreement, no later than March 14, 2008.

154.    Pursuant to the HSBC Bank USA, N.A. ISDA Master Agreement, OCERS entered into at least 4 BBSW-based Australian dollar foreign exchange forward transactions directly with HSBC Bank USA, N.A. between April 13, 2012 and April 29, 2015, including:

a.    One Australian dollar foreign exchange forward on April 13, 2012, agreeing to buy AUD 451,532.00 for $469,977.53 on April 20, 2012;

b.    One Australian dollar foreign exchange forward on May 15, 2013, agreeing to buy AUD 870,000.00 for $859,068.45 U.S. dollars on May 23, 2013;

c.    One Australian dollar foreign exchange forward on April 29, 2015 agreeing to buy AUD 30,000 for $24,029.85 on May 6, 2015.

155.    Under Section 1 of the HSBC Bank USA, N.A. ISDA Master Agreement, each of these BBSW-Based Derivatives transactions was incorporated into and formed a single agreement with the HSBC Bank USA, N.A. ISDA Master Agreement. *See* ¶ 38, *supra*. As a result, HSBC Bank USA, N.A., as agent acting on behalf of Defendants HSBC Holdings plc and HSBC Australia Limited (*see* ¶¶ 311-21, *infra*) consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

### 11.  *Morgan Stanley & Co. LLC*

156.    Morgan Stanley & Co. LLC ("MSCo."),[7] previously known as Morgan Stanley & Co. Incorporated, entered into a FEOMA with OCERS through one of its external asset managers on June 30, 2002 (the "MSCo. FEOMA"). Ex. L, at 4, 42. The MSCo. FEOMA used the standard form 1997 FEOMA, and incorporated the provisions described above. *See* ¶ 45, *supra*.

---

[7] MSCo. is a domestic, wholly-owned subsidiary of Defendant Morgan Stanley and corporate affiliate of Defendant Morgan Stanley Australia Limited that interacts with customers and executes trade documentation with them as agent for the entities organized within Morgan Stanley's Institutional Securities division, including Morgan Stanley Australia Limited, as more particularly alleged below.

157.     The MSCo. FEOMA contained the standard governing law and jurisdiction

provision from section 12 of the form 1997 FEOMA described above. *See* ¶ 48, *supra*. This provision

stated:

> 12.1 <u>Governing Law</u>.   This  Agreement  shall  be  governed  by,  and
> construed in accordance with, the laws of the jurisdiction set forth in
> Part XII of the Schedule without giving effect to conflict of laws
> principles.
>
> 12.2 <u>Consent to Jurisdiction</u>. (a) With respect to any Proceedings, each
> Party irrevocably (i) submits to the non-exclusive jurisdiction of the
> courts of the jurisdiction set forth in Part XIII of the Schedule and (ii)
> waives any objection which it may have at any time to the laying of
> venue of any Proceedings brought in any such court, waives any claim
> that such Proceedings have been brought in an inconvenient forum
> and further waives the right to object, with respect to jurisdiction, that
> such court does not have jurisdiction over such Party.
>
> Ex. L, at 25.

158.     MSCo. and OCERS, through one of its external asset managers, also executed a

Schedule to the MSCo. FEOMA (the "Schedule to the MSCo. FEOMA") on June 30, 2002. Ex. L at

4.

159.     In Part XII of the Schedule to the MSCo. FEOMA, MSCo. and OCERS selected

"the State of New York" as the law governing the MSCo. FEOMA. Ex. L, at 33.

160.     Part XIII of the Schedule to the MSCo. FEOMA stated that:

> <u>Consent to Jurisdiction</u>
>
> In accordance with Section 12.2 of this Agreement, each Party
> irrevocably submits to the non-exclusive jurisdiction of: the courts of
> the State of New York and the United States District Court located in
> the Borough of Manhattan in New York City.
>
> Ex. L, at 34.

161.     Pursuant to the MSCo. FEOMA, OCERS entered into at least two BBSW-based

Australian dollar foreign exchange forward transactions with MSCo., including:

a.  One Australian dollar foreign exchange forward on July 29, 2003 agreeing to sell AUD 32,264.55 to MSCO for 18,644.21 euros on September 5, 2003;

b.  One Australian dollar foreign exchange forward on July 29, 2003 agreeing to sell AUD 2,267,238.64 to MSCO for 179,361,249.00 Japanese yen on September 5, 2003.

162.    Under Section 2 of the MSCo. FEOMA, each of these BBSW-Based Derivatives transactions was governed by the MSCo. FEOMA. *See* ¶ 47, *supra*. As a result, MSCo., as agent for Morgan Stanley Australia Limited (*see* ¶¶ 346-55, *infra*), consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York.

## **PARTIES**

### A.    Plaintiffs

163.    Plaintiff OCERS was established in January 1945 and has been providing retirement, death, disability, and cost-of-living benefits to employees of Orange County, California and certain districts for over 70 years. As of October 2018, OCERS had over $15 billion in assets under management. OCERS is organized under California's County Employee Retirement Law of 1937, Cal. Gov't Code §§ 31450 *et seq.* OCERS engaged in hundreds of U.S.-based transactions for BBSW-Based Derivatives during the Class Period, including (i) BBSW-based interest rate swaps directly with Defendants CBA, Credit Suisse, Deutsche Bank, JPMorgan, Morgan Stanley, RBC, RBS, and UBS; and (ii) Australian dollar foreign exchange forwards with ANZ, BNP Paribas, CBA, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, Morgan Stanley, RBC, RBS, UBS, and Westpac. OCERS entered into these transactions at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a direct and proximate result of Defendants' manipulative conduct, OCERS was damaged and suffered legal injury on Australian dollar foreign exchange forwards and interest rate swaps transacted during the Class Period. *See* ¶¶ 511-34, *infra*.

164.    Plaintiff Richard Dennis ("Dennis) is a natural person who resides in Florida. Dennis engaged in U.S.-based transactions for BBSW-Based Derivatives, including hundreds of Australian

dollar futures contracts traded on the Chicago Mercantile Exchange ("CME"), during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a direct and proximate result of Defendants' manipulative conduct, Dennis was damaged and suffered legal injury, including a net loss, on CME Australian dollar futures contracts transacted during the Class Period. *See* ¶¶ 494-96, *infra*.

165.    During a substantial part of the Class Period, Plaintiff Sonterra Capital Master Fund, Ltd., ("Sonterra") was an investment fund with its principal place of business in New York. Sonterra engaged in U.S.-based transactions for BBSW-Based Derivatives, including Australian dollar foreign exchange swaps and forwards directly with Defendant Morgan Stanley, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a direct and proximate result of Defendants' manipulative conduct, Sonterra was damaged and suffered legal injury on Australian dollar foreign exchange forwards transacted with Morgan Stanley during the Class Period. *See* ¶¶ 497-505, *infra*.

166.    During a substantial part of the Class Period, Plaintiff FrontPoint Financial Services Fund, L.P., was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut and its investment team based in this District. FrontPoint Financial Services Fund, L.P., engaged in U.S.-based transactions for BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a direct and proximate result of Defendants' manipulative conduct, FrontPoint Financial Services Fund, L.P., was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period.

167.    During a substantial part of the Class Period, Plaintiff FrontPoint Asian Event Driven Fund, L.P., was an investment fund with its principal place of business in Greenwich, Connecticut. FrontPoint Asian Event Driven Fund, L.P., engaged in U.S.-based transactions for

BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a direct and proximate result of Defendants' manipulative conduct, FrontPoint Asian Event Driven Fund, L.P., was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period. *See* ¶¶ 506-10, *infra*.

168.    During a substantial part of the Class Period, Plaintiff FrontPoint Financial Horizons Fund, L.P., was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut and its investment team based in this District. FrontPoint Financial Horizons Fund, L.P., engaged in U.S.-based transactions for BBSW-based swaps, including with Defendant Macquarie, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a direct and proximate result of Defendants' manipulative conduct, FrontPoint Financial Horizons Fund, L.P., was damaged and suffered legal injury on BBSW-based swaps transacted with Macquarie during the Class Period.

169.    Collectively, Plaintiffs FrontPoint Financial Services Fund, L.P., FrontPoint Asian Event Driven Fund, L.P., and FrontPoint Financial Horizons Fund, L.P., are referred to as "FrontPoint." FrontPoint collectively traded more than $100 million in BBSW-based swaps with Defendant Macquarie during the Class Period.

**B.    JPMorgan**

170.    Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware corporation with its headquarters located at 270 Park Avenue, New York, NY10017. JPMorgan provides businesses, institutions, and individuals with investment banking, treasury and securities, private banking, and commercial banking services. Its U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps. JPMorgan "actively manages the risks from its exposure to these

46

derivatives by entering into other derivative transactions or by purchasing or selling other financial instruments that partially or fully offset the exposure from client derivatives."[8]

171.    Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association headquartered at 270 Park Avenue, New York, New York 10017. JPMorgan Chase Bank, N.A. is a wholly-owned subsidiary of JPMorgan. JPMorgan Chase Bank, N.A. is a provisionally registered swap dealer with the CFTC. JPMorgan Chase Bank, N.A was an AFMA Prime Bank from early 2009 through November 30, 2011.

172.    JPMorgan Chase Bank, N.A. has a substantial presence in Australia, including through its subsidiary JPMorgan Chase Bank, N.A. Australia Branch. During the Class Period, JPMorgan Chase Bank, N.A. Australia Branch was a member of the BBSW Panel.

### C.    BNP Paribas

173.    Defendant BNP Paribas, S.A., is one of the world's largest global banking organizations and is headquartered in Paris, France. BNP Paribas, S.A. maintains a branch at 787 Seventh Avenue, New York, NY 10019. BNP Paribas, S.A.'s New York Branch is the legal and operational extension of BNP Paribas, S.A. and thus, is not a separate legal entity.[9] BNP Paribas's New York branch serves as the headquarters of BNP Paribas's U.S. operations.

174.    BNP Paribas S.A. filed its most recent U.S. Resolution Plan on December 31, 2015 with the Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation (the "FDIC"), as required by Title I, Section 165(d) of the Dodd-Frank Act.[10]

---

[8] *Public Section of 2015 § 165(d) Tailored Resolution Plan*, JPMorgan Chase & Co, (July 1, 2015) at 45, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/jpmchase-165-1507.pdf.
[9] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, BNP Paribas, (Dec. 31, 2015) at 21, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/bnp-165-1512.pdf.
[10] *Id.* at 1.

175.    BNP Paribas S.A. is registered with NYSDFS and licensed to do business in this state. BNP Paribas is also regulated by the Board of Governors of the Federal Reserve System. BNP Paribas S.A. considers its New York Branch to be a "material entity" within the United States.[11]

176.    BNP Paribas S.A. offers corporate and investment banking services to clients in New York through its Global Equities and Commodity Derivatives division, among others.[12] BNP Paribas S.A. employs approximately 15,000 people in the U.S. and maintains locations in nine states.[13] BNP Paribas S.A. markets itself in the United States through events like the Billy Jean King Cup in New York City, that BNP Paribas S.A., uses to "target[…] clients in the New York region, the Bank's North American headquarters."[14] BNP Paribas S.A. is "a global player in the derivatives markets" and "actively trades in derivatives . . . including swaps, forwards, futures, and options."[15] BNP Paribas S.A.'s U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which include interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[16] BNP Paribas S.A. is a provisionally registered swap dealer with the CFTC. BNP Paribas S.A. was an AFMA Prime Bank from 2005 through February 24, 2012.

177.    BNP Paribas S.A.'s G10 interest rates and foreign exchange product areas are housed within its Fixed Income trading division. Beginning in early 2007, BNP Paribas S.A. "aimed to significantly enhance [its] fixed income structured products business in the U.S."[17] by adding

---

[11] *Id.* at 30.

[12] *Id.* at 2.

[13] *Id.*

[14] *See Press Release, BNP Paribas USA, BNP Paribas welcomes the world tennis elite to the United States* (Mar. 17, 2010), *available at* http://usa.bnpparibas/en/2010/03/17/bnp-paribas-welcomes-the-world-tennis-elite-to-the-united-states/.

[15] See BNP 2013 Resolution Plan, supra note 4, at 7.

[16] *See* Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2007, at 12, 16-17 (BNP Paribas participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction") (hereinafter "Federal Reserve Bank of New York 2007 Survey").

[17] The Bank Defendants traded foreign exchange and interest rate derivatives from trading desks within their fixed income trading businesses. Fixed income traders price these products by reference to an internally developed model known as a yield curve, which is designed to predict future cash flows by forecasting the value of benchmark interest rates.

personnel to its New York-based interest rate derivatives trading and sales teams. For example, BNP Paribas S.A. hired HSBC's former Head of Interest Rate Derivatives Trading, Sam Nunn, in its New York office as a Managing Director and Head of Interest Rates and Foreign Exchange Structuring.[18] At the same time, BNP Paribas S.A. bolstered its New York interest rate derivatives sales team by hiring Mallory Brooks as Managing Director and Head of the Core Interest Rates Sales Team in the U.S. to market interest rate derivatives to clients based in the United States.[19] In a press release to announce the new hires, a senior BNP Paribas S.A. manager commented that "the heart of BNP Paribas Fixed Income activities has always been the derivatives business."[20]

178.    BNP Paribas S.A.'s focus on the U.S. interest rate derivatives market continued throughout the Class Period. In 2011, BNP Paribas S.A. announced that it had promoted two executives to lead its Fixed Income, Americas division from New York, describing the move as "maximi[z]ing the synergies between trading and sales and increasing the size of our flow products businesses."[21] Since at least January 2005, BNP Paribas S.A. has directed considerable resources to offer a full range of fixed income products to American clients from its New York office and has placed senior New York-based executives on its global Fixed Income Executive Committee.[22] New York-based foreign exchange traders led BNP Paribas S.A.'s weekly global FX meetings, which were attended by BNP Paribas S.A. FX traders located in Australia and elsewhere.

---

[18] *See* Press Release, BNP Paribas USA, Appointments-BNP Paribas enhances its structured products and interest rates business in New York (May 2, 2007), *available at* http://usa.bnpparibas/en/2007/05/02/appointments-bnp-paribas-enhances-its-structured-products-and-interest-rates-business-in-new-york/.

[19] *Id.*

[20] *Id.*

[21] Press Release, BNP Paribas Hong Kong, BNP Paribas Corporate & Investment Banking announces senior appointments within Fixed Income (June 24, 2011), *available at* http://www.bnpparibas.com.hk/en/2011/06/24/bnp-paribas-corporate-investment-banking-announces-senior-appointments-within-fixed-income/.

[22] *See BNP Paribas Fixed Income Reorganises Its Structure and Management Team to Give Clients a More Integrated Coverage across Asset Classes and Products*, BUSINESS WIRE (London), Jan. 21, 2005, *available at* http://www.businesswire.com/news/home/20050121005240/en/BNP-Paribas-Fixed-Income-Reorganises-Structure-Management.

179.     In November 2012, BNP Paribas S.A. hired three members to its FX team in New

York, bolstering the bank's "commitment to its North American clients."[23] In a press release

announcing the move, BNP Paribas S.A. explained that it was "focused on expanding and deepening

BNP Paribas' relationships with targeted investors" located in the United States.[24] The press release

highlighted BNP Paribas S.A.'s decision to focus its FX and interest rate trading activities on United

States-based investors, writing that one new hire "brings excellent client relationships and broad

market knowledge to help grow BNP Paribas' presence with US asset managers."[25] The press release

quotes George Nunn, BNP Paribas S.A.'s Head of FX and Emerging Markets Sales North America,

who stated, "In support of our strategy to expand our overall fixed income flow capabilities, these

additions are in line with our growth plans for BNP Paribas' US FX group, and will help us achieve

our goal of being a leading global FX provider with our target Institutional client base."[26]

180.     BNP Paribas S.A. entered into a settlement with ASIC on January 28, 2014, in which

it admitted to manipulating BBSW.[27] In the settlement, BNP Paribas further admitted that its ALM-

Treasury Business, which "manages the liquidity and market risks (interest rate and currency) arising

from the bank's balance sheet activities," submitted false BBSW rates to benefit its derivatives

positions during the Class Period. BNP Paribas further advertises that executive level ALM-Treasury

staff are based in New York.[28] New York-based ALM-Treasury staff "actively manage BNP Paribas'

---

[23] *BNP Paribas Expands Its Foreign Exchange Presence in the US*, MARKETWIRE (New York), Nov. 9, 2012, *available at* http://www.marketwired.com/press-release/bnp-paribas-expands-its-foreign-exchange-presence-in-the-us-1724226.htm.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Enforceable Undertaking with BNP Paribas*, AUSTRALIAN SECURITIES AND INVESTMENT COMMISSION (Jan. 28, 2014), *available at* http://asic.gov.au/about-asic/media-centre/find-a-media-release/2014-releases/14-014mr-asic-accepts-enforceable-undertaking-from-bnp-paribas/.
[28] *Job Detail for Vice President - ALM Treasury/Prime Solutions & Financing*, CLIMBER, http://jobs.climber.com/jobs/Management-Business/New-York-NY-03582-USA/Vice-President-ALM-Treasury-Prime-Solutions-Financing-P-L-Supervisor-Standard-Permanent/170633626 (last visited Dec. 13, 2016).

interest rate and liquidity risk positions" and "trade off balance sheet products," including benchmark interest rate swaps on a spot and forward basis.

181.    BNP Paribas S.A. operates in Australia in part through its subsidiary BNP Paribas, Australia Branch. BNP Paribas, Australia Branch was a member of the BBSW Panel during the Class Period. BNP Paribas, Australia Branch was a designated AFMA Prime Bank from 2005 through February 24, 2012.

### D.    RBS

182.    Defendant RBS PLC is a wholly-owned subsidiary of Defendant The Royal Bank of Scotland Group plc ("RBS Group"). RBS Group is a registered bank holding company. This includes a substantial presence in the United States as alleged more particularly below.

183.    RBS Group filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[29] According to RBS Group's 2014 U.S. Resolution Plan, it made 24% of its income for the 2013 year in the United States.[30]

184.    RBS PLC maintains a Foreign Representative Office, registered with the NYSDFS, in this District at 340 Madison Avenue, New York, New York. RBS Bank is a provisionally registered swap dealer with the CFTC.

185.    RBS Bank's U.S. headquarters is located in Connecticut. RBS Bank operates a Connecticut branch ("The Royal Bank of Scotland plc, Connecticut Branch"), located at 600 Washington Boulevard, Stamford, Connecticut 06901. The Royal Bank of Scotland plc, Connecticut Branch is regulated by the Connecticut Department of Banking and licensed do business in that state.

---

[29] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Royal Bank of Scotland Group plc, (Dec. 31, 2015) at i-1, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/rbs-165-1512.pdf.
[30] *See Public Section of 2014 § 165(d) Resolution Plan*, Royal Bank of Scotland Group plc, (Oct. 1, 2014) at i-2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/rbs-165-1410.pdf.

186.     From its Stamford offices, RBS Bank offers United States-based clients the full

spectrum of financial products including Rates,[31] Asset-Backed Products, Credit, Prime Services,

Foreign Exchange and Short-Term Markets.[32] RBS Markets and International Banking division, the

wholesale banking division of RBS Group, advertises itself as "focuse[d] on its core strength in fixed

income," including foreign exchange and interest rate derivative products. In 2012, 47% of RBS

Bank's Markets division revenues were derived from the rates and FX businesses. RBS Bank's

Markets and International Banking identifies its "three key trading hubs" as "Stamford, London, and

Singapore," in that order.[33] RBS Bank traders based in Stamford also trade interest rate swaps on

U.S.-based electronic trading platforms.[34] During the Class Period, Michael Lyublinsky, Global Co-

Head of Fixed Income Commodities and Currencies for RBS Bank, directed RBS Bank's currency

and interest rate derivative trading activities from Stamford, Connecticut.[35] RBS Bank also employs

other senior traders and directors in its Stamford office to focus on trading Asian currencies and

interest rates in the United States market with medium-to-large sized corporate clients, as well as

sovereigns and the public sector.[36] RBS Bank also maintains a specialized Interest Rates Derivatives

Business in the United States.[37]

187.     RBS Bank derivatives traders are responsible for trading financial instruments, such

as interest rate swaps and forward rate agreements, priced, benchmarked or settled to BBSW. These

---

[31] "Rates" is commonly used to describe a trading desk that focuses on interest rate derivatives products. *See* Part I. D., *infra.*

[32] *See Director, EM FX Trading*, ROYAL BANK OF SCOTLAND CAREERS, http://jobs.rbs.com/jobs/6189990-director-em-fx-trading?bid=326 (last visited Dec. 13, 2016).

[33] *Id.*

[34] *See* Press Release, TradeWeb, The Royal Bank of Scotland Joins TradeWeb's Swaps Platform, *available at* http://www.tradeweb.com/News/News-Releases/The-Royal-Bank-of-Scotland-Joins-TradeWeb-s-Swaps-Platform/.

[35] *See* Michael Lyublinsky, BLOOMBERG, http://www.bloomberg.com/research/stocks/private/person.asp?personId=12145384&privcapId=716949&previousCapId=271459&previousTitle=GLEACHER%20&%20CO%20INC (last visited Dec. 13, 2016).

[36] See *Director, EM FX Trading*, ROYAL BANK OF SCOTLAND CAREERS, http://jobs.rbs.com/jobs/6189990-director-em-fx-trading?bid=326 (last visited Dec. 13, 2016).

[37] *See Front Office Developer – Swaps*, ROYAL BANK OF SCOTLAND CAREERS, http://jobs.rbs.com/jobs/2521473-front-office-developer-swaps (last visited Dec. 13, 2016).

traders are located throughout the world, and, as alleged more particularly in ¶ 186, *supra*, trade from RBS Bank offices located in New York and Connecticut.

188.    During the Class Period, RBS Bank transacted in BBSW-Based Derivatives with counterparties located within the United States, including asset management corporations, business corporations, insurance companies, universities, and non-profit organizations.

189.    In the Deferred Prosecution Agreement entered into by RBS Bank with the DOJ on February 5, 2013 for manipulating worldwide benchmark interest rates such as the London Interbank Offered Rate ("LIBOR"), RBS Bank provided the DOJ with certain supplemental information regarding "additional benchmark rates" which RBS requested be kept under seal pending the result of further DOJ investigations:

> Although not addressed in Attachment A, this Agreement also encompasses RBS's submissions for the additional benchmark rates listed in Attachment C, which is also incorporated into this Agreement. The rates listed in Attachment C are the focus of an ongoing investigation and, for that reason, Attachment C will be held in confidence by the parties to this Agreement, will not be included in the public filing of this document, and will not be made available to the public unless and until the Department of Justice, in its sole discretion, determines that such information can and should be disclosed.[38]

190.    Plaintiffs have good grounds to believe that these submissions, when disclosed, will provide further evidence that RBS Bank engaged in additional collusive and manipulative activities regarding BBSW.

191.    Defendant RBS N.V. is part of RBS Group and is the successor entity to ABN AMRO N.V., which was a member of the BBSW Panel from 2005 through December 31, 2006. Defendant RBS N.V. was a member of the BBSW Panel from January 1, 2007 to November 18,

---

[38] United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement with The Royal Bank of Scotland PLC (Feb. 5, 2013), at ¶ 2, n. 1, *available at* https://www.justice.gov/atr/case-document/file/509081/download.

2010. The Royal Bank of Scotland plc, Australia succeeded RBS N.V. on the BBSW Panel from

November 19, 2010 to April 30, 2012.

192.     In a July 21, 2014 settlement with ASIC, the Royal Bank of Scotland Group plc and

RBS N.V. admitted that, while on the BBSW Panel, each entity made false BBSW submissions in

order to benefit BBSW-Based Derivatives positions.[39] These entities also admitted to engaging in

Prime Bank Bill trading to manipulate BBSW fixings.[40] At the same time, RBS Money Markets,

foreign exchange, and rates traders booked BBSW-Based Derivatives trades with United States-

based counterparties from offices located in New York and Connecticut.

193.     In its settlement with ASIC, RBS PLC and RBS N.V. admitted the following:

> The relevant conduct involved communications in which Derivative
> Traders or Money Market Traders discussed their own (or their desk's)
> financial position in connection with the entering of RBS's BBSW
> Submissions, or discussions between the Delta Desk and Money
> Market Desk regarding a direction in which submissions should be
> entered by reference to the desk's positions. Submitters openly
> acknowledged preferences and at times, solicited preferences. A
> dedicated chat room entitled "BBSW rate set" was used for such
> communications during the period I October 2009 to 25 November
> 2010.[41]

194.     Defendant RBS Group (Australia) Pty Limited operates as a subsidiary of RBS

Group and was a member of the BBSW Panel during the Class Period.

195.     Collectively, RBS Group, RBS PLC, RBS Group (Australia) Pty Limited, and RBS

N.V. are referred to as "RBS."

**E.     UBS**

196.     Defendant UBS AG is a banking and financial services company headquartered in

Switzerland. UBS AG provides investment banking, asset management, and wealth management

---

[39] *See Enforceable Undertaking with RBS*, AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION (July 21, 2014) *available at* http://asic.gov.au/about-asic/media-centre/find-a-media-release/2014-releases/14-169mr-asic-accepts-enforceable-undertaking-from-the-royal-bank-of-scotland/.
[40] *Id.* at ¶ 3.3, *available at* http://download.asic.gov.au/media/1301281/028492039.pdf.
[41] *Id.* at ¶ 3.2, *available at* http://download.asic.gov.au/media/1301281/028492039.pdf.

services for private, corporate, and institutional clients worldwide. It has operations in over 50 countries, including the United States where UBS AG maintains a substantial presence.

197.    UBS filed its most recent U.S. Resolution Plan on July 1, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[42]

198.    UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its headquarters in New York and Stamford, Connecticut. UBS's Stamford Branch is the primary booking center for UBS's foreign exchange business with U.S. clients and U.S. corporate lending business. UBS AG, Stamford Branch also houses operations and support functions for other U.S. branches and subsidiaries.

199.    UBS is registered with the OCC and the CFTC as a provisionally-registered swap dealer. UBS is also licensed and supervised by the Board of Governors of the Federal Reserve System and is registered with the Connecticut Department of Banking. UBS's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, and foreign exchange swaps.[43]

200.    During the Class Period, UBS's Rates Division and Short Term Interest Rate ("STIR") desk transacted in interest rate derivatives, such as interest rate swaps, whose value depended on BBSW through traders located in Connecticut.

201.    UBS filed a Resolution Plan with the Federal Reserve in 2014 in which it acknowledged that it is a global institution with the majority of its operations located in Switzerland, the United Kingdom, and the United States.[44] UBS's shares are registered as Global Registered Shares on the NYSE.

---

[42] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, UBS AG, (July 1, 2015) at 4-5, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/ubs-165-1507.pdf.
[43] *See Federal Reserve Bank of New York 2007 Survey*, *supra* note 37, at 12, 16-17 (UBS participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).
[44] *See Public Section of 2014 § 165(d) Tailored Resolution Plan*, UBS AG, (July 1, 2014) at 4, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/ubs-165-1407.pdf.

202.     UBS positioned executive-level foreign exchange personnel, including its Head of Americas Client Strategy for Foreign Exchange, Rates & Credit at its Connecticut and New York offices during the Class Period.

203.     In 2012, the CFTC found that UBS traders manipulated BBSW, among other rates, to benefit their derivatives trading positions.[45] In addition, UBS suspended some of its foreign exchange traders from New York in 2014 after completing internal investigations.[46] These same internal investigations uncovered evidence of BBSW manipulation by UBS derivatives traders.

204.     UBS also entered into a settlement with ASIC on December 23, 2013, in which it admitted to submitting false BBSW rates from its STIR desk and that UBS derivatives traders caused UBS to submit false BBSW rates.[47] In the settlement, UBS made the following admission:

> at times during [the period of January 30, 2005 through November 23, 2006], Derivative Traders had expressed preferences as to the direction or level of BBSW Submissions and at times, preferences were solicited by a Submitter himself or herself. Submitter Influence may also have occurred at other times from about 2005 until early 2011.[48]

205.     UBS AG operates in Australia in part through its wholly-owned subsidiary, UBS AG, Australia Branch based in Sydney, Australia. UBS AG, Australia Branch was a member of the BBSW Panel during the Class Period.

### F.     Australia and New Zealand Banking Group

206.     Defendant Australia and New Zealand Banking Group Ltd. ("ANZ") is headquartered in Melbourne, Australia. ANZ is the fourth-largest bank in Australia and among the

---

[45] CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against UBS AG, at 38, n. 21, CFTC Docket No. 15-20 (Dec. 19, 2012).
[46] *See* Liam Vaughan, Amberdeen Choudhury, and Gavin Finch, *UBS Said to Suspend Traders in New York, Zurich, Singapore*, BLOOMBERG, Mar. 26, 2014, *available at* http://www.bloomberg.com/news/articles/2014-03-26/ubs-said-to-suspend-fx-traders-in-new-york-zurich-and-singapore-i2zcvvxf.
[47] *Enforceable Undertaking with UBS,* AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION (Dec. 23, 2013) *available at* http://asic.gov.au/about-asic/media-centre/find-a-media-release/2013-releases/13-366mr-asic-accepts-enforceable-undertaking-from-ubs/
[48] *Id.* at ¶ 3.2, *available at* http://download.asic.gov.au/media/1301413/028553828.pdf.

top twenty largest banks in the world.[49] ANZ was an AFMA Prime Bank and a member of the

BBSW Panel throughout the Class Period.

207.    ANZ filed its most recent U.S. Resolution Plan on December 31, 2015 as required

by Title I, Section 165(d) of the Dodd-Frank Act.[50]

208.    ANZ maintains a licensed branch at 277 Park Avenue, New York, NY 10172, where

it recently relocated to a space containing over 20,000 rentable square feet and a trading

floor.[51]ANZ's New York branch is registered as a Foreign Banking Organization with the U.S.

Office of the Comptroller of Currency ("OCC") and regulated by the Federal Reserve Bank of New

York and the Board of Governors of the Federal Reserve System.

209.    ANZ has operated its New York branch since December 1968.[52] ANZ provides

corporate and investment banking services and international trade finance from its New York

branch, including foreign exchange, currency options, and credit and interest rate derivatives.[53] In

September 2005, Mark Timoney joined ANZ's New York commodity and trade finance team as its

Vice-President to grow ANZ's structured commodity finance business as well as servicing core

clients in their classical trade finance needs.[54] Current ANZ New York-based Head of Financial

Institutions FX Sales—Americas, Cameron Whiteley, moderated a panel discussion titled "Finance

& Investment Series - Panel Discussion & Networking Reception 'Making Cents - Aussie Dollar

---

[49] *See* 2015 Annual Report, Australia and New Zealand Banking Group Ltd. (2015), at 1, *available at* http://news.iguana2.com/anz/ASX/ANZ/433344.

[50] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Australia and New Zealand Banking Group Limited, (Dec. 31, 2015) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/anz-165-1512.pdf.

[51] *See* Sarah Danckert, *Sex clubs, racial insults: Inside ANZ's New York Office*, THE SYDNEY MORNING HERALD, Nov. 16, 2016, *available at* http://www.smh.com.au/business/banking-and-finance/sex-clubs-racial-insults-inside-anzs-new-york-office-20161115-gspjd2.html

[52] *See ANZ in the USA*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, https://www.anz.com/unitedstates/en/about-us/our-company/anz-usa/?pid=brd-pbl-text-ahp-sep11-anzintheusa (last visited Dec. 4, 2016).

[53] *See Public Section of 2013 § 165(d) Tailored Resolution Plan*, Australia and New Zealand Banking Group Limited, (Dec. 31, 2013) at 3, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/anz-165-1312.pdf.

[54]*See ANZ New York Welcomes Absa man,* GLOBAL TRADE REVIEW, Sept. 9, 2005, *available at* http://www.gtreview.com/news/on-the-move/anz-new-york-welcomes-absa-man/.

Outlook'" sponsored by ANZ and the American Australian Association in November 2013. ANZ

considers its New York branch to be an "extension" of the bank in the United States.[55] ANZ's

American Depository Receipts ("ADRs") are listed on the New York Stock Exchange ("NYSE").

210.    ANZ employs executive-level foreign exchange derivatives traders in its New York

office to trade products, including Australian dollar-denominated derivatives, during the Class

Period.[56] For example, Ravi Nursey, Managing Director of Corporate Foreign Exchange Sales,

Enilolobo Oyo, Vice President of Foreign Exchange Sales, Cameron Whiteley, Head of Financial

Institutions FX Sales, Americas, Raghu Prabhakaran, Vice President FX Options, and Charlie

Lachman, Global Head of Markets, were among the more than 100 employees in ANZ's New York

office.[57] These employees' responsibilities included settling trades booked by other ANZ trading

offices located in Asia as well as trading interest rate and FX derivatives with counterparties located

in the United States.[58] ANZ also employed sales personnel for interest rate-related products for the

Asia, Australia, and New Zealand markets from its New York office. During the Class Period,

traders from other ANZ offices also travelled to New York to meet with senior FX traders in the

United States.[59] From its Australian offices, ANZ employed full-time personnel to trade forward

exchange contracts, FX options and forwards during New York market hours. ANZ is a

provisionally registered as a swap dealer under the Commodity Exchange Act.

211.    ANZ's Financial Institutions Group – Americas is based in its New York office and

targets customers such as insurance companies, banks, hedge funds, and other non-bank financial

institutions for products including interest rate and foreign exchange derivatives, including BBSW-

Based Derivatives. Through its wholly-owned subsidiary ANZ Securities, Inc., ANZ's New York-

---

[55] See ANZ 2013 Resolution Plan, supra note 48, at 2.
[56] See Oyo v. ANZ Securities, Inc. et al, 1:2016-cv-05436 (S.D.N.Y. 2016).
[57] Id.
[58] Id.
[59] See id.

based team supports trade and investment flows between clients in America with Australia, New Zealand and Asia.

212. ANZ Securities, Inc. is headquartered and has its principal place of business at 277 Park Avenue, New York, New York 10172-0003. ANZ Securities, Inc. is a broker-dealer registered with the Securities and Exchange Commission and is a member FINRA, as well as the Securities Investor Protection Corporation (SIPC).

213. ANZ Securities, Inc. acts as ANZ's agent when arranging transactions in BBSW-Based Derivatives. During the Class Period, ANZ Securities, Inc. reported that it was a "dealer in Australian" fixed income securities, which included BBSW-Based Derivatives, and "acted as an agent for [ANZ], liaising between U.S. customers and [ANZ]. [ANZ] performs execution, clearing, and settlement services for the transactions where [ANZ Securities] acts as its agent."

214. During the Class Period, ANZ and ANZ Securities, Inc. solicited and encouraged United States residents to enter into BBSW-Based derivative transactions with ANZ and ANZ Securities, Inc. while they were actively involved in the conspiracy alleged in this Complaint.

215. ANZ produced and circulated to its customers a document explaining ANZ's role as an active foreign exchange dealer and market maker: "Disclosure Regarding ANZ's Role in the Wholesale Foreign Exchange Markets" (the "ANZ Market Making Disclosure"). ANZ stated that: ANZ "acting through its various branches and affiliates (ANZ) operates as a dealer and market maker undertaking and providing a wide range of financial services and products to counterparties in the wholesale foreign exchange (FX) market." ANZ explained: "ANZ acts in the wholesale FX markets as a 'market maker' meaning that it offers two-way prices in a variety of currencies on a continuous basis," and could trade for its own account and enter into transactions to hedge against actual or anticipated exposures "prior to, during and post the [BBSW Bank Bill] Fixing Window."

216.    At the same time it was manipulating BBSW, ANZ was acting in the United States a market maker in BBSW-based derivatives; and ANZ and ANZ Securities were making continuous oral and written trading recommendations to U.S. residents concerning derivatives linked to BBSW. For example, ANZ issued Market Focus Reports providing market information and investment advice concerning BBSW derivative products, including, as indicated in a report dated May 10, 2010, "investment advice on the following types of securities ... Derivative products including interest rate and currency forward rate contracts and options ...."  The May 10, 2010 report states it was prepared by ANZ and distributed in the United States by ANZ Securities (referenced in the report as "ANZ S"), and directs that: "Any US person(s) receiving this document and wishing to effect transactions in any fixed income securities referred to herein should contact ANZ S 277 Park Avenue, 31st Floor, New York, NY 10172 USA, Tel: 1-212-801-9160, Fax: 1-212-801-9163, not its affiliates."

217.    ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

218.     ANZ also maintained a substantial team within its Institutional Banking[60] division in its New York offices, including in "customer relationship roles" which acted in the United States to create relationships with investors for BBSW-Based Derivatives. ANZ's Institution Banking division was regularly involved in manipulating BBSW to benefit ANZ's BBSW exposure, and used its New York operations to manage Prime Bank Bill inventory for this purpose. The following example involved a discussion where Mark Budrewicz, one of the principal actors responsible for manipulating BBSW at ANZ, explained to a treasury employee at ANZ that the amount of newly issued Prime Bank Bills he would need to manipulate BBSW depended on the volume of Prime Bank Bills that he could secure from ANZ's New York office:

December 9, 2011

ANZ [Collier]:      how large is your rate set on Friday?
ANZ [Budrewicz]: 5bn
ANZ [Collier]:       sizeable...and what volume are you looking to push out [issue] NCD wise
ANZ [Budrewicz]: 1bn - can do 1.5 if u want
ANZ [Collier]:      will see what we are likely to **get out of the US** tonight..… will cover  1bn
                         for you to start with on Friday [ellipsis in original]

219.     ANZ admitted that it "prepared an estimate of the BBSW Rate Set Exposure" of its Global Markets division daily during the Class Period. ANZ used its BBSW Rate Set Exposure to calculate the direction to move BBSW. At the same time, ANZ Global Markets personnel in its New York offices transacted in BBSW-Based Derivatives with counterparties located in the United States.

220.     ANZ maintained an active United States presence throughout the Class Period that it used to market and sell BBSW-Based Derivatives, including through its Global Markets division. For example, ANZ reports that its Global Markets division employees "in our team in dealing rooms located in the major financial centers," which includes New York. ANZ further reported that its

---

[60] The terms "Institutional Banking" and "Global Market" refer to the same business division within ANZ. ASIC uses the term "Institutional – Global Markets" to describe the business division in which employees who engaged in BBSW manipulation worked.

Global Markets business operated in the United States with a market "focused on Investor clients" and boasted of a "a growing client base" in the United States.

221.     During the Class Period, ANZ maintained trading systems that measured the BBSW exposure of its interest rate trading portfolios. A unit within ANZ, known as the "Market Risk" unit, also provided daily reports that showed ANZ's upcoming BBSW exposure for various tenors of BBSW. ANZ's interest rate derivatives traders also had access to an internal trading system known as "CICS" that displayed ANZ's cache of Prime Bank Bills that it used to manipulate BBSW and which included information such as tenure and maturity.

222.     At the same time, ANZ employed Global Markets personnel in the United States throughout the Class Period. Thus, ANZ personnel who engaged in BBSW-Based Derivatives trading within the United States were aware of ANZ's BBSW exposure on future days when establishing BBSW-Based Derivatives transactions in the United States.

223.     ANZ collected payments due under BBSW-Based Derivatives trades from within the United States, while failing to disclose to its counterparties in the United States BBSW-Based Derivatives market that it was engaged in a conspiracy to manipulate BBSW for its own benefit at the direct expense of these counterparties.

224.     ANZ also frequently raised funding by issuing debt in the United States market. ANZ managed the interest rate and currency risks arising from these debt issuances in the United States by executing BBSW-Based Swap transactions.

225.     When transacting with counterparties in this District, ANZ designates New York law as the governing law and agrees that the courts of this District have jurisdiction.[61] For example, ANZ's Trade Terms for U.S.-based counterparties include an addendum titled "State of New York,

---

[61] See *ANZ Trade Terms United States*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, Sep. 2010, *available at* https://www.anz.com/resources/c/b/cbe699804a9991fdbaacfe220cbfe79e/trade-terms.pdf?MOD=AJPERES

United States of America as Governing Jurisdiction" that applies "where New York, New York, United States of America is the Governing Jurisdiction (being the city and the state in the United States of America in which the Customer's ANZ Office is located)."[62]

> ### G.    Commonwealth Bank of Australia

226.    Defendant Commonwealth Bank of Australia ("CBA") is headquartered in Sydney, Australia. CBA is a multinational bank and is one of the largest financial institutions in Australia. CBA was an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period.

227.    Defendant CBA filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[63]

228.    CBA has offices located in New York and Houston. CBA's New York office is located at 599 Lexington Avenue, New York, NY 10022. Since 1977, CBA has offered a full range of financial services from its New York office to American clients, including foreign exchange sales and spot trading, interest rate derivatives, commodities, fixed income products, and money market services.[64] CBA offers a full range of financial services to Australian and New Zealand corporate and institutional clients with interests in the Americas as well as North American companies with connections in Australia and New Zealand or who are considering expanding their business to the region. CBA's New York team provides global markets services, including foreign exchange and interest rate derivatives. CBA is a provisionally registered swap dealer with the CFTC.

229.    CBA had an active presence in the United States throughout the Class Period. This included marketing BBSW-Based derivatives, recommending and soliciting BBSW-Based Derivatives transactions in the U.S. market, arranging for U.S. residents to deposit collateral in this

---

[62] *Id.*
[63] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Commonwealth Bank of Australia, (Dec. 31, 2015) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/cba-165-1512.pdf.
[64] *See CBA 2015 Resolution Plan, supra* note 57, at 2.

District to secure their performance on such derivatives, and collecting payments due under BBSW-Based Derivatives.

230.    From its New York office, CBA quotes short term interest rate, foreign exchange options, and FX forwards products to Corporates, Central Banks, Pension Funds and Hedge Funds. CBA's New York-based short term interest rate trading is concentrated within G10 currencies, with a focus on Australian dollar, Japanese yen, and euro, and manages risk through exchange-traded and over-the-counter products. For example, at least a Director of Short Term Interest Rate Trading, a Director of Short Term Interest Rate Derivatives, and two Directors of Interest Rate Options Trading are based in CBA's New York office. From at least September 2010 through July 2012, Commonwealth Bank employed Senior Short Term Interest Rate ("STIR") Traders in their New York office to price short-term interest rate derivatives, including instruments that were priced or settled based on BBSW, directly with American counterparties. CBA's Head of Foreign Exchange Sales, Americas is also based in its New York office. CBA also employs full-time in-house legal counsel to provide specialized legal counsel for CBA's trading and sales activities in the Americas.

231.    CBA's New York branch is regulated by the OCC and is supervised by the Federal Reserve Bank of New York as a branch operation of a Foreign Banking Organization.[65]

232.    Commonwealth Australia Securities, LLC ("CAS LLC"), is a Delaware Limited Liability Company formed on May 10, 2005, whose sole "member" or equity owner is Defendant CBA.[66] As a single member limited liability company, CAS LLC is treated as a division of CBA for federal and state income tax purposes, not as a separate taxable entity.

---

[65] *See Public Section of 2013 § 165(d) Tailored Resolution Plan*, Commonwealth Bank of Australia, (Dec. 31, 2013) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/cba-165-1312.pdf.
[66] Commonwealth Australia Securities, LLC Annual Audited Report on Form X-17A-5 (Part III) for the period ending June 30, 2018, filed pursuant to Section 17 of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 17a-5 thereunder ("CAS Focus Report" or "Focus Report"), at p. 3. Available at:
https://www.sec.gov/Archives/edgar/data/1332031/000133203118000007/CmnwlthAus18sfc.pdf

233.    CAS LLC is a broker-dealer registered with the SEC and a member of FINRA.[67] CAS LLC is also registered as a broker-dealer in 34 U.S. States.[68]   CAS LLC is registered with the CFTC as a futures introducing broker and is a member of the National Futures Association.[69]

234.    CAS LLC brokers or arranges the sale of fixed income products through its parent CBA to major U.S. institutional investors.  It may also engage in a variety of other business customarily undertaken by broker-dealers or futures introducing brokers.[70]  CAS LLC has an agreement with CBA whereby CBA executes and settles fixed income transactions for CAS LLC.

235.    CAS LLC also introduces customer orders for U.S. institutional investors in fixed CAS LLC income and debt securities to its parent company, CBA, in accordance with Rule 15A-6 under the Exchange Act for execution and settlement on a delivery-versus-payment basis.

236.    During the Class Period, CAS LLC provided specific recommendations for U.S. customers to transact in BBSW-Based derivatives.

237.    CBA also marketed and sold BBSW-Based Derivatives in the United States market on its behalf. For example, CBA used its Global Markets Research publication entitled "Fixed Income: Weekly Strategy" ("CBA Strategy Reports") as a marketing tool to solicit U.S.-based investors to invest in the Australian fixed income and derivatives markets, including BBSW-Based Derivatives. In so doing, CBA regularly produced a portfolio of "Key Trades" in the Australian fixed income and derivatives markets that CBA updated on a weekly basis.

238.    These CBA Strategy Reports always provided U.S. sales contact information and a New York phone number ("(212) 336-7737") so that U.S.-based investors could place orders in the recommended Australian fixed income securities and derivatives.

---

[67] *Id.*
[68] FINRA BrokerCheck Report for Commonwealth Australia Securities LLC, CRD# 136321 ("CAS BrokerCheck Report"), at pp. 8-9, available at: https://files.brokercheck.finra.org/firm/firm_136321.pdf. The list of registrations includes such States as New York, New Jersey, Pennsylvania, Illinois, California, Florida and Texas. *Id.* at p. 9.
[69] CAS Focus Report at pp. 3-4.
[70] *Id.*

239.     At the same time that CBA employees solicited U.S. investors for BBSW-Based Derivatives, ASIC documents show that CBA regularly distributed information concerning its own planned BBSW manipulation and planned BBSW manipulation by its co-conspirators to the Fixed Income Sales team. For example, ASIC uncovered a communication in which CBA trader Brad Dillon, copying Mark Hulme (the employee known as the "Powerful Owl" who served as CBA's "single face to market," *see* ¶ 7, *supra*),[71] informed CBA's Fixed Income Sales concerning the prospects that co-conspirator Defendants who typically engaged in BBSW manipulation on certain dates would successfully "push rate sets up" on certain upcoming trading days in February 2011:

> February 10, 2011:
>
> CBA [Dillon]: This is an unusually small amount of [Prime Bank Bill] issuance by CBA to the interbank market. The implication is swap books who push rate sets up on the 13th -15th and 28th - 31st might not have enough supply to swamp buyer demand.

240.     The following day, Dillon again informed the Fixed Income Sales team, again copying Hulme, that CBA's co-conspirators planned to manipulate BBSW higher on Monday, February 14, 2011:

> February 11, 2011
>
> CBA [Dillon]: Looking at yesterdays['] BBSW we saw 4.925 on the 3 months and we expect that today's rate set should be 4.94, the 6 month set was 5.1233 and there seems to be interest to push this set higher especially on Monday…

241.     CBA employed Fixed Income Sales employees in its New York office to establish BBSW-Based Derivatives trading positions opposite investors in the United States market. For example, CBA sent a Director of Fixed Income Sales from its Fixed Income Sales team in Sydney, David Murray, to lead a Fixed Income Sales team in CBA's New York offices. Accordingly, CBA

---

[71] Hulme also served as CBA's representative on the NTI Committee during the Class Period. *See* Part II.C., *infra* (describing Defendants' practice of placing employees responsible for BBSW manipulation on AFMA committees).

kept employees who established BBSW-Based Derivatives positions for CBA in the United States informed of planned BBSW manipulation during the Class Period, enabling these employees to profit from this information through United States-based trading positions.

242.    CBA also acted in the United States to collect and process payments under rigged BBSW-Based Derivatives transactions. CBA did not disclose to counterparties based in the United States that it was simultaneously participating in a conspiracy that rendered BBSW artificial in a direction that benefitted CBA and directly injured its counterparties to BBSW-Based Derivatives transactions.

### H.    National Australia Bank

243.    Defendant NAB, Australia's largest bank, had an active presence in the United States throughout the Class Period which included marketing, trading, and collecting payments due under BBSW-Based Derivatives.[72] NAB employees acting in the United States also recommending and solicited U.S. residents for transactions in BBSW-Based Derivatives, and directed U.S. residents to deposit collateral in accounts located in this District to secure obligations due under BBSW-Based Derivatives transactions.

244.    NAB targeted the United States market for its BBSW-Based Derivatives trading business beginning at the start of the Class Period. In its 2003 Annual Report ("2003 Report"), issued shortly after the start of the Class Period, NAB reported that "[d]uring 2003, we continued to leverage our core capabilities by selectively exporting components of our model to *targeted* international markets."  (Emphasis added).

245.    The 2003 Report highlighted NAB's presence in the United States, noting "We have operations in Asia and the United States as a result of our Corporate & Institutional Banking

---

[72] NAB Annual Review 2010 at p. 22, available at
https://www.nab.com.au/content/dam/nabrwd/documents/reports/corporate/annual-report-2010.pdf

business" line. In the 2003 Report, NAB reported that 9% of its total income derived from the United States. However, NAB's U.S. operations amounted to a much larger proportion of its total income from its Corporate & Institutional Banking business line, the business line principally responsible for trading BBSW-Based Derivatives, because NAB's New York office was primarily focused on Corporate & Institutional Banking business during the Class Period.

246.    In May 2004, NAB "beefed up its U.S.-based foreign exchange team with the hire of a new head of forward trading and the transfer of a senior strategist to New York." Robert Cone, then-Senior Vice President of NAB's America's Division, announced that NAB had hired Graham Davidson (formerly of co-conspirator Westpac Banking Corporation) to oversee NAB's U.S.-based foreign exchange forwards[73] operations from New York. Cone also announced that NAB transferred a senior strategist, Michael Jansen, from Sydney to New York to oversee NAB's foreign exchange, commodities, and "derivatives-based" trading strategies in New York. The moves followed NAB's hire of Jacqui Steel (also formerly of co-conspirator Westpac) to lead its foreign exchange institutional sales efforts in NAB's New York offices. Cone explained that NAB had "committed to building an institutional presence in North America."

247.    In its 2015 Annual Report, NAB reported that despite lackluster global economic growth, "[s]olid growth has continued in the United States."

248.    NAB filed its most recent U.S. Resolution Plan on December 31, 2016 as required by Title I, Section 165(d) of the Dodd-Frank Act. NAB's Plan describes NAB's U.S. operations, detailing, among other things: (i) trading in derivative financial instruments held or issued for trading purposes, (ii) trading in derivative financial instruments held for hedging purposes, (iii) the payment, clearing, and settlement systems NAB used in conjunction with its U.S. operations.

249.    NAB has operated in New York since 1972.

---

[73] Australian dollar foreign exchange forwards are a type of BBSW-Based Derivative. *See* Part I.D., *infra*.

250.     "[T]he vast majority of [NAB's] U.S. operations" during the Class Period were conducted through its federally licensed New York Branch, located at 245 Park Avenue, #2800, New York, NY 10167.

251.     NAB organizes its activities into seven "business lines." NAB uses the business line structure to organize its activities by function. The business line responsible both for marketing, selling, and trading BBSW-Based Derivatives, and which also maintained its own inventory of Prime Bank Bills for engaging in manipulative transactions during the Fixing Window, is the "Wholesale Banking" business line.[74] NAB's Wholesale Banking business line was also responsible for making BBSW submissions. NAB employees who represented NAB on the BBSW and NTI subcommittees were also employed in NAB's Wholesale Banking business line. ASIC publicly identified 28 NAB employees as a result of its investigation into NAB's misconduct as alleged in this Complaint. These employees worked in NAB's Wholesale Banking business line.

252.     NAB's New York branch housed around 95 employees during the Class Period who were "primarily within the Wholesale Banking division of NAB Ltd." Additionally, employees within NAB's Wholesale Banking business line periodically participate in two-year rotation programs in which they are temporarily transferred to NAB's New York branch. NAB's New York branch maintains a "specialty in Aussie/Kiwi markets" and reported that "Our key clients are the major financial institutions and investors in North America."

253.     NAB has repeatedly stated that NAB's New York branch is not a separate legal entity, making it expressly clear that NAB's New York branch is "not a legal entity with separate legal existence from NAB, but an office of NAB that is licensed to engage in a banking business from its location at 245 Park Avenue, 28th Floor, New York, New York."

---

[74] NAB sometimes refers to this business line as "Global Markets" or "Wholesale Markets."

254.     NAB's New York branch is regulated by its licensing authority, the Office of the Comptroller of the Currency ("OCC"), and the Federal Reserve Bank of New York.

255.     Through its New York branch, NAB operated an interest rates derivative sales and trading business. NAB is also a registered swaps dealer swaps dealer with the CFTC.

256.     NAB engaged in substantial BBSW-Based Derivatives trading and sales activities in this District throughout the Class Period both from its New York branch and through offices located elsewhere.[75] NAB kept employees responsible for BBSW-Based Derivatives trading in the United States apprised of plans to manipulate BBSW and take other steps for the purpose of manipulating BBSW, such as purchasing Prime Bank Bills to use as "ammo."

257.     Gavin Sheridan is an employee within NAB's Wholesale Banking business line. Sheridan served as NAB's Head of Swaps Trading for the United States during a significant part of the Class Period. Senior employees who were responsible for executing NAB's BBSW-Based Derivatives trading activities in the United States, such as Sheridan, received regular updates concerning NAB's plans to manipulate BBSW.

258.     These regular, near-daily updates from NAB employees who were responsible for manipulating BBSW included emails from employees such as former NAB employee Brock Johnson who worked with NAB's Wholesale Banking business line as a short-term interest rate derivatives trader. Johnson testified as a witness in ASIC's case against co-conspirator Westpac. In that testimony, Johnson submitted a sworn affidavit testifying that, for several years, Johnson and other traders in NAB's Wholesale Banking business made BBSW rate submissions designed to benefit NAB's BBSW-Based Derivatives positions. Johnson further testified that this was a "practice of

---

[75] NAB was alleged to have traded BBSW-Based Derivatives in the United States in the First Amended Class Action Complaint. ECF No. 63 ("FAC"), at 92-95.  It submitted a declaration in support of its motion to dismiss the FAC, but did not deny this allegation. *See* Decl. of Stephen H. O. Clarke, ECF No. 136.

NAB, long before I got there," and "believed it was an accepted practice at other banks" and "didn't see it as being contrary to AFMA rules."

259.    For example, Johnson sent Sheridan and other employees within NAB's Wholesale Banking business line an email on May 20, 2008 in which Johnson wrote that NAB had a "small down set [*i.e.* short BBSW exposure] and another punter was with us, but there were no offers… it took nothing to push it [BBSW] 5 points lower."

260.    On June 18, 2008, Johnson sent an email to Sheridan and other employees within NAB's Wholesale Banking business line stating that "Rate sets – We have 3mth down a yard and 6mth down 200mio tomorrow. We need to do some buying before a set to the topside the following day, so this shouldn't present too many problems."

261.    Johnson sent numerous similar emails to NAB Wholesale Banking employees with responsibility for establishing BBSW-Based Derivatives trading positions in the United States, indicating that this was a common practice within NAB's Wholesale Banking business line. In ASIC filings, the recipients are listed as "various NAB recipients."

262.    Other employees within NAB's Wholesale Banking business line made sure to keep Sheridan and other NAB traders responsible for establishing BBSW-Based Derivatives positions in the United States informed of NAB's plans to manipulate BBSW and the results of manipulation on days when NAB had a large BBSW-Based Derivatives exposure. For example, on December 10, 2010, Tsakiris informed colleagues within NAB's Wholesale Banking business line that NAB planned to "sell the rest of it [Prime Bank Bill inventory] out on the 13th so we have room to buy [Prime Bank Bills] on the 14th and 15th." Another NAB employee forwarded this update to Sheridan.

263.    On a similar occasion on Friday May 20, 2011, Tsakiris advised other traders within NAB's Wholesale Banking business line that NAB had manipulated BBSW "as low as possible as we have a large down set on Monday." NAB trader Helmeet Najjhur forwarded this email to Sheridan.

264.     These regular updates concerning NAB's BBSW exposure and plans to manipulate BBSW continued into 2012.

265.     NAB maintained trading systems during the Class Period that measured NAB's BBSW exposure on a near real-time basis, for one year into the future, and which contained the amount and direction of that exposure for each day.

266.     NAB Wholesale Banking employees located in the United States executed BBSW-Based Derivatives transactions in the United States market and entered these transactions into NAB's trading systems.

267.     NAB made these trading systems available to traders who were responsible for trading BBSW-Based Derivatives as part of NAB's short term interest rate trading unit. NAB employed short term interest rate trading personnel, who were also responsible for trading Australian dollar FX forwards as well as BBSW-Based swaps, in its New York branch during the Class Period.

268.     Employees within NAB's Wholesale Banking business line distributed daily updates concerning NAB's BBSW exposure and Prime Bank Bill trading activity other NAB trading units responsible for trading BBSW-Based Derivatives, including in the United States. ASIC documents show that NAB allowed BBSW-Based Derivatives traders in its Wholesale Banking business to maintain a portfolio of Prime Bank Bills, which they used to manipulate BBSW.

269.     Accordingly, NAB's trading and sales staff located in the United States established BBSW-Based Derivatives positions knowing the amount and direction of NAB's BBSW exposure in near real-time for up to one year in the future. At the same time, ASIC's evidence demonstrates that NAB regularly manipulated BBSW as often as twice per week to benefit these BBSW exposures.

270.     NAB used its trading systems to build large BBSW exposures that it used to generate additional trading profits by manipulating BBSW on that date. This practice enabled NAB to earn

outsized profits from very large BBSW exposures that ordinarily would have been prohibitively risky. For example, on July 21, 2008, Paul Howarth (who served as NAB's representative on the AFMA's NTI committee during the Class Period) explained to other traders within NAB's Wholesale Banking business line that "we don't want to close out our rateset exposures. On the contrary, we are trying to add to them, because of the bbsw mechanism, we (nab) have a comparative advantage." Howarth further noted that NAB's practice of developing large BBSW exposures to profit from BBSW manipulation "goes in part to explain o[u]r particular keen-ness in attracting off-shore flow in short end derivatives." Howarth's reference to "off-shore flow" refers to BBSW-Based Derivatives trading positions established at NAB's major trading centers outside of Australia, including NAB's New York branch.

271.    NAB maintains accounts located in this District for trade payment, settlement, and clearing purposes, which included transactions in BBSW-Based Derivatives. NAB reports five separate payment accounts and three separate accounts located in this District that it uses when trading BBSW-Based Derivatives in this District with counterparties located throughout the United States. For example, NAB uses the Bank of New York's trade settlement system for BBSW-Based Derivatives trades.

272.    During the Class Period, NAB employed its Head of Global Institutional Banking, Patrick Ryan, in New York City. NAB employed a team of 80 foreign exchange specialists to provide service globally, quoting prices on a 24-hour basis through sales teams located in different time zones, including in the United States, to allow NAB clients to access liquidity and execute spot, forward, and swap transactions 24 hours a day, including BBSW-Based Derivatives transactions.

273.    NabSecurities, LLC ("NabSec") is a wholly-owned subsidiary of Defendant NAB. NabSec was formed under the laws of the State of Delaware on September 25, 1998 as a limited

liability company. NabSec is headquartered at 245 Park Avenue, 28th Floor, New York, NY 10167, the same location as Defendant NAB's New York branch.

274.    NabSec is a registered broker-dealer and a member of FINRA. As a registered broker-dealer, NabSec engages in trading, brokerage and investment advisory services, on behalf of NAB. Such activities include acting as a market maker with respect to transactions by U.S. investors in BBSW-Based Derivatives.

275.    Richard Rauchenberger, Chairman of NabSec's Board since 2010, is also head of Defendant NAB's New York branch. Tom DeMaio, President and CEO of NabSec since 2004, has been employed by Defendant NAB since 1996 and is currently a Managing Director and Head of Markets, Americas for Defendant NAB.  At least four of the NabSec's five directors are NAB employees. NabSec identifies Defendant NAB and two members of NabSec's board, who are also NAB employees, Tom DeMaio and David Petrullo, an NAB Managing Director, as "direct[ing] the management or policies of the firm [*i.e.*, NabSec]."

276.    NAB and NabSec solicited and encouraged United States residents to enter into BBSW-Based Derivatives transactions while actively involved in the conspiracy alleged in this Complaint. For example, from no later than December 14, 2007 through at least 2011, at the direction of Defendant NAB, NabSec produced and distributed reports weekly reports that often contained suggestions for transactions in derivative products. In these reports, NAB and NabSec omitted that NAB was engaged in a conspiracy that rendered BBSW artificial to the advantage of NAB and its co-conspirators.

277.    ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

278.   ██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

279.   ██████████████████████████████████████████

████████ ██  ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

280.   ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

281.   ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

[76] ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

75

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

282.   ████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████

283.     NAB distributed these reports throughout the Class Period to investors in the United States market.

284.     Through at least the foregoing acts, Defendant NAB acted in the United States to develop the market for BBSW-Based Derivatives and to establish substantial U.S. BBSW-Based Derivatives positions here.

285.     Further, Defendants NAB and NabSec maintained accounts located in this District for trade payment, settlement and clearing purposes, and took steps to debit U.S. resident accounts, send emails and other communications from within the United States confirming such steps, take U.S. residents' collateral and otherwise acted in the U.S. to collect the manipulated profits from Defendants' BBSW manipulations. At no time during such conduct, did NAB or NabSec disclose that the prices and payments due under BBSW-Based Derivatives were being manipulated to the advantage of NAB and its co-conspirators at the expense of Defendants' BBSW-Based Derivatives customers and other investors in the United States BBSW-Based Derivatives market, such as Plaintiff OCERS and the Class.

## I.     Westpac

286.     Defendant Westpac Banking Corporation ("Westpac") is a wholly owned subsidiary of Westpac Banking Group, and was both an AFMA Prime Bank and a member of the BBSW Panel throughout the Class Period. Defendant Westpac had an active presence in the United States throughout the Class Period which included marketing BBSW-Based derivatives, recommending BBSW-Based Derivatives to counterparties, and arranging that U.S. residents deposit collateral to accounts located in this District to secure the performance on such derivatives, and collecting payments due under the BBSW-Based Derivatives.

287.     Westpac has a history of operating in America spanning more than 40 years and a dedicated US based team, headquartered in New York.[77] Westpac filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[78]

288.     In March 2010, Westpac renewed and expanded its lease at 575 5th Ave, New York, NY 10017 where it has resided since 1996 and where it operates a federally-licensed branch.[79] The renewal option "enables Westpac to maintain its prestigious location [and] redesign its layout to accommodate a growing subsidiary…"[80]

289.     Westpac considers its New York Branch to be a legal and operational extension of Westpac Banking Group.[81] Westpac's New York Branch is a U.S. federally-licensed branch and therefore is subject to supervision, examination and extensive regulation by the Federal Reserve

---

[77] *See Westpac group globally at a glance*, WESTPAC NEW ZEALAND LIMITED (2016), https://www.westpac.co.nz/wib/about-us/westpac-group-globally-at-a-glance/ (last visited Dec. 4, 2016).
[78] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Westpac Banking Corporation, (Dec. 31, 2015) at 4-5, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/wbc-165-1512.pdf.
[79] *See Aussie bank recommits at 575 Fifth*, REAL ESTATE WEEKLY, Mar. 31, 2015, http://rew-online.com/2015/03/31/aussie-bank-recommits-at-575-fifth/ (last visited Dec. 4, 2016).
[80] *Id.*
[81] *See Westpac 2015 Resolution Plan*, *supra* note 65, at 16.

Bank under the U.S. International Banking Act of 1978 and related regulations.[82] Westpac is a provisionally registered swap dealer with the CFTC.[83]

290.     Westpac has further cemented its New York footprint by soliciting internship opportunities for its Westpac Americas, New York program, where candidates were encouraged to "[i]mmerse yourself in New York's financial sector while supporting Westpac to develop relationships with some of the world's biggest companies."[84] Globally, Westpac's specialty is in AUD and NZD currencies, focusing on international clients wishing to do business with Australia and New Zealand. It has offices in Europe, the U.S., and Asia. Westpac's Financial Markets and Treasury Division, which was primarily responsible for managing Westpac's trading activities in the BBSW Fixing Window, boasts that it "is a leading provider of Fixed Income, Foreign Exchange and Commodities products and services to our core retail, corporate and institutional clients, wherever they are located," through teams based in Australia, New York, and London.[85] Westpac's New York office allows it to offer clients "[r]ound the clock 24hr 5.5 days a week coverage providing seamless execution" via electronic foreign exchange trading platforms.[86] During the Class Period, Westpac employed a Director and VP of Corporate Foreign Exchange and Interest Rate Derivatives in its New York office as well as a Director of Corporate Foreign Exchange and Commodities sales to provide risk management services, including foreign exchange, commodities, and interest rates, to

---

[82] *See Public Section of 2013 § 165(d) Tailored Resolution Plan*, Westpac Banking Corporation, (Dec. 31, 2013) at 13, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/wbc-165-1312.pdf.
[83] *See Corporate terms and conditions*, WESTPAC BANKING CORPORATION, https://www.westpac.com.au/terms-and-conditions/wib-terms-conditions/ (last visited Dec. 2, 2016).
[84] Press Flyer, Westpac, Institutional Banking Intern: Westpac Americas (2015), https://www.internz.aut.ac.nz/students/international-internships/2016-opportunities/westpac-americas2 (last visited Dec. 4, 2016).
[85] *Financial Markets & Treasury,* Westpac Group Graduate Programs (2013), https://graduates.westpacgroup.com.au/intern_financial_markets (last visited Dec. 4, 2016).
[86] *eFX,* Westpac Banking Corporation, https://www.westpac.com.au/corporate-banking/financial-markets/foreign-exchange/efx/ (last visited Dec. 4, 2016).

Westpac's North American client base, consisting of Fortune 100 companies from a diverse industry set encompassing mining, media and technology, industrials, financials, energy and utilities.

291.    In its 2018 Annual Report, Defendant Westpac described its two specialist global desks "which aim to be the market leaders in credit and rates products, providing markets in: Interest rate swaps, currency swaps, interest rate options and fixed interest derivatives, Commonwealth Government, Semi-Government, supranational/agency, and CPI-linked cash bonds…"[87]  Dennis Gorman, Director, Head of Institutional Sales Americas in New York, is among the contacts provided for U.S. investors.

292.    Westpac's foreign exchange forward business trades BBSW-Based Derivatives with United States counterparties from its offices in New York. The Global Head of FX Forwards, Craig Betts, manages a global team based in New York, London, Sydney, and Auckland.

293.    Westpac's Group Treasury book is managed throughout the trading day by Westpac employees based in New York, London, and Sydney. During New York hours, the book is managed by William Trembath, a Senior Associate in Group Treasury, from his office in New York. Westpac made the following admissions about its Group Treasury book in its responsive pleadings in Australian Federal Court:

> Group Treasury dealt in financial products and entered into transactions involving financial products, including Actual BBSW Referenced Products and BAB Futures, on the Defendant's behalf
>
> * * *
> the net profit and loss of the Defendant affected by a movement in BBSW was determined by a range of matters including Group Treasury's exposure to the level of BBSW on any given day.

294.    Westpac further admitted that it calculated its daily BBSW exposure by aggregating the total long BBSW positions and short BBSW positions from its Group Treasury book.

---

[87]   Westpac Banking Corporation website – Financial markets/ Credit and Rates/ Global contacts available at: https://www.westpac.com.au/corporate-banking/financial-markets/credit-and-rates/

Accordingly, when Westpac Group Treasury personnel transacted with counterparties located in the United States and entered those trades into its Group Treasury trading book, they knew that those trades would be benefited from Westpac's BBSW manipulation. Accordingly, Westpac purposefully directed its manipulation of BBSW at the United States market.

295.     Westpac Capital Markets LLC ("WCM") is a U.S. subsidiary of Defendant Westpac. WCM is a Delaware limited liability company that was incorporated on June 7, 2012.

296.     WCM lists its principal place of business with the SEC as 575 Fifth Avenue, Floor 39, New York, New York 10017, the same address as Westpac's New York Branch.  In March 2015, Westpac renewed and expanded its lease at 575 Fifth Avenue, having resided there since 1996.[88] The renewal option "enables Westpac to maintain its prestigious location [and] redesign its layout to accommodate a growing subsidiary…"[89]

297.     WCM is a registered broker-dealer under the Securities Exchange Act of 1934 and became a member of FINRA on January 15, 2013.  In its capacity as broker-dealer in the United States, WCM executes, clears and settles all securities transactions through Defendant Westpac and its subsidiaries, as permitted by SEC Rule 15a-6 and pursuant to a services agreement with Westpac. Through that services agreement, WCM issues required confirmation statements to U.S. investors and maintain books and records with respect to transactions entered into by WCM under the service agreement. During the Class Period, WCM arranged securities transactions with institutional clients referred by Westpac, and received revenue through a cost-plus contractual agreement with Westpac.[90]

---

[88] *See* Aussie bank recommits at 575 Fifth, REAL ESTATE WEEKLY, Mar. 31, 2015, http://rew-online.com/2015/03/31/aussie-bank-recommits-at-575-fifth/ (last visited Dec. 4, 2016).

[89] *See* Aussie bank recommits at 575 Fifth, REAL ESTATE WEEKLY, Mar. 31, 2015, http://rew-online.com/2015/03/31/aussie-bank-recommits-at-575-fifth/ (emphasis added) (last visited Dec. 4, 2016).

[90]   *See* WCM's September 30, 2014 Focus Report at p. 6, available at: https://www.sec.gov/Archives/edgar/vprr/1404/14042290.pdf

298.     In a Form 20-F disclosure to the SEC in 2010, Westpac described its trading of derivatives in its capacity as both a proprietary trader and market maker in the United States market, referring to "key markets" which included the United States:

> As a trader, the Group's [*i.e.* Westpac's] primary objective is to derive income from the sale of derivatives to meet Westpac's customers' needs. In addition to the sale of derivatives to customers, the Group also undertakes market making and discretionary trading activities. Market making involves providing quotes to other dealers, who reciprocate by providing the Group with their own quotes. This process provides liquidity in the key markets in which the Group operates. The Group also trades on its own account to exploit arbitrage opportunities and market anomalies, as well as to take outright views on market direction. These activities, known as proprietary trading, represent a limited part of the Group's derivative activities.[91]

299.     WCM participated as a member of Defendant Westpac's "Group" operations, as described in its Form 20-F disclosure.  According to Part III of WCM's Focus Report filing for the reporting period ending September 30, 2017, WCM describes itself as a "chaperoning" broker-dealer, primarily involved in the brokerage of Australian and New Zealand interest rate and credit fixed income products to institutional clients.

300.     During the Class Period, employees within Westpac's Financial Markets Division were made aware of Westpac's plans to manipulate BBSW on future trading days. Employees within Westpac Group Treasury solicited and received requests from BBSW-Based Derivatives traders located in Westpac offices located outside Australia to engage in BBSW manipulation to benefit BBSW-Based Derivatives trading positions. For example, ASIC found that Westpac Group Treasury employees such as Sophie Johnston and Colin Roden would "communicate their book's BBSW Rate Set exposure with each other and with employees in other PRM books including… Financial Markets AUD Swaps book."

---

[91]   Westpac Banking Corporation Form 20-F for the fiscal year ended September 30, 2010 at p. 254, available at: https://www.secinfo.com/d11MXs.r1XS9.htm.

301.     At the same time, Westpac admitted that: "From time to time during the relevant period, certain employees of Westpac's Financial Markets division employed in New York may have entered into transactions involving certain derivative products…"[92] Westpac also communicated to potential recruits for its Financial Markets business that the business "live[s] and breathe[s] Australian and New Zealand markets" but does so in a "global framework" that involves "multinational teams based in London, New York, and Asia."  The employees who established these BBSW-Based Derivatives trading positions in the United States included employees within Westpac's Financial Markets business.

302.     During the Class Period, Westpac and WCM traded with United States counterparties in BBSW-Based derivatives, including Class members, and made continuous written and oral recommendations to U.S investors to trade BBSW-based derivatives from their offices in New York. Through the foregoing and multiple other steps, Westpac directly acted in the U.S., and directed the actions of WCM, to engage in BBSW-Based Derivatives trading with customers located in the United States. Neither Westpac nor WCM disclosed to Class members or any other U.S. investors that it was engaged in a conspiracy to fix the prices of BBSW-Based Derivatives, including those it traded with customers in the United States.

303.     Westpac collected payments due under BBSW-Based Derivatives transactions from within the United States throughout the Class Period.

### J.     Deutsche Bank

304.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany. Deutsche Bank maintains a substantial presence in the United States, as is more particularly alleged below.

---

[92] *See* Westpac Decl. ECF No. 131.

305.     Deutsche Bank filed its most recent U.S. Resolution Plan on July 1, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[93]

306.     Deutsche Bank's U.S. headquarters is in New York. Its New York branch is located at 60 Wall Street, New York, NY 10005. Deutsche Bank considers its New York branch to be a "material entity" within the United States.[94] Deutsche Bank's New York branch acts as an agent of Deutsche Bank in the United States and in this District. Deutsche Bank's New York branch has been registered with NYSDFS and licensed to do business in this state since 1978. Deutsche Bank is also registered with the Board of Governors of the Federal Reserve System. Deutsche Bank's New York branch has more than 1,700 employees and total assets exceeding $152 billion. Deutsche Bank is a registered swap dealer with the CFTC. Deutsche Bank's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[95]

307.     Deutsche Bank based executive and senior-level interest rate and foreign exchange swaps traders at its New York office to trade products including G10 denominated currencies during the Class Period. From its New York office, Deutsche Bank offered FX, Rates and over the counter derivatives to its clients.[96] Deutsche Bank employs full-time specialized legal counsel at its New York office who specifically, "draft, review, and advise on over-the-counter derivatives and options (including credit, FX and rates) and structured finance transactions."[97]

---

[93] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Deutsche Bank AG, (July 1, 2015) at 1, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/deutschebank-165-1507.pdf.
[94] *See Public Section of 2014 § 165(d) Tailored Resolution Plan*, Deutsche Bank AG, (July 1, 2014) at 4, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/deutschebank-idi-1407.pdf.
[95] *See Federal Reserve Bank of New York 2007 Survey*, *supra* note 11, at 12, 16-17 (Deutsche Bank participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).
[96] *See* Job Announcement, Debt Market Structure, DEUTSCHE BANK (Oct. 3, 2016).
[97] Job Announcement, Counsel in Global Markets Team (Fixed Income & Currencies (FIC) and Swaps Infrastructure VP, DEUTSCHE BANK (Aug. 1, 2016).

308.    Through its wholly owned subsidiary, Deutsche Bank Securities Inc., Deutsche Bank engages in a high volume of securities transactions, including clearing activities, currency transactions, interest rate derivatives, and swaps, on behalf of American clients and with counterparties located in the United States and in this District.

309.    Deutsche Bank entered into Australian dollar-denominated derivatives transactions with Plaintiffs FrontPoint Asian Event Driven Fund L.P., FrontPoint Financial Services Fund L.P., and FrontPoint Financial Horizons Fund L.P., during the Class Period. Deutsche Bank AG agreed that these transactions were governed by New York law, listed its New York headquarters as its address for notices, and agreed to the following provision:

> **Governing Law**. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of law doctrine).

310.    Defendant Deutsche Bank AG operates in Australia through it wholly-owned subsidiary Deutsche Bank AG, Australia Branch which is headquartered in Sydney, Australia. During the Class Period, Deutsche Bank AG, Australia Branch was a member of the BBSW Panel. Deutsche Bank was an AFMA Prime Bank from May 1, 2007 to December 23, 2008.

**K.    HSBC**

311.    Defendant HSBC Holdings plc is a British public limited company with its principal place of business in London. HSBC Holdings plc is the parent company of some of the world's largest banking and financial services groups, with subsidiaries providing services in 75 countries and territories and approximately 16,000 employees in the United States. Through its American subsidiaries, HSBC Holdings plc's U.S.-based dealers trade in the over-the-counter foreign exchange

and derivatives markets, which include interest rate swaps, forward rate agreements, and foreign exchange swaps.[98] HSBC Holdings plc's ADRs are listed on the NYSE.

312.    HSBC Holdings plc's former global head of foreign exchange cash trading, Mark Johnson, was indicted and arrested by the FBI in the United States after an investigation of HSBC Holdings plc's and its subsidiaries foreign exchange trading practices.[99] Prior to his arrest, Johnson relocated to HSBC's New York offices for his role as head of foreign exchange and commodities in the Americas.[100] In 2014, the CFTC ordered HSBC to pay $275 million in fines for manipulating foreign exchange rates in the United States.[101]

313.    HSBC Holdings plc organizes itself into four global business lines based on function. HSBC Holdings plc, through subsidiaries in its Global Banking and Markets business line, employs foreign exchange and interest rate derivative traders in New York, including FX traders Rohan Yelvigi, who "executes daily foreign exchanges trades, spot, forward, swaps, options structures," Adler Shiga, and Sooyun Byun, and Vice President of foreign exchange Elio Spieza. HSBC Holdings plc's Global Banking and Markets business line also employs foreign exchange sales staff to target investors in New York, including a team dedicated to soliciting foreign exchange business with United States-based hedge funds. Jason Merritt, Vice-Presidents of FX Sales, and Sandra Tamayo, Senior Vice President and Head of FX Bank Sales, are both based in HSBC's New York office.

---

[98] *See* Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2010, at 13, 17-18 (HSBC participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer) (hereinafter "Federal Reserve Bank of New York 2010 Survey").

[99] Matt Turner, *Betrayal, corruption, and manipulation: 2 traders have been charged with 'front-*running', BUSINESS INSIDER (July 20, 2016) *available at* http://www.businessinsider.com/report-a-big-name-hsbc-trader-just-got-arrested-2016-7.

[100] Martin Arnold & Caroline Binham, *HSBC internal probe 'cleared' top forex traders*, CNBC (July 21, 2016, *available at* http://www.cnbc.com/2016/07/21/hsbc-internal-probe-cleared-top-forex-traders.html.

[101] Press Release, U.S. Commodity Futures Trading Commission, CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates (Nov. 12, 2014), *available at* http://www.cftc.gov/PressRoom/PressReleases/pr7056-14.

314.     From 2006 to 2015, Senior VP of Institutional FX Sales Patrick Pisapia and Senior VP of FX Sales Paul Denslow were based in New York. Lon Dolan is currently Senior Vice-President of FX Sales in HSBC Holdings plc's New York office. HSBC Holdings plc filed its most recent U.S. Resolution Plan on December 31, 2015 with the Board of Governors of the Federal Reserve System and the FDIC, as required by Title I, Section 165(d) of the Dodd-Frank Act.[102]

315.     HSBC Bank USA, N.A. is HSBC Holdings plc's principal U.S. banking subsidiary and is a national banking association chartered by the OCC, with 253 branches in the U.S. and 22 representative offices in the U.S., including 165 branches in the State of New York. It is a wholly owned subsidiary of HSBC North America Holdings Inc, which is a wholly owned subsidiary of Defendant HSBC Holdings plc. HSBC Bank USA, N.A.'s main office is in McLean, Virginia, and its principal executive offices are located at 452 Fifth Avenue, New York, NY. Its domestic operations are located primarily in the State of New York. HSBC Bank USA, N.A. has total assets of $183.1 billion as of December 31, 2015 and serves 2.4 million customers through its retail banking and wealth management, commercial banking, private banking, asset management, and global banking and markets segments. HSBC Bank USA, N.A. is subject to regulation by the OCC, the Federal Deposit Insurance Corporation, the Consumer Financial Protection Bureau and the Federal Reserve System. HSBC Bank USA, N.A. is registered with the CFTC as a provisionally registered swap dealer, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account." HSBC Bank USA, N.A. is an approved Swap Firm and National Futures Association Member.

316.     Defendant HSBC Bank Australia Limited ("HSBC Bank Australia") is a wholly-owned subsidiary of HSBC Holdings plc and is headquartered in Sydney, Australia. HSBC Bank

---

[102] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, HSBC Holdings plc, (Dec. 31, 2015) at 1, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/hsbc-165-1512.pdf.

Australia is HSBC Holdings plc's principal banking subsidiary in Australia.[103] During the Class Period, HSBC Bank Australia Limited was a member of the BBSW Panel.

317.     HSBC Holdings plc refers to HSBC Bank Australia as a "Principal Subsidiary" of HSBC Holdings plc and describes HSBC Bank Australia as its "Australian arm." HSBC Holdings plc's website writes that it conducts activities in Australia "through" HSBC Bank Australia. These activities included Prime Bank Bill trading, BBSW-Based Derivatives trading, and making BBSW submissions to the AFMA.

318.     Employees within both HSBC Bank Australia and HSBC Bank USA, N.A. conduct BBSW-Based Derivatives trading and sales and Prime Bank Bill trading as part of HSBC Holdings plc's Global Banking and Markets business line. HSBC Bank Australia and HSBC Bank USA, N.A. share a common brand that they emphasize when interacting with customers, and HSBC Holdings plc describes the HSBC brand as a "powerful asset across all our business lines and markets and gives us the strength and values to help grow our business."

319.     HSBC Holdings plc further emphasizes its international research and expertise in local markets as a key selling point for institutional customers of its Global Banking and Markets business line. For example, HSBC Holdings plc wrote that it was "committed to meeting customer demands locally and we back this up with international experience and expertise" in 2013. To supports its Global Banking and Markets business, HSBC Holdings plc uses "global relationship management teams." Employees within these teams interact with customers and negotiate trade documentation to establish commercial relationships, such as ISDA Master Agreements, with customers in major markets where HSBC Holdings plc and its subsidiaries operate. HSBC Holdings plc writes that its global relationship management teams "work closely with sector and product

---

[103] *See* Federal Reserve Bank of New York 2010 Survey, supra note 80, at 6.

specialists to provide tailored client solutions, putting HSBC[104] in its entirety to work for each of our clients." It further writes that its subsidiaries carrying out its Global Banking and Markets business, such as HSBC Bank Australia and HSBC Bank USA, N.A., "coordinate our activities closely around the client's global needs, taking advantage of HSBC's presence around the world."

320.    HSBC Holdings plc, through its Global Banking and Markets business line, designated certain employees as "product specialists" to direct trading and sales strategy and make pricing decisions about discrete categories of financial products (*e.g.*, Australian dollar foreign exchange forwards; BBSW-Based Swaps). Product specialists in BBSW-Based Derivatives for HSBC's Global Banking and Markets business line are employed within HSBC Bank Australia. As alleged above, these product specialists "work closely" with other employees within HSBC Holdings plc's Global Banking and Markets business lines that are nominally employed by other entities within the business line, such as HSBC Bank USA, N.A., who are responsible for managing customer relationships and executing trade documentation with clients.

321.    In the United States, HSBC Holdings plc tasked customer "relationship management" employees with negotiating and entering into ISDA Master Agreements and executing these documents with customers through a specialized division called "HSBC Securities Services." This division's roles is to support the Global Banking and Markets Division by executing trade documentation with institutional customers. The ISDA Master Agreement described in Part A.i.10, *supra*, that OCERS entered into with HSBC Bank USA, N.A. was executed by Paulomi Shah, a former employee of HSBC Holdings plc's Securities Services division, on behalf of HSBC Bank USA, N.A. OCERS transacted in BBSW-Based Derivatives with HSBC Bank USA, N.A. pursuant to this ISDA Master Agreement, including Australian dollar foreign exchange forwards.

---

[104] HSBC Holdings plc often fails to distinguish among legal entities within its Global Banking and Markets business line, and instead to refers to the business as "HSBC" or "Global Banking and Markets."

322.    Collectively, HSBC Holdings plc and HSBC Bank Australia Limited are referred to as "HSBC."

**L.    Lloyds**

323.    Defendant Lloyds Bank plc ("Lloyds Bank") is a U.K.-based financial services group that provides a wide range of banking services and is a wholly-owned subsidiary of Defendant Lloyds Banking Group plc.  Lloyds Banking Group plc was formed on January 19, 2009 when Lloyds TSB Group plc (the parent company of Lloyds TSB Bank plc) acquired HBOS plc. After this acquisition, Lloyds TSB Group plc changed its name to Lloyds Banking Group plc, the ultimate parent of Lloyds TSB Bank plc and HBOS. On September 23, 2013, Lloyds TSB Bank plc changed its name to Lloyds Bank plc. Lloyds Banking Group plc's U.S. activities "are primarily undertaken" by the New York branch of Lloyds Bank plc ("Lloyds Bank plc, New York Branch") located in this District at 1095 Avenue of the Americas, New York, NY 10036. Lloyds' ADRs are listed on the New York Stock Exchange.

324.    Lloyds Banking Group plc filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[105]

325.    Lloyds Bank maintained a substantial presence in the U.S. as is more particularly alleged below. Lloyds Bank is a registered swap dealer with the CFTC. Lloyds Bank plc, New York Branch is registered with the NYSDFS and is licensed to do business in this state.

326.    Lloyds Bank's New York branch is a material entity in the United States that conducts core business lines and/or critical operations for Lloyds Bank and acts as an agent for Lloyds Bank in the United States and in this District. Lloyds Bank's New York branch's primary

---

[105] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Lloyd's Banking Group plc, (Dec. 31, 2015) at 2, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/lloyds-165-1512.pdf.

activities include providing lending and deposit products to U.S. banks, other financial institutions, corporate non-financial institutions, and government agencies.

327.    Lloyds Bank engaged in Australian dollar-denominated lending and derivatives transactions with counterparties located within the United States during the Class Period. Lloyds Bank entered such transactions with asset management corporations, mortgage and loan corporations, insurance companies, banks, and other financial institutions that frequently transact in Australian dollar-denominated derivatives, including BBSW-Based Derivatives.

328.    Lloyds Bank based executive and director-level foreign exchange trading personnel at its New York office, including its Head of Foreign Exchange Trading for North America, during the Class Period. In 2015, when Garry Popofsky was hired by Lloyds Bank as its Head of Foreign Exchange Sales for the U.S., Andy Schaeffer, Lloyds' Head of Markets in North America, said "Our ability to attract someone of Garry's calibre and experience to the North America team demonstrates the capability and reputation we are building in the US. Garry's arrival will ensure even more focus can be given to delivering high-quality products and service to our clients."[106]

329.    To connect United States-based clients to the Australian financial markets, Lloyds Bank employed foreign exchange sales personnel who rotated between its Sydney and New York offices. For example, Paul Bernasconi served as Director of FX Institutional Sales and was based in both Sydney and New York.

330.    The Australian subsidiary of HBOS plc, Bank of Scotland Plc, Australia Branch, was a member of the BBSW Panel until November 15, 2010, when it became Defendant Lloyds TSB Bank plc, Australia. Lloyds TSB Bank plc, Australia is a subsidiary of Lloyds and was a member of the BBSW Panel from November 15, 2010, until the end of the Class Period.

---

[106] Robert Mackenzie Smith, *Lloyds appoints US head of FX sales*, FX WEEK, Apr. 29, 2015, *available at* http://www.fxweek.com/fx-week/news/2406155/lloyds-bank-appoints-head-of-fx-sales-for-us.

331.     HBOS Treasury Services PLC was an AFMA Prime Bank from May 1, 2007 until November, 2010, when it became Lloyds TSB Bank plc Australia Branch. Defendant Westpac acquired Lloyds Bank's Australian assets in October, 2013.

332.     Defendants Lloyds Bank and Lloyds Banking Group plc are collectively referred to as "Lloyds."

### M.     Macquarie Bank

333.     Defendant Macquarie Group Ltd. is a global banking and diversified financial services corporation headquartered in Sydney, Australia. Through its wholly-owned subsidiary, Macquarie Securities (USA) Inc., Macquarie has been expanding its operations in the United States.

334.     Defendant Macquarie Bank Ltd. ("Macquarie Bank") is an Australian corporation headquartered in Sydney, Australia, and is a global provider of banking, advisory, trading, asset management, and retail financial services. Macquarie Bank is a wholly-owned subsidiary of Macquarie Group Ltd. Macquarie Bank maintains a foreign representative office at 125 West 55th Street, 22nd Floor, New York, NY 10019, which is regulated by the NYSDFS. Including its wholly-owned subsidiaries, Macquarie maintains twenty-five offices in total across the United States. Macquarie's head of operations for the U.S., Michael McLaughlin, is based in New York.[107] Macquarie Group recruits students in the District for its New York offices:

> Fourteen employees from The Macquarie Group, a global investment banking and financial services firm, offered resume critiques and conducted mock interviews with nine DDC (Double Discovery Center—Columbia College, Columbia University) juniors and sophomores. The afternoon gave students real-world experience as they prepare for college admissions and future job interviews. Staff members from the firm's Macquarie Capital, Commodities and Financial Markets, Securities, Risk

---

[107] *See* David Bauerlein, *Global heavy-hitting bank Macquarie Group plans move to downtown Jacksonville that could create 123 jobs*, THE FLORIDA TIMES-UNION, Aug. 6, 2015, *available at* http://jacksonville.com/news/metro/2015-07-30/story/global-heavy-hitting-bank-macquarie-group-plans-move-downtown#.

Management, Financial Management Group, IT, and Legal divisions conducted resume critiques and mock-interviews.[108]

335.   Macquarie Bank, Ltd. transacted in BBSW-based interest rate swaps with Plaintiffs FrontPoint Financial Horizons Fund L.P., FrontPoint Asian Event Driven Fund L.P., and FrontPoint Financial Services Fund L.P., during the Class Period. The transactions between Macquarie Bank and FrontPoint called for floating payments based on BBSW to be made to Macquarie Bank's account with the Bank of New York in New York. In the ISDA Master Agreements governing these transactions, Macquarie included the following provision:

> **Governing Law**. This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement or any Transaction (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York (without reference to any choice of law rules that would result in the application of the law of any other jurisdiction).

336.   Macquarie Bank was a member of the BBSW Panel during the Class Period.

## N.   Royal Bank of Canada

337.   Defendant Royal Bank of Canada ("RBC") is the largest bank in Canada and is a bank holding company registered with the Federal Reserve.[109] In the United States, RBC offers a full suite of products and services which include corporate and investment banking, equity and debt origination and distribution, and structuring and trading. In the U.S., RBC has full industry sector coverage, offers a full investment banking product range, and competes with large U.S. and global investment banks as well as smaller regional firms. RBC is a provisionally registered swap dealer with the CFTC.

---

[108] Lisa Herndon, *The Macquarie Group held mock interview sessions with DDC juniors and sophomores*, Colombia College, Colombia University, https://ddc.college.columbia.edu/news/macquarie-group-held-mock-interview-sessions-ddc-juniors-and-sophomores (last visited Dec. 13, 2016).
[109] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Royal Bank of Canada, (Dec. 31, 2015) at 12, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/rbc-165-1512.pdf.

338.    Defendant RBC Capital Markets LLC is a premier global investment bank and is a wholly-owned subsidiary of the Royal Bank of Canada.

339.    Royal Bank of Canada filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[110]

340.    RBC has had a presence in the United States since 1899, when RBC opened a New York State chartered agency.[111] RBC maintains four federal branches (three in New York, New York and one in Miami, Florida); two state agencies in Texas; four representative offices, located in California, Delaware, Texas and Washington State; a subsidiary national bank, RBC Bank (Georgia), National Association; and a full service broker-dealer with its principal place of business in New York, NY.[112] RBC has over 700 traders in New York and in the last decade has continued expanding its New York operations.[113] In 2016, RBC announced additional plans to boost its share in the U.S. investment banking market and expand its presence in U.S. capital markets.[114]

341.    In 2010, RBC built a new 71,000-square-foot trading floor and hired approximately seventy people in trading and technology.  Robert Grubert, managing director, head of U.S. equity sales and trading specifically celebrated that he "can [now] walk down the rows and go from options to equities to emerging markets to high-yield to investment grade to FX" and can teach traders about relationships between products.  In 2012, RBC reported employing 1,705 front-office and 897 back-office employees in the United States with equity and fixed income sales and trading capabilities to target investors located in the United States.

---

[110] *Id.* at 3-4.
[111] *Id.* at 5.
[112] *Id.* at 5.
[113] *See* Boyd Erman, *How RBC is making waves in New York*, THE GLOBE AND MAIL, Aug. 23, 2012, *available at* http://www.theglobeandmail.com/globe-investor/how-rbc-is-making-waves-in-new-york/article4320190.
[114] *See* John Tilak, *RBC targets market share gains in U.S. investment banking*, REUTERS, Mar. 4, 2016, *available at* http://www.reuters.com/article/us-rbc-usa-idUSKCN0W52LW.

342.     From 2011 to 2012, RBC generated 25% of its Fixed Income and Currency revenue, which includes interest rate and FX derivatives, from the United States. RBC's New York FX business includes executives such as Elsa Lignos, Managing Director and Head of North American G10 FX Strategy, and Daniel Tenengauze, head of Emerging Markets and Global FX Strategy.

343.     In 2012, Jonathan Hunter, Global Head, Fixed Income & Currencies, gave a speech for RBC's "Analyst and Investor Day."  In this discussion, Hunter described exactly what Fixed Income and Currencies do, including using derivative and FX products out of New York, one of its primary hubs.  Some of these specific functions include "provide derivative solutions to clients through the use of interest rate swaps, cross-currency swaps and provide foreign exchange services and solutions."  Hunter has overseen RBC Capital Markets LLC Fixed Income and Currencies business from RBC's New York offices since 2006. In total, RBC derives roughly $8 billion annually from its activities in the United States.

344.     Defendant Royal Bank of Canada, Australia Branch is a wholly-owned subsidiary of RBS. Royal Bank of Canada, Australia Branch was on the BBSW Panel during the Class Period.

345.     Royal Bank of Canada, RBC Capital Markets LLC, and Royal Bank of Canada, Australia Branch are collectively referred to as "RBC Group."

**O.     Morgan Stanley**

346.     Defendant Morgan Stanley is a Delaware Corporation with its headquarters located at 1585 Broadway, New York, New York 10036. Morgan Stanley's FX business provides execution in spot, forward and derivative currency markets to government and institutional clients (including sovereigns and government agencies, corporations, pension plans, hedge funds and mutual funds).[115]

---

[115] *See Public Section of 2012 § 165(d) Tailored Resolution Plan*, Morgan Stanley, (June 29, 2012) at 25-26, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/morgan-1207.pdf.

347.    Morgan Stanley filed its most recent U.S. Resolution Plan on July 1, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[116]

348.    Morgan Stanley & Co. LLC, previously known as Morgan Stanley & Co. Incorporated, is a Delaware corporation with its headquarters at 1585 Broadway, New York, New York 10036. Morgan Stanley & Co. LLC is a wholly-owned subsidiary of Defendant Morgan Stanley and a "material entity," "significant to [Morgan Stanley's] core business and critical activities." It operates as the "primary institutional U.S. broker-dealer" for Morgan Stanley. Morgan Stanley & Co. LLC is registered with the SEC as a broker-dealer and with the CFTC as a futures commission merchant and provisionally as a swap dealer. Plaintiff OCERS entered into BBSW transactions during the Class Period directly with Morgan Stanley & Co. LLC (formerly known as Morgan Stanley & Co. Incorporated) pursuant to ISDA and FEOMA Master Agreements, as set forth more fully above.

349.    Defendant Morgan Stanley Australia Limited is headquartered in Sydney, Australia. Morgan Stanley Australia Limited provides investment banking services in Australia. It advises, originates, trades, and manages capital for governments, institutions, and individuals. During the Class Period, Morgan Stanley Australia Limited was a reserve member of the BBSW Panel.

350.    Morgan Stanley refers to itself as a "global investment bank" that organizes itself into three business lines based on function. It refers to the business line that engages in BBSW-Based Derivatives and Prime Bank Bill trading as its "Institutional Securities" business line. It conducts its Institutional Securities business primarily through wholly-owned subsidiaries.

351.    The wholly-owned Morgan Stanley subsidiaries that engage in BBSW-Based Derivatives sales and trading as part of Morgan Stanley's Institutional Securities business include

---

[116] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Morgan Stanley, (July 1, 2015) at 3-4, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/morgan-165-1507.pdf.

both Defendant Morgan Stanley Australia Limited ("Morgan Stanley Australia") and Morgan Stanley & Co. Incorporated ("MSCo."). As of 2010, Morgan Stanley reported that these entities "conduct sales and trading activities worldwide, as principal and agent, and provide related financing services on behalf of institutional investors."

352.    Morgan Stanley further organizes its Institutional Securities business into several subunits based on function. It refers to one of these activities as "Sales and Trading." Morgan Stanley Australia Limited and MSCo. work together to conduct Morgan Stanley's Sales and Trading business with respect to financial products that allow investors located in the United States to invest in Australian-dollar denominated financial products, including BBSW-Based Derivatives. For example, Morgan Stanley Australia Limited and MSCo. employees work together to publish marketing materials, including comprehensive reports about various geographic markets called "Blue Papers," that inform customers about developments in Australian financial markets. Morgan Stanley Australia Limited employees provide the expertise about Australian financial markets, while MSCo. employees distribute these materials to potential and existing customers in the United States.

353.    Morgan Stanley supports its Sales and Trading Activities by designating certain personnel to negotiate, arrange, and execute trade documentation with customers. These personnel are employed by Morgan Stanley (the parent company) but are authorized to execute contracts with customers on behalf of Morgan Stanley subsidiaries that carry out Sales and Trading activities within its Institutional Securities business, such as MSCo. and Morgan Stanley Australia Limited.

354.    As alleged in Part A.i.11 above, MSCo. executed an ISDA Master Agreement and a FEOMA with Plaintiff OCERS that contained a New York choice of law provision and a forum selection clause in which the parties consented to jurisdiction in this District. These agreements were executed by Julia Sands, a Managing Director and senior foreign exchanges salesperson employed by Morgan Stanley in New York, signing on behalf of MSCo.

96

355.     Collectively, Morgan Stanley and Morgan Stanley Australia Limited are referred to as "Morgan Stanley."

### P.     Credit Suisse

356.     Defendant Credit Suisse Group AG ("Credit Suisse Group") is a Swiss banking and financial services company incorporated in Switzerland. Credit Suisse Group provides a broad range of services to individual and corporate clients, such as investment banking, private banking, and asset management for customers located globally. Of its six primary offices, one is located in this District at 11 Madison Avenue, New York, NY 10010. Together with its subsidiaries, Credit Suisse Group employs over 8,000 people in the United States, over 7,000 of which are in New York.

357.     Credit Suisse Group filed its most recent U.S. Resolution Plan on July 1, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.[117]

358.     Defendant Credit Suisse AG, a wholly owned subsidiary of Defendant Credit Suisse Group, maintains an office at 11 Madison Ave. New York, New York 10010. Credit Suisse AG is registered with the NYSDFS and licensed to do business in this state. Credit Suisse AG is also licensed and supervised by the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York. Credit Suisse is also regulated by the SEC, the NYSE, the FINRA, the National Futures Association, and the U.S. Commodity Futures Trading Commission.[118] Collectively, Defendants Credit Suisse Group and Credit Suisse AG are referred to as "Credit Suisse."

---

[117] *See Public Section of 2015 § 165(d) Tailored Resolution Plan*, Credit Suisse Group AG, (July 1, 2015) at 3, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/creditsuisse-165-1507.pdf.
[118] *Id.* at 18.

359.     In 2013, Credit Suisse ranked first in overall fixed income trading in the U.S. with the largest market share of all dealers.[119] Credit Suisse's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which include Australian dollar interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[120] Credit Suisse's Investment Banking Department houses its Rate Products Team, which is a global market maker in cash and derivatives markets and a primary dealer in the United States, trading, *inter alia*, interest rate swaps and options and other risk management structures and forms.

360.     Credit Suisse's U.S.-based dealers actively trade in the over-the-counter foreign exchange and interest rate derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[121] Credit Suisse based executive level Vice Presidents, interest rates derivatives traders, and its Global Head of FX Electronic Trading in its New York office during the Class Period. In New York, Credit Suisse traders took "proprietary and hedging positions in FX forwards and other FX and interest rate (IR) products, including IR futures, IR options, IR swaps, OIS, FRAs, FX spot and FX options."

361.     Credit Suisse's U.S. broker-dealer subsidiary has been operating continuously in the United States since 1932, when the First Boston Corporation was founded, according to testimony that Credit Suisse's managing director, Daniel Mathisson, provided to the U.S. Senate Committee on Banking, Housing, and Urban Affairs on October 28, 2009, regarding trading and market structure issues. Credit Suisse's Advanced Execution Services is a team of approximately 200 financial and technological professions based in New York that executes trades electronically on behalf of mutual funds, pension funds, and hedge funds.

---

[119] *See* Greenwich Associates, *2013 Greenwich Leaders: U.S. Fixed Income*, at 1, *available at* https://www.greenwich.com/fixed-income-fx-cmds/2013-greenwich-leaders-us-fixed-income.
[120] *See* Federal Reserve Bank of New York 2010 Survey, supra note 80, at 12, 16-17.
[121] *Id.* at 12, 16-17 (Credit Suisse participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

362.   **The BBSW Panel:** Defendants ANZ, BNP Paribas, Australia Branch, Australia Branch, CBA, Deutsche Bank AG, Australia Branch, HSBC Bank Australia Limited, JPMorgan Chase Bank NA, Australia Branch, Lloyds TSB Bank plc Australia Branch, Macquarie Bank Limited, NAB, Royal Bank of Canada, Australia Branch, RBS Group (Australia) Pty Limited, UBS AG, Australia Branch, and Westpac, along with Citibank NA, were members of the BBSW Panel during the Class Period. These entities are referred to collectively as "Panel Banks."

363.   **AFMA Prime Banks:** Defendants ANZ, CBA, NAB, and Westpac were designated AFMA Prime Banks during the entirety of the Class Period. Defendant JPMorgan Chase, N.A. was a designated AFMA Prime Bank from early 2009 through November 2011. Defendant BNP Paribas, Australia Branch was a designated AFMA Prime Bank from 2005 through February 24, 2012. Defendant Deutsche Bank AG was an AFMA Prime Bank from May 1, 2007 through December 23, 2008. HBOS Treasury Services plc was an AFMA Prime Bank from May 1, 2007 through September 29, 2010. Citibank NA was an AFMA Prime Bank from 2005 through December 23, 2008. Collectively, the designated AFMA Prime Banks are referred to as "Prime Banks."

## Q.   ICAP

364.   Defendant ICAP plc is a UK-based voice broker and is the largest provider of electronic dealer broker and post trade risk services in the world. ICAP trades a wide range of derivative products, including interest rate derivatives, credit derivatives, foreign exchange, interest rate swaps, and equity swaps. ICAP SEF (US) LLC is a limited liability company organized under the laws of the State of Delaware and is a wholly owned subsidiary of ICAP Broking Holdings North America LLC. The ultimate parent company of ICAP SEF (US) LLC is ICAP plc, a company listed on the London Stock Exchange. ICAP SEF (US) LLC's Swap Execution Facility Rulebook list the laws of the State of New York, without regard to its conflict of laws principles, as the governing law

for all disputes arising out of or related to the SEF or any transaction.[122] ICAP's Swap Exchange Facility offers BBSW-Based Derivatives on to market participants in the United States.

365.    Defendant ICAP Australia Pty Ltd. is headquartered in Sydney, Australia and is the Australian subsidiary of ICAP plc. Collectively, ICAP plc and ICAP Australia Pty Ltd. are referred to as "ICAP."

### R.    Tullett Prebon

366.    Defendant Tullett Prebon plc is headquartered in London and is one of the world's leading interdealer brokers. Tullett Prebon products include fixed income securities and derivatives, interest rate derivatives, treasury products, equities, and energy and commodities.

367.    Tullett Prebon has its principal offices in New Jersey, London, Hong Kong, Singapore and Tokyo. Tullett Prebon's wholly-owned subsidiary, Tullett Prebon Financial Services LLC, is based in this District at One Seaport Plaza, 199 Water St, New York, NY 10038. Defendant Tullett Prebon's swap execution facility, known as "tpSEF", is a wholly-owned subsidiary of Tullett Prebon and is permanently registered with the ("CFTC"). tpSEF Inc.'s Rulebook lists the law of the State of New York as governing the SEF Rules regardless of the laws that would otherwise apply under applicable choice-of-law principles.[123]

368.    Defendant Tullett Prebon (Australia) Pty Limited is an Australian subsidiary of Tullett Prebon plc headquartered in Sydney, Australia. Collectively, Tullett Prebon plc and Tullett Prebon (Australia) Pty Limited are referred to as "Tullett Prebon."

369.    **Broker Defendants:** ICAP and Tullett Prebon were the only brokerages operating in the Prime Bank Bill market during the daily BBSW Fixing Window and possessed a 100% market

---

[122] *Swap Execution Facility Rulebook (Version 2.5)*, ICAP SEF (US) LLC (Feb. 2015) at 46, *available at* http://www.cftc.gov/filings/orgrules/rule013015icapsefsef002.pdf.

[123] *tpSEF Inc. Rulebook*, tpSEF Inc. (Nov. 10, 2016) at 88, *available at* http://www.tullettprebon.com/swap_execution_facility/documents/tpSEF%20-%20Rulebook.pdf?20161122.

share in this market during the Class Period. ICAP and Tullett Prebon are collectively referred to as the "Broker Defendants."

370.     John Doe Defendants Nos. 1-50 are other entities or persons, including banks, derivatives traders, and other co-conspirators whose identities are currently unknown to Plaintiffs. The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade and manipulation of BBSW and the prices of BBSW-Based Derivatives.

## SUBSTANTIVE ALLEGATIONS

### I.     Background

#### A.  The Money Market

371.     Financial market participants commonly distinguish between two kinds of markets: "capital markets" – like the stock market or bond market – where companies go to raise funds for long-term purposes, and the "money market," where borrowing and lending occurs on a short-term basis, typically for periods of less than one year.

372.     Banks are some of the most important money market participants. Banks both borrow from the money market to fund their operations and act as dealers in related over-the-counter interest rate derivatives, like swaps (*see* Part I.D.1 *infra*), which allow third-parties to exchange future cash payments based on movements in specified market interest rates.

373.     Banks use the money market to borrow money by issuing "Bank Bills." Bank Bills are bills of exchange — similar to checks — that require the issuing bank to pay a specified amount of money, *i.e.*, the "face value" of the bill, on a certain maturity date. The number of days between when a Bank Bill is issued and when it matures determines its "tenor." For example, a Bank Bill that matures in 90 days has a three-month tenor, while one maturing in 180 days has a six-month tenor.

374.     Banks issue Bank Bills at a discount to their face value. In this way, a Bank Bill serves as a short term loan, with the difference between the price paid for the bill and its face value representing the amount of interest. For example, assume an investor pays $98,382.75 to purchase a Bank Bill with a face value of $100,000 that matures in 120 days. When the investor redeems that Bank Bill at maturity it will receive the full $100,000 face value, $1,617.25 more than what it paid to purchase that bill. The extra $1,617.25 represents the amount of interest the bank paid to borrow $98,382.75 for 120 days, or approximately 5% annually.

375.     This example also demonstrates the inverse relationship between a Bank Bill's purchase price and its yield. Because interest is represented as the difference between a Bank Bill's purchase price and its face value, the amount of interest paid increases as the bill's purchase price decreases and vice versa. For example, if the purchase price of the Bank Bill in ¶ 374 above increased from $98,382.75 to $99,000.00, the yield of that bill would decrease to approximately 3.1% annually, as the purchase price moved closer to the face value. A decrease in the purchase price of that Bank Bill to below $98,382.75, however, would increase the yield to greater than 5% as the difference between the purchase price and $100,000 face value increased.

376.     Bank Bills can be "accepted" or "endorsed" by any bank. When a bank accepts a Bank Bill it becomes obligated to pay the face value of that bill on the maturity date. If instead a bank endorses a Bank Bill, it becomes obligated to pay the face value of that bill at maturity only if the acceptor or drawer is unable to do so. The terms "Bank Accepted Bill" and "Bank Endorsed Bill" refer to Bank Bills that have been accepted or endorsed, respectively.

377.     In addition to issuing Bank Bills, banks also sell certificates of deposit ("CDs") to raise short term funds. A CD is a document evidencing a deposit placed with a depository institution for a certain amount of time. The certificate states the terms of the deposit, typically the amount of the deposit, the maturity date, the interest rate paid, and the method of interest calculation.

102

378.     CDs can be either negotiable or nonnegotiable. A negotiable CD ("NCD") can be sold by the depositor to other parties who can in turn resell the NCD in the secondary market. In contrast, a nonnegotiable CD generally must be held by the depositor until maturity.

**B.     Australian Prime Banks**

379.     The Australian Financial Markets Association ("AFMA") is a trade association and the principal Australian financial markets industry group. Each Defendant, either directly or through a subsidiary it controlled, was a member of the AFMA during the Class Period.

380.     The AFMA organizes several committees, each with its own functions, procedures, and criteria for membership. One of the main AFMA committees, the Market Governance Committee, is responsible for developing and maintaining market protocols used to facilitate and promote the efficient and orderly running of the over-the-counter derivatives markets in Australia.

381.     The Market Governance Committee oversees a number of sub-committees with the objective of developing consensus in the market on technical matters such as transaction documentation, trading conventions, and market data. One of these sub-committees, the Negotiable & Transferable Instruments ("NTI") Committee, is responsible for maintaining the conventions for trading money market instruments, including Bank Bills and NCDs.

382.     The NTI Committee also runs the AFMA's annual election of "Prime Banks," a designated subset of banks operating in Australia whose Bank Bills and NCDs are recognized as having the highest quality with regard to liquidity, credit, and consistency of relative yield.

383.      To be eligible for Prime Bank status, a bank must be (1) an Australian Prudential Regulation Authority ("APRA") authorized deposit-taking institution; (2) classified by APRA as either an Australian-owned bank, foreign subsidiary bank, or branch of a foreign bank that is authorized to carry on banking business under the Australian Banking Act of 1959 or comparable legislation in its country of origin; and (3) able to meet certain credit rating criteria.

384.     Prime Banks are appointed through an election process from among the eligible banks. On or following the anniversary of the prior election the AFMA asks all institutions that meet the Prime Bank eligibility criteria to nominate a list of banks. Next, banks that the NTI Committee deems to be significant traders and investors in Bank Accepted Bills and NCDs vote on which of the nominated banks should be appointed Prime Banks. Votes are weighted according to a formula determined by the NTI Committee so that the most active market participants have a proportionally higher involvement in the process than less active members.

385.     The voting structure favors consistency. Existing Prime Banks are re-appointed if they capture at least 70% of the weighted survey vote. New banks face a higher threshold and must receive 80% of the weighted survey vote to become a Prime Bank. The process assumes that there will be at least three banks eligible and nominated as Prime Banks in each election.

386.     During the Class Period, there were between four and eight Prime Banks: Defendants ANZ, CBA, NAB, and Westpac were designated as Prime Banks for the whole Class Period. Defendant BNP Paribas was a designated Prime Bank from 2005 through February 24, 2012. Defendant Deutsche Bank was a designated Prime Bank from May 1, 2007, through December 23, 2008. Defendant JPMorgan Chase, N.A. and HBOS Treasury Services PLC were appointed Prime Banks for shorter periods of time, from early 2009 through November 30, 2011, and May 1, 2007, through September 29, 2010, respectively. Citibank was also a designated AFMA Prime Bank from 2005 through December 23, 2008.

387.     There are several advantages to the Prime Bank designation. Bank Bills and NCDs issued by Prime Banks trade at the lowest possible interest rates as a homogenous asset class known as "Prime Bank Bills." This increases liquidity and allows Prime Banks to raise funds in the money market at a discount. Prime Banks are also automatically members of the BBSW Panel and directly involved in setting Australia's short-term interbank interest rate.

388.     Prime Bank Bills are traded in two ways, either (a) through "dealer markets" comprised of interdealer brokers who acted as intermediaries, quoting prices at which their respective clients would buy ("bid") and sell ("offer") Prime Bank Bills as counterparties to and from other market participants; or (b) in direct trades between counterparties.

389.     Broker Defendants ICAP and Tullett Prebon were the only interdealer brokers operating markets for Prime Bank Bills during the Class Period. Both maintained electronic systems for reporting Prime Bank Bill prices and would post bids and offers for Prime Bank Bills at all tenors shortly after receiving bids and offers for their clients. This pricing information, once posted, became accessible by, and visible to, other market participants, in contrast to the direct trades between counterparties, which remained private.

## C.     The BBSW Fixing

390.     BBSW is intended to reflect the observed rate of interest paid on Prime Bank Bills actually traded in the Australian money market. The rate is calculated based on submissions from a group of fourteen panel banks, including Prime Banks, who are selected periodically through a private election held at the discretion of the current BBSW Panel. This discretionary election process resulted in an extremely low turnover in panel membership. While there were several BBSW panel elections during the Class Period, the composition of the panel did not change.

391.     The AFMA's Market Governance Committee administers the rate-setting process through its BBSW sub-committee, which is responsible for the overall management of the BBSW rate, rates directly related to the BBSW rate,[124] the procedure for the production of the BBSW rate, and the resolution of disputes among AFMA members involving BBSW and directly related rates.

---

[124] For example, the AFMA also publishes a rate called "BBSY", which creates a "bid" and an "offer" rate from BBSW by adding or subtracting five basis points (0.05%) to the BBSW fix.

392.     The BBSW Committee is comprised of two representatives from each of the following AFMA committees: (1) NTI Committee; (2) Interest Rate Options Committee; and (3) Swaps Committee. In addition, there is also one broker representative, two investment manager representatives, and one borrower representative on the committee. Although the exact membership of the BBSW Committee is secret, ASIC revealed that it included several of Defendants' traders directly involved in manipulating the BBSW during the Class Period, including:

> (a)  Paul Woodward, Andrew Miller, and Matthew Morris from ANZ (*see* Part II.A, *infra*);
>
> (b)  Colin Roden, Sophie Johnston, and Michael Dodd from Westpac (*see* Part II.A, *infra*);
>
> (c)  Paul Howarth and Michael Tsakiris from NAB. (*See* Part II.A, *infra*).

393.     According to AFMA guidelines, the BBSW is fixed every business day using the following procedure. First, the BBSW Panel Banks submit to the AFMA the observed "mid-rate," *i.e.*, the midpoint between the bid price at which banks offer to buy and the ask price at which they offer to sell, Prime Bank Bills with six tenors – one, two, three, four, five, and six months – traded between 9:55 A.M. and 10:05 A.M. Sydney Time (the "Fixing Window"). Panel members also submitted rates for the nine-month and twelve-month tenors until January 5, 2009, when the nine and twelve-month rates were discontinued.

394.     The BBSW Panel Banks were supposed to base their submissions to the AFMA on prices that were displayed on two Prime Bank Bill trading screens, one from ICAP and one from Tullett Prebon. The BBSW Panel Banks had access to these screens during the Fixing Window.

395.     Next, the AFMA calculates the BBSW "fix" for each tenor by ranking the quotes in numerical order and eliminating the highest and lowest submissions – a procedure known as "topping and tailing" – before averaging the remaining six submissions. The AFMA then publishes the resulting average rate to financial data providers, including Thomson Reuters and Bloomberg, who distribute BBSW rates within the United States, Australia, and other markets.

D.      **BBSW-Based Derivatives**

396.      The BBSW fix directly affects the prices of financial instruments that incorporate the rate as a component of price (collectively "BBSW-Based Derivatives") including, for example: (i) BBSW-based swaps; (ii) BBSW-based forward rate agreements; (iii) Australian dollar futures contracts; (iv) Australian dollar foreign exchange forwards; and (v) 90-day Bank Accepted Bill futures contracts. More than $1 trillion in BBSW-Based Derivatives traded "over-the-counter," directly between counterparties, within the United States during the month of April 2013 alone. In total, tens of trillions of dollars in BBSW-Based Derivatives traded over-the-counter and on public exchanges within the United States during the Class Period.

1.      BBSW-Based Swaps

397.      A swap is an over-the-counter BBSW-Based Derivative in which two parties exchange the obligation to make a series of payments based on some underlying principal amount for some set period of time. BBSW determines the price and payments due under BBSW-based swaps by determining the amount paid or received by each party.

398.      There are many different types of BBSW-based swaps. For example, in the most common "plain vanilla" interest rate swap, the parties agree to a "fixed-for-floating" exchange in which one party will make payments based on a variable price or rate, *e.g.*, BBSW, while the other will make payments based on a fixed rate, *e.g.*, 1.5%, for the same notional amount.

399.      Counterparties may also use swaps to conduct a "floating-for-floating" exchange in which both parties agree to make payments based on a variable price or rate. For example, one party can agree to make payments equal to the return on a stock or index, *e.g.*, the ASX 200, an index of the largest 200 stocks listed on the Australian Stock Exchange, in exchange for receiving interest rate payments based on a variable interest rate, like BBSW.

400.     Payments under a swap contract are due at regular intervals, *e.g.*, every six months, for the duration of the agreement on certain specified "fixing" or "reset" dates. Each time a payment is due, the amount owed by the two parties are netted against each other so that only the party with the larger obligation will make a payment. For example, assume Party A enters into a floating-for-floating swap contract with Party B and agrees to make payments every six months equal to the return of the ASX 200 index. In exchange, Party B agrees to make payments to Party A every six months based on the six-month BBSW tenor. On each reset date, if six-month BBSW is greater than the percentage return of the ASX 200 index, Party B has the larger obligation and will make a payment to Party A. But if the ASX 200 returns more on a percentage basis than six month BBSW, Party A has the larger obligation and will make a payment to Party B.

2.     BBSW-Based Forward Rate Agreements

401.     A forward rate agreement ("FRA") is an interest rate forward contract. FRAs, which are also known as single-period swaps, are similar to interest rate swaps and represent an agreement between two counterparties to exchange fixed-for-floating interest rate payments on some principal amount at a future reset date. On the reset date, the party with the larger obligation makes an interest rate payment equal to the difference between the fixed rate and floating rate specified in the contract. For example, assume Party A enters into a FRA with Party B in which Party A agrees to receive 4% interest on $1,000,000 and Party B agrees to receive interest equal to six-month BBSW, determined on a date one year in the future, for the same underlying principal amount. If, after one year, six-month BBSW is higher than 4%, Party A must pay Party B the difference in interest between 4% and the six-month BBSW fixing on that date. However, if six-month BBSW is lower than 4%, Party B must pay Party A the difference in interest. Thus, BBSW determines the price and payments due under a BBSW-based FRA.

### 3. CME Australian Dollar Futures Contracts

402.    A CME Australian dollar futures contract is an exchange-traded BBSW-Based Derivative that represents an agreement to buy (called a "long" position) or sell (called a "short" position) 100,000 Australian dollars in terms of U.S. dollars on some future date. Prices of CME Australian dollar futures contracts are determined by a formula that incorporates BBSW as one of its terms. This formula uses BBSW to adjust the "spot price" of Australian dollars for immediate delivery to account for the "cost of carry," *i.e.*, the amount of interest earned on Australian dollar deposits over the duration of the agreement.

403.    Because BBSW is a component in the formula used to price CME Australian dollar futures contracts, there is a statistically significant relationship between a change in BBSW and a change in the prices of CME Australian dollar futures contracts. Plaintiffs used a regression analysis – a statistical process that evaluates the relationships among variables – to verify this relationship by comparing the daily change in: (1) the closing price of the CME Australian dollar futures contracts closest to expiration; (2) the spot price of purchasing Australian dollars in terms of U.S. dollars; and (3) the one, three, and six-month tenors of BBSW. This regression analysis produced statistically significant results indicating that a change in BBSW affects the prices of CME Australian dollar futures contracts.

### 4. Australian Dollar Foreign Exchange Swaps & Forwards

404.    A foreign exchange swap is a contract in which two counterparties agree to exchange streams of interest payments in different currencies for an agreed-upon period of time and to exchange principal amounts in different currencies at an agreed-upon exchange rate at maturity. There are two components to a foreign exchange swap: (1) a spot transaction in which the parties buy or sell a certain amount of one currency (*e.g.*, Australian dollars) at the current market prices for immediate delivery (*i.e.*, typically within two days); and (2) a foreign exchange forward, which

reverses the spot transaction by buying or selling an equivalent amount of a second currency (*e.g.*, U.S. dollars) on some future maturity date (*e.g.*, 14 days later).

405.     An Australian dollar foreign exchange forward is an agreement to buy or sell Australian dollars on some future date and is the over-the-counter equivalent of a CME Australian dollar futures contract. Australian dollar foreign exchange forwards are priced using the same formula that determines the value of CME Australian dollar futures contracts and the prices of Australian dollar foreign exchange forwards are affected by changes in BBSW for the reasons stated in ¶ 403 above.

### 5.   90-Day Bank Accepted Bill Futures

406.     90-day Bank Accepted Bill ("BAB") futures contracts are standardized contracts in which one party, the "long," agrees to buy a 90-day Prime Bank Bill with a face value of $1,000,000 at a specified yield (and thus price) on a certain future expiration date and another party, the "short," agrees to sell a 90-day Prime Bank Bill with a face value of $1,000,000 at a specified yield (and thus price) on the same future expiration date.

407.     BAB futures contracts expire at noon on one of four dates per year; the Thursday before the second Friday in each of March, June, September, and December.

408.     BAB futures contracts are "deliverable," meaning that if a BAB futures contract is held through the expiration date then the "short" party must actually deliver the 90-day Prime Bank Bill(s) to the "long" party, who must then actually pay for those Prime Bank Bill(s). Delivery occurs on the day following the day on which the BAB futures contract expires.

409.     BAB futures contracts are traded on the ASX24 exchange. A party can enter into BAB Futures contracts with a term (time left to the expiry date) of up to five years.

410.     BAB futures contracts are quoted in terms of 100 minus the annual percentage yield of the underlying Prime Bank Bills. So a BAB futures contract quoted at "96" means that the parties

to the BAB futures contract agree to buy (or sell) $1,000,000 of 90-day Prime Bank Bill(s) on the expiry date at a price that represents a yield of 4% (that is, the "price" of the 90-day Prime Bank Bill will be discounted to reflect a yield of 4%).

411.     As BBSW Panel members and the largest BBSW-Based Derivatives dealers in the world, Defendants understood the direct, mathematical pricing relationships described above and that manipulating the BBSW fixing would affect the prices of BBSW-Based Derivatives, including those traded within the United States.

## II.     Defendants Agreed to and Did Restrain Trade In, and Intentionally Manipulated the Prices of, BBSW-Based Derivatives

412.     ASIC's investigation uncovered hundreds of communications evidencing a conspiracy among Defendants to systematically manipulate BBSW by *inter alia*: (1) engaging in manipulative transactions during the Fixing Window; (2) making false BBSW submissions in violation of AFMA guidelines; (3) sharing proprietary information regarding BBSW-Based Derivatives positions with other Defendants; and (4) using their control over the AFMA rule-making process to ensure that BBSW remained susceptible to manipulation. This manipulative conduct, together with UBS', RBS', and BNP Paribas' admitted false reporting of BBSW, fixed BBSW-Based Derivatives prices at artificial levels that financially benefited Defendants at the expense of Plaintiffs and the Class.

### A.  Defendants Rigged BBSW by Coordinating Manipulative Transactions within the Fixing Window

413.     Bank Defendants rigged BBSW by engaging in transactions during the Fixing Window to manipulate the supply of Prime Bank Bills. These illegitimate trades were often uneconomic. Communications show that Defendants would intentionally lose money on Prime Bank Bill transactions to manipulate BBSW in a direction that generated considerably larger profits

from their derivatives positions. Thus, the net gain from manipulating the fixing was positive even when the Prime Bank Bill transactions Defendants' used to manipulate the fixing resulted in a loss.

414.   Defendants' manipulation of BBSW had already developed into a routine business practice by February 2003, when NAB's Head of Money Markets coached a colleague about "our natural BBSW advantage." In October 2003, an NAB dealer wrote that there was "[n]o strong need to get funds in right now, unless opp[o]rtunity arises to protect a rate set."

415.   To maximize their impact on the BBSW fixing, Bank Defendants conferred with each other before executing these manipulative transactions, aligning their interests and recruiting co-conspirators to trade in the same direction. Bank Defendants also engaged in transactions with each other before the start of the Fixing Window to concentrate the supply of Prime Bank Bills, which they referred to as "stock," "ammo," or "bullets," so that their traders, with help from the Broker Defendants, could "puke out" a massive quantity during the Fixing Window.

1.   Defendants manipulated BBSW by artificially increasing or decreasing the supply of Prime Bank Bills during the Fixing Window

416.   The forces of supply and demand determine the prices and, therefore, yields, of Prime Bank Bills. Defendants' strategy of manipulating the BBSW fixing was effective because they controlled the supply of Prime Bank Bills during the Fixing Window. As Prime Bank Bill supply increases, Prime Bank Bill prices decrease and yields rise. *See* ¶¶ 374-75, *supra*. Thus, artificially increasing the supply of Prime Bank Bills during the Fixing Window results in an artificially higher BBSW fix.

417.   To determine which direction to manipulate BBSW on a given day, Defendants engaged in a daily practice of calculating the net BBSW exposure, *i.e.*, the amount of profit or loss caused by movements in BBSW, of certain trading books. Through this process, Defendants were able to track in real-time the amount of revenue they derived from each basis point change in BBSW and ensure that their manipulative trading was executed with mathematical precision.

418.    ANZ trader Mark Budrewicz explained the effect of selling Prime Bank Bills to increase supply during the Fixing Window to ANZ analyst Saju Yohannan in the December 10, 2010 phone conversation below:

> **December 10, 2010**
>
> ANZ [Budrewicz]: BBSW is a traded rate at 10 o'clock…people in the market can affect that rate by selling bills or buying bills in the market…So by me selling bills, I'm adding to the supply of bills into the market, right - - which then pushed the yield higher… Or pushes the price lower and the yield higher conversely…So all I'm doing is I'm taking those bills and selling them back out on the same day
>
> ANZ [Yohannan]: All right

419.    Budrewicz's example was not a hypothetical. ANZ calculated that its Global Markets book had a $5.4 billion net long exposure to the results of the December 10, 2010 fixing, *i.e.*, it would benefit from an increase in the rate, and planned to manipulate BBSW higher on that day.

420.    To carry out this plan, Budrewicz acquired $1.575 billion in Prime Bank Bills over two days for the express purpose of manipulating the BBSW fix. First, he purchased $860 million in Prime Bank Bills from various sources on December 9, 2010, explaining to a colleague in a contemporaneous email that this "stock is going to be used to affect a rate set that I have tomorrow."  Next, he purchased and held 715 December 2010 BAB futures contracts on the expiration date, taking delivery of $715 million in Prime Bank Bills on December 10, 2010. Budrewicz explained in a different conversation with Yohannan that these additional bills were also going to be used to manipulate the BBSW fix:

> **December 10, 2010**
>
> ANZ [Budrewicz]: I still ended up taking 715 bills into expiry. These are physically delivered, ie I will receive $715mio 90day bills on Friday. What
> I have done today, is to sell them into the rate set to help push it in my favour.

421.     Standing for delivery of these 715 BAB futures contracts was uneconomic and caused ANZ to lose money. But as Budrewicz explained, in another message to Yohannan, the massive size of ANZ's BBSW exposure made up for the loss and resulted in a net profit:

> **December 10, 2010**
> ANZ [Budrewicz]: Now I would have lost money on the bills. However if my rate set is larger…than 715 mill, say its $2bn. I've push that rate set 6 points on $2bn. I might have lost 715mill, 6 points…but net – net I'm still better

422.     ANZ sold all $1.575 billion in Prime Bank Bills it had acquired during the December 10, 2010 Fixing Window. This massive sale accounted for 62.2% of all Prime Bank Bills traded that day. Following this transaction, one-month and three-month BBSW tenors increased from 4.85% and 5.07% on December 9 to 4.905% and 5.095% on December 10, 2010, financially benefiting ANZ's large net long position.

423.     Prime Bank Defendants could also increase supply by issuing new Prime Bank Bills during the Fixing Window. This had the same effect as selling and would drive Prime Bank Bill prices lower while increasing yields. For example, in the chat below Budrewicz explains that ANZ planned on issuing new bills during the December 1, 2010 Fixing Window to manipulate BBSW higher to benefit ANZ's long BBSW exposure of $777 million:

> **December 1, 2010**
> ANZ [Budrewicz]: so we are issuing today into the rate set
> I am not concerned with the level would like to push it as high as possible… will decs bills move, if todays BBSW gets rammed?

424.     Following this communication, both the one-month and three-month BBSW tenors increased by 1 and 3 basis points respectively, from 4.82% and 5.07% on November 30, 2010 to 4.83% and 5.1% on December 1, 2010, consistent with ANZ's plan.

425.     The ability to manipulate BBSW by issuing new Prime Bank Bills served as a major incentive for banks to acquire and then retain Prime Bank status. In the chat below, which took

114

place just after Citibank and BNP Paribas acquired Prime Bank status, a trader from NAB relays a

conversation he had with a Citibank trader where the Citibank trader had complained of Citibank's

inability to "issue" Prime Bank Bills in the Fixing Window to offset Westpac's downward

manipulation of BBSW:

> **March 9, 2005**
> NAB [Reid]: FYI, in a chat with David Heriot from Citibank ages ago, he has
> showed that he has had a rate setting to the tune of 2 bio, that went against him
> when WBC pushed the rate down & he couldn't issue to offset it. Not sure if this is a
> continuing swap interest, or just a FRA set, but it would appear he will be there at
> times to support the rate.

426.    While increasing Prime Bank Bill supply during the Fixing Window caused prices to

fall and yields to rise, decreasing supply had the opposite effect. Decreasing Prime Bank Bill supply

during the Fixing Window through large purchases would cause bill prices to increase and yields to

fall, resulting in an artificially lower BBSW fixing.

427.    This cause and effect relationship is demonstrated in the conversation below, where

Westpac traders Colin "the Rat" Roden and William Hosie discuss purchasing $1.2 billion in Prime

Bank Bills to manipulate one-month BBSW artificially lower:

> **July 1, 2011**
> Westpac [Roden]: Mate you're a fucking thief
> Westpac [Hosie]: A thief. Why?
> Westpac [Roden]: I heard about the 1 month
> Westpac [Hosie]: Yeah mate, we got it back down . . . I bought 340 from CBA and
> one through Jase and I've bought 220 all from Goldmans in the, in the other once . .
> . So didn't actually spending too much, spent like 1.2 [billion] across both
> Westpac [Roden]: That's good, that's good, that's very good

428.    Consistent with this conversation, one-month BBSW decreased by four basis points

from 4.87% on June 30, 2011, to 4.83% on July 1, 2011, following Westpac's large purchase of

Prime Bank Bills during the Fixing Window that day.

429.    Bank Defendants were willing to spend billions of dollars purchasing Prime Bank Bills to manipulate the BBSW fixing because they realized a much larger gain on their BBSW-Based Derivatives positions as a result. For example, in the conversation below Westpac trader Sophie Johnston, known among traders as the "Perfume Steam Roller" because of how she would "run over" or manipulate the BBSW fixing, explained to an undisclosed group of Westpac employees that while Roden had spent roughly $2 billion purchasing Prime Bank Bills to manipulate BBSW lower, Westpac Group Treasury's BBSW short exposure of $14.06 billion was large enough that it still realized a net gain:

> **April 7, 2010**
> Well Col[in Roden] spent a crap load of money yesterday and he sold quite a bit today ... he bought like 2 billion dollars' worth of stock for the rate set so ... he's sold I think today. Spend 2 for 20's not bad. So he'll be selling stuff over the next couple of days because he's got no rate sets for like another week or whatever so that shouldn't be too much of an outflow of cash.

430.    In fact, on April 6, 2010, Westpac bought $1.853 billion in 30-day Prime Bank Bills from the money market, accounting for 100% of all purchases made in that tenor through the Broker Defendants.

431.    Defendants created large distortions in BBSW by timing their manipulative trading when they knew the market was illiquid. For example, CBA trader Garfield Lee learned that Westpac's Colin Roden had manipulated BBSW by six basis points, from 3.27% to 3.21%, in a single day on which Westpac's $560 million purchase of 90 day Prime Bank Bills constituted 100% of the market:

> **June 30, 2009**
> Westpac [Conway]: have a look at bbsw
> ***
> Westpac [Conway]: 3mthhbills [sic] 3.18/3.14[.] from 3.27 yday [sic]
> CBA [Lee]: yr [sic] guys[.] i [sic] hear[.] farkin carnts [sic]

116

> Westpac [Conway]: y [sic][.] amazing
> CBA [Lee]: you make out of that? [sic]
> Westpac [Conway]: yeah weve [sic] had a cracker

2.   The Bank Defendants shared information regarding their net BBSW rate
     exposure to align interests on the direction of the manipulation

432.   The Bank Defendants decided whether to increase or decrease supply during the

Fixing Window based on their net BBSW rate exposure and shared information regarding their

BBSW-Based Derivatives positions to align interests on whether to fix BBSW higher or lower. For

example, in the instant message below NAB trader Robert Collins and HSBC trader Carl Radford

discuss their BBSW exposure, *e.g.*, whether they are paying ("pay") or receiving ("rec") interest based

on the BBSW, the size of their positions, and the desired BBSW fix:

> **December 20, 2010**
> NAB [Collins]: what you have rateset wise on 17 18 jan 6mnth
> HSBC [Radford]: i rec a yard today
> NAB [Collins]: i need to rec 17th pay 18 of 6mnth wowo
> HSBC [Radford]: nada
> NAB [Collins]: 1yd
> HSBC [Radford]: that will be fun I need set higher today
> NAB [Collins]: so you need the set higher in 6mnth so do i and so does my short
> end

433.   Defendants also shared their trading strategies, *i.e.* whether they would be buying or

selling, prior to the BBSW Fixing Window. This knowledge allowed Defendants to predict

fluctuations in BBSW that were not caused by genuine economic factors and gave Defendants and

their co-conspirators an advantage over counterparties who did not have access to this information.

For example, in the following two conversations, NAB trader Collins tells HSBC trader Radford

that NAB would be buying during the BBSW Fixing Window that day:

> **February 26, 2010**
> NAB [Collins]: u strapped in[.] rateset[.] 3mnth set might be ok
> HSBC [Radford]: fk i have some on it
> NAB [Collins]: we are bbuyers[.] 6s we are buyers too[,] but sets looking ok

\*\*\*
NAB [Collins]: there killing it
HSBC [Radford]: h[o]wie the terminator[125]

434.     Defendants often shared information about BBSW movements over a sustained period of time. This information enabled co-conspirators to determine which direction BBSW would be trading for weeks into the future and establish trading positions that allowed them to profit from this knowledge. For example, in the following chat, NAB's Collins tells HSBC's Radford to expect NAB to be a buyer during BBSW Fixing Windows occurring at the end of the month:

**April 30, 2010**
NAB [Collins]: careful in the sets\[.] our investor base just workedd it out
HSBC [Radford]: haha
NAB [Collins]: so we haev orders to buy 3yds now[.] on end of months[.] think this will be the case going fwd[.] keep that to yourself[.] be inting to see what happens today
HSBC [Radford]: really thats good news :-)

435.     This practice of sharing proprietary information with supposed competitors was endemic among the Bank Defendants. For example, Collins also shared information about NAB's BBSW exposure, derivatives positions, and desired fixings with others, including CBA trader Garfield Lee, so they could coordinate trading Prime Bank Bills in the same direction:

**January 25, 2011**
CBA [Lee]: you have 6m on thurs [Thursday, January 27, 2011]?
NAB [Collins]: 6m set?
CBA [Lee]: yes
NAB [Collins]:  na got bugger all on it
NAB [Collins]: 75mill i need it lower
NAB [Collins]: i have 31 jan 6mnth up
NAB [Collins]: which is good
NAB [Collins]: so a pay set on 27th and 28th and a rec set on 31st

---

[125] "Howie" is a nickname for NAB trader Paul Howarth.

436.     NAB and CBA followed through on the plan to manipulate BBSW lower on January 27, 2011, and congratulated each other just after the Fixing Window that morning. In the following chat, CBA's Lee compliments Howarth on their successful manipulation and Howarth reveals that he "presold" Prime Bank Bills before the Fixing Window to clear space in his credit limit to buy Prime Bank Bills during the Fixing Window:

> **January 27, 2011**
> CBA [Lee]: well done.
> NAB [Howarth]: hardly bought a thing maybe 500 certainly sold more pre rateset
> CBA [Lee]: so you sold pre rateset and bought into the set genius

437.     In the following chat, Credit Suisse trader Chris Corbett also receives proprietary information from NAB. Corbett shares Credit Suisse's BBSW exposure with Collins in exchange for secret information about the planned manipulation of BBSW:

> **July 19, 2011**
> NAB [Collins]: the set going to be volatile next few days
> Credit Suisse [Corbett]: so long as 3mth pops at some stage im ok
> NAB [Collins]: just saw howies [NAB trader Paul Howarth's] sets
> Credit Suisse [Corbett]: im paid it and pay more next 2 days. oh fark do I need to FRA out?
> NAB [Collins]: i think tom goes up and following day goes down
> Credit Suisse [Corbett]: excellent info
> NAB [Collins]: don't repeat
> Credit Suisse [Corbett]: I wont

438.     Corbett also contacted NAB trader Michael Tsakiris, as exemplified in the conversation below, to ask how much lower they planned to manipulate BBSW that day:

> **February 15, 2012**
> Credit Suisse [Corbett]: whats the expected drop this time around in 3s and 6s my you maniupulators
> NAB [Tsakiris]: 32 and 34 best guess

439. Deutsche Bank received information about the future manipulation of BBSW from ANZ. On March 3, 2009, ANZ's Pritchard disclosed to a Deutsche Bank trader in a chat message that he was "trying to ram a rate set" during the Fixing Window that day.

440. Communications released in ASIC's complaint against ANZ show traders routinely exchanging information about the bank's BBSW exposure, derivatives positions, and upcoming manipulations with multiple co-conspirators. For example, in the chat below, ANZ trader Jason Pritchard tells Credit Suisse trader Bradley Harper of a plan to manipulate BBSW the following week to benefit ANZ's $7.1 billion long exposure, warning him to "ZIP LOCK," *i.e.*, to keep the information secret:

> **March 4, 2010**
> ANZ [Pritchard]: what about this basis and rate sets???!!! what the fcuk is going on?
> Credit Suisse [Harper]: medic[.] you mates (and idols) driving it
> ANZ [Pritchard]: cnuts[.] why?
> Credit Suisse [Harper]: no idea, but not doubt they are stuffing their internal pricing and taking external with it
> ANZ [Pritchard]: cnuts[.] absolutely ZIP LOCK but we are going to buy a lot on Monday [March 8] . . . and slaughter it on Tuesday and Wednesday . . . Slaughter it . . . or try
> Credit Suisse [Harper]: cheers

441. ANZ trader Michael Dodd shared similar information with Macquarie traders Renaye Skidmore and Beth Wallace on multiple occasions. For example, Dodd revealed ANZ's net long exposure of $5.8 billion and $4.1 billion on February 20, 2011 and June 3, 2011, respectively:

> **February 20, 2011**
> ANZ [Dodd]: [to Macquarie trader Skidmore] We'll print some CD's today if you have any interest. We're looking to push the rate set higher.
>
> **June 3, 2011 [9:54 A.M.]**
> ANZ [Dodd]: [to Macquarie trader Wallace] And I can tell you that we will be looking to sell to make them go higher
>
> **June 3, 2011 [10:09 A.M.]**

> ANZ [Dodd]: [to Macquarie traders Wallace and Skidmore] Big rate set 3m tom. We want it higher

442.    Westpac similarly disclosed its BBSW manipulation plans to supposed competitors at other Defendants in advance of the Fixing Window. In a chat with Colin Roden of Westpac, Craig Betts, who later joined Westpac as Global Head of FX Forwards, revealed that he knew ahead of time that Westpac planned to manipulate BBSW:

> **September 23, 2008**
> ABN AMRO [Betts]: …okay BBSW.. let you go do some ramping cheers
> Westpac [Roden]: ar yes

443.    In another message on July 20, 2011, Westpac trader William Hosie wrote to his colleagues in Westpac's Group Treasury division that he learned in advance that "It is going to be impossible to sell in the set bec[au]se the only buyers there are playing for a rateset (stockpiling to sell it out – RBS and Woody [Paul Woodward] at ANZ)." Hosie's message indicates that he knew ahead of the Fixing Window that both ANZ and RBS were going to manipulate the supply of Prime Bank Bills by stockpiling, and then selling, a large quantity of Prime Bank Bills for the purpose of "playing for a rateset," as opposed to a legitimate funding strategy.

444.    Defendants further shared information about internal single counterparty credit exposure limits, referred to simply as "credit" by traders. By sharing information about available credit at each bank, Defendants knew each other's Fixing Window trading strategy, and thus, the direction of BBSW, ahead of time. For example, in the following chat, a trader from NAB reveals that he has received a tip from other Defendants that the banks, as a bloc, are "full" on Deutsche Bank credit:

> **April 7, 2008**
> NAB [Johnson]: Will find it difficult to defend the 1mth with Deutsche issuing into the 1mth and most (including us) full on their credit.

445.    As Johnson predicted, Deutsche Bank issued one-month Prime Bank Bills into the Fixing Window on April 8, 2008, causing one-month BBSW to set at 7.70%, an increase of twelve basis points from the previous trading day.

446.    Sharing proprietary information about BBSW exposure and derivatives positions allowed the Bank Defendants to reach consensus on the direction to manipulate BBSW and amplify their effect on the rate. For example, in the conversation below, NAB trader Paul  "Howie" Howarth explains to Bank of New Zealand trader Murray Jones that three-month BBSW increased by almost 10 basis points, from 4.29% to 4.385% on March 24, 2010, because *everyone* wanted it higher:

> **March 24, 2010**
> BNZ [Jones]: Howie – we are hearing BBSW printed 10 points wider today. Is this just BBSW volatility or is there something more fundamental behind it??
> NAB [Howarth]: everyone wanted it set up, so its back to where it should be ie. 20 over ois . . . that last couple of days were just noise
> BNZ [Jones]: so not a function of funding pressures
> NAB [Howarth]: no

447.    Consistent with Howarth's explanation for the rate increase, communications released by ASIC show that in addition to sharing proprietary information about their BBSW-Based Derivatives positions and rate exposure, Defendants also coordinated transactions to manipulate the results of the BBSW fix in a direction that financially benefited those positions.

       3.    Defendants coordinated manipulative trades to maximize their impact on BBSW

448.    Bank Defendants coordinated transactions for at least two reasons: (1) to concentrate Prime Bank Bill supply prior to the Fixing Window; and (2) to amplify the effect of manipulative transactions during the Fixing Window by having multiple co-conspirators buy or sell Prime Bank Bills at the same time.

4. <u>Defendants helped their co-conspirators acquire the "ammo they needed to manipulate BBSW</u>

449.   Bank Defendants frequently spoke of their need to either acquire Prime Bank Bills or clear up credit lines to purchase Prime Bank Bills, which they referred to as "stock," "bullets," or "ammo," so they could carry out manipulative transactions during the Fixing Window and manipulate BBSW. The chats below are some examples of traders at ANZ, Westpac, and NAB discussing Prime Bank Bills in this context:

<u>June 8, 2010</u>
<u>Westpac [Roden]</u>: … I'm going to fuck them as well that's why I don't want to get I'm going to fuck the rate set right on the 10th… I am a big receiver. Problem is I'm a massive receiver on the 15th, right because it's 14th but then you end up in late territory… On the 14th I got like a 4 yard rate set, right so I'm going to deliver. We may not deliver but we may as well. We've got, we've got about 2.2 billion of other bank billable paper, which we are definitely going to deliver because we need the credit lines… we bought it to have ammunition because we were like 20,000 contracts short so he set it up for a bit

<u>March 9, 2011</u>
<u>ANZ [Budrewicz]</u>: i have taken some stock in mar futs just working out whether to buy some more. . . more about getting ammo rather than hedging the rate set

<u>January 19, 2012</u>
<u>NAB [McVicar]</u>: Big down in 3s Monday [January 23, 2012] so want to have some ammo for that

450.   To ensure that their co-conspirators had enough "ammunition" to manipulate the BBSW fix, Bank Defendants organized trades before the start of the Fixing Window to supply each other with Prime Bank Bills. For example, in the chat below, JPMorgan trader Imran Ismail offers to provide NAB with an extra $250 million in "ammunition" on March 8, 2011, to assist in manipulating BBSW higher the next day:

<u>March 8, 2011</u>
<u>JPMorgan [Ismail]</u>: you must be more confident tmrrw. . .im giving you more ammunition! . . .an extra 250 for you to jam it with!

123

451.     Consistent with this plan to manipulate BBSW higher, the one-month and three-month BBSW tenors increased from 4.83% and 4.965% on March 8, 2011, to 4.845% and 4.975% on March 9, 2011, respectively.

452.     The Broker Defendants helped the Bank Defendants manipulate BBSW lower by lining up counterparties to accept Prime Bank Bills that a Bank Defendant purchased during the Fixing Window. This allowed Bank Defendants who made large Prime Bank Bill purchases during the Fixing Window to dispose of their newly acquired Prime Bank Bills after the Fixing Window. In this manner, Defendants could buy Prime Bank Bills to manipulate yields lower, and then sell the Prime Bank Bills to a co-conspirator to free up credit limit space to purchase more Prime Bank Bills on subsequent days.  For example, ICAP's Howell placed Westpac's Prime Bank Bills with JPMorgan immediately after Westpac purchased $980 million of Prime Bank Bills to benefit its $2.85 billion short position during that day's Fixing Window:

> **April 30, 2010**
> ICAP [Howell]: What I am working on is the girls from Chase might have a bit more cash might be able to buy some more bills and might be able to reduce some of your [stock]
> Westpac [Roden]: Just get rid of the ANZ stuff mate

> 5.   Defendants coordinated manipulative trades in the same direction to maximize their impact on BBSW

453.     Bank Defendants also conspired with each other to trade in the same direction during the Fixing Window.  The Bank Defendants bought and sold Prime Bank Bills as a group to amplify their manipulative impact on the BBSW fix. For example, CBA trader Garfield Lee, who was fired in the wake of ASIC's investigation, regularly spoke with Westpac trader Colin "the Rat" Roden about coordinating manipulative conduct during the Fixing Window. The two had the following exchange on April 22, 2010:

> **April 22, 2010**
> CBA [Lee]: Waiting for you to start some BBSW fireworks.

<u>Westpac [Roden]</u>: Yet again … you steal ideas/women/whatevr (sic) … have a look at yourself and leave the funny stuff to the pro's!

454.    Later that year, on November 25, 2010, Lee sent Roden the following picture of a bus with the letters "BBSW" written on the side:



455.    Roden responded to Lee, recognizing that Westpac and CBA had manipulated the BBSW fix and praised CBA for its "nice work":

**<u>April 22, 2010</u>**
<u>Westpac [Roden]</u>: You been run over by that big fat bus? … saw the lovely cba having a small lash as well...nice work!

456.    Roden and Lee knew that Defendants' collusive misconduct in rigging BBSW was harming other market participants and, in April 2010, Roden commented that BBSW had become a "bloody dangerous gane [sic]…full flack [sic] jacket stuff."  Lee responded: "You say that with the innocence of pol pot in 1980", a testament to Westpac's role in the manipulation.

457.    Defendants discouraged traders from offering competitive prices to customers and knew that, by prioritizing BBSW manipulation, they were hurting their clients. For example, on May 16, 2005, NAB trader Paul Foley ("Foles") refused to "control the set" *i.e.*, manipulate BBSW, on a date when NAB had a significant BBSW exposure. When NAB trader Michael Krohn learned of Foley's actions, he complained to his colleague David Page that "[w]e had two yards setting to the topside today. only winner was Foles's client."

458.    Traders at NAB and UBS engaged in similar collusive conduct. For example, in the chat below NAB trader Michael Tsakiris discusses manipulating BBSW on "turn dates", typically the end of the month or year, with UBS trader Jason Coulloupas:

> **October 19, 2010**
> UBS [Coulloupas]: no interest in the 30th . . .why are you trying to jam the turn dates. . . you being a phuckhead?
> NAB [Tsakiris]: haha
> UBS [Coulloupas]: i remember last year i moved it 8 pts.. ha.. so I would make it 9.5/7.5.. and knowing the book probably 10/8
> NAB [Tsakiris]: yea its got smashed last yr.
> UBS [Coulloupas]: i was happy to smash it.

**B.    The Broker Defendants Actively Participated in the Conspiracy by Facilitating Manipulative Trading for the Bank Defendants**

459.    The Broker Defendants were ideal co-conspirators because of their position as intermediaries in the Bank Bill market. Their frequent contact with Bank Defendants gave the Broker Defendants a wealth of information that enhanced the cartel's efficacy, including other banks' (a) BBSW rate exposure; (b) Prime Bank Bill stock levels; and (c) plans for manipulative trading during the Fixing Window. Broker Defendants served as a conduit for this information, coordinating with at least one senior trader at each bank, known as the "Single Face to Market," who was responsible for issuing orders to ICAP and Tullett Prebon for rapid execution during the Fixing Window. The Broker Defendants were, in turn, rewarded for their participation in the conspiracy with outsized commission payments, generated by facilitating the high-volume trades used by the Bank Defendants to manipulate the BBSW fix.

460.    The Single Face to Market would instruct the Broker Defendants on the direction the Defendants planned to manipulate BBSW before the Fixing Window started. For example, the following communications are from Paul Woodward, who served as ANZ's Single Face to Market in addition to being a member of the AFMA's NTI and BBSW Committees:

**March 10, 2011**
ANZ [Woodward] to Tullett [Donlan]: I've got a big set already and I'll be pushing the fuck out of it
**August 10, 2011**
ANZ [Woodward] to New Edge Capital [Prosser], Tullett [Donlan] and ICAP [Smith]: I'm going to be very busy in the rate set. I'm going to smash the market.

461.    Consistent with Woodward and Donlan's plan, three-month BBSW moved from 4.96% on March 10, 2011 to 4.985% on March 11, 2011, benefitting ANZ's $4.6 billion long exposure. Three-month BBSW also moved higher on August 10, 2011, from 4.77% the previous day to 4.86%, benefitting ANZ's $200 million long BBSW exposure.

462.    Broker Defendants maintained communication with the Bank Defendants' traders before, during, and after the Fixing Window to execute the desired manipulative strategy. In addition to informing a Broker Defendant of their preference for the BBSW fix, traders from Bank Defendants would pre-authorize the Broker Defendants to use their Prime Bank Bill stock to achieve the desired fixing. For example, Paul Howarth, an NAB trader and a member of the AFMA's NTI Committee, told Matthew Blades at ICAP to manipulate BBSW upward to benefit NAB's $4.35 billion long exposure. To achieve this, Howarth provided him with the necessary stock to trade during the Fixing Window:

**February 22, 2011**
NAB [Howarth]: I've got a …ahh…big set to the upside in the three month
ICAP [Blades]: Right you've now got three buyers against you. Another one just arrived… Yep and just see if I can do it in 20's and just keep punching it up? That sort of thing.
NAB [Howarth]: Yeah, yeah I wanted to get this high set. You can have …take 400 for a start… Make it 700… Alright. I've got… You've got 700 to sell for me… I want it set as high as possible.
ICAP [Blades]: Understood… ok… You want it to be high. Yep OK.

463.    Working together, the Broker Defendants and the Bank Defendants maximized the impact of their efforts to manipulate BBSW. For example, after the Fixing Window on February 22, 2011, Howarth had the following conversation with Blades:

> **February 23, 2011**
> ICAP [Blades]: So you got a 91 print yesterday, that worked out
> NAB [Howarth]: That worked out alright. Thank you for your help with that

464.     The Broker Defendants shared knowledge about the other Bank Defendants' positions and preferred fixings with their clients. By planning BBSW manipulation in advance, the Broker Defendants could help the Bank Defendants acquire enough "stock" (to move BBSW higher by selling Prime Bank Bills) or offload enough "stock" (to move BBSW lower by buying Prime Bank Bills) to significantly impact BBSW. For example, Howarth had the following conversations with Graeme Bruce at Tullett Prebon in which they discussed plans to acquire stock to decrease BBSW lower to benefit NAB's $2.95 billion short position on Monday, March 14, 2011:

> **March 10, 2011**
> NAB [Howarth]: You won't see Citi again now and CBA I doubt whether you'll see. But Col could.[126] And I'm lining up buyers from the institutional and customer side to buy stock on opportunity Monday Tuesday.
> Tullett [Bruce]: Yep
> NAB [Horwath]: And then I'll take the rest of the inventory into my book.
> Tullett [Bruce]: Yep, it's probably not going to be Tuesday is it? It's probably more likely to be tomorrow or Monday [March 14, 2011].

465.     The Broker Defendants' status as intermediaries in the Bank Bill market also provided them with unique information about the various Bank Defendants' positions, including the direction of BBSW from which each Bank Defendant would most benefit. The Bank Defendants relied on the Broker Defendants' advance knowledge of other Bank Defendants' manipulation plans to coordinate and maximize the manipulative effects of their Prime Bank Bill trading. For example, the following chat took place immediately before the Fixing Window on April 7, 2011:

> **April 7, 2011**
> NAB [Howarth]: I've got a down set as well
> Tullett [Bruce]: Ah okay, got ya
> NAB [Howarth]: And I do need the stock
> Tullett [Bruce]: Right, so all the stars are aligned

---

[126] "Col" refers to Colin Roden of Westpac.

> NAB [Howarth]: So they are all aligned so – the other side, the other side of
> five two we can start stepping it up but, yeah, you can give yourself a billion
> to buy and I want the set low.

466.    The Bank Defendants also conspired with the Broker Defendants to line up trades in

Prime Bank Bills at artificial prices – either above or below market rates – to manipulate BBSW. As

part of this manipulative trading strategy, Defendants would overpay for Prime Bank Bills with a

lower yield when they wanted to manipulate BBSW downward and sell Prime Bank Bills at

artificially higher yields, giving away returns at above market interest rates, when they wanted to

manipulate BBSW higher. For example, on April 30, 2010, Westpac had a short position of $2.85

billion. Westpac trader Sophie Johnston, who also served as Chairperson of the AFMA NTI

Committee and was a member of the BBSW Committee, had the following conversation with ICAP

broker Howell that morning:

> **April 30, 2010**
> ICAP [Howell]: …Yours at 44 ANZ selling. You're the 44
> Westpac [Johnston]: Keep me there…
> ICAP [Howell]: I did 80 [indistinct] you're the 44
> Westpac [Johnston]:  buy 44 bid I don't want to see 50. Keep me at 44 bid.
> ICAP [Howell]: Okay what's that?
> Westpac [Johnston]: Keep me at 44 bid
> ICAP [Howell]: Jesus, hang on . . . You've got a fair bit . . . getting multiple hits by
> ANZ, CBA and NAB.

467.    In the above exchange, Johnston offers to buy 30-day Prime Bank Bills at a yield of

4.44% and instructs ICAP to keep her bid at that level because she does not want the yield to rise to

4.50%. This instruction is uneconomic and demonstrates a manipulative trade. Absent manipulation,

an entity buying Prime Bank Bills wants yields to rise because rising yields result in lower bank bill

prices. *See* Part I.A. *supra*. Instead of taking the lower prices, Johnston continued to bid at below

market rates, overpaying for Prime Bank Bills with a lower yield during the Fixing Window to

manipulate BBSW artificially lower.

468.    This manipulative trading caused one-month BBSW to decrease by a basis point on April 30, 2010, from 4.37% the previous day to 4.36%, financially benefiting Westpac's $2.85 billion net short position.

469.    As illustrated by the conversations above, the Broker Defendants' goal was to drive BBSW higher or lower in accordance with their clients' positions, rather than finding the actual best price to trade Prime Bank Bills in the Bank Bill market.

### C.    Defendants Used Their Dominant Positions in the AFMA and the AFMA Market Committees to Maintain Their Ability to Manipulate BBSW

470.    Defendants used their domination of the AFMA Market Governance Committees, including the BBSW and NTI Committees, to control the BBSW rule-making process, conceal complaints from other market participants, and perpetuate the BBSW methodology that they used to secretly manipulate BBSW. The existence of the BBSW and NTI Committees, and the supposed oversight that these Committees maintained over the BBSW Rate-Setting Process, created the illusion that BBSW was a trustworthy, reliable market rate.

471.    By placing BBSW-Based Derivatives traders on the Market Governance Committees, Defendants created a conflict of interest. In many instances, Defendants went one step further and placed BBSW manipulators in important positions on the BBSW and NTI Committees. For example, Paul Woodward, who was ANZ's Single Face to Market during the Class Period, also served as ANZ's representative on both the BBSW and NTI Committees. ANZ also appointed traders Matthew Morris and Andrew Miller to serve on both the NTI and BBSW Committees during the Class Period. All three of ANZ's representatives regularly manipulated BBSW. *See* Part II.A-B, *supra*.

472.    Similarly, Westpac placed its most prolific BBSW manipulators, Colin Roden, Sophie Johnston, and Michael Dodd, *see* Part II.A-B, *supra*, on both the NTI and BBSW Committees during

the Class Period. In fact, Sophie Johnston served as Chairperson of the NTI Committee in at least

2010 and 2011.

473.     NAB traders Paul Howarth and Michael Tsakiris served as NAB representatives on

the NTI Committee, during the same time period when Howarth and Tsakiris regularly manipulated

BBSW. *See* Part II.A-B, *supra*. NAB traders Robert Collins and Hermeet Najjhur, both of whom also

manipulated BBSW during the Class Period, represented NAB on the BBSW Committee.

474.     Defendants appointed senior executives at the highest ranks of the AFMA, including

Chair (Morgan Stanley) and Deputy Chair (NAB) of the AFMA, ensuring that oversight of the

BBSW process by the Board of Directors was illusory because of each banks' conflicting motive to

keep BBSW susceptible to manipulation so they could generate additional illicit profits. The

following Defendants placed senior executives on the AFMA Board of Directors during the Class

Period: Morgan Stanley, NAB, Deutsche Bank, UBS, JPMorgan, CBA, Macquarie, Westpac, ANZ,

Credit Suisse, and RBS. Throughout the Class Period, Defendants maintained a majority of seats on

the AFMA Board of Directors.

475.     Defendants used their domination of the AFMA Market Committees to propose

rules and regulations that kept the Committees' activities secret. For example, throughout the Class

Period, a Market Committee rule held that "minutes are confidential documents and care should be

taken in their circulation."

476.     The Defendants used their control of the BBSW Rate-Setting Process to keep BBSW

susceptible to manipulation. In a 2012 position paper, the AFMA rejected a proposal to switch to a

mechanical calculation system whereby BBSW would be calculated by averaging of the National Best

Bid and Best Offer rates for Prime Bank Bills at each tenor, as well as introducing a number of

complementary measures. The AFMA rejected the proposed reforms and defended the existing

methodology even though the proposed changes would have led to less manipulated BBSW rates.

131

477.     This decision is indicative of collusion in the rule-making process because the

Defendants knew that the BBSW rate-setting mechanism allowed them to manipulate BBSW to gain

an unfair advantage over counterparties. For example, traders at NAB and ANZ made the following

statements about the shortfalls in how the BBSW was set:

> **May 14, 2010**
> NAB [Elder]: physical rate set . . . keeps us honest? or
> easy to manipulate if you have the cash?
> NAB [Snooks]: indeed
>
> **March 7, 2012**
> ANZ [Tarraran]: there is no doubt that BBSW/BKBM can be moved around by
> buying/selling paper and new issuance

478.     With control over the AFMA, the NTI Committee, and the BBSW Committee,

Defendants implemented a complaint procedure to create the impression that they were actually

taking measures to ensure that BBSW represented an accurate rate and were investigating reports of

suspicious activity. But this only served as another way to conceal their wrongdoing. Complaints

about BBSW were dismissed without explanation, ensuring those issues never saw the light of day.

For example, during the Class Period market participants complained of "a tendency for the BBSW

rate to increase relative to other short-term domestic rates during the mid-month and end-month

cycles." After purportedly investigating the discrepancies, the BBSW Committee reported that "[t]his

review confirmed that the overall [BBSW] process is in keeping with best practice, and further

confirmed that variations in the BBSW rate are consistent with and reflect normal market forces."

The AFMA provided no explanation for the discrepancies that gave rise to the complaint.

**D.     Defendants Conspired to Create Special Positions and Reorganized their Trading Desks to Facilitate Manipulative Transactions**

479.     CBA and ANZ both designated a senior employee as the "single face to market"

who was ultimately responsible for communicating trading strategy during the Fixing Window to the

Broker Defendants. At CBA this person was known as the "powerful owl" and was in charge of planning trades that would manipulate BBSW to increase the profitability of CBA's BBSW-Based Derivatives positions.

480.    In a chat between Roden and Lee, Roden convinced Lee that CBA and Westpac could make even more money manipulating BBSW if CBA shifted responsibility for BBSW manipulation from its derivatives trading group to its treasury group because the treasury group had a greater BBSW Rate Exposure, and thus a larger incentive to conspire in manipulating the rate. Roden coached Lee how to "make the case" to CBA's then-CEO, Ralph Norris, to give Lee control over CBA's BBSW activities, explaining that, by shifting control over BBSW to its Group Treasury, CBA could derive an extra "couple of 100 million dollars very easily." By enlisting CBA in Roden's plan to manipulate BBSW lower, Roden knew that Westpac's efforts to manipulate BBSW would be twice as effective:

> Westpac [Roden]: it sucks[.] why dont you give ralph a call and explain teh situation.,,,,save teh bank a couple of 100 million dollars..very esasily [sic]
> CBA [Lee]: give me some guidance here mate
> Westpac [Roden]: it could make your career !
> CBA [Lee]: how do I make the acse? [sic]
> Westpac [Roden]: teh new vincent !
> CBA [Lee]: HA! I wanna be the new col roden[.] being vincent is too hard on the lungs and liver
> Westpac [Roden]: cases is easy....1. it is just another liability 2, your ( ie treasury) ratesets with dwarf teh cba FM rate sets 3. teh goal is to get bbsw down as all your liabilities are set off it ...FM s is usually to get it up...we are talikng [sic] massive dollars here [sic]
> CBA [Lee]: yes[.] I see that[.] you see that[.] how do I prove it
> Westpac [Roden]: logic[.] even if you start by just getting the owl/ bbsw within treasury

481.    Lee agreed to wrest control over CBA's BBSW submissions for Westpac and CBA's benefit, describing his efforts as "the Westpac treasury replication project," and solidifying a conspiratorial link between the two banks.

482.     In other instances, traders shared proprietary information regarding their upcoming BBSW exposure to alert co-conspirators of when they needed to manipulate BBSW in a certain direction. This way, other Bank Defendants would not unknowingly engage in transactions that would reduce the effect of their manipulative conduct.  Bank Defendants that received advance notice of a particular manipulative trading strategy profited from this secret information by transacting in BBSW-Based Derivatives with non-cartel counterparties who were unaware that BBSW would be rigged on the settlement date. For example, on or around May 16, 2011, Westpac trader Sophie Johnston learned that NAB had a large BBSW rate exposure on a series of upcoming days.  Rather than engage in transactions that were against NAB and could cancel out the effects of its manipulative trading, Johnston used that information to hedge Westpac's trading book, engaging in BBSW-Based Derivatives tractions with other market participants that would generate a profit for Westpac, offsetting any losses resulting from NAB's manipulative conduct.

### E.     Defendants Made False BBSW Submissions in Violation of AFMA Rules

483.     In addition to manipulative trading, Defendants submitted false BBSW rates that were intended to benefit their own BBSW-Based Derivatives positions instead of following AFMA guidelines and reporting observed Prime Bank Bill rates. For example, UBS' internal investigation found that UBS personnel in charge of submitting BBSW rates would ask UBS derivatives traders for their preferred rates, and then submit those preferred rates to benefit UBS' derivatives positions. This conduct occurred from at least 2005 through 2011.

484.     In some instances, Defendants went even further to encourage BBSW manipulation by appointing their derivatives traders as BBSW submitters, creating a direct conflict of interest between the bank's profit motive and its obligation to submit accurate market rates. For example, 89% of RBS' BBSW submissions were actually submitted by RBS' BBSW-Based Derivatives traders during the Class Period. Even on the rare occasions when RBS' money market personnel made

134

submissions, they did so based on preferences expressed by RBS derivatives traders via a dedicated chat room entitled "BBSW rate set".

485.    The Defendants accepted, and even solicited, BBSW manipulation requests from traders based in other major international financial centers. For example, BNP Paribas' submitters, who were part of BNP Paribas's ALM-Treasury division, solicited requests to submit BBSW rates at a particular artificial level from derivatives traders located in Singapore.

486.    Even when Defendants allowed non-traders to submit BBSW contributions, they encouraged their submitters to first look to the bank's trading positions and submit BBSW rates that favored the bank's trading positions, as opposed to following AFMA guidelines and submitting the observed mid-rate of trades during the Fixing Window. For example, when submitters at BNP did not receive explicit instructions from derivatives traders for where to set BBSW, they simply calculated which direction would be most profitable for BNP and submitted rates that were skewed accordingly.

487.    An analysis of Defendants' BBSW submissions indicates that more than just UBS, BNP Paribas, and RBS made false BBSW submission during the Class Period. The figure below, which was submitted to the International Organization of Securities Commissions by the AFMA, compares the variance between BBSW Panel Bank submissions during the Class Period with the variance between banks that were members of the U.S. dollar LIBOR panel. This chart shows that, in contrast to U.S. dollar LIBOR, there was almost no variation between the quotes submitted by the Panel Banks during the Class Period:



488.    Absent collusion among BBSW Panel Banks, there should be greater variation in the

Panel Banks' submissions than demonstrated above. For example, if UBS, RBS, and BNP Paribas

were the *only* banks submitting false BBSW rates, their false submissions should register as outliers in

the analysis and increase variation among the Panel's submissions. The fact that the Panel Banks still

submitted nearly identical rates for at least four years while three Defendants *admitted* to making false

submissions reflects collusion in the submission process.

### F.    ASIC's Investigation into Defendants' Conduct.

489.    ASIC devoted significant resources to its investigation and civil prosecution of

Defendants' BBSW-related misconduct. In recent Parliamentary hearings, ASIC repeatedly cited

"resource constraints" and the high cost of pursuing court action (which it estimated at $45 million

AUD), involving Defendants' BBSW-related misconduct as a significant factor for settling litigation

against Defendants at an earlier stage rather than pursuing recovery for the full extent of

Defendants' misconduct.

490.    Greg Medcraft, Chairman of ASIC, previously announced that ASIC's investigation

is expansive in nature and encompasses all of the entities involved in the BBSW rate-setting process,

including Defendants here. For example, in a hearing before the Australian Senate on August 14,

2015, Medcraft was asked to give an example of the type of investigation in which ASIC might seek

reimbursement for legal costs by Senator Deborah O'Neill of the Parliamentary Joint Committee on Corporations and Financial Services. Medcraft testified that "we are investigating the banks of BBSW at the moment."

491.    Prior to Commissioner Medcraft's testimony about ASIC's BBSW investigation, ANZ issued a press release in 2014 revealing that ASIC's investigation extended to at least the fourteen Panel Banks:

> Since mid-2012 ASIC has been undertaking inquiries of 14 BBSW panel bank members in relation to the integrity of their past involvement in the BBSW submission process.

492.    Following ANZ's announcement that ASIC was investigating the Panel Banks' BBSW-related conduct, Australian media reports confirmed that the Panel Banks were under investigation for their conduct while they were members on the BBSW Panel. For example, in a June 3, 2015 article titled "'Appalling' Banks Hindering ASIC Probe into Swap Rate," The Australian, one of Australia's leading newspapers, reported:

> It is understood that ASIC is working its way through the 14 panel members that set the swap rate, including the nation's major banks. ASIC is pouring over millions of documents, including texts, records of telephone calls and other methods of communication.

493.    ASIC recovered a total of $128.3 million AUD from ANZ, NAB, Westpac, and CBA for BBSW-related misconduct. As part of these settlements, ANZ, NAB, and CBA each admitted to engaging in unconscionable conduct by manipulating BBSW for the purpose of benefitting their BBSW-Based Derivatives positions.

## III.   Plaintiffs Transacted in BBSW-Based Derivatives at Artificial Prices that were Proximately Caused by Defendants' Manipulative Conduct

### A.   Plaintiff Dennis

494.    Plaintiff Richard Dennis purchased CME Australian dollar futures contracts that were priced, benchmarked and/or settled based on BBSW, from within the United States during the

Class Period at artificial prices proximately caused by Defendants' manipulative conduct. *See* ¶ 164, *supra*. For example, on November 22, 2010, Dennis purchased 119 December 2010 CME Australian dollar futures contracts and sold 120 December 2010 CME Australian dollar futures contracts, resulting in a net short position of one December 2010 CME Australian dollar futures contract.

495.    Communications released by ASIC show that at least NAB was involved in manipulating BBSW artificially higher on November 22, 2010 to financially benefit its $4.6 billion net long exposure to BBSW that day. NAB trader Michael Tsakiris described the events during the November 22, 2010 Fixing Window in his daily rate set email:

> **November 22, 2010**
> NAB [Tsakiris]: "Rate set. Speak of Smashed.. [sic] we attempted to defend out 4 yard rate set with 200M with not much luck… Sold 00 to mainly UBS resulting in a 5.00 rate set… damn…"

496.    As a result of Defendants' manipulative conduct, Dennis was damaged and suffered legal injury, including a $170.00 net loss on his November 22, 2010, CME Australian dollar futures position.

## B.    Plaintiff Sonterra

497.    Plaintiff Sonterra engaged in dozens of Australian dollar foreign exchange swaps and forwards worth more than $490 million U.S. dollars from within the United States directly with Defendant Morgan Stanley during the Class Period at artificial prices proximately caused by Defendants' manipulative conduct. For example, on November 5, 2010, Sonterra entered into a foreign exchange swap with Morgan Stanley worth $330,000 Australian dollars that matured on November 30, 2010.

498.    Communications released as part of ASIC's complaint against NAB show that on November 5, 2010, Defendants, including Westpac, were engaged in manipulating one-month BBSW artificially lower:

**November 5, 2010**
NAB [Tsakiris]: 1mth as per usual getting crunched lower...
WPK bid 1mth at 4.80

499.     This manipulative conduct caused one-month BBSW to remain unchanged from the previous day. By maintaining one-month BBSW at an artificially lower level, Defendants' manipulation of BBSW on November 5, 2010 artificially increased the cost for Sonterra to purchase Australian dollars from Morgan Stanley on November 30, 2010. As a result, Sonterra was injured when it entered into an Australian dollar foreign exchange swap with Morgan Stanley on November 5, 2010, at an artificially higher price.

500.     Similarly, on June 3, 2011, Sonterra entered into an Australian dollar foreign exchange forward, agreeing to sell $280,320 to Morgan Stanley on June 7, 2011.

501.     Communications released as part of ASIC's complaint against ANZ show that on June 2, 2011, ANZ traders Mark Budrewicz and Sean Collier discussed issuing more than $500 million in Prime Bank Bills during the Fixing Window on June 3, 2011, to manipulate BBSW artificially higher to benefit the bank's $4.1 billion net long BBSW-Based Derivatives position:

**June 2, 2011**
ANZ [Collier]: how much do you need on 3mth issuance for your rate set tomorrow? Simon mentioned 500m or do you need more?
ANZ [Budrewicz]: if we could do more that would be good

502.     ASIC found that on June 3, 2011, ANZ issued $543 million in Prime Bank Bills and sold at least an additional $97 million of inventory during the Fixing Window to manipulate BBSW artificially higher. This manipulation artificially increased the amount of Australian dollars required for Sonterra to fulfill its obligation to Morgan Stanley on June 7, 2011. As a result, Sonterra was damaged when it entered into an Australian dollar foreign exchange forward with Morgan Stanley on June 3, 2011 at an artificially lower price.

503.    Other communications indicate that Sonterra entered into Australian dollar foreign exchange swaps with Morgan Stanley when the bank was involved in manipulating BBSW lower. For example, on May 14, 2010, Sonterra entered into a foreign exchange swap with Morgan Stanley worth $1,000,000 Australian dollars that matured on May 28, 2010.

504.    On May 12, 2010, CBA trader Garfield Lee had the following conversation with NAB's Paul Howarth regarding Morgan Stanley's involvement in manipulating BBSW:

> **May 12, 2010**
> NAB [Horwath]: what does an IB care about a major banks bill maturities? They don't even get involved in MM unless it's in an attempt to fudge the set . . . for example Moron Stanley came to rateset wanting it lower they drive it lower enough to bring me out to issue
> CBA [Lee]: I think the idea also removes the need for these IBs with bill portfolios to spray them out on those days
> NAB [Horwath]: they spray them to try and distort the set . . . why do they need bill portfolios when they don't have a fracise/ answer, to play around at set

505.    Consistent with Morgan Stanley's desire for an artificially lower BBSW fix, on May 14, 2010, the one-month, three-month and six-month BBSW tenors all decreased. This decrease in BBSW artificially increased the cost for Sonterra to purchase Australian dollars from Morgan Stanley on May 28, 2010. As a result, Sonterra was injured when it entered into an Australian dollar foreign exchange swap contract with Morgan Stanley on May 14, 2010, at an artificially higher price.

### C.    FrontPoint Plaintiffs

506.    The FrontPoint Plaintiffs engaged in hundreds of BBSW-based swap transactions during the Class Period from within the U.S., including directly with Defendant Macquarie at artificial prices proximately caused by Defendants' manipulative conduct. For example, on February 23, 2010, Plaintiff FrontPoint Asian Event Driven Fund, L.P., entered into a swap governed by the ISDA Master Agreement described in ¶ 335, *supra*, with Defendant Macquarie Bank in which

Macquarie agreed to make interest rate payments to FrontPoint Asian Event Driven Fund, L.P., equal to one-month BBSW on certain valuation dates.

507.    Communications released by ASIC in its complaint against Westpac show that on July 1, 2010, one of the valuation dates listed in the swap agreement between FrontPoint Asian Event Driven Fund, L.P., and Defendant Macquarie, at least Defendant Westpac was involved in manipulating one-month BBSW artificially lower:

> **July 1, 2011**
> Westpac [Roden]: Mate, you're a fucken thief
> Westpac [Hosie]: A thief. Why?
> Westpac [Roden]: I heard about the 1 month
> Westpac [Hosie]: Yeah mate, we got it back down

508.    As a result of Defendants' manipulative conduct, and consistent with the conversation above, one-month BBSW decreased by four basis points on July 1, 2011, from 4.87% to 4.83%. This decrease in one-month BBSW caused injury to Plaintiff FrontPoint Asian Event Driven Fund, L.P., which received less in interest than it should have from Defendant Macquarie on July 1, 2011.

509.    Plaintiff FrontPoint Asian Event Driven Fund, L.P., also entered into a swap with Macquarie Bank in which FrontPoint received one-month BBSW on January 27, 2011. This time, at least NAB and CBA were involved in manipulating one-month BBSW artificially lower:

> **January 27, 2011**
> CBA [Lee]: Well done.
> NAB [Howarth]: hardly bought a thing maybe 500 certainly sold more pre rateset
> CBA [Lee]: so you sold pre rateset and bought into the set genius

510.    As a result of Defendants' manipulative conduct, and consistent with the conversation above, one-month BBSW decreased by four basis points on January 27, 2011, from 4.88 to 4.84. This decrease in one-month BBSW caused injury to Plaintiff FrontPoint Asian Event

Driven Fund, L.P., which received less in interest than it should have from Defendant Macquarie on January 27, 2011.

**D.     Plaintiff OCERS**

511.    Plaintiff OCERS engaged in hundreds of BBSW-based interest rate swap and FX forward transactions during the Class Period from within the U.S., including directly with Defendants ANZ, BNP Paribas, S.A., CBA, Credit Suisse AG, Deutsche Bank AG, JPMorgan Chase Bank, N.A., Royal Bank of Canada, UBS AG, Westpac, and Royal Bank of Scotland plc. Each of OCERS's transactions with these Defendants were entered pursuant to the terms of an ISDA master agreement or FEOMA that that provided for consent to personal jurisdiction in New York. *See* ¶¶ 53-162, *supra*. OCERS was injured when it transacted BBSW-Based Derivatives artificial prices proximately caused by Defendants' manipulative conduct.

512.    For example, on January 24, 2011, OCERS, entered into two Australian dollar FX forward transactions to: (1) purchase AUD 975,000.00 from Defendant Royal Bank of Scotland plc for $953,277.00 on April 29, 2011; and (2) purchase AUD 479,000.00 from Defendant Westpac for $468,231.12 on April 29, 2011. These transactions were entered into pursuant to the terms of the RBS ISDA Master Agreement and the Westpac ISDA Master Agreement, respectively, discussed *supra*, at ¶¶ 110-19, 137-46.

513.    Communications released by ASIC in its complaint against ANZ show that Defendants, including at least ANZ, planned to manipulate three-month BBSW lower on, January 24, 2011 by artificially trading for the purpose of influencing the BBSW:

> **January 24, 2011**
> ANZ [Collier]: is this ANZ pushing 3mth?
> ANZ [Budrewicz]: yep it was ANZ.
> ANZ [Collier]: dep
> ANZ [Budrewicz]: i tried to issue
> ANZ [Budrewicz]: i am on the offer
> ANZ [Budrewicz]: annoyed
> ANZ [Budrewicz]: would have been good to get some out

514.     Defendants' manipulative conduct caused three-month BBSW to artificially decrease from 4.925% on January 21, 2011 to 4.9217% on January 24, 2011. This decrease in BBSW artificially increased the cost for OCERS to purchase Australian dollars from RBS and Westpac on April 29, 2011. As a result, OCERS was injured when it entered into Australian dollar FX forwards with Defendants Royal Bank of Scotland plc and Westpac on January 24, 2011.

515.     On December 9, 2010, OCERS entered into two FX forward transactions directly with Defendant BNP Paribas, S.A. to: (1) sell AUD 39,000.00 for $38,095.28; and (2) sell AUD 46,000.00 for $44,932.89 on January 28, 2011. These transactions were entered pursuant to the terms of the BNP Paribas ISDA Master Agreement discussed at ¶¶ 63-72, *supra*.

516.     Instant messages released by ASIC in its complaint against Westpac show that Defendants planned to manipulate three-month BBSW artificially higher on December 9, 2010:

> **December 9, 2010**
>
> ANZ [Parker]: fears of a ramp into bbsw [sic] today confirmed. 3mth sets 5.08 from 5.00 yesterday.

517.     Consistent with this communication, Defendants' manipulative conduct caused three-month BBSW to artificially increase from 5.00% on December 8, 2010 to 5.08% on December 9, 2010. As a result of Defendants' manipulative conduct on December 9, 2010, OCERS was damaged and suffered injury when it agreed to sell AUD foreign exchange forwards to Defendant BNP Paribas, S.A. at an artificially lower price.

518.     On May 20, 2011, OCERS entered into an FX forward transaction with Defendant Royal Bank of Canada, agreeing to purchase AUD 300,000.00 from RBC for $320,022.00 on May 31, 2011. This transaction was entered pursuant to the terms of the RBS ISDA Master Agreement discussed *supra*, at ¶¶ 100-09.

519.    Communications released by ASIC in its complaint against NAB show that Defendants, including at least NAB, planned to manipulate one-month and six-month BBSW lower on May 20, 2011:

**May 20, 2011**

NAB [Tsakiris]: 6mth traded at 18 and 19 with WPK issuing around 280M. **I have closed 6mth as low as possible as we have a large down set on Monday**.

520.    Consistent with this communication, Defendants' manipulative conduct caused one-month and six-month BBSW to artificially to remain artificially lower at 4.82% and 5.17%, respectively on May 20, 2011. As a result of Defendant's manipulative conduct on May 20, 2011, OCERS was damaged and suffered injury when it agreed to purchase AUD foreign exchange forwards from Defendant Royal Bank of Canada at an artificially inflated price.

521.    On October 4, 2011, OCERS entered into an FX forward transaction with Defendant RBS agreeing to purchase AUD 138,000,00 from Royal Bank of Scotland PLC for $130,215.93 on December 21, 2011.

522.    Communications released by ASIC as part of its complaint against Defendant NAB show that on October 4, 2011, Defendants, including at least NAB, planned to manipulate BBSW artificially lower by artificially buying bank bills during the fixing window:

**October 4, 2011**

NAB [Najjhur]: wot level we buy stock up to think anz may issue
NAB [Tsakiris]: Upto 71... just buying for rateset.. Also to sell Tom..

* * *

NAB [Najjhur]: **do we realyl want to buy bills below cash rate**
NAB [Najjhur]: **suppose its just for rateset**
NAB [Najjhur]: **as we are selling tom**
NAB [Tsakiris]: **No but its all about rate set**

* * *

NAB [Tsakiris]: Have u spoken to tangles re his plan..?

<u>NAB [Najjhur]</u>: yep
<u>NAB [Najjhur]</u>: he same ways as us
<u>NAB [Najjhur]</u>: buyer at 77
<u>NAB [Najjhur]</u>: not below 75
<u>NAB [Najjhur]</u>: but letting me do it
<u>NAB [Tsakiris]</u>: k
<u>NAB [Tsakiris]</u>: He has 200M Early Jans..
<u>NAB [Tsakiris]</u>: He will try to hit u if u push it too far..

523.     Defendants' manipulative conduct caused an artificial decrease in BBSW across all tenors. In particular, from October 3, 2011 to October 4, 2011 one-month BBSW decreased from 4.82% to 4.75%, two-month BBSW decreased from 4.8% to 4.735%, three-month BBSW decreased from 4.77% to 4.67%, four-month BBSW decreased from 4.74% to 4.61%, and six-month BBSW decreased from 4.6% to 4.46%.

524.     As a result of Defendant's manipulative conduct on October 4, 2011, OCERS was damaged and suffered injury when it agreed to purchase AUD foreign exchange forwards from Defendant RBS at an artificially inflated price.

525.     On October 25, 2011, OCERS entered into an FX forward transaction with Defendant RBS agreeing to purchase AUD 37,000.00 from Royal Bank of Scotland PLC for $38,443.39 on December 21, 2011.

526.     On October 25, 2011, Defendant NAB had a net short exposure to three-month BBSW in the amount of $1,050,000,000.

527.     Communications released by ASIC as part of its complaint against NAB show that on October 25, 2011, Defendants, including at least NAB, again planned to manipulate three-month BBSW artificially lower by artificially buying bank bills during the fixing window:

**October 25, 2011**

<u>NAB [Tsakiris]</u>: Little interest in todays set. We have 3mth down in 1.1B

* * *

<u>NAB [Tsakiris]</u>: We bought 680M of 3mth today defending our sets today

145

528.     Defendants' manipulative conduct caused three-month BBSW to artificially decrease from 4.74% on October 24, 2011 to 4.73% on October 25, 2011. This decrease in BBSW artificially increased the cost for OCERS to purchase Australian dollars from Defendant RBS on December 21, 2011. As a result, OCERS was injured when it entered into an Australian dollar FX forward with RBS on October 25, 2011 at an artificially higher price.

529.     OCERS also entered into an FX forward transaction with Defendant RBS on November 22, 2011 in which it agreed to sell AUD 3,272,557 to Royal Bank of Scotland PLC for $3,331,000 on December 21, 2011.

530.     Communications released by ASIC in its complaint against NAB show that Defendants, including at least NAB, planned to manipulate three-month BBSW artificially higher by selling bank bills during the rate fixing window:

> **November 22, 2011**
>
> NAB [Tsakiris]: We hav 3mth up today.... selling around 1.3B.. Suggesting 61 for the set today..
> NAB [Tsakiris]: 1mth was well bought by WPK again yesterday.. They also were issuers of 6mth yesterday.. So there is quite a bit of 6mth stock around

531.     Defendants' manipulative conduct caused three-month BBSW to artificially increase from 4.6% on November 21, 2011 to 4.63% on November 22, 2011. This increase in BBSW caused OCERS to receive less than it should have in its sale of Australian dollars to RBS on December 31, 2011. As a result, OCERS was injured when it entered into an Australian dollar FX forward with BNP Paribas on October 22, 2011 at an artificially lower price.

532.     On June 6, 2012, Plaintiff OCERS entered into an interest rate swap agreement with Defendant Deutsche Bank AG in which it agreed to make interest payments based on six-month BBSW to Deutsche Bank AG in exchange for receiving fixed 5.0% interest on AUD 1,600,000. This transaction was entered pursuant to the terms of the Deutsche Bank ISDA Master Agreement discussed at ¶¶ 90-99, *supra*.

146

533.     Communications released by ASIC in its complaints against Defendants Westpac

and NAB show that, on June 6, 2012, Defendants, including at least Westpac and NAB, were

involved in manipulating BBSW artificially higher:

> **June 6, 2012**
>
> Westpac [Conway]: Did we have any rate sets today?
> Westpac [Johnston]: Set at 3.049 (+9.5)
> Westpac [Johnston]: Huge set
> Westpac [Johnston]: Collin purchased 3bn!! off nab
>
> * * *
>
> Westpac [Conway]: Where now?
> Westpac [Johnston]: Nothing trading obviously. Billy thinks maybe round 46.
> But likely to go higher 2mos [sic]
>
> **June 6, 2012**
>
> NAB [Page]:     (copying and pasting Tsakiris's message)
> Ok cool… I have offered my European jumper as a reward if they can sell 1B… we
> have down sets for the next 2 days then upsets… so will do as little as possible…
>
> ***
>
> NAB [Page]:     I am thinking of cutting a deal with him… if he doesn't spend much
> money on downsets I will let him have some of my stock on upsets if hes running
> low.

534.     As a result of Defendants' manipulative conduct, and consistent with the

conversation above, six-month BBSW increased by 17 basis points from 3.1883% on June 5, 2012

to 3.3583% on June 6, 2012. This increase in BBSW on June 6, 2012 harmed OCERS by artificially

increasing amount of interest that OCERS was obligated to pay Deutsche Bank AG under the June

6, 2012 interest rate swap.

## TRADE AND COMMERCE

535.     Beginning on at least January 1, 2003, Defendants engaged in a continuing contract,

combination, or conspiracy in restraint of trade in violation of the Sherman Act.

536.     During the Class Period, Defendants sold substantial quantities of BBSW-Based

Derivatives in a continuous and uninterrupted flow in interstate commerce to customers located in

states other than the states in which Defendants produced BBSW-Based Derivatives.

537.     The Defendants' business activities that are subject to this Complaint were within

the flow of and substantially affected interstate trade and commerce.

538.     During the Class Period, the Defendants' conduct and their co-conspirators' conduct

occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## CLASS ACTION ALLEGATIONS

539.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on their own behalf and as representatives of the following Class:[127]

> All persons or entities that engaged in U.S.-based transactions in financial
> instruments that were priced, benchmarked, and/or settled based on BBSW
> at any time from at least January 1, 2003, through the date on which the
> effects of Defendants' unlawful conduct ceased.
>
> Excluded from the Class are Defendants and their employees, agents,
> affiliates, parents, subsidiaries and co-conspirators, whether or not named in
> this complaint, and the United States government.

540.      The Class is so numerous that individual joinder of all members is impracticable.

While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are

informed and believe that at least thousands of geographically-dispersed Class members transacted

in BBSW-Based Derivatives worth trillions of dollars during the Class Period.

541.     Plaintiffs' claims are typical of the claims of the other members of the Class.

Plaintiffs and the members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of law as complained of herein. The injuries and damages of each

---

[127] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the
definition of the Class, including, without limitation, membership criteria and the Class Period.

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws
as alleged herein.

542.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.
Plaintiffs are adequate representatives of the Class and have no interest which is adverse to the
interests of absent Class members. Plaintiffs have retained counsel competent and experienced in
class action litigation, including antitrust litigation.

543.    Common questions of law and fact exist as to all members of the Class, which
predominate over any questions affecting solely individual members of the Class. These common
questions of law and fact include, without limitation:

> a. whether Defendants and their co-conspirators engaged in a combination
> or conspiracy to manipulate BBSW and the prices of BBSW-Based
> Derivatives in violation of the Sherman Act;
>
> b. the identity of the participants in the conspiracy;
>
> c. the duration of the conspiracy;
>
> d. the character and nature of the acts performed by the Defendants in
> furtherance of their conspiracy;
>
> e. whether Defendants' unlawful conduct caused injury to the business and
> property of Plaintiffs and the Class;
>
> f. whether Defendants' unlawful acts violate the RICO Act;
>
> g. whether Defendants manipulated the price of Australian dollar futures
> contracts and other BBSW-based financial instruments in violation of the
> CEA;
>
> h. the appropriate measure of damages sustained by Plaintiffs and Class
> members.

544.    A class action is superior to other methods for the fair and efficient adjudication of
this controversy because joinder of all Class members is impracticable. Treatment as a class will
permit a large number of similarly-situated persons to adjudicate their common claims in a single

149

forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

545.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

546.    The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

547.    The secret nature of Defendants' conspiracy—which relied on non-public methods of communication, including private instant messages, to conceal their agreements to manipulate BBSW and the prices of BBSW-Based Derivatives—was intentionally self-concealing. This concealment-through-secrecy prevented Plaintiffs from uncovering their unlawful conduct.

548.    Defendants used affirmative acts of concealment to hide their violations of law from Plaintiffs and the Class, including: (1) knowingly submitting (or causing to be submitted) BBSW quotes that were false, misleading, or inaccurate because they were manipulative, based in whole or in part on impermissible and illegitimate factors, such as the rate that would financially benefit Defendants' BBSW-Based Derivatives positions and/or the BBSW-Based Derivatives positions of their co-conspirators; (2) implicitly representing that their BBSW submissions were a reliable and truthful assessment of, and only of, each Defendant's observations of the traded mid-rates for Prime

Bank Bills during the Fixing Window; (3) using secret, collusive trades during the Fixing Window to manipulate BBSW and the prices of BBSW-Based Derivatives; (4) representing, through the AFMA and its subcommittees, that BBSW was a legitimate benchmark determined by submissions that complied with their own guidelines.

549.    Many, if not all, of these affirmative acts of concealment were also inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other members of the Class.

550.    As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence prior to the time of public disclosures reporting the manipulation of BBSW and the prices of BBSW-Based Derivatives. Plaintiffs thus assert the tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)**
**(Against all Defendants)**

551.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

552.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

553.    During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of BBSW and

the prices of BBSW-Based Derivatives, by conspiring to, *inter alia*: (1) engage in manipulative money market transactions during the BBSW Fixing Window; (2) make false BBSW rate submissions that did not reflect actual transaction prices; (3) uneconomically buy or sell money market instruments at a loss to cause artificial derivatives prices; and (4) share proprietary BBSW-Based Derivatives information.

554.    This conspiracy to manipulate the prices of BBSW-Based Derivatives caused both Plaintiffs and members of the Class to be overcharged and underpaid in their BBSW-Based Derivatives transactions. Plaintiffs and members of the Class also were deprived of the ability to accurately price BBSW-Based Derivatives entered into during the Class Period and to accurately determine the settlement value of BBSW-Based Derivatives by reference to an accurate BBSW. Plaintiffs and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts in furtherance of the conspiracy.

555.    The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the BBSW-Based Derivatives market. There is no legitimate business justification for, and no pro-competitive benefit caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pre-textual or could have been achieved by less restrictive means.

556.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

557.    Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act and under § 4 of the Clayton Act.

558.    Plaintiffs and members of the class also seek an injunction against Defendants,

preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**SECOND CLAIM FOR RELIEF**
**(Manipulation in Violation of the Commodity Exchange Act)**
**(7 U.S.C. §§ 1, *et seq.*)**
**(Against ANZ, Westpac, NAB, CBA, RBS, BNP Paribas, UBS, HSBC, and Credit Suisse)**

559.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though

fully set forth herein.

560.    Each Defendant is liable under §§ 6(c), 9, and 22, of the CEA, codified at 7 U.S.C. §§

9, 13, and 25 respectively, for the manipulation of BBSW and the prices of BBSW-Based Derivatives

that were priced, benchmarked, and/or settled based on BBSW.

561.    Defendants had the ability to manipulate BBSW and the price of BBSW-Based

Derivatives. Defendants, through interstate commerce, knowingly submitted or caused to be

submitted false rate quotes to the AFMA and engaged in manipulative Prime Bank Bill transactions

during the Fixing Window. These submissions and manipulative trades were used to determine the

official published BBSW. By virtue of the BBSW methodology, the Defendants had the ability to

influence and did affect the rates that would become the official BBSW. Further, because of their

market power as Prime Banks and major dealers of BBSW-Based Derivatives, the Defendants had

the ability to influence and did affect the prices of BBSW-Based Derivatives.

562.    As evidenced by communications revealed by ASIC, the Defendants fully,

intentionally, and systematically manipulated BBSW and BBSW-Based Derivatives prices to artificial

levels for the express purpose of obtaining hundreds of millions (if not billions) of dollars in

illegitimate profits on BBSW-Based Derivatives, held by themselves or other co-conspirators, the

prices of which (and thus profits or losses) were priced, benchmarked and/or settled based on

BBSW. As an intended and direct consequence of Defendants' knowingly unlawful conduct, the

prices of Plaintiffs' BBSW-Based Derivatives, and those traded by Class members, were manipulated to artificial levels by Defendants.

563.    During the Class Period, BBSW and the prices of derivatives that were priced, benchmarked, and/or settled based on BBSW were artificial and did not result from legitimate market information, competition, or supply and demand factors. Defendants directly caused artificial BBSW and artificial prices of BBSW-Based Derivatives by, *inter alia*, making false BBSW submissions to the AFMA and conducting manipulative trading activity in the money market for Prime Bank Bills that created artificial supply and demand.

564.    As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial BBSW and prices of derivatives that were priced, benchmarked, and/or settled based on BBSW.

### THIRD CLAIM FOR RELIEF
**(Principal-Agent Liability in Violation of § 2 of the Commodity Exchange Act)**
**(Against ANZ, Westpac, NAB, CBA, RBS, BNP Paribas, UBS, HSBC, and Credit Suisse)**

565.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

566.    Each Defendant is liable under § 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

567.    Plaintiffs and members of the Class seek the actual damages they sustained in BBSW-Based Derivatives for the violations of the CEA alleged herein.

### FOURTH CLAIM FOR RELIEF
**(Aiding and Abetting Liability in Violation of § 22 of the Commodity Exchange Act)**
**(Against ANZ, Westpac, NAB, CBA, RBS, BNP Paribas, UBS, HSBC, and Credit Suisse)**

568.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

569.     Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation of BBSW and willfully intended to assist these manipulations, which resulted in artificial BBSW-Based Derivatives prices during the Class Period in violation of § 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

570.     Plaintiffs and members of the Class seek the actual damages they sustained in BBSW-Based Derivatives for the violations of the CEA alleged herein.

### FIFTH CLAIM FOR RELIEF
**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**
**18 U.S.C. §§ 1961, *et seq.***
**(Against ANZ, Westpac, NAB, CBA, RBS, BNP Paribas, UBS, HSBC, and Credit Suisse)**

571.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

572.     18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

573.     18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

574.     Under 18 U.S.C. § 1961(1), and as applicable to § 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

575.     18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and at least the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

576.     18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

577.     18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C. § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, fraud, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such a scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

578.     At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including, *inter alia*, by making false BBSW rate submissions, engaging in fraudulent Prime Bank Bill transactions solely intended to impact BBSW, sharing proprietary order flow or position information with co-conspirators, or directing other employees to do so, among other predicate acts of wire fraud), were "an enterprise" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and hierarchy of corporate direction and control.

579.     At all relevant times, Plaintiffs were a "person" within the meaning of 18 U.S.C. § 1961(3).

580.     Defendants' collective association, including through their participation together (i) as members of the AFMA and its subcommittees; (ii) as BBSW Panel Banks; and (iii) acting as a trading bloc and engaging in secret collusive trades in the Prime Bank Bill market to manipulate BBSW, constitutes the RICO enterprise in this case. Every member of the enterprise participated in

156

the process of trading or causing to be traded bank bill trades at artificial prices, BBSW-Based

Derivative price quotes, trade confirmations including those false rates, and confirmations for

collusive transactions intended to impact BBSW, during the Class Period. As alleged herein, each

Defendant engaged in the acts of wire fraud in furtherance of the conspiracy and participated as a

member of the association-in-fact enterprise.

581.    Defendants completed all elements of wire fraud within the United States or while

crossing United States borders. Defendants did so by: (a) transmitting or causing to be transmitted

artificial BBSW rates in the U.S. or while crossing U.S. borders through electronic servers located in

the United States; (b) transmitting or causing to be transmitted false and artificial BBSW

submissions that were relied on by Thomson Reuters and the AFMA in collecting, calculating,

publishing, and/or disseminating the daily BBSW rates that were transmitted, published, and

disseminated in the United States or while crossing U.S. borders through electronic servers located

in the United States; and (c) transmitting or causing to be transmitted confirmations for fraudulent

transactions intended to impact BBSW in the U.S. or while crossing U.S. borders through electronic

servers located in the United States.

582.    The common purpose of the enterprise was simple: profiteering. By engaging in the

predicate acts alleged including, but not limited to, entering into collusive and artificial BBSW

transactions to cause distorted BBSW rates to be transmitted to Thomson Reuters as agent for the

AFMA, and by exchanging BBSW-Based Derivatives positions and prices, Defendants affected the

prices of BBSW-Based Derivatives, rendering them artificial. This directly resulted in Defendants

reaping hundreds of millions (if not billions) of dollars in illicit trading profits on their BBSW-Based

Derivatives positions.

583.    Defendants each committed far more than two predicate acts of wire fraud. As

alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

157

a.   The transmission of artificial BBSW rates to Thomson Reuters in the United States for further dissemination;

b.   The electronic transmission of confirmations for collusive transactions intended to manipulate BBSW;

c.   Causing the transmission and dissemination in the United States of the artificial BBSW rates by Thomson Reuters as agent for the AFMA;

d.   Causing the transmission and dissemination in the United States of distorted BBSW individual bank quotes by Thomson Reuters;

e.   The transmission and dissemination of false bid and ask price quotes for BBSW-Based Derivatives within the United States;

f.   Electronic communications and instant messages containing manipulative requests that emanated from within the United States or were routed through electronic servers located within the United States; and

g.   Sending trade confirmations based on manipulated and false BBSW rates to counterparties within the United States.

h.   Sending communications to encourage, negotiate, or complete the sale or purchase of price-fixed BBSW-based financial instruments to counterparties within the United States.

584.   Defendants' misconduct underlying the predicate acts of wire fraud occurred within the United States. Defendants caused and conspired to cause the manipulated BBSW to be published to servers in the U.S., and used U.S. wires to transmit artificial BBSW rates, confirmations for collusive transactions intended to impact BBSW, and other electronic communications containing requests to manipulate these rates.

585.   Defendants' racketeering scheme affected interstate commerce. Trillions of dollars in BBSW-Based Derivatives were traded within the United States during the Class Period, including, but not limited to, currency forward agreements, interest rate swaps, and forward rate agreements.

586.   As alleged herein, Plaintiffs' and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, depriving Plaintiffs and the Class of their money relative to their BBSW-Based Derivatives contracts was the very purpose of

158

the Defendants' scheme. Plaintiffs and members of the Class seek treble damages for the injuries

they have sustained, as well as restitution, cost of suit, and reasonable attorneys' fees in accordance

with 18 U.S.C. § 1964(c).

587.    As a direct and proximate result of the subject racketeering activities, Plaintiffs and

members of the Class seek an order, in accordance with 18 U.S.C. § 1964(a), enjoining and

prohibiting Defendants from further engaging in their unlawful conduct.

**SIXTH CLAIM FOR RELIEF**
**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**
**18 U.S.C. § 1962(d)**
**(Against ANZ, Westpac, NAB, CBA, RBS, BNP Paribas, UBS, HSBC, and Credit Suisse)**

588.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though

fully set forth herein.

589.    Apart from constructing and carrying out the racketeering scheme detailed above,

Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. §

1962(d).

590.    The fraudulent scheme, as set forth above, alleges a violation of RICO in and of

itself.

591.    Defendants organized and implemented the scheme, and ensured it continued

uninterrupted, by concealing their manipulation of BBSW and the prices of BBSW-Based

Derivatives from Plaintiffs and members of the Class.

592.    Defendants knew their manipulative scheme would defraud participants in the

BBSW-Based Derivatives market, yet each Defendant agreed to participate despite their

understanding of the fraudulent nature of the enterprise.

593.    As alleged herein, Plaintiffs and members of the Class are direct victims of

Defendants' wrongful and unlawful conduct. Plaintiffs and the Class' injuries were direct, proximate,

159

foreseeable, and natural consequences of Defendants' conspiracy, indeed, those effects were precisely why the scheme was concocted.

594.     Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

595.     As a direct and proximate result of the subject racketeering activity, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SEVENTH CLAIM FOR RELIEF
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against Defendants ANZ, BNP Paribas, CBA, Credit Suisse, Deutsche Bank AG, RBC, RBS, UBS, Westpac, HSBC, and Morgan Stanley)**

596.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

597.     To the extent required this claim is pled in the alternative to Plaintiffs' eighth claim for relief in accordance with Fed. R. Civ. P. 8(d) and other applicable law.

598.     Plaintiff OCERS entered into binding and enforceable contracts with Defendants ANZ, BNP Paribas, CBA, Credit Suisse, Deutsche Bank AG, RBC, RBS, UBS, Westpac, HSBC, and Morgan Stanley in connection with transactions for BBSW-Based Derivatives. Plaintiff Sonterra entered into binding and enforceable contracts with Defendant Morgan Stanley in connection with transactions for BBSW-Based Derivatives.

599.     Each contract includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not to take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

160

600.     Defendants ANZ, BNP Paribas, CBA, Credit Suisse, Deutsche Bank AG, RBC, RBS, UBS, Westpac, HSBC, and Morgan Stanley breached their duty to Plaintiff OCERS, and without reasonable basis and with improper motive, acted in bad faith by, among other things, (a) intentionally manipulating BBSW for the express purpose of generating illicit profits from its BBSW-Based Derivatives; and (b) conspiring with other Defendants to manipulate BBSW and the prices of BBSW-Based Derivatives.

601.     As a direct and proximate result of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purpose of these contracts, Plaintiffs FrontPoint, Sonterra, and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**
**(Unjust Enrichment in Violation of Common Law)**
**(Against ANZ, BNP Paribas, CBA, Credit Suisse, Deutsche Bank AG, RBC, RBS, UBS, Westpac, HSBC, and Morgan Stanley)**

602.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

603.     To the extent required this claim is pleaded in the alternative to Plaintiffs' seventh claim for relief in accordance with FED. R. CIV. P. 8(d).

604.     Defendants and members of the Class, including Plaintiffs, entered into BBSW-Based Derivatives transactions. These transactions were directly priced, benchmarked, and/or settled based on BBSW, which was supposed to reflect actual market conditions in a market where Defendants were supposed to be perpetually competing. Rather than compete honestly and aggressively with each other, Defendants colluded to manipulate BBSW and the prices of BBSW-Based Derivatives to ensure they had an unfair advantage in the marketplace.

605.     Defendants financially benefited from their unlawful acts, reaping illicit profits by, *inter alia*, (i) coordinating the manipulation of BBSW by taking advantage of the BBSW submission

process or other activities designed to artificially suppress, inflate, maintain, or otherwise alter BBSW and the prices of BBSW-Based Derivatives; and (ii) acting as a trading bloc and engaging in secret, collusive trades in the swap market to manipulate BBSW. These unlawful and inequitable acts caused Plaintiffs and Class members to suffer injury, lose money, and otherwise be deprived of the benefit of accurate BBSW rates, as well as the ability to accurately price, benchmark and or settle BBSW-Based Derivatives transactions. As a result, Plaintiffs and the Class received, upon execution or settlement of their trades, less in value than they would have received absent Defendants' wrongful conduct. Plaintiffs' and the Class' losses correspond to Defendants' unlawful gains.

606.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

607.    Plaintiffs and members of the Class seek restitution of the monies of which they were unfairly and improperly deprived as described herein.

## PRAYER FOR RELIEF

Plaintiffs demand relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.      For a judgment awarding Plaintiffs and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.      That the Court award Plaintiffs and the Class damages against Defendants for their violations of the Commodity Exchange Act;

H.      That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and the Class;

I.      That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

J.      That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

K.      That the Court directs such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  April 3, 2019                    Respectfully submitted,
White Plains, New York

LOWEY DANNENBERG P.C.

/s/ Vincent Briganti
Vincent Briganti
Geoffrey M. Horn
Peter D. St. Phillip
Raymond Girnys

Christian Levis
Roland R. St. Louis, III
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email:  vbriganti@lowey.com
        ghorn@lowey.com
        pstphillip@lowey.com
        rgyrnis@lowey.com
        clevis@lowey.com
        rstlouis@lowey.com


Christopher Lovell
Victor E. Stewart
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN
JACOBSON LLP
500 5th Avenue, Suite 2440
New York, NY 10110
Tel: (212) 608-1900
Fax: (212) 719-4775
Email: clovell@lshllp.com
       vestewart@lshllp.com
       bjaccarino@lshllp.com


Todd Seaver
Carl N. Hammarskjold
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
Email:  tseaver@bermantabacco.com
        chammarskjold@bermantabacco.com


Patrick T. Egan (PE-6812)
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617) 542-1194
Email:  pegan@bermantabacco.com


*Counsel for Plaintiffs*

164