UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
RICHARD DENNIS, et al.,

               Plaintiffs,

      -against-                               16-cv-6496 (LAK)

JPMORGAN CHASE & CO., et al.,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/13/2020

## MEMORANDUM OPINION

Appearances:

        Vincent Briganti
        Geoffrey M. Horn
        Peter D. St. Phillip
        Raymond Girnys
        Christian Levis
        Roland R. St. Louis, III
        LOWEY DANNENBERG, P.C. (WHITE PLAINS, NY)

        Christopher Lovell
        Victor E. Stewart
        Benjamin M. Jaccarino
        LOVELL STEWART HALEBIAN JACOBSON LLP (NEW YORK, NY)

        Todd Seaver
        Carl N. Hammarskjold
        BERMAN TABACCO (SAN FRANCISCO, CA)

        Patrick T. Egan
        BERMAN TABACCO (BOSTON, MA)

        *Attorneys for Plaintiffs*

        Nowell D. Bamberger
        CLEARY GOTTLIEB STEEN & HAMILTON LLP (NEW YORK, NY)

Nowell D. Bamberger
CLEARY GOTTLIEB STEEN & HAMILTON LLP (WASHINGTON, DC)

*Attorneys for Defendants HSBC Holdings plc and HSBC Bank Australia Limited*

Kenneth I. Schacter
Elizabeth Buechner
MORGAN LEWIS & BOCKIUS LLP (NEW YORK, NY)

Jon R. Roellke
Anthony R. Van Vuren
MORGAN LEWIS & BOCKIUS LLP (WASHINGTON, DC)

*Attorneys for Defendants Morgan Stanley and Morgan Stanley Australia Limited*

David H. Braff
Matthew J. Porpora
Stephen H. O. Clarke
SULLIVAN & CROMWELL LLP (NEW YORK, NY)

*Attorneys for Defendant National Australia Bank Limited*

Penny Shane
SULLIVAN & CROMWELL LLP (NEW YORK, NY)

Christopher M. Viapiano
SULLIVAN & CROMWELL LLP (WASHINGTON, DC)

*Attorneys for Defendant Australia and New Zealand Banking Group Ltd.*

Jeffrey T. Scott
Mark A. Popovsky
SULLIVAN & CROMWELL LLP (NEW YORK, NY)

*Attorneys for Defendant Commonwealth Bank of Australia*

Jayant W. Tambe
Stephen J. Obie
Kelly A. Carrero
JONES DAY (NEW YORK, NY)

*Attorneys for Defendant BNP Paribas, S.A.*

David G. Januszewski
Herbert S. Washer
Elai Katz
Sheila C. Ramesh
Adam S. Mintz
CAHILL GORDON & REINDEL LLP (NEW YORK, NY)

*Attorneys for Defendant Credit Suisse AG*

Thomas J. Perrelli
JENNER & BLOCK (WASHINGTON, DC)

Stephen L. Ascher
Andrew J. Lichtman
JENNER & BLOCK (NEW YORK, NY)

*Attorneys for Defendant Deutsche Bank AG*

Marshall H. Fishman
Christine V. Sama
Elizabeth M. Zito
GOODWIN PROCTER LLP (NEW YORK, NY)

*Attorneys for Defendants Royal Bank of Canada and RBC Capital Markets LLC*

Fraser L. Hunter, Jr.
David S. Lesser
Jamie S. Dycus
WILMER CUTLER PICKERING HALE AND DORR LLP (NEW YORK, NY)

*Attorneys for Defendants The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc, RBS Group (Australia) Pty Ltd., and RBS N.V.*

Mark A. Kirsch
Eric J. Stock
Jefferson E. Bell
GIBSON DUNN & CRUTCHER LLP (NEW YORK, NY)

*Attorneys for Defendant UBS AG*

Daniel Slifkin
Michael A. Paskin
Timothy G. Cameron
CRAVATH SWAINE & MOORE LLP (NEW YORK, NY)

*Attorneys for Defendant Westpac Banking Corporation*

LEWIS A. KAPLAN, *District Judge.*

Every spring, the bar-tailed godwit makes an astounding 7,000 mile journey from Australia to its native Alaska. This avian odyssey takes roughly nine days, during which the remarkable twelve-ounce land bird does not stop for food or even to rest its tiny wings. Its nonstop flight is the longest known migration of any bird on earth.[1]

New York is to complex commercial lawsuits what Alaska is to bar-tailed godwits. Even in the face of serious obstacles – though of the jurisdictional, rather than the geographical sort – such cases flock to New York courts as though guided by natural instinct. Like the bar-tailed godwit, this complex commercial lawsuit seeks to journey home from Australia.

The Bank Bill Swap Rate ("BBSW") is a benchmark interest rate that is intended to reflect the rate of interest paid on prime bank bills traded on the Australian money market. Although

---

[1] *See Bar-Tailed Godwit Sets Record for Long-Distance Flight*, SCI. DAILY (Aug. 22, 2010), https://www.sciencedaily.com/releases/2010/06/100609102052.htm; Carl Zimmer, *7,000 Miles Nonstop, and No Pretzels*, N.Y. TIMES (May 24, 2010), https://www.nytimes.com/2010/05/25/science/25migrate.html. The Court is indebted to one of its law clerks, Daniel Ottaunick, for this bit of avian science.

BBSW is set in Australia, it is used to price financial derivatives in many countries, including the United States. It thus is similar in concept to the London Interbank Offered Rate ("LIBOR").

Plaintiffs are investors that engaged in U.S.-based transactions for financial derivatives making use of BBSW. They accuse defendants, which are financial institutions based all over the world, of conspiring to manipulate BBSW. They assert claims for damages under the Clayton Act, the Commodity Exchange Act ("CEA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the common law theories of unjust enrichment and breach of the implied covenant of good faith and fair dealing.

In two prior opinions, familiarity with which is assumed, the Court dismissed the majority of plaintiffs' claims.[2] Many were dismissed for lack of personal jurisdiction. Plaintiffs then filed a second amended complaint, which various defendants now move to dismiss in three separate motions. In addition to opposing these motions, plaintiffs move for jurisdictional discovery. This opinion resolves all four motions.

*Analysis*

I.  *Defendants' Motion to Dismiss the Second Amended Class Action Complaint for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim [DI-298]*

   A.  *Personal Jurisdiction*

Largely for the reasons discussed in the Court's prior opinion, all plaintiffs except the

---

[2]  *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122 (S.D.N.Y. 2018); *Dennis v. JPMorgan Chase & Co.*, 342 F. Supp. 3d 404 (S.D.N.Y. 2018). Unless otherwise noted, the facts alleged in the second amended complaint that are relevant to this opinion are materially the same as those alleged in the amended complaint and summarized in the Court's prior opinions.

newly added Orange County Employees Retirement System ("OCERS") again have failed to demonstrate that the Court may assert personal jurisdiction over the sixteen defendants participating in this motion. The new allegations in second amended complaint do not cure the defects the Court already has discussed at length.[3]

A different analysis applies to OCERS's claims against these sixteen defendants. For this purpose, defendants fall into three groups.

The first group is the nine "Consent Defendants."[4] In a prior opinion, the Court concluded that defendant Macquarie Bank Ltd. had consented to personal jurisdiction in New York for claims brought by plaintiff FrontPoint Asian Event Driven Fund.[5] The consent came via a master agreement governing BBSW transactions between the two parties, by which Macquarie had agreed to submit to jurisdiction of a New York state or federal court over "any suit, action, or proceedings related to [the master agreement]."[6]

OCERS alleges that it entered into similar agreements with the Consent Defendants. Under these alleged master agreements, each of these defendants consented to jurisdiction of courts

---

[3] See *Dennis*, 343 F. Supp. 3d at 196-211.

[4] The Consent Defendants are: Australia and New Zealand Banking Group, BNP Paribas, S.A., Commonwealth Bank of Australia, Deutsche Bank AG, Royal Bank of Canada, The Royal Bank of Scotland plc, UBS AG, Westpac Banking Corporation, and Credit Suisse AG.

[5] See *id.* at 208-09.

[6] *Id.* at 208.

in New York over any claims "arising out of or in connection with [the master agreement]"[7] or to "any suit, action, or other proceedings relating to the agreement, any FX transaction or any Option."[8] This language is identical in substance to that of the agreement between FrontPoint and Macquarie. And as FrontPoint alleged for Macquarie, OCERS alleges that it and the Consent Defendants engaged in BBSW-based transactions covered by their master agreements during the class period. These alleged master agreements make a *prima facie* showing that the Consent Defendants consented to personal jurisdiction in this forum with respect to all of OCERS's claims against them.

The next group is the three "Corporate Family Defendants."[9] OCERS alleges that it signed master agreements similar to those described above with nonparties HSBC Bank USA, N.A. and Morgan Stanley & Co. LLC. It alleges also that HSBC Bank USA and defendant HSBC Bank Australia Limited are subsidiaries of defendant HSBC Holdings plc, and that HSBC Bank USA therefore is an "affiliate" of the commonly owned HSBC Bank Australia Limited. OCERS contends further that Morgan Stanley & Co. LLC and defendant Morgan Stanley Australia Limited are subsidiaries of defendant Morgan Stanley and that Morgan Stanley & Co. LLC therefore is an "affiliate" of the commonly owned Morgan Stanley Australia Limited. OCERS argues that the nonparties' alleged consent to personal jurisdiction in New York should apply also to the Corporate Family Defendants.

"[A]n agency relationship between a parent corporation and a subsidiary that sells

---

[7]    Second Amended Class Action Complaint ¶¶ 42-43 [DI-281].

[8]    *Id.* ¶ 48 & n.4.

[9]    The Corporate Family Defendants are: HSBC Bank Australia Limited, HSBC Holdings plc, and Morgan Stanley Australia Limited.

securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities."[10] But for a court to impute a broker-dealer's contacts to an alleged parent, the plaintiff must do more than "generally allege[] that [the parent] controlled or otherwise directed or materially participated in the operations of the broker-dealer[], and reaped proceeds or other financial benefits from the broker-dealer['s] sales of [the relevant] financial instruments."[11] The Second Circuit has credited allegations of principal-agent relationships, for example, where a plaintiff alleged that corporate officers "benefitted from [the] corporation's in-forum activities and exercised extensive control over [the] corporation in the transaction underlying the suit."[12]

The second amended complaint alleges that the nonparties and Corporate Family Defendants worked together in business that included the sale of BBSW-based derivatives. But it does not permit a reasonable inference that the Corporate Family Defendants controlled the nonparties with respect to the alleged sales to OCERS. Without more, the Court cannot properly impute the nonparties' alleged contacts to the Corporate Family Defendants.

In fact, of the three Corporate Family Defendants, only HSBC Holdings plc is alleged to be a parent corporation of one of the nonparties that OCERS believes consented to personal jurisdiction in New York. With respect to HSBC Bank Australia and Morgan Stanley Australia Limited, OCERS alleges merely that these defendants and their affiliated nonparties are subsidiaries

---

[10]

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85–86 (2d Cir. 2018).

[11]

*Id.* at 86 (alterations and quotation marks omitted).

[12]

*Id.* at 85 (brackets omitted) (quoting *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988)).

of the same parent corporation. OCERS has offered no theory allowing the Court to attribute the contacts of one corporation to another under such circumstances.[13]

OCERS does not allege that any master agreement governs its claims against the remaining four defendants.[14] The Court lacks personal jurisdiction over these defendants with respect to OCERS's claims for the same reason it lacks personal jurisdiction over them with respect to the other plaintiffs' claims.

In sum, the claims of all plaintiffs except OCERS against the sixteen moving defendants are dismissed for lack of personal jurisdiction. For the same reason, OCERS's claims against HSBC Bank Australia Limited, HSBC Holdings plc, Morgan Stanley Australia Limited, National Australia Bank Limited, The Royal Bank of Scotland Group plc, RBS N.V., and RBS Group (Australia) Pty Limited are dismissed.

### B.   OCERS's Claims – Timeliness

Defendants argue that OCERS's state law and CEA claims are untimely under the governing statutes of limitations, which are, respectively, six years and two years. Although this action was filed on August 16, 2016, OCERS did not assert its claims until April 3, 2019, when plaintiffs added it as a party in the second amended complaint.

OCERS argues first that the Court need not consider the statute of limitations at all.

---

[13]   OCERS relies on the above-described test for attributing an agent's contacts to its parent. But that is far different than attributing the contacts of one alleged agent of a parent corporation to another.

[14]   These defendants are: National Australia Bank Limited, The Royal Bank of Scotland Group plc, RBS N.V., and RBS Group (Australia) Pty Limited.

This is so, in OCERS's view, plaintiffs failure to include OCERS in the amended complaint was a "mistake concerning the proper party's identity" as contemplated by Federal Rule of Civil Procedure 15(c). Thus, OCERS contends, the amendment adding its claims relates back to the other plaintiffs' August 2016 filing. Because the Court declined to dismiss those plaintiffs' CEA claim as untimely, OCERS argues that the same holding should apply to its CEA claim.

This argument seriously misperceives the meaning of "mistake concerning the proper party's identity" under Rule 15(c).[15] The classic example of a mistake in party identity is when a plaintiff sues the wrong defendant, such as an agency instead of an agency head.[16] Here, according to plaintiffs, the "mistake" is that they believed erroneously that the amended complaint established personal jurisdiction over defendants. After the Court dismissed plaintiffs' claims for lack of personal jurisdiction, in plaintiffs' telling, "OCERS promptly came forward to offer itself as a more capable representative."[17] In other words, plaintiffs believed that OCERS had a better argument for personal jurisdiction, and with OCERS joining the lawsuit, at least one plaintiff could proceed against defendants on behalf of the putative class. This is not a mistake in party identity. It is a miscalculation for which Rule 15 provides no remedy.

OCERS argues that several district courts in this circuit have applied the "mistake" rule more liberally in favor of relation back. Indeed, several courts appear to have allowed the

---

[15]

See FED. R. CIV. P. 15(c)(3)(B).

[16]

See, e.g., Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 469 (2d Cir. 1995), modified, 74 F.3d 1366 (2d Cir. 1996).

[17]

See Plaintiffs' Mem. at 50 [DI-317].

addition of new plaintiffs with untimely claims without a showing of mistake.[18]  But the Second

Circuit clearly has rejected this view.  In *Allstate Insurance Co. v. Mazzola*,[19] it held that where

plaintiffs with untimely claims sought to join a lawsuit involving a plaintiff with timely claims via

a Rule 15 amendment, the relation-back doctrine did not apply because "[the prior plaintiff] did not

seek to add [the new plaintiffs] because of a mistake, *as required by Fed. R. Civ. P. 15(c)(3)(B)*."[20]

The Court is bound by this precedent.

Rule 15 is not the only arrow in plaintiffs' quiver.  "The Court will not dismiss

plaintiffs' claims on statute of limitations grounds at the pleading stage unless 'the complaint clearly

shows the claim is out of time.'"[21] As the Court held in a prior opinion, it is plausible that plaintiffs

succeed in relying on fraudulent concealment to defeat the statute of limitations.[22]  The Court there

concluded that plaintiffs were "entitled to an opportunity to prove fraudulent concealment at trial or,

at least, adduce a fuller record on a motion for summary judgment."[23]  OCERS is entitled to the same

---

[18]     *See, e.g.*, *Bensinger v. Denbury Res. Inc.*, No. 10-cv-1917 (JG), 2013 WL 3353975, at *4 (E.D.N.Y. July 3, 2013) ("Courts in this Circuit consistently allow relation back of new plaintiffs where defendants had fair notice of the new plaintiffs' claims and would not suffer undue prejudice." (citing cases)).

[19]     175 F.3d 254 (2d Cir. 1999) (per curiam).

[20]     *Id.* at 255 (emphasis added).

[21]     *Dennis*, 343 F. Supp. 3d at 195 (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)).

[22]     *Id.* at 194-96 (citing *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065 (2d Cir. 1988)).

[23]     *Id.* at 196; *see also* Second Amended Class Action Complaint ¶¶ 546-50 [DI-281] (alleging fraudulent concealment).

opportunity.

This reasoning allows OCERS to proceed with its state law claims, which are subject to a six-year statute of limitations that plausibly had not expired by the time plaintiffs filed the second amended complaint.[24] But the CEA's statute of limitations is two years.[25] Plaintiffs conceded previously that they were on notice of the existence of the CEA claim no later than April 5, 2016.[26] They filed the second amended complaint adding OCERS on April 3, 2019, nearly three years later. It therefore is implausible that OCERS has a fraudulent concealment defense to the CEA's two-year statute of limitations.

However, one final arrow keeps alive OCERS's CEA claim, at least insofar as it is asserted in OCERS's individual capacity.[27] Under the doctrine of *American Pipe* tolling, "the timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint."[28] *American Pipe* tolling is an equitable doctrine, rather than an interpretation of

---

[24]

    *See id.*; N.Y. C.P.L.R. § 213(2).

[25]

    7 U.S.C. § 25(c).

[26]

    *Dennis*, 343 F. Supp. 3d at 196 & n.386.

[27]

    All plaintiffs assert their claims "on behalf of themselves and all others similarly situated." *See* Second Amended Class Action Complaint [DI-281].

[28]

    *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018).

    *American Pipe* involved a plaintiff that sought to raise its claims *after* the denial of class certification in an existing class action. OCERS seeks to raise its claims *before* the Court has ruled on class certification. Under Second Circuit law, *American Pipe* applies in both circumstances. *See In re WorldCom Sec. Litig.*, 496 F.3d 245, 256 (2d Cir. 2007).

the Federal Rules of Civil Procedure or any particular statute of limitations.[29]

Plaintiffs other than OCERS filed their original complaint asserting a CEA claim on August 16, 2016.[30] It is plausible that the CEA claim of those plaintiffs is timely because of their possible fraudulent concealment defense to the statute of limitations.[31] If the claim is timely, the original filing would have tolled the statute of limitations, and OCERS's CEA claim will be treated as though it too were filed on August 16, 2016.[32]

The same is not true for the CEA claim OCERS asserts on behalf of the putative class. In *China Agritech, Inc. v. Resh*,[33] the Supreme Court held that "*American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations."[34] This is because "[t]he watchwords of *American Pipe* are efficiency and economy of litigation," and "[e]xtending *American Pipe* tolling to successive class actions does not serve that purpose."[35] Thus, while OCERS may proceed with its own CEA claim, it may do so only in its individual capacity.

---

[29]

California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2051 (2017) ("[T]he source of the tolling rule applied in *American Pipe* is the judicial power to promote equity, rather than to interpret and enforce statutory provisions.").

[30]

See Class Action Complaint ¶¶ 276-78 [DI-1] (Aug. 16, 2016) (asserting a CEA claim).

[31]

*Dennis*, 343 F. Supp. 3d at 196.

[32]

Defendants do not meaningfully challenge this conclusion insofar as OCERS asserts this claim in its individual capacity.

[33]

138 S. Ct. 1800 (2018).

[34]

*China Agritech*, 138 S. Ct. at 1804.

[35]

*Id.* at 1811.

OCERS argues that *China Agritech* does not control here. That case, it observes, concerned a new plaintiff filing a *successive* class action. This one concerns a new plaintiff's attempt to join an *existing* class action via amendment.[36]

But while *China Agritech*'s most narrowly stated holding is distinguishable, its reasoning is not. The Supreme Court declined to apply *American Pipe* to follow-on class actions to "propel putative class representatives to file suit well within the limitation period and seek certification promptly."[37] "Ordinarily, to benefit from equitable tolling, plaintiffs must demonstrate that they have been diligent in pursuit of their claims."[38] In fact, the Second Circuit has read *China Agritech* to mean that "[l]itigants may benefit from equitable tolling *only* if they were 'diligent in pursuit of their claims.'"[39] By sitting on the sidelines until this Court denied class certification, OCERS failed to demonstrate such diligence here.[40] Plaintiffs have offered no persuasive excuse

---

[36]

      *China Agritech* is distinguishable also because there, the successor plaintiff filed its claims *after* the denial of class certification. OCERS filed its claims *before* a decision on class certification. The First Circuit held that any attempt to distinguish *China Agritech* on this ground "relies on an impermissibly narrow reading of [the case]." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d 1, 16 (1st Cir. 2019). But several courts in this circuit are of the view that *China Agritech* applies only "when class action status previously has been denied." *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 409 F. Supp. 3d 261, 271 (S.D.N.Y. 2019) (quoting *Betances v. Fischer*, 403 F. Supp. 3d 212, 223 (S.D.N.Y. 2019)). As plaintiffs make no attempt to distinguish their case on this ground, the Court does not consider whether this temporal difference matters.

[37]

      *China Agritech*, 138 S. Ct. at 1811.

[38]

      *Id.* at 1808.

[39]

      *Testa v. Becker*, 910 F.3d 677, 684 (2d Cir. 2018) (emphasis added) (quoting *China Agritech*, 138 S. Ct. at 1808).

[40]

      *See China Agritech*, 138 S. Ct. at 1808 ("A would-be class representative who commences suit after expiration of the limitation period, however, can hardly qualify as diligent in

for OCERS's failure to join this lawsuit in 2016.

Further, *China Agritech* relied on a concern that permitting successive class actions "would allow the statute of limitations to be extended time and again," to the point that "the time for filing successive class suits, if tolling were allowed, could be limitless."[41] A similar risk is present here, where plaintiffs concede that they added OCERS to keep their class claims alive following the dismissal of much of the amended complaint.[42] Under OCERS's theory of *American Pipe*, plaintiffs conceivably could continue recruiting new representatives in piecemeal fashion, long after a statute of limitations has expired, if for some reason an existing plaintiff were unable to proceed as class representative for some or all claims against some or all defendants. Perhaps a district court could halt any such abuse by denying leave to amend.[43] But this arguable safety valve does not mitigate the Supreme Court's concerns about diligence and finality.

Finally, plaintiffs' position would create doctrinal incoherence. *American Pipe* tolling allows plaintiffs to pursue stale claims through several different procedural avenues. In fact, *American Pipe* itself did not involve the fact pattern for which it most commonly is cited. The claimants in that case attempted to intervene in an ongoing lawsuit, rather than file a successive

---

asserting claims and pursuing relief. Her interest in representing the class as lead plaintiff, therefore, would not be preserved by the prior plaintiff's timely filed class suit.").

[41] *Id.* at 1808-09.

[42] *See* Plaintiffs' Mem. at 50 [DI-317].

[43] Doing so, however, could create a degree of tension with the rule that leave to amend should be "liberally granted." *See, e.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008).

one.[44]  In a subsequent case extending *American Pipe* tolling to successive lawsuits, the Supreme

Court held that, although "*American Pipe* concerned only intervenors, . . . the holding of that case

is not to be read so narrowly.  The filing of a class action tolls the statute of limitations as to all

asserted members of the class."[45]  It would be strange to say that the tolling rule applies regardless

of how a plaintiff seeks to join a lawsuit, but *China Agritech*'s limitation on that rule applies only

when a plaintiff initiates a new action.[46]

OCERS's class capacity CEA claim is dismissed.

C.      *OCERS's Claims – Remaining Issues*

Defendants argue that the Court should limit the class period to 2009 to 2012.  This

effectively is a challenge to the class definition, rather than a basis for a motion to dismiss under

Rule 12(b)(6).  The Court will consider this issue if and when plaintiffs move for class certification.

At this stage, the second amended complaint permits a reasonable inference that the alleged

---

[44]

*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 544 (1974).

[45]

*See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983).

[46]

*Cf.* 3 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 9:64 (5th ed.) (noting that after *China Agritech*, "the continued vitality of tolling for substitute representatives [that seek to join existing class action lawsuits via intervention following the denial of class certification] is precarious").

At least one other district court has considered this issue in the wake of *China Agritech*. It held that *"China Agritech* does not prohibit *American Pipe* tolling from applying . . . to allow the addition or substitution of a named plaintiff in an ongoing putative class action following the expiration of the statute of limitations but prior to a decision on class certification." *Schultz v. Midland Credit Mgmt., Inc.*, 16-cv-4415 (JLL), 2019 WL 2083302, at *10 (D.N.J. May 13, 2019); *see also id.* at *8-12 (explaining this holding). Respectfully, this Court disagrees.

conspiracy giving rise to plaintiffs' claims lasted for the duration of the proposed class period.[47]

Although defendants' papers imply that they have moved to dismiss under Rule 12(b)(3) for "improper venue," no such argument appears in their memorandum. Defendants instead raise an argument that plaintiffs cannot use the general venue statute or the Clayton Act's venue provision as bases for establishing personal jurisdiction.[48] The Court denies these challenges as moot in light of the above conclusions and finds that defendants have waived any challenge under Rule 12(b)(3) that New York is an improper venue.

## II. *Plaintiffs' Motion for Jurisdictional Discovery [DI-261]*

Pursuant to the foregoing discussions of the personal jurisdiction issues in this case, as well as the more detailed analysis of these issues in its prior opinion, the Court is not persuaded that jurisdictional discovery would serve any useful purpose or enable plaintiffs to correct their pleading defects. The motion for jurisdictional discovery is denied.

## III. *Morgan Stanley and Morgan Stanley Australia Limited's Motion to Dismiss [DI-303]*

### A. *Sherman Act Claim*

The Court held previously that the amended complaint stated a Sherman Act Section

---

[47] For this reason, the Court rejects defendants' argument that the alleged master agreement between OCERS and Commonwealth Bank of Australia was executed outside the class period. The Court rejects also defendants' argument that the alleged transactions involving Australia and New Zealand Banking Group pursuant to their alleged master agreement with OCERS took place outside the class period.

[48] Defendants' Mem. 38-40 [DI-301].

1 claim against Morgan Stanley.[49] The second amended complaint retains largely the same allegations as the amended complaint and adds additional ones, some of which are particular to OCERS. Morgan Stanley argues that the additional allegations are self-defeating. In its view, the second amended complaint permits no reasonable inference other than that Morgan Stanley is a holding company that did not engage in the alleged conduct giving rise to plaintiffs' antitrust claim.

The second amended complaint, just like the amended complaint, plausibly alleges that Morgan Stanley violated the Sherman Act. Morgan Stanley's reading would construe an allegation that it "conducts its Institutional Securities business *primarily* through wholly-owned subsidiaries"[50] to mean that it acted in all relevant ways *exclusively* through such subsidiaries. And it would overlook the numerous other allegations, which the Court credited previously and credits again, that Morgan Stanley "conspired [with other defendants] to rig the process of setting BBSW."[51]

B.    *State Law Claims*

Morgan Stanley and Morgan Stanley Australia Limited move also to dismiss OCERS's claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment. They argue principally that these claims must fail because OCERS does not allege to having engaged in any transactions with either of them. Instead, defendants contend, the second amended complaint ascribes the relevant conduct to Morgan Stanley & Co. LLC, which plaintiffs

---

49

 *See Dennis*, 343 F. Supp. 170-71.

50

 Second Amended Class Action Complaint ¶ 350 [DI-281] (emphasis added).

51

 *See Dennis*, 343 F. Supp. 170-71 (discussing these allegations in the amended complaint).

allege is a wholly owned subsidiary of Morgan Stanley.

"[A] New York unjust enrichment claim requires no 'direct relationship' between [a] plaintiff and [a] defendant."[52]  Instead, such a claim may survive a motion to dismiss based on a more "modest" showing that the alleged connection between the parties is not too attenuated.[53] Courts may credit allegations that a defendant's misconduct "artificially moved market prices in a way that directly harmed [p]laintiffs while benefitting [d]efendants."[54]

Plaintiffs allege that Morgan Stanley & Co. LLC and Morgan Stanley Australia Limited "work together to conduct Morgan Stanley's Sales and Trading business with respect to financial products that allow investors located in the United States to invest in Australian-dollar denominated financial products, including BBSW-Based Derivatives."[55]  Although the second amended complaint does not spell out this point, it permits a reasonable inference that both defendants were enriched as a result of these dealings with Morgan Stanley & Co. LLC.[56]  These allegations suffice to state a claim for unjust enrichment.

They do not amount, however, to a claim for breach of the implied covenant of good

---

52

*Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018).

53

*Id.*; *see Dennis*, 343 F. Supp. 3d at 160.

54

*See Myun-Uk Choi*, 890 F.3d at 69.

55

Second Amended Class Action Complaint ¶¶ 156 & n.7, 352 [DI-281].

56

*See id.* ¶ 162 (alleging Morgan Stanley & Co. LLC acted as an agent of Morgan Stanley Australia Limited in entering into transactions with OCERS); *id.* ¶ 351 (alleging Morgan Stanley & Co. LLC is a wholly owned subsidiary of Morgan Stanley that conducts trades as its agent); *id.* ¶ 605 (alleging the two defendants were unjustly enriched as a result of the allegations stated in the second amended complaint).

faith and fair dealing. The second amended complaint plausibly alleges that Morgan Stanley and Morgan Stanley Australia Limited *worked with* Morgan Stanley & Co. LLC on some level with respect to BBSW transactions. But it does not permit a reasonable inference that Morgan Stanley & Co. LLC was either entity's *agent* with regard to the transactions with plaintiffs. And while plaintiffs allege a parent-subsidiary relationship between Morgan Stanley and Morgan Stanley & Co. LLC – though not between Morgan Stanley Australia Limited and Morgan Stanley & Co. LLC – they cite no authority discussing when, if ever, a parent can be liable for breach of the implied covenant of good faith and fair dealing based on a contract entered into by its subsidiary.[57] As plaintiffs have offered no valid basis for attributing Morgan Stanley & Co. LLC's conduct to Morgan Stanley or Morgan Stanley Australia Limited, the implied covenant claim is dismissed.

IV. *RBC Capital Markets LLC's Motion to Dismiss the Second Amended Class Action Complaint [DI-306]*

The Court held previously that the amended complaint stated a Sherman Act Section 1 claim against RBC Capital Markets LLC.[58] RBC Capital Markets LLC moves to dismiss that claim under Rule 12(b)(6) on the ground that plaintiffs' second amended complaint no longer alleges anticompetitive conduct on its behalf. Perhaps surprisingly, the fate of plaintiffs' antitrust claim turns on the rule that a district court may not look outside the pleadings in deciding a motion to

---

[57] At least some authority suggests that they may not pursue such a claim. *See Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 727 (S.D.N.Y. 2014) (citing cases). But the Court need not explore this theory because plaintiffs have not advanced it sufficiently.

[58] *See Dennis*, 343 F. Supp. 170-71.

dismiss for failure to state a claim.[59]

The amended complaint defined the term "RBC" to refer to both the Royal Bank of Canada and RBC Capital Markets LLC.[60] But the second amended complaint – without modifying the relevant substantive allegations – changed that defined term to "RBC Group"[61] and elsewhere defined "RBC" to mean the Royal Bank of Canada alone.[62] The effect of these changes is that numerous allegations against "RBC," which once referred to both defendants, now apply only to the Royal Bank of Canada. Many such allegations appear in the paragraphs that the Court relied upon previously, when construing identical paragraphs in the amended complaint, in holding that plaintiffs stated a Sherman Act claim against both defendants. As all parties recognize, the redefinition of "RBC" is a problem for plaintiffs.

In a footnote referring to this problem as a "typographical error" – the better term is "clerical error"[63] – plaintiffs ask the Court to read "RBC" to include, as it previously did, both the

---

[59]

See, e.g., *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013).

[60]

Amended Complaint ¶ 139 [DI-63].

[61]

Second Amended Complaint ¶ 346 [DI-281].

[62]

*Id.* ¶ 337.

[63]

*See* Plaintiffs' Mem. at 3 n.2 [DI-315].

A typographical error is "a mistake (such as a misspelled word) in typed or printed text." *Typographical Error*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/typographical%20error. A clerical error is an "an error made in copying or writing." *Clerical Error*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/clerical%20error.

Royal Bank of Canada and RBC Capital Markets LLC. But the Court may not look to the amended complaint to interpret the second amended complaint. Error or not, the second amended complaint unambiguously defines "RBC" to refer only to the Royal Bank of Canada.[64] Because the bulk of the antitrust allegations are attributed to "RBC," the second amended complaint does not permit a reasonable inference that RBC Capital Markets LLC violated the antitrust laws. Plaintiffs have failed to state a Sherman Act claim against RBC Capital Markets LLC.

*Conclusion*

1. Defendants' Motion to Dismiss the Second Amended Class Action Complaint for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim [DI-298] is granted to the extent that (1) the claims of all plaintiffs except OCERS against all moving defendants are dismissed for lack of personal jurisdiction,[65] (2) OCERS's claims against the seven defendants that it does not allege consented to personal jurisdiction are dismissed for lack of personal jurisdiction,[66] and (3) OCERS's CEA claim asserted in its representative capacity is dismissed as untimely. The motion otherwise is denied.

---

[64]

Second Amended Class Action Complaint ¶ 337 [DI-281].

[65]

These defendants are: BNP Paribas, S.A., The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland plc, RBS N.V., RBS Group (Australia) Pty Limited, UBS AG, Australia and New Zealand Banking Group Ltd., Commonwealth Bank of Australia, National Australia Bank Limited, Westpac Banking Corporation, Deutsche Bank AG, HSBC Holdings PLC, HSBC Bank Australia Limited, Royal Bank of Canada, Morgan Stanley Australia Limited, and Credit Suisse AG.

[66]

These defendants are: HSBC Bank Australia Limited, HSBC Holdings plc, Morgan Stanley Australia Limited, National Australia Bank Limited, The Royal Bank of Scotland Group plc, RBS N.V., and RBS Group (Australia) Pty Limited.

2.  Plaintiffs' Motion for Jurisdictional Discovery [DI-261] is denied.

3.  Morgan Stanley and Morgan Stanley Australia Limited's Motion to Dismiss [DI-303] is granted to the extent that OCERS's claim for breach of the implied covenant of good faith and fair dealing against Morgan Stanley and Morgan Stanley Australia Limited is dismissed.  The motion otherwise is denied.

4.  RBC Capital Markets LLC's Motion to Dismiss the Second Amended Class Action Complaint [DI-306] is granted.

SO ORDERED.

Dated:          February 13, 2020

_____
Lewis A. Kaplan
United States District Judge