## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD DENNIS, SONTERRA CAPITAL MASTER FUND, LTD., FRONTPOINT FINANCIAL SERVICES FUND, L.P., FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., FRONTPOINT FINANCIAL HORIZONS FUND, L.P., and ORANGE COUNTY EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | Case No. 1:16-cv-6496 (LAK) <br><br> ECF CASE |

Plaintiffs,

v.

JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., BNP PARIBAS, S.A., THE ROYAL BANK OF SCOTLAND GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, RBS N.V., RBS GROUP (AUSTRALIA) PTY LIMITED, UBS AG, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD., COMMONWEALTH BANK OF AUSTRALIA, NATIONAL AUSTRALIA BANK LIMITED, WESTPAC BANKING CORPORATION, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, HSBC BANK AUSTRALIA LIMITED, LLOYDS BANKING GROUP PLC, LLOYDS BANK PLC, MACQUARIE GROUP LTD., MACQUARIE BANK LTD., ROYAL BANK OF CANADA, RBC CAPITAL MARKETS LLC, MORGAN STANLEY, MORGAN STANLEY AUSTRALIA LIMITED, CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, ICAP PLC, ICAP AUSTRALIA PTY LTD., TULLETT PREBON PLC, TULLETT PREBON (AUSTRALIA) PTY LTD., AND JOHN DOES NOS. 1-50,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## BNP PARIBAS'S RULE 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

RELEVANT BACKGROUND ............................................................... 2

    A.    Procedural History ..................................................................... 2

        1.    First Amended Complaint and Motion to Dismiss ................... 2

        2.    Second Amended Complaint and Motion to Dismiss ............... 4

        3.    BNPP's Answer and Affirmative Defenses ............................. 6

    B.    The FX Benchmark Rates Antitrust Litigation and Settlement ............ 7

        1.    FX Benchmark Litigation Allegations ...................................... 7

        2.    The FX Benchmark Litigation Settlement Agreement .............. 9

ARGUMENT ..................................................................................... 12

I.    The FX Benchmark Litigation Settlement Agreement Expressly Bars All Claims Arising Out of the Trades with BNPP Identified by OCERS ........................................... 13

    A.    OCERS Is A Party To The FX Benchmark Settlement Agreement .................. 14

    B.    The Trades Between OCERS and BBSW Alleged In The BBSW Complaint Are Released Claims Under the Settlement Agreement .................. 14

    C.    The Settlement Agreement's Release Is Valid And Enforceable Against OCERS ................................................................................ 16

II.    This Court's Prior Personal Jurisdiction Rulings Bar Any Remaining Claims Against BNPP ................................................................... 18

CONCLUSION .................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allianz Global Investors GmbH v. Bank of America Corp.*,
    No. 18 Civ. 10364 (LGS), 2020 WL 2765693 (S.D.N.Y. May 28, 2020)..............................17

*Bank of New York v. Amoco Oil Co.*,
    35 F.3d 643 (2d Cir. 1994)...................................................................................................13

*Byrd v. City of New York*,
    No. 04-1396-CV, 2005 WL 1349876 (2d Cir. 2005) ............................................................12

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018).......................................................................................................4

*City of Almaty, Kazakhstan v. Ablyazov*,
    No. 15-cv-5345 (AJN), 2019 WL 1430155 (S.D.N.Y. Mar. 29, 2019)..................................12

*Cowan v. Ernest Codelia, P.C.*,
    No. 98 Civ. 5548 (JGK), 2001 WL 856606 (S.D.N.Y. July 30, 2001) ..................................12

*Dennis v. JPMorgan Chase & Co.*,
    No. 16-cv-6496 (LAK), 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018) ...................................4

*Dennis v. JPMorgan Chase & Co.*,
    439 F. Supp. 3d 256 (S.D.N.Y. 2020)............................................................................6, 9, 18

*Dennis v. JPMorgan Chase & Co.*,
    343 F. Supp. 3d 122 (S.D.N.Y. 2018)....................................................................4, 5, 6, 18

*In re Adelphia Comm'ns Corp. Secs. & Derivative Litig.*,
    272 F. App'x 9 (2d Cir. 2008) ..............................................................................................17

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    No. 13 Civ. 7789 (LGS), 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018)................................10

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011)..................................................................................................16

*Leighton v. Poltorak*,
    No. 17-cv-3120 (LAK) (KNF), 2018 WL 2338789 (S.D.N.Y. May 23, 2018)......................12

*Marino v. Jonke*,
   No. 7:11-cv-430 (VB), 2011 WL 3251585 (S.D.N.Y. June 30, 2011)....................................13

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002)......................................................................................................16

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).........................................................................................................13

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005).........................................................................................................17

**STATUTES AND RULES**

Federal Rule of Civil Procedure 12(c)....................................................................................1, 12

Federal Rules of Evidence Rule 201(b)...................................................................................13

**OTHER AUTHORITIES**

UBS AG and UBS Securities Japan Co., Ltd, CFTC No. 13-09, 2012 WL 6642376
   (CFTC Dec. 19, 2012) ................................................................................................................9

Defendant BNP Paribas ("BNPP") respectfully submits this memorandum of law in support of its motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## PRELIMINARY STATEMENT

In ruling on defendants' motion to dismiss the Second Amended Complaint ("SAC"), this Court found personal jurisdiction over BNPP predicated solely on Australian Dollar Foreign Exchange ("FX") Forward trades with plaintiff Orange County Employee Retirement System ("OCERS"). Those trades are the sole basis for OCERS's assertion of personal jurisdiction over BNPP with respect to the claims that BNPP conspired with the Defendants to manipulate the Australian Bank Bill Swap Rate ("BBSW") so as to manipulate the price of BBSW-based financial instruments, which OCERS expressly defines to include FX Forward trades.

OCERS's claims, however, are subsumed by the claims litigated and fully released in BNPP's classwide settlement of *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 13-cv-7789 (S.D.N.Y.) (the "FX Benchmark Litigation"). BNPP's settlement of that litigation for $115,000,000 is the subject of Final Approval, Judgment, and Dismissal Orders. OCERS cannot relitigate claims concerning the same products, covering the same time period, and arising out of the same conduct. Because all of OCERS's claims concerning FX Forward trades were fully pursued and settled in the FX Benchmark Litigation, and OCERS did not opt out of that settlement, OCERS is precluded from relitigating those claims here against BNPP. Because OCERS is barred from relitigating the settled FX Forward claims, there is no basis for the Court's exercise of personal jurisdiction over BNPP and the entire case against BNPP must be dismissed.

**RELEVANT BACKGROUND**

**A.      Procedural History**

**1.      First Amended Complaint and Motion to Dismiss**

Plaintiffs Richard Dennis, Sonterra Capital Master Fund, Ltd., Frontpoint Financial

Services Fund, L.P., Frontpoint Asian Event Driven Fund, LP., and Frontpoint Financial

Horizons Fund, L.P. filed the initial class action complaint in this matter in 2016.  ECF No. 1

(filed August 16, 2016).  Shortly thereafter, this same set of Plaintiffs filed a First Amended

Complaint ("FAC") against defendants including BNPP.  ECF No. 63 (filed December 19,

2016).  The FAC alleged, among other claims, antitrust, RICO, and CEA claims on behalf of a

putative class of:

> All persons or entities that engaged in U.S.-based transactions in
> financial instruments that were priced, benchmarked, and/or settled
> based on BBSW at any time from at least January 1, 2003, through
> the date on which the effects of Defendants' unlawful conduct
> ceased.

FAC at ¶ 304; *see also* ECF No. 281, Seconded Amended Complaint at ¶ 539 (hereafter,

"SAC").[1]  BBSW is the wholesale interbank rate within Australia—Australia's equivalent of

LIBOR—and is the borrowing rate among the country's top market makers.  FAC at ¶ 1; SAC

¶ 1.  Until September 2017, it was administered by the Australian Financial Markets Association

("AFMA").  FAC at ¶ 1; SAC ¶ 1.

Plaintiffs contend that Defendants engaged in a conspiracy to manipulate the BBSW rate

beginning in 2003 premised entirely on purported conduct outside the United States, namely by

allegedly (i) sharing confidential information regarding their BBSW exposure and coordinating

their trades; (ii) using their policy-setting position within the AFMA to adopt and maintain

---

[1] Where allegations in the FAC track those included in the subsequently filed amended
complaint, dual citations to the FAC and SAC are provided.

policies conducive to their manipulative scheme, and (iii) making false rate submissions in violation of AFMA rules. *See, e.g.*, FAC ¶¶ 2–5, 201; SAC ¶¶ 2–5, 412. As to BNPP, Plaintiffs rely upon an alleged Australian regulatory inquiry and settlement. FAC ¶¶ 4, 52, 201; SAC ¶¶ 4, 180, 412. Although this purported manipulation of BBSW occurred entirely outside the United States, Plaintiffs contend Defendants allegedly marketed and sold in the United States at artificial prices so-called BBSW-Based Derivatives, which they define to include FX instruments such as Australian Dollar FX Forwards. FAC ¶¶ 13, 185, 192–94; SAC ¶¶ 13, 36, 45, 71, 403–05. An Australian dollar FX Forward is an over-the-counter ("OTC") agreement to buy or sell Australian dollars in exchange for U.S. dollars on a specified future date. FAC ¶ 194; SAC ¶ 405.

In moving to dismiss the FAC, certain defendants, including BNPP, argued that FX instruments are contracts that do not reference BBSW. ECF No. 134, Defendants' Memorandum In Support of Motion to Dismiss FAC, at 5–6 (filed Feb. 24, 2017). Plaintiffs vehemently disagreed. ECF No. 156, Plaintiffs' Opposition to Motion to Dismiss FAC, at 6–7 (filed Apr. 28, 2017). They claimed that this Court must accept as true their allegations that "Australian dollar foreign exchange forwards are priced using the same formula that determines the value of CME Australian dollar futures contracts" and are "affected by changes in BBSW" based on Plaintiffs' regression analysis purporting to find "a statistically significant relationship between a change in BBSW and a change in prices of the CME Australian dollar futures contracts." *See id.* (citing FAC ¶¶ 192, 194); *see also* SAC ¶¶ 403, 405. CME Australian dollar futures, in turn, Plaintiffs allege are "determined by a formula that incorporates BBSW as one of its terms" using BBSW "to adjust the 'spot price' of Australian dollars for immediate delivery to account for the 'cost of carry.'" FAC at ¶ 191; *see also* SAC at ¶ 402. This Court accepted Plaintiffs' allegations as true

at the pleading stage.  *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 161

(S.D.N.Y. 2018) (hereinafter "*BBSW I*").

 As a foreign defendant, BNPP also moved to dismiss the FAC for lack of personal

jurisdiction.  ECF No. 110, Defendants' Memorandum in Support of Motion to Dismiss FAC for

Lack of Jurisdiction (filed Feb. 24, 2017); *see also* ECF No. 112, Declaration of Julie Lauck in

support of BNPP's Motion to Dismiss FAC for Lack of Personal Jurisdiction (filed Feb. 24,

2017).  This Court, applying the Second Circuit's controlling decision in *Charles Schwab Corp.*

*v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018), concluded that the FAC failed to allege

jurisdiction as to BNPP under either a "purposeful availment" theory or the "effects test," *BBSW*

*I*, 343 F. Supp. 3d at 203–08, and affirmed that ruling when denying Plaintiffs' motion for

reconsideration, *Dennis v. JPMorgan Chase & Co.*, No. 16-cv-6496 (LAK), 2018 WL 6985207,

at *1 (S.D.N.Y. Dec. 20, 2018) (hereinafter "*BBSW II*").

  **2.**  **Second Amended Complaint and Motion to Dismiss**

 In an attempt to ameliorate the jurisdictional deficiencies, Plaintiffs joined a new

plaintiff, OCERS, and filed the SAC.  As to BNPP, Plaintiff OCERS alleges:

> Pursuant to the BNP Paribas ISDA Master Agreement, OCERS
> entered into at least 8 BBSW-based ***Australian dollar FX forward***
> ***transactions*** with BNP Paribas, S.A. between February 6, 2009
> and April 29, 2013, including for examples:
>
>  a. One ***Australian dollar foreign exchange forward*** on February 6,
>    2009 agreeing to buy AUD 653,000.00 from BNP Paribas, S.A. for
>    $439,142.50 on February 19, 2009;
>
>  b. Two ***Australian dollar foreign exchange forwards*** on December 9,
>    2010 agreeing to sell AUD 39,000.00 and AUD 46,000.00,
>    respectively, to BNP Paribas, S.A. for $38,095.28 and $44,932.89,
>    respectively, on January 28, 2011;
>
>  c. One ***Australian dollar foreign exchange forward*** on June 17, 2011
>    agreeing to sell AUD 392,588.50 to BNP Paribas, S.A. for
>    $371,000.00 on June 30, 2011;

      d.     One ***Australian dollar foreign exchange forward*** on November 21, 2012 agreeing to buy AUD 176,000.00 from BNP Paribas, S.A. for $ 181,347.58 on January 10, 2013;

      e.     One ***Australian dollar foreign exchange forward*** on April 29, 2013 agreeing to buy AUD 1,740,000.00 from BNP Paribas, S.A. for $ 1,796,854.50 on May 23, 2013.

SAC ¶ 71 (emphases added).[2]

Plaintiffs allege the BNPP ISDA Master Agreement was between BNPP and one of OCERS's investment advisors.  SAC ¶ 69.  OCERS is allegedly identified as the contracting party in an appendix to that contract, and OCERS allegedly became a party to the BNPP ISDA Master Agreement no later than March 14, 2008.  SAC ¶ 70.  The Master Agreement is governed by New York law and also contained a "Governing Law and Jurisdiction" provision, "[w]ith respect to any suit, action or proceedings relating to this Agreement," that "submits… to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the state of New York."  SAC, Ex. B at 13; SAC ¶ 64.  Because each of these trades was purportedly made under the BNPP ISDA Master Agreement, Plaintiffs contend BNPP allegedly "consented to personal jurisdiction for OCERS's claims arising out of or related to these BBSW-Based Derivatives transactions in the Southern District of New York."  SAC ¶ 72.

---

[2] OCERS alleges that it "entered into at least 8" BBSW-based Australian dollar FX forward transactions with BNPP during the relevant time period, but identifies only six such transactions.  To the extent OCERS claims that any other transactions establish personal jurisdiction here, OCERS has failed to make the requisite "averment of facts that, if credited, would suffice to establish jurisdiction over" BNPP.  *BBSW I*, 343 F. Supp. 3d at 196-97 (internal quotation marks and alterations omitted); *see also infra* Part II.  In any event, the number of FX forward trades is irrelevant, because as discussed *infra* in Part I, the FX Benchmark Settlement Agreement applies to *all* FX Forward trades with BNPP.

Foreign defendants, including BNPP, moved to dismiss the SAC for, among other reasons, lack of personal jurisdiction on the basis that the SAC did not cure the jurisdictional deficiencies identified by this Court in *BBSW I* and *II*.  *See* ECF No. 301 (filed May 20, 2019). On February 13, 2020, this Court ruled on the foreign defendants' motion.  *Dennis v. JPMorgan Chase & Co.*, 439 F. Supp. 3d 256 (S.D.N.Y. 2020) (hereinafter "*BBSW III*").[3]  In *BBSW III*, as to BNPP, this Court granted the motion in substantial part for "the reasons discussed in the Court's prior opinion."  *Id*. at 261.  However, as to "the newly added" plaintiff OCERS, this Court found that OCERS alleged that BNPP and certain other defendants—referred to as "Consent Defendants"—purportedly engaged in BBSW-based transactions during the class period covered by their master agreements, under which they allegedly consented to the jurisdiction of courts in New York.  *Id*.  Under the motion to dismiss standard, this Court held "[t]hese alleged master agreements make a *prima facie* showing that the Consent Defendants consented to personal jurisdiction in this forum with respect to all of OCER's claims against them."  *Id*.  Following *BBSW III*, Plaintiff OCERS's remaining claims as to BNPP are class-based antitrust and RICO claims, and an individual CEA claim.  *Id.* at 269–70.

### 3.    BNPP's Answer and Affirmative Defenses

On June 16, 2020, BNPP filed its Answer to the Second Amended Complaint.  ECF No. 375.  As affirmative defenses therein, among others, BNPP raised that:

- "Plaintiffs' claims are barred, in whole or in part, by the doctrine of res judicata and/or collateral estoppel." (Eighth Defense)

- "Plaintiffs' claims are barred, in whole or in part, to the extent they have been previously extinguished by prior compromise, settlement agreement, and mutual release."  (Thirty-Fifth Defense).

---

[3] For a procedural history prior to this Court's decision on defendants' motion to dismiss the SAC for lack of personal jurisdiction, improper venue, and failure to state a claim, BNPP incorporates by reference the fact section from that motion.  *See* ECF No. 301 at 3–6.

- Plaintiffs' claims were released in prior litigation, including the settlements in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789 (S.D.N.Y.) (e.g., ECF Nos. 481-8, 1101). Upon information and belief, Plaintiffs did not opt out of the class settlements in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789 (S.D.N.Y.), and are bound by the releases. (Eighty-Sixth Defense)

It is upon these affirmative defenses that this motion for judgment on the pleadings is predicated.

### B.     The FX Benchmark Rates Antitrust Litigation and Settlement

#### 1.     FX Benchmark Litigation Allegations

In 2013, a group of U.S.-based plaintiffs brought a class action suit against a number of the world's largest banks—including against BNPP—in a case captioned *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789 (S.D.N.Y.) (the "FX Benchmark Litigation").[4]  Like here, plaintiffs' counsel in that matter included Lowey Dannenberg Cohen & Hart, P.C.

The FX Benchmark Litigation complaint alleged claims arising out of a purported "long-running conspiracy … to manipulate the benchmark rates in one of the world's largest markets, the foreign exchange ("FX") market."  74 F. Supp. 3d 581, 585 (S.D.N.Y. 2015).  At least as to FX instruments, Plaintiffs' theory in the BBSW matter is a subset of plaintiffs' theory in the FX Benchmark litigation.  There, plaintiffs allege defendants, such as BNPP, conspired with other major international banks to "fix" a variety of benchmark rates at artificial levels, which in turn "impacted the pricing of all FX Instruments, inflicting severe financial harm" on those who transacted with them.  Declaration of Kurt M. Gosselin dated July 16, 2020 ("Gosselin Decl."),

---

[4] As used herein, "FX Benchmark Litigation" refers to *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789-LGS (S.D.N.Y.), which includes all actions filed in or transferred to the United States District Court for the Southern District of New York and consolidated thereunder, including: *Taylor v. Bank of America Corp.* (15 Civ. 1350), *Sterk v. Bank of America Corp.* (15 Civ. 2705), *Bakizada v. Bank of America Corp.* (15 Civ. 4230), *Teel v. Bank of America Corp.* (15 Civ. 4436), and *Robert Charles Class A, L.P. v. Bank of America Corp.* (15 Civ. 4926).

Ex. A, FX Benchmark Litig., ECF No. 619, Third Amended Complaint at ¶ 13; *see also id.* at ¶¶ 172–73.  FX Instruments are defined to include FX forward contracts, identical to those alleged in this action.  *Id.* at ¶ 67 n.15; *see also id.* at ¶¶ 30, 32, 35, 38, 43-45 (identifying plaintiffs that entered into Australian Dollar FX Instruments).  While plaintiffs do not identify all of the benchmark rates by name, they make clear that "[d]efendants' conspiracy targeted the pricing of over two dozen currencies, including the most heavily traded currency pairs," and that the "conspiracy encompassed … pricing fixing various bench mark rates, ***including, but not limited to***, WM/Reuters benchmark rates and the ECB reference rate."  *Id.* at ¶ 124 (emphasis added).  Plaintiffs also provided non-exhaustive examples of "Other Benchmark Rates," *id.* at ¶¶ 111–14, which are of a similar nature to BBSW.

In a section of the complaint titled "Defendants Conspired to Fix the Benchmark Rates," plaintiffs' allegations include, *inter alia*, the purported sharing of "confidential customer order information" and trading information between defendants, *id.* ¶¶ 178, 186, and conversations between defendants in chat rooms regarding various benchmark rates, *id.* ¶ 195–96.  In a subsequent section of the complaint titled "Government Investigations," plaintiffs further allege that law enforcement and regulatory agencies around the world "instituted enforcement actions, entered into settlements, and imposed massive fines based on Defendants' conduct described" in the complaint.  *Id.* ¶ 287.  Plaintiffs plead in support of their allegations that "[l]aw enforcement and regulatory authorities in … Australia," among other countries, "are continuing to actively investigate Defendants' conduct in the FX market."  *Id.* at ¶ 287.  Further, they aver that "[m]any of these entities have instituted enforcement actions, entered into settlements, and imposed massive fines based on Defendants' conduct described herein."  *Id.*  The referenced government investigations in the complaint clearly include LIBOR and other "ibor" rates, *id.* ¶¶ 288–89,

which this Court has noted are "similar in concept" to BBSW.  *BBSW III*, 439 F. Supp. 3d at

260; *see also* Gosselin Decl., Ex. A, ¶ 306 (referencing CFTC Order regarding co-defendant

UBS, which states that UBS's internal investigation "identified evidence of similar misconduct

involving submissions for at least the … Australian Bank Bill Swap Rate ("BBSW").[5]

   In the FX Benchmark Litigation, plaintiffs alleged defendants' conduct ran afoul of the

Sherman Antitrust Act and the Commodity Exchange Act and brought claims on behalf of two

classes.  Gosselin Decl., Ex. A at ¶ 1.  One of the two classes includes: "[A]ll persons who,

between January 1, 2003 and December 31, 2013 (inclusive) entered into an FX Instrument

directly with a Defendant, where such persons were either domiciled in the United States or its

territories or, if domiciled outside the United States or its territories, transacted one or more FX

instruments in the United States or its territories."  *Id.* at ¶ 67.  This class encompasses OCERS's

Australian Dollar FX Forward trades upon which personal jurisdiction in the BBSW matter is

solely predicated.

### 2.     The FX Benchmark Litigation Settlement Agreement

   In October 2015, BNPP entered into a stipulation and agreement of settlement (the "FX

Benchmark Litigation Settlement Agreement" or "Settlement Agreement") that resolved claims

against BNPP arising out of and/or related to BNPP's purported role in the manipulation of

benchmark rates.  Gosselin Decl., Ex. B, FX Benchmark Litig., ECF No. 481-8, Settlement

Agreement.  By its express terms, the Settlement Agreement sought to effectuate "final and

complete resolution of all disputes asserted or which could be asserted by Class Plaintiffs and/or

any Class Member" against BNPP with respect to the FX Benchmark Litigation.  *Id.* at Section

16(b).  As of 2018, fifteen settlement agreements were approved in the FX Benchmark Litigation

---

   [5] *See* UBS AG and UBS Securities Japan Co., Ltd, CFTC No. 13-09, 2012 WL 6642376,
at *33 n.21 (CFTC Dec. 19, 2012).

resulting in the creation of a settlement fund totaling $2,310,275,000, of which BNPP

contributed $115,000,000.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13

Civ. 7789 (LGS), 2018 WL 5839691, at *1 (S.D.N.Y. Nov. 8, 2018) ("On January 12, 2018,

Plaintiffs moved for final approval of 15 settlements, which together create a settlement fund

totaling $2,310,275,00"); *see also* Gosselin Decl., Ex. B, at Section 10(h) ("BNP Paribas shall be

responsible for paying the Total Settlement Amount of U.S. $115,000,000").  Two aspects of the

Settlement Agreement are of particular relevance here.

     *First*, as detailed *infra* in Part I, the Settlement Agreement released all claims relating to

or arising out of the manipulation of reference rates and/or other FX instruments—the precise

claims that OCERS brings here.  Specifically, the Settlement Agreement defined "Released

Claims" in relevant part to mean:

> "Released Claims" means any and all manner of claims … known or unknown,
> suspected or unsuspected, asserted or unasserted, arising from or relating in
> any way to any conduct alleged or that could have been alleged in and arising
> from the factual predicate of the Action, or any amended complaint or pleading
> therein, from the beginning of time until the Effective Date, which shall be
> deemed to include but not be limited to: (i) communications related to FX
> Instruments, FX Trading, or FX Benchmark Rates, between a Released Party
> and any other FX dealer or any other participant in the conspiracy alleged in
> the Action through chat rooms, instant messages, email, or other means; (ii)
> agreements, arrangements, or understandings related to FX Instruments, FX
> Trading, or FX Benchmark Rates, between a Released Party and any other FX
> dealer or any other participant in the conspiracy alleged in the Action through
> chat rooms, instant messages, email, or other means; (iii) the sharing or
> exchange of customer information between a Released Party and any other FX
> dealer or any other participant in the conspiracy alleged in the Action—
> including but not limited to customer identity, trading patterns, transactions,
> net positions or orders, stop losses or barrier options, pricing, or spreads related
> to FX Instruments, FX Trading, or FX Benchmark Rates; … vii) the
> establishment, calculation, or use of any other FX benchmarks, including
> benchmark fixing rates, benchmark settlement rates, or benchmark reference
> rates; (viii) the establishment, calculation, communication, manipulation, or
> use of the price, spread, or rate of any FX Instrument or FX Exchange-Based
> Instrument; and (ix) the exchange of customer information or confidential
> information in the possession of BNP Paribas between a Released Party and

> any other FX dealer or any other participant in the conspiracy alleged in the
> Action related to the establishment, calculation, manipulation, or use of any FX
> price, spread, or rate.

*Id*. at Section 2(nn).

*Second*, the Settlement Agreement bound all parties who entered into an FX Instrument directly with BNPP between January 1, 2003 and 2015—a period which plainly encapsulates all of the Australian Dollar FX Forwards identified in OCERS's complaint.  Specifically, the Settlement Agreement identifies two settlement classes to be certified as to BNPP, one of which consists of "[a]ll Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant, a Released Party, or co-conspirator where such Persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted FX Instruments in the United States or its territories." *Id*. at Section 3(a)(i)–(ii).

Members of each class are included in the definition of "Releasing Party," which refers to the swath of individuals who agreed to a "full and final disposition" of their "Released Claims [as defined above] as against all Released Parties."  *Id*. at Section 2(pp) (definition of "Releasing Parties"); Section 8(a) (Scope and Effect of Settlement).  "Released Parties," in turn, means "BNP Paribas and each of their past, present, and future, direct and indirect parents (including holding companies), subsidiaries, affiliates, associates …, divisions, predecessors, successors, and each of their respective officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, advisors, and assigns."  *Id*. at Section 2(oo) (definition of "Released Parties").

BNPP and the Releasing Parties executed the Settlement Agreement in October 2015, and the district court preliminarily approved it on December 15, 2015.  Gosselin Decl., Ex. C,

-11-

FX Benchmark Litig., ECF No. 536, Order Preliminarily Approving Settlements (entered Dec. 15, 2015).  The district court entered a final approval and order of settlement, final judgment, and its order of dismissal as to BNPP pursuant to the Settlement Agreement on August 6, 2018, at which point the settlement took preclusive effect.  Gosselin Decl., Ex. D, FX Benchmark Litig., ECF No. 1101, Final Approval Order of Settlement and Final Judgment and Order of Dismissal With Prejudice as to BNPP (entered Aug. 6, 2018).  The Final Approval Order contained an Exhibit A identifying the persons who had timely filed notices opting out of the Settlement.  *Id.* at Exhibit A.  That exhibit does not identify OCERS as an opt out party.  *Id.*  OCERS nonetheless now seeks to relitigate claims covered by the Settlement Agreement and Final Approval, Judgment, and Dismissal Orders, giving rise to this motion.

## ARGUMENT

It is well-settled that "[c]ourts evaluate Rule 12(c) motions" like this one by "employing the familiar 12(b)(6) standard"  *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-5345 (AJN), 2019 WL 1430155, at *2 (S.D.N.Y. Mar. 29, 2019) (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)) (alterations omitted); *see also Leighton v. Poltorak*, No. 17-cv-3120 (LAK) (KNF), 2018 WL 2338789, at *1 (S.D.N.Y. May 23, 2018) (Kaplan, J.) (same).  In so ruling, courts may consider "material that is a matter of public record"—such as complaints and other pleadings filed in other lawsuits, as well as publicly filed settlement agreements.  *Byrd v. City of New York*, No. 04-1396-CV, 2005 WL 1349876, at *1–2 (2d Cir. 2005) (affirming district court's grant of Rule 12(c) motion because "[b]ased on the materials permissibly considered in a Rule 12(c) motion … [plaintiff's] action was foreclosed by the settlement agreement"); *see also Cowan v. Ernest Codelia, P.C.*, No. 98 Civ. 5548 (JGK), 2001 WL 856606, at *1 (S.D.N.Y. July

30, 2001) ("Thus, it is proper to consider public documents on a motion to dismiss to determine whether claims are barred by prior litigation.").[6]

Applying that established standard here, OCERS's claims against BNPP arising out of the FX forwards trades identified in the operative complaint are expressly barred by the FX Benchmark Litigation Settlement Agreement and therefore fail as a matter of law.  Because those trades form the sole basis for exercising personal jurisdiction over BNPP, if the claims arising out of those trades are found to have been released, there is no longer any basis for exercising personal jurisdiction over BNPP and the remaining claims should be dismissed on that basis.

## I.     The FX Benchmark Litigation Settlement Agreement Expressly Bars All Claims Arising Out of the Trades with BNPP Identified by OCERS.

Under well-settled New York law, settlement agreements are "subject to the rules governing the construction of contracts" meaning "the agreement will be construed in accordance with the intent of the parties," with "[u]nambigous words and phrases … construed according to their plain meaning."  *Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 661 (2d Cir. 1994) (internal quotation marks omitted).

The plain language of the Settlement Agreement confirms that OCERS is a party to that agreement and that OCERS released any claim it may have had against BNPP related to the trades to which OCERS's assertion of personal jurisdiction is tethered.

---

[6] Pursuant to Rule 201(b) of the Federal Rules of Evidence, BNPP respectfully requests that the Court take judicial notice of the publicly available pleadings and orders filed in the FX Benchmark Litigation that are referenced in this motion:  the Third Amended Complaint, the Settlement Agreement, the Order Preliminarily Approving Settlements, and the Final Approval Order of Settlement and Final Judgment and Order of Dismissal With Prejudice as to BNPP (attached for the Court's convenience as Exhibits A to D to the accompanying Gosselin Decl.). *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a "complaint as a public record"); *Marino v. Jonke*, No. 7:11-cv-430 (VB), 2011 WL 3251585, at *1 n.1 (S.D.N.Y. June 30, 2011) ("Court is permitted to take judicial notice of matters of public record including the fact of such litigation and related filings." (internal quotation marks omitted)).

A.      **OCERS Is A Party To The FX Benchmark Settlement Agreement.**

First, OCERS is a party to the FX Benchmark Settlement Agreement because it is a member of the Direct Settlement Class and did not opt out.  The Settlement Agreement provided for certification of two classes, including one consisting of "[a]ll Persons who, between January 1, 2003 and the date of the Preliminary Approval Order [add date], entered into an FX Instrument directly with" BNPP "where such Persons were … domiciled in the United States or its territories."  Gosselin Decl., Ex. B at Section 3(a)(i).

OCERS's own complaint in the instant action confirms that OCERS fulfills the criteria of the class definition.  By OCERS's own admission, OCERS is domiciled in the United States. SAC ¶ 163.  The operative complaint likewise acknowledges that all of the identified BBSW-based Australian dollar FX forward transactions with BNPP occurred "between February 6, 2009 and April 29, 2013."  SAC ¶ 71.  Further, OCERS alleges direct FX forward trades with BNPP. *Id.*

Finally, OCERS alleges that it entered into "Australian dollar FX forward transactions with" BNPP, SAC ¶ 71, and the definition of "FX Instrument" in the Settlement Agreement unambiguously includes FX forwards.  Gosselin Decl., Ex. B at Section 2(z).  Accordingly, absent filing to opt out (which it has not), OCERS is a Class Member and bound by all the terms of the Settlement Agreement.

B.      **The Trades Between OCERS and BBSW Alleged In The BBSW Complaint Are Released Claims Under the Settlement Agreement.**

It is equally clear that the antitrust, RICO, and CEA claims OCERS has asserted against BNPP—which are all premised on an alleged conspiracy to fix the BBSW benchmark rate that allegedly resulted in an artificial price at which OCERS transacted FX forward trades with

BNPP—are "Released Claims," as defined in the FX Benchmark Settlement Agreement. That definition, in relevant part, is as follows:

> "Released Claims" means any and all manner of claims … known or unknown, suspected or unsuspected, asserted or unasserted, arising from or relating in any way to any conduct alleged or that could have been alleged in and arising from the factual predicate of the Action, or any amended complaint or pleading therein, from the beginning of time until the Effective Date, which shall be deemed to include but not be limited to: (i) communications related to FX Instruments, FX Trading, or FX Benchmark Rates, between a Released Party and any other FX dealer or any other participant in the conspiracy alleged in the Action through chat rooms, instant messages, email, or other means; (ii) agreements, arrangements, or understandings related to FX Instruments, FX Trading, or FX Benchmark Rates, between a Released Party and any other FX dealer or any other participant in the conspiracy alleged in the Action through chat rooms, instant messages, email, or other means; (iii) the sharing or exchange of customer information between a Released Party and any other FX dealer or any other participant in the conspiracy alleged in the Action— including but not limited to customer identity, trading patterns, transactions, net positions or orders, stop losses or barrier options, pricing, or spreads related to FX Instruments, FX Trading, or FX Benchmark Rates; … vii) the establishment, calculation, or use of any other FX benchmarks, including benchmark fixing rates, benchmark settlement rates, or benchmark reference rates; (viii) the establishment, calculation, communication, manipulation, or use of the price, spread, or rate of any FX Instrument or FX Exchange-Based Instrument; and (ix) the exchange of customer information or confidential information in the possession of BNP Paribas between a Released Party and any other FX dealer or any other participant in the conspiracy alleged in the Action related to the establishment, calculation, manipulation, or use of any FX price, spread, or rate.

Gosselin Decl., Ex. B at Section 2(nn).

As the foregoing reflects, the "Released Claims" includes known and unknown claims "arising from or relating in any way to any conduct alleged or that could have been alleged in and arising from the factual predicate of the" FX Benchmark Litigation, such as conspiracies, agreements related to, communications regarding, or manipulation of "FX Instruments, FX Trading, or FX Benchmark Rates." *Id*. "FX Instruments" are defined to include FX forwards. *Id*. at Section 2(z). "FX Trading" is defined broadly and includes "trading of FX Instruments . . .

regardless of the manner . . . ."  *Id*. at Section 2(aa).  "FX Benchmark Rates," in turn, are defined to include "(iv) any other FX benchmark, fixing or reference rate."  *Id*. at Section 2(x).

OCERS's own pleadings in the instant action confirm that its claims with regard to the FX forward transactions with BNPP fall within the Settlement Agreement's release.  Taking OCERS's allegations in the complaint as true, as the Court must on a 12(c) motion, the Bank Bill Swap Reference Rate is a benchmark reference rate.  SAC ¶ 1.  As OCERS alleges, the "BBSW fix directly affects the prices of financial instruments that incorporate the rate as a component of price, including, for example … Australian dollar foreign exchange forwards."  SAC ¶ 396; *see also* ECF No. 156 at 6 (arguing that, according to the allegations in the complaint, BBSW "affect[s] the prices of Australian Dollar FX swaps, forwards, or futures that Plaintiffs traded").  Because even OCERS admits that its claim against BNPP is predicated on the manipulation of FX forwards (by virtue of the impact that manipulation of BBSW purportedly has on those products), OCERS's claims arising from the Australian FX forwards are released.

### C.    The Settlement Agreement's Release Is Valid And Enforceable Against OCERS.

Insofar as OCERS's claims against BNPP are based on FX forward trades, those claims are barred by res judicata.  *See, e.g.*, *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002) ("It is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes.").  That the Settlement Agreement was reached in the context of a class action does not change that fact.  It is well settled that "[p]laintiffs in a class action may release claims that were or could have been pled in exchange for settlement release."  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247 (2d Cir. 2011) (internal quotation marks omitted).  That is true even where the release "encompass[es] claims not presented in the complaint," *id.* at 247–48, and even where the

-16-

settlement "seek[s] to discharge parties who have not been served with process and are therefore not before the court," *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 12.16, at 318 (4th ed. 2002)). As long as the released claims "arise out of the same factual predicate as settled class claims," then the release is valid and enforceable as to even unasserted claims. *Id.* at 108; *see also In re Adelphia Comm'ns Corp. Secs. & Derivative Litig.*, 272 F. App'x 9, 13 (2d Cir. 2008) (deeming class action settlement agreement's release of fraud claims arising from defendant's fraudulent activity to be enforceable when those claims "were based on the same core of facts as the claims in the consolidated class litigation").

That standard is easily satisfied where, as here, OCERS's claims as to BNPP are based on FX forward trades that were, in fact, claims presented in the FX Benchmark Litigation. Indeed, Judge Schofield recently reiterated that benchmark manipulation claims arising out of FX forward trades were squarely at issue in the FX Benchmark Litigation. *Allianz Global Investors GmbH v. Bank of America Corp.*, No. 18 Civ. 10364 (LGS), 2020 WL 2765693, at *12–13 (S.D.N.Y. May 28, 2020) (rejecting as untimely benchmark manipulation claims—including claims predicated on FX forward trades, *see* No. 18-cv-10346, ECF 221, Second Amended Complaint ¶¶ 19, 23, 27, 31, 39, 43, 47, 51, 55, 59, 63, 73, 77, 81 (alleging each plaintiff engaged in FX forward transactions with late-added defendants)—because the FX Benchmark Litigation put plaintiffs on notice of such claims, thus precluding the application of equitable tolling). The Settlement Agreement therefore clearly bars OCERS's FX forward related claims.

But even if the FX forward trade claims OCERS asserts here were not at issue in the FX Benchmark Litigation—and again, they were—it is clear that those claims arise out of or are related to an identical factual predicate and the same core facts as the settled action.

Accordingly, because OCERS's FX forward trade based claims were presented directly in the

FX Benchmark Litigation or, at the very least, they arise out of the same factual predicate, the

Settlement Agreement is fully enforceable as to those claims.

## II.    This Court's Prior Personal Jurisdiction Rulings Bar Any Remaining Claims Against BNPP.

OCERS's sole alleged basis for personal jurisdiction over BNPP is that OCERS executed

FX forward trades with BNPP pursuant to a master agreement containing a New York consent

provision.  SAC ¶¶ 63–72.  Without these trades, as this Court explained in each of its motion to

dismiss opinions, there are no facts establishing that BNPP has "sufficient minimum contacts"

with New York to satisfy constitutional due process.  *BBSW I*, 343 F. Supp. 3d at 208

(concluding that the FAC failed to allege jurisdiction as to BNPP under either a "purposeful

availment" theory or the "effects test"); *BBSW III*, 439 F. Supp. 3d at 261 (finding "[t]he new

allegations in [the] second amended complaint do not cure the defects the Court already has

discussed at length" except as to the new plaintiff for the alleged transactions covered by master

agreements with consent jurisdiction clauses).[7]  Accordingly, without the alleged FX Forward

transactions, this Court should dismiss this action as to BNPP in its entirety for lack of personal

jurisdiction.

---

[7] BNPP incorporates by reference its prior arguments in support of dismissal for lack of personal jurisdiction.  *See, e.g.*, ECF 110, Defendants' Memorandum in Support of Motion to Dismiss FAC for Lack of Jurisdiction (filed Feb. 24, 2017); ECF 112, Declaration of Julie Lauck in support of BNPP's Motion to Dismiss FAC for Lack of Personal Jurisdiction (filed Feb. 24, 2017); ECF 164, Defendants' Reply Memorandum in Support of Motion to Dismiss FAC for Lack of Jurisdiction (filed May 25, 2017); ECF No. 301, Defendants' Memorandum of Law in Support of Motion to Dismiss SAC for Lack of Personal Jurisdiction (filed May 20, 2019); ECF 324, Defendants' Reply Memorandum in Support of Motion to Dismiss SAC for Lack of Personal Jurisdiction (Filed August 7, 2019).

## CONCLUSION

For the foregoing reasons, this Court should grant judgment on the pleadings to BNPP on OCERS's claims relating to the Australian FX forward transactions identified in the operative complaint.  To the extent any claims remain, the Court should dismiss those claims with prejudice for lack of personal jurisdiction.


Dated: New York, New York
         July 27, 2020

/s/ *Jayant W. Tambe*
Jayant W. Tambe
Stephen J. Obie
Kelly A. Carrero
James M. Gross
Kurt M. Gosselin
JONES DAY
250 Vesey Street
New York, New York  10281
Telephone: (212) 326-3939
Fax: (212) 755-7306
jtambe@jonesday.com
sobie@jonesday.com
kacarrero@jonesday.com
jgross@jonesday.com
kgosselin@jonesday.com


*Attorneys for Defendant BNP Paribas*

## <u>CERTIFICATE OF SERVICE</u>

I, Jayant W. Tambe, a lawyer admitted to practice in this Court, hereby certify that, on July 27, 2020, I caused the foregoing document to be filed with the Clerk of the Court and served upon all counsel of record via the CM/ECF system.

<u>/s/ <i>Jayant W. Tambe</i>   </u>
Jayant W. Tambe
