UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RICHARD DENNIS, et al.,

      Plaintiffs,

   -against-             16-cv-6496 (LAK)

JPMORGAN CHASE & CO., et al.,

      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #:
DATE FILED: 5/11/2021

## MEMORANDUM OPINION

Appearances:

   Vincent Briganti
   Geoffrey M. Horn
   Raymond Girnys
   Christian Levis
   Roland R. St. Louis, III
   LOWEY DANNENBERG, P.C.

   Christopher Lovell
   Gary Jacobson
   Jody Krisiloff
   LOVELL STEWART HALEBIAN JACOBSON LLP

   Todd Seaver
   Carl N. Hammarskjold
   Patrick T. Egan
   BERMAN TABACCO

   *Attorneys for Plaintiffs*

Jayant W. Tambe
Stephen J. Obie
Kelly A. Carrero
James M. Gross
Kurt M. Gosselin
JONES DAY

*Attorneys for Defendant BNP Paribas, S. A.*

Richard D. Owens
William O. Reckler
Jason C. Hegt
Sharon M. Casola
LATHAM & WATKINS LLP

*Attorneys for Defendant Deutsche Bank AG*

Marshall H. Fishman
Christine V. Sama
Elizabeth M. Zito
GOODWIN PROCTER LLP

*Attorneys for Defendant Royal Bank of Canada*

David S. Lesser
Jamie S. Dycus
WILMER CUTLER PICKERING HALE AND DORR LLP

*Attorneys for Defendant The Royal Bank of Scotland plc*

Eric J. Stock
Jefferson E. Bell
GIBSON DUNN & CRUTCHER LLP

*Attorneys for Defendant UBS AG*

LEWIS A. KAPLAN, *District Judge.*

This is the Court's fourth opinion resolving motions under Federal Rule of Civil Procedure 12 in this purported class action, which relates to an alleged conspiracy to manipulate an Australian benchmark interest rate known as the Bank Bill Swap Rate ("BBSW"). Plaintiffs are

investors that engaged in transactions for certain financial derivatives that allegedly are affected by changes in BBSW. Defendants are the banks and brokerage firms with which plaintiffs transacted.

In three prior opinions, familiarity with which is assumed, the Court dismissed the majority of plaintiffs' claims[1] under Rule 12(b). Defendants BNP Paribas, Deutsche Bank AG, UBS AG, The Royal Bank of Scotland plc, and Royal Bank of Canada (together, the "Moving Defendants")[2] now move under Rule 12(c) for judgment on the pleadings. These defendants argue that certain claims relating to transactions with plaintiff Orange County Employee Retirement System ("OCERS") should be dismissed because they were released by prior class action settlement agreements. For the following reasons, the Moving Defendants' motions are denied.

*Facts*

The Court extensively has summarized the facts alleged in this action in its prior opinions and generally will not do so again here.[3] Nevertheless, a limited amount of additional

---

[1] Plaintiffs brought claims under the Sherman Act, the Commodity Exchange Act ("CEA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as common law claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment.

[2] *See* Dkts. 390 (motion by BNP Paribas), 396 (motion by Deutsche Bank AG, Morgan Stanley, Royal Bank of Canada, The Royal Bank of Scotland PLC, and UBS AG). Morgan Stanley initially joined the motion by Deutsche Bank AG, et al., but requested to withdraw from it after it was filed. The Court grants Morgan Stanley's request to withdraw and thus does not consider the arguments in that motion relating to Morgan Stanley.

Defendant Australia and New Zealand Banking Group Ltd. ("ANZ") moved separately for judgment on the pleadings (Dkt. 400), but also requested to withdraw its motion. The Court granted this request and denied ANZ's motion on March 30, 2021. Dkt. 458.

[3] *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122 (S.D.N.Y. 2018) [hereinafter *Dennis I*]; *Dennis v. JPMorgan Chase & Co.*, 342 F. Supp. 3d 404 (S.D.N.Y. 2018)

background information is necessary to understand the Moving Defendants' principal argument for dismissal under Rule 12(c).

   The Moving Defendants argue that the claims relating to OCERS's Australian dollar foreign exchange ("FX") forward transactions should be dismissed because they were fully resolved and released by class action settlement agreements in *In re Foreign Exchange Benchmark Rates Antitrust Litigation* (the "FX Litigation").[4] Plaintiffs disagree, arguing, among other things, that the settlements in the FX Litigation did not release the claims relating to OCERS's FX forwards because they do not share an "identical factual predicate" with the claims in the FX Litigation, which is necessary in the class action context.[5]

   An analysis of these arguments requires an appreciation of the pricing structure of Australian dollar FX forwards as well as an understanding of the claims that were brought in the FX Litigation. The following summary is based on the allegations in the second amended complaint, documents incorporated by reference or integral to second amended complaint, and judicially noticed facts, such as the court-approved settlement agreements and the third amended complaint in the FX Litigation.[6]

---

[hereinafter *Dennis II*]; *Dennis v. JPMorgan Chase & Co.*, 439 F. Supp. 3d 256, 262 (S.D.N.Y. 2020) [hereinafter *Dennis III*].

[4] 13-cv-7789 (LGS) (S.D.N.Y.).

[5] *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005).

[6] *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a "complaint as a public record"); *Byrd v. City of New York*, No. 04-1396-CV, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) (taking judicial notice of a "Stipulation of Settlement," which "was filed in connection with Byrd's prior lawsuits and was so ordered by the court.")(collecting cases).

I.    *Australian Dollar FX Forwards*

          OCERS entered into over 50 Australian dollar FX forward transactions with the

Moving Defendants from 2007 to 2015.[7]  An Australian dollar FX forward is "an agreement to buy

or sell Australian dollars on some future date."[8]  Plaintiffs' fundamental claim with respect to these

transactions is that defendants "systematically manipulate[d] BBSW" – a benchmark interest rate

designed to measure the cost of borrowing Australian dollars – to favor their trading positions with

respect to these transactions, which allegedly incorporate BBSW as part of their price.[9]  Plaintiffs

allege that defendants accomplished this by, among other things,

> "(1) engaging in manipulative [prime bank bill] transactions during
> the [BBSW] Fixing Window [between 9:55 A.M. and 10:05 A.M.
> Sydney Time];[[10]] (2) making false BBSW submissions in violation
> of AFMA guidelines; (3) sharing proprietary information regarding
> BBSW-Based Derivatives positions with other Defendants; and (4)
> using their control over the AFMA rule-making process to ensure that
> BBSW remained susceptible to manipulation."[11]

Some of this conduct allegedly was carried out via messaging between traders in electronic

---

[7]

      Second Amended Compl. [hereinafter SAC] ¶¶ 71, 98, 108, 118, 125, 135.

[8]

      *Id.* ¶ 405.

[9]

      *Id.* ¶¶ 1, 412.

[10]

      As this Court has explained previously, BBSW is administered by the Australian Financial
Markets Association ("AFMA").  The Fixing Window refers to a window of time in which
"[e]ach bank on the BBSW Panel submitted to AFMA the observed 'mid-rate' – that is .
. . the midpoint between the rates at which banks offered to buy and sell Prime Bank Bills
– for Prime Bank Bills at each of six tenors traded between 9:55 am and 10:05 am (Sydney
Time)." *Dennis I*, 343 F. Supp. 3d at 145.

[11]

      SAC ¶ 412.

chatrooms, one of which was entitled "BBSW rate set."[12]

The price of an Australian dollar FX forward is calculated by adjusting the "spot price of Australian dollars for immediate delivery" by "the 'cost of carry.'"[13] According to plaintiffs, this formula is represented mathematically below.[14]

$$\text{Future Price} = \text{Spot Price} \times \left( \frac{1 + [\text{Rterm} \times (d / 360)]}{1 + [\text{Rbase} \times (d / 360)]} \right)$$

A few of the terms in this formula require further explanation.

"*Spot Price.*" A "spot" is "the simple exchange of one currency for another."[15] Spot prices are determined by benchmark FX rates "known generally as 'Fixes.'"[16] The Fixes are "published exchange rate[s]" intended to reflect the price of actual FX spot trading "at a moment in

---

[12]

    *E.g., id.* ¶¶ 22, 193, 439.

[13]

    *Id.* ¶¶ 402, 405.

[14]

    *See* Pls.' Omnibus Mem. of Law in Opp. to Defs.' Mot. for Judgment on the Pleadings [Dkt. 412] at 11; *see also* Gosselin Decl., Ex. A (Dkt. 392-1) [hereinafter FX Compl.] ¶ 281. The formula below allegedly is "the [Chicago Mercantile Exchange's ("CME")] standard pricing formula used to determine the value of FX futures contracts. *Id.* ¶¶ 281-82. Though this formula ostensibly relates to a "Future Price," plaintiffs have alleged that the Australian dollar FX forward contracts that are the subject of this motion were "priced using the same formula that determines the value of CME Australian dollar futures contracts." SAC ¶ 405; *see also* Dkt. 412 at 10 n.9.

[15]

    FX Compl. ¶ 88.

[16]

    *Id.* ¶¶ 10, 84, 253, 275.

time over a short interval of time."[17]  The most widely used Fixes are the WM/Reuters Closing Spot Rates and the European Central Bank's fixing rates.[18]  Like BBSW, the Fixes are calculated during a "fixing window."[19]  For instance, the WM/Reuters Closing Spot Rates are calculated with reference to a "median of a snapshot of . . . actual spot transactions in the 30 seconds after 4:00 p.m. London time."[20]

      *"Cost of Carry."*  The "cost of carry" is "the overall cost involved when lending one currency and borrowing another during the time period stretching from the spot date until the forward date."[21]  In the formula above, it is represented by the numbers and variables within the parentheses.  BBSW, as a benchmark interest rate, allegedly is used to calculate the cost of carry with respect to the Australian dollar FX forwards that are the subject of this motion.[22]  With regard to the formula above, plaintiffs aver that BBSW is "the input for the 'Rterm' or 'Rbase' variable, depending on whether the purchaser is selling or buying Australian dollars."[23]  The "d" variable

---

17

      *Id.* ¶¶ 94-95, 101, 104, 107-08.

18

      *Id.* ¶ 10.

19

      *Id.* ¶ 104.

20

      *Id.*

21

      *Id.* ¶ 85.

22

      SAC ¶¶ 402, 405.

23

      Dkt. 412 at 10-11.

"represents the duration of the [forward] contract."[24]

## II.     The FX Litigation

In 2013, a class of investors brought the FX Litigation, which accused a variety of banks, including all of the Moving Defendants except Royal Bank of Canada,[25] of manipulating the Fixes in violation of the Sherman Act and the CEA.  The FX plaintiffs' "core allegation" was that the banks manipulated the Fixes to favor their trading positions with respect to "FX instruments," including FX forwards, that are "priced at or by the Fix[es]."[26]

According to the FX plaintiffs, the FX defendants manipulated the Fixes by using chat rooms, instant messages, and email to "execut[e] concerted trading strategies."[27]  For instance, in chat rooms "with evocative names such as 'The Cartel,' 'The Bandits' Club,' 'The Mafia' and 'One Team, One Dream,'" FX traders primarily based in London allegedly manipulated the WM/Reuters Closing Spot Rates by

> "shar[ing] inappropriate 'market-sensitive information with rivals' including 'information about pricing,' their customers' orders and their net trading positions in advance of 4 p.m. London time. The

---

[24]

FX Compl. ¶ 282.

[25]

See In re Foreign Exch. Benchmark Rates Antitrust Litig., 74 F. Supp. 3d 581, 585-87 (S.D.N.Y. 2015); FX Compl. ¶¶ 5, 50, 53, 58, 59, 62.  Royal Bank of Canada's wholly-owned subsidiary RBC Capital Markets LLC later was added as a defendant in the FX Litigation.  Id. ¶ 58; SAC ¶ 338.

[26]

In re Foreign Exch. Benchmark Rates Antitrust Litig., 74 F. Supp. 3d at 585-87; see also FX Compl. at 2 n.5.

[27]

In re Foreign Exch. Benchmark Rates Antitrust Litig., 74 F. Supp. 3d at 587.

traders discussed the 'types and volume of trades they planned to place.' Using this nonpublic information, and 'by agreeing in chat rooms and instant messages' to employ collusive trading strategies, [the banks] moved the [WM/Reuters Closing Spot Rates] in the direction they desired and thereby fixed the prices of the FX instruments."[28]

According to plaintiffs, BBSW never was mentioned in the FX Litigation.[29]  None of the benchmark

FX rates in the FX Litigation measured interest rates for any currency.  Likewise, none of the

benchmark FX rates was set in Australia.

## III.    The FX Settlements

Settlement discussions in the FX Litigation began in earnest by late 2015.  By 2017,

the parties had entered into class action settlement agreements that included provisions releasing and

finally resolving claims by the class against all of the Moving Defendants.[30]  Plaintiffs do not dispute

that OCERS was a member of the settlement class.[31]  The district court finally approved the

---

28

*Id.*; *see also* FX Compl. ¶ 118, 131-32.

29

Dkt. 412 at 3, 9.

30

Gosselin Decl., Ex. B [Dkt. 392-2]; Roellke Decl., Ex. B [Dkt. 398-2], Ex. C [Dkt. 398-3], Ex. D [Dkt. 398-4]; Ex. E [Dkt. 398-5].  The settlement agreement between RBC Capital Markets LLC and the FX plaintiffs includes Royal Bank of Canada (as the indirect parent of RBC Capital Markets LLC), as a "Released Party" for the purposes of the released claims.  *See* Roellke Decl., Ex. E at § 2(mm).

31

The FX Litigation settlement agreements defined "Class Plaintiffs" to include all persons domiciled in the United States who entered into an "FX Instrument" directly with the Moving Defendants between 2003 and 2015.  *E.g.*, Dkt. 398-5 at § 3(a)(i).  "FX Instrument" is defined to include "FX . . . forwards."  *Id.* § 2(x).  Plaintiffs allege OCERS engaged in over 50 transactions for FX forwards with the Moving Defendants from 2007 to 2015.

10

settlement agreements in August 2018.[32]

The FX settlement agreements purport to release a broad category of claims.[33]  They define "released claims" as "any and all manner of claims . . . , known or unknown, suspected or unsuspected, asserted or unasserted, arising from or relating in any way to any conduct alleged or that could have been alleged in and arising from the factual predicate of the Action."[34]  The "factual predicate" is defined to include, among other things, "the establishment, calculation, or use of the WM/Reuters fixing rates, including the 4:00 p.m. London closing spot rates, and trading that may impact such rates," "the establishment, calculation, or use of any other FX benchmarks, including benchmark fixing rates, benchmark settlement rates, or benchmark reference rates," and "the establishment, calculation, communication, manipulation, or use of the price, spread, or rate of any FX Instrument," which is defined to include FX forwards.[35]

*Discussion*

Under Rule 12(c), judgment "is appropriate if, from the pleadings, the moving party

---

32

    Dkt. 391 at 9-10; Dkt. 396 at 2 n.4; *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS), 2018 WL 5839691, at *1 (S.D.N.Y. Nov. 8, 2018), *aff'd sub nom. Kornell v. Haverhill Ret. Sys.*, 790 F. App'x 296 (2d Cir. 2019).

33

    The settlement agreements are virtually identical with respect to the provisions relevant to this motion.

34

    *E.g.*, Dkt. 398-5 at § 2(ll).

35

    *Id.* §§ 2(x), (ll).

is entitled to judgment as a matter of law."[36]  Motions under Rule 12(c) are decided under the same

standard as motions under Rule 12(b)(6).[37]  Courts must "accept[] the allegations contained in the

complaint as true and draw[] all reasonable inferences in favor of the nonmoving party."[38]  Though

"Rule 12(c) motions generally are limited to facts alleged in the complaint," courts may consider also

matters that are subject to judicial notice.[39]

      The Moving Defendants first argue that, under the plain language of the settlement

agreements in the FX Litigation, plaintiffs' claims relating to OCERS's Australian dollar FX

forwards "are expressly barred . . . and therefore fail as a matter of law."  That language with respect

to the release of future claims admittedly is broad.  For instance, the agreements purport to release

"any and all . . . claims . . . asserted or unasserted . . . arising from . . . the . . . manipulation . . . of

the price, spread, or rate of any FX Instrument [including FX forwards]."[40]  This language arguably

encompasses plaintiffs' claims that the Moving Defendants manipulated BBSW to affect the price

of OCERS's FX forwards.  But "it is elementary that" a class action settlement agreement "cannot

---

36

    *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Loc. 537*, 47 F.3d 14, 16 (2d Cir. 1995) (citing Fed. R. Civ. P. 12(c) and *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 n. 2 (1977)).

37

    *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994)).

38

    *Id.*

39

    *Byrd*, 2005 WL 1349876, at *1.  This includes "material that is a matter of public record" such as the class action settlement agreements and amended complaint filed in the FX Litigation.  *See Rothman*, 220 F.3d at 92; *Byrd*, 2005 WL 1349876, at *1.

40

    *E.g.*, Dkt. 398-5 at § 2(ll).

release claims that the parties were not authorized to release."[41]  Accordingly, the Court assumes for

the purposes of this motion that the claims relating to OCERS's FX forwards fall within the claims

purportedly released by the settlement agreements in the FX Litigation, and moves to determining

whether the parties in that litigation were authorized to release such claims.

"[C]lass action releases may include claims not presented and even those which could

not have been presented as long as the released conduct arises out of the 'identical factual predicate'

as the settled conduct."[42]  Under the "identical factual predicate" doctrine, a class action settlement

"could properly be framed so as to prevent class members from subsequently asserting claims relying

on a legal theory different from that relied upon in the class action complaint but depending upon

the very same set of facts."[43]  Claims that rely "upon proof of further facts," however, cannot be

released.[44]  The underlying principle is that "[i]f a judgment after trial cannot extinguish claims not

asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily

should not be able to do so either."[45]

The claims relating to OCERS's Australian dollar FX forwards in this action do not

arise out of an identical factual predicate as the claims settled in the FX Litigation.  Though the two

---

41

        *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 135-36 (2d Cir. 2011) (citing *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 19 (2d Cir. 1981)).

42

        *Wal-Mart Stores*, 396 F.3d at 107 (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).

43

        *Nat'l Super Spuds*, 660 F.2d at 18 n.7.

44

        *TBK Partners*, 675 F.2d at 462.

45

        *Nat'l Super Spuds*, 660 F.2d at 18.

matters broadly relate to benchmark rate manipulation that allegedly affected the price of OCERS's

Australian dollar FX forwards, there is very little factual overlap between the two alleged schemes.

        As an initial matter, this action and the FX Litigation relate to the alleged

manipulation of two distinct and unrelated benchmark rates. BBSW is a benchmark *interest* rate that

is intended to reflect the observed interest rate on prime bank bills traded in the Australian money

market.[46] It is administered by the AFMA in Australia.[47]  The "Fixes" at issue in the FX Litigation

were benchmark *foreign exchange* rates that were intended to reflect the observed FX rates on spot

transactions traded globally.  They were set by entities such as W/M Reuters and the European

Central Bank.  The FX Litigation did not regard the alleged manipulation of any benchmark interest

rate, including BBSW.[48]  Likewise, this action does not regard alleged manipulation of the Fixes.

        Though both BBSW and the Fixes allegedly were incorporated into the pricing

structure of OCERS's Australian dollar FX forwards, it is clear that they played separate and

---

[46]

    SAC ¶¶ 1, 390.

[47]

    *Id.* ¶ 1, 390.

[48]

    The Moving Defendants misleadingly argue that the FX Litigation was "premised on facts uncovered by government investigations around the globe into manipulation of FX benchmark *interest* rates." *See* Reply Mem. of Law in Support of BNP Paribas's Rule(c) Mot. for Judgment on the Pleadings [Dkt. 416] at 2-3 (emphasis in original). Though the FX Complaint references certain investigations regarding manipulation of benchmark interest rates – none of which explicitly mention BBSW – these investigations only are mentioned in the context of explaining the source of certain factual allegations.  Putting aside the fact that BBSW never was mentioned in the FX Complaint, the fact that benchmark interest rate investigations uncovered facts regarding benchmark FX manipulation is immaterial to the question of whether this action and the FX Litigation are based on an identical factual predicate.

14

unrelated roles.[49]  In the pricing formula referenced above, BBSW allegedly is used to calculate the

cost of carry and apparently is the input for either the "Rterm" or "Rbase" variables.  The Fixes, on

the other hand, were used to calculate the "spot price" variable.  Neither this action nor the FX

Litigation makes any allegations suggesting that there is any overlap between BBSW and the Fixes

in terms of their calculation or measurement.  Likewise, neither action alleges that manipulation of

BBSW would affect the Fixes or *vice versa.*

Finally, this action and the FX Litigation allege that defendants manipulated these

distinct rates in entirely different ways.  The Moving Defendants allegedly manipulated BBSW by,

among other things, engaging in manipulative prime bank bill transactions during the BBSW Fixing

Window (between 9:55 A.M. and 10:05 A.M. Sydney Time), sharing proprietary information

regarding "BBSW-Based Derivatives" positions in a chatroom called "BBSW rate set," making false

BBSW submissions in violation of AFMA guidelines, and using their control over the AFMA

rule-making process to ensure that BBSW remained susceptible to manipulation.  By contrast, the

FX defendants – primarily through traders based on London – allegedly manipulated the Fixes by,

among other things, sharing inappropriate market-sensitive information in chatrooms "with evocative

names such as 'The Cartel,' 'The Bandits' Club,' 'The Mafia' and 'One Team, One Dream'" in

advance of the fixing window for WM/Reuters Closing Spot Rates (4 P.M. London Time). Were the

---

[49]
 The Moving Defendants argue that, if the Court credits plaintiffs' arguments regarding the distinct roles of BBSW and the Fixes with respect to the pricing of Australian dollar FX forwards, it necessarily must reject plaintiffs' claim that BBSW is used to adjust the spot price of Australian dollars. *See* Reply Mem. of Law in Support of Released Defs.' Rule 12(c) Mot. for Judgment on the Pleadings [Dkt. 417] at 5.  This argument is unpersuasive. The formula referenced above clearly shows that BBSW is used to adjust the spot price of Australian dollars in the context of calculating the price of the Australian dollar FX forwards at issue.  The fact that BBSW does not independently affect the Fixes or the spot prices is irrelevant to this claim.

15

two cases to proceed to trial, establishing these disparate schemes would require proof of an entirely separate set of facts.[50]  As plaintiffs have noted, "[t]he two cases involve different schemes carried out by different traders in different chatrooms, in different markets in different regions of the world . . . , which were tied to different benchmarks designed to measure different things."[51]

In sum, the factual predicates for plaintiffs' claims regarding OCERS's Australian dollar FX forwards and the claims settled in the FX Litigation are far from identical.  Accordingly, plaintiffs' claims here were not released by the settlement agreements in the FX Litigation.

*Conclusion*

Defendants' motions for judgment on the pleadings [Dkts. 390, 396] are denied.

SO ORDERED.

Dated:        May 11, 2021

_____
Lewis A. Kaplan
United States District Judge

---

[50]

*See TBK Partners*, 675 F.2d at 462.

[51]

Dkt. 412 at 2.