# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RICHARD DENNIS, SONTERRA CAPITAL MASTER
FUND, LTD., FRONTPOINT FINANCIAL SERVICES
FUND, L.P., FRONTPOINT ASIAN EVENT DRIVEN FUND,
L.P., FRONTPOINT FINANCIAL HORIZONS FUND, L.P.,
AND ORANGE COUNTY EMPLOYEES RETIREMENT
SYSTEM, on behalf of themselves and all others similarly
situated,

                    *Plaintiffs*,

                    *-against-*

JPMORGAN CHASE & CO., JPMORGAN CHASE BANK,
N.A., BNP PARIBAS, S.A., THE ROYAL BANK OF
SCOTLAND GROUP PLC, THE ROYAL BANK OF
SCOTLAND PLC, RBS N.V., RBS GROUP (AUSTRALIA)
PTY LIMITED, UBS AG, AUSTRALIA AND NEW
ZEALAND BANKING GROUP LTD., COMMONWEALTH
BANK OF AUSTRALIA, NATIONAL AUSTRALIA BANK
LIMITED, WESTPAC BANKING CORPORATION,
DEUTSCHE BANK AG, HSBC HOLDINGS PLC, HSBC
BANK AUSTRALIA LIMITED, LLOYDS BANKING
GROUP PLC, LLOYDS BANK PLC, MACQUARIE GROUP
LTD., MACQUARIE BANK LTD., ROYAL BANK OF
CANADA, RBC CAPITAL MARKETS LLC, MORGAN
STANLEY, MORGAN STANLEY AUSTRALIA LIMITED,
CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, ICAP
PLC, ICAP AUSTRALIA PTY LTD., TULLETT PREBON
PLC, TULLETT PREBON (AUSTRALIA) PTY LTD., AND
JOHN DOES NOS. 1-50.

                    *Defendants*.

Docket No. 16-cv-06496 (LAK)

# MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

# TABLE OF CONTENTS

A.      The High Risks of Successful Prosecution of These Claims…………….……….…….1

       1.      Consistent With These Hight Risks, No Other Cases or Class Actions
Were Filed…………………………………………………..……….…….……2

       2.      Pleading Risks: Class Counsel Overcame the High Risks Involved in
Six Separate Rule 12 Motions……………………………...……………..…….2

       3.      However, Ten Settling Defendants Prevailed On Their Motion To Dismiss
For Lack Of Personal Jurisdiction…………………………………..……….3

       4.      Class Counsel Then Resourcefully Solved the Personal Jurisdiction
Problem……………………………………………………...……….3

       5.      Class Counsel's Need to Obtain Substantial Discovery from Defendants
While This Court Was Still Burdened by Repeated Rounds of
Rule 12 Motions………………………………………………..……..……….4

B.      Fee Request……………………………………………………………….…….7

C.      Lodestar Method……………………………………………….……………….8

D.      Percentage of the Fund Method…………………………………….…………….9

E.      Fee Awards Reflecting Market Rates………………………………………….9

F.      High Risks and Other *Goldberger* Factors………………………………….10

G.      Litigation Expenses………………………………………………………….11

ARGUMENT……………………………………………………………...……..11

I.      Class Counsel's Fee Requests Is Fair and Reasonable Under Multiple
Different Metrics………………………………………………………….11

       A.      The Requested Fee Is Reasonable Under the Lodestar Method,
Including Because The Lodestar Multiplier is Well Within The Range
of Multipliers Approved In This Circuit…………………………………….12

       B.      The Requested Fee Is Within The Range of the Fees Approved In This
Circuit For Similar Sized Settlements And Is Further Supported by
The Graduated Fee-Scale Negotiated With OCERS…………………………17

       C.      The Requested Fee Is Further Supported by The Graduated Fee-Scale
Negotiated with OCERS…………………………………………………19

D. The Risks of The Case and Other *Goldberger* Factors Support The Requested Fee.............................................................................21

    1. The High Risks of the Litigation Support the Requested Fee............21

    2. The Time and Labor Expended by Class Counsel That Resulted In The Creation of The Common Fund In The High Risk Environment Of This Action Support The Requested Fee.............22

    3. The Magnitude and Complexity of the Litigation Support the Requested Fee..........................................................22

    4. The Quality of the Representation Supports the Requested Fee...........24

    5. The Fee Award Is Reasonable in Relationship to the Settlement...........................................................25

    6. Public Policy Considerations Support the Requested Fee...............25

E. Plaintiff OCERS' Approval and the Class's Reaction Support the Requested Fee...........................................................27

II. Counsel's Litigation Expenses are Reasonable and Should be Reimbursed...............28

CONCLUSION.............................................................................28

**Cases**                                                                                    **Page(s)**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty. Bd. of
   Elections*,
   522 F.3d 182 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   2012 WL 2064907 (S.D.N.Y. June 7, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Beckman v. KeyBank N.A.*,
   293 F.R.D. 467 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 28

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cange v. Stotler & Co., Inc.*,
   826 F.2d 581 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Carlson v. Xerox Corp.*,
   355 F. App'x 523 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   2021 WL 2453972 (S.D.N.Y. June 15, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Dennis v. JPMorgan Chase & Co.*,
   343 F. Supp. 3d 122 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4

*Dennis v. JPMorgan Chase & Co.*,
   439 F. Supp. 3d 256 (S.D.N.Y. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Dennis v. JPMorgan Chase & Co.*,
   2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Dennis v. JPMorgan Chase & Co.*,
 2021 WL 1893988 (S.D.N.Y. May 11, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Espinal v. Victor's Café 52nd St., Inc.*,
 2019 WL 5425475 (S.D.N.Y. Oct. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Flanagan, Lieberman, Hoffman & Swaim v. Ohio Public Employees*
 814 F.3d 652 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Goldberger v. Integrated Res., Inc.*,
 209 F.3d 43 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 26, 28

*Grice v. Pepsi Beverages Co.*,
 363 F. Supp. 3d 401 (S.D.N.Y. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
 298 F.R.D. 171 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re "Agent Orange" Prod. Liab. Litig.*,
 818 F.2d 226 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Arakis Energy Corp. Securities Litig.*,
 2001 WL 1590512 (E.D.N.Y. Oct. 31, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Auction Houses Antitrust Litig.*,
 197 F.R.D. 71 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Beacon Associates Litig.*,
 2013 WL 2450960 (S.D.N.Y. May 9, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Bristol–Myers Squibb Sec. Litig.*,
 361 F.Supp.2d 229 (S.D.N.Y.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Cendant Corp. Litig.*,
 264 F.3d 201 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Citigroup Inc. Bond Litig.*,
  988 F. Supp. 2d 371 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Colgate-Palmolive Co. Erisa Litig.,*
  36 F. Supp. 3d 344 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 26

*In re Comverse Tech., Inc. Sec. Litig.*,
  2010 WL 2653354 (E.D.N.Y. June 24, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Credit Default Swaps Antitrust Litig.,*
  2016 WL 2731524 (S.D.N.Y April 26, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  407 F. Supp. 3d 422, (S.D.N.Y. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re GSE Bonds Antitrust Litig.,*
  2020 WL 3250593 (S.D.N.Y. June 16, 2020) . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 23, 26

*In re Holocaust Victim Assets Litig.*,
  2007 WL 805768 (E.D.N.Y. Mar. 15, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re LIBOR-Based Fin. Antitrust Litig.*,
  11-MD-2262 2018 WL 3863445 (S.D.N.Y. Aug. 14, 2018) . . . . . . . . . . . . . . . . . . . . . . 16

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, No. 02,
  2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  249 F.R.D. 124 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Nortel Networks Corp. Sec. Litig.*,
  539 F.3d 129 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20

*In re Platinum & Palladium Commodities Litig.*,
  2015 WL 4560206 (S.D.N.Y. July 7, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 28

*In re Platinum and Palladium Commodities Litig.*,
  2014 WL 3500655 (S.D.N.Y. July 15, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re RJR Nabisco, Inc. Sec. Litig.*,
  1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Sumitomo Copper Litig.*,
  74 F. Supp. 2d 393 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
  991 F. Supp. 2d 437 (E.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

*In re Vitamin C. Antitrust Litigation*
  2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Maley v. Del Global Technologies Corp.,*
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 25

*McDaniel v. County of Schenectady*,
595 F.3d 411 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Meredith Corp. v. SESAC LLC*,
87 F. Supp. 3d 650 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Missouri v. Jenkins*,
491 U.S. 274 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
2016 WL 3369534 (S.D.N.Y. May 2, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Nypl v. JP Morgan Chase & Co.*,
2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pillsbury Co. v. Conboy*,
459 U.S. 248 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

*Victor v. Argent Classic Convertible Arbitrage Fund L.P.*,
623 F.3d 82 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

**Rules**

Fed. R. Civ. P 12-(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Fed. R. Civ. P. 12(b)(1), (b)(2), (b)(3), (b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P 23(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Other Authorities**

Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*,
  92 N.Y.U. L. Rev. 937 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Pursuant to this Court's Conditional Certification Orders (ECF Nos. 517-522, 542-544) and Fed. R. Civ. P 23(h) and 23(b)(3), Court-appointed Class Counsel respectfully move for an award of attorneys' fees and reimbursement of litigation expenses from the $185,875,000 common fund created by Plaintiffs' eight proposed class action Settlements with twelve Settling Defendants.[1]

**The Substantial Recovery After Six Years of Litigation**.  Counsel's work in this complex, high-risk case for the last six years has produced a substantial recovery of $185,875,000 for the benefit of the Class.

A.    **The High Risks of Successful Prosecution of These Claims**.  The claims here involved numerous intrinsic existential risks.  Such risks began with the Fed. R. Civ. P. 12 stage. These risks included failure to state a claim, failure to show personal jurisdiction, failure to allege standing, collateral estoppel and prior release of the BBSW foreign exchange ("FX") derivatives based upon an earlier class action settlement, and various other attacks by Settling Defendants' counsel, who included the cream of the defense bar.

Second, to any extent that Plaintiffs survived the foregoing risks, Plaintiffs faced the risks of class certification.  Here, Plaintiffs contended that the BBSW rate was manipulated upward on

---

[1] Class Counsel refers to Lowey Dannenberg, P.C. and Lovell Stewart Halebian Jacobson LLP. Plaintiffs refers to Orange County Employees Retirement System ("OCERS") and Richard Dennis.  Counsel refers to Class Counsel and Berman Tabacco.  Settlements refers to Plaintiffs' proposed settlements with the Settling Defendants.  Settling Defendants refers to JPMorgan Chase & Co. and JPMorgan Chase Bank (together, "JPMorgan"), Westpac Banking Corporation ("Westpac"), Australia and New Zealand Banking Group Limited ("ANZ"), Commonwealth Bank of Australia ("CBA"), National Australia Bank Limited ("NAB"), Morgan Stanley and Morgan Stanley Australia Limited (together, "Morgan Stanley"), Credit Suisse AG and Credit Suisse Group AG ("Credit Suisse"), BNP Paribas, S.A. ("BNPP"), Deutsche Bank AG ("Deutsche Bank"), Royal Bank of Canada ("RBC"), The Royal Bank of Scotland Plc (n/k/a NatWest Markets plc) ("RBS"), and UBS AG ("UBS").

some days, and downward on other days.  In these circumstances, various courts have not so far been receptive to certification of litigated classes.[2]

Third, Plaintiffs faced the existential risks involved in prevailing at the merits stage of the case.  These risks included a mismatch between the antitrust conspiracy gravamen of Plaintiffs' claims here, and the treatment by the Australian Securities and Investment Commission ("ASIC") of each Defendant's conduct as a mere individual breach of a duty to customers.  *See* "F" below (discussing the limited ASIC allegations).

1.      **Consistent With These High Risks, No Other Cases or Class Actions Were Filed**.  Likely because of the foregoing high risks, no other law firms filed a complaint or otherwise attempted to represent or seek relief for the Class.  This is the polar opposite of the norm in class actions that have a significant prospect of recovery.[3]

2.      **Pleading Risks: Class Counsel Overcame the High Risks Involved in Seven Separate Rule 12 Motions.**  Counsel had to win, and (ultimately) did win, every significant litigation battle involved in seven different rounds of Rule 12 motions submitted by the Settling Defendants' excellent counsel:

- *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 167, 171 (S.D.N.Y. 2018), *adhered to on denial of reconsideration*, No. 16-CV-6496 (LAK), 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018) (holding Plaintiffs plausibly alleged Defendants conspired to fix the BBSW rate; that Plaintiffs plausibly alleged these rate manipulations adversely affected BBSW-Based Derivatives; but acknowledging "the damages calculations in this case may indeed be complex");

---

[2] *E.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 299 F. Supp. 3d 430 (S.D.N.Y. 2018); *In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 407 F. Supp. 3d 422 (S.D.N.Y. 2019); *Nypl v. JP Morgan Chase & Co.,* No. 15 CIV. 9300 (LGS), 2022 WL 819771, at *6 (S.D.N.Y. Mar. 18, 2022).

[3] *E.g., In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, No. 02 MDL 1484, 2007 WL 4526593, at *17 (S.D.N.Y. Dec. 20, 2007) (the filing of "some 140 class-action complaints" following a highly-publicized investigation showed "the prospect of recovery was promising from the outset").

- *Dennis v. JPMorgan Chase & Co.*, No. 16-CV-6496 (LAK), 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018) (denying motion to reconsider the denial of motion to dismiss Plaintiffs' claims by alleged conspirator Defendants who were not on the Panel which made the submissions used to calculate the BBSW rate);

- *Dennis v. JPMorgan Chase & Co.*, 439 F. Supp. 3d 256 (S.D.N.Y. 2020) (denying in significant part the motion to dismiss claims directed at OCERS);

- Order dated August 4, 2020 (ECF No. 394) (denying motion by ANZ and CBA for reconsideration of the Court's Order denying motions to dismiss OCERS's claims on statute of limitations and other grounds);

- Order dated March 30, 2021 (ECF No. 458) (denying the Rule 12(c) motion by ANZ to dismiss on statute of limitations and other grounds);

- *Dennis v. JPMorgan Chase & Co.*, No. 16-CV-6496 (LAK), 2021 WL 1893988, at *2 (S.D.N.Y. May 11, 2021) (denying Rule 12(c) motion by five Defendants to dismiss Plaintiffs' claims relating to the BBSW-Based Derivatives consisting of FX forwards on the basis that the claims had been released by earlier class action settlement).

**3.      However, Ten Settling Defendants Prevailed on Their Motion To Dismiss For Lack Of Personal Jurisdiction.**  But one of the many existential Rule 12 risks was realized when this Court largely granted the Settling Defendants' personal jurisdiction dismissal motions. *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 171 (S.D.N.Y. 2018).

**4.      Class Counsel Then Resourcefully Solved the Personal Jurisdiction Problem**. After the personal jurisdiction risk had fully materialized, Counsel then accomplished a 180-degree turnaround in this litigation battle on which the Settling Defendants had largely prevailed.

Specifically, after dismissal, this Court granted Plaintiffs leave to amend the Complaint. ECF No. 276.  Making the most of the opportunity afforded by the Court, Class Counsel then added as a party plaintiff Orange County Employees Retirement System ("OCERS").  *Dennis v. JPMorgan Chase & Co.*, 439 F. Supp. 3d at 269.

Defendants' excellent counsel then renewed their personal jurisdiction arguments and also made numerous other arguments to dismiss OCERS' claims.  ECF Nos. 298, 303, 306.  But this Court ruled that the agreements which OCERS entered into with numerous Settling

Defendants included an enforceable consent jurisdiction agreement. *Dennis v. JPMorgan Chase & Co.*, 439 F. Supp. 3d at 261-266. This Court further consistently ruled that such consent clauses were sufficient to confer personal jurisdiction over those Defendants who were parties thereto. *Id*. at 261; *see also Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d at 209 and *Dennis v. JPMorgan Chase & Co.,* 439 F. Supp. 3d at 266.

     **5.**     **Class Counsel's Need to Obtain Substantial Discovery from Defendants While This Court Was Still Burdened by Repeated Rounds of Rule 12 Motions**. Before Defendants' repeated Rule 12 motions ended, Counsel began the discovery phase of the case and performed substantial discovery work for more than 14 months *before* the later rounds of Rule 12 motions had been decided. In addition to the continuing risks from the Rule 12 motions, Class Counsel's judgment was that they needed to obtain substantial discovery documents going far beyond those reflected in the ASIC proceedings[4] in order to be able to prove by a preponderance of the evidence the antitrust conspiracy gravamen of Plaintiffs' claims.

     Thus, the critical focus of Plaintiffs' discovery work was to obtain as many types of relevant documents as they successfully could. Thereby, Class Counsel would give Plaintiffs the chance to establish that the alleged manipulations of BBSW, *which were in different directions and at different times over the course of many years*, were undertaken pursuant to an unlawful agreement among Defendants to fix and manipulate prices.

---

[4] First, ASIC made limited settlements with limited or no findings involving three defendants' individual wrongdoings. ECF No. 136, Exs. 22-24 (BNPP, RBS and UBS enforceable undertakings). Second, ASIC made a significant record of conversations consistent with sporadic manipulations through market moving conduct during the five-minute BBSW fixing window. Order, *ASIC v ANZ*, VID 197 of 2016, (Fed. Ct. of Australia, Nov. 10, 2017); Order, *ASIC v NAB*, VID 604 of 2016, (Fed. Ct. Australia, Nov. 10, 2017); Order, *ASIC v CBA*, VID65 of 2018, (Fed. Ct. Australia June 21, 2018); Order, *ASIC v. Westpac,* VID 282 of 2016, (Fed. Ct. Australia Nov. 9, 2018).

Accordingly, Plaintiffs began aggressively pursuing discovery as soon as it opened in late March 2020. Defendants took what Class Counsel believed was an extremely narrow view of discovery. Ultimately, Class Counsel obtained approximately 2.4 million documents from Defendants.

As Class Counsel aggressively pursued discovery, they conducted more than seventy (70) discovery meet and confers with Defendants during the prosecution of these claims. Joint Declaration of Vincent Briganti and Christopher Lovell ("Joint Declaration") ¶37. These meet and confers were designed to justify why, based on the facts of this case, Defendants should produce various categories of documents. Frequently, senior partners participated in these meet and confers in order to maximize Plaintiffs' chances to obtain documents consensually, without burdening the Court.

Counsel and their experts analyzed the substantial amount of dense information produced by Defendants in discovery. These documents included industry-specific jargon, numerous types of financial instruments, different categories of records at each bank, audio recordings, and many other types of records.

However, unlike other cases involving manipulation of a daily fixed rate, this case did not involve chat rooms in which the banks worked out before each day's fixing period how they were going to conduct that day's manipulation. *Compare In re Foreign Exch.Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 587-88 (S.D.N.Y. 2015). On the contrary, Defendants forcefully argued that, to paraphrase the words of one market participant to the Reserve Bank of Australian, "some days I get tackled, and other days I tackle."

Based upon their review and analysis of the records, Class Counsel skillfully used these different documents (a) to begin to piece together the types of evidence that, in their judgment,

could improve Plaintiffs' chance to prove a conspiracy, and (b) to make settlement presentations to various Defendants and seek to settle before the substantial risk of class certification or decisions on the merits materialized. As a result of Class Counsel's skillful prosecution of discovery and repeatedly prevailing against the Rule 12 attacks, by June 2021 Plaintiffs had agreed in principle to settle with six more Defendants.[5] But in order to be able to prove the alleged conspiracy, Plaintiffs continued to seek more cooperation documents from these six Defendants, while also prosecuting the Class's claims against the six remaining Defendants.

Class Counsel had unavoidably been forced to make two motions to compel discovery. ECF Nos. 427 and 428. But after this Court ruled that the release in the prior *FX* class action did not bar the Plaintiffs' claims here, the parties suggested to the Court in July 2021 that they could resolve portions of the motion to compel consensually. ECF No. 471. The Court directed the parties to resolve **all** portions of the motion to compel. *Id*.

Thereafter, relying on senior partner involvement in most of the meet and confers in order to execute the Court's direction, Class Counsel diligently negotiated with the remaining Defendants to resolve the issues in the motions to compel, obtain discovery, and do so prior to the discovery cut off. Shortly before the initial cut-off of discovery, Class Counsel reached an agreement with these six Defendants to resolve in substantial part the motions to compel. ECF No. 484, pp. 1-2.

Granting the requested extension of discovery, this Court noted that such extension was likely to be the last. ECF No. 532. Class Counsel thereafter continued zealously to pursue discovery from the remaining Defendants, worked internally and with experts to prepare a class

---

[5] JPMorgan had become the first settling defendant prior to the resolution of the first round of motions to dismiss. ECF No. 225-1 (stipulation of settlement dated November 20, 2018).

certification impact model, and analyzed with experts the meaning of the non-Settling

Defendants' communications, and conducted settlement negotiations with the remaining

Defendants.  As a result of Class Counsel's extensive prior learning and persistent efforts,

Plaintiffs reached an agreement for settlements with all of the remaining Defendants by late

April 2022.

Through their foregoing skillful work, Class Counsel overcame all of the extensive Rule

12 risks in this case.  Class Counsel then aggressively pursued discovery and skillfully used the

discovery record in settlement negotiations.  As a result of their foregoing and other zealous

efforts, Class Counsel succeeding in producing a substantial recovery for the benefit of the Class

notwithstanding the complexity and high risks of the claims.

**B.** **Fee Request**.  Class Counsel respectfully request an award of attorneys' fees in

the amount of $47,218,750.  The requested fee represents approximately 25.4% of the

$185,875,000 common fund and a 1.58 lodestar multiplier.  The requested fee is fair and

reasonable under the multiple metrics recognized by this Court for awarding fees in common

fund cases.  *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-CV-0256 (LAK),

2021 WL 2453972, at *1 (S.D.N.Y. June 15, 2021) (Kaplan, J.) ("The Court may evaluate the

reasonableness of a fee request using either the percentage of the fund obtained for the class or

the lodestar method.").

**C.** **Lodestar Method**.  The requested fee is fair and reasonable under the lodestar

method because the lodestar is comprised of a reasonable number of hours of work performed at

a reasonable rate.  *See* "I.A" below (detailing Counsel's hours and rates).  The lodestar multiplier

of 1.58 is well within the range of multipliers previously awarded in this Circuit in similar

complex class actions.  *City of Westland*, 2021 WL 2453972, at *5 (2.5 multiplier found to be

reasonable and "well within the range of multipliers that typically are approved in this Circuit" in much less complex securities class action); *see* I.A below (collecting cases awarding similar or greater multipliers in connection with similar sized class action settlements); *see also* Theodore Eisenberg *et. al.*, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 951 (2017) (the average lodestar multiplier was 1.61 in fifteen different antitrust class actions studied during 2009-2013).

Counsel's fee compensable lodestar here is $29,908,595.15. *See* "I.A" below and accompanying attorney declarations submitted by Counsel.[6] The lodestar represents 53,814.49 hours of fee compensable work since the case began in 2016. *Id.* In accordance with this Court's recent ruling in *City of Westland*, Counsel has stated its lodestar based on historic hourly rates, not current hourly rates, and has capped the hourly rates for paralegals at $200 per hour. *See* "I.A" below; *City of Westland*, 2021 WL 2453972, at *3. Counsel has also provided the Court with: (1) each timekeeper's hours, tasks, and current and blended hourly rates, (2) the categories of work for which compensation is sought and (3) biographical information for the individuals for whom compensation is sought. *See* "I.A" below; *City of Westland*, 2021 WL 2453972, at *2. Counsel's current and historical hourly rates are reasonable and consistent with rates recently approved by this Court in *City of Westland*. *Id.*

**D.** **Percentage of the Fund Method**. The requested 25.4% fee is also fair and reasonable under the percentage of the fund method. *See* "I.B" below. It is well within the range of fees previously awarded in this Circuit in connection with similar sized class action settlements in complex cases. *Id.* (collecting decisions awarding fees of 25% or greater in cases

---

[6] Concurrently submitted herewith are the attorney declarations of Vincent Briganti on behalf of Lowey Dannenberg ("Briganti Decl."), Benjamin M. Jaccarino on behalf of Lovell Stewart ("Jaccarino Decl.") and Todd A. Seaver on behalf of Berman Tabacco ("Seaver Decl.").

with similar sized settlements and that represented lodestar multipliers greater than that requested here); *see also* Center for Litigation and Courts and The Huntington National Bank, *2021 Antitrust Annual Report: Class Actions in Federal Court* (April 2022) at 27-28 (median fee awards of 30% in antitrust settlements ranging from $100 million to $249 million between 2009 and 2021)[7]; Theodore Eisenberg *et. al.*, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. at 951 (the average fee award in nineteen different antitrust class actions studied during 2009-2013 was 27%).

      **E.**    **Fee Awards Reflecting Market Rates**.  The 25.4% fee is also strongly supported because it follows the declining fee scale negotiated at arm's length by Counsel and Plaintiff OCERS before OCERS joined the case.  Declaration of Gina M. Ratto ("Ratto Decl.", ¶¶5-8. The agreed upon fee structure employs a graduated fee scale that provides for a 28% fee on the first $25 million recovered, 25% on the next $175 million recovered, and lower percentages for any additional sums recovered.  *Id.*  OCERS has more than $22.4 billion in assets under management, is one of the nation's largest public pension funds, acts as a fiduciary on behalf of its more than 49,000 members and has a large stake in this litigation.  *Id.*, ¶¶1-4.  The declining percentage fee structure negotiated by a highly sophisticated client like OCERS is the "best indication of a market rate," which is "an ideal proxy for [Class Counsel's] compensation." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 52 (2d Cir. 2000) (market rates "are the ideal proxy" for "lawyers who successfully prosecute" class actions); *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) ("In many cases, the agreed-upon fee will offer the best indication of a market rate.").

---

[7] *Available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4117930

**F.** **High Risks and Other *Goldberger* Factors**. Class Counsel undertook to prosecute this case on a fully contingent basis despite the high risks involved. The risks of this case fully justify the requested fee, which represents a 1.58 lodestar multiplier. *Compare In re Bristol–Myers Squibb Sec. Litig.*, 361 F.Supp.2d 229, 233 (S.D.N.Y.2005) (the risk of the litigation is the "first, and most important, Goldberger factor") *with In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 4526593, at *17 (S.D.N.Y. Dec. 20, 2007) (the filing of "some 140 class-action complaints" following a highly-publicized investigation showed that "the prospect of recovery was promising from the outset").

Class Counsel built the plausible allegations of a conspiracy among some of the largest banks in the world from the ground up and based on their prior expertise litigating benchmark rate manipulation cases. At the time Class Counsel filed the initial complaint herein (August 2016), ASIC had brought actions against certain Defendants herein. ECF No. 1, ¶¶3-4. Importantly, however, ASIC had not alleged any collusion or coordination. Instead, ASIC focused on various types of individual misconduct by certain Defendants, including BBSW submission influence and manipulative trading in prime bank bills during the BBSW rate set window. Class Counsel conducted their investigation, worked with experts and harvested materials from the public record and without the benefit of discovery in order to go far beyond the individual violations pursued by ASIC and construct plausible allegations of a conspiracy to manipulate and fix BBSW. Complaint, *passim*. Thus, Class Counsel, not ASIC, filed the first (and only) collusion claims concerning BBSW. ASIC recovered 83.6 million AUD (approximately $58 million) in connection with settlements from five Defendants, and an additional 3.3 million AUD (approximately $2.3 million) from one Defendant that did not settle

with ASIC.[8]  Thus, Class Counsel ultimately recovered more than **three times** as much money as ASIC.

      **G.**     <u>**Litigation Expenses**</u>.  Class Counsel also respectfully seek reimbursement of $845,471.57 in out-of-pocket expenses incidental and necessary to the representation of the Class since the inception of the case in 2016.  *See* II below.  The requested expenses are detailed and categorized in the accompanying attorney declarations submitted by Counsel.  *Id*.  More than 95% of the expenses incurred consisted of expert and consultant expenses, document discovery expenses and computer research.  *Id*.

<u>**ARGUMENT**</u>

**I.**    **CLASS COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE UNDER MULTIPLE DIFFERENT METRICS**

      "[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 86 (2d Cir. 2010).  Courts "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method" although "the trend in this Circuit is toward the percentage method."  *McDaniel v. County of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010) (citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)).  Class Counsel's fee request is reasonable under both approaches, is further reasonable because it follows the fee agreement Counsel negotiated with Plaintiff OCERS, and is further supported by each of the *Goldberger* factors, including the high risks of litigating this case on a contingent basis.

---

[8] Also, four Defendants were ordered to pay litigation costs and other reimbursements totaling 59 million AUD (approximately $41 million).

**A. The Requested Fee Is Reasonable Under the Lodestar Method, Including Because The Lodestar Multiplier Is Well Within The Range of Multipliers Approved In This Circuit**

Under the lodestar method, the Court first ascertains the number of hours reasonably billed to the Class and then multiplies that figure by an appropriate hourly rate. *City of Westland*, 2021 WL 2453972, at \*1. Courts compare the requested award to the reasonable time and labor expended to confirm that the fee award is reasonable and avoid windfalls. *Grice v. Pepsi Bev. Co.*, 363 F. Supp. 3d 401, 406 (S.D.N.Y. 2019); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir. 1987) (adoption of the lodestar method intended to "provide counsel with [fair and just] compensation and, at the same time, temper these awards to prevent windfalls). Courts in the Second Circuit routinely approve fee awards that result in multipliers between 2 and 6. *See, e.g.*, *Wal-Mart*, 396 F.3d at 123 (upholding a multiplier of 3.5 as reasonable and observing that "multipliers of between 3 and 4.5 have become common"); *Carlson v. Xerox Corp.*, 355 F. App'x 523, 526 (2d Cir. 2009) ("the resulting multiplier would be 3.59, still below the 3.6 average and in line with the 3.1 median for similar cases"); *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2016 WL 2731524, at \*17 (S.D.N.Y. Apr. 26, 2016) ("*CDS*") (approving a lodestar multiplier of "just over 6" in a complex antitrust class action); *Beckman v. KeyBank N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (approving a multiplier of 6.3 in class action, explaining that "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (holding that a 4.65 lodestar multiplier is modest, fair, and reasonable).

**Counsel's Limitations and Audits of Time**. In this case, Counsel self-imposed certain limits to control time and hourly rates. The rates for timekeepers performing first-level document review were capped at $350 per hour, and rates for paralegals and other litigation

professionals were capped at $200 per hour. Timekeepers that worked less than 15 hours on the case have been excluded for the purpose of the lodestar calculation, and any time relating to preparing this motion has been excluded as well. On top of these caps, Class Counsel have audited the time of each firm and adjusted the lodestar in the exercise of billing judgment. Finally, the lodestar has been calculated based on historical rates, rather than current rates. The limits imposed by Class Counsel confirm that there is no windfall resulting from the fee request.

**Number of Hours Billed**. As reflected in the accompanying attorney declarations, Counsel invested a total of 53,814.49 fee compensable hours prosecuting the claims on behalf of the Class and reaching the eight Settlements. A summary of the hours spent by law firm per year is set forth in the below matrix.

| Law Firm | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|----------|------|------|------|------|------|------|------|
| | | | | | | | |
| Lowey Dannenberg | 1,398.30 | 1,931.96 | 2,363.40 | 2,046.05 | 4,247.84 | 8,955.77 | 1,727.70 |
| Lovell Stewart | 54.15 | 2,078.75 | 2,601.49 | 2,291.74 | 6,382.85 | 9,310.94 | 2,393.70 |
| Berman Tabacco | | 6.15 | 292.40 | 160.90 | 1,248.40 | 3,864.50 | 457.50 |
| | | | | | | | |
| **TOTALS** | **1,452.45** | **4,016.86** | **5,257.29** | **4,498.69** | **11,879.09** | **22,131.21** | **4,578.90** |

Counsel assert that the fee compensable hours are reasonable when viewed in the context of the work undertaken in this case over approximately six years. Counsel's efforts on behalf of the Class are detailed in the Joint Declaration and the three attorney declarations submitted concurrently herewith, including summaries of work for each timekeeper. Counsel's work included the following:

- Investigated and filed the first and only complaint herein alleging an unlawful agreement among many of the largest banks in the world that was designed to manipulate, fix and rig BBSW;
- Amended the complaint multiple times in order to address shortcomings identified by the Court in its motion to dismiss opinions, including amending the complaint to add Plaintiff OCERS who had consent jurisdiction agreements with many of the defendants;

- Successfully defeated six rounds of dismissal motions, including motions pursuant to Rules 12(b)(1), (b)(2), (b)(3) and (b)(6), motions for judgment on the pleadings pursuant to Rule 12(c) and dismissal motions premised upon a release from a prior class action settlement;
- Prepared and served multiple Rule 34 document requests to each of the twelve Defendants during discovery;
- Engaged in individual meet and confers with each of the ten remaining Defendants concerning their responses and objections to Plaintiffs' Rule 34 requests and other discovery matters, and non-parties concerning the production of information for class notice. In total, Class Counsel conducted at least seventy (70) meet and confers.
- Mindful of the burdens on this Court, Counsel sought to and did resolve their many discovery disputes without Court intervention. Plaintiffs submitted only two motions to compel to the Court and then resolved those motions by agreement with Defendants pursuant to the Court's instructions;
- Based on Class Counsel's aggressive representation, Plaintiffs received more than 2.4 million documents produced by Defendants. Class Counsel and their experts engaged in an extensive analysis these complex documents and utilized them to build on the allegations in the complaint and also to persuade Defendants' counsel during settlement negotiations that Plaintiffs would have the proof necessary to establish their claims;
- Engaged in numerous meet and confers with several Defendants concerning Plaintiffs' responses and objections to Defendants' Rule 34 requests. Plaintiff OCERS gathered, reviewed and produced over 23,000 pages of documents for production, with meet and confer conferences continuing through the litigation and up to the time of the final settlements.
- Worked with economists to develop an impact model to detect and estimate the impact of manipulations on BBSW;
- Negotiated eight separate settlements involving twelve different banks, all of which included months of hard-fought negotiations with Defendants' counsel over material provision such as the specifics of the cooperation provisions;
- Developed a detailed class notice plan that was approved by the Court and also developed a proposed Plan of Distribution which, subject to the Court's approval, will be used to distribute the proceeds of the Settlements to eligible Class members.

The number of hours Counsel spent litigating this case is extremely reasonable given the complexity of the case (*see* "D.3" below), the length of the litigation (six years), the high volume of motion practice, the large number of Defendants and the large number of documents produced in the case (approximately 2.4 million).

**Hourly Rates**. The billing rates used to develop the lodestar are also reasonable. The hourly billing rates for attorneys working on this case ranged from $185 to $1,295. Briganti

Decl. Ex. A (schedule listing attorney rates from $325-$1,295); Jaccarino Decl. Ex. A (schedule listing attorney rates from $185-$1,140); Seaver Decl. Ex. A (schedule listing attorney rates from $350-$1,085). Billing rates in the same range have been previously approved in federal cases in New York for work of comparable size and complexity. *See*, *e.g.*, *City of Westland,* 2021 WL 2453972, at *1 (finding counsel's hourly rates between $170 to $1,058 were reasonable); *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704 (JSR), 2020 WL 3250593, at *1 (S.D.N.Y. June 16, 2020) (granting fee award using partner rates of $675 to $1,150 and associate rates of $365 to $820), *see also* Decls. in Support of Award for Attorney's Fees and Expenses, *GSE Bonds* (S.D.N.Y. Apr. 13, 2020), ECF No. 393-96; *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) (granting fee award using partner rates up to $1,375 and associate rates of $350 to $700), *see also* Decl. in Support of Award for Attorney's Fees and Expenses, *In re Foreign Exchange,* No. 13 Civ. 7789 (LGS), (S.D.N.Y. Jan. 12, 2018), ECF No. 939; *CDS*, 2016 WL 2731524, at *17 (granting fee award using partner rates of $834 to $1,125 and associate rates of $411 to $714; *see* ECF No. 482).

Again, hourly rates for paralegals and other litigation support personnel were capped at $200. *City of Westland*, 2021 WL 2453972 at *3 (approving rate of $200 an hour for paralegals and litigation support personnel). First-level document review rates were capped at $350 an hour.

**Lodestar.** Lodestar is calculated by "multipl[ying] the reasonable hours billed by a reasonable hourly rate." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 347 (S.D.N.Y. 2014). If the Court accepts the reasonableness of the hours and the rates reported here, the fee compensable lodestar totals $29,908,595.15. The lodestar for each firm is set forth below.

| Law Firm | Lodestar |
|---|---|
| Lowey Dannenberg, P.C. | $12,009,690.35 |
| Lovell Stewart Halebian Jacobson LLP | $15,190,556.80 |
| Berman Tabacco[9] | $2,708,348.00 |
| | |
| **TOTAL** | **$29,908,595.15** |

**Lodestar Multiplier**.  Once the lodestar figure is determined, courts typically enhance it by a positive multiplier "to reflect consideration of a number of factors, including the contingent nature of success and the quality of the attorney's work." *Maley,* 186 F. Supp. 2d at 370.

The fee request represents a lodestar multiplier of 1.58.  This multiplier is well within the range of multipliers typically approved in this Circuit.  *See*, *e.g.*, *GSE Bonds,* 2020 WL 3250593, at *5 (awarding $77.3 million in fees, representing a 4.09 multiplier on the lodestar); *CDS*, 2016 WL 2731524, at *18 (approving fees totaling over $253 million, which was "equivalent to a lodestar multiple of just over 6"); *Maley*, 186 F. Supp. 2d at 371 (approving a fee award that represented a 4.65 multiplier); *In re RJR Nabisco, Inc. Sec. Litig*., No. 88 Civ. 7905 (MBM), 1992 WL 210138, at *6-8 (S.D.N.Y. Aug. 24, 1992) (awarding multiplier of 6); *In re LIBOR-Based Fin. Antitrust Litig*., No. 11-MD-2262 (NRB), 2018 WL 3863445, at *4 (S.D.N.Y. Aug. 14, 2018) (noting "mean multiplier in this Circuit is approximately 1.55, with multipliers in antitrust and securities cases recently averaging 1.77 and 1.43, respectively"); *see also In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (Pollack, J.) (noting that a multiplier of "2.5 times the reported charges" would be reasonable in commodities class action); Order, at ¶¶ 2, 6, 9, *In re Nat. Gas Commodity Litig*., 03 Civ. 6186, (S.D.N.Y. June 15, 2007), ECF No. 445 (approving a 1.9 multiplier in commodities class action); *In re Platinum &*

---

[9] Pursuant to Local Rule 23.1, Class Counsel state that they have a fee sharing agreement with Berman Tabacco, counsel for Plaintiff OCERS.  The agreement provides that Berman Tabacco is entitled to share up to 17% of attorneys' fees awarded herein.

*Palladium Commodities Litig.*, No. 10 Civ. 3617, 2015 WL 4560206, at *4 (S.D.N.Y. July 7, 2015) (approving a 1.9 multiplier in commodities action for attorneys representing the Futures Class); *In re BP Propane Direct Purchaser Antitrust Litig.*, No. 06 Civ. 3541, slip op. (N.D. Ill. Feb. 10, 2010), ECF No. 209, [Joint Decl. Ex. Q, Tab 2] (33% fee award that resulted in a 2.7 lodestar multiplier).

Additionally, the multiplier accounts for the risks of the litigation, the complexity of the issues, the quality of the representation (for both Plaintiffs and Defendants), the six-year delay in payment, the contingent nature of the case and each of the other *Goldberger* factors. *See* "D" below.

### B. The Requested Fee Is Within The Range of the Fees Approved In This Circuit For Similar Sized Settlements And Is Further Supported by The Graduated Fee-Scale Negotiated with OCERS

The reasonableness of the requested fee is confirmed when compared to cases applying the "percentage method" to calculate fees, the method which is favored in this Circuit. *Wal-Mart Stores*, 396 F.3d at 121 ("The trend in this Circuit is toward the percentage method"); *see also In re Beacon Assoc. Litig.*, No. 09 Civ. 777(CM), 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013) (explaining that "percentage of recovery" is "the preferred method of calculating the award for class counsel in common fund cases"). Notably, other judges, including Your Honor, find that the percentage method is not a panacea, potentially encouraging counsel to prematurely settle cases and avoid extensive opportunity costs, or "to collect a large fee after investing relatively little time in the case, rather than continuing the litigation in order to maximize plaintiffs' recovery but receiving a lower marginal rate of return on his or her work." *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 77 (S.D.N.Y. 2000). That has not happened here.

In this case, even if used simply as a point of comparison to the lodestar method, a fee of 25.4% is amply reasonable. The percentage is comparable to fees awarded in other **less complex**

**actions** with settlements of between $100 million and $300 million that resulted in higher

lodestar multipliers than requested here. *In re Signet Jewelers Ltd. Sec. Litig.,* No. 1:16-CV-

06728-CM-SDA, 2020 WL 4196468, at *1 (S.D.N.Y. July 21, 2020) (approving attorneys' fees

that equaled 25% of a $240 million settlement and that represented a 1.89 lodestar multiplier);

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, No. 1:08-CV-10783, 2016 WL

3369534 at *1 (S.D.N.Y. May 2, 2016) (approving attorneys' fees that equaled 21% of a

$272 million settlement and that represented a lodestar multiplier of 3.9.); *Bd. of Trustees of

AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 CIV. 686 SAS, 2012 WL 2064907, at

*1 (S.D.N.Y. June 7, 2012) (approving attorneys' fees that equaled 25% of $150 million

settlement and that represented a lodestar multiplier of 2.86); *In re Comverse Tech., Inc. Sec.

Litig.,* 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (awarding attorneys' fees that equaled

25% of $225 million settlement and that represented a lodestar multiplier of 2.78.); *In re

Sumitomo Copper Litig.,* 74 F. Supp. 2d at 399 (Pollack, J.) (approving attorneys' fees that

equaled 27.5% of $116.6 million settlement and that represented a lodestar multiplier of 2.5).

When looking at comparable cases involving benchmark manipulation, the fee request is

in line with awards granted in this District where the total settlements to date were approximately

$300 million or less. *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC) (S.D.N.Y. May 18,

2018) ECF No. 425 (order granting 22.24% of the $309 million settlement fund as attorneys'

fees); *Laydon v. Mizuho Bank Ltd.*, No. 12-cv-3419 (GBD) (S.D.N.Y.) ECF Nos. 723 (Nov. 10,

2016) (granting 25% fee on first set of settlements totaling $58 million), 837 (Dec. 7, 2017)

(awarding attorneys' fee of 23.57% from a second set of settlements totaling $148 million); *see

also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-cv-7126 (JMF), 2018 WL

6250657, at *3 (S.D.N.Y. Nov. 29, 2018) (awarding 26% of the net settlement fund from a

$504.5 million settlement involving the manipulation of ISDAfix). Recent studies of antitrust class actions further confirm the reasonableness of the requested 25.4% fee. *See* above.

Moreover, the facts of this case demonstrate that the pitfalls that have concerned the Court about awarding fees based on a percentage are not present. Counsel have invested more than 53,800 hours over six years prosecuting this case. *See* "A" above. In that time, they have responded to and largely prevailed on six pleadings-related motions, negotiated the production of over 2.4 million documents, and conducted multiple rounds of months'-long negotiations to produce the resulting Settlements. *Id.* Moreover, based on their experience in other benchmark litigation cases, Class Counsel firmly believe that they have achieved optimal value for the Class, particularly when one considers the amount of time that has already elapsed in litigating this case, and the amount of time that would likely be required to get to a trial on the merits in this action. *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 176 (S.D.N.Y. 2014) ("any potential recovery by Class members in the absence of a settlement would occur years in the future, substantially delaying payment to Class members"). Continuing the prosecution in the hope of obtaining a larger settlement would have subjected the Class to more uncertainty and risk.

### C. The Requested Fee Is Further Supported by The Graduated Fee-Scale Negotiated with OCERS

Counsel's arm's-length fee agreement with OCERS provides the Court with a valuable guidepost that may be used to determine the appropriate fee. The Supreme Court and the Second Circuit have recognized that an appropriate Court-awarded fee is intended to approximate what counsel would receive if they were offering their services in the marketplace. *Missouri v. Jenkins*, 491 U.S. 274, 285-86 (1989); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty. Bd. of Elections,* 522 F.3d 182, 184 (2d Cir. 2008) (a

"reasonable" fee reflects "what a reasonable, paying client would be willing to pay" for counsel's services); *Goldberger*, 209 F.3d at 52 ("market rates, where available, are the ideal proxy for [class counsel's] compensation."). Courts accordingly may give weight to negotiated fee agreements because they typically reflect actual market rates *Nortel Networks,* 539 F.3d at 133 ("In many cases, the agreed-upon fee will offer the best indication of a market rate."). Moreover, there is "a well-recognized rebuttable 'presumption of correctness' given to the terms of an *ex ante* fee agreement between class counsel and lead plaintiffs" applied in antitrust cases where the fee was negotiated by a "sophisticated benefits fund with fiduciary obligations to its members and where that fund has a sizeable stake in the litigation." *CDS Litig.*, 2016 WL 2731524, at *16 (quoting *Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Emps. Ret. Sys.*, 814 F.3d 652, 659 (2d Cir. 2016); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001).

Here, there is no need to approximate what Class Counsel's services in this case are worth or what a reasonable client would be willing to pay. The fee request reflects the agreed-upon sliding scale percentage OCERS negotiated with Counsel prior to its participation in this action. Ratto Declaration, ¶¶5-8. OCERS has more than $22.4 billion in assets under management, is one of the nation's largest public pension funds, acts as a fiduciary on behalf of more than 49,000 members and has a large stake in this litigation. *Id.*, ¶¶1-8. The fee agreement is entitled to a "presumption of correctness" because its terms were negotiated by a "sophisticated benefits fund"—such as OCERS—"with fiduciary obligations to its members and . . . a sizeable stake in the litigation." *CDS*, 2016 WL 2731524, at *16 (quoting *Flanagan,* 814 F.3d at 659).

**D. The Risks of The Case and Other *Goldberger* Factors Support The Requested Fee**

Under *Goldberger*, in awarding a fee the Court should consider "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50. The requested fee is also supported by each of the six *Goldberger* factors.

### 1. The High Risks of the Litigation Support the Requested Fee

The risk of the litigation is the preeminent *Goldberger* factor. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("*Payment Card*") ("The most important *Goldberger* factor is often the case's risk"); *Goldberger,* 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement."). The risk of undertaking litigation is "measured as of when the case is filed." *Goldberger*, 209 F.3d at 55.

The substantial risks in this complex case included the following. Class Counsel overcame the risks of Defendants' six rounds of Rule 12 dismissal motions and Plaintiffs would eventually face dispositive motions for summary judgment where Defendants would challenge Plaintiffs' ability to provide evidentiary support for their claims. For example, Defendants consistently challenged Plaintiffs' ability to establish a **conspiracy** to manipulate BBSW, which was essential to Plaintiffs' claims. Defendants argued that, if anything, each of their alleged unlawful conduct in connection with BBSW was an individual undertaking, and not one performed as part of any conspiracy. In order to obtain the proof necessary to defeat summary judgment (and eventually prevail at trial), Plaintiffs first needed to obtain significant discovery from Defendants. Discovery proved to be challenging. Defendants took (in Counsel's opinion)

a very narrow view of the case and aggressively opposed Plaintiffs' discovery requests. This required extensive negotiation efforts that involved more than seventy (70) meet and confers. Counsel's diligence in discovery paid off. Ultimately, Defendants produced more than 2.4 million documents to Plaintiffs. Class Counsel also faced the risk of certifying a class in this action where Plaintiffs alleged that BBSW was manipulated both higher and lower than its competitive price on different days. Class certification motions based on similar records have repeatedly been denied (incorrectly, in Class Counsel's judgment). *See* fn. 2 above. The Settlements reached with the Defendants avoids all these additional risks and the uncertainties of continued litigation and trial.

### 2. The Time and Labor Expended by Class Counsel That Resulted In The Creation of The Common Fund In The High Risk Environment Of This Action Support the Requested Fee

During the last six years, Counsel dedicated a substantial amount of time (more than 53,800 hours) and resources to prosecuting the claims herein on behalf of the Class. Counsel's efforts on behalf of the Class are detailed in the Joint Declaration and the individual attorney declarations submitted concurrently herewith, including summaries of each timekeeper's work. A summary of the work undertaken in this Action is set forth in "I.A" above.

### 3. The Magnitude and Complexity of the Litigation Support the Requested Fee

A greater fee award is warranted for counsel prosecuting complex class action cases. *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379 (S.D.N.Y. 2013) ("The upshot is that the magnitude and complexity of the litigation also weigh in favor of a significant award."); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ("*NASDAQ III*") ("[C]lass actions have a well-deserved reputation as being most complex"). Complex cases require a greater level of investment by counsel, in terms of effort, expertise, and resources, to

competently litigate the claims and issues at stake on behalf of plaintiffs and the class. Class actions involving antitrust and commodities claims stand out as some of the most "'complex, protracted, and bitterly fought.'" *Meredith Corp. v. SESAC LLC*, 87 F. Supp. 3d 650, 670 (S.D.N.Y. 2015) (citations omitted); *In re Platinum and Palladium Commodities Litig.,* No. 10cv3617, 2014 WL 3500655, at *12 (S.D.N.Y. July 15, 2014) (noting that commodities cases are "complex and expensive" to litigate); *In re Vitamin C Antitrust Litig.*, No. 06 Md. 1738 (BMC)(JO), 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012).

**Complexity**. This case involves an alleged conspiracy among multiple banks and interdealer brokers to fix BBSW and BBSW-Based Derivatives prices over more than 13 years through multiple means, including, *inter alia*: (1) engaging in manipulative money market transactions during the BBSW Fixing Window; (2) making false BBSW rate submissions that did not reflect actual transaction prices; (3) uneconomically buying or selling money market instruments at a loss to cause artificial derivatives prices; and (4) sharing proprietary information to align interests and avoid conduct that could harm co-conspirators. ECF No. 281 (Second Amended Class Action Complaint ("SAC")). The amount of work required to understand the inner workings of a cartel with this level of sophistication was extraordinary in both its complexity and scope and required Class Counsel to master the properties of complex financial instruments and markets. *GSE Bonds*, 2020 WL 3250593, at *4 (finding "complexity [is] present [where] plaintiffs claimed that the defendants colluded in the GSE Bond market over more than seven years, involving thousands of bond issuances, and implicating sixteen defendants"); *In re Holocaust Victim Assets Litig.*, No. CV 06-0983 (FB)(JO), 2007 WL 805768, at *46 (E.D.N.Y. Mar. 15, 2007).

**Magnitude**.  This is a massive case.  Over the course of six years of litigation involving seventeen different financial institutions as Defendants, the Court and the parties generated over 500 docket entries associated with two amended complaints, multiple motions to dismiss, reconsideration requests and multiple requests for judgment on the pleadings.  More than 2.4 million documents have been produced, and thousands of hours have been spent analyzing and contextualizing the relevant information.  The nature, duration, size of the case, complexity of the financial instruments, and sophistication and the breadth of the alleged conspiracy weigh heavily in favor of approving the requested fee.

### 4.  The Quality of the Representation Supports the Requested Fee

"[T]he quality of representation is best measured by results," *Goldberger*, 209 F.3d at 55, which are evaluated in light of "the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008).

**Results Obtained**.  The eight Settlements provide for a $185,875,000 benefit to the Class.  This is an extraordinary recovery in light of the challenges of prosecuting this action and the risks of continuing litigation.

**Background of Counsel**.  Counsel has decades of experience prosecuting class action cases, including some of the largest class action recoveries under the commodities and antitrust laws.  *See* ECF Nos. 452-6, 452-7 (firm resumes).  This includes specific expertise in benchmark manipulation as demonstrated by Class Counsel's current tenure as lead or co-lead counsel in cases alleging anticompetitive and manipulative conduct.  *Id*.  Additional examples of Class Counsel's more than 70 years of combined experience with complex litigation are detailed in Class Counsel's resumes.  *Id*.  The background of each timekeeper for whom fees are being requested are set forth in the attorney declarations submitted herewith.

Another consideration for assessing the quality of the representation is "[t]he quality of the opposing counsel" in the case. *Maley*, 186 F. Supp. 2d. at 373. The fact that Class Counsel successfully prosecuted this action for six years against more than a dozen different Defendants all represented by well-respected and high-caliber law firms and obtained a substantial recovery for the Class reflects the quality of representation provided.

### 5. The Fee Award Is Reasonable in Relationship to the Settlement

Courts evaluate the requested fee in relation to the settlement by looking to "comparable cases" for "guideposts." *Payment Card.*, 991 F. Supp. 2d at 443-44 (evaluating a fee request against other "large class cases with court-set fees"). Here, the Court has several guideposts to assist its evaluation, including OCERS' retainer agreement and the cases cited above with similar lodestar multipliers and fee award percentages in cases that involved similar sized class action settlements. *See* "A"–"C" above. Class Counsel's fee request compares favorably to these other cases.

### 6. Public Policy Considerations Support the Requested Fee

The Supreme Court has recognized the benefits of private civil suits as a means of enforcing federal antitrust laws. *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."). If Class Counsel had not taken on the risks of this lawsuit in 2016, the Class would have been left without recompense. The relatively small regulatory fines imposed by ASIC on certain Defendants were not allocated to private investors.

Awarding a fair and reasonable fee from the common fund ensures that Class Counsel retains the ability and incentive to pursue antitrust violations at their own expense even when recovery is uncertain. *Goldberger*, 209 F.3d at 51 ("There is . . . commendable sentiment in

favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest."); *Colgate-Palmolive3*, 36 F. Supp. 3d at 352 ("providing lawyers with sufficient incentive to bring common fund cases . . . serve[s] the public interest") (citations omitted). *Espinal v. Victor's Café 52nd St., Inc.*, No. 16-CV-8057 (VEC), 2019 WL 5425475, at *3 (S.D.N.Y. Oct. 23, 2019) ("The Second Circuit and courts in this District have taken into account the 'social and economic value of class actions, and the need to encourage experienced and able counsel to undertake such litigation' as a basis for increasing the percentage of the fund awarded to Class Counsel.").

It further ensures that our legal system, which relies on citizens to act as private attorneys general to vindicate the public interest, benefits from the involvement and expertise of top tier law firms to prosecute these large and highly complex cases. *Colgate-Palmolive,* 36 F. Supp. 3d at 352 ("While court awarded fees must be reasonable, setting fees too low or randomly will create poor incentives to bringing large class action cases.").  This is particularly true in the context of private prosecutions of antitrust and CEA violations.  *See GSE Bonds*, 2020 WL 3250593, at *5 ("Congress has encouraged enforcement of the antitrust laws through private civil suits to deter infringing conduct in the future."); *CDS*, 2016 WL 2731524, at *18 ("Our antitrust laws address issues that go to the heart of our economy. Our economic health, and indeed our stability as a nation, depend upon adherence to the rule of law and our citizenry's trust in the fairness and transparency of our marketplace."); *Leist v. Simplot*, 638 F.2d 283, 311 (2d Cir. 1980) ("The 1974 Congress repeatedly expressed its view that the changes [to the CEA] were designed to strengthen commodity futures regulation, a goal that would be ill-served by abolishing the private right of action that everyone had thought to exist."), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) (citing CEA legislative

history); *Cange v. Stotler & Co., Inc.*, 826 F.2d 581, 584 (7th Cir. 1987) (explaining that Congress depends on the "critical" role of additional private suits to deter violations of the CEA); *see also Pillsbury*, 459 U.S. at 262-263 ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes . . . .").

### E.  Plaintiff OCERS' Approval and the Class's Reaction Support the Requested Fee

Plaintiff OCERS is a highly sophisticated client with fiduciary responsibilities to its members.  Ratto Declaration, ¶¶4-5.  OCERS was actively involved in the prosecution and settlement of this action.  *Id.*, ¶¶9-15.  The requested fee follows the graduated fee scale negotiated by OCERS prior to entering this case, providing *ex ante* support for the fee.  *Id.*, ¶¶5-8.  Additionally, OCERS gives *post* hoc support of the fee request based on their knowledge of Counsel's work and the risks of continued prosecution.  *Id.*, ¶¶16-19.

The reaction of the Class so far also supports the requested fee.  As of August 1, 2022, the Settlement Administrator had mailed the class notice to over 52,000 potential Class members and has otherwise executed the robust publication notice aspects of the Court-approved notice plan.  ECF No. 548.  The notice informed Class members that Class Counsel intended to request an award of attorneys' fees of up to one-third (33.33%) of the Settlement Funds.  ECF No. 548-1, p. 33.  The time to object and opt out does not expire until September 2, 2022.  *Id.*, ¶¶26-28. However, so far, no objections have been received and only one Class member has requested to opt out.  *Id.*  Any objection(s) received will be addressed in Class Counsel's reply brief due to be filed on October 25, 2022.  ECF No. 543, ¶10.

When all of the *Goldberger* factors are considered, there is an ample basis for the Court to grant Class Counsel's requested fee of 25.4% of the common fund or $47,218,750.

## II. COUNSEL'S LITIGATION EXPENSES ARE REASONABLE AND SHOULD BE REIMBURSED

District courts in this Circuit grant expense requests in common fund cases as a matter of course. *In re Arakis Energy Corp. Sec. Litig.*, 95 CV 3431(ARR), 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001). As detailed in the accompanying attorney declarations, Counsel incurred $845,471.57 in litigation expenses prosecuting this action on behalf of the Class for which they seek reimbursement. These expenses were "incidental and necessary to the representation of the [C]lass," and should be reimbursed. *Beckman*, 293 F.R.D. at 482.

Counsel incurred the requested expenses over the course of approximately six years, from the inception of the action in 2016 through August 5, 2022. The class notices approved by the Court advised Class members that Counsel would seek reimbursement of expenses of no more than $1,250,000. ECF No. 548-1, pp. 33, 41. The vast majority of the expenses related to payments to experts and consultants (approximately 60%), document discovery and computer research costs (collectively, approximately 35.5%). These types of expenses are routinely granted. *See, e.g., In re Platinum & Palladium*, 2015 WL 4560206, at *5.

## CONCLUSION

Class Counsel respectfully request the Court approve attorneys' fees in the amount of $47,218,750 and reimbursement of litigation expenses in the amount of $845,471.57. A proposed order is respectfully submitted herewith.

Dated: August 18, 2022
White Plains, New York

**LOWEY DANNENBERG, P.C.**

By: */s/ Vincent Briganti*
Vincent Briganti
Geoffrey M. Horn
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
vbriganti@lowey.com

ghorn@lowey.com

**LOVELL STEWART HALEBIAN JACOBSON
LLP**

By: *_/s/ Christopher McGrath_*
Christopher Lovell
Christopher McGrath
500 Fifth Avenue, Suite 2440
New York, NY 10110
Tel: (212) 608-1900
clovell@lshllp.com
cmcgrath@lshllp.com

*Counsel for Plaintiffs and the Proposed Class*

Todd Seaver
Carl N. Hammarskjold
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com

Patrick T. Egan (PE-6812)
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617) 542-1194
pegan@bermantabacco.com

*Additional Plaintiffs' Counsel for Orange County
Employees Retirement System*